# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT CANNON, | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **ADVANCED DISPOSAL** | ) | **3:07cv846-wkw** |
| **SERVICES ALABAMA L.L.C.,** | ) | |
| **d/b/a SUNFLOWER WASTE** | ) | |
| **L.L.C.,** | ) | |
| | ) | |
|     **Defendant.** | ) | |

## DEFENDANT ADVANCED DISPOSAL SERVICES ALABAMA L.L.C., d/b/a SUNFLOWER WASTE, L.L.C.'S EVIDENTIARY SUBMISSION IN SUPPORT OF IT'S MOTION FOR SUMMARY JUDGMENT

Defendant Advanced Disposal Services Alabama, L.L.C., d/b/a Sunflower Waste, L.L.C., ("ADS" or "defendant") submits the following evidentiary submission in support of its Motion for Summary Judgment:

Exhibit A  -    Plaintiff's Deposition, with exhibits;

Exhibit B  -    Sherry Beasley's Deposition;

Exhibit C  -    Glenn Guest's Deposition, with exhibits;

Exhibit D  -    Glenn Guest's Declaration, with exhibits;

Exhibit E  -    Danny Futral's Deposition;

Exhibit F  -    Danny Futral's Declaration;

Exhibit G  -    Tom Davis' Declaration;

Exhibit H - Subpoenaed records from St. Louis MRO; and

Exhibit I - Defendant's supporting Brief.

Respectfully submitted,

s/J.Tobias Dykes
J. Tobias Dykes, ASB-0483-E66J
tdykes@constangy.com
CONSTANGY, BROOKS & SMITH, LLC
1819 Fifth Avenue North
Suite 900
Birmingham, Alabama 35203
Telephone (205) 252-9321
Facsimile (205) 323-7674

**ATTORNEY FOR DEFENDANT**
**ADVANCED DISPOSAL SERVICES**
**ALABAMA L.L.C., d/b/a/ SUNFLOWER**
**WASTE L.L.C.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following:

James B. Douglas, Jr.
McNeal & Douglas, Attorneys at Law, L.L.C.
P.O. Box 1423
Auburn, Alabama 36831

This the 11<u>th</u> day of July, 2008.

s/ J. Tobias Dykes_____
J. Tobias Dykes

2

# DEPOSITION OF ROBERT CANNON

## April 10, 2008

## Pages 1 through 125

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE MIDDLE DISTRICT OF ALABAMA
 3                     EASTERN DIVISION
 4
 5   ROBERT CANNON,
 6        Plaintiff,
 7   Vs.                CIVIL ACTION NO.
                        3:07-CV-846-WKW
 8   ADVANCED DISPOSAL SERVICES
     ALABAMA, LLC, d/b/a SUNFLOWER
 9   WASTE, LLC,
10        Defendant.
11
12
            * * * * * * * * * * * * *
13
14        DEPOSITION OF ROBERT CANNON, taken pursuant
15   to stipulation and agreement before Haley A.
16   Phillips, Certified Court Reporter, ACCR # 151, and
17   Commissioner for the State of Alabama at Large, in
18   the Law Offices of McNeal & Douglas, 1710 Catherine
19   Court, Auburn, Alabama, on Thursday, April 10,
20   2008, commencing at approximately 10:05 a.m.
21
22          * * * * * * * * * * * * *
23
```

Page 2

```
 1            APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   James B. Douglas, Jr., Esq.
     McNeal & Douglas
 5   Suite B
     1710 Catherine Court
 6   Auburn, Alabama 36830
 7   FOR THE DEFENDANT:
 8   J. Tobias Dykes, Esq.
     Constangy, Brooks & Smith
 9   Attorneys at Law
     1819 Fifth Avenue North
10   One Federal Place, Suite 900
     Birmingham, Alabama 35203
11
     ALSO PRESENT:
12
     Mr. Glenn Guest
13
            * * * * * * * * * * * *
14
           EXAMINATION INDEX
15   BY MR. DYKES . . . . . . . . . . .  5
16
17
         DEFENDANT'S EXHIBIT INDEX
18
     1  Drug Test from Waste Management       8
19
     2  Employee Disciplinary Report from Waste   8
20      Management
21   3  Deposition Notice            13
22   4  Opelika Housing Authority Job       24
        Termination Verification
23
```

Page 3

```
 1          DEFENDANT'S EXHIBIT INDEX (cont'd)
 2   5  Federal Drug Testing Custody Control    58
        Form
 3
     6  Driver's application for employment     64
 4
     7  Acknowledgement of receipt of employee  66
 5      handbook
 6   8  Drug free workplace policy       66
     9  Collection form for urine analysis test   76
 7
 8  10  Results of DOT Controlled Substance Test  78
    11  Results of DOT Controlled Substance Test  83
 9
10  12  Drug screen by Kent V. Klinner, Jr.,    85
        M.D.
11
12  13  Final clearance for terminating employee  90
13  14  Employee disciplinary report       91
14  15  Alcohol and/or drug test notification   96
15
16  16  Charge of discrimination         97
17  17  Dismissal and notice of rights      99
18  18  Complaint                100
19  19  Fax to Ann Dora's             105
20  20  Plaintiff's initial disclosures      116
21
              * * * * * * * * * * * * *
22
23
```

Page 4

```
 1              STIPULATION
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of ROBERT CANNON is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Haley A. Phillips,
 7   Certified Court Reporter, ACCR # 151, and
 8   Commissioner for the State of Alabama at Large,
 9   without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time
13   as the said deposition may be offered in evidence
14   or used for any other purpose by either party
15   provided for by the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Deposition of Robert Cannon

April 10, 2008

---

Page 5

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby waived.
4  * * * * * * * * * * * * *
5  ROBERT CANNON
6  The witness, after having first been duly
7  sworn to speak the truth, the whole truth and
8  nothing but the truth testified as follows:
9  EXAMINATION
10  BY MR. DYKES:
11  Q.  Mr. Cannon, my name is Tobi Dykes.  We
12  introduced ourselves a little while ago.
13  I'm an attorney for Advanced Disposal
14  Services, and I am representing them in a
15  lawsuit that you have filed against them.
16  And so I'm going to be asking you some
17  questions today about your lawsuit and your
18  employment with them and, you know, just
19  probably a broad range of topics.  Has your
20  attorney told you kind of what goes on in a
21  deposition?
22  A.  Yes, sir.
23  Q.  Have you given a deposition before?

---

Page 7

1  A.  No.
2  Q.  Have you used any illegal drugs or cocaine
3  in the last two years?
4  A.  No.
5  Q.  I know we're here over a failed drug test
6  with Advanced Disposal Services, and I know
7  you're disputing that.  But other than that
8  drug test, have you ever had another
9  positive on a drug test?
10  A.  Yes.
11  Q.  Where was that?
12  A.  That was through the parole officer back
13  when in 2002.
14  Q.  What was that positive for?
15  A.  Marijuana, cocaine, alcohol.
16  Q.  Any other positive drug test?
17  A.  No.
18  Q.  Did you take any drug -- It's my
19  understanding you worked for Waste
20  Management?
21  A.  Yes.
22  Q.  And did you take any drug test at Waste
23  Management?

---

Page 6

1  A.  No.
2  Q.  And you understand, you know, even though
3  we're not in court today that you have been
4  placed under oath and the testimony you
5  give today is the same, you know, as if you
6  were giving it in court?
7  A.  Yes.
8  Q.  Now, I'm going to be asking you a bunch of
9  questions.  I'm not trying to trick you
10  with questions, but sometimes I don't ask
11  the best question.  If I don't ask -- If I
12  ask you a question that you don't
13  understand or doesn't make sense, will you
14  tell me so that we -- I can ask you a
15  question that you understand that does make
16  sense?
17  A.  Yes.
18  Q.  Can I assume that if you answer a question
19  that you understood the question?
20  A.  Yes.
21  Q.  Have you taken any medications or alcohol
22  or drugs or anything that would keep you
23  from telling the truth today?

---

Page 8

1  A.  Yes.
2  Q.  Did you fail any of those?
3  A.  No.
4        (Defendant's Exhibit 1 was marked
5        for identification.)
6  Q.  I'm going to show you what I'm going to
7  mark as Plaintiff's Exhibit -- Defendant's
8  Exhibit 1, a drug report from Waste
9  Management.  Mr. Cannon, have you seen that
10  before?
11  A.  No, I haven't seen this one.
12  Q.  Were you -- Were you discharged from Waste
13  Management, or were you -- or did you
14  resign?
15  A.  Waste Management, they said lack of work is
16  what they told me.
17        (Defendant's Exhibit 2 was marked
18        for identification.)
19  Q.  Okay.  I'm going to mark as Defendant's
20  Exhibit 2 an employee discipline report
21  from Waste Management.  Have you seen this
22  before, Mr. cannon?
23  A.  No, I haven't seen this.

---

2 (Pages 5 to 8)

Page 9

1  Q.  And did anybody from Waste Management tell
2      you that you had tested positive for drugs?
3  A.  No.
4  Q.  Did you take a drug test with Waste
5      Management in December of 2006?
6  A.  No.  I took one when I first went there.
7  Q.  Okay.  Looking back at Defendant's Exhibit
8      1, which is the drug testing report, this
9      shows that a drug -- that a sample was
10     collected on 12/19/2006.  Do you deny that
11     you took a -- that a specimen of your urine
12     was collected on December 19, 2006?
13 A.  I can't recall at this time when I took the
14     drug screen at Waste Management.
15 Q.  Okay.  Well, is this -- is your social
16     security number 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?
17 A.  That's correct.
18 Q.  Is that your social security number on the
19     drug testing results in Defendant's Exhibit
20     1?
21 A.  That's it.
22 Q.  And is that your name, Robert Cannon, in
23     Defendant's Exhibit 1?

Page 10

1  A.  That's it.
2  Q.  And Waste Management was your employer at
3      that time; is that right?
4  A.  Yes.
5  Q.  And this -- Looking at Defendant's Exhibit
6      1, it shows a positive for cocaine; is that
7      right?
8          MR. DOUGLAS:  You're asking him if
9          that's what the document
10         says?
11         MR. DYKES:  If that's what the
12         document says.
13 A.  You're asking me?
14 Q.  Yes.
15 A.  Oh, yes.  That's what the document say.
16 Q.  Have you taken any other drug tests since
17     the ones you took for Advanced Disposal
18     Services in January and February of 2007?
19 A.  Repeat the question.
20 Q.  I know you took drug tests at Advanced
21     Disposal in January of 2007 and in February
22     of 2007.  Since those tests have you taken
23     any other drug tests?

Page 11

1  A.  Yes.
2  Q.  Where have you done that?
3  A.  At Staffing Solutions when I went to work
4      for them.
5  Q.  What was the result of that test?
6  A.  Negative.
7  Q.  Any place else that you've taken a drug
8      test since February of 2007?
9  A.  No.
10 Q.  And I want to go back to Defendant's
11     Exhibit 1, the results of the drug test.
12     Had you used cocaine in December of 2006?
13 A.  No.
14 Q.  Any idea why you would have a drug test
15     that shows that you did?
16 A.  No idea.  I have no idea.
17 Q.  I just want to make sure I understand.
18     This is the first time that you're aware --
19     that you have seen the failed drug test,
20     Defendant's Exhibit 1?
21 A.  Yes.
22 Q.  And it's the first time you've been told
23     that Waste Management has indicated that

Page 12

1      they discharged you for failing a drug test
2      which is indicated on Defendant's Exhibit
3      2?
4  A.  Yes.
5  Q.  Did you seek unemployment when your
6      employment with Waste Management ended?
7  A.  No.
8  Q.  Do you know if any future employers have
9      contacted Waste Management about your
10     employment?
11 A.  No.
12 Q.  Have you given them Waste Management as --
13     On applications for employment, have you
14     given Waste Management as a place where you
15     have worked?
16 A.  Say again.
17 Q.  I know on your application -- and we'll
18     talk about your application with Advanced
19     Disposal -- you listed Waste Management as
20     a prior employer.  On applications since
21     you left Waste Management, have you listed
22     Waste Management -- Let me start that
23     question over.

Deposition of Robert Cannon                                                April 10, 2008

---

Page 13

1  Since you left Advanced Disposal and
2  have applied with other employers, have you
3  listed Waste Management as a place you have
4  worked?
5  A.  I can't recall at this time.
6  Q.  When is the last time you used cocaine?
7  A.  2002.
8  Q.  And I realize this is kind of jumping
9  around a little bit, but can you just state
10  your name for the Record.
11  A.  Robert Cannon.
12  Q.  Do you have any nicknames you go by?
13  A.  Red.
14  Q.  Have you ever gone by any other names?
15  A.  No.
16  Q.  Any other -- Any aliases?
17  A.  No.
18          (Defendant's Exhibit 3 was marked
19          for identification.)
20  Q.  I'm going to mark as Defendant's Exhibit 3
21  the deposition notice that I sent your
22  attorney.  Have you seen this before?
23  A.  What was the question?

---

Page 14

1  Q.  Have you seen that before -- Defendant's
2  Exhibit 3 before?
3  A.  No.
4  Q.  Did you bring any documents with you to the
5  deposition today?
6  A.  No.
7  Q.  Your attorney has shown me this morning --
8  Do you remember -- There was a -- There
9  were three drug tests, the decision of --
10  unemployment decision.  Was there any
11  other --
12          MR. DOUGLAS:  No, I think that's
13          it.
14  Q.  -- documents that he has produced as
15  supporting your claims in this lawsuit.
16  Have you got any documents other than what
17  your attorney has given me that you believe
18  support your claims against Advanced
19  Disposal Services?
20  A.  No, not at this time.  I can't recall at
21  this time.
22  Q.  Well, I guess what -- anything you can
23  think of that might be out there that you

---

Page 15

1  haven't given your attorney that would
2  support your claims against Advanced
3  Disposal Services?
4  A.  No, not that I can recall.
5  Q.  I mean, did you take any notes while you
6  worked at Advanced Disposal Services about
7  what was going on?
8  A.  No.
9  Q.  Do you keep a calendar where you jotted
10  down kind of what you did during the day
11  while you worked for Advanced Disposal
12  Services?
13  A.  Explain to me what you mean.
14  Q.  Well, sometimes -- I've got a calendar and
15  I'll jot down various things that happen
16  and, you know, keep up with what I'm doing
17  on my calendar.  Did you do anything like
18  that about what was going on while you were
19  working for Advanced Disposal Services?
20  A.  No.
21  Q.  Did you take any statements or write down
22  notes from any conversations with anybody
23  who you talked to at Advanced Disposal

---

Page 16

1  Services?
2  A.  Saying some employees?  I mean, I don't
3  quite understand the question.
4  Q.  Yeah.  I mean, did you talk to any
5  employees there and take notes of what
6  y'all were talking about?
7  A.  Oh, I talked to some employees, but I
8  didn't take notes.
9  Q.  Did you record any conversations with
10  anybody from Advanced?
11  A.  No.
12  Q.  Have you got any audio recordings of
13  conversations that relate to this lawsuit?
14  A.  I mean, what recordings?  What's --
15  Q.  I mean, have you called somebody on the
16  phone and asked them questions about your
17  employment with Advanced and recorded the
18  conversation or taped any conversations
19  about -- about Advanced or your allegations
20  in this complaint?
21  A.  Have I recorded any of it?
22  A.  Yeah.
23  A.  With any Advanced Disposal employees?

---

Page 17

1  Q.  Right.
2  A.  No.
3  Q.  And I know there was an employment hearing
4      that was taped.  But other than that, are
5      you aware of any other recordings that have
6      anything to do with your employment with
7      Advanced Disposal or your claims against
8      Advanced Disposal?
9  A.  No.
10 Q.  And I think one of the -- I didn't mention
11     this.  In the list of documents was what
12     was produced to Ann Dora's.  Is that
13     something that you had produced as well?
14     MR. DOUGLAS:  Yes.
15 Q.  Which I believe there was a -- paperwork
16     that was submitted to Ann Dora's from
17     Sherry Beasley that I -- that you have
18     alleged in your complaint was -- or
19     alleging that that was slander.  Are there
20     any other documents that you believe --
21     that you are claiming Advanced Disposal has
22     done that is slanderous or that you're
23     complaining about in this complaint or this

Page 18

1      lawsuit?
2  A.  Any other documents beside that document?
3  Q.  Besides that one.
4  A.  No.
5  Q.  And -- Well, I'll ask you some questions
6      about that document as we're going.  I just
7      want to make sure there's not another
8      document out there that you're saying
9      Advanced Disposal sent out that was
10     slanderous to you.  So I'm right, it's just
11     that one document?
12 A.  Right.
13 Q.  What did you do to get ready for the
14     deposition today?
15 A.  What did I do?
16     MR. DOUGLAS:  I object to the form
17     of that question.
18 Q.  And I don't want to know anything that you
19     talked to your attorney about.  But other
20     than talking to your attorney, did you talk
21     to anybody else to get ready for your
22     deposition?
23     THE WITNESS:  You say you object

Page 19

1      to it?
2      MR. DOUGLAS:  You can answer the
3      question.  Don't tell him
4      anything you and I talked
5      about.
6      THE WITNESS:  Oh.
7      MR. DYKES:  Yeah.
8      MR. DOUGLAS:  He wants to know if
9      you talked to anybody other
10     than me in order to get ready
11     today to take this deposition.
12     THE WITNESS:  I mean, talk
13     to them.  What do you mean?
14     Explain the --
15     MR. DOUGLAS:  Well, maybe you can
16     ask the question again.
17     THE WITNESS:  Yeah.  I mean ...
18 Q.  I'm just trying to figure out who all you
19     talked to to prepare for your deposition
20     today.  And I don't want to know anything
21     you talked about with your lawyer.  But
22     other than that, did you talk to anybody
23     else about coming to take your -- have your

Page 20

1      deposition taken?
2  A.  Yes, sir.  Uh-huh (positive response).
3  Q.  Who is that?
4  A.  My wife know I was coming to have my
5      deposition and my cousin and a couple of
6      friends.
7  Q.  Who is your cousin?
8  A.  Willie Summers.
9  Q.  Does he work for Advanced Disposal?
10 A.  Yes.
11 Q.  Which friends did you talk to?
12 A.  Which friends?
13 Q.  Yeah.
14 A.  A friend of mine, Reuben Lowder, and my
15     cousin, Elaine Frazier.
16 Q.  Anybody else?
17 A.  No.
18 Q.  Did Reuben Lowder work for Advanced
19     Disposal?
20 A.  He used to.
21 Q.  How about Elaine Frazier, did she work for
22     Advanced Disposal?
23 A.  She's just my cousin.

Page 21

1  Q. Okay. What did you talk to Willie Summers
2      about in regards to your deposition?
3  A. Just told him I was coming to have my
4      hearing today.
5  Q. Do you think he has anything that would
6      support your claims against Advanced
7      Disposal?
8  A. Repeat the question.
9  Q. Do you think he has any -- Does he have any
10     knowledge that you believe supports your
11     claims against Advanced Disposal?
12 A. Yes.
13 Q. What? What knowledge do you think he has?
14 A. He was my helper on the truck.
15 Q. What do you think he would say to help your
16     claims?
17 A. The truth. The truth of what ...
18 Q. Anything specific related to your claim of
19     race discrimination or fraud that you
20     believe he has knowledge about?
21 A. Yes.
22 Q. What -- Tell me what.
23 A. Well, I mean, he knew of the -- The day I

Page 22

1      got terminated, he knew of that.
2  Q. Okay. Anything else that he would know of?
3  A. Well, he would knew about the drug screens
4      because, I mean, he seen the paperwork.
5  Q. Anything else?
6  A. Not at this time that I can recall.
7  Q. Do you think Reuben Lowder has any
8      knowledge that would be helpful to your
9      lawsuit?
10 A. No more than what I've told him.
11 Q. So just everything that he knows about the
12     lawsuit is what you've told him; is that
13     right?
14 A. Yes.
15 Q. Does Elaine Frazier have any -- Do you
16     think -- Do you believe that Elaine Frazier
17     has any knowledge that you would use to
18     support your claims against Advanced
19     Disposal?
20 A. No.
21 Q. Did you review any documents to get ready
22     for your deposition today?
23 A. Did I review any ...

Page 23

1  Q. Did you look at any paperwork to get ready
2      for your deposition?
3  A. My paperwork, yes.
4  Q. What did you look at?
5  A. The papers I got from termination and stuff
6      like that.
7  Q. Are those the papers you've given your
8      lawyer?
9  A. Yes.
10         MR. DYKES: Jim, would you just
11         show -- will you show him what
12         you showed me this morning
13         just to make sure there's
14         nothing else?
15         MR. DOUGLAS: Sure.
16         MR. DYKES: Do you mind if I make
17         a copy of those and just make
18         them as an exhibit --
19         MR. DOUGLAS: No.
20         MR. DYKES: -- just so that it's
21         clear as to what documents
22         we've been talking about?
23         MR. DOUGLAS: Not at all.

Page 24

1  (Brief recess was taken.)
2
3  (Defendant's Exhibit 4 was marked
4  for identification.)
5  MR. DYKES: I'm going to mark as
6      Defendant's Exhibit 4 the
7      documents that Mr. Cannon's
8      attorney has provided me as
9      the documents that were
10     reviewed in preparation for
11     the deposition which are an
12     Opelika Housing job
13     termination verification, a
14     drug testing custody and
15     control form with a date
16     2/12/07, a decision of
17     unemployment compensation
18     claim, drug testing results
19     with a verification date of
20     2/2/07, previous employer
21     information request completed
22     by Sherry Beasley dated
23     4/2/07, drug test -- a drug

Page 25

```
 1          testing custody and control
 2       form that appears to have a
 3       date of 2/12/07, a drug test
 4       and result from Kent
 5       Klimner --
 6       MR. DOUGLAS:  It's Klinner.
 7       MR. DYKES:  Klinner.
 8          -- results of a DOT
 9       controlled substance test with
10       a verification date of
11       2/14/07, and then a statement
12       of claim of unlawful detainer
13       with a -- filed June 7, 2007.
14  Q.  Other than these documents, Mr. Cannon, did
15     you review anything else in preparation for
16     your deposition?
17          MR. DOUGLAS:  Those are the
18       documents you just looked at.
19          THE WITNESS:  Oh.
20  A.  No.
21  Q.  Mr. Cannon, what's your social security
22     number?
23  A.  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.
```

Page 26

```
 1  Q.  Your date of birth?
 2  A.  12/5/59.
 3  Q.  Do you have a driver's license?
 4  A.  Yes.
 5  Q.  What's your driver's license number?
 6  A.  4492920.
 7  Q.  Have you ever had your driver's license
 8     suspended?
 9  A.  Yes.
10  Q.  Yes?
11  A.  Yes.
12  Q.  When was that?
13  A.  1990 or '91.  Somewhere back in there.
14  Q.  What was it suspended for?
15  A.  DUI.
16  Q.  Other than 1991, has it been suspended on
17     any other occasions?
18  A.  Not that I can recall.
19  Q.  Has it ever been -- Has your driver's
20     license ever been revoked?
21  A.  Revoked.  What's that -- What do you mean
22     by revoked?
23  Q.  Okay.  Well, the only time you remember
```

Page 27

```
 1     anything happening to your driver's license
 2     being the 1991 DUI?
 3  A.  Yes.
 4  Q.  Where are you living now?
 5  A.  In Opelika.
 6  Q.  What's your address?
 7  A.  426-B Toomer Court.
 8  Q.  How long have you lived there?
 9  A.  Two years.
10  Q.  Where did you live prior to that?
11  A.  1001 Ward Place, Lot 16, Opelika.
12  Q.  How long did you live there at one --
13  A.  About 13, 14 years.
14  Q.  Have you ever lived anywhere outside of
15     Opelika?
16  A.  Yeah.  I lived in Auburn when I was young.
17  Q.  Okay.  No place outside of Auburn, Opelika
18     area?
19  A.  No.
20  Q.  Who lives with you at -- Or does anybody
21     live with you at 426-B Toomer Court?
22  A.  My wife and three kids.
23  Q.  What's your wife's name?
```

Page 28

```
 1  A.  Jennifer.
 2  Q.  How long have y'all been married?
 3  A.  Two and a half years.
 4  Q.  What are your -- the children's names?
 5  A.  Carlos Cox, Myracle Hicks.
 6  Q.  Can you --
 7  A.  Myracle Hicks.  Tiana Cannon.
 8  Q.  How old is Carlos?
 9  A.  11.
10  Q.  Myracle?
11  A.  Five.
12  Q.  Tiana?
13  A.  Two.
14  Q.  Are these your children or are they
15     Jennifer's children?
16  A.  The last one is mine.
17  Q.  Okay.  Have you been married before other
18     than to Jennifer?
19  A.  No.
20  Q.  Other than Tiana, do you have any other
21     children?
22  A.  No.
23  Q.  What is your wife, Jennifer's, maiden name?
```

Deposition of Robert Cannon

April 10, 2008

| | |
|---|---|
| **Page 29** | **Page 31** |

**Page 29**

1  A.  Cox.
2  Q.  Was she previously married?
3  A.  No.
4  Q.  Does Jennifer work anywhere?
5  A.  Yes.
6  Q.  Where does she work?
7  A.  Briggs & Stratton.
8  Q.  How long has she worked there?
9  A.  Over nine years I know.
10 Q.  What does she do?
11 A.  I don't know.  She work on the line is all
12     I know.
13 Q.  Have you got any other family living in the
14     Auburn, Opelika area?
15 A.  I have a brother that lives in Opelika.
16 Q.  What's his name?
17 A.  David Cannon.
18 Q.  Where does she work?
19 A.  He drives trucks.
20 Q.  Who does he drive trucks for?
21 A.  I don't know.  He -- I don't know exactly.
22     He over the road, back and forth.
23 Q.  Has he ever worked for Advanced Disposal?

**Page 31**

1  A.  No.
2  Q.  Instead of going through them with you
3     today, would you -- the names that you can
4     remember of your distant -- of your cousins
5     and great aunts, can you make a list and
6     give that to your attorney if you can
7     remember any of their names?
8  A.  Yes.
9  Q.  Do you go to church?
10 A.  Yes.
11 Q.  Where do you go to church?
12 A.  New Poplar Springs in Dadeville.
13 Q.  How long have you been going there?
14 A.  Since I met my wife.
15 Q.  How long ago did you meet your wife?
16 A.  Three years ago.
17 Q.  Are you a member of any social clubs or
18     hunting clubs or anything?
19 A.  No.
20 Q.  Mr. Cannon, have you ever been arrested or
21     convicted of a crime?
22 A.  Yes.
23 Q.  And I know from your interrogatories what

**Page 30**

1  A.  No.
2  Q.  Does he have any knowledge of your claims
3     against Advanced Disposal?
4  A.  He know I filed the claim.
5  Q.  Okay.  Would everything he knows about your
6     lawsuit be from what you've told him?
7  A.  Yes.
8  Q.  Any other family in the Auburn, Opelika
9     area?
10 A.  Nothing but distant cousins and stuff like
11     that.  No immediate family.
12 Q.  Have you got any immediate family, I guess,
13     in Alabama?
14 A.  No.
15 Q.  And the reason I ask is, if this case goes
16     to a jury, I just need to know who your
17     family is in the event they're called onto
18     a jury, so ...
19 A.  Right.
20 Q.  When you say distant cousins, how distant?
21 A.  Like second, third cousin.  Stuff like
22     that.  Great aunts and stuff.
23 Q.  Do you see them regularly?

**Page 32**

1     they are, but let's just kind of walk
2     through them.  When was the first time you
3     were arrested?
4  A.  I can't recall at this time.  I was young
5     the first time I was arrested.
6  Q.  In your interrogatory responses, there was
7     a 1978 assault.  Do you remember that?
8  A.  Yes.
9  Q.  What -- Where was that?
10 A.  Opelika.
11 Q.  I know you were arrested.  Were you
12     convicted in regards to that assault in
13     1978?
14 A.  Yes.
15 Q.  What was the conviction for?
16 A.  Attempted robbery.
17 Q.  Was there a trial or was there a plea?
18 A.  A plea.
19 Q.  What was the sentence?
20 A.  Ten years.
21 Q.  Did -- How much time did you serve?
22 A.  Over two years.  I don't know exactly.
23 Q.  Where were you in prison?

Deposition of Robert Cannon

April 10, 2008

Page 33

1    A.  Frank Lee Youth Center.
2    Q.  How old were you at the time?
3    A.  17.
4            MR. DOUGLAS:  Was that a juvenile
5            conviction or a conviction as
6            an adult?
7            THE WITNESS:  It wasn't -- They
8            made it adult.  Yes.
9            MR. DOUGLAS:  Okay.  I just wanted
10           to be clear because the name
11           of the facility sounds like
12           it.  I apologize.
13           MR. DYKES:  Oh, no.  No.  Because
14           that was going to be my next
15           question.
16   Q.  Were you on probation when you got out?
17   A.  Parole, yes.
18   Q.  How long were you on parole?
19   A.  It wasn't a year.  I can't remember exactly
20       how many months, but it wasn't even a year.
21   Q.  Were you arrested again after you got out
22       of jail for this -- for the attempted
23       robbery?

Page 34

1    A.  Was I arrested for attempted robbery
2        again?
3    Q.  No.  Were you arrested again for
4        anything -- for something else?
5    A.  Yes.
6    Q.  Tell me about that.
7    A.  It was third degree robbery.
8    Q.  Where was that?
9    A.  Auburn.
10   Q.  When was that?
11   A.  '82 or '83.  I can't remember exactly.
12   Q.  Were you convicted for that?
13   A.  Yes.
14   Q.  Was there a trial or was there a plea?
15   A.  Plea.
16   Q.  What was the sentence?
17   A.  Five years.
18   Q.  Did you serve any time?
19   A.  Yes.
20   Q.  How much?
21   A.  A year and a half, I believe.
22   Q.  Were you on parole when you got out?
23   A.  Yes.

Page 35

1    Q.  How long was that parole?
2    A.  Two months.
3    Q.  Were you arrested again after that?
4    A.  Yes.
5    Q.  When was that?
6    A.  1986.
7    Q.  What was that for?
8    A.  Second degree theft.
9    Q.  Were you convicted for that?
10   A.  Yes.
11   Q.  Was that a plea, or was there a trial?
12   A.  A trial.
13   Q.  What was the sentence?
14   A.  25 years.
15   Q.  How long did you serve?
16   A.  Two years and -- Right at two and a half
17       years.
18   Q.  When you got out, were you on parole?
19   A.  Yes.
20   Q.  How long were you on parole?
21   A.  I'm still on it now.
22   Q.  What are the terms of the parole?
23   A.  What do you mean?

Page 36

1    Q.  Well, are there any restrictions on what
2        you can and can't do?
3    A.  Yes.
4    Q.  What are those restrictions?
5    A.  I'm not to commit another felony, not to
6        fail drug screens.
7    Q.  What happens if you fail a drug screen?
8    A.  I go back.
9    Q.  Do they know that you were discharged from
10       Advanced Disposal for failing a drug
11       screen?
12   A.  Yes.
13   Q.  Did they tell you why they didn't send you
14       back to prison?
15   A.  Because I wasn't -- didn't have a positive
16       urine.
17   Q.  Did you show your parole officer the drug
18       test results?
19   A.  Yes.
20   Q.  Does the outcome of this litigation and
21       your challenge of the drug test have
22       anything -- any influence on whether or not
23       you go back to prison?

Deposition of Robert Cannon

Page 37

1   A.  Would you repeat that?
2   Q.  I guess --
3            MR. DOUGLAS: I object to the form
4            of the question. There's no
5            way he could -- Never mind. I
6            object to the form of the
7            question. Go ahead.
8   Q.  Has your parole officer told you -- Did
9        your parole officer tell you you needed to
10       challenge the drug test?
11  A.  Did -- Tell me I need to challenge my drug
12       test?
13  Q.  From Advanced Disposal.
14  A.  No.
15  Q.  Did you talk to your parole officer about
16       the lawsuit?
17  A.  Yes.
18  Q.  What have you talked to your parole officer
19       about in regards to the lawsuit?
20  A.  I just told her I was filing an action
21       against them because I wasn't dirty.
22  Q.  What did the parole officer tell you in
23       response to that?

Page 38

1   A.  I can't recall what she said.
2   Q.  Does the parole officer know about the drug
3        test from Waste Management from December of
4        2006?
5   A.  No.
6   Q.  If they knew that -- Would you be subject
7        to going back to prison if they knew that
8        you had failed a drug test in December of
9        2006?
10  A.  Wait a minute. What you --
11           MR. DOUGLAS: Are you asking him
12           if he had tested with the
13           parole officer or if they had
14           known that an employer had
15           tested?
16           MR. DYKES: Right.
17           MR. DOUGLAS: I mean, the question
18           is very unclear.
19           MR. DYKES: Okay.
20  Q.  With your drug tests where that would
21       subject you to go back to prison, are those
22       drug tests that are given to you by your
23       parole officer or do drug tests given to

Page 39

1        you by employers count into that as well?
2   A.  If I lose a job for a drug screen, is that
3        what you're saying?
4   Q.  Yeah.
5   A.  I couldn't say what she'll do. I don't
6        know. I can't say. I can't say.
7   Q.  But if you fail a drug test that's given to
8        you by the parole officer, then you go back
9        to prison for sure?
10  A.  Yes.
11  Q.  But in terms of if you fail a drug test
12       given to you by an employer, you don't know
13       what result that would be?
14  A.  No.
15  Q.  Have you been arrested since you were
16       released from your conviction for the
17       second degree theft?
18  A.  Yes.
19  Q.  Tell me about that.
20  A.  The repo guy came to my house and tried to
21       repo my car, and me and him had some words
22       out there and he put me in jail for
23       harassment.

Page 40

1   Q.  When was that?
2   A.  August of last year.
3   Q.  Were any charges brought?
4   A.  Yes. He put me in jail for harassment.
5   Q.  Harassment. Okay.
6            What was the result of those charges?
7   A.  I was found guilty, and I appealed it to
8        the Justice Center and it was thrown out
9        down there.
10  Q.  Who found you guilty?
11  A.  Judge Wilkes.
12           MR. DOUGLAS: Opelika Municipal
13           Court.
14           THE WITNESS: Opelika. Yeah,
15           Opelika court.
16           MR. DOUGLAS: And you appealed to
17           Circuit Court?
18           THE WITNESS: To Circuit Court.
19           Right.
20  Q.  Was it the judge or a jury that heard the
21       case?
22  A.  A judge.
23  Q.  Judge. Okay.

Deposition of Robert Cannon

Page 41

1    Any other arrests since you got out of
2    prison the last time?
3    A.  None that I can recall.
4    Q.  Were you arrested for a DUI in 1999?
5    A.  I might have. I don't know. I don't
6    know. Might have. I don't recall.
7    Q.  I know you told me earlier that you had
8    been arrested for a DUI in 1991.
9    A.  Right.
10   Q.  Have you been arrested for a DUI on any
11   other occasions?
12   A.  I can't say at this time. I might have
13   were. I don't know.
14   Q.  Any other arrests or convictions that we
15   haven't talked about?
16   A.  None as I can recall.
17   Q.  Any traffic violations?
18   A.  Yeah. I had run the stop sign.
19   Q.  When was that?
20   A.  It was last year. I don't remember
21   exactly, but it was last year.
22   Q.  Any other traffic ...
23   A.  Expired tag one time.

Page 42

1    Q.  Any arrests for traffic violations, or were
2    those just fines?
3    A.  Fine.
4    Q.  I know you filed this lawsuit against
5    Advanced Disposal. Have you filed any
6    other lawsuits?
7    A.  No.
8    Q.  Have you had any lawsuits filed against
9    you?
10   A.  Yes.
11   Q.  Tell me about those.
12   A.  A loan company filed one against me for a
13   loan did.
14   Q.  Was that a consolidated loan recovery?
15   A.  Yes.
16   Q.  When was that?
17   A.  They filed it last year. They filed it
18   last year.
19   Q.  Is that still going on?
20   A.  No. They entered the judgment against me.
21   Q.  What was the judgment? What was the amount
22   of it?
23   A.  I don't know the exact. It was over

Page 43

1    $5,000.
2        MR. DOUGLAS:  Robert, if you don't
3        know the exact amount, you
4        don't have to guess for him.
5        THE WITNESS:  Okay.
6        MR. DOUGLAS:  It seems like he may
7        have the information. So if
8        you know, tell him. If you
9        don't know ... I don't
10       know is a fine answer. You
11       don't -- This is not a memory
12       test. You don't have to have
13       the exact number.
14       THE WITNESS:  Okay.
15       MR. DYKES:  No.
16   Q.  Have you got a payment plan worked out to
17   make the payments back or to pay off the
18   judgment, I guess?
19   A.  Yes.
20   Q.  Any other actions been brought against you?
21   A.  No.
22   Q.  Do you remember any -- an action being
23   brought against you by the Opelika Housing

Page 44

1    Authority?
2    A.  Yes.
3    Q.  Tell me about that.
4    A.  Okay. That's when you fall behind on your
5    rent, they take action against you. But
6    once you catch it up and pay it, they drops
7    it.
8    Q.  And you've caught up on your rent, so it's
9    been dropped?
10   A.  Yes.
11   Q.  Was a lawsuit brought by Big Al's Check
12   Cashing?
13   A.  I'm not aware of it.
14   Q.  Not aware of that. Okay.
15       How about one by the East Alabama
16   Medical Center?
17   A.  I'm not aware of that one.
18   Q.  Do you know a Lisa Powell?
19   A.  No.
20   Q.  Other than the times you would have been in
21   court with your -- with the arrests and
22   convictions and with the lawsuits we've
23   talked about, have you been a witness or in

Deposition of Robert Cannon                                                      April 10, 2008

| Page 45 |
| --- |

1     court for any other reasons?
2  A.  No.
3  Q.  Other than the EEOC charge that you filed
4     against Advanced Disposal, have you filed
5     any other EEOC charges?
6  A.  No.
7  Q.  Have you ever filed a claim for Social
8     Security Disability?
9  A.  No.
10 Q.  Ever filed for bankruptcy?
11 A.  Yes.
12 Q.  When was that?
13 A.  I don't know the exact date.
14 Q.  Is that bankruptcy still pending or has it
15     been resolved?
16 A.  It's been dismissed.
17 Q.  Any other bankruptcies other than the one
18     we just talked about?
19 A.  No.
20 Q.  Have your wages ever been garnished?
21 A.  No.
22 Q.  And we've been talking a little bit about
23     your unemployment -- your claim for

| Page 46 |
| --- |

1     unemployment benefits that you had with
2     Advanced Disposal.  Have you had any other
3     claims for unemployment benefits?
4  A.  Yes.
5  Q.  When was that?
6  A.  I don't remember exactly.
7  Q.  Do you remember the company?
8  A.  No.
9  Q.  Have you ever had a workers' compensation
10     claim?
11 A.  No.
12 Q.  Where did you go to high school?
13 A.  Opelika.
14 Q.  Did you graduate?
15 A.  No.
16 Q.  Did you get a GED?
17 A.  Yes.
18 Q.  When did you get your GED?
19 A.  1978.
20 Q.  Did you go to college?
21 A.  No.
22 Q.  Other than training you might have gotten
23     with an employer, have you had any other

| Page 47 |
| --- |

1     type of training or classes or education?
2  A.  No.
3  Q.  Do you have a CDL license?
4  A.  Yes.
5  Q.  When did you get that?
6  A.  2000.
7  Q.  Has that license ever been suspended or
8     revoked?
9  A.  No.
10 Q.  Are you driving trucks now?
11 A.  No.
12 Q.  I want to ask you some questions about
13     where all you worked prior to coming to
14     Advanced Disposal Services.  From your
15     interrogatory responses, it looks like your
16     first job was with H & H Logging back in
17     February of 1980 --
18 A.  Right.
19 Q.  -- is that right?
20 A.  Yes.
21 Q.  Where is H & H Logging?
22 A.  It was H & W.
23 Q.  H & W.  I'm sorry.

| Page 48 |
| --- |

1  A.  They're out of business.  They used to be
2     on Lafayette Parkway in Opelika.  They went
3     out of business.
4  Q.  What did you do for them?
5  A.  I, like, run errands, just work around the
6     shop, around the yard.  Laborer.
7  Q.  How long did you work there?
8  A.  I don't know exactly.
9  Q.  Was it during the time while you were, I
10     guess -- When you went to prison, you come
11     out and go back to work there; is that --
12 A.  Right.  Yes.
13 Q.  Did your employment there end when they
14     were sold?
15 A.  The guy that owned the place, he -- It
16     ended before then.  But he had another
17     business too, and I sill worked for him.
18 Q.  What was the other business?
19 A.  Firewood.  Selling firewood.  Treated wood
20     and firewood.
21 Q.  Do you know what the name of that was?
22 A.  It was Fleming Wood Products.
23 Q.  How long did you work for Fleming?

Page 49

1   A.  Off and on over 20 years.
2   Q.  While you worked for H & W, did you ever --
3       were you drug tested there?
4   A.  No.
5   Q.  Did you ever feel like you were being
6       discriminated against working for H & W?
7   A.  No.
8   Q.  Did you use illegal drugs while you worked
9       there?
10  A.  No.
11  Q.  How about while you worked for Fleming Wood
12      Products?  Did you ever feel like you were
13      being discriminated against?
14  A.  No.
15  Q.  Did you ever have any -- Did you take any
16      drug tests working for Fleming Wood
17      Products?
18  A.  No.
19  Q.  Were you using illegal drugs during that
20      time period?
21  A.  No.
22  Q.  Where did you go to work after H & W
23      Logging?

Page 50

1   A.  I can't remember that.
2   Q.  Did you ever work at a place called Lester
3       Mill?
4   A.  Oh, yes.
5   Q.  Do you know if that was after you had
6       stopped working at H & W Logging?
7   A.  Yes.
8   Q.  What did you do for Lester Mill?
9   A.  I was a workman.
10  Q.  What does a workman do?
11  A.  Put the -- Pulling the looms to put the
12      yarn in the looms.
13  Q.  Not driving trucks?
14  A.  No.
15  Q.  Were you -- Did you take drug tests while
16      you worked for Lester Mill?
17  A.  Yes.
18  Q.  How often?
19  A.  I took one when I went there.  I mean,
20      that's ...
21  Q.  A preemployment drug test?
22  A.  Yes.
23  Q.  Did they do random testing?

Page 51

1   A.  Yes.
2   Q.  Were you randomly tested?
3   A.  One or two times, yes.
4   Q.  Did you pass those tests or fail?
5   A.  I passed them.
6   Q.  Were you using illegal drugs during that
7       time period?
8   A.  No.
9   Q.  How long did you work for Lester Mill?
10  A.  Over a year and a half.
11  Q.  And I'm not trying to trip you up.  I'm
12      just trying to make sure that I get a full
13      history.  I know in the discovery -- in the
14      responses to interrogatories it had that
15      you worked there for -- Let me see.  In
16      your application with Waste Management, it
17      had you working there until December of
18      2000.  And I'm not -- I'm just -- I can't
19      remember what I did four years ago.  So I'm
20      just trying to figure out where all you
21      worked.
22  A.  Uh-huh (positive response).
23  Q.  Did you work anywhere between Lester Mill

Page 52

1       and when you went to Waste Management?
2   A.  I can't recall.
3   Q.  Well, we've talked about H & W Logging.
4       We've talked about Fleming Wood Products,
5       and we've talked about Lester Mill.  And I
6       know you worked for Waste Management, which
7       we'll talk about in a minute.  Can you
8       remember any other places that you worked
9       before you started at Advanced Disposal
10      Services?
11  A.  You know, like I had temporary jobs, you
12      know, like temp agencies here and there.  I
13      can't remember.  I can't remember this.
14  Q.  Did you work through a temp company?
15  A.  When?
16  Q.  Well, I guess -- You've -- There was an
17      Employment Resource.  Is that a --
18  A.  Oh, yes.  That's a temp company.
19  Q.  Did you work with any other temp companies?
20  A.  Yes.  I can't -- I can't remember the name
21      of them.  Back years ago.
22  Q.  When did you work for Employment Resource?
23  A.  I can't recall the date on that.

Deposition of Robert Cannon

April 10, 2008

Page 53

1   Q.  Would January of 2004 to April 2005 sound
2      about right?
3   A.  Yes, I would say. Yeah. Uh-huh (positive
4      response).
5   Q.  And, you know, I understood -- I'm not
6      trying to tie you down to the dates. I
7      gave those because those are the dates that
8      I had. But, I mean, you're not going to be
9      held to those dates. I'm just trying to
10     get a general idea.
11        You got your CDL in 2000. Is that what
12    you had said?
13  A.  Yes. Uh-huh (positive response).
14  Q.  What made you decide to get a CDL?
15  A.  I just decided to get them. Just -- I
16    mean, job -- to get a better job.
17  Q.  Where did you -- Where did you go work when
18    you got your CDL?
19  A.  I can't recall. I can't recall right now.
20  Q.  Did you work for Waste Management?
21  A.  Yes. I went to work for them. I went to
22    work for them at that time, yes.
23  Q.  How many times did you work for Waste

Page 54

1    Management?
2  A.  Twice. I worked for them two times.
3  Q.  The first time that you worked for Waste
4    Management, when was that?
5  A.  Might have been 2001.
6  Q.  What did you do for them?
7  A.  Drive.
8  Q.  Were you subject to drug tests when you
9    worked for them that first time?
10  A.  Yes.
11  Q.  Did you have a preemployment drug test?
12  A.  Yes.
13  Q.  Did you have random drug tests?
14  A.  Yes.
15  Q.  Did you fail any of those drug tests?
16  A.  No.
17  Q.  Did you use illegal drugs while you were
18    working for them?
19  A.  No.
20  Q.  Did you ever feel like you were being
21    discriminated against by Waste Management
22    when you worked for them?
23  A.  No.

Page 55

1   Q.  Why did you stop working for them the first
2    time?
3  A.  I went to jail.
4  Q.  What did you go to jail for then?
5  A.  I don't remember exactly what it was.
6  Q.  How long were you in jail at that time?
7  A.  I don't remember.
8  Q.  Do you remember when it was?
9  A.  It was two thousand -- 2002, I believe it
10    was. 2002.
11  Q.  Was it for a violation of parole?
12  A.  Yes.
13  Q.  Do you know what the violation of parole
14    was?
15  A.  No, I don't remember exactly.
16  Q.  Anything that would help you remember what
17    it was?
18  A.  I know I was into it with a spouse, a lady
19    friend. Yeah, I know that much.
20  Q.  The lady friend, it wasn't Jennifer at that
21    time, though?
22  A.  No.
23  Q.  Who was it?

Page 56

1  A.  Brenda Hughley.
2  Q.  Who?
3  A.  Brenda Hughley.
4  Q.  Brenda Hughley.
5      You were never married to her, though?
6  A.  No.
7  Q.  When you got out of prison at that point,
8    where did you go work?
9  A.  I don't remember.
10  Q.  Do you remember working any place -- I know
11    you -- I know you got out of prison -- It
12    would have been sometime in 2002 or 2003.
13    You started working for Employment Resource
14    after that. Do you remember working any
15    place between getting out of prison and
16    going to Employment Resource?
17  A.  I can't remember.
18  Q.  With Employment Resource, what type of
19    trucks were you driving?
20  A.  I worked in the plant.
21  Q.  What did you do?
22  A.  Spot weld machines.
23  Q.  Were you subject to drug testing with them?

Page 57

1    A.   Yes.
2    Q.   Was there random testing?
3    A.   Yes.
4    Q.   Were you given a preemployment test?
5    A.   Yes.
6    Q.   Did you fail any of those tests?
7    A.   No.
8    Q.   Did you use any illegal drugs while you
9         worked for them?
10   A.   No.
11   Q.   I want to talk about the -- Why did you
12        stop working for Employment Resource?
13   A.   I don't recall.  I think I went back to
14        Waste Management then.
15   Q.   When you went back to Waste Management, did
16        you take any -- a preemployment drug test?
17   A.   Yes.
18   Q.   Did you pass that one?
19   A.   Yes.
20   Q.   Who was your supervisor at Waste
21        Management?
22   A.   William Stabler.
23   Q.   Did you ever feel like you were

Page 58

1         discriminated against while you worked for
2         Waste Management?
3    A.   No.
4    Q.   Were you subject to random drug tests while
5         you worked there?
6    A.   Yes.
7              (Defendant's Exhibit 5 was marked
8              for identification.)
9    Q.   I'm going to mark as Defendant's Exhibit
10        5 -- And I apologize.  This is the only
11        copy I've got.
12             MR. DYKES:  You can look at it,
13        Jim.
14   Q.   -- a drug testing custody form.
15             MR. DOUGLAS:  Is there a question?
16             MR. DYKES:  I was just giving him
17        a chance to look at it.
18             MR. DOUGLAS:  Okay.
19   Q.   Have you seen that before?
20   A.   Not this, no.  Not this one.
21   Q.   Is that your name on it, Mr. Cannon?
22   A.   Yeah.  Yeah, that's my name.
23   Q.   Is that your social security number on

Page 59

1         there, Mr. Cannon?
2    A.   Social security.  Yeah, that's it.
3    Q.   And this is dated 12 -- Let's see.  This is
4         dated 12/4/01, so that looks like a pre --
5         probably your preemployment test from the
6         first time; is that right?
7    A.   Right.  Uh-huh (positive response).
8    Q.   Can you think of any other place that you
9         worked prior to coming to work for Advanced
10        Disposal?
11   A.   I can't think of any.
12   Q.   Had you ever used illegal drugs before
13        coming to work for Advanced Disposal?
14   A.   No.
15   Q.   Have you ever used illegal drugs?
16   A.   Yes.
17   Q.   When?
18   A.   Back in the past.  Back years ago in the
19        past.
20   Q.   Well, I mean, you've -- you were -- This
21        lawsuit is over a failed drug test.  So, I
22        mean, when you say years ago in the past,
23        are you talking a couple of years ago, are

Page 60

1         you talking ten years ago, 20 years ago?
2              MR. DOUGLAS:  I'm going to object
3         to the form.  He testified
4         that he tested positive in two
5         thousand and something or
6         another already.  Are you
7         asking before that or since
8         that or just -- are you asking
9         every time he's ever used
10        drugs?
11             MR. DYKES:  Well, I mean, I've
12        asked with all of his
13        employers up until he started
14        with Advanced Disposal
15        Services, and he said he
16        didn't use any drugs while he
17        worked for them.  I know he
18        said he failed a test in
19        2002.
20   Q.   I'm just trying to figure is the
21        testimony -- Is the only time you used
22        illegal drugs in 2002, or are there other
23        times that you've used other illegal drugs?

Deposition of Robert Cannon

April 10, 2008

Page 61

1  A.  Before 2002.
2  Q.  But no drug use since 2002?
3  A.  No.
4  Q.  Any idea how if you haven't used drugs
5      since 2002 there's a drug test with Waste
6      Management with your social security number
7      on it that has a positive for cocaine and a
8      drug test with Advanced Disposal with your
9      social security number on it with a drug
10     test that's positive for cocaine?
11 A.  What's the question?
12         MR. DOUGLAS:  He's asking you to
13         explain the positive drug
14         test; right?
15         MR. DYKES:  Yeah.
16 Q.  I just -- Your testimony is you haven't
17     used drugs since 2002.  I'm just trying to
18     figure out why there's a drug test from
19     Waste Management with your -- from December
20     of 2006 with your social security number on
21     it and a drug test from Advanced Disposal
22     in January of 2007 with your social
23     security number on it with both of them

Page 62

1      having a tested positive for cocaine.  I'm
2      just trying to understand that.
3  A.  So you --
4         THE WITNESS:  Explain it to him?
5         Is that what you're saying?
6         MR. DOUGLAS:  Yeah.  If you know
7         why it is, you can tell him.
8         THE WITNESS:  Okay.
9         MR. DOUGLAS:  If you don't know
10        why it is, then you don't
11        know.
12 A.  Okay.  Well, the one from Waste Management,
13     like I said, this is the first I've seen of
14     that.
15 Q.  Okay.
16 A.  And I didn't -- I didn't have no positive
17     drug screen at Waste Management.  No one
18     told me nothing about I had a positive drug
19     screen.  Okay.  And Advanced Disposal don't
20     have no -- nothing with my name on it
21     saying I had a positive drug screen.  So
22     that's the best I can explain that.
23 Q.  Okay.  And I just -- I want to make sure

Page 63

1      that I'm right.  Looking back at
2      Defendant's Exhibit 1 -- This is your name
3      on Defendant's Exhibit 1 as Robert Cannon?
4  A.  Uh-huh (positive response).
5  Q.  And this is your social security number on
6      Defendant's Exhibit 1?
7  A.  Uh-huh (positive response).
8  Q.  And that's a positive drug test for
9      cocaine; is that right?
10 A.  That's what I see.  Uh-huh (positive
11     response).
12 Q.  Okay.
13        (Off-the-Record discussion.)
14        MR. DYKES:  If y'all want to take
15        a quick break.  I'm fixing to
16        get into his Advanced Disposal
17        employment.
18        MR. DOUGLAS:  No.  Let's roll on.
19        MR. DYKES:  Okay.
20        (Off-the-Record discussion.)
21 Q.  When did you start working for Advanced
22     Disposal?
23 A.  January 23, '07.

Page 64

1  Q.  Did you fill out an application with them
2      before you started?
3  A.  Yes.
4         (Defendant's Exhibit 6 was marked
5         for identification.)
6  Q.  I'm going to mark as Defendant's Exhibit
7      Number 6 a driver's application for
8      employment.  Is this your application with
9      Advanced Disposal Services?
10 A.  Yes.
11 Q.  On page two, is that your signature?
12 A.  You.
13 Q.  On the application on page one, it asks
14     have you ever been convicted of a felony.
15     Did you complete that section?
16 A.  No.
17 Q.  Did you tell anybody at Advanced Disposal
18     that you had been convicted of a felony?
19 A.  Yes.
20 Q.  Who did you tell?
21 A.  Russell Davis.
22 Q.  When did you tell him?
23 A.  The day he asked me why I didn't check that

16 (Pages 61 to 64)

Page 65

1  and I told him the reason I don't check it
2  is because I like to explain to people
3  about that when they ask me about it.
4  Because if you don't check it, they're
5  going to ask you about it. That's why -- I
6  like to explain it to them when I go to
7  them with it. That's why I didn't check
8  it.
9  Q.  How long after you submitted the
10  application were you hired?
11  A.  I think it was the next day.
12  Q.  Who hired you?
13  A.  Russell Davis.
14  Q.  Did you go through any training after you
15  started with Advanced Disposal?
16  A.  I don't recall going through any training.
17  I don't recall.
18  Q.  Did you -- Once they hired you, did you
19  just -- did you start driving at that point
20  or was there a delay before you started to
21  drive?
22  A.  I started driving.
23  Q.  Did they give you an employee handbook when

Page 66

1  you got it -- when you got hired?
2  A.  Yes.
3        (Defendant's Exhibit 7 was marked
4        for identification.)
5  Q.  I'm going to mark as Defendant's Exhibit 7
6  an acknowledgment of receipt of employee
7  handbook. Have you seen this before,
8  Mr. Cannon?
9  A.  Yes.
10  Q.  Is that your signature on Defendant's
11  Exhibit 7?
12  A.  Yes.
13  Q.  Did you receive a copy of the employee
14  handbook?
15  A.  Yes.
16  Q.  Were you familiar with the company's drug
17  free workplace policy?
18  A.  Yes.
19        (Defendant's Exhibit 8 was marked
20        for identification.)
21  Q.  I'm just going to mark as Defendant's
22  Exhibit 8 the drug free workplace policy.
23  Is this the policy that you're familiar

Page 67

1  with?
2  A.  What was the question?
3  Q.  Was that the drug free workplace policy?
4  A.  Was this the one they give me?
5  Q.  Uh-huh (positive response).
6  A.  I assume. I can't remember exactly what I
7  looked at that day. It's been a while.
8  Q.  But you were familiar with the drug free
9  workplace policy when you worked there?
10  A.  Right.
11  Q.  And looking back at Defendant's Exhibit
12  Number 7, which is the acknowledgment of
13  the handbook, the last paragraph before
14  your name, does this indicate that you
15  would be subject to, among other things, a
16  urine analysis pursuant to the drug and
17  alcohol policy or the drug policy?
18  A.  Now, what's the question?
19  Q.  The last paragraph here indicates that you
20  would be subject to urine analysis subject
21  to that drug -- the drug policy; is that
22  right?
23  A.  Yes.

Page 68

1  Q.  Before you were hired, did you go through
2  any interviews or anything?
3  A.  Yes.
4  Q.  Who interviewed you?
5  A.  Russell Davis and Danny -- I forget
6  Danny's last name.
7  Q.  Futral? Does that sound familiar?
8  A.  Yes. I think that's it.
9  Q.  Do you remember anything about the
10  interview?
11  A.  Nothing specific. Speaking of ...
12  Q.  Any complaints about the interview?
13  A.  No.
14  Q.  And I'm going to talk to you about the drug
15  test and your discharge. Other than the
16  drug test and the discharge, do you -- are
17  you complaining about anything else that
18  happened during your employment with
19  Advanced Disposal?
20  A.  Yes.
21  Q.  Tell me about that.
22  A.  Me and Danny didn't see eye to eye on a few
23  things.

Page 69

1  Q.  How so?
2  A.  Say what, now?  ·
3  Q.  How did y'all not see eye to eye?
4  A.  Okay.  When I went there in the job, the
5      drivers was supposed to, like -- We was on
6      day rate pay.  Okay.  If I finished my
7      route before you, I would come and help you
8      and we would help each other.
9  Q.  Okay.
10 A.  All right.  I was the fastest man there.  I
11     always beat everybody through, so I go help
12     out on everybody else route two or three
13     times a week, help out two or three hours.
14     They sat at the store drinking coffee and
15     smoking cigarettes and I'm out there
16     working.  I finished my route and I'm doing
17     their job.
18        I complained to Danny about that.  I'm
19     tired of doing others' job.  Danny had a
20     habit of cussing, raising his voice, saying
21     he's the boss; we're going to do what he
22     say do.  Okay.  I go back and tell Danny
23     again, Danny, you know, my application did

Page 70

1      not say that I'll do my job and do somebody
2      else's.  I said, now, we was doing this
3      here -- kind of hard.  All the drivers help
4      each other.  I told him I was tired of
5      doing they job.
6         I complained to Russell one time about
7      Danny -- the first time I complained to
8      him.  Then he tells me -- Russell Davis
9      tell me, well, Danny is just military; you
10     know, he's an old military vet; y'all
11     just -- he don't mean no harm.  I tell
12     Danny again, you know, Danny, don't keep
13     cussing at me; I'm grown just like you
14     are.  And it goes on and on.
15 Q.  Did he -- I'm sorry.  Go ahead.
16 A.  No.  Go ahead.
17 Q.  No.  I didn't mean to interrupt.  If you
18     were --
19 A.  And then I go back to Russell again and
20     complain again to him.  I'm tired of Danny
21     cussing at me.  I'm tired of doing the
22     other guy's job.  And so Russell said he
23     would spoke to Danny about the situation.

Page 71

1      If he did or not, I don't know, but he kept
2      going on and on.
3  Q.  Did Danny say anything to you about your
4      race?
5  A.  No.
6  Q.  You say he was cussing at you.  How -- What
7      was he saying?
8  A.  What, the words he was saying?
9  Q.  Yeah.
10 A.  Well, I'm the God damn boss.  Y'all are
11     going to do what I say do.  If you don't,
12     find you another damn job.  I run this.  If
13     I want you to help out on somebody else's
14     route, you're going to do it.  He got to
15     have -- Put his fingers just about up in
16     your.  And I backed off one day and told
17     him don't do that.
18 Q.  Okay.  He -- I'm sorry.
19 A.  And I complained to Russell Davis again.
20     And finally one morning it just got out of
21     hand in a little meeting.  Me and Danny had
22     words back and forth.  Two days later Danny
23     fired me.  Said the drug screening I took

Page 72

1      two weeks ago was positive and said he had
2      to terminate me.  That was his words.
3  Q.  Did Danny just yell at -- curse at you or
4      did he curse at other folks out there too?
5  A.  It was mainly me, because I was the only
6      one complaining about I'm tired of doing
7      other people job.  I was the main one
8      helping out on everybody else's route.  I
9      never got any help because I beat everybody
10     through.
11 Q.  What was the racial makeup of the drivers
12     out there?
13 A.  Explain to me what you're talking about.
14 Q.  Well, how many drivers was it?
15 A.  It was four of us.
16 Q.  How many -- Of those four how many were
17     black?
18 A.  Three.
19 Q.  How many were white?
20 A.  One.
21 Q.  Was the white driver treated any
22     differently than the three black drivers?
23 A.  He wasn't driving at the time when I was

Page 73

1      there. He was on the back of the truck.
2      He took my spot after I left.
3   Q.  How do you know that?
4   A.  I see him in the truck.
5   Q.  What was his name?
6   A.  Coke Conway.
7   Q.  Ever heard of William Perry?
8   A.  Yes.
9   Q.  Who is William Perry?
10   A.  I just know him as William Perry.
11   Q.  Do you know if he works for -- or worked
12      for Advanced Disposal Services?
13   A.  Yes, he went to work there.
14   Q.  Do you know when he went to work there?
15   A.  No.
16   Q.  Any other -- Any other complaints about
17      while you were working at Advanced Disposal
18      Services? And I know we're going to talk
19      about the drug test and the discharge. But
20      any other complaints?
21   A.  Yes. The complaint that -- The last time I
22      complained to Russell Davis was that my
23      truck was down one Friday morning, I think,

Page 74

1      about two hours. And I still get out there
2      on my route and beat everybody through and
3      then still got to go help out on the other
4      guys' route. And I really got -- It really
5      teed me off on that.
6         And I said, well, Danny -- You know, I
7      went back to Danny again. This just don't
8      make sense. Somebody should have been
9      helping me if my truck was been down for two
10     hours. This time he got -- shouted and
11     raised his voice and, you know, telling me
12     that I'll keep complaining to Russell and
13     he complain to him and I won't have a job.
14   Q.  Did you -- When you complained to them, did
15     you complain that you thought these things
16     were going on because you were black?
17   A.  No, I didn't -- I didn't tell him that.
18   Q.  While you were working for Advanced
19     Disposal, did anybody say anything to you
20     about your race or color?
21   A.  No.
22   Q.  And I know I kind of jumped over this. You
23     were hired as a driver?

Page 75

1   A.  Yes.
2   Q.  What -- As a driver what did you do?
3   A.  You know, you drive through to stops and
4     you'll get out on occasion and help the
5     helper on occasion. You'll get out and
6     help. Sometimes you couldn't get out and
7     help him depending on the traffic.
8   Q.  How many trucks -- How many trucks were
9     there with -- where you worked?
10   A.  They had three trucks and they had one
11     spare, so there were four trucks.
12   Q.  So did each truck have a helper?
13   A.  Yes.
14   Q.  Was Coke Conway -- was that your helper?
15   A.  No.
16   Q.  Who was your helper?
17   A.  Willie Summers was my helper.
18   Q.  When the other drivers would get done, I
19     realize it was after you got done, but
20     would they help out with anybody else or
21     did they just go home?
22   A.  No. They would help out. That's when they
23     got through.

Page 76

1   Q.  So the issue you had was you got done
2     sooner which left you to help out more?
3   A.  Yes.
4   Q.  What were you wanting them to do to help
5     you?
6   A.  I was wanting everybody to pull they load,
7     everybody do they own route and then just
8     be -- That's it. Because it wasn't fair to
9     me to keep doing an hour and two hours
10     every day on somebody else's route.
11        (Defendant's Exhibit 9 was marked
12        for identification.)
13   Q.  I'm going to mark as Defendant's Exhibit 9,
14     a collection form for urinalysis test. Do
15     you recognize this form that's been marked
16     as Defendant's Exhibit 9?
17   A.  Yes.
18   Q.  Is that your signature on Defendant's
19     Exhibit 9?
20   A.  Yes.
21   Q.  Is that your social security number at the
22     top of Defendant's Exhibit 9, the 428 --
23     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?

Deposition of Robert Cannon

April 10, 2008

Page 77

1  A.  Yes, that's it.
2  Q.  Do you have any complaints about being
3     required to complete this form to give a
4     urinalysis test?
5  A.  Say again.
6  Q.  Do you have any complaints about Advanced
7     Disposal requiring you to take a urinalysis
8     test when you were hired?
9  A.  Did I have any complaints?
10  Q.  Yeah.
11  A.  No.
12  Q.  Did you give a urinal -- urine sample on
13     January 22, 2007?
14  A.  Yes.
15  Q.  Did you ever see the results of -- or the
16     test results from that urine sample?
17  A.  From this one?
18  Q.  Yes.
19  A.  No.  Talking about did I see it after he
20     gave me the test or did I ever see it?
21  Q.  Did you ever see it while you worked for
22     Advanced Disposal --
23  A.  No.

Page 78

1  Q.  -- Services?
2  A.  No, I didn't see it while I was working
3     there.
4         (Defendant's Exhibit 10 was marked
5         for identification.)
6  Q.  What I'll mark as Defendant's Exhibit 10
7     are the results of the January 22, 2007
8     drug test.
9         MR. DOUGLAS:  I'm going to object
10         to the form.
11  Q.  I'm going to mark as Defendant's Exhibit 10
12     what is entitled results of DOT control
13     substance test with a verification date
14     of -- typed in of February 2, 2007,
15     handwritten in February 12, 2007.  Have you
16     seen this form?
17  A.  Did I see it while I was working for them
18     or have I seen it period?
19  Q.  I know you testified you haven't -- you did
20     not see it while you were working for them.
21  A.  Right.
22  Q.  Had you seen it prior today?
23         MR. DOUGLAS:  I object.  He said

Page 79

1     he didn't see the results of
2     the blood test.  And he can
3     attest that these are those
4     results.  So that's why it was
5     fair for him to ask you when.
6         MR. DYKES:  Okay.
7         MR. DOUGLAS:  I apologize.
8         MR. DYKES:  That's fine.
9  Q.  I'm going to just start my question over.
10     Did you see Defendant's Exhibit 10 while
11     you worked for Advanced Disposal?
12  A.  No.
13  Q.  When is the first time you saw Defendant's
14     Exhibit 10?
15  A.  Well, after I was terminated.
16  Q.  Who gave it to you?
17  A.  I sent for it.
18  Q.  Who did you send for it to?
19  A.  To this -- To these company.
20  Q.  Okay.  Is this -- Is Defendant's Exhibit 10
21     the form you got back?
22  A.  Yes, this is one of them.  Yeah.
23  Q.  And I understand there was a second drug

Page 80

1     test you took from St. Louis MRO or where
2     they did the test.  Did you receive any
3     other drug test from them?
4  A.  No.
5  Q.  Looking at Defendant's Exhibit 10, does
6     this -- is this your social security number
7     on it?
8  A.  Yes, it is.
9  Q.  And the name is Robert and it looks like
10     Rannon; is that right?
11  A.  I can't pronounce it.
12  Q.  Well, looking at the first name it looks
13     like Robert, does it not?
14  A.  Right.  Uh-huh (positive response).
15  Q.  And the second name looks like there's a
16     capital R, A-N-N-O-N.  Is that what it
17     looks like to you?
18  A.  It looks like that's an H on one of them.
19  Q.  And Defendant's Exhibit 10 shows a positive
20     test for cocaine; is that right?
21  A.  Yes, that's what it shows.
22  Q.  I know you asked St. Louis MRO to send you
23     a copy of what's been marked as Defendant's

Deposition of Robert Cannon                                                                    April 10, 2008

---

Page 81

1    Exhibit 10. Did you talk to anybody at
2    St. Louis MRO about this test, about these
3    results?
4    A. No.
5    Q. Other than your lawyer -- and I don't want
6      to know what y'all talked about -- have you
7      talked to anybody else about the results of
8      Defendant's Exhibit 10?
9    A. Yes.
10   Q. Who's that?
11   A. I can't recall. I mean, I don't remember
12     the person name who I talked to at MRO.
13   Q. Have you had discussions with anybody other
14     than your attorney about the accuracy of
15     the results from Defendant's Exhibit 10?
16   A. Explain that a little bit better to me.
17   Q. Well, have you talked to anybody other than
18     your attorney -- and I don't want to know
19     what y'all have talked about -- that has
20     questioned the results of defendant's
21     exhibit -- listed on Defendant's Exhibit
22     10?
23   A. No.

Page 82

1    Q. Why do you think the results on Defendant's
2      Exhibit 10 are not your drug -- your drug
3      test -- your urine test taken on January
4      22, 2007?
5    A. Well, it's not my name for one.
6    Q. Okay.
7    A. And it hasn't been signed by a medical
8      review officer, or whatever. So I -- And
9      so that's why I feel like it wasn't a fair
10     test to me, because a drug test is supposed
11     to be signed by someone. And this has
12     never been signed and it's not my name.
13   Q. Do you know anybody -- Are you aware of any
14     other test results from St. Louis MRO that
15     another employee of Advanced Disposal has
16     claimed wasn't their test?
17   A. Repeat that, sir.
18   Q. Have you heard of anybody -- any other
19     Advanced Disposal employees complaining
20     about the results of a drug test from
21     St. Louis MRO?
22   A. No.
23   Q. Do you know of anybody else who's worked

Page 83

1    for Advanced Disposal who has taken a drug
2    test that had a positive result and
3    continued to work there?
4    A. No.
5    Q. My understanding is that you took a second
6      test from Advanced Disposal. When did you
7      do that?
8    A. February 12th.
9          (Defendant's Exhibit 11 was marked
10           for identification.)
11   Q. I'm going to mark as Defendant's Exhibit 11
12     the results of a DOT controlled substance
13     test with a verification date of 2/14/07.
14     Do you recognize these results or this
15     test?
16   A. Yes.
17   Q. Is this the second test you took with
18     St. Louis MRO?
19   A. Yes.
20   Q. This shows a positive -- I mean, a negative
21     result; right?
22   A. Yes.
23   Q. Do you dispute the results on this test?

Page 84

1    A. No.
2    Q. Is that your social security number on the
3      test?
4    A. Yes.
5    Q. Did you take your own personal drug test
6      through your own personal physician -- a
7      drug test through him?
8    A. Say again.
9    Q. Did you have a -- your personal physician
10     do a drug test on you?
11   A. Yes. I did another drug screen.
12   Q. Why did you do that?
13   A. Because the day that I -- when Danny came
14     and told me this first drug screen that I
15     took -- he said that -- He come in a
16     hostile way. You need to go back and take
17     another drug screen. And so we had a few
18     words on that. He going to tell me I know
19     you dirty. I told him I wasn't. So he
20     said, well, can you take another one. And
21     he was just -- The reason -- what made me
22     take the second drug screen is because when
23     I left to take this one, his word was to me

Page 85

1    I'm going to get Coke off the back of that
2    truck if it's the last thing I do. He was
3    talking about Coke Conway, the white guy.
4    Q.   Okay.
5    A.   So when I went and took this drug screen --
6    That's why I come back on my own and paid
7    out of my pocket and took one.
8         (Defendant's Exhibit 12 was marked
9         for identification.)
10   Q.   I'm going to mark as Defendant's Exhibit 12
11   a drug screen from Kent V. Klimmer (sic).
12   Do you recognize this?
13   A.   From Dr. Klinner.
14   Q.   Do you recognize that, Mr. Cannon?
15   A.   Yes.
16   Q.   Is this the result -- Are these the results
17   of the drug test you took from Dr. Klimmer?
18   A.   Yes.
19   Q.   Okay.
20        MR. DOUGLAS:  Just for the Record
21        it's Klinner, K-L-I-N-N-E-R.
22        MR. DYKES:  Klinner.
23        MR. DOUGLAS:  It looks like an M

Page 86

1         but it's two Ns.
2         MR. DYKES:  Okay.
3         (Off-the-Record discussion.)
4    Q.   How long did you work for Advanced Disposal
5    after you gave him the results of this drug
6    test?
7    A.   Up until -- until March 9th.
8    Q.   Tell me what happened on March 9th.
9    A.   March 9th -- On the 7th, which was the
10   Wednesday before that Friday on the 9th --
11   On March 7th, that Wednesday morning --
12   Q.   Yeah.
13   A.   -- me and Danny had a heated argument.
14   This one almost got out of hand.  Danny
15   followed my truck all day that Wednesday.
16   He followed my truck all day Thursday.  He
17   followed my truck all day Friday.  Friday
18   afternoon I come in the office, dumped the
19   truck, did my paperwork as usual.  He
20   pulled me in the office and tells me that
21   the drug screen you took two weeks ago come
22   back positive; I'm going to have to let you
23   go.

Page 87

1    I responded to him, I said, Danny, the
2    same day I took that drug screen I gave you
3    a copy where I went by a doctor.  He said,
4    we can't recognize your personal doctor.  I
5    said, well, he's not my personal doctor;
6    it's just a doctor office I stopped by to
7    take a drug screen.  I said, and I gave it
8    to you.  He said, well, I gave it to
9    Russell.  I said, well, you still firing me
10   saying that that drug screen was positive.
11   He said, well, Russell told me to terminate
12   you.  I said, well, okay.
13   Q.   Anything said about your race when he was
14   terminating you?
15   A.   No.
16   Q.   Do you know who made the decision to
17   discharge you?
18   A.   No.
19   Q.   Did you ask Danny why he was following you?
20   A.   Yes, I did.
21   Q.   What did he tell you?
22   A.   I asked him that -- Well, that Wednesday I
23   didn't say nothing to him.  But that

Page 88

1    Thursday when I saw him and I stopped at
2    the store, I went out back -- to the back
3    of his truck and asked him why are you
4    following me, Danny.  I said, I saw you
5    yesterday following me.  He said, I'm going
6    to make sure you don't do nothing out of
7    the ordinary because I'm tired of your
8    smart mouth.  I went back and got in the
9    truck.
10   Q.   Did you get any disciplines while you
11   worked for Advanced Disposal?
12   A.   No.
13   Q.   Any performance evaluations?
14   A.   Any what, now?
15   Q.   Any performance evaluations.
16   A.   Performance -- I mean, as far as work
17   performance?
18   Q.   Yeah.
19   A.   Yeah.  The first couple of weeks -- first
20   week or so he come and told all the
21   drivers, you know, we're doing a good job;
22   we're just now getting the contract and
23   we're trying to get things situated.  He

Page 89

1    said, y'all are doing a good job. And
2    that's it.
3    Q.  Your pay ever get decreased while you
4    worked there?
5    A.  No.
6    Q.  Who was your supervisor at Advanced
7    Disposal?
8    A.  Danny.
9    Q.  What was your pay rate?
10   A.  125 day rate.
11   Q.  How many hours did you typically work?
12   A.  It all depends.  Anywhere from 30 to 42
13   hours -- 32 to 42 hours.  Whenever you got
14   through with your route, you're finished.
15   Q.  Okay.  When you went to take the test with
16   Dr. Klinner, did you plan in advance to go
17   get -- to go take a test with him or did
18   you just show up one day?
19   A.  No.  I just stopped by.  Just showed up.
20   Q.  When you took your second test with
21   St. Louis MRO, were you -- did you schedule
22   it in advance, or how did that work?
23   A.  Danny told me to go down there that Monday

Page 90

1    morning.
2    Q.  Okay.
3    A.  Told me to go take it and then come to work
4    after I took the test.
5    Q.  Did he tell you on Monday to go take it or
6    did he tell you on Friday that you were
7    going to take it on Monday?
8    A.  He told me on Friday.
9    Q.  Any idea how long cocaine stays in the
10   system?
11   A.  I don't know.
12         (Defendant's Exhibit 13 was marked
13         for identification.)
14   Q.  I'm going to mark as Defendant's Exhibit 13
15   a final clearance for terminating
16   employee.  Have you seen that before,
17   Mr. Cannon?
18   A.  You're saying did I sign this?
19   Q.  Have you seen this before?
20   A.  No, I haven't seen this before.
21   Q.  Is that your signature on the bottom?
22   A.  Yeah, that's my name, but I didn't sign
23   this paper here.

Page 91

1    Q.  So you're saying that's not your
2    signature?
3    A.  That's not -- I mean, that's not -- I did
4    not sign this paper here.  When they
5    brought this paper to me to sign on
6    termination that day, I told them I wasn't
7    going to sign it because it's saying
8    violating drug and alcohol policy.  I
9    didn't violate no policy.  I did not sign
10   this paper.
11         (Defendant's Exhibit 14 was marked
12         for identification.)
13   Q.  I'm going to mark as Defendant's Exhibit 14
14   what has been marked as an employee
15   disciplinary report.  Have you seen that
16   before, Mr. Cannon?
17   A.  No, I've never seen this before.
18   Q.  At the bottom of this, it's signed by what
19   looks to be Trey Darby indicating employee
20   refused to sign.
21   A.  Yeah, I see Darby.  I see that.  Uh-huh
22   (positive response).
23   Q.  This report -- This document does not have

Page 92

1    your signature on it; is that right?
2    A.  No.
3         MR. DOUGLAS:  Object to the form.
4    Q.  Do you see your signature on Defendant's
5    Exhibit 14?
6    A.  No.
7    Q.  Have we talked about the reasons you
8    dispute the validity of the drug test from
9    St. Louis MRO that showed a positive
10   cocaine?
11   A.  Say what, now?
12   Q.  Have we talked about all the reasons that
13   you dispute the validity of the drug test
14   from St. Louis MRO showing the positive for
15   cocaine results?
16   A.  Have we talked about --
17   Q.  Well, you told me that you didn't agree
18   with it because it didn't have your name --
19   A.  Right.
20   Q.  -- and it didn't have a doctor's
21   signature on -- or the signature on there.
22   A.  Right.
23   Q.  Any other reasons that you dispute those

Page 93

1    results?
2    A.  Not at this time.
3         MR. DYKES:  Can we take a break
4              for a second?
5         MR. DOUGLAS:  Sure.
6         (Brief recess was taken.)
7    Q.  Mr. Cannon, the time when you would help
8    the other folks out, I guess, when you got
9    done with your route, were you compensated
10   for the time that you were helping them?
11   A.  No.
12   Q.  How do you know you weren't compensated?
13   A.  Because my check was the same.
14   Q.  Did you have to clock in and clock out?
15   A.  Yes.
16   Q.  Did you clock -- Would you clock out and
17   then go back and do more work, or would you
18   clock out at the end when you got done
19   helping everybody else?
20   A.  We'd just clock out at the end when we got
21   done helping everybody.
22   Q.  Do you know how your pay rate -- how your
23   pay was calculated at the end of the week?

Page 94

1    A.  All I know is it was $125 a day rate paid.
2    And, I mean, if you -- You just -- I mean,
3    your check was calculated with a 125 day
4    rate and taxes come out of that, you know.
5    And that's the way it were.
6    Q.  If you worked over 40 hours, did you get
7    overtime?
8    A.  Yes.  Uh-huh (positive response).
9    Q.  Do you know what the rates -- day rates
10   were of the other folks who were working
11   there with you?
12   A.  All drivers were the same day rate.  I
13   don't know what the helper was.
14   Q.  You had said -- I had asked you earlier
15   about the racial makeup of the drivers and
16   you had said three blacks and one white; is
17   that right?
18   A.  Yes.
19   Q.  Were there -- What was the makeup -- racial
20   makeup of the helpers?
21   A.  All of them was black.  I believe they was.
22   Q.  Was Coke -- I'm trying to -- Was Coke
23   Conway a helper or was he a driver?

Page 95

1    A.  Coke was a helper until I was terminated.
2    Q.  How many helpers would there have been out
3    there?
4    A.  Three, four.
5    Q.  Four?
6    A.  Four.
7    Q.  Was that -- Was that three blacks and one
8    white as well then, I guess?
9    A.  Yes.  Uh-huh (positive response).
10   Q.  Have you seen Coke Conway's personnel file?
11   A.  Personnel file.  What do you mean?
12   Q.  Well, have you seen his employment records
13   with Advanced Disposal Services?
14   A.  No.
15   Q.  The only way that -- through your knowledge
16   that he moved into the truck was from what
17   you observed yourself seeing the truck go
18   by and, I guess, him driving?
19   A.  Yes.
20   Q.  And I'm going to mark -- And I realize this
21   is jumping back a little bit, but when you
22   were ...
23        MR. DYKES:  Are we on 15?

Page 96

1         COURT REPORTER:  We are.
2         (Defendant's Exhibit 15 was marked
3              for identification.)
4    Q.  When you were hired, were you given an
5    alcohol and/or drug test notification?
6    A.  Yes.
7    Q.  Is that your signature on there?
8    A.  Yes.
9    Q.  And after you got this on January 22, 2007,
10   that's when you went down and took the drug
11   test; is that right?
12   A.  I took it on the 22nd.  I don't know if I
13   got this before or after.
14   Q.  But this is telling -- Defendant's Exhibit
15   15 is telling you what time and what date
16   to go for the drug test?
17   A.  Yes.
18   Q.  I don't want to know what you talked about
19   with the lawyer, but when did you first go
20   see a lawyer about what was going on at
21   Advanced Disposal?
22   A.  I don't know.  Maybe a week or two weeks
23   later.  I don't know.  It might have been

Page 97

1     two.  It might have been three.  It might
2     have been less.
3   Q.  But it was after the discharge?
4   A.  Yes.
5   Q.  Did you file a charge of discrimination
6     with the Equal Employment Opportunity
7     Commission?
8   A.  What's that?
9         (Defendant's Exhibit 16 was marked
10        for identification.)
11  Q.  What I'm going to mark as Defendant's
12    Exhibit 16, which is entitled, charge of
13    discrimination.  Have you seen this -- the
14    charge of discrimination, Mr. Cannon?
15  A.  Yes.
16  Q.  Is that your signature at the bottom?
17  A.  Yes.
18  Q.  I want you to look through your allegations
19    in the charge.  And is there anything --
20    any allegation you make in the charge we
21    have not talked about?
22        MR. DOUGLAS:  The charge is that
23        part right there.

Page 98

1   Q.  Yeah, there in the middle, the typed -- the
2     paragraph there.
3   A.  Uh-huh (positive response).
4         Now, what was your question?
5   Q.  I just want to make sure there are no
6     allegations that you're making in this
7     charge of discrimination that we have not
8     talked about.
9   A.  And you're saying you want to make sure
10    that we've talked about all of this?  Is
11    that what you're saying?
12  Q.  Yeah.  I just -- I want to make sure there
13    are not any claims that you're making from
14    this charge that we haven't talked about.
15  A.  No.
16  Q.  Now -- I didn't mean to cut you off, if I
17    did.
18  A.  Oh, we talked about it.
19  Q.  In here you say, I have documented proof my
20    drug screen, for which Sunflower Waste,
21    LLC, claims I was terminated, was, in fact,
22    negative.  What is the documented proof?
23  A.  The second drug screen I took February 12th

Page 99

1     and the one that I took from Dr. Klinner's
2     office.
3         (Defendant's Exhibit 17 was marked
4         for identification.)
5   Q.  I'm going to mark as Defendant's Exhibit 17
6     what's entitled, dismissal and notice of
7     rights.  Have you seen that, Mr. Cannon?
8   A.  No, I haven't seen this.
9   Q.  After getting -- Well ...
10        MR. DOUGLAS:  Just so the Record
11        is clear, it indicates that it
12        was sent to me -- to my
13        office.
14        MR. DYKES:  Yeah.  That's fine.  I
15        was just asking if he had seen
16        it.  I don't ...
17  Q.  And I know you're not a lawyer, but why did
18    you file this lawsuit against Advanced
19    Disposal Services?
20  A.  Why did I file?
21  Q.  Uh-huh (positive response).
22  A.  Because I wasn't treated fairly, you know.
23    I mean -- And, I mean, I was lied on.  You

Page 100

1     know, I've got a wife and three kids, and
2     it took food out of my family mouth.  I've
3     got a family to provide for.  If I was
4     wrong, I could see, but I wasn't wrong.
5     And I don't feel I was treated right.
6   Q.  When you say you were lied on, is it the
7     results of the drug test you think you were
8     lied on?
9   A.  Exactly.
10        (Defendant's Exhibit 18 was marked
11        for identification.)
12  Q.  I'm going to mark as Defendant's Exhibit 18
13    a copy of the complaint.  Mr. Cannon, have
14    you seen this before?
15  A.  Yes.
16  Q.  Now, one of the claims in here is that --
17    is race discrimination.  Have we talked
18    about all the ways that you think you were
19    discriminated against because of your race?
20  A.  No.
21  Q.  Tell me how else you think you were
22    discriminated against because of your
23    race.

Page 101

1    A.   Okay.  Well, I feel like that Danny was
2         trying to get Coke off the back of that
3         truck because he made that comment to me
4         that he's going to get Coke off the back of
5         the truck if it's the last thing he do.
6         And then, like I say, every time we
7         would -- I would complain to him about me
8         doing others' jobs, he always tell me that,
9         well, you keep on and you won't have a job;
10        better be glad you got one, because I've
11        got a man on the back of the truck just
12        waiting to start driving.  And Coke was the
13        only man -- the only guy on the back of the
14        truck with CDLs that was ready to drive.
15            And I felt like he was trying to get me
16        out of the way to put Coke in the truck.
17        That's just the way I feel.  He
18        discriminated against me with that.  He
19        always tell me I have a smart mouth because
20        I kept going to Russell on him.  And so I
21        feel like he was trying to get him off the
22        truck and just get me out of the way.
23   Q.   Were you working there when Coke was hired?

Page 102

1    A.   Yes.  I was hired -- I think it was two
2         days before Coke.
3    Q.   Do you know if Coke is still there?
4    A.   No.  He's -- Not to my knowledge.  I
5         haven't seen him in the truck lately.
6    Q.   Does -- The truck that Coke was driving
7         after you were discharged, does it go by
8         your house or does it go somewhere else?
9    A.   No.  At that time my cousin works out there
10        and I was still taking him to work in the
11        morning time, and I was -- he was in the
12        truck with Coke.  He was Coke's helper
13        after I left.
14   Q.   Any other ways -- Anything else race
15        related that you're claiming was
16        discrimination that we have not talked
17        about?
18   A.   Not at this time.
19   Q.   Is there anything that would help you
20        remember?
21   A.   I can't -- I don't know right now.  I
22        mean ...
23   Q.   Well, the reason I ask is because this is

Page 103

1         the only chance I get to ask you
2         questions --
3    A.   Right.
4    Q.   -- about your allegations.  So I just want
5         to make sure that I know everything you're
6         complaining about.  So, you know, if
7         there's anything that would help you
8         remember something else, you know, please
9         let me know.
10   A.   Nothing that I can think of right now, no.
11   Q.   In the complaint you make a claim that the
12        terms and conditions of your employment
13        were tainted with discrimination.  Have we
14        talked about how you think the terms -- how
15        you think your employment -- the terms and
16        conditions of your employment were tainted
17        with discrimination?
18   A.   Tainted.  Explain that word to me, tainted.
19   Q.   Well, just how you think just in your
20        day-to-day work you were discriminated
21        against because of your race.  Have we
22        talked about everything in that regard?
23   A.   Well, no.  I feel that -- Can I go on?

Page 104

1    Q.   Yeah.
2    A.   Okay.  Well, I feel that one of the reasons
3         he used the dirty urine thing was that
4         because that's the way that he could get
5         rid of me.  Because, I mean, I did my job.
6         I come to work.  I did my job.  I did other
7         people job, so he couldn't put it on work
8         performance, you know.  Then, like I say, I
9         do what I need to do when I get there.
10            But it's just that I was tired of doing
11        other people's job.  And when I complained,
12        I guess he just was tired of me complaining
13        so he felt like that that's a way to get
14        rid of me, just say dirty urine and go
15        ahead like that.  I feel like that that's
16        the reason that he lied on me with the
17        dirty urine, because my urine was not dirty
18        and I know that from neither drug screen.
19        Neither one of them.  My urine wasn't dirty
20        at all.
21   Q.   One of your allegations is that you were
22        slandered.  Do you know what slandered
23        means?

Page 105

1   A. Lie.
2   Q. How do you think you were slandered?
3   A. Well, when he lied about that, I mean, that
4      gave me a bad rep, a bad name. It will
5      hurt me in the future as far as getting
6      jobs or anything else.
7   Q. Do you know if anything was written that
8      you're complaining about?
9   A. If anything was written?
10  Q. Was written down that you're complaining
11     about.
12  A. You're saying did I write anything down?
13  Q. That -- If Advanced Disposal did. In the
14     documents you produced there was a thing to
15     Ann Dora's. I'm going to mark it as
16     Defendant's Exhibit 19.
17         (Defendant's Exhibit 19 was marked
18         for identification.)
19  A. Ann Dora's.
20         MR. DOUGLAS: What's your
21     question? I'm sorry.
22  Q. Are you complaining about what was
23     submitted to Ann Dora's, which is indicated

Page 106

1      in Defendant's Exhibit --
2   A. Oh, yes.
3   Q. Okay. And this was in the documents that
4      you've already given us today?
5   A. Yes.
6   Q. What are you complaining about from this
7      document marked as Defendant's Exhibit 19?
8   A. I'm complaining about where it's saying in
9      here that I had positive drug urine and
10     violated the drug and alcohol policy. And
11     I'm also complaining about the date results
12     on there. She said the date come back on
13     3/9/07, but the date come back on 2nd 14,
14     '07.
15  Q. Your employment ended on 3/9/07; is that
16     right?
17  A. Yes, employment ended. But the way it --
18     Okay. I'm just going by the way it reads
19     to me.
20  Q. Right. I understand. I understand.
21  A. Uh-huh (positive response).
22  Q. Any other ways? Any other ways that you're
23     claiming that you were slandered?

Page 107

1   A. Yes. Because this was sent to another
2      employer -- to another job employer.
3      Right. Uh-huh (positive response).
4   Q. Other than --
5   A. So that's -- Uh-huh (positive response).
6   Q. Other than this being sent to Ann Dora's,
7      the employer -- potential employer, are you
8      aware of anybody with Advanced Disposal
9      Services telling somebody that you had
10     had -- were discharged for failing a drug
11     test?
12  A. Not that I'm aware of. No, not that I can
13     think of.
14  Q. Nobody else -- Nobody has told you that
15     they were told by -- from somebody by
16     Advanced Disposal that you failed a drug --
17     were discharged for failing a drug test?
18  A. No.
19  Q. One of your complaints is that you were --
20     is that Advanced Disposal committed fraud
21     with your testing. How did they -- What
22     are you claiming there?
23         MR. DOUGLAS: Object to the form

Page 108

1      to the extent it calls for a
2      legal conclusion.
3         THE WITNESS: So what --
4         MR. DOUGLAS: Go ahead and answer.
5   Q. Do you know what fraud is?
6   A. Fraud?
7   Q. Uh-huh (positive response).
8   A. Yeah. When you falsify documents. I mean,
9      not the truth, you know, not truthful about
10     what you're saying or what you're doing.
11  Q. What -- Is there anything that Advanced
12     Disposal told you that you claim was not
13     true?
14  A. When they told me I had dirty urine.
15  Q. All right. That's what you're complaining
16     about with regards to fraud, is about the
17     statements made about the urine test?
18  A. Well, when they said I violated the drug
19     and alcohol policy. Yes, I'm complaining
20     about that.
21  Q. Were all employees that -- Are you aware of
22     any employees being hired who weren't given
23     a preemployment drug test?

Deposition of Robert Cannon                                                    April 10, 2008

Page 109

1  A.  No, I'm not aware.
2  Q.  What are you hoping to get out of this
3      lawsuit?
4  A.  I can't answer at this time.  Hoping to get
5      fair treatment for one.
6  Q.  Anything else?
7  A.  I'm afraid I'll have to consult my attorney
8      on that question.  I don't ...
9  Q.  How have you been damaged by what you claim
10     Advanced Disposal did?
11 A.  How have I been damaged?
12 Q.  Yeah.
13 A.  I've lost a CD in the bank for my kids that
14     I was saving for their future.  I received
15     over four eviction notices from the Housing
16     Authority threatening to put me and my
17     family -- kids and wife outside.  My wife
18     had to go into her 401(k) twice to pay
19     bills and make ends meet at the household.
20     I lost a car in this deal, been kicked out
21     of bankruptcy.  My bankruptcy got
22     dismissed.
23         I went to jail by the repo man trying

Page 110

1      to repo my car.  I went to the doctor for
2      medication for -- just stressed out -- lot
3      of stress and pressure.  Hard for me to get
4      another job making decent money, the kind
5      of money I was making.  I just been
6      suffering ever since the time I lost this
7      job by something that I did not do.  I've
8      been sued, got a judgment against me
9      already.  Got more threatening.  A couple
10     of them that you read off to me that I'm
11     not aware of, so I know they're on the way.
12     I know they're coming.
13 Q.  What's -- I missed that.  I'm sorry.
14 A.  A couple of lawsuits that you read off to
15     me, you said that -- asked me did I know
16     about.  I don't know about them yet, so I'm
17     figuring that they're probably on the way
18     if you got copies of them but I didn't.  I
19     haven't seen them yet.  Big Al's is one --
20     you named one of them.
21 Q.  Anything else?
22 A.  Yeah.  I got an eviction notice now from
23     the Housing Authority where I'm behind in

Page 111

1      March and still ain't paid for April yet.
2      I've got to try to get that up sometime
3      this month.
4  Q.  Are you working now?
5  A.  Yes.  I started working about two weeks
6      ago.
7  Q.  Where are you working?
8  A.  TruGreen Lawn Service -- Lawn Care.
9  Q.  What are you doing there?
10 A.  Spray -- Go out and spray lawns, spray the
11     weeds out of lawns and stuff like that.
12 Q.  Did you have to take a preemployment drug
13     test there?
14 A.  At True Lawn (sic)?
15 Q.  Yes.
16 A.  Yes.
17 Q.  Did you pass that one?
18 A.  Yes.
19 Q.  Had you worked anywhere else from the time
20     you got discharged with Advanced Disposal
21     until you were hired by TruGreen?
22 A.  Yes.  I worked for Staffing Solutions.
23 Q.  How long did you work there?

Page 112

1  A.  It's a temp agency.  I worked there four
2      months, I believe.
3  Q.  When was that?
4  A.  From October till February, I believe.
5  Q.  What were you -- Anything specific you were
6      doing for them or through them?
7  A.  I was working out of Wal-Mart Distribution
8      for them.
9  Q.  What were you doing at the Wal-Mart
10     Distribution?
11 A.  Order filling.
12 Q.  What were you getting paid?
13 A.  $12 an hour.
14 Q.  How many hours a week were you working?
15 A.  24 sometimes.  Might get 30.  It was just a
16     weekend shift.
17 Q.  Did you go from doing that to TruGreen?
18 A.  Yes.
19 Q.  How much are you making at TruGreen?
20 A.  $9 an hour.
21 Q.  How many hours a week are you working?
22 A.  Probably -- Well, I haven't got 40 hours.
23     I just been -- This is my second week.  So

28 (Pages 109 to 112)

Page 113

1    I got 32 hours one week -- last week. This
2    week I should have about 36 hours.
3    Q.  Prior to getting a job through Staffing
4    Solutions at Wal-Mart, what have you done
5    to try to get a job?
6    A.  Putting in applications everywhere,
7    everywhere I can think to go.
8    Q.  Did you get any interviews?
9    A.  No.
10   Q.  Other than with Ann Dora's, are you
11   complaining about anything Advanced
12   Disposal did in regards to your getting
13   interviews or jobs with other employers?
14   A.  Could I -- What are you saying, now?
15   Q.  Other than -- And we've talked about Ann
16   Dora's --
17   A.  Right.
18   Q.  -- where -- and that document. Other than
19   in regards to Ann Dora's, are you aware of
20   any of those other potential employers or
21   anything that you're -- Let me just start
22   over.
23        Over than with Ann Dora's, have you got

Page 114

1    any complaints that Advanced Disposal
2    contacted any other potential employers?
3    A.  I don't know if they contacted them or
4    not. Like I said, the jobs don't -- they
5    don't tell you that. When you go for a
6    job, they're not going to tell you -- say,
7    well, Advanced Disposal contacted me and
8    told me this. They just tell you we ain't
9    hiring. They're not going to tell you
10   that.
11   Q.  With your applications, have you got
12   info -- are you putting information about
13   your criminal convictions on there?
14   A.  Yes. I put it on some -- on some of them.
15   Q.  Do you think that has an influence on
16   whether or not somebody will hire you?
17   A.  I don't know. It haven't. I mean, hasn't
18   nobody told me in the past, so, I mean ...
19   Q.  Do you think if these potential employers
20   were getting references or information from
21   Waste Management and they found out about a
22   drug test there that could influence their
23   decision to hire you?

Page 115

1        MR. DOUGLAS:  Object to the form.
2    A.  What do you mean? What are you saying?
3    Q.  Now, one of your complaints here is that,
4    you know, this -- the drug test from
5    Advanced Disposal and the discharge because
6    of it has hurt you from getting other
7    jobs.
8    A.  Uh-huh (positive response).
9    Q.  If an employer saw Defendant's Exhibit 1
10   and Defendant's Exhibit 2, which are a
11   failed drug test and a discharge for a
12   failed drug test from Waste Management, do
13   you think that would have an impact on
14   their decision of whether or not to hire
15   you?
16   A.  I couldn't say. I can't say what, you
17   know -- what the job -- next job would
18   think.
19   Q.  In your discovery responses, the places you
20   listed as applying at a
21   Wallace Building, Laffiter (phonetic)
22   Concrete Company, Twin City Wholesale,
23   Sherman Concrete and Langley Trucking and

Page 116

1    that you were trying to get a job with
2    Roto-Rooter through Staffing Solutions. Do
3    you remember any place else you've applied?
4    A.  Not at this time.
5    Q.  How soon after you were discharged did you
6    start applying for other jobs?
7    A.  I started the next week.
8        (Defendant's Exhibit 20 was marked
9        for identification.)
10   Q.  Okay. I'm going to mark as Defendant's
11   Exhibit 20 the initial disclosures that I
12   got from your lawyer in this case. Have
13   you seen those, Mr. Cannon?
14       MR. DOUGLAS:  Are you asking him
15       if he's seen this document or
16       seen those names?
17       MR. DYKES:  Well, I was asking him
18       here if he's seen this
19       document.
20       MR. DOUGLAS:  Okay.
21   A.  No, I haven't seen this.
22   Q.  There are some names listed in A that are
23   individuals likely to have discoverable

Page 117

```
1       information which may support plaintiff's
2       claims and allegations. I want to ask you
3       about these folks that are listed, that
4       they might have information to support your
5       claims. There's -- There's yourself. I
6       assume -- And we've talked about everything
7       you -- to your knowledge, that supports
8       your claim; is that right?
9    A. Right.
10   Q. Danny White is listed as Mr. Cannon's
11      supervisor. If I -- If I tell you that
12      there was not a Danny White that worked for
13      Advanced Disposal but there was a Danny
14      Futral instead of White?
15      instead of White?
16   A. I said Futral, yeah.
17   Q. Okay. Have we talked about all your
18      allegations regarding Danny Futral?
19   A. Yes.
20   Q. Next name listed is Coke Conway. Have we
21      talked about, you know, everything you know
22      in regards to Coke Conway that you believe
23      supports your claims?
```

Page 118

```
1    A. Yes.
2    Q. There's a corporate representative from
3       St. Louis MRO. Have we talked about all
4       your issues that you have with St. Louis
5       MRO and the drug testing results?
6    A. Yes, we talked about them.
7    Q. Next is listed Tom Davis. Who is that?
8          And if you don't know, that's fine.
9    A. I don't know. I don't know. I know he's
10      listed on this -- on the MRO paper.
11   Q. Okay. Jo Ann Holder, who is that?
12   A. Again, I don't know. I believe she's
13      listed on some of the MRO papers.
14   Q. If -- On six where she's listed, it says
15      that she's part of the Department of
16      Industrial Relations. Would that -- Would
17      that ring a bell?
18   A. Industrial Relations. What's that?
19   Q. Well, did you apply for unemployment
20      after --
21   A. Oh, yes. Okay. yes. That's the hearing
22      officer.
23   Q. Yeah.
```

Page 119

```
1    A. Okay. Right.
2    Q. Tell me what happened with -- Did you get
3       unemployment benefits?
4    A. Yes, I did.
5    Q. Was there a hearing in regards to those?
6    A. . Yes.
7    Q. Who all -- Who all testified or was
8       involved in that? Do you know?
9    A. Just me, Russell Davis and -- He testified
10      and I testified. That was all.
11   Q. Okay. I don't want to know anything you
12      talked about with your lawyer. Was your
13      lawyer there? Did you have a lawyer with
14      you at the time?
15   A. No.
16   Q. Do you know if there was a lawyer there for
17      Advanced Disposal?
18   A. I don't know.
19   Q. But there wasn't -- Was there a lawyer from
20      Advanced Disposal that asked you questions?
21   A. No. There was Ms. Holder. She was the
22      hearing officer.
23   Q. Next -- Number seven is Dr. Kent Klinner.
```

Page 120

```
1       Have we talked about everything you know in
2       regards to Dr. Klinner?
3    A. Yes.
4    Q. Number eight is Reuben Lowder. I think we
5       talked earlier that everything he knows
6       about the lawsuit is from what you told
7       him; is that right?
8    A. Yes.
9    Q. Number nine is a representative from
10      Opelika Housing Authority. What -- How do
11      you think a representative from Opelika
12      Housing Authority would support your
13      claims?
14   A. Well, she is -- The manager there, she can
15      verify that I was issued eviction notice
16      and on the verge of getting kicked out --
17      out in the streets and stuff and I had to
18      come up with the money to stay in the
19      Housing Authority.
20   Q. Who is Harvey Stanford -- Standard?
21   A. Stanford.
22   Q. Stanford. Who is that?
23   A. He was one of the drivers out there at the
```

Page 121

1    time when all of this was going on.
2  Q.  Is he black or white?
3  A.  He's black.
4  Q.  Does he have anything you believe
5    supports -- any knowledge you believe
6    supports your claims?
7  A.  Yes.  He can -- He can -- He know about all
8    this, what was going on between me and
9    Danny.
10  Q.  And we've talked about what was going on
11    between you and Danny?
12  A.  Yes.  Uh-huh (positive response).
13  Q.  Anything else that you think Mr. Stanford
14    would have knowledge about?
15  A.  No.
16  Q.  Have you -- Other than the folks we talked
17    about earlier -- who was Reuben, David
18    Cannon and Elaine Frazier -- have you
19    talked to anybody else about -- other than
20    your lawyer, and I don't want to know what
21    you talked to your lawyer about -- talked
22    to anybody else about your lawsuit?
23  A.  Not at this time.  I can't think of anyone

Page 122

1    at this time.
2  Q.  Anybody else that you believe can help you
3    or would have knowledge supporting your
4    claims against Advanced Disposal that we
5    have not talked about?
6  A.  No.
7  Q.  Other than the folks we've already talked
8    about today, any former or current
9    employees of Advanced Disposal Services
10    that you've talked to about your case?
11  A.  No.
12  Q.  We talked about all the folks that if you
13    could call who you wanted to the trial of
14    this case that you would want to call.  And
15    I recognize your lawyer might -- I mean,
16    I'm not holding you to this.  But anybody
17    else that you would want to testify on your
18    behalf?
19  A.  That would know something about the case
20    you're saying?
21  Q.  Uh-huh (positive response).
22  A.  No, not that I ...
23  Q.  Any -- I'm sorry.

Page 123

1  A.  I'm trying to think of somebody.  No, not
2    that I know of.
3  Q.  Is there anything else about your claims
4    against Advanced Disposal Services that
5    you -- that we have not talked about today?
6  A.  No, not that I can recall at this time.
7  Q.  If you'll give me just a second, I think
8    I'm about done.
9      (Off-the-Record discussion.)
10      MR. DYKES:  I don't have anything
11      else.
12
13      * * * * * * * * * * * * *
14      FURTHER DEPONENT SAITH NOT
15      * * * * * * * * * * * * *
16
17
18
19
20
21
22
23

Page 124

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA:
3  ELMORE COUNTY:
4      I, Haley A. Phillips, Certified Court
5  Reporter, ACCR # 151, and Commissioner for the
6  State of Alabama at Large, do hereby certify that I
7  reported the deposition of:
8      ROBERT CANNON
9  who was first duly sworn by me to speak the truth,
10  the whole truth and nothing but the truth, in the
11  matter of:
12      ROBERT CANNON,
13      Plaintiff,
14      vs.
15      ADVANCED DISPOSAL SERVICES
16      ALABAMA, LLC, d/b/a SUNFLOWER
17      WASTE, LLC,,
18      Defendants.
19      In The U.S. District Court
20      For the Middle District of Alabama
21      Eastern Division
22      Case Number 3:07-CV-846-WKW
23  on Thursday, April 10, 2008.

Deposition of Robert Cannon

Page 125

```
1          The foregoing 124 computer-printed pages
2     contain a true and correct transcript of the
3     examination of said witness by counsel for the
4     parties set out herein.  The reading and signing of
5     same is hereby waived.
6          I further certify that I am neither of kin
7     nor of counsel to the parties to said cause nor in
8     any manner interested in the results thereof.
9          This 2nd day of May 2008.
10
11
12
13         _____
           Haley A. Phillips, ACCR #151
           Expiration Date:  9/30/08
14         Certified Court Reporter and
           Commissioner for the State
15         of Alabama at Large
16
17
18
19
20
21
22
23
```

Deposition of Robert Cannon

**A**

about 5:17 12:9,18
15:6,18 16:6,16,19
16:19 17:23 18:6,19
19:5,21,23 20:21
21:2,20 22:3,11
23:22 27:13 30:5
34:6 37:15,19 38:2
39:19 41:15 42:11
44:3,15,23 45:18,22
47:12 49:11 52:3,4,5
52:7 53:2 57:11
62:18 65:3,3,5 68:9
68:12,14,17,21 69:18
70:6,23 71:3,15 72:6
72:13 73:16,19 74:1
74:20 77:2,6,19 81:2
81:2,6,7,14,19 82:20
85:3 87:13 92:7,12
92:16 94:15 96:18,20
97:21 98:8,10,14,18
100:18 101:7 102:17
103:4,6,14,22 105:3
105:8,11,22 106:6,8
106:11 108:9,16,16
108:17,20 110:16,16
111:5 113:2,11,15
114:12,21 117:3,6,17
117:21 118:3,6
119:12 120:1,6 121:7
121:10,14,17,19,21
121:22 122:5,8,10,12
122:19 123:3,5,8
ACCR 1:16 4:7 124:5
125:13
accuracy 81:14
Acknowledgment 3:4
acknowledgment 66:6
67:12
action 1:7 37:20 43:22
44:5
actions 43:20
address 27:6
adult 33:6,8
advance 89:16,22
Advanced 1:8 5:13 7:6
10:17,20 12:18 13:1
14:18 15:2,6,11,19
15:23 16:10,17,19,23
17:7,8,21 18:9 20:9
20:18,22 21:6,11
22:18 29:23 30:3
36:10 37:13 42:5
45:4 46:2 47:14 52:9
59:9,13 60:14 61:8
61:21 62:19 63:16,21
64:9,17 65:15 68:19
73:12,17 74:18 77:6

77:22 79:11 82:15,19
83:1,6 86:4 88:11
89:6 95:13 96:21
99:18 105:13 107:8
107:16,20 108:11
109:10 111:20
113:11 114:1,7 115:5
117:13 119:17,20
122:4,9 123:4 124:15
afraid 109:7
after 5:6 33:21 35:3
49:22 50:5 56:14
65:9,14 73:2 75:19
77:19 79:15 86:5
90:4 96:9,13 97:3
99:9 102:7,13 116:5
118:20
afternoon 86:18
again 12:16 19:16
33:21 34:2,3 35:3
69:23 70:12,19,20
71:19 74:7 77:5 84:8
88:12
against 5:15 14:18 15:2
17:7 21:6,11 22:18
30:3 37:21 42:4,8,12
42:20 43:20,23 44:5
45:4 49:6,13 54:21
58:1 99:18 100:19,22
101:18 103:21 110:8
122:4 123:4
agencies 52:12
agency 112:1
ago 5:12 31:15,16
51:19 52:21 59:18,22
59:23 60:1,1 72:1
86:21 111:6
agree 92:17
agreed 4:2,16,23
agreement 1:15
ahead 37:7 70:15,16
104:15 108:4
ain't 111:1 114:8
Alabama 1:2,8,17,19
2:6,10 4:8 30:13
44:15 124:2,6,16,20
125:15
alcohol 3:13 6:21 7:15
67:17 91:8 96:5
106:10 108:19
aliases 13:16
allegation 97:20
allegations 16:19 97:18
98:6 103:4 104:21
117:2,18
alleged 17:18
alleging 17:19
almost 86:14
already 60:6 106:4

110:9 122:7
always 69:11 101:8,19
Al's 44:11 110:19
among 67:15
amount 42:21 43:3
analysis 3:7 67:16,20
and/or 3:13 96:5
Ann 3:17 17:12,16
105:15,19,23 107:6
113:10,15,19,23
118:11
another 7:8 18:7 36:5
48:16 60:6 71:12
82:15 84:11,17,20
107:1,2 110:4
answer 6:18 19:2 43:10
108:4 109:4
anybody 9:1 15:22
16:10 18:21 19:9,22
20:16 27:20 64:17
74:19 75:20 81:1,7
81:13,17 82:13,18,23
107:8 121:19,22
122:2,16
anyone 121:23
anything 6:22 14:22
15:17 17:6 18:18
19:4,20 21:5,18 22:2
22:5 25:15 27:1
31:18 34:4 36:22
55:16 68:2,9,17 71:3
74:19 87:13 97:19
102:14,19 103:7
105:6,7,9,12 108:11
109:6 110:21 112:5
113:11,21 119:11
121:4,13 123:3,10
anywhere 27:14 29:4
51:23 89:12 111:19
apologize 33:12 58:10
79:7
appealed 40:7,16
APPEARANCES 2:1
appears 25:2
application 3:3 12:17
12:18 51:16 64:1,7,8
64:13 65:10 69:23
applications 12:13,20
113:6 114:11
applied 13:2 116:3
apply 118:19
applying 115:20 116:6
approximately 1:20
April 1:19 53:1 111:1
124:23
area 27:18 29:14 30:9
argument 86:13
around 13:9 48:5,6
arrested 31:20 32:3,5

32:11 33:21 34:1,3
35:3 39:15 41:4,8,10
arrests 41:1,14 42:1
44:21
asked 16:16 60:12
64:23 80:22 87:22
88:3 94:14 110:15
119:20
asking 5:16 6:8 10:8,13
38:11 60:7,8 61:12
99:15 116:14,17
asks 64:13
assault 32:7,12
assume 6:18 67:6 117:6
attempted 32:16 33:22
34:1
attest 79:3
attorney 5:13,20 13:22
14:7,17 15:1 18:19
18:20 24:8 31:6
81:14,18 109:7
Attorneys 2:9
Auburn 1:19 2:6 27:16
27:17 29:14 30:8
34:9
audio 16:12
August 40:2
aunts 30:22 31:5
Authority 2:22 44:1
109:16 110:23
120:10,12,19
Avenue 2:9
aware 11:18 17:5 44:13
44:14,17 82:13 107:8
107:12 108:21 109:1
110:11 113:19
A-N-N-O-N 80:16
a.m 1:20

**B**

B 2:4,5
back 7:12 9:7 11:10
26:13 29:22 36:8,14
36:23 38:7,21 39:8
43:17 47:16 48:11
52:21 57:13,15 59:18
59:18 63:1 67:11
69:22 70:19 71:22
73:1 74:7 79:21
84:16 85:1,6 86:22
88:2,2,8 93:17 95:21
101:2,4,11,13 106:12
106:13
backed 71:16
bad 105:4,4
bank 109:13
bankruptcies 45:17
bankruptcy 45:10,14
109:21,21

Beasley 17:17 24:22
beat 69:11 72:9 74:2
before 1:15 4:6 5:23
8:10,22 13:22 14:1,2
28:17 48:16 52:9
58:19 59:12 60:7
61:1 64:2 65:20 66:7
67:13 68:1 69:7
86:10 90:16,19,20
91:16,17 96:13
100:14 102:2
behalf 122:18
behind 44:4 110:23
being 27:2 43:22 49:5
49:13 54:20 77:2
107:6 108:22
believe 14:17 17:15,20
21:10,20 22:16 34:21
55:9 94:21 112:2,4
117:22 118:12 121:4
121:5 122:2
bell 118:17
benefits 46:1,3 119:3
beside 18:2
Besides 18:3
best 6:11 62:22
better 53:16 81:16
101:10
between 4:3,17 5:1
51:23 56:15 121:8,11
Big 44:11 110:19
bills 109:19
Birmingham 2:10
birth 26:1
bit 13:9 45:22 81:16
95:21
black 72:17,22 74:1
94:21 121:2,3
blacks 14:6 95:7
blood 79:2
boss 69:21 71:10
both 61:23
bottom 90:21 91:18
97:16
break 63:15 93:3
Brenda 56:1,3,4
Brief 24:1 93:6
Briggs 29:7
bring 14:4
broad 5:19
Brooks 2:8
brother 29:15
brought 40:3 43:20,23
44:11 91:5
Building 115:21
bunch 6:8
business 48:1,3,17,18

**C**

calculated 93:23 94:3
calendar 15:9,14,17
call 122:13,14
called 16:15 30:17 50:2
calls 108:1
came 39:20 84:13
cannon 1:5,14 4:4 5:5
    5:11 8:9,22 9:22
    13:11 25:14,21 28:7
    29:17 31:20 58:21
    59:1 63:3 66:8 85:14
    90:17 91:16 93:7
    97:14 99:7 100:13
    116:13 121:18 124:8
    124:12
Cannon's 24:7 117:10
capital 80:16
car 39:21 109:20 110:1
Care 111:8
Carlos 28:5,8
case 4:18,20 30:15
    40:21 116:12 122:10
    122:14,19 124:22
Cashing 44:12
catch 44:6
Catherine 1:18 2:5
caught 44:8
cause 125:7
CD 109:13
CDL 47:3 53:11,14,18
CDLs 101:14
Center 33:1 40:8 44:16
CERTIFICATE 124:1
Certified 1:16 4:7
    124:4 125:14
certify 124:6 125:6
challenge 36:21 37:10
    37:11
chance 58:17 103:1
charge 3:14 45:3 97:5
    97:12,14,19,20,22
    98:7,14
charges 40:3,6 45:5
check 44:11 64:23 65:1
    65:4,7 93:13 94:3
children 28:14,15,21
children's 28:4
church 31:9,11
cigarettes 69:15
Circuit 40:17,18
City 115:22
Civil 1:7 4:5
claim 21:18 24:18
    25:12 30:4 45:7,23
    46:10 103:11 108:12
    109:9 117:8
claimed 82:16
claiming 17:21 102:15
    106:23 107:22

claims 14:15,18 15:2
    17:7 21:6,11,16
    22:18 30:2 46:3
    98:13,21 100:16
    117:2,5,23 120:13
    121:6 122:4 123:3
classes 47:1
clear 23:21 33:10 99:11
clearance 3:11 90:15
clock 93:14,14,16,16
    93:18,20
clubs 31:17,18
cocaine 7:2,15 10:6
    11:12 13:6 61:7,10
    62:1 63:9 80:20 90:9
    92:10,15
coffee 69:14
Coke 73:6 75:14 85:1,3
    94:22,22 95:1,10
    101:2,4,12,16,23
    102:2,3,6,12 117:20
    117:22
Coke's 102:12
collected 9:10,12
collection 3:7 76:14
college 46:20
color 74:20
come 48:10 69:7 84:15
    85:6 86:18,21 88:20
    90:3 94:4 104:6
    106:12,13 120:18
coming 19:23 20:4 21:3
    47:13 59:9,13 110:12
commencing 1:20
comment 101:3
commission 4:9 97:7
Commissioner 1:17 4:8
    124:5 125:14
commit 36:5
committed 107:20
companies 52:19
company 42:12 46:7
    52:14,18 79:19
    115:22
company's 66:16
compensated 93:9,12
compensation 24:17
    46:9
complain 70:20 74:13
    74:15 101:7
complained 69:18 70:6
    70:7 71:19 73:22
    74:14 104:11
complaining 17:23
    68:17 72:6 74:12
    82:19 103:6 104:12
    105:8,10,22 106:6,8
    106:11 108:15,19
    113:11

complaint 3:16 16:20
    17:18,23 73:21
    100:13 103:11
complaints 68:12 73:16
    73:20 77:2,6,9
    107:19 114:1 115:3
complete 64:15 77:3
completed 24:21
computer-printed
    125:1
conclusion 108:2
Concrete 115:22,23
conditions 103:12,16
consolidated 42:14
Constangy 2:8
consult 109:7
contacted 12:9 114:2,3
    114:7
contain 125:2
continued 83:3
contract 88:22
control 3:2 24:15 25:1
    78:12
controlled 3:8,9 25:9
    83:12
cont'd 3:1
conversation 16:18
conversations 15:22
    16:9,13,18
convicted 31:21 32:12
    34:12 35:9 64:14,18
conviction 32:15 33:5,5
    39:16
convictions 41:14
    44:22 114:13
Conway 73:6 75:14
    85:3 94:23 117:20,22
Conway's 95:10
copies 110:18
copy 23:17 58:11 66:13
    80:23 87:3 100:13
corporate 118:2
correct 9:17 125:2
counsel 4:3,17 125:3,7
count 39:1
COUNTY 124:3
couple 20:5 59:23
    88:19 110:9,14
court 1:1,16,19 2:5 4:7
    6:3,6 27:7,21 40:13
    40:15,17,18 44:21
    45:1 96:1 124:4,19
    125:14
cousin 20:5,7,15,23
    30:21 102:9
cousins 30:10,20 31:4
Cox 28:5 29:1
crime 31:21
criminal 114:13

current 122:8
curse 72:3,4
cussing 69:20 70:13,21
    71:6
custody 3:2 24:14 25:1
    58:14
cut 98:16

**D**

Dadeville 31:12
damaged 109:9,11
damn 71:10,12
Danny 68:5,22 69:18
    69:19,22,23 70:7,9
    70:12,12,20,23 71:3
    71:21,22 72:3 74:6,7
    84:13 86:13,14 87:1
    87:19 88:4 89:8,23
    101:1 117:10,12,13
    117:18 121:9,11
Danny's 68:6
Darby 91:19,21
date 24:15,19 25:3,10
    26:1 45:13 52:23
    78:13 83:13 96:15
    106:11,12,13 125:13
dated 24:22 59:3,4
dates 53:6,7,9
David 29:17 121:17
Davis 64:21 65:13 68:5
    70:8 71:19 73:22
    118:7 119:9
day 15:10 21:23 64:23
    65:11 67:7 69:6
    71:16 76:10 84:13
    86:15,16,17 87:2
    89:10,18 91:6 94:1,3
    94:9,12 125:9
days 71:22 102:2
day-to-day 103:20
deal 109:20
December 9:5,12 11:12
    38:3,8 51:17 61:19
decent 110:4
decide 53:14
decided 53:15
decision 14:9,10 24:16
    87:16 114:23 115:14
decreased 89:3
Defendant 1:10 2:7
Defendants 124:18
defendant's 2:17 3:1
    8:4,7,17,19 9:7,19,23
    10:5 11:10,20 12:2
    13:18,20 14:1 24:3,6
    58:7,9 63:2,3,6 64:4
    64:6 66:3,5,10,19,21
    67:11 76:11,13,16,18
    76:22 78:4,6,11

79:10,13,20 80:5,19
    80:23 81:8,15,20,21
    82:1 83:9,11 85:8,10
    90:12,14 91:11,13
    92:4 96:2,14 97:9,11
    99:3,5 100:10,12
    105:16,17 106:1,7
    115:9,10 116:8,10
degree 34:7 35:8 39:17
delay 65:20
deny 9:10
Department 118:15
depending 75:7
depends 89:12
DEPONENT 123:14
deposition 1:14 2:21
    4:4,6,13,18 5:2,21,23
    13:21 14:5 18:14,22
    19:11,19 20:1,5 21:2
    22:22 23:2 24:11
    25:16 124:7
detainer 25:12
differently 72:22
dirty 37:21 84:19 104:3
    104:14,17,17,19
    108:14
Disability 45:8
discharge 68:15,16
    73:19 87:17 97:3
    115:5,11
discharged 8:12 12:1
    36:9 102:7 107:10,17
    111:20 116:5
disciplinary 2:19 3:12
    91:15
discipline 8:20
disciplines 88:10
disclosures 3:18 116:11
discoverable 116:23
discovery 51:13 115:19
discriminated 49:6,13
    54:21 58:1 100:19,22
    101:18 103:20
discrimination 3:14
    21:19 97:5,13,14
    98:7 100:17 102:16
    103:13,17
discussion 63:13,20
    86:3 123:9
discussions 81:13
dismissal 3:15 99:6
dismissed 45:16 109:22
Disposal 1:8 5:13 7:6
    10:17,21 12:19 13:1
    14:19 15:3,6,11,19
    15:23 16:23 17:7,8
    17:21 18:9 20:9,19
    20:22 21:7,11 22:19
    29:23 30:3 36:10

37:13 42:5 45:4 46:2
47:14 52:9 59:10,13
60:14 61:8,21 62:19
63:16,22 64:9,17
65:15 68:19 73:12,17
74:19 77:7,22 79:11
82:15,19 83:1,6 86:4
88:11 89:7 95:13
96:21 99:19 105:13
107:8,16,20 108:12
109:10 111:20
113:12 114:1,7 115:5
117:13 119:17,20
122:4,9 123:4 124:15
dispute 83:23 92:8,13
92:23 117:14
disputing 7:7
distant 30:10,20,20
31:4
Distribution 112:7,10
District 1:1,2 124:19
124:20
Division 1:3 124:21
doctor 87:3,4,5,6 110:1
doctor's 92:20
document 10:9,12,15
18:2,6,8,11 91:23
106:7 113:18 116:15
116:19
documented 98:19,22
documents 14:4,14,16
17:11,20 18:2 22:21
23:21 24:7,9 25:14
25:18 105:14 106:3
108:8
doing 15:16 69:16,19
70:2,5,21 72:6 76:9
88:21 89:1 101:8
104:10 108:10 111:9
112:6,9,17
done 11:2 17:22 75:18
75:19 76:1 93:9,18
93:21 113:4 123:8
Dora's 3:17 17:12,16
105:15,19,23 107:6
113:10,16,19,23
DOT 3:8,9 25:8 78:12
83:12
Douglas 1:18 2:4,4
10:8 14:12 17:14
18:16 19:2,8,15
23:15,19,23 25:6,17
33:4,9 37:3 38:11,17
40:12,16 43:2,6
58:15,18 60:2 61:12
62:6,9 63:18 78:9,23
79:7 85:20,23 92:3
93:5 97:22 99:10
105:20 107:23 108:4

115:1 116:14,20
down 15:10,15,21 40:9
53:6 73:23 74:9
89:23 96:10 105:10
105:12
Dr 85:13,17 89:16 99:1
119:23 120:2
drinking 69:14
drive 29:20 54:7 65:21
75:3 101:14
driver 72:21 74:23
75:2 94:23
drivers 69:5 70:3 72:11
72:14,22 75:18 88:21
94:12,15 120:23
driver's 3:3 26:3,5,7,19
27:1 64:7
drives 29:19
driving 47:10 50:13
56:19 65:19,22 72:23
95:18 101:12 102:6
dropped 44:9
drops 44:6
drug 2:18 3:2,6,10,13
7:5,8,9,16,18,22 8:8
9:4,8,9,14,19 10:16
10:20,23 11:7,11,14
11:19 12:1 14:9 22:3
24:14,18,23,23 25:3
36:6,7,10,17,21
37:10,11 38:2,8,20
38:22,23 39:2,7,11
49:3,16 50:15,21
54:8,11,13,15 56:23
57:16 58:4,14 59:21
61:2,5,8,9,13,18,21
62:17,18,21 63:8
66:16,22 67:3,8,16
67:17,21,21 68:14,16
71:23 73:19 78:8
79:23 80:3 82:2,2,10
82:20 83:1 84:5,7,10
84:11,14,17,22 85:5
85:11,17 86:5,21
87:2,7,10 91:8 92:8
92:13 96:5,10,16
98:20,23 100:7
104:18 106:9,10
107:10,16,17 108:18
108:23 111:12
114:22 115:4,11,12
118:5
drugs 6:22 7:2 9:2 49:8
49:19 51:6 54:17
57:8 59:12,15 60:10
60:16,22,23 61:4,17
DUI 26:15 27:2 41:4,8
41:10
duly 5:6 124:9

dumped 86:18
during 15:10 48:9
49:19 51:6 68:18
Dykes 2:8,16 5:10,11
10:11 19:7 23:10,16
23:20 24:5 25:7
33:13 38:16,19 43:15
58:12,16 60:11 61:15
63:14,19 79:6,8
85:22 86:2 93:3
95:23 99:14 116:17
123:10
d/b/a 1:8 124:16

E

each 69:8 70:4 75:12
earlier 41:7 94:14
120:5 121:17
East 44:15
Eastern 1:3 124:21
education 47:1
EEOC 45:3,5
eight 120:4
either 4:14,20
Elaine 20:15,21 22:15
22:16 121:18
ELMORE 124:3
else's 70:2 71:13 72:8
76:10
employee 2:19 3:4,11
3:12 8:20 65:23 66:6
66:13 82:15 90:16
91:14,19
employees 16:2,5,7,23
82:19 108:21,22
122:9
employer 10:2 12:20
24:20 38:14 39:12
46:23 107:2,2,7,7
115:9
employers 12:8 13:2
39:1 60:13 113:13,20
114:2,19
employment 3:3 5:18
12:6,10,13 16:17
17:3,6 48:13 52:17
52:22 56:13,16,18
57:12 63:17 64:8
68:18 95:12 97:6
103:12,15,16 106:15
106:17
end 48:13 93:18,20,23
ended 12:6 48:16
106:15,17
ends 109:19
entered 42:20
entitled 78:12 97:12
99:6
Equal 97:6

errands 48:5
Esq 2:4,8
evaluations 88:13,15
even 6:2 33:20
event 30:17
ever 7:8 13:14 26:7,19
26:20 27:14 29:23
31:20 45:7,10,20
46:9 47:7 49:2,5,12
49:15 50:2 54:20
57:23 59:12,15 60:9
64:14 73:7 77:15,20
77:21 89:3 110:6
every 60:9 76:10 101:6
everybody 69:11,12
72:8,9 74:2 76:6,7
93:19,21
everything 22:11 30:5
103:5,22 117:6,21
120:1,5
everywhere 113:6,7
eviction 109:15 110:22
120:15
evidence 4:13
exact 42:23 43:3,13
45:13
exactly 29:21 32:22
33:19 34:11 41:21
46:6 48:8 55:5,15
67:6 100:9
examination 2:15 5:9
125:3
exhibit 2:17 3:1 8:4,7,8
8:17,20 9:7,19,23
10:5 11:11,20 12:2
13:18,20 14:2 23:18
24:3,6 58:7,9 63:2,3
63:6 64:4,6 66:3,5,11
66:19,22 67:11 76:11
76:13,16,19,22 78:4
78:6,11 79:10,14,20
80:5,19 81:1,8,15,21
81:21 82:2 83:9,11
85:8,10 90:12,14
91:11,13 92:5 96:2
96:14 97:9,12 99:3,5
100:10,12 105:16,17
106:1,7 115:9,10
116:8,11
Expiration 125:13
Expired 41:23
explain 15:13 19:14
61:13 62:4,22 65:2,6
72:13 81:16 103:18
extent 108:1
eye 68:22,22 69:3,3

F

facility 33:11

fact 98:21
fail 8:2 36:6,7 39:7,11
51:4 54:15 57:6
failed 7:5 11:19 38:8
59:21 60:18 107:16
115:11,12
failing 12:1 36:10
107:10,17
fair 76:8 79:5 82:9
109:5
fairly 99:22
fall 44:4
falsify 108:8
familiar 66:16,23 67:8
68:7
family 29:13 30:8,11
30:12,17 100:2,3
109:17
far 88:16 105:5
fastest 69:10
Fax 3:17
February 10:18,21
11:8 47:17 78:14,15
83:8 98:23 112:4
Federal 2:10 3:2 4:5
feel 49:5,12 54:20
57:23 82:9 100:5
101:1,17,21 103:23
104:2,15
felony 36:5 64:14,18
felt 101:15 104:13
few 68:22 84:17
Fifth 2:9
figure 19:18 51:20
60:20 61:18
figuring 110:17
file 95:10,11 97:5 99:18
99:20
filed 5:15 25:13 30:4
42:4,5,8,12,17,17
45:3,4,7,10
filing 4:18,22 37:20
fill 64:1
filling 112:11
final 3:11 90:15
finally 71:20
find 71:12
fine 42:3 43:10 79:8
99:14 118:8
fines 42:2
fingers 71:15
finished 69:6,16 89:14
fired 71:23
firewood 48:19,19,20
firing 87:9
first 5:6 9:6 11:18,22
32:2,5 47:16 54:3,9
55:1 59:6 62:13 70:7
79:13 80:12 84:14

88:19,19 96:19 124:9
Five 28:11 34:17
fixing 63:15
Fleming 48:22,23
    49:11,16 52:4
folks 72:4 93:8 94:10
    117:3 121:16 122:7
    122:12
followed 86:15,16,17
following 87:19 88:4,5
follows 5:8
food 100:2
foregoing 125:1
forget 68:5
form 3:2,7 4:11 18:16
    24:15 25:2 37:3,6
    58:14 60:3 76:14,15
    77:3 78:10,16 79:21
    92:3 107:23 115:1
formality 4:9
former 122:8
forth 29:22 71:22
found 40:7,10 114:21
four 51:19 72:15,16
    75:11 95:4,5,6
    109:15 112:1
Frank 33:1
fraud 21:19 107:20
    108:5,6,16
Frazier 20:15,21 22:15
    22:16 121:18
free 3:6 66:17,22 67:3
    67:8
Friday 73:23 86:10,17
    86:17 90:6,8
friend 20:14 55:19,20
friends 20:6,11,12
from 2:18,19 6:23 8:8
    8:12,21 9:15 12:22
    16:10 17:16 23:5
    25:4 30:6 31:23 36:9
    37:13 38:3,3 39:16
    47:14 59:5 61:18,19
    61:21 62:12 77:16,17
    80:1,3 81:15 82:14
    82:20 83:6 85:11,13
    85:17 89:12 92:8,14
    95:16 98:13 99:1
    104:18 106:6 107:15
    109:15 110:22
    111:19 112:4,17
    114:20 115:4,6,12
    116:12 118:2 119:19
    120:6,9,11
full 51:12
further 4:16,23 123:14
    125:6
Futral 68:7 117:14,14
    117:16,18

----

future 12:8 105:5
    109:14

----

G

garnished 45:20
gave 53:7 77:20 79:16
    86:5 87:2,7,8 105:4
GED 46:16,18
general 53:10
getting 56:15 88:22
    99:9 105:5 112:12
    113:3,12 114:20
    115:6 120:16
give 6:5 31:6 65:23
    67:4 77:3,12 123:7
given 5:23 12:12,14
    14:17 15:1 23:7
    38:22,23 39:7,12
    57:4 96:4 106:4
    108:22
giving 6:6 58:16
glad 101:10
Glenn 2:12
go 11:10 13:12 31:9,11
    36:8,23 37:7 38:21
    39:8 46:12,20 48:11
    49:22 53:17 55:4
    56:8 65:6,14 68:1
    69:11,22 70:15,16,19
    74:3 75:21 84:16
    86:23 89:16,17,23
    90:3,5 93:17 95:17
    96:16,19 102:7,8
    103:23 104:14 108:4
    109:18 111:10
    112:17 113:7 114:5
God 71:10
goes 5:20 30:15 70:14
going 5:16 6:8 8:6,6,19
    13:20 15:7,18 18:6
    24:5 31:2,13 33:14
    38:7 42:19 53:8
    56:16 58:9 60:2 64:6
    65:5,16 66:5,21
    68:14 69:21 71:2,11
    71:14 73:18 74:16
    76:13 78:9,11 79:9
    83:11 84:18 85:1,10
    86:22 88:5 90:7,14
    91:7,13 95:20 96:20
    97:11 99:5 100:12
    101:4,20 105:15
    106:18 114:6,9
    116:10 121:1,8,10
gone 13:14
good 88:21 89:1
gotten 46:22
graduate 46:14
great 30:22 31:5

----

grown 70:13
guess 14:22 30:12 37:2
    43:4,18 48:10 52:16
    93:8 95:8,18 104:12
Guest 2:12
guilty 40:7,10
guy 39:20 48:15 85:3
    101:13
guys 74:4
guy's 70:22

----

H

H 47:16,16,21,21,22,23
    49:2,6,22 50:6 52:3
    80:18
habit 69:20
Haley 1:15 4:6 124:4
    125:13
half 28:3 34:21 35:16
    51:10
hand 71:21 86:14
handbook 3:5 65:23
    66:7,14 67:13
handwritten 78:15
happen 15:15
happened 68:18 86:8
    119:2
happening 27:1
happens 36:7
harassment 39:23 40:4
    40:5
hard 70:3 110:3
harm 70:11
Harvey 120:20
having 5:6 62:1
heard 40:20 73:7 82:18
hearing 17:3 21:4
    118:21 119:5,22
heated 86:13
held 53:9
help 21:15 55:16 69:7,8
    69:11,13 70:3 71:13
    72:9 74:3 75:4,6,7,20
    75:22 76:2,4 93:7
    102:19 103:7 122:2
helper 21:14 75:5,12
    75:14,16,17 94:13,23
    95:1 102:12
helpers 94:20 95:2
helpful 22:8
helping 72:8 74:9
    93:10,19,21
her 37:20 56:5 109:18
hereto 4:21 5:1
Hicks 28:5,7
high 46:12
him 10:8 19:3 21:3
    22:10,12 23:11 30:6
    38:11 39:21 43:4,8

----

48:17 58:16 62:4,7
    64:22 65:1 70:4,8,20
    71:17 73:4,10 74:13
    74:17 75:7 79:5 84:7
    84:19 86:5 87:1,22
    87:23 88:1,3 89:17
    95:18 101:7,20,21
    102:5,10 116:14,17
    120:7
hire 114:16,23 115:14
hired 65:10,12,18 66:1
    68:1 74:23 77:8 96:4
    101:23 102:1 108:22
    111:21
hiring 114:9
history 51:13
Holder 118:11 119:21
holding 122:16
home 75:21
hoping 109:2,4
hostile 84:16
hour 76:9 112:13,20
hours 69:13 74:1,10
    76:9 89:11,13,13
    94:6 112:14,21,22
    113:1,2
house 39:20 102:8
household 109:19
Housing 2:22 24:12
    43:23 109:15 110:23
    120:10,12,19
Hughley 56:1,3,4
hunting 31:18
hurt 105:5 115:6

----

I

idea 11:14,16,16 53:10
    61:4 90:9
identification 8:5,18
    13:19 24:4 58:8 64:5
    66:4,20 76:12 78:5
    83:10 85:9 90:13
    91:12 96:3 97:10
    99:4 100:11 105:18
    116:9
illegal 7:2 49:8,19 51:6
    54:17 57:8 59:12,15
    60:22,23
immediate 30:11,12
impact 115:13
INDEX 2:15,17 3:1
indicate 67:14
indicated 11:23 12:2
    105:23
indicates 67:19 99:11
indicating 91:19
individuals 116:23
Industrial 118:16,18
influence 36:22 114:15

----

114:22
info 114:12
information 24:21 43:7
    114:12,20 117:1,4
initial 3:18 116:11
instead 31:2 117:15
interested 125:8
interrogatories 31:23
    51:14
interrogatory 32:6
    47:15
interrupt 70:17
interview 68:10,12
interviewed 68:4
interviews 68:2 113:8
    113:13
introduced 4:19 5:12
involved 119:8
issue 76:1
issued 120:15
issues 118:4

----

J

J 2:8
jail 33:22 39:22 40:4
    55:3,4,6 109:23
James 2:4
January 10:18,21 53:1
    61:22 63:23 77:13
    78:7 82:3 96:9
Jennifer 28:1,18 29:4
    55:20
Jennifer's 28:15,23
Jim 23:10 58:13
Jo 118:11
job 2:22 24:12 39:2
    47:16 53:16,16 69:4
    69:17,19 70:1,5,22
    71:12 72:7 74:13
    88:21 89:1 101:9
    104:5,6,7,11 107:2
    110:4,7 113:3,5
    114:6 115:17,17
    116:1
jobs 52:11 101:8 105:6
    113:13 114:4 115:7
    116:6
jot 15:15
jotted 15:9
Jr 2:4 3:10
judge 40:11,20,22,23
judgment 42:20,21
    43:18 110:8
jumped 74:22
jumping 13:8 95:21
June 25:13
jury 30:16,18 40:20
just 5:18 11:17 13:9
    18:6,10,19 18:20 20:23

Deposition of Robert Cannon

| | | | | |
|---|---|---|---|---|
| 21:3 22:11 23:10,13 | 74:6,11,22 75:3 | **Lester** 50:2,8,16 51:9 | 82:14,21 83:18 89:21 | **married** 28:2,17 29:2 |
| 23:17,20 25:18 30:16 | 78:19 80:22 81:6,18 | 51:23 52:5 | 92:9,14 118:3,4 | 56:5 |
| 32:1 33:9 37:20 42:2 | 82:13,23 84:18 87:16 | **let** 12:22 51:15 86:22 | **Lowder** 20:14,18 22:7 | **matter** 124:11 |
| 45:18 48:5 51:9,12,18 | 88:21 90:11 93:12,22 | 103:9 113:21 | 120:4 | **may** 4:6,12,13,19 43:6 |
| 51:20 53:9,15,15 | 94:1,4,9,13 96:12,18 | **let's** 32:1 59:3 63:18 | | 117:1 125:9 |
| 58:16 60:8,20 61:16 | 96:22,23 99:17,22 | **license** 26:3,5,7,20 27:1 | **M** | **maybe** 19:15 96:22 |
| 61:17 62:2,23 65:19 | 100:1 102:3,21 103:5 | 47:3,7 | **M** 85:23 | **McNeal** 1:18 2:4 |
| 66:21 70:9,11,13 | 103:6,8,9 104:8,18 | **Lie** 105:1 | **machines** 56:22 | **mean** 15:5,13 16:2,4,14 |
| 71:15,20 72:3 73:10 | 104:22 105:7 108:5,9 | **lied** 99:23 100:6,8 | **made** 4:11 33:8 53:14 | 16:15 19:12,13,17 |
| 74:7 75:21 76:7 79:9 | 110:11,12,15,16 | 104:16 105:3 | 84:21 87:16 101:3 | 21:23 22:4 26:21 |
| 84:21 85:20 87:6 | 114:3,17 115:4,17 | **like** 15:17 23:6 30:10 | 108:17 | 35:23 38:17 50:19 |
| 88:22 89:18,19,19 | 117:21,21 118:8,9,9 | 30:21,21 33:11 43:6 | **maiden** 28:23 | 53:8,16 59:20,22 |
| 93:20 94:2 98:5,12 | 118:9,12 119:8,11,16 | 47:15 48:5 49:5,12 | **main** 72:7 | 60:11 70:11,17 81:11 |
| 99:10,15 101:11,17 | 119:18 120:1 121:7 | 52:11,12 54:20 57:23 | **mainly** 72:5 | 83:20 88:16 91:3 |
| 101:22 103:4,19,19 | 121:20 122:19 123:2 | 59:4 62:13 65:2,6 | **make** 6:13,15 11:17 | 94:2,2 95:11 98:16 |
| 104:10,12,14 106:18 | **knowledge** 21:10,13,20 | 69:5 70:13 80:9,13 | 18:7 23:13,16,17 | 99:23,23 102:22 |
| 110:2,5 112:15,23 | 22:8,17 30:2 95:15 | 80:15,17,18 82:9 | 31:5 43:17 51:12 | 104:5 105:3 108:8 |
| 113:21 114:8 119:9 | 102:4 117:7 121:5,14 | 85:23 101:1,6,15,21 | 62:23 74:8 88:6 | 114:17,18 115:2 |
| 123:7 | 122:3 | 104:8,13,15,15 | 97:20 98:5,9,12 | 122:15 |
| **Justice** 40:8 | **known** 38:14 | 111:11 114:4 | 103:5,11 109:19 | **means** 104:23 |
| **juvenile** 33:4 | **knows** 22:11 30:5 | **likely** 116:23 | **makeup** 72:11 94:15 | **medical** 44:16 82:7 |
| | 120:5 | **line** 29:11 | 94:19,20 | **medication** 110:2 |
| **K** | **K-L-I-N-N-E-R** 85:21 | **Lisa** 44:18 | **making** 98:6,13 110:4 | **medications** 6:21 |
| **keep** 6:22 15:9,16 | | **list** 17:11 31:5 | 110:5 112:19 | **meet** 31:15 109:19 |
| 70:12 74:12 76:9 | **L** | **listed** 12:19,21 13:3 | **man** 69:10 101:11,13 | **meeting** 71:21 |
| 101:9 | **Laborer** 48:6 | 81:21 115:20,20 | 109:23 | **member** 31:17 |
| **Kent** 3:10 25:4 85:11 | **lack** 8:15 | 116:22 117:3,10,20 | **Management** 2:18,20 | **memory** 43:11 |
| 119:23 | **lady** 55:18,20 | 118:7,10,13,14 | 7:20,23 8:9,13,15,21 | **mention** 17:10 |
| **kept** 71:1 101:20 | **Lafayette** 48:2 | **litigation** 36:20 | 9:1,5,14 10:2 11:23 | **met** 31:14 |
| **kicked** 109:20 120:16 | **Laffiter** 115:21 | **little** 5:12 13:9 45:22 | 12:6,9,12,14,19,21 | **middle** 1:2 98:1 124:20 |
| **kids** 27:22 100:1 | **Langley** 115:23 | 71:21 81:16 95:21 | 12:22 13:3 38:3 | **might** 14:23 41:5,6,12 |
| 109:13,17 | **Large** 1:17 4:8 124:6 | **live** 27:10,12,21 | 51:16 52:1,6 53:20 | 46:22 54:5 96:23 |
| **kin** 125:6 | 125:15 | **lived** 27:8,14,16 | 54:1,4,21 57:14,15 | 97:1,1 112:15 117:4 |
| **kind** 5:20 13:8 15:10 | **last** 7:3 13:6 28:16 40:2 | **lives** 27:20 29:15 | 57:21 58:2 61:6,19 | 122:15 |
| 32:1 70:3 74:22 | 41:2,20,21 42:17,18 | **living** 27:4 29:13 | 62:12,17 114:21 | **military** 70:9,10 |
| 110:4 | 67:13,19 68:6 73:21 | **LLC** 1:8,9 98:21 | 115:12 | **Mill** 50:3,8,16 51:9,23 |
| **Klimmer** 85:11,17 | 85:2 101:5 113:1 | 124:16,17 | **manager** 120:14 | 52:5 |
| **Klimner** 25:5 | **lately** 102:5 | **load** 76:6 | **manner** 4:20 125:8 | **mind** 23:16 37:5 |
| **Klinner** 3:10 25:6,7 | **later** 71:22 96:23 | **loan** 42:12,13,14 | **many** 33:20 53:23 | **mine** 20:14 28:16 |
| 85:13,21,22 89:16 | **Law** 1:18 2:9 | **Logging** 47:16,21 | 72:14,16,16,19 75:8 | **minute** 38:10 52:7 |
| 119:23 120:2 | **Lawn** 111:8,8,14 | 49:23 50:6 52:3 | 75:8 89:11 95:2 | **missed** 110:13 |
| **Klinner's** 99:1 | **lawns** 111:10,11 | **long** 27:8,12 28:2 29:8 | 112:14,21 | **Monday** 89:23 90:5,7 |
| **knew** 21:23 22:1,3 38:6 | **lawsuit** 5:15,17 14:15 | 31:13,15 33:18 35:1 | **March** 86:7,8,9,11 | **money** 110:4,5 120:18 |
| 38:7 - | 16:13 18:1 22:9,12 | 35:15,20 48:7,23 | 111:1 | **month** 111:3 |
| **know** 5:18 6:2,5 7:5,6 | 30:6 37:16,19 42:4 | 51:9 55:6 65:9 86:4 | **Marijuana** 7:15 | **months** 33:20 35:2 |
| 10:20 12:8,17 15:16 | 44:11 59:21 99:18 | 90:9 111:23 | **mark** 8:7,19 13:20 24:5 | 112:2 |
| 17:3 18:18 19:8,20 | 109:3 120:6 121:22 | **look** 23:1,4 58:12,17 | 58:9 64:6 66:5,21 | **more** 22:10 76:2 93:17 |
| 20:4 22:2 29:9,11,12 | **lawsuits** 42:6,8 44:22 | 97:18 | 76:13 78:6,11 83:11 | 110:9 |
| 29:21,21 30:4,16 | 110:14 | **looked** 25:18 67:7 | 85:10 90:14 91:13 | **morning** 14:7 23:12 |
| 31:23 32:11,22 36:9 | **lawyer** 19:21 23:8 81:5 | **looking** 9:7 10:5 63:1 | 95:20 97:11 99:5 | 71:20 73:23 86:11 |
| 38:2 39:6,12 41:5,6,7 | 96:19,20 99:17 | 67:11 80:5,12 | 100:12 105:15 | 90:1 102:11 |
| 41:13 42:4,23 43:3,8 | 116:12 119:12,13,13 | **looks** 47:15 59:4 80:9 | 116:10 | **mouth** 88:8 100:2 |
| 43:9,10 44:18 45:13 | 119:16,19 121:20,21 | 80:12,15,17,18 85:23 | **marked** 8:4,17 13:18 | 101:19 |
| 48:8,21 50:5 51:13 | 122:15 | 91:19 | 24:3 58:7 64:4 66:3 | **moved** 95:16 |
| 52:6,11,12 53:5 | **Lee** 33:1 | **looms** 50:11,12 | 66:19 76:11,15 78:4 | **MRO** 80:1,22 81:2,12 |
| 55:13,18,19 56:10,11 | **left** 12:21 13:1 73:2 | **lose** 39:2 | 80:23 83:9 85:8 | 82:14,21 83:18 89:21 |
| 60:17 62:6,9,11 | 76:2 84:23 102:13 | **lost** 109:13,20 110:6 | 90:12 91:11,14 96:2 | 92:9,14 118:3,5,10 |
| 69:23 70:10,12 71:1 | **legal** 108:2 | **lot** 27:11 110:2 | 97:9 99:3 100:10 | 118:13 |
| 73:3,10,11,14,18 | **less** 97:2 | **Louis** 80:1,22 81:2 | 105:17 106:7 116:8 | **much** 32:21 34:20 |

| | | | | |
|---|---|---|---|---|
| 55:19 112:19 | observed 95:17 | 27:5,11,15,17 29:14 | page 64:11,13 | 35:11 |
| **Municipal** 40:12 | **occasion** 75:4,5 | 29:15 30:8 32:10 | **pages** 125:1 | **please** 103:8 |
| **Myracle** 28:5,7,10 | **occasions** 26:17 41:11 | 40:12,14,15 43:23 | **paid** 85:6 94:1 111:1 | **pocket** 85:7 |
| **M.D** 3:10 | **October** 112:4 | 46:13 48:2 120:10,11 | 112:12 | **point** 56:7 65:19 |
| | **off** 43:17 49:1 71:16 | **Opportunity** 97:6 | **paper** 90:23 91:4,5,10 | **policy** 3:6 66:17,22,23 |
| **N** | 74:5 85:1 98:16 | **order** 19:10 112:11 | 118:10 | 67:3,9,17,17,21 91:8 |
| **name** 5:11 9:22 13:10 | 101:2,4,21 110:10,14 | **ordinary** 88:7 | **papers** 23:5,7 118:13 | 91:9 106:10 108:19 |
| 27:23 28:23 29:16 | **offered** 4:13 | **other** 4:10,14,20 7:7,16 | **paperwork** 17:15 22:4 | **Poplar** 31:12 |
| 33:10 48:21 52:20 | **office** 86:18,20 87:6 | 10:16,23 13:2,14,16 | 23:1,3 86:19 | **positive** 7:9,14,16 9:2 |
| 58:21,22 62:20 63:2 | 99:2,13 | 14:11,16 17:4,5,20 | **paragraph** 67:13,19 | 10:6 20:2 36:15 |
| 67:14 68:6 73:5 80:9 | **officer** 7:12 36:17 37:8 | 18:2,19 19:9,22 | 98:2 | 51:22 53:3,13 59:7 |
| 80:12,15 81:12 82:5 | 37:9,15,18,22 38:2 | 25:14 26:16,17 28:17 | **Parkway** 48:2 | 60:4 61:7,10,13 62:1 |
| 82:12 90:22 92:18 | 38:13,23 39:8 82:8 | 28:20,20 29:13 30:8 | **parole** 7:12 33:17,18 | 62:16,18,21 63:4,7,8 |
| 105:4 117:20 | 118:22 119:22 | 41:1,11,14,22 42:6 | 34:22 35:1,18,20,22 | 63:10 67:5 72:1 |
| **named** 110:20 | **Offices** 1:18 | 43:20 44:20 45:1,3,5 | 36:17 37:8,9,15,18 | 80:14,19 83:2,20 |
| **names** 13:14 28:4 31:3 | **Off-the-Record** 63:13 | 45:17,17 46:2,22,23 | 37:22 38:2,13,23 | 86:22 87:10 91:22 |
| 31:7 116:16,22 | 63:20 86:3 123:9 | 48:18 52:8,19 59:8 | 39:8 55:11,13 | 92:9,14 94:8 95:9 |
| **need** 4:11 30:16 37:11 | **often** 50:18 | 60:22,23 67:15 68:15 | **part** 97:23 118:15 | 98:3 99:21 106:9,21 |
| 84:16 104:9 | **Oh** 10:15 16:7 19:6 | 69:8 70:4,22 72:4,7 | **parties** 4:3,17 5:1 | 107:3,5 108:7 115:8 |
| **needed** 37:9 | 25:19 33:13 50:4 | 73:16,16,20 74:3 | 125:4,7 | 121:12 122:21 |
| **negative** 11:6 83:20 | 52:18 98:18 106:2 | 75:18 80:3 81:5,13 | **party** 4:14,20 | **potential** 107:7 113:20 |
| 98:22 | 118:21 | 81:17 82:14,18 92:23 | **pass** 51:4 57:18 111:17 | 114:2,19 |
| **neither** 104:18,19 | **okay** 8:19 9:7,15 21:1 | 93:8 94:10 102:14 | **passed** 51:5 | **Powell** 44:18 |
| 125:6 | 22:2 26:23 27:17 | 104:6,11 106:22,22 | **past** 59:18,19,22 | **pre** 59:4 |
| **never** 37:5 56:5 72:9 | 28:17 30:5 33:9 | 107:4,6 113:10,13,15 | 114:18 | **preemployment** 50:21 |
| 82:12 91:17 | 38:19 40:5,23 43:5 | 113:18,20 114:2 | **pay** 43:17 44:6 69:6 | 54:11 57:4,16 59:5 |
| **New** 31:12 | 43:14 44:4,14 58:18 | 115:6 116:6 121:16 | 89:3,9 93:22,23 | 108:23 111:12 |
| **next** 33:14 65:11 | 62:8,12,15,19,23 | 121:19 122:7 | 109:18 | **preparation** 24:10 |
| 115:17 116:7 117:20 | 63:12,19 69:4,6,9,22 | **others** 69:19 101:8 | **payment** 43:16 | 25:15 |
| 118:7 119:23 | 71:18 79:6,20 82:6 | **ourselves** 5:12 | **payments** 43:17 | **prepare** 19:19 |
| **nicknames** 14:23 | 85:4,19 86:2 87:12 | **out** 14:23 18:8,9 19:18 | **pending** 45:14 | **PRESENT** 2:11 |
| **nine** 29:9 120:9 | 89:15 90:2 101:1 | 33:16,21 34:22 35:18 | **people** 65:2 72:7 104:7 | **pressure** 110:3 |
| **nobody** 107:14,14 | 104:2 106:3,18 | 39:22 40:8 41:1 | **people's** 104:11 | **previous** 24:20 |
| 114:18 | 116:10,20 117:17 | 43:16 48:1,3,11 | **performance** 88:13,15 | **previously** 29:2 |
| **None** 41:3,16 | 118:11,21 119:1,11 | 51:20 56:7,11,15 | 88:16,17 104:8 | **prior** 12:20 27:10 |
| **North** 2:9 | **old** 28:8 33:2 70:10 | 61:18 64:1 69:12,13 | **period** 49:20 51:7 | 47:13 59:9 78:22 |
| **notes** 15:5,22 16:5,8 | **once** 44:6 65:18 | 69:15 71:13,20 72:4 | 78:18 | 113:3 |
| **nothing** 5:8 23:14 | **one** 2:10 8:11 9:6 17:10 | 72:8,12 74:1,3 75:4,5 | **Perry** 73:7,9,10 | **prison** 32:23 36:14,23 |
| 30:10 62:18,20 68:11 | 18:3,11 27:12 28:16 | 75:6,20,22 76:2 85:7 | **person** 81:12 | 38:7,21 39:9 41:2 |
| 87:23 88:6 103:10 | 41:23 42:12 44:15,17 | 86:14 88:2,6 93:8,14 | **personal** 84:5,6,9 87:4 | 48:10 56:7,11,15 |
| 124:10 | 45:17 50:19 51:3 | 93:16,18,20 94:4 | 87:5 | **probably** 5:19 59:5 |
| **notice** 2:21 3:15 13:21 | 57:18 58:20 62:12,17 | 95:2 100:2 101:16,22 | **personnel** 95:10,11 | 110:17 112:22 |
| 99:6 110:22 120:15 | 64:13 67:4 70:6 | 102:9 109:2,20 110:2 | **Phillips** 1:16 4:6 124:4 | **probation** 33:16 |
| **notices** 109:15 | 71:16,20 72:6,7,20 | 111:10,11 112:7 | 125:13 | **Procedure** 4:5 |
| **notification** 3:13 96:5 | 73:23 75:10 77:17 | 114:21 120:16,17,23 | **phone** 16:16 | **produced** 14:14 17:12 |
| **Ns** 86:1 | 79:22 80:18 82:5 | 125:4 | **phonetic** 115:21 | 17:13 105:14 |
| **number** 9:16,18 25:22 | 84:20,23 85:7 86:14 | **outcome** 36:20 | **physician** 84:6,9 | **Products** 48:22 49:12 |
| 26:5 43:13 58:23 | 89:18 94:16 95:7 | **outside** 27:14,17 | **place** 2:10 11:7 12:14 | 49:17 52:4 |
| 61:6,9,20,23 63:5 | 99:1 100:16 101:10 | 109:17 | 13:3 27:11,17 48:15 | **pronounce** 80:11 |
| 64:7 67:12 76:21 | 104:2,19,21 107:19 | **over** 7:5 12:23 29:9,22 | 50:2 56:10,15 59:8 | **proof** 98:19,22 |
| 80:6 84:2 119:23 | 109:5 110:19,20 | 32:22 42:23 49:1 | 116:3 | **provide** 100:3 |
| 120:4,9 124:22 | 111:17 113:1 115:3 | 51:10 59:21 74:22 | **placed** 6:4 | **provided** 4:15,21 24:8 |
| | 120:23 | 79:9 94:6 109:15 | **places** 52:8 115:19 | 49:17 52:4 |
| **O** | **ones** 10:17 | 113:22,23 | **Plaintiff** 1:6 2:3 124:13 | **pull** 76:6 |
| **oath** 6:4 | **only** 26:23 58:10 60:21 | **overtime** 94:7 | **plaintiff's** 3:18 8:7 | **pulled** 86:20 |
| **object** 18:16,23 37:3,6 | 72:5 95:15 101:13,13 | **own** 76:7 84:5,6 85:6 | 117:1 | **Pulling** 50:11 |
| 60:2 78:9,23 92:3 | 103:1 | **owned** 48:15 | **plan** 43:16 89:16 | **purpose** 4:14 |
| 107:23 115:1 | **onto** 30:17 | | **plant** 56:20 | **pursuant** 1:14 4:4 |
| **objections** 4:10,10 | **Opelika** 2:22 24:12 | **P** | **plea** 32:17,18 34:14,15 | 67:16 |
| | | | | **put** 39:22 40:4 50:11 |

Deposition of Robert Cannon

50:11 71:15 101:16
104:7 109:16 114:14
putting 113:6 114:12

**Q**

question 4:11 6:11,12
6:15,18,19 10:19
12:23 13:23 16:3
18:17 19:3,16 21:8
33:15 37:4,7 38:17
58:15 61:11 67:2,18
79:9 98:4 105:21
109:8
questioned 81:20
questions 4:10 5:17 6:9
6:10 16:16 18:5
47:12 103:2 119:20
quick 63:15
quite 16:3

**R**

R 80:16
race 21:19 71:4 74:20
87:13 100:17,19,23
102:14 103:21
racial 72:11 94:15,19
raised 74:11
raising 69:20
random 50:23 54:13
57:2 58:4
randomly 51:2
range 5:19
Rannon 80:10
rate 69:6 89:9,10 93:22
94:1,4,12
rates 94:9,9
read 110:10,14
reading 125:4
reads 106:18
ready 18:13,21 19:10
22:21 23:1 101:14
realize 13:8 75:19
95:20
really 74:4,4
reason 30:15 65:1
84:21 102:23 104:16
reasons 45:1 92:7,12
92:23 104:2
recall 9:13 13:5 14:20
15:4 22:6 26:18 32:4
38:1 41:3,6,16 52:2
52:23 53:19,19 57:13
65:16,17 81:11 123:6
receipt 3:4 66:6
receive 66:13 80:2
received 109:14
recess 24:1 93:6
recognize 76:15 83:14
85:12,14 87:4 122:15

record 13:10 16:9
85:20 99:10
recorded 16:17,21
recordings 16:12,14
17:5
records 95:12
recovery 42:14
Red 13:13
references 114:20
refused 91:20
regard 103:22
regarding 117:18
regardless 4:21
regards 21:2 32:12
37:19 108:16 113:12
113:19 117:22 119:5
120:2
regularly 30:23
relate 16:13
related 21:18 102:15
Relations 118:16,18
released 39:16
remember 14:8 26:23
31:4,7 32:7 33:19
34:11 41:20 43:22
46:6,7 50:1 51:19
52:8,13,13,20 55:5,7
55:8,15,16 56:9,10
56:14,17 67:6 68:9
81:11 102:20 103:8
116:3
rent 44:5,8
rep 105:4
repeat 10:19 21:8 37:1
82:17
repo 39:20,21 109:23
110:1
report 2:19 3:12 8:8,20
9:8 91:15,23
reported 124:7
Reporter 1:16 4:7 96:1
124:5 125:14
REPORTER'S 124:1
representative 118:2
120:9,11
representing 4:3,17
5:14
request 24:21
required 77:3
requiring 77:7
reserved 4:12
resign 8:14
resolved 45:15
Resource 52:17,22
56:13,16,18 57:12
responded 87:1
response 20:2 37:23
51:22 53:4,13 59:7
63:4,7,11 67:5 80:14

91:22 94:8 95:9 98:3
99:21 106:21 107:3,5
108:7 115:8 121:12
122:21
responses 32:6 47:15
51:14 115:19
restrictions 36:1,4
result 11:5 25:4 39:13
40:6 83:2,21 85:16
results 3:8,9 9:19 11:11
24:18 25:8 36:18
77:15,16 78:7,12
79:1,4 81:3,7,15,20
82:1,14,20 83:12,14
83:23 85:16 86:5
92:15 93:1 100:7
106:11 118:5 125:8
Reuben 20:14,18 22:7
120:4 121:17
review 22:21,23 25:15
82:8
reviewed 24:10
revoked 26:20,21,22
47:8
rid 104:5,14
right 10:3,7 17:1 18:10
18:12 22:13 30:19
35:16 38:16 40:19
41:9 47:18,19 48:12
53:2,19 59:6,7 61:14
63:1,9 67:10,22
69:10 78:21 80:10,14
80:20 83:21 92:1,19
92:22 94:17 96:11
97:23 100:5 102:21
103:3,10 106:16,20
107:3 108:15 113:17
117:8,9 119:1 120:7
rights 3:15 99:7
ring 118:17
road 29:22
robbery 32:16 33:23
34:1,7
Robert 1:5,14 4:4 5:5
9:22 13:11 43:2 63:3
80:9,13 124:8,12
roll 63:18
Roto-Rooter 116:2
route 69:7,12,16 71:14
72:8 74:2,4 76:7,10
89:14 93:9
Rules 4:5
ruling 4:12
run 41:18 48:5 71:12
Russell 64:21 65:13
68:5 70:6,8,19,22
71:19 73:22 74:12
87:9,11 101:20 119:9

**S**

SAITH 123:14
same 4:22 6:5 87:2
93:13 94:12 125:5
sample 9:9 77:12,16
sat 69:14
saving 109:14
saw 79:13 88:1,4 115:9
saying 16:2 18:8 39:3
62:5,21 69:20 71:7,8
87:10 90:18 91:1,7
98:9,11 105:12 106:8
108:10 113:14 115:2
122:20
says 10:10,12 118:14
schedule 89:21
school 46:12
screen 3:10 9:14 36:7
36:11 39:2 62:17,19
62:21 84:11,14,17,22
85:5,11 86:21 87:2,7
87:10 98:20,23
104:18
screening 71:23
screens 22:3 36:6
second 30:21 35:8
39:17 79:23 80:15
83:5,17 84:22 89:20
93:4 98:23 112:23
123:7
section 64:15
security 9:16,18 25:21
45:8 58:23 59:2 61:6
61:9,20,23 63:5
76:21 80:6 84:2
see 30:23 51:15 59:3
63:10 68:22 69:3
73:4 77:15,19,20,21
78:2,17,20 79:1,10
91:21,21 92:4 96:20
100:4
seeing 95:17
seek 12:5
seems 43:6
seen 8:9,11,21,23 11:19
13:22 14:1 22:4
58:19 62:13 66:7
78:16,18,22 90:16,19
90:20 91:15,17 95:10
95:12 97:13 99:7,8
99:15 100:14 102:5
110:19 116:13,15,16
116:18,21
Selling 48:19
send 36:13 79:18 80:22
sense 6:13,16 74:8
sent 13:21 18:9 79:17
99:12 107:1,6

sentence 32:19 34:16
35:13
serve 32:21 34:18
35:15
Service 111:8
Services 1:8 5:14 7:6
10:18 14:19 15:3,6
15:12,19 16:1 47:14
52:10 60:15 64:9
73:12,18 78:1 95:13
99:19 107:9 122:9
123:4 124:15
set 125:4
seven 119:23
Sherman 115:23
Sherry 17:17 24:22
she'll 39:5
shift 112:16
shop 48:6
shouted 32:16
show 8:6 23:11,11
36:17 89:18
showed 23:12 89:19
92:9
showing 92:14
shown 14:7
shows 9:9 10:6 11:15
80:19,21 83:20
sic 85:11 111:14
sign 41:18 90:18,22
91:4,5,7,9,20
signature 5:2 64:11
66:10 76:18 90:21
91:2 92:1,4,21,21
96:7 97:16
signed 82:7,11,12
91:18
signing 125:4
sill 48:17
since 10:16,22 11:8
12:20 13:1 31:14
39:15 41:1 60:7 61:2
61:5,17 110:6
sir 5:22 20:2 82:17
situated 88:23
situation 70:23
six 118:14
slander 17:19
slandered 104:22,22
105:2 106:23
slanderous 17:22 18:10
smart 88:8 101:19
Smith 2:8
smoking 69:15
social 9:15,18 25:21
31:17 45:7 58:23
59:2 61:6,9,20,22
63:5 76:21 80:6 84:2
sold 48:14

Deposition of Robert Cannon

April 10, 2008

Page 8

Solutions 11:3 111:22
  113:4 116:2
some 5:16 16:2,7 18:5
  39:21 47:12 114:14
  114:14 116:22
  118:13
somebody 16:15 70:1
  71:13 74:8 76:10
  107:9,15 114:16
  123:1
someone 82:11
something 17:13 34:4
  60:5 103:8 110:7
  122:19
sometime 56:12 111:2
sometimes 6:10 15:14
  75:6 112:15
somewhere 26:13
  102:8
soon 116:5
sooner 76:2
sorry 47:23 70:15
  71:18 105:21 110:13
  122:23
sound 53:1 68:7
sounds 33:11
spare 75:11
speak 5:7 124:9
Speaking 68:11
specific 21:18 68:11
  112:5
specimen 9:11
spoke 70:23
spot 56:22 73:2
spouse 55:18
spray 111:10,10,10
Springs 31:12
St 80:1,22 81:2 82:14
  82:21 83:18 89:21
  92:9,14 118:3,4
Stabler 57:22
Staffing 11:3 111:22
  113:3 116:2
Standard 120:20
Stanford 120:20,21,22
  121:13
start 12:22 63:21 65:19
  79:9 101:12 113:21
  116:6
started 52:9 56:13
  60:13 64:2 65:15,20
  65:22 111:5 116:7
state 1:17 4:8 13:9
  124:2,6 125:14
statement 25:11
statements 15:21
  108:17
STATES 1:1
Statute 4:15,21

stay 120:18
stays 90:9
still 35:21 42:19 45:14
  74:1,3 87:9 102:3,10
  111:1
stipulated 4:2,16,23
stipulation 1:15 4:1
stop 41:18 55:1 57:12
stopped 50:6 87:6 88:1
  89:19
stops 75:3
store 69:14 88:2
Stratton 29:7
streets 120:17
stress 110:3
stressed 110:2
stuff 23:5 30:10,21,22
  111:11 120:17
subject 38:6,21 54:8
  56:23 58:4 67:15,20
  67:20
submitted 17:16 65:9
  105:23
substance 3:8,9 25:9
  78:13 83:12
sued 110:8
suffering 110:6
Suite 2:5,10
Summers 20:8 21:1
  75:17
Sunflower 1:8 98:20
  124:16
supervisor 57:20 89:6
  117:11
support 14:18 15:2
  21:6 22:18 117:1,4
  120:12
supporting 14:15 122:3
supports 21:10 117:7
  117:23 121:5,6
supposed 69:5 82:10
sure 11:17 18:7 23:13
  23:15 39:9 51:12
  62:23 88:6 93:5 98:5
  98:9,12 103:5
suspended 26:8,14,16
  47:7
sworn 5:7 124:9
system 90:10

———————
T
———————

tag 41:23
tainted 103:13,16,18
  103:18
take 7:18,22 9:4 15:5
  15:21 16:5,8 19:11
  19:23 44:5 49:15
  50:15 57:16 63:14
  77:7 84:5,16,20,22

84:23 87:7 89:15,17
  90:3,5,7 93:3 111:12
taken 1:14 4:4,6 6:21
  10:16,22 11:7 20:1
  24:1 82:3 83:1 93:6
taking 102:10
talk 12:18 16:4 18:20
  19:12,22 20:11 21:1
  37:15 52:7 57:11
  68:14 73:18 81:1
talked 15:23 16:7
  18:19 19:4,9,19,21
  37:18 41:15 44:23
  45:18 52:3,4,5 81:6,7
  81:12,17,19 92:7,12
  92:16 96:18 97:21
  98:8,10,14,18 100:17
  102:16 103:14,22
  113:15 117:6,17,21
  118:3,6 119:12 120:1
  120:5 121:10,16,19
  121:21,21 122:5,7,10
  122:12 123:5
talking 16:6 18:20
  23:22 45:22 59:23
  60:1 72:13 77:19
  85:3
taped 16:18 17:4
taxes 94:4
teed 74:5
tell 6:14 9:1 19:3 21:22
  34:6 36:13 37:9,11
  37:22 39:19 42:11
  43:8 44:3 62:7 64:17
  64:20,22 68:21 69:22
  70:9,11 74:17 84:18
  86:8 87:21 90:5,6
  100:21 101:8,19
  114:5,6,8,9 117:11
  119:2
telling 6:23 74:11
  96:14,15 107:9
tells 70:8 86:20
temp 52:12,14,18,19
  112:1
temporary 52:11
ten 32:20 60:1
terminate 72:2 87:11
terminated 22:1 79:15
  95:1 98:21
terminating 3:11 87:14
  90:15
termination 2:22 23:5
  24:13 91:6
terms 23:2 39:11
  103:12,14,15
test 2:18 3:7,8,9,13 7:5
  7:8,9,16,22 9:4 11:5
  11:8,11,14,19 12:1

24:23 25:3,9 36:18
  36:21 37:10,12 38:3
  38:8 39:7,11 43:12
  50:21 54:11 57:4,16
  59:5,21 60:18 61:5,8
  61:10,14,18,21 63:8
  68:15,16 73:19 76:14
  77:4,8,16,20 78:8,13
  79:2 80:1,2,3,20 81:2
  82:3,3,10,10,14,16
  82:20 83:2,6,13,15
  83:17,23 84:3,5,7,10
  85:17 86:6 89:15,17
  89:20 90:4 92:8,13
  96:5,11,16 100:7
  107:11,17 108:17,23
  111:13 114:22 115:4
  115:11,12
tested 9:2 38:12,15
  49:3 51:2 60:4 62:1
testified 5:8 60:3 78:19
  119:7,9,10
testify 122:17
testimony 6:4 60:21
  61:16
testing 3:2 9:8,19 24:14
  24:18 25:1 50:23
  56:23 57:2 58:14
  107:21 118:5
tests 10:16,20,22,23
  14:9 38:20,22,23
  49:16 50:15 51:4
  54:8,13,15 57:6 58:4
theft 35:8 39:17
their 31:7 69:17 82:16
  109:14 114:22
  115:14
thereof 125:8
thing 85:2 101:5 104:3
  105:14
things 15:15 67:15
  68:23 74:15 88:23
think 14:12,23 17:10
  21:5,9,13,15 22:7,16
  57:13 59:8,11 65:11
  68:8 73:23 82:1
  100:7,18,21 102:1
  103:10,14,15,19
  105:2 107:13 113:7
  114:15,19 115:13,18
  120:4,11 121:13,23
  123:1,7
third 30:21 34:7
though 6:2 55:21 56:5
thought 74:15
thousand 55:9 60:5
threatening 109:16
  110:9
three 14:9 27:22 31:16

69:12,13 72:18,22
  75:10 94:16 95:4,7
  97:1 100:1
through 7:12 31:2 32:2
  52:14 65:14,16 68:1
  69:11 72:10 74:2
  75:3,23 84:6,7 89:14
  95:15 97:18 112:6
  113:3 116:2
thrown 40:8
Thursday 1:19 86:16
  88:1 124:23
Tiana 28:7,12,20
tie 53:6
till 112:4
time 4:12,12 9:13 10:3
  11:18,22 13:5,6
  14:20,21 22:6 26:23
  32:2,4,5,21 33:2
  34:18 41:2,12,23
  48:9 49:20 51:7
  53:22 54:3,9 55:2,6
  55:21 59:6 60:9,21
  70:6,7 72:23 73:21
  74:10 79:13 93:2,7
  93:10 96:15 101:6
  102:9,11,18 109:4
  110:6 111:19 116:4
  119:14 121:1,23
  122:1 123:6
times 44:20 51:3 53:23
  54:2 60:23 69:13
tired 69:19 70:4,20,21
  72:6 88:7 104:10,12
Tobi 5:11
Tobias 2:8
today 5:17 6:3,5,23
  14:5 18:14 19:11,20
  21:4 22:22 31:3
  78:22 106:4 122:8
  123:5
told 5:20 8:16 11:22
  21:3 22:10,12 30:6
  37:8,20 41:7 62:18
  65:1 70:4 71:16
  84:14,19 87:11 88:20
  89:23 90:3,8 91:6
  92:17 107:14,15
  108:12,14 114:8,18
  120:6
Tom 118:7
Toomer 27:7,21
top 76:22
topics 5:19
traffic 41:17,22 42:1
  75:7
training 46:22 47:1
  65:14,16
transcript 125:2

treated 48:19 72:21
  99:22 100:5
treatment 109:5
Trey 91:19
trial 4:19 32:17 34:14
  35:11,12 122:13
trick 6:9
tried 39:20
trip 51:11
truck 21:14 73:1,4,23
  74:9 75:12 85:2
  86:15,16,17,19 88:3
  88:9 95:16,17 101:3
  101:5,11,14,16,22
  102:5,6,12
Trucking 115:23
trucks 29:19,20 47:10
  50:13 56:19 75:8,8
  75:10,11
true 108:13 111:14
  125:2
TruGreen 111:8,21
  112:17,19
truth 5:7,7,8 6:23
  21:17,17 108:9 124:9
  124:10,10
truthful 108:9
try 111:2 113:5
trying 6:9 19:18 51:11
  51:12,20 53:6,9
  60:20 61:17 62:2
  88:23 94:22 101:2,15
  101:21 109:23 116:1
  123:1
twice 54:2 109:18
Twin 115:22
two 7:3 27:9 28:3,13
  32:22 35:2,16,16
  51:3 54:2 55:9 60:4
  64:11 69:12,13 71:22
  72:1 74:1,9 76:9 86:1
  86:21 96:22 97:1
  102:1 111:5
type 47:1 56:18
typed 78:14 98:1
typically 89:11

**U**

Uh-huh 20:2 51:22
  53:3,13 59:7 63:4,7
  63:10 67:5 80:14
  91:21 94:8 95:9 98:3
  99:21 106:21 107:3,5
  108:7 115:8 121:12
  122:21
unclear 38:18
under 6:4
understand 6:2,13,15
  11:17 16:3 62:2

79:23 106:20,20
understanding 7:19
  83:5
understood 6:19 53:5
unemployment 12:5
  14:10 24:17 45:23
  46:1,3 118:19 119:3
UNITED 1:1
unlawful 25:12
until 51:17 60:13 86:7
  86:7 95:1 111:21
urinal 77:12
urinalysis 76:14 77:4,7
urine 3:7 9:11 36:16
  67:16,20 77:12,16
  82:3 104:3,14,17,17
  104:19 106:9 108:14
  108:17
use 22:17 49:8 54:17
  57:8 60:16 61:2
used 4:14,20 7:2 11:12
  13:6 20:20 48:1
  59:12,15 60:9,21,23
  61:4,17 104:3
using 49:19 51:6
usual 86:19
U.S 124:19

**V**

V 3:10 85:11
validity 92:8,13
various 15:15
verge 120:16
verification 2:22 24:13
  24:19 25:10 78:13
  83:13
verify 120:15
very 38:18
vet 70:10
violate 91:9
violated 106:10 108:18
violating 91:8
violation 55:11,13
violations 41:17 42:1
voice 69:20 74:11
vs 1:7 124:14

**W**

W 47:22,23 49:2,6,22
  50:6 52:3
wages 45:20
Wait 38:10
waiting 101:12
waived 4:19 5:3 125:5
waiving 4:22
walk 32:1
Wallace 115:21
Wal-Mart 112:7,9
  113:4

want 11:10,17 18:7,18
  19:20 47:12 57:11
  62:23 63:14 71:13
  81:5,18 96:18 97:18
  98:5,9,12 103:4
  117:2 119:11 121:20
  122:14,17
wanted 33:9 122:13
wanting 76:4,6
wants 19:8
Ward 27:11
wasn't 33:7,19,20
  36:15 37:21 55:20
  72:23 76:8 82:9,16
  84:19 91:6 99:22
  100:4 104:19 119:19
Waste 1:9 2:18,19 7:19
  7:22 8:8,12,15,21 9:1
  9:4,14 10:2 11:23
  12:6,9,12,14,19,21
  12:22 13:3 38:3
  51:16 52:1,6 53:20
  53:23 54:3,21 57:14
  57:15,20 58:2 61:5
  61:19 62:12,17 98:20
  114:21 115:12
  124:17
way 37:5 84:16 94:5
  95:15 101:16,17,22
  104:4,13 106:17,18
  110:11,17
ways 100:18 102:14
  106:22,22
Wednesday 86:10,11
  86:15 87:22
weeds 111:11
week 69:13 88:20
  93:23 96:22 112:14
  112:21,23 113:1,1,2
  116:7
weekend 112:16
weeks 72:1 86:21 88:19
  96:22 111:5
weld 56:22
well 9:15 14:22 15:14
  17:13 18:5 19:15
  21:23 22:3 26:23
  36:1 39:1 52:3,16
  59:20 60:11 62:12
  70:9 71:10 72:14
  74:6 79:15 80:12
  81:17 82:5 84:20
  87:5,8,9,11,12,22
  92:17 95:8,12 99:9
  101:1,9 102:23
  103:19,23 104:2
  105:3 108:18 112:22
  114:7 116:17 118:19
  120:14

went 9:6 11:3 48:2,10
  50:19 52:1 53:21,21
  55:3 57:13,15 69:4
  73:13,14 74:7 85:5
  87:3 88:2,8 89:15
  96:10 109:23 110:1
were 6:6 8:12,12,13
  14:9 15:18 16:6 24:9
  32:3,11,11,23 33:2
  33:16,18,21 34:3,12
  34:22 35:3,9,18,20
  36:9 39:15 40:3 41:4
  41:13 42:1 48:9,14
  49:3,5,12,19 50:15
  51:2,6 54:8,17,20
  55:6 56:5,19,23 57:4
  57:23 58:4 59:22
  65:10 66:16 67:8
  68:1 70:18 72:16,19
  73:17 74:16,16,18,23
  75:8,11 76:4 77:8
  78:20 89:21 90:6
  93:9,10 94:5,10,10
  94:12,19 95:22 96:4
  96:4 100:6,7,18,21
  101:23 102:7 103:13
  103:16,20 104:21
  105:2 106:23 107:10
  107:15,17,19 108:21
  111:21 112:5,5,9,12
  112:14 114:20 116:1
  116:5
weren't 93:12 108:22
we'll 12:17 52:7
we're 6:3 7:5 18:6
  69:21 73:18 88:21,22
  88:23
we've 23:22 44:22
  45:22 52:3,4,5 98:10
  113:15 117:6 121:10
  122:7
while 5:12 15:5,11,18
  48:9 49:2,8,11 50:15
  54:17 57:8 58:1,4
  60:16 67:7 73:17
  74:18 77:21 78:2,17
  78:20 79:10 80:10
  89:3
white 72:19,21 85:3
  94:16 95:8 117:10,12
  117:15 121:2
whole 5:7 124:10
Wholesale 115:22
wife 20:4 27:22 28:23
  31:14,15 100:1
  109:17,17
wife's 27:23
Wilkes 40:11
William 57:22 73:7,9

73:10
Willie 20:8 21:1 75:17
witness 5:1,2,6 18:23
  19:6,12,17 25:19
  33:7 40:14,18 43:5
  43:14 44:23 62:4,8
  108:3 125:3
wood 48:19,22 49:11
  49:16 52:4
word 84:23 103:18
words 39:21 71:8,22
  72:2 84:18
work 8:15 11:3 20:9,18
  20:21 29:4,6,11,18
  48:5,7,11,23 49:22
  50:2 51:9,23 52:14
  52:19,22 53:17,20,21
  53:22,23 56:8 59:9
  59:13 73:13,14 83:3
  86:4 88:16 89:11,22
  90:3 93:17 102:10
  103:20 104:6,7
  111:23
worked 7:19 12:15
  13:4 15:6,11 29:8,23
  43:16 47:13 48:17
  49:2,8,11 50:16
  51:15,21 52:6,8 54:2
  54:3,9,22 56:20 57:9
  58:1,5 59:9 60:17
  67:9 73:11 75:9
  77:21 79:11 82:23
  88:11 89:4 94:6
  111:19,22 112:1
  117:12
workers 46:9
working 15:19 49:6,16
  50:6 51:17 54:18
  55:1 56:10,13,14
  57:12 63:21 69:16
  73:17 74:18 78:2,17
  78:20 94:10 101:23
  111:4,5,7 112:7,14
  112:21
workman 50:9,10
workplace 3:6 66:17
  66:22 67:3,9
works 73:11 102:9
write 15:21 105:12
written 105:7,9,10
wrong 100:4,4

**Y**

yard 48:6
yarn 50:12
yeah 16:4,22 19:7,17
  20:13 27:16 39:4
  40:14 41:18 53:3
  55:19 58:22,22 59:2

| | | |
|---|---|---|
| 61:15 62:6 71:9 | 92:5 106:13 | 4/2/07 24:23 |
| 77:10 79:22 86:12 | 15 3:13 95:23 96:2,15 | 40 94:6 112:22 |
| 88:18,19 90:22 91:21 | 151 1:16 4:7 124:5 | 401(k) 109:18 |
| 98:1,12 99:14 104:1 | 16 3:14 27:11 97:9,12 | 42 89:12,13 |
| 108:8 109:12 110:22 | 17 3:15 33:3 99:3,5 | 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 9:16 |
| 117:16 118:23 | 1710 1:18 2:5 | 25:23 76:23 |
| year 33:19,20 34:21 | 18 3:16 100:10,12 | 426-B 27:7,21 |
| 40:2 41:20,21 42:17 | 1819 2:9 | 428 76:22 |
| 42:18 51:10 | 19 3:17 9:12 105:16,17 | 4492920 26:6 |
| years 7:3 27:9,13 28:3 | 106:7 | |
| 29:9 31:16 32:20,22 | 1978 32:7,13 46:19 | **5** |
| 34:17 35:14,16,17 | 1980 47:17 | 5 2:16 3:2 58:7,10 |
| 49:1 51:19 52:21 | 1986 35:6 | 58 3:2 |
| 59:18,22,23 60:1,1 | 1990 26:13 | |
| yell 72:3 | 1991 26:16 27:2 41:8 | **6** |
| yesterday 88:5 | 1999 41:4 | 6 3:3 64:4,7 |
| young 27:16 32:4 | | 64 3:3 |
| Youth 33:1 | **2** | 66 3:4,6 |
| y'all 16:6 28:2 63:14 | 2 2:19 8:17,20 12:3 | |
| 69:3 70:10 71:10 | 78:14 115:10 | **7** |
| 81:6,19 89:1 | 2nd 106:13 125:9 | 7 3:4 25:13 66:3,5,11 |
| | 2/12/07 24:16 25:3 | 67:12 |
| **$** | 2/14/07 25:11 83:13 | 7th 86:9,11 |
| $12 112:13 | 2/2/07 24:20 | 76 3:7 |
| $125 94:1 | 20 3:18 49:1 60:1 116:8 | 78 3:8 |
| $5,000 43:1 | 116:11 | |
| $9 112:20 | 2000 47:6 51:18 53:11 | **8** |
| | 2001 54:5 | 8 2:18,19 3:6 66:19,22 |
| **#** | 2002 7:13 13:7 55:9,10 | 82 34:11 |
| #151 125:13 | 56:12 60:19,22 61:1 | 83 3:9 34:11 |
| | 61:2,5,17 | 85 3:10 |
| **0** | 2003 56:12 | |
| 07 63:23 106:14 | 2004 53:1 | **9** |
| | 2005 53:1 | 9 3:7 76:11,13,16,19,22 |
| **1** | 2006 9:5,12 11:12 38:4 | 9th 86:7,8,9,10 |
| 1 2:18 8:4,8 9:8,20,23 | 38:9 61:20 | 9/30/08 125:13 |
| 10:6 11:11,20 63:2,3 | 2007 10:18,21,22 11:8 | 90 3:11 |
| 63:6 115:9 | 25:13 61:22 77:13 | 900 2:10 |
| 10 1:19 3:8 78:4,6,11 | 78:7,14,15 82:4 96:9 | 91 3:12 26:13 |
| 79:10,14,20 80:5,19 | 2008 1:20 124:23 125:9 | 96 3:13 |
| 81:1,8,15,22 82:2 | 22 77:13 78:7 82:4 96:9 | 97 3:14 |
| 124:23 | 22nd 96:12 | 99 3:15 |
| 10:05 1:20 | 23 63:23 | |
| 100 3:16 | 24 2:22 112:15 | |
| 1001 27:11 | 25 35:14 | |
| 105 3:17 | | |
| 11 3:9 28:9 83:9,11 | **3** | |
| 116 3:18 | 3 2:21 13:18,20 14:2 | |
| 12 3:10 59:3 78:15 85:8 | 3/9/07 106:13,15 | |
| 85:10 | 3:07-CV-846-WKW | |
| 12th 83:8 98:23 | 1:7 124:22 | |
| 12/19/2006 9:10 | 30 89:12 112:15 | |
| 12/4/01 59:4 | 32 89:13 113:1 | |
| 12/5/59 26:2 | 35203 2:10 | |
| 124 125:1 | 36 113:2 | |
| 125 89:10 94:3 | 36830 2:6 | |
| 13 2:21 3:11 27:13 | | |
| 90:12,14 | **4** | |
| 14 3:12 27:13 91:11,13 | 4 2:22 24:3,6 | |



**Drug Testing System**
**Lab Results Report:**
**drugtest**

3/29/2007

**WASTE MANAGEMENT**

| | |
|---|---|
| **Employee:** | CANNON, ROBERT |
| **Employee Number:** | |
| **Employer:** | WASTE MANAGEMENT |
| | 1001 FANNIN DRIVE |
| | SUITE 4000 |
| | HOUSTON, TX 77002 |

DEFENDANT'S
EXHIBIT
PENGAD 800-631-6989

| | |
|---|---|
| **Employer Number:** | 2751 |
| **Location:** | WM OF AL – EAST |
| **Location Code:** | D02572 |
| **Ordering Account Number:** | 021720D02572 |
| **COC Number:** | 0447984246 |
| **Specimen ID:** | 0447984246-1206 |
| **Reason:** | RANDOM |
| **Modality:** | FHWA |
| **Date Collected:** | 12/19/2006 |
| **Lab Received:** | 12/21/2006 |
| **Lab Reported:** | 12/23/2006 |
| **Date COC Rec:** | 12/26/2006 |
| **MRO Verified:** | 12/28/2006 |
| **Date Reported:** | 12/28/2006 |
| **MRO Operator:** | POHGTURNER |
| **Result:** | POSITIVE DILUTE |

| **Drug Class:** | **Result:** |
|---|---|
| AMPHETAMINES | NEGATIVE |
| COCAINE | **POSITIVE** |
| MARIJUANA | NEGATIVE |
| OPIATES | NEGATIVE |
| PHENCYCLIDINE | NEGATIVE |

**NOTE: All positive drug test results have been verified through GC/MS confirmation tests.**

**Laboratory:** LABCORP

\* You must treat the test as a verified positive test. You must not direct the employee to take another test based on the fact that the specimen was dilute.

Dr. Jerome Cooper D.O., Medical Review Officer
Pembrooke Occ Health
2307 N. Parham Rd.
Richmond, VA 23229
Phone: 804-346-1010 Fax: 804-346-5050

IMPORTANT NOTE: Any person failing a drug or alcohol screen is ineligible to perform US Department of Transportation (DOT) safety-sensitive duties for ANY employer per DOT Regulation 49 CFR 40.285. Such persons must complete a Substance Abuse Professional (SAP) evaluation and treatment process before becoming eligible again.





DEFENDANT'S
EXHIBIT
2

Copy To:
□ Employee
☑ Employee's Personnel File
□ Other : _____

# Employee Disciplinary Report

| Name: Robert Cannon | District: WM of AL-East Opelika |
|---|---|
| Emp. No.: 072850 | Dept.: Residential |
| Date of Incident: 12-28-06 | Time of Incident: 10:45 A.M |

**Action to be taken:** □ Warning  □ Suspension  ☑ Dismissal
This report is to be made part of the official record of the above mentioned employee.

**Nature of Incident:**

1. ( ) Unexcused Absence
2. ( ) Tardiness
3. ( ) Drinking on Duty
4. ( ) Insubordination
5. ( ) Dishonesty
6. ( ) Garnishments
7. ( ) Failure to Follow Instructions
8. ( ) Fighting on Company premises
9. ( ) Leaving without permission
10. ( ) Substandard Work

11. ( ) Housekeeping
12. ( ) Improper Conduct
13. ( ) Reporting under the Influence of Alcohol
14. ( ) Violation of Safety Rules
15. ( ) Carelessness
16. ( ) Destruction of Company property
17. ( ) Defective and improper work
18. ( ) Theft (Stealing)
19. ( ) Violation of Company Rules & Conduct
20. (✓) Other: Tested Positive for Drugs "Substance Abuse"

**Supervisor's Remarks:** On 12-28-06 at approx. 10:45 A.M. I Recieved a Call from Pembrook Occ. Health, stating that Robert Cannon Tested Positive for Drugs. This Will Result in termination.

**Witnesses:** _____

**Employee Remarks:** _____

□ **PROBATIONARY EMPLOYEE**

| _Harris Webb_   12-28-06 | **I have read this report** |
|---|---|
| Signature of Supervisor          Date | Signature of Employee          Date |
| Signature of Witness          Date | Signature of Witness          Date |

**THE ABOVE OFFENSE OR OFFENSES HAVE BEEN NOTED AND ARE MADE A PART OF THE ABOVE EMPLOYEE'S PERSONNEL FILE AS OF THIS DATE.**

OFFENSE NUMBER    1  2  3  4  5    _____
                                    Personnel Consultant          Date
LAST OFFENSE _____
                    Date
Additional Remarks: Employee Refused to Sign.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT CANNON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **ADVANCED DISPOSAL** | ) | **3:07cv846-wkw** |
| **SERVICES ALABAMA L.L.C.,** | ) | |
| **d/b/a SUNFLOWER WASTE** | ) | |
| **L.L.C.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S EXHIBIT 3**
PENGAD 800-631-6989

## DEPOSITION NOTICE

Please take notice that beginning on **Wednesday, April 9, 2008, beginning at 10:00 a.m.,** and continuing from day to day until completed, **at the offices of James B. Douglas, Jr., McNeal & Douglas, Attorneys at Law, L.L.C., 1710 Catherine Ct., Suite B, Auburn, Alabama 36830**, defendant Advanced Disposal Services Alabama L.L.C., d/b/a Sunflower Waste L.L.C., will take the deposition of plaintiff **Robert Cannon** before an officer authorized by law to administer oaths and record testimony.

Pursuant to the Federal Rules of Civil Procedure, defendant requests that plaintiff bring the following documents with him to the deposition:

1.      Please produce any documents, emails, writings, notes, tapes (video or audio), or correspondence that plaintiff contends support his claims.

353670.1

2.    Please produce any documents, emails, writings, notes, tapes (video or audio), or correspondence that plaintiff has that relates to or concerns his employment with defendant.

3.    All income tax returns filed by plaintiff for the last four years or any and all other documents or writings including, but not limited to, W-2 forms, that show plaintiff's wages, earnings, and hours worked during the last four years.

4.    Any and all documents, writings, notes, or correspondence reviewed by plaintiff or utilized by plaintiff to refresh his recollection in preparation for his deposition and/or the allegations in his Complaint.

J. Tobias Dykes (ASB-0483-E66J)
E-mail:  Tdykes@constangy.com
CONSTANGY, BROOKS & SMITH, LLC
Suite 900, One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone:  (205) 252-9321
Facsimile:   (205) 323-7674

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following via U. S. Mail:

James B. Douglas, Jr.
McNeal & Douglas, Attorneys at Law, L.L.C.
P.O. Box 1423
Auburn, Alabama 36831

This the 27th day of February, 2008.

_____
J. Tobias Dykes

353670.1



**Opelika Housing Authority**
P.O Box 786
Opelika, Alabama 36801
(334)745-2250
Please Fax to (334)745-6783

334-283-2670

## JOB TERMINATION VERIFICATION

Name: Robert Cannon

Address:

Soc. Sec. No.: _____

Date: 3-12-07

To Whom It May Concern:

The above named person is currently renting through our Public Housing Program. They have reported to us that your company no longer employs them. To make necessary changes we must have written verification of this information. Your promptly reply to the information requested below will be greatly appreciated. All information is kept confidential. Thanks for your cooperation in this matter.

Sincerely,

_____
Housing Authority Representative

I authorize the release of this in formation to the O.H.A.

_____
Resident

1. Employed Since  1-23-2007   Last date employee worked  3-9-2007

2. Was employee X terminated, □ laid off, or □ voluntarily quit?

   (a.) If laid-off: Permanent or temporary? _____
   (b.) If temporary, how long do you expect lay off to last? _____

3. Date employee received last check  3-16-07

Additional remarks: Terminated due to Violation of drug & Alcohol policy

Firm Name: Sunflower Waste, LLC

Phone No.: 334-252-0458

Signed: _____

Date: 3-13-07

DEFENDANT'S
EXHIBIT
4

PENGAD 800-631-6989

SPECIMEN ID NO.    299 877 794

LAB ACCESSION NO.

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

OMB No. 0930-0158

**A.** Employer Name, Address, I.D. No.
ADVANCED DISPOSAL SERVICE
THB DEPT.
2905 GATE PARKWAY BOX 9
JACKSONVILLE FL 3224
PL 904-270-2008    FAX 904-636-0699

**B.** MRO Name, Address, Phone and Fax No.
HORACIE BERAFIGI, MD    #092659026
2905 JAFFOB BLVD
SAMOLB SD 69099
PH:826-632-4099    FAX:698-461-9491

**C.** Donor SSN or Employee I.D. No.

**D.** Reason for Test:    [X] Pre-employment    [ ] Random    [ ] Reasonable Suspicion/Cause    [ ] Post-Accident
[ ] Return to Duty    [ ] Follow-up    [ ] Other (specify)

**E.** Drug Tests to be Performed:    [X] THC, COC, PCP, OPI, AMP    [ ] THC & COC Only    [ ] Other (specify)

**F.** Collection Site Name: TALLASSEE FAMILY CARE
Address: 410 PERRY HILL RD
City, State and Zip: TALLASSEE    AL 36078
Collection Site Code:
Collector Phone No.: 234-283-3471
Collector Fax No.: 234-283-4162

**STEP 2: COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F?    [X] Yes    [ ] No, Enter Remark
Specimen Collection:    [X] Split    [ ] Single    [ ] None Provided (Enter Remark)    [ ] Observed (Enter Remark)

REMARKS

**STEP 3:** Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed, and released to the Delivery Service noted in accordance with applicable Federal requirements.

X_____
Signature of Collector
_____
(Print) Collector's Name (First, MI, Last)

Time of Collection ___ AM [ ] PM [ ]
Date (Mo./Day/Yr.)

**SPECIMEN BOTTLE(S) RELEASED TO:**
[ ] Quest Diagnostics Courier    [ ] FedEx
[X] DHL / Airborne    [ ] Other
Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB:** X_____
Signature of Accessioner
_____
(Print) Accessioner's Name (First, MI, Last)    Date (Mo./Day/Yr.)

**Primary Specimen Bottle Seal Intact**
[ ] Yes
[ ] No, Enter Remark Below

**SPECIMEN BOTTLE(S) RELEASED TO:**

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X_____
Signature of Donor
_____
(PRINT) Donor's Name (First, MI, Last)
_____
Date (Mo./Day/Yr.)

Daytime Phone No.    Evening Phone No.    Date of Birth    Mo.    Day    Yr.

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you choose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification is:
[ ] NEGATIVE    [ ] POSITIVE    [ ] TEST CANCELLED    [ ] REFUSAL TO TEST BECAUSE:
[ ] DILUTE    [ ] ADULTERATED    [ ] SUBSTITUTED

REMARKS

X_____
Signature of Medical Review Officer
_____
(PRINT) Medical Review Officer's Name (First, MI, Last)
_____
Date (Mo./Day/Yr.)

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SECONDARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:
[ ] RECONFIRMED    [ ] FAILED TO RECONFIRM - REASON

X_____
Signature of Medical Review Officer
_____
(PRINT) Medical Review Officer's Name (First, MI, Last)
_____
Date (Mo./Day/Yr.)

COPY 5 - 2D COPY

# STATE OF ALABAMA
## DEPARTMENT OF INDUSTRIAL RELATIONS
### HEARINGS AND APPEALS DIVISION
#### MONTGOMERY, ALABAMA   36130



## DECISION ON UNEMPLOYMENT COMPENSATION CLAIM

**CLAIMANT**

ROBERT J CANNON
426 B TOOMER CT
OPELIKA AL 36801

**EMPLOYER**

JACKSON II DONWARD W ETAL
SUNFLOWER WASTE LLC
PO BOX 781150
TALLASSEE AL 36078-1150

| | |
|---|---|
| **APPELLANT** : EMPLOYER | **DATE MAILED** : 04/20/07 |
| **LOCATION** : MONTGOMERY | **CASE  NO.** : 03502-AT-07 |
| (TELEPHONE) | **S. S. NO.** : |
| **OC  NO.** : 00-74 | **HEARING DATE** : 04/13/07 |

**APPEARANCES AT THE HEARING:** Claimant and employer representative with observer

**ISSUE(S):**  Whether the claimant was discharged or removed from work for a dishonest or criminal act committed in connection with work or for sabotage or an act endangering the safety of others or for the use of illegal drugs after previous warning or for the refusal to submit to or cooperate with a blood or urine test after previous warning.  Section 25-4-78(3)(a) Code of Alabama 1975

Availability for work.  Section 25-4-77(a)(3) Code of Alabama 1975

**FINDINGS:** This employer, with whom the claimant had most recent bona fide work, appealed an Examiner's determination on a claim for unemployment benefits.

The claimant worked for the listed employer as a CDL driver from January 23, 2007, until March 9, 2007.  The employer requires a pre-employment drug test, which the claimant took on January 22, 2007, before beginning work the following day.  Because the employer was in the process of changing medical review officers, the results were not returned immediately.  When the manager noticed the misspelling of the claimant's name, although the social security number was correct, the manager then asked the claimant to take another drug test, which he did, on February 12, 2007.  On that same day, approximately two hours later, the claimant went to his own doctor, took the drug test, and returned the results to the employer, showing that it was negative.  The results of the second drug test completed by the employer were also negative.  The employer has a drug policy, which has been in effect for at least seven years.  The claimant received a copy of the policy.  The employer falls under the Department of Transportation's regulations.  All employees are subject to drug testing.  Their doctor's office collects the specimen, which is then sent to the medical review officer for the results.  The results of the pre-employment test were returned on March 6, 2007.  The manager's supervisor instructed him to terminate the claimant, based upon the positive results of the first drug test taken, which he did on March 9, 2007.

**CONCLUSIONS:** Section 25-4-78(3)(a) of the Law requires a disqualification of an individual discharged or removed from work for a dishonest or criminal act committed in connection with work or for sabotage or an act endangering the safety of others or for the use of illegal drugs after previous

warning or for the refusal to submit to or cooperate with a blood or urine test after previous warning. The evidence presented in this case shows that although the claimant was given a test before employment, which was returned positive, his subsequent tests, as an employee of the company, were negative. In addition, he provided another drug test result showing negative from his own personal doctor. The evidence does not show that he would be subject to a disqualification under this section of the Law.

Section 25-4-77(a)(3) of the Law provides that an unemployed individual shall be eligible to receive benefits with respect to any week in a benefit year only if the Director finds that he is physically and mentally able and available to perform work of a character which he is qualified to perform based upon past experience or training. The evidence does not show that he would be unavailable for work. He would, therefore, not be subject to a disqualification under this section of the Law.

**DECISION:** The Examiner's determination under the provisions of Section 25-4-78(3)(a) of the Law is affirmed. No disqualification is imposed.

The claimant remains eligible for benefits under Section 25-4-77(a)(3) of the Law.

**APPEAL RIGHTS:** This decision becomes final unless an application for leave to appeal to the Board of Appeals is received in writing at the Department address above or by fax at 334-242-0539 on or before the **FINAL DATE OF May 7, 2007.**

Jo Ann S. Holder
Administrative Hearing Officer

JSH/amr

MAR-13-2007 FRI 11:06 AM SUNFLOWER WASTE                FAX NO. 3342832670                    P. 06

02/06/2007 13:10 FAX                                                    002/002





3695 Jeffco Boulevard
Arnold, Missouri 63010
636/532.4099

ATTENTION:

Tom Davis                                              Participant: Robert Ranhon
Advanced Disposal Services, Inc. - Dot                 Other ID:
9798 Normandy Blvd                                     SSN:
Jacksonville, FL 32221

## Results of DOT Controlled Substance Test

| | |
|---|---|
| Record Status: Positive | Laboratory: Quest Diagnostics |
| Test Type: Pre-Employment | 506 E State Parkway |
| Collection Date/Time: 01/22/2007  2:49 PM | Schaumburg, IL 60173 |
| Batch ID: 20070202 | Collection Site: TALLASSEE FAMILY CARE |
| Specimen ID: 61742550 | 115 HERON HILL ROAD |
| Date COC Received: 01/22/2007 | TALLASSEE, AL  36078 |
| Sample Type: Urine | Specimen Collector: JANE S BELLEW |

| Substance Tested | Result | | Substance Tested | Result |
|---|---|---|---|---|
| Amphetamines | Negative | | Cocaine | POSITIVE |
| Marijuana | Negative | | Phencyclidine | Negative |
| Opiates | Negative | | | |

MRO UNABLE TO CONTACT
TEST IS POSITIVE:
C O C A I N E

No - Sign

Horacio Marsfioti M.D. MRO                              2/2/2007
                                                      Verification Date

Results for Robert Ranhon, Other ID:                   Printed on 2/2/2007 at  6:58:42PM

APR-03-2007 TUE 12:02 PM SUNFLOWER WASTE          FAX NO. 3342832670          P. 02

04/02/2007  12:37  13342422157                    WALLACE BUILDING                PAGE 02/02

*Exhibit-3*

## PREVIOUS EMPLOYER INFORMATION REQUEST

FROM: ANN DORA'S
504 B FAIRVIEW ST
MONTGOMERY, AL 36104
334-224-0591 FAX 334-242-2157
CONTACT: ANTHONY FLOYD

PREVIOUS EMPLOYER
COMPANY: *Sun Flower Waste LLC*
STREET: *115 Herren Hill Rd.*
CITY: *Tallassee AL 36078*
PHONE NO. *283-0671* FAX *283-2670*

THE PERSON NAMED BELOW HAS MADE APPLICATION FOR EMPLOYMENT AT ANN DORA'S AS A DRIVER. YOUR NAME WAS GIVEN AS A PAST/PRESENT EMPLOYER. YOUR PROMPT ATTENTION AND RESPONSE WILL BE GREATLY APPRECIATED.

APPLICANTS NAME *Robert Cannon*          DATE *3/28/07*
SOCIAL SECURITY #_____ DRIVERS LICENSE#_____ STATE *AL*

**ABOVE FILLED OUT BY APPLICANT**

DATE OF EMPLOYMENT *1-23-07* TO *3-9-07* POSITION HELD *Res Driver*
INDICATE EQUIPMENT OPERATED: *✓* STRAIGHT TRUCK ____ TRACTOR TRAILER ____
TYPE OF TRAILER _____
TYPE OF DRIVING? *✓* LOCAL ____ OVER THE ROAD ____
IN COMPLIANCE WITH 49 C.F.R. 382, WAS THIS APPLICANT SUBJECT TO FEDERAL ALCOHOL & DRUG TESTING? *✓* YES ____ NO ____
DID HE/SHE TEST POSITIVE ON DRUG TEST? *✓* YES ____ NO ____ ALCOHOL .04>? ____ YES *✓* NO
IF YES, GIVE DATE AND EXPLAIN *3-9-07 /result came back in reference to pre-employment testing - had to take 2 tests - 1st test had wrong SSN# on it*
HAS THIS PERSON, IN THE LAST 2 YEARS, HAD ANY DRUG OR ALCOHOL VIOLATIONS? *✓* YES ____ NO *so we're tested*
IF YES, EXPLAIN *See Above*

REASON FOR LEAVING *Terminated!*

WOULD YOU REHIRE? ____ YES *✓* NO IF NO, PLEASE EXPLAIN *Violation of drug & Alcohol policy*

WAS THIS PERSON INVOLVED IN ANY ACCIDENTS? ____ YES *✓* NO IF SO, WHEN? _____

WAS ACCIDENT EMPLOYEES FAULT? ____ YES ____ NO IF YES, EXPLAIN *N/A*

NAME OF PERSON SUPPLYING INFORMATION *Sherry Beasley*    TITLE *Office Manager*
SIGNATURE *Sherry Beasley*    DATE *4-2-07*

APPLICANT WAIVER
FORMER EMPLOYER _____    DATE _____

I HEREBY AUTHORIZE YOU TO RELEASE THE ABOVE INFORMATION ALONG WITH ANY MEDICAL INFORMATION THAT MIGHT AFFECT MY ABILITY TO PERFORM IN THE POSITION I HAVE APPLIED FOR.

APPLICANT'S SIGNATURE *Robert Cannon*    WITNESS *Bill Lucas*

Please Fax RESPONSE: 1-334-242-2157

...RAL DRUG TESTING CUSTODY AND CONTROL FORM

**Quest Diagnostics**
800-877-7484

SPECIMEN ID NO.

LAB ACCESSION NO.

OMB No. 0930-0158

## STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE

A. Employer Name, Address, I.D. No.

B. MRO Name, Address, Phone and Fax No.

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☐ Pre-employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post-Accident
☐ Return to Duty ☐ Follow-up ☐ Other (specify) _____

E. Drug Tests to be Performed: ☐ THC, COC, PCP, OPI, AMP ☐ THC & COC Only ☐ Other (specify) _____

F. Collection Site Name: _____   Collection Site Code: _____
   Address: _____
   City, State and Zip: _____   Collector Phone No.: _____
   Collector Fax No.: _____

## STEP 2: COMPLETED BY COLLECTOR

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F? ☐ Yes ☐ No, Enter Remark | Specimen Collection: ☐ Split ☐ Single ☐ None Provided (Enter Remark) ☐ Observed (Enter Remark)

REMARKS

## STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

## STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed, and released to the Delivery Service noted in accordance with applicable Federal requirements.

X _____ AM ☐ PM
Signature of Collector   Time of Collection ►

_____ / _____
(Print) Collector's Name (First, MI, Last)   Date (Mo./Day/Yr.)

**SPECIMEN BOTTLE(S) RELEASED TO:**
☐ Quest Diagnostics Courier ☐ FedEx
☐ DHL / Airborne ☐ Other _____
Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB: X _____ ►
Signature of Accessioner

_____ / _____
(Print) Accessioner's Name (First, MI, Last)   Date (Mo./Day/Yr.) ►

**Primary Specimen Bottle Seal Intact**
☐ Yes
☐ No, Enter Remark Below

**SPECIMEN BOTTLE(S) RELEASED TO:**

## STEP 5: COMPLETED BY DONOR

I certify that I provided my urine specimen to the collector, that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X _____
Signature of Donor   (PRINT) Donor's Name (First, MI, Last)   Date (Mo./Day/Yr.)

Daytime Phone No. ( )   Evening Phone No. ( )   Date of Birth _____
Mo.   Day   Yr.

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you choose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

## STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN

In accordance with applicable Federal requirements, my determination/verification is:

☐ NEGATIVE ☐ POSITIVE ☐ TEST CANCELLED ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE ☐ ADULTERATED ☐ SUBSTITUTED

REMARKS _____

X _____
Signature of Medical Review Officer   (PRINT) Medical Review Officer's Name (First, MI, Last)   Date (Mo./Day/Yr.)

## STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SECONDARY SPECIMEN

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED ☐ FAILED TO RECONFIRM - REASON _____

X _____
Signature of Medical Review Officer   (PRINT) Medical Review Officer's Name (First, MI, Last)   Date (Mo./Day/Yr.)

COPY 5 - 2D COPY

**KENT V. KLINNER, JR. M.D.**
**1711 PEPPERELL PARKWAY**
**OPELIKA, AL 36801**
**(334)745-7098**

EMPLOYEE NAME _Robert Cannon_                    COLLECTION  DATE _2 12·07_

ID/SS# _____

TIME OF COLLECTION _10 18 AM_                    NAME OF COLLECTOR _TJ Curtis_

_Robert Cannon_                                 _O Curtis_
**DONOR'S SIGNATURE**                           **COLLECTOR'S SIGNATURE**

LOCATION OF TEST: 1711 PEPPERELL PKWY, OPELIKA, AL 36801

TIME OF TEST _10 20_ (AM/PM)

TEST OPERATOR _TJ Curtis_

TESTING RESULTS

    COCAINE _neg_
    AMPHETAMINES _neg_
    THC _neg_
    OPITAES _neg_
    PCP _neg_

    REMARKS _____

CUSTODY AND CONTROL
    SPECIMEN RECEIVED BY _TJ Curtis_    DATE _2 17 07_
    SPECIMEN DESTROYED BY _TJ Curtis_    DATE _3 17 07_

_Robert Cannon_                                 _O Curtis_
**DONOR'S SIGNATURE**                           **COLLECTOR'S SIGNATURE**

*ATTN:*

*Jennifer Barnes*



3895 Jeffco Boulevard
Arnold, Missouri 63010
636/532.4099

## ATTENTION:

Tom Davis
Advanced Disposal Services, Inc. - Dot
9798 Normandy Blvd
Jacksonville, FL 32221

Participant: Robert Cannon
Other ID:
SSN:

### Results of DOT Controlled Substance Test

| | |
|---|---|
| Record Status: Negative | Laboratory: Quest Diagnostics |
| Test Type: Pre-Employment | 506 E State Parkway |
| Collection Date/Time: 02/12/2007 08:42 AM | Schaumburg, IL 60173 |
| Batch ID: 20070214 | Collection Site: TALLASSEE FAMILY CARE |
| Specimen ID: 5662214 | 115 HERON HILL ROAD |
| Date COC Received: 02/12/2007 | TALLASSEE, AL 36078 |
| Sample Type: Urine | Specimen Collector: JANE BELLEW |

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | Negative |
| Marijuana | Negative | Phencyclidine | Negative |
| Opiates | Negative | | |

_____                    2/14/2007
Horacio Maraflioti M.D. MRO                                 Verification Date

Results for Robert Cannon, Other ID:  (SSN: 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)                    Printed on 3/13/2007 at 8:49:41AM

| State of Alabama<br>Unified Judicial System<br><br>Form C-59    Rev. 01/2007 | STATEMENT OF CLAIM<br>Unlawful Detainer<br><br>Sections 6-6-310, et seq., *Code of Alabama 1975* | Case Number<br>DV07-341 |

IN THE DISTRICT COURT OF _Lee_ COUNTY, ALABAMA

Opelika Housing Authority

**PLAINTIFF(S)**

ADDRESS: 1701 Toomer Street
Opelika, AL 36801

Robert Cannon

**DEFENDANT(S)**                    A

ADDRESS: _____

PLAINTIFF'S ATTORNEY: _____
ADDRESS: _____

## COMPLAINT

**FILED**
JUN 0 7 2007
IN OFFICE
CORINNE T. HURST
CIRCUIT CLERK

1.  Plaintiff(s) demands the right to possession from the defendant(s) of the house, apartment or other dwelling located at
    406 B Toomer Street, Opelika, Alabama 36801

2.  Defendant(s) no longer has the right to possession because: The tenant is in violation of their rental lease for non-payment of rent.

3.  Defendant(s) right of possession has been lawfully terminated by written notice.
4.  Plaintiff(s) also claims the sum of $ _____ from the Defendant(s) consisting of: rents, late charges and attorney fees (if applicable) and other charges.
5.  Plaintiff(s) also claims future rents, late charges, attorney fees (if applicable) and other charges until Plaintiff(s) recovers possession of the leased premises.

Clerk       **CORINNE T. HURST**
Address:    **CIRCUIT CLERK**
            **2311 GATEWAY DR.**
            **OPELIKA AL 36801-6907**

Plaintiff/Attorney Signature
Phone Number: (334) 745-4171

---

### NOTICE TO DEFENDANT(S) - READ CAREFULLY

This complaint for eviction must be answered by you within seven (7) days after these papers were either served or posted at the leased premises as provided by law. Your answer must be received by the Court Clerk at the above address within the above seven (7) days. A copy of the answer must be sent to the Plaintiff(s) or Plaintiff(s)' Attorney at the above address. If you file an answer a notice of trial will be mailed to you; otherwise, a judgment of eviction may be entered against you, and after fourteen (14) days from date of service, a money judgment may be entered against you.

---

### Return on Service (check the appropriate box)

☐ Personal service on _____ by _____ on _____
            (name)                    (signature)            (date)

☐ Mailed (with adequate prepaid postage) by _____ on _____
                                        (signature)            (date)

☐ Posted on premises on _____ and mailed by _____ on _____
                        (date)                    (signature)            (date)

Court Record (Original)          Plaintiff (Copy)          Defendant (Copy)

# FEDERAL DRUG TESTING CUSTODY AND CONTROL FORM

A DIVISION OF NWT. Inc.
1141 EAST 3900 SOUTH, SUITE A-110
SALT LAKE CITY, UTAH 84124
(801) 293-2300   FAX (801) 263-3605



CLIENT ACCOUNT NO. 81685
CLIENT NAME ABI - DIVISION 3

35061997
LOCATION CODE WMALE4

SPECIMEN ID NO.                                    LABORATORY ACCESSION NO.

## STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE

**A.** Employer Name, Address, I.D. No.   Ph: 334-705-4345

WM OF AL-EAST
4210 LEE ROAD 183

OPELIKA AL 36801

**B.** MRO Name, Address, Phone and Fax No.
MAIL ALL PAPERWORK TO:
DFW/ABI/JAMES R BABER MD
PO BOX 8520

LITTLE ROCK AR 72215
Ph:(800)762-3623 Fax:(501)664-8886

**DEFENDANT'S EXHIBIT 5**

**C.** Donor SSN or Employee I.D. No.

**D.** Reason for Test:   ☐ Pre-employment   ☐ Random   ☐ Reasonable Suspicion/Cause   ☒ Post Accident
☐ Return to Duty   ☐ Follow-up   ☐ Other (specify)

**E.** Drug Tests to be Performed:   ☒ THC, COC, PCP, OPI, AMP   ☐ THC & COC Only   ☐ Other (specify)

**F.** Collection Site Address:
HUGHSON CLINIC
101 E UNIV DR
AUBURN AL 36832

Collector Phone No. (334)821-7188

Collector Fax No.

## STEP 2: COMPLETED BY COLLECTOR

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F?  ☒ Yes   ☐ No, Enter Remark

Specimen Collection:
☒ Split   ☐ Single   ☐ None Provided (Enter Remark)   ☐ Observed (Enter Remark)

REMARKS

## STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

## STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable Federal requirements.

X L.A. Browning
Signature of Collector

L.A. Browning
(PRINT) Collector's Name (First, MI, Last)

4:35 PM
Time of Collection

12/01/01
Date (Mo./Day/Yr.)

SPECIMEN BOTTLE(S) RELEASED TO:
VIA COURIER
SEALED IN BAG
Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB:**

X
Signature of Accessioner

(PRINT) Accessioner's Name (First, MI, Last)

/ /
Date (Mo./Day/Yr.)

Primary Bottle Seal Intact
☐ Yes
☐ No, Enter Remark Below

SPECIMEN BOTTLE(S) RELEASED TO:

## STEP 5: COMPLETED BY DONOR

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X Robert Cannon
Signature of Donor

Robert Cannon
(PRINT) Donor's Name (First, MI, Last)

12/1/01
Date (Mo. / Day /Yr.)

Daytime Phone No.                    Evening Phone No. ( ) same              Date of Birth / /

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you choose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

## STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN

In accordance with applicable Federal requirements, my determination/verification is:
☐ NEGATIVE   ☐ POSITIVE   ☐ TEST CANCELLED   ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE                    ☐ ADULTERATED   ☐ SUBSTITUTED

REMARKS

X
Signature of Medical Review Officer

(PRINT) Medical Review Officer's Name (First, MI, Last)

/ /
Date (Mo./Day/Yr.)

## STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED   ☐ FAILED TO RECONFIRM - REASON

X
Signature of Medical Review Officer

(PRINT) Medical Review Officer's Name (First, MI, Last)

/ /
Date (Mo./Day/Yr.)

I 2:00 pm I

PENGAD 800-631-6989

**DEFENDANT'S
EXHIBIT**

6

# DRIVER'S
# APPLICATION FOR EMPLOYMENT

Company **Sunflower Waste**
**Russell Davis**
Address **1303 Washington Blvd.**
**Tallassee, Alabama 36078**
City **(866) 252-0458** Zip

(answer all questions · please print)

In compliance with Federal and State equal employment opportunity laws, qualified applicants are considered for all positions without regard to race, color, religion, sex, national origin, age, marital status, veteran status, non-job related disability or any other protected group status.

Date of application: **1-22-07**

Position(s) Applied for: **DRIVER**

Name **CANNON** **ROBERT** **JAMES** Social Security No. ___
 Last First Middle

List your addresses:

Current Address ___
 City ___

 Phone ___ Long? **1 YR**
 yr./mo.

Previous State ___ Zip Code ___
Addresses Street ___ City ___ State & Zip Code ___ How Long? ___ yr./mo.

 Street ___ City ___ State & Zip Code ___ How Long? ___ yr./mo.

 Street ___ City ___ State & Zip Code ___ How Long? ___ yr./mo.

Do you have the legal right to work in the United States? **YES**

Date of Birth **12 / 5 / 59** Can you provide proof of age? **YES**
(Required for Commercial Drivers)

Have you worked for this company before? **NO** Where? ___

Dates: From ___ To ___ Rate of Pay ___ Position ___

Reason for leaving ___

Are you now employed? **NO** If not, how long since leaving last employment? **1 MONTH**

Who referred you? **FRIEND** Rate of pay expected ___

Have you ever been bonded? ___ Name of bonding company ___
(answer only if a job requirement)

Have you ever been convicted of a felony? ___

If yes, please explain fully on a separate sheet of paper. Conviction of a crime is not an automatic bar to employment-all circumstances will be considered.

Is there any reason you might be unable to perform the functions of the job for which you have applied (as described in the attached job description)?

If yes, explain if you wish.

___

___

© Copyright 2002 J. J. KELLER & ASSOCIATES, INC., Neenah, WI · USA
(800) 327-6868 · www.jjkeller.com · Printed in the United States

CONFIDENTIAL
ADS / CANNON
0019

## EXPERIENCE AND QUALIFICATIONS – OTHER

SHOW ANY TRUCKING, TRANSPORTATION OR OTHER EXPERIENCE THAT MAY HELP IN YOUR WORK FOR THIS COMPANY

*I CAN OPERATE Floor toaster, site Leader, one ABC Leader, rear Loader, etc.*

LIST COURSES AND TRAINING OTHER THAN SHOWN ELSEWHERE IN THIS APPLICATION

LIST SPECIAL EQUIPMENT OR TECHNICAL MATERIALS YOU CAN WORK WITH (OTHER THAN THOSE ALREADY SHOWN)

### TO BE READ AND SIGNED BY APPLICANT

This certifies that this application was completed by me, and that all entries on it and information in it are true and complete to the best of my knowledge.

I authorize you to make such investigations and inquiries of my personal, employment, financial or medical history and other related matters as may be necessary in arriving at an employment decision. (Generally, inquiries regarding medical history will be made only if and after a conditional offer of employment has been extended.) I hereby release employers, schools, health care providers and other persons from all liability in responding to inquiries and releasing information in connection with my application.

In the event of employment, I understand that false or misleading information given in my application or interview(s) may result in discharge. I understand, also, that I am required to abide by all rules and regulations of the Company.

1-22-07

Date                                                    Applicant's Signature

### PROCESS RECORD

APPLICANT HIRED _____    REJECTED _____

DATE EMPLOYED _____    POINT EMPLOYED _____

DEPARTMENT _____    CLASSIFICATION _____
(IF REJECTED, SUMMARY REPORT OF REASONS SHOULD BE PLACED IN FILE)

THIS SECTION TO BE FILLED IN BY RESPONSIBLE OFFICER OR COMPANY REPRESENTATIVE

| | SUPERIOR | GOOD | FAIR | BELOW AVERAGE | POOR | WRITTEN RECORD ON FILE |
|---|---|---|---|---|---|---|
| 1. APPLICATION | | | | | | |
| 2. INTERVIEW | | | | | | |
| 3. PAST EMPLOYMENT | | | | | | |
| 4. WRITTEN EXAM | | | | | | |
| 5. ROAD TEST | | | | | | |
| 6. CRIMINAL AND TRAFFIC CONVICTIONS | | | | | | |

SIGNATURE OF INTERVIEWING OFFICER _____

### TRANSFERS

FROM _____ TO _____         FROM _____ TO _____

DATE _____                        DATE _____

REASON FOR TRANSFER _____         REASON FOR TRANSFER _____

FROM _____ TO _____         FROM _____ TO _____

DATE _____                        DATE _____

REASON FOR TRANSFER _____         REASON FOR TRANSFER _____

### TERMINATION OF EMPLOYMENT

DATE TERMINATED _____            DEPARTMENT RELEASED FROM _____

DISMISSED _____        VOLUNTARILY QUIT _____        OTHER _____

TERMINATION REPORT PLACED IN FILE _____        SUPERVISOR _____

PAGE 4. 160 (Rev. 8/93) AS1

CONFIDENTIAL
ADS / CANNON
0020

ACCIDENT RECORD (EQUIPAGE) 4 YEARS OR MORE. (ATTACH SHEET IF MORE SPACE IS NEEDED) IF NONE, WRITE NONE

| DATES | NATURE OF ACCIDENT (HEAD-ON, REAR-END, UPSET, ETC.) | FATALITIES | INJURIES |
|---|---|---|---|
| LAST ACCIDENT | | | |
| NEXT PREVIOUS | | | |
| NEXT PREVIOUS | | | |

TRAFFIC CONVICTIONS AND FORFEITURES FOR THE PAST 5 YEARS (OTHER THAN PARKING VIOLATIONS) IF NONE, WRITE NONE

| LOCATION | DATE | CHARGE | PENALTY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

(ATTACH SHEET IF MORE SPACE IS NEEDED)

## EDUCATION

CIRCLE HIGHEST GRADE COMPLETED: 1 2 3 4 5 6 7 8      HIGH SCHOOL: 1 2 3 4      COLLEGE: 1 2 3 4

LAST SCHOOL ATTENDED _____ (NAME) _____ G.Ed _____ (CITY) _____

## EXPERIENCE AND QUALIFICATIONS – DRIVER

| | STATE | LICENSE NO. | TYPE | EXPIRATION DATE |
|---|---|---|---|---|
| DRIVER LICENSES | AL | 149-2920 | Class A | 6-8-08 |
| | | | | |

A.  Have you ever been denied a license, permit or privilege to operate a motor vehicle?      YES _____ NO  ✓

B.  Has any license, permit or privilege ever been suspended or revoked?      YES _____ NO  ✓

IF THE ANSWER TO EITHER A OR B IS YES, GIVE DETAILS _____

DRIVING EXPERIENCE IF NONE, WRITE NONE

| CLASS OF EQUIPMENT | TYPE OF EQUIPMENT (VAN, TANK, FLAT, ETC.) | DATES | | APPROX. NO. OF MILES (TOTAL) |
|---|---|---|---|---|
| | | FROM | TO | |
| STRAIGHT TRUCK | | | | |
| TRACTOR AND SEMI-TRAILER | ✓ | | | |
| TRACTOR - TWO TRAILERS | | | | |
| MOTORCOACH - SCHOOL BUS | | | | |
| OTHER | | | | |

LIST STATES OPERATED IN FOR LAST FIVE YEARS _____

SHOW SPECIAL COURSES OR TRAINING THAT WILL HELP YOU AS A DRIVER: _____

WHICH SAFE DRIVING AWARDS DO YOU HOLD AND FROM WHOM? _____

PAGE 2 16F (Rev. 6/02)  X01

CONFIDENTIAL
ADS / CANNON
0021

## EMPLOYMENT HISTORY

All driver applicants to drive in interstate commerce must provide the following information on all employers during the preceding 3 years. List complete mailing address, street number, city, state and zip code.

Applicants to drive a commercial motor vehicle in intrastate or interstate commerce shall also provide an additional 7 years' information on those employers for whom the applicant operated such vehicle. (NOTE: List employers in reverse order starting with the most recent. Add another sheet as necessary.)

| EMPLOYER | DATE |
|---|---|
| NAME _Waste Management_ | FROM MO. _2_ YR. _01_ TO MO. _12_ YR. _07_ |
| ADDRESS _4210 1661 Rd. 183_ | POSITION HELD _Driver_ |
| CITY _Opelika_  STATE _AL_  ZIP _36801_ | SALARY/WAGE _$13.00_ day rate |
| CONTACT PERSON _Lewis Webb_   PHONE NUMBER | REASON FOR LEAVING _Out of work_ |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☑YES ☐NO | |

| EMPLOYER | DATE |
|---|---|
| NAME _Leshna Mills_ | FROM MO. _ _ YR. _99_ TO MO. _ _ YR. _200_ |
| ADDRESS _261 Ave_ | POSITION HELD _Assn. Supervisor_ |
| CITY _Opelika_  STATE _AL_  ZIP _36801_ | SALARY/WAGE _$12.05_ |
| CONTACT PERSON _Sold out_   PHONE NUMBER | REASON FOR LEAVING |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐YES ☑NO | |

| EMPLOYER | DATE |
|---|---|
| NAME _Heil woodwork_ | FROM MO. _2_ YR. _80_ TO MO. _ _ YR. _90_ |
| ADDRESS _Lafayette Mill_ | POSITION HELD _Labor_ |
| CITY _Opelika_  STATE _AL_  ZIP _36801_ | SALARY/WAGE _$1,850_ |
| CONTACT PERSON    PHONE NUMBER | REASON FOR LEAVING |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐YES ☐NO | |

| EMPLOYER | DATE |
|---|---|
| NAME | FROM MO. YR. TO MO. YR. |
| ADDRESS | POSITION HELD |
| CITY   STATE   ZIP | SALARY/WAGE |
| CONTACT PERSON   PHONE NUMBER | REASON FOR LEAVING |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐YES ☐NO | |

| EMPLOYER | DATE |
|---|---|
| NAME | FROM MO. YR. TO MO. YR. |
| ADDRESS | POSITION HELD |
| CITY   STATE   ZIP | SALARY/WAGE |
| CONTACT PERSON   PHONE NUMBER | REASON FOR LEAVING |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐YES ☐NO | |

| EMPLOYER | DATE |
|---|---|
| NAME | FROM MO. YR. TO MO. YR. |
| ADDRESS | POSITION HELD |
| CITY   STATE   ZIP | SALARY/WAGE |
| CONTACT PERSON   PHONE NUMBER | REASON FOR LEAVING |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐YES ☐NO | |

*Includes vehicles having a GVWR of 26,001 lbs. or more, vehicles designed to transport 15 or more passengers, or any size vehicle used to transport hazardous materials in a quantity requiring placarding.

PAGE 1 35F (Rev. 6/02) 091

CONFIDENTIAL
ADS / CANNON
0022



## ACKNOWLEDGEMENT OF RECEIPT OF EMPLOYEE HANDBOOK

This will acknowledge that I have received my copy of Advanced Disposal Services Employee Handbook. I have read it and been given the opportunity to ask questions that I may have concerning any of the Company's policies and procedures.

I understand that this Handbook represents only current policies, regulations, and benefits, and that it does not create a contract of employment. The Company retains the right to change these policies, procedures and benefits, as it deems advisable.

I understand that I am an "at will" employee. I have the right to terminate my employment at any time, with or without cause, and that the Company has a similar right. I further understand that my status as an "at-will" employee may not be changed except in writing signed by the President of the Company. Nothing in this Handbook is intended to void my "at-will" status.

I understand that I am employed subject to a 90-calendar-day introductory period. I understand that I may be required to reimburse the Company for the cost of any uniforms I received if I voluntarily resign during the introductory period.

I understand that under circumstances as outlined in the Drug and Alcohol policy, I will be subject to physical examination, including a hair, blood and/or urine analysis by qualified personnel.

PRINTED FULL NAME: _Robert Cannon_

SIGNATURE: _Robert Cannon_

DATE: _1-22-07_

NOTE: *This form should be signed, detached and returned to your supervisor or human resources administrator within three (3) days after receiving your Employee Handbook.*

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

CONFIDENTIAL
ADS / CANNON
0023

## Customer Relations

The Company expects all employees who interact in any manner with customers to be responsive to their requests and treat them with respect. Do not hesitate to ask your supervisor for assistance if a customer becomes abusive or irate, if the customer specifically asks to speak with a supervisor or manager or if you feel more confident having your supervisor or a manager assist the customer.



DEFENDANT'S EXHIBIT
8
PENGAD 800-631-6989

## Dress and Appearance

The image of the Company is influenced by the appearance of its employees. We are all expected to practice good hygiene and dress appropriately for our job duties. The dress requirements for your facility or department may be posted or communicated to you by your supervisor. Generally, clothing that is too revealing, tight fitting or provocative is inappropriate during business hours.

Some Company facilities require the use of uniforms while employees are engaged in their job duties. If uniforms are required, you must obtain your supervisor's approval before wearing any other type of clothing. Your supervisor will also advise you about the procedure for obtaining and cleaning uniforms.

In all cases regarding what is considered acceptable attire, the final decision rests with the Company. If your attire does not meet standards considered acceptable, you may be requested to go home to change, with time involved unpaid.

## Drug Free Workplace

In a commitment to safeguard the health of our employees and to provide a safe working environment for everyone, the Company has a drug-free workplace policy. It is the intent of the Company to provide á safe work environment for all employees free of the effects of substance abuse or abusers. Similarly, it is your responsibility to maintain personal health so you are physically and mentally capable of performing in the workplace. The abuse of drugs or alcohol is an unsafe and counter-productive practice that will not be tolerated. *If you believe you have a substance abuse problem, you are urged to seek assistance before your actions violate Company policy.*

Our drug-free workplace policy includes the following provisions:

- The Company prohibits the illegal use, possession, sale, manufacture, or distribution, of drugs, alcohol, or other controlled substances on Company property and in Company vehicles or equipment. It is against Company policy for you to report to work or to perform job duties, including the operation of a motor vehicle, under the influence of drugs or alcohol.

CONFIDENTIAL
ADS / CANNON
0024

- All applicants considered final candidates for a position may be tested for the presence of drugs as part of the application process. Any applicant refusing to submit to a pre-employment drug test will be ineligible for hire. If an applicant's test is confirmed positive, the applicant will not be considered for employment at that time and will be informed that he or she has failed to meet employment standards.

- *You are subject to* _random drug testing_ *in accordance with Company policies and governmental regulations.*

- *You may be tested when there is a* _reasonable suspicion_ *that you are using or have used drugs/alcohol.*

- If you suffer an injury on the job that requires referral for medical treatment you may be tested.

- If you refuse to submit to a drug/alcohol test, you will be terminated from employment or otherwise disciplined.

- Prescription drugs prescribed by your physician may be taken during work hours. You should notify your supervisor if the use of properly prescribed prescription drugs might adversely affect your work performance. You may be assigned other duties if the use of prescribed medication may interfere with your regular job duties. Abuse of prescription drugs will be considered a violation of this policy.

- In the case of a violation of the Company policy, including a positive drug or alcohol test result, you will be subject to discipline up to and including discharge.

## Honesty

Honesty and integrity are personal characteristics that each of us should strive for at all times. Unfortunately, there are times when, for whatever reason, the line that separates honesty and integrity is violated. If that line is violated in any of the following areas, the employee may be subject to disciplinary action up to and including discharge:

- Falsifications of Company paperwork, including but not limited to service agreements, landfill and recycling tickets, incentive pay sheets, vehicle condition reports, repair orders, time cards, expense reports, accident and safety reports, purchase orders, insurance forms, commission calculations, adjustment forms, employment applications and any other type of form or paperwork that you are required to complete from time-to-time.

- Theft of Company equipment, including but not limited to, tools owned by the Company or other employees, office equipment, office supplies, sales marketing and promotional items and any other Company or employee owned property.

CONFIDENTIAL
ADS / CANNON
0025

This fax was received by GFI FaxMaker fax server. For more information, visit: http://www.gfi.com

Acct# 039VT

Lab Code  Yburza Bswk

51742560

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.
ADVANCED DISPOSAL SVCS -SUNFLOWER
DER:  TOM DAVIS
9065 GATE PARKWAY NORTH
JACKSONVILLE FL 32240
PH 904-493-7000  FAX 904-40

B. MRO Name, Address, Phone and Fax No.
HORACIO MARABOUT - EMPLOYEE SCREE | Ph 337-991-1516
P. O. BOX 82113
221 SOUTHPARK BLDG. 9
LAFAYETTE LA 70508
Fx 337-989-1134

DEFENDANT'S EXHIBIT
9

C. Donor SSN or Employee I.D. No.

D. Reason for Test:  ☑ Pre-employment  ☐ Random  ☐ Reasonable Suspicion/Cause  ☐ Post-Accident
☐ Return to Duty  ☐ Follow-up  ☐ Other (specify)

E. Drug Tests to be Performed:  ☑ THC, COC, PCP, OPI, AMP  ☐ THC & COC Only  ☐ Other (specify)

F. Collection Site Address:
TALLASSEE FAMILY CARE
115 HERREN HILL RD
TALLASSEE AL 36078

Collector Phone No.  3 5 4 - 2 8 3 - 4 4 7 7

Collector Fax No.  3 5 4 - 2 8 3 - 4 1 8 2

**STEP 2: COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F?  ☐ Yes  ☑ No, Enter Remark

Specimen Collection  ☑ Split  ☐ Single  ☐ None Provided (Enter Remark)  ☐ Observed (Enter Remark)

**STEP 3:** Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

REMARKS (NONE)

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable Federal requirements.

Collector's Name: (PRINT First, MI, Last)
J a n e   S L B e l l e w

Date of Collection  0 1 - 2 2 - 0 7

Time of Collection  0 2 4 4  HR  MIN  ☐ AM  ☑ PM

Signature of Collector  X  Bellew

SPECIMEN BOTTLE(S) RELEASED TO:
DHC Courier

Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB**

X _____
Signature of Accessioner

_____ (PRINT) Accessioner's Name (First, MI, Last)  Date (Mo./Day/Yr)

Primary Specimen  SPECIMEN BOTTLE(S) RELEASED TO:
Bottle Seal Intact
☐ Yes
☐ No, Enter Remark Below

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my urine specimen to the collector, that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X  Robert Mannon
Signature of Donor

Robert Mannon
(PRINT) Donor's Name (First, MI, Last)

0 1 - 2 2 - 0 7
Date (Mo./Day/Yr)

Daytime Phone No. _____

Evening Phone No. _____

Date of Birth _____  Mo.  Day  Yr.

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you chose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification is:

☐ NEGATIVE  ☐ POSITIVE  ☐ TEST CANCELLED  ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE  ☐ ADULTERATED  ☐ SUBSTITUTED

REMARKS _____

X _____
Signature of Medical Review Officer

_____ (PRINT) Medical Review Officer's Name (First, MI, Last)

_____ Date (Mo./Day/Yr)

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED  ☐ FAILED TO RECONFIRM - REASON _____

X _____
Signature of Medical Review Officer

_____ (PRINT) Medical Review Officer's Name (First, MI, Last)

_____ Date (Mo./Day/Yr)

CONFIDENTIAL
ADS / CANNON
0027







DEFENDANT'S
EXHIBIT
10

3885 Jeffco Boulevard
Arnold, Missouri 63010
636/532.4099

**ATTENTION:**

Tom Davis

Advanced Disposal Services, Inc. – DOT

9780 Normandy Blvd

Jacksonville, FL 32221

Participant: Robert Rannon
Other ID:
SSN:

### Results of DOT Controlled Substance Test

| | |
|---|---|
| Record Status: Positive | Laboratory: Quest Diagnostics |
| Test Type: Pre-Employment | 506 E State Parkway |
| Collection Date/Time: 01/22/2007  2:45 PM | Schaumburg, IL 60173 |
| Batch ID: 20070202 | Collection Site: TALLASSEE FAMILY CARE |
| Specimen ID: 51742550 | 115 HERON HILL ROAD |
| Date COC Received: 01/22/2007 | TALLASSEE, AL 36078 |
| Sample Type: Urine | Specimen Collector: JANE B BELLEW |

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | POSITIVE |
| Marijuana | Negative | Phencyclidine | Negative |
| Opiates | Negative | | |



MRO UNABLE TO CONTACT
TEST IS POSITIVE:
COCAINE

_____          2/2/2007
Horacio Marafioti M.D. MRO          Verification Date

Feb 12, 2007

Results for Robert Rannon, Other ID:          Printed on 2/2/2007 at 6:59:42PM

CONFIDENTIAL
ADS / CANNON
0028

03/28/2007  14:24  3347456783                    OPELIKA HOUSING AUTH                    PAGE 05/05
MAR-13-07  07:41AM  FROM-ST LOUIS MRO INC          0365322067               T-812  P.001/..  F-823

ATTN:
MS. Pullum

St. Louis
MRO, inc.

This is THE COMPANY DRUG SCREEN

3895 Jeffco Boulevard
Arnold, Missouri 63010
636/882.4099

DEFENDANT'S
EXHIBIT
11

ATTENTION:

Tom Davis
Advanced Disposal Services, Inc. - Dot        Participant: Robert Cannon
9790 Normandy Blvd                                Other ID:
Jacksonville, FL 32221                                SSN:

## Results of DOT Controlled Substance Test

| | |
|---|---|
| Record Status: Negative | Laboratory: Quest Diagnostics |
| Test Type: Pre-Employment | 506 E State Parkway |
| Collection Date/Time: 02/12/2007 08:42 AM | Schaumburg, IL 60173 |
| Batch ID: 20070214 | Collection Site: TALLASSEE FAMILY CARE |
| Specimen ID: 6662214 | 115 HERON HILL ROAD |
| Date COC Received: 02/12/2007 | TALLASSEE, AL 36078 |
| Sample Type: Urine | Specimen Collector: JANE BELLEW |

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | Negative |
| Marijuana | Negative | Phencyclidine | Negative |
| Opiates | Negative | | |

Horacio Marafioti M.D., MRO                    2/14/2007
                                               Verification Date

CONFIDENTIAL
ADS / CANNON
0069

Results for Robert Cannon, Other ID:  (SSN: 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)                    Printed on 3/13/2007 at 8:49:41AM

DEFENDANT'S
EXHIBIT

_12_

PENGAD 800-631-6989

_personal_

**KENT V. KLINNER, JR., M.D.**
**1711 PEPPERELL PARKWAY**
**OPELIKA, AL 36801**
**(334)745-7098**

EMPLOYEE NAME _Robert Cannon_     COLLECTION DATE _2-12-07_

ID/SS# _____     _____

TIME OF COLLECTION _10:18 AM_     NAME OF COLLECTOR _TJ Curtis_

_Robert Cannon_           _[signature]_
**DONOR'S SIGNATURE**           **COLLECTOR'S SIGNATURE**

LOCATION OF TEST: 1711 PEPPERELL PKWY, OPELIKA, AL 36801

TIME OF TEST _10:20_ (AM)/PM

TEST OPERATOR _TJ Curtis_

TESTING RESULTS

     COCAINE _neg_
     AMPHETAMINES _neg_
     THC _neg_
     OPITAES _neg_
     PCP _neg_

     REMARKS _____

CUSTODY AND CONTROL

     SPECIMEN RECEIVED BY _[signature]_ DATE _2-12-07_
     SPECIMEN DESTROYED BY _[signature]_ DATE _2-12-07_

_Robert Cannon_           _[signature]_
**DONOR'S SIGNATURE**           **COLLECTOR'S SIGNATURE**

CONFIDENTIAL
ADS / CANNON
0084

# FINAL CLEARANCE FOR TERMINATING EMPLOYEE

DEFENDANT'S EXHIBIT 13

PENGAD 800-631-6989

Robert Cannon                                    Driver
**Employee Name** _____ **ss#** _____ **Position** _____

Opelika _____ 3/9/07 _____ 1 Feb 07
**Location** _____ **Termination Date** _____ **Date of Hire** _____

Violation Drug and alcohol Policy
**Reason:** _____

**Eligible For Rehire:**     Yes _____     No ✓

## PLEASE DETERMINE IF ANY OF THE FOLLOWING ARE OUTSTANDING: Please Initial

| | | | |
|---|---|---|---|
| Travel Advance | _____ | Accounting _____ | Date _____ |
| Petty Cash Advance | _____ | Accounting _____ | Date _____ |
| *Avail. Vacation Accrual | _____ | | |
| *Avail. Sick Accrual | _____ | *Number of hours | |
| *Avail. PTO Accrual | _____ | | |

## *PLEASE COLLECT/CANCEL THE FOLLOWING: PLEASE INITIAL

| | | | |
|---|---|---|---|
| Telephone Credit Card | Supervisor _____ | Date _____ |
| Credit Card/Fuel Card/Toll Card | Supervisor _____ | Date _____ |
| DP Access Codes | Supervisor _____ | Date _____ |
| Bldg. Keys/Access Codes/Loan Equipment | Supervisor _____ | Date _____ |
| Miscellaneous (tools, manuals, etc.) | Supervisor _____ | Date _____ |
| ID Card/Badge | Supervisor _____ | Date _____ |
| Policy Manuals and/or Handbook | Supervisor _____ | Date _____ |
| Locker Key | Supervisor _____ | Date _____ |
| Uniforms | Supervisor _____ | Date _____ |
| Office Equipment (i.e., cell phone, fax machine, pager, computer) | Supervisor  DCf | Date 3/9/07 |
| Payroll Deductions for Insurance | $ _____ | Date _____ |
| Cobra letter sent | 17M | Date _____ |

**Select One:**     Mail check to: _____          **Hold For Pick up:** _____

**Employee Signature:** _Robert Cannon_     Date 3/9/07

**Supervisor Signature:** _Danny C. Scott_     Date 3/9/07

**CHECK RELEASED:**

**Payroll Coordinator:** _Beasley_     Date _____

CONFIDENTIAL
ADS / CANNON
0029

Case 3:07-cv-00846-WKW-TFM   Document 12-6   Filed 07/11/2008   Page 3 of 3

DEFENDANT'S
EXHIBIT
14
PENGAD 800-631-6889

# EMPLOYEE DISCIPLINARY REPORT

EMPLOYEE NAME  Robert Cannon          DATE OF OFFENSE _____

POSITION  Driver                      COMPANY LOCATION  Opeliks

COMPANY NAME  Sunflower               DISTRICT  A1

The following disciplinary action was taken today and is to be made part of the official record of the above mentioned employee.

The Company views progressive discipline and the issuance of written disciplinary action as a constructive method of communicating to employees the importance of meeting the performance standards established by the Company. The Company believes that adherence to Company policies and procedures and exemplification of a positive work ethic by all employees is essential in creating a work environment that is satisfying, safe and productive.

The Company believes that progressive discipline is a mutually beneficial process for both employee and employer. It is the Company's intention to utilize this process, whenever practical, to identify deficiencies in job performance and provide direction to employees for taking corrective measures.

However, continued violation of Company policies could result in additional disciplinary action, leading up to and/or including termination. The Company recognizes there are certain offenses that, if committed by an employee, are serious enough to justify immediate discharge, thereby, superseding the progressive discipline process.

| | | | |
|---|---|---|---|
| ☐ Verbal Documentation | ☐ 1st Written Warning | ☐ 2nd Written Warning in lieu of suspension | ☒ Termination |
| | | ☐ 2nd Written Warning with suspension without pay ____ day(s) | Attach Exit Interview |

Suspension - Designate Specific Dates  /  /  thru  /  /   Return to work on  /  /

| | | |
|---|---|---|
| ☐ 1. Unexcused absence | ☒ 11. Violation of company drug and alcohol policy | ☐ 17. Preventable accident |
| ☐ 2. Excessive tardiness/absence | | ☐ 18. Failure to wear personal safety equipment |
| ☐ 3. Abuse of lunch/break privileges | ☐ 12. Failure to maintain required driving credentials | ☐ 19. Destruction of company property |
| ☐ 4. Improper conduct | | ☐ 20. Reckless driving |
| ☐ 5. Dishonesty | ☐ 13. Substandard work/customer complaints | ☐ 21. Equipment abuse |
| ☐ 6. Insubordination | | ☐ 22. Violation of safety rules |
| ☐ 7. Failure to follow instructions | ☐ 14. Housekeeping (work area/assigned vehicle) | ☐ 23. Stealing/Unauthorized accounts |
| ☐ 8. Failure to report an accident | | ☐ 24. Salvaging |
| ☐ 9. Failure to report an injury | ☐ 15. Fighting | ☐ 25. Falsification of documents |
| ☐ 10. Leaving without permission | ☐ 16. Carelessness | ☐ 26. Other _____ |

Explain Violation: _____

_____

_____

Corrective Measures To Be Taken By Employee: _____

_____

I have read this report and acknowledge receipt.

x _____                    x _Fran Dunley_

Employee Signature                           Employee refused to sign - witness signature

Employee Comments (continue on back of this form if necessary): _____

Issued By: _Danny C. Sutut_        Title _Residential Mgr._        Date Issued _3/9/07_

Reviewed By: _____        Title _____        Date Reviewed _____

CONFIDENTIAL
ADS / CANNON
0055

# ALCOHOL AND/OR DRUG TEST NOTIFICATION

**Part 382 - Controlled Substances and Alcohol Use Testing applies to drivers of this company.**

**§382.113 Requirement for notice.**
Before performing an alcohol or controlled substances test under this part, each employer shall notify a driver that the alcohol or controlled substances test is required by this part. No employer shall falsely represent that a test is administered under this part.

Company Name: _Sunflower Waste_

Driver/Applicant Name: _Robert Cannon_
(Print) (First, M.I., Last)

You are hereby notified the following test will be administered in compliance with the
Federal Motor Carrier Safety Regulations.

**DEFENDANT'S EXHIBIT 15**
PENGAD 800-631-6989

1. The test is scheduled:   Date: _1/22/07_

   Location: _Tallassee_

   Time: _2:00 PM_

2. Check type of test:   ☐ Alcohol          ☑ Controlled Substance

3. Check reason for test:   ☑ Pre-employment   ☐ Random          ☐ Reasonable suspicion
   ☐ Post-accident   ☐ Return to duty   ☐ Follow-up

4. Appointment instructions/comments:
   _____
   _____
   _____

I understand as a condition of my employment with this company, the above identified test is required.

_Robert Cannon_
Driver/Applicant's Signature

_1-22-07_
Date

Witnessed by:
_Russell_
Company Representative

_1/22/06_
Date

CONFIDENTIAL
ADS / CANNON
0026
375-FS-C2 3048
(Rev. 7/01)

© Copyright 2001
Published by J.J. KELLER & ASSOCIATES, INC.
Neenah, WI 54957-0368 • www.jjkeller.com

**RETAIN IN EMPLOYEE'S CONFIDENTIAL FILE**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2007-03001 |

and EEOC

*State or local Agency, if any*

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Robert Cannon | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Sunflower Waste, LLC | | 334.252.0458 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 115 Herrin Hill Road, Tallassee, AL 36078 | | Macon |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)    LATEST (ALL) |
|---|---|
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ AGE  ☐ RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  ☐ OTHER (Specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On March 9, 2007, I was unjustly terminated by Sunflower Waste, LLC. I believe my termination was based upon race, because the reason I was given, failure of a drug screen, was false. Sunflower Waste, LLC falsified and fabricated the reason for my termination, as I have documented proof that my drug screen, for which Sunflower Waste, LLC, claims I was terminated, was, in fact, negative. I was qualified to perform the work I was doing, I was terminated unjustly, and, upon information and belief, the person who took over my duties was not a minority. Therefore, I believe my termination was based on my race.

**DEFENDANT'S EXHIBIT**

RECEIVED EEOC

MAY 18 2007

BIRMINGHAM AREA OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT *Robert Cannon* |
| 5-14-07 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
| Date    Charging Party (Signature) | 14, MAY 2007 |

EEOC FORM 5 (10/94)

EEOC Form 161 (3/98)

U.S. FINAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Mr. Robert Cannon | From: Birmingham District Office |
| --- | --- |
| | Ridge Park Place |
| | 1130 22nd Street, South |
| | Birmingham, AL 35205 |

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

**DEFENDANT'S EXHIBIT**
17

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| 420-2007-03001 | Ollie M. Croom, Investigator | (205) 212-2140 |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Delner Franklin-Thomas_                    8/27/7

**Delner Franklin-Thomas,**                (Date Mailed)
**District Director**

Enclosures(s)

cc:  Sunflower Wast LLC                     James B. Douglas, Jr. ,Attorney
     115 Herrin Hill Road                   McNeal & Douglas
     Tallassee, AL 36078                    Post Office Box 1423
                                            Auburn, AL 36630
     J. Tobias Dykes, Attorney
     Constangy, Brooks, & Smith LLC
     One Federal Place
     1819 Fifth Avenue, North Suite 900
     Birmingham, AL 35203

CONFIDENTIAL
ADS/CANNON
0007

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED
EASTERN DIVISION

2007 SEP 18 P 3: 11

ROBERT CANNON,                          )

    PLAINTIFF,                        )

    v.                                )          CIVIL ACTION NO. 3:07 CV 846-WKW

                                      )

ADVANCED DISPOSAL SERVICES              )
ALABAMA LLC d/b/a SUNFLOWER             )
WASTE, LLC                              )

    DEFENDANTS.                       )

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

DEFENDANT'S
EXHIBIT

1P

## COMPLAINT

### I. JURISIDICTION

1.    This is an action for legal and equitable relief to redress discrimination in

employment on the basis of race. This action arises under Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Civil Rights Act of 1991, and 42

U.S.C. § 1981.

2.    The Court has jurisdiction of the subject of this action pursuant to 28 U.S.C. §§

1331, 1332(a)(1),1343(a)(4), 2201 & 2202, and 42 U.S.C. § 2000e-5(f)(3).

### II.    PARTIES

3.    Plaintiff, Robert Cannon, is an African-American citizen of the United States over

the age of nineteen years. Plaintiff resides in Opelika, Alabama, which is located in Lee

County. At all times relevant to this action, Plaintiff was an employee within the meaning

of Section 701(f) of Title VII, 42 U.S.C. Sec.2000e(f).

4.      Upon information and belief, Defendant Alabama Disposal Services Alabama LLC d/b/a Sunflower Waste LLC operates a business in this judicial district and division and is incorporated in the state of Delaware. Defendant is an employer within the meaning of Section 701(b) of Title VII, 42 U.S.C. Sec. 2000e(b).

## III.    ALLEGATIONS OF FACT

5.      From January 23rd 2007 until March 9th 2007, the Plaintiff was an employee of Defendant; Plaintiff worked as a truck driver; the Defendant is engaged in the business of solid waste collection and disposal.

6.      Plaintiff's terms and conditions of employment were tainted with racial discrimination. Plaintiff was subject to disparate treatment by management, and management's policies had a disparate impact on plaintiff due to his race. Ultimately, Plaintiff's employment was terminated due to his race, and Defendant falsified a non-racial reason for the termination.

7.      The Plaintiff, as a truck driver, was required to submit to drug-testing by the Defendant. The Defendant submitted a specimen, collected on January 22, 2007, to St. Louis MRO, Inc., the company the Defendant uses to process the drug tests, which did not show the Plaintiff's name and was not signed by the testing company, but did show the Plaintiff's social security number. Said test showed a positive result for cocaine.

8.      The Plaintiff was asked to submit another sample, by the Defendant, and the Plaintiff did so on February 12, 2007. The Plaintiff was suspicious that he was being targeted by the Defendant, thus the Plaintiff also submitted a sample to his personal physician as well.

9.    Results from both St. Louis MRO, Inc. and Dr. Kent Klinner, Plaintiff's personal physician, showed negative results for the presence of drugs, regarding the February 12th 2007 sample. At no time while employed by the Defendant, nor in the months prior to Plaintiff applying for employment with Defendant, did the Plaintiff use any drugs.

10.    Notwithstanding this, Defendant terminated the Plaintiff by falsely claiming that he had failed the drug screen.

11.    Furthermore, Defendant slandered the Plaintiff, by falsely contending, to prospective employers, that Plaintiff had failed a drug screen. This defamation made the Plaintiff unemployable in his chosen field of employment.

12.    The Plaintiff was, at all times, qualified for his position with the Defendant, was terminated without cause, and his position was, upon information and belief, filled by a non-minority employee.

13.    Plaintiff was treated differently and ultimately terminated by Defendant due to his race in violation of Federal Civil Rights Laws.

14.    Defendant's actions as alleged herein were committed with malice or with reckless indifference to the federally protected rights of Plaintiff.

15.    As the proximate result of Defendant's unlawful conduct, Plaintiff has suffered, is continuing to suffer, and will in the future suffer, great and irreparable loss and injury, including but not limited to economic losses, humiliation, embarrassment, emotional distress and deprivation of his civil rights.

IV.    **CLAIM ONE – 703 OF TITLE VII AND 42 U.S.C. 1981**

16.    Plaintiff adopts and re-alleges Paragraphs 1-15 above, as if set out in full herein.

17.    Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, attached hereto as exhibit "A." The Plaintiff was given a dismissal and notice of rights on August 27th 2007, attached hereto as exhibit "B."

18.    The conduct of Defendant violated Plaintiff's rights guaranteed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981a, in particular, the right not to be discriminated against on the basis of race in discharge or with respect to terms, conditions and privileges of employment, 42 U.S.C. Sec. 2000e-2 (a) (1).

## V.  CLAIM TWO-§ 1981

19.    Plaintiff re-alleges paragraphs 1-18 as if set forth here in full.

20.    The conduct of Defendant violated Plaintiff's rights guaranteed by the Civil Rights Act of 1866, as amended, 42 U.S.C § 1981, and the Civil Rights Restoration Act of 1991, which prohibits discrimination in employment with regard to race and mandates the enforcement of contracts without regard to race.

## VI.    CLAIM THREE-SLANDER

21.    Plaintiff re-alleges paragraphs 1-20 as if set forth here in full.

22.    In April 2007, the Defendant slandered the Plaintiff by publishing a false and defamatory statement of and concerning the Plaintiff to wit: Defendant falsely indicated to a prospective employer of the Plaintiff that the Plaintiff had previously tested positive for drug use.

23.    As a result of not securing the employment sought with Ann Dora's, the prospective employer, Plaintiff was forced to accept employment at a lower rate of pay and suffered economic, as well as, emotional damages.

24. Plaintiff claims mental anguish and emotional distress as a result of the slander by the Defendant.

25. Plaintiff claims punitive damages of the Defendant because Defendant published said statement with malice and with knowledge of its falsity or with gross and reckless disregard of its falsity.

## VII. CLAIM FOUR-FRAUD

26. Plaintiff re-alleges paragraphs 1-25 as if set forth here in full.

27. After being unjustly terminated by Defendant, Plaintiff applied for other employment with prospective employers.

28. One prospective employer, Ann Dora's, received a false representation from Defendant that Plaintiff had failed a drug test.

29. This representation was false and Defendant knew it was false, or was false and Defendant made the misrepresentation with reckless disregard of its falsity, or was false and made by Defendant by mistake, but with the intention that prospective employers would rely on it.

30. Plaintiff was among the class of persons Defendant intended to rely on the misrepresentation and thus, under Alabama Law, has demonstrated detrimental reliance, even though the statement was not made directly to Plaintiff.

31. As a proximate result of Defendant's fraud, Plaintiff has suffered damages, including lost wages, other economic damages, and emotional damages, including mental anguish.

32. Plaintiff claims punitive damages of the Defendant due to the intentional nature of said fraud.

## VIII.  CLAIM FIVE-FRAUD

33.  Plaintiff re-alleges paragraphs 1-32 as if set forth here in full.

34.  Defendant represented to Plaintiff that it would take a specimen from Plaintiff for drug testing that would be properly submitted, tested, and reported.

35.  The Defendant's obvious intention was to falsify the results as a subterfuge to terminate the Plaintiff's employment.

36.  The representations by Defendant, regarding the drug-testing, were false and Defendant knew they were false, were false, and were made by Defendant with reckless disregard of their falsity, or were false, and made by mistake, but with the intention that Plaintiff rely on them.

37.  Plaintiff detrimentally relied on the misrepresentations by submitting the drug samples and by accepting the employment position.

38.  As a proximate result of Defendant's fraud, Plaintiff suffered damages as outlined in this complaint, supra.

## VII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court will grant him the following relief:

A.  Issue a declaratory judgment declaring that the wrongs complained of herein violate the rights of Plaintiff guaranteed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.

B.  Enter a permanent injunction or other injunctive relief-enjoining Defendant from maintaining or continuing any customs, policies, patterns, practices or actions which operate to discriminate on the basis of race.

**C.**    Awarding Plaintiff compensatory and punitive damages, including pre-judgment interest.

**D.**    Retain jurisdiction of this action for a sufficient time to ensure full compliance with the remedial decree requested herein.

**E.**    Award Plaintiff his costs incurred in this case, together with reasonable attorneys fees and pre-judgment interest, pursuant to applicable federal law.

**F.**    Grant such additional and further relief as the Court may deem just and equitable under the circumstances.

Respectfully submitted this the 18th day of September, 2007.

James B. Douglas, Jr.
Attorney for Plaintiff
McNeal & Douglas, Attorneys at
Law. L.L.C.
Ala. Bar. #8935-u83j
P.O. Box 1423
Auburn, Alabama, 36831
334-821-6401

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by struck jury.

Respectfully submitted this 18th day of September, 2007.

James B. Douglas, Jr.
Attorney for Plaintiff

EXHIBIT "A"

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

_____ and EEOC

State or local Agency if any

NAME (Indicate Mr., Ms., Mrs.)
Mr. Robert Cannon

HOME TELEPHONE (Include Area Code)

STREET ADDRESS    CITY, STATE AND ZIP CODE    DATE OF BIRTH

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Sunflower Waste, LLC | | 334.252.0458 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 115 Herrin Hill Road, Tallassee, AL 36078 | | Macon |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ AGE
☐ RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)    LATEST

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)).

On March 9, 2007, I was unjustly terminated by Sunflower Waste, LLC. I believe my termination was based upon race, because the reason I was given, failure of a drug screen, was false. Sunflower Waste, LLC falsified and fabricated the reason for my termination, as I have documented proof that my drug screen, for which Sunflower Waste, LLC, claims I was terminated, was in fact, negative. I was qualified to perform the work I was doing, I was terminated unjustly, and, upon information and belief, the person who took over my duties was not a minority. Therefore, I believe my termination was based on my race.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT
*Robert Cannon*

5-14-07
Date

*Robert Cannon*
Charging Party (Signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

14 MAY 2007

EEOC FORM 5 (10/94)

EXHIBIT "B"

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Mr. Robert Cannon | From: Birmingham District Office<br>Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2007-03001 | Ollie M. Croom,<br>Investigator | (205) 212-2140 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [ ] | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| [ ] | While reasonable efforts were made to locate you, we were not able to do so. |
| [ ] | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| [X] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_signature_

**Delner Franklin-Thomas,**
**District Director**

8/27/7

(Date Mailed)

Enclosures(s)

cc:    Sunflower Wast LLC
       115 Herrin Hill Road
       Tallassee, AL 36078

       J. Tobias Dykes, Attorney
       Constangy, Brooks, & Smith LLC
       One Federal Place
       1819 Fifth Avenue, North Suite 900
       Birmingham, AL 35203

       James B. Douglas, Jr. ,Attorney
       McNeal & Douglas
       Post Office Box 1423
       Auburn, AL 36630

Enclosure with EEOC
Form 161 (3/98)

INFORMATION RELATED TO FILING SUIT
UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within**
**90 days of the date you *receive* this Notice.** Therefore, you should **keep a record of this date.** Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office. If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit
before 7/1/02 – not 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if
you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed
within 90 days of this Notice *and* within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# ANN`DORA'S CUSTOM WROUGHT IRON

DEFENDANT'S EXHIBIT

19

PENGAD 800-631-6989

504 B Fairview st.
Montgomery, Al. 36104
Telephone: (334) 224-0591 Fax: (334) 242-2157

## FACSIMILE COVER SHEET

From

**To:** ~~Cherry~~ Sherry

**With:**

**Phone #**

**Fax #**

**Comments:** Please fill out Information
and Return

**If there is no inconvenience please respond back as soon as possible.
Thank You for Your Cooperation and Have a Great Day.**

To

**From:** Amy

**Total number of pages faxed:** 2 (including cover sheet)
**Date** 4/2/07

CONFIDENTIAL
ADS / CANNON
0057

PREVIOUS EMPLOYER INFORMATION REQUEST

FROM: ANN DORA'S
504 B FAIRVIEW ST
MONTGOMERY, AL 36104
334-224-0591 FAX 334-242-2157
CONTACT: ANTHONY FLOYD

PREVIOUS EMPLOYER
COMPANY: *Sun Flower Waste LLC*
STREET: *115 Herren Hill Rd.*
CITY: *Tallassee     AL   36078*
PHONE *334* *252-0458* FAX *285-2670*

THE PERSON NAMED BELOW HAS MADE APPLICATION FOR EMPLOYMENT AT ANN DORA'S AS A DRIVER. YOUR
NAME WAS GIVEN AS A PAST/PRESENT EMPLOYER. YOUR PROMPT ATTENTION AND RESPONSE WILL BE GREATLY
APPRECIATED.

APPLICANTS NAME *Robert Cannon*                DATE *3/28/07*
SOCIAL SECURITY                          IVERS LICENSE#                          STATE *AL*
***************************** **ABOVE FILLED OUT BY APPLICANT** *****************************

DATE OF EMPLOYMENT *1-23-07* TO *3-9-07* POSITION HELD *Res Driver*
INDICATE EQUIPMENT OPERATED: ✓ STRAIGHT TRUCK ____ TRACTOR TRAILER
                                        TYPE OF TRAILER
TYPE OF DRIVING? ✓ LOCAL ____ OVER THE ROAD
IN COMPLIANCE WITH 49 C.F.R. 382, WAS THIS APPLICANT SUBJECT TO FEDERAL ALCOHOL
& DRUG TESTING? ✓ YES ____ NO
DID HE/SHE TEST POSITIVE ON DRUG TEST? ✓ YES ____ NO ALCOHOL .04>? ____ YES ✓ NO
IF YES, GIVE DATE AND EXPLAIN *3-9-07 / results came back in reference to pre-*
*employment testing - had to take 2 tests - 1st test had wrong SSN# on it*
HAS THIS PERSON, IN THE LAST 2 YEARS, HAD ANY DRUG OR ALCOHOL VIOLATIONS? ✓ YES ____ NO *So we retested*
.F YES, EXPLAIN. *See Above*

REASON FOR LEAVING *Terminated !*

WOULD YOU REHIRE? ____ YES ✓ NO    IF NO, PLEASE EXPLAIN *Violation of drug & Alcohol*
*policy*

WAS THIS PERSON INVOLVED IN ANY ACCIDENTS? ____ YES ✓ NO   IF SO, WHEN? ____

WAS ACCIDENT EMPLOYEES FAULT? ____ YES ____ NO   IF YES, EXPLAIN *N/A*

NAME OF PERSON SUPPLYING INFORMATION *Sherry Beasley*      TITLE *Office Manager*
                        SIGNATURE *Sherry Beasley*          DATE *4-2-07*

APPLICANT WAIVER
FORMER EMPLOYER: _____              DATE _____

I HEREBY AUTHORIZE YOU TO RELEASE THE ABOVE INFORMATION ALONG WITH ANY MEDICAL INFORMATION
THAT MIGHT AFFECT MY ABILITY TO PERFORM IN THE POSITION I HAVE APPLIED FOR.

APPLICANT'S SIGNATURE *Robert Cannon*     WITNESS *Bill Lucas*

Please Fax RESPONSE: 1-334-242-2157

CONFIDENTIAL
ADS / CANNON
0058

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

ROBERT CANNON,                )
                              )
        PLAINTIFF,            )
                              )
                              )
v.                            )        CIVIL ACTION NO.
                              )        3:07cv846-wkw
                              )
                              )
ADVANCED DISPOSAL SERVICES    )
ALABAMA LLC d/b/a SUNFLOWER   )
WASTE, LLC                    )
                              )
        DEFENDANT.            )

DEFENDANT'S
EXHIBIT
20
PENGAD 800-631-6989

<u>**PLAINTIFF'S INTIAL DISCLOSURES**</u>

**COMES NOW** Plaintiff, and submits his Initial Disclosures, pursuant to Rule

26(a)(1) of the Federal Rules of Civil Procedures as follows:

A.      Individuals likely to have discoverable information which may support the
Plaintiff's claims and allegations are as follows:

1.      Robert Cannon.  Mr. Cannon will testify regarding all the allegations in his

Complaint, including the fact that the Defendant falsified a positive drug screen as an

excuse to terminate him due to his race.

2.      Danny White, Mr. Cannon's supervisor.  Mr. White will have discoverable

information regarding his treatment of Mr. Cannon.

3.      Coke Conway.  Mr. Conway will have discoverable information regarding his

employment with the Defendant, which relates to the Plaintiff's claims.

4.    A corporate representative from St. Louis MRO, Inc. Said representative should have discoverable information regarding the testing performed on behalf of the Defendant.

5.    Tom Davis.  Mr. Davis will have discoverable information regarding the Defendant's drug testing procedures, as well as the Defendant's treatment of the Plaintiff.

6.    Jo Ann Holder.  Ms. Holder will have discoverable information regarding her investigation of this incident on behalf of the State of Alabama, Department of Industrial Relations.

7.    Dr. Kent Klinner.  Dr. Klinner will have discoverable information which proves that the Plaintiff did not have illegal drugs in his system at the time of testing.

8.    Reuben Lowder.  Mr. Lowder will have discoverable information regarding his treatment as an employee of the Defendant.

9.    A representative from the Opelika Housing Authority.  Said representative will have discoverable information regarding Plaintiff's damages.

B. Documents

Upon information and belief, all relevant documents which support Mr. Cannon's claims are in the possession, custody, and control of the Defendant.  Plaintiff does not have any documents, other than those which may be used solely for impeachment, which are not in the possession of the Defendant.

C. Computation of Damages.

Plaintiff's damages would include back-pay from the time of his termination until the date of judgment.  Plaintiff does not have documents regarding these damages, as said documents are in the sole custody and control of the Defendant.  The Plaintiff also

suffered mental anguish and claims punitive damages of the Defendant, for which not documentation would exist.

D. Not Applicable.

Plaintiff reserves the right to supplement these disclosures, should other documents, or matters required to be disclosed, are discovered during the litigation.

Respectfully submitted this the 2nd day of January, 2008.

James B. Douglas, Jr. -DOU-009
Attorney for Plaintiff
ALA BAR NO: 8935-U83J
P.O. Box 1423
Auburn, AL 36831-1423
(334) 821-1596

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing, by placing the same in the U.S. mail, postage prepaid and properly addressed, on this the 2nd day of January, 2008.

J. Tobias Dykes
Constangy, Brooks & Smith, LLC
One Federal Place
Suite 900
1819 Fifth Avenue North
Birmingham, AL 35203

James B. Douglas, Jr.

# DEPOSITION OF SHERRY BEASLEY

## April 10, 2008

## Pages 1 through 59

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



Page 1

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3           EASTERN DIVISION
4
5  ROBERT CANNON,
6     Plaintiff,
7  Vs.         CIVIL ACTION NO.
             3:07-CV-846-WKW
8  ADVANCED DISPOSAL SERVICES
    ALABAMA, LLC, d/b/a SUNFLOWER
9  WASTE, LLC,
10    Defendant.
11
12
        * * * * * * * * * * * * *
13
14    DEPOSITION OF SHERRY BEASLEY, taken pursuant
15  to stipulation and agreement before Haley A.
16  Phillips, Certified Court Reporter, ACCR # 151, and
17  Commissioner for the State of Alabama at Large, in
18  the Law Offices of McNeal & Douglas, 1710 Catherine
19  Court, Auburn, Alabama, on Thursday, April 10,
20  2008, commencing at approximately 2:15 p.m.
21
22       * * * * * * * * * * * * *
23

Page 2

1         APPEARANCES
2
3  FOR THE PLAINTIFF:
4  James B. Douglas, Jr., Esq.
    McNeal & Douglas
5  Suite B
    1710 Catherine Court
6  Auburn, Alabama 36830
7  FOR THE DEFENDANT:
8  J. Tobias Dykes, Esq.
    Constangy, Brooks & Smith
9  Attorneys at Law
    1819 Fifth Avenue North
10  One Federal Place, Suite 900
    Birmingham, Alabama 35203
11
    ALSO PRESENT:
12
    Mr. Glenn Guest
13
14     * * * * * * * * * * * * *
15    EXAMINATION INDEX
16  BY MR. DOUGLAS . . . . . . . . . . .   4
17
     * * * * * * * * * * * * *
18
19
20
21
22
23

Page 3

1         STIPULATION
2    It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of SHERRY BEASLEY is taken pursuant to
5  the Federal Rules of Civil Procedure and that said
6  deposition may be taken before Haley A. Phillips,
7  Certified Court Reporter, ACCR # 151, and
8  Commissioner for the State of Alabama at Large,
9  without the formality of a commission, that
10  objections to questions other than objections as to
11  the form of the question need not be made at this
12  time but may be reserved for a ruling at such time
13  as the said deposition may be offered in evidence
14  or used for any other purpose by either party
15  provided for by the Statute.
16    It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23    It is further stipulated and agreed by and

Page 4

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby not waived.
4     * * * * * * * * * * * * *
5       SHERRY BEASLEY
6    The witness, after having first been duly
7  sworn to speak the truth, the whole truth and
8  nothing but the truth testified as follows:
9        EXAMINATION
10  BY MR. DOUGLAS:
11  Q.  Would you state your name, please, ma'am.
12  A.  Sherry Beasley.
13  Q.  Ms. Beasley, my name is Jim Douglas.  I
14     represent Robert Cannon in this lawsuit.
15     Do you and I know each other?
16  A.  No, sir.
17  Q.  Have we met prior to today?
18  A.  No, sir.
19  Q.  Have you ever given a deposition before?
20  A.  No, sir.
21  Q.  I'm going to be asking you some questions.
22     And you understand that you're under oath?
23  A.  Yes, sir.

Deposition of Sherry Beasley

April 10, 2008

Page 5

1  Q.  You understand it's just like being in
2      court?
3  A.  Right.  Yes, sir.
4  Q.  I'm going to do my best to ask questions
5      that make sense to you.  There will be
6      times when I fail to do that.  If you would
7      just let me know, I'll be happy to rephrase
8      my question, okay?
9  A.  Okay.
10  Q.  If I ask a question and you answer it, I'll
11      assume you understood my question.  Fair
12      enough?
13  A.  Fair enough.
14  Q.  Where do you live, ma'am?
15  A.
16  Q.  What's your address?
17  A.
18  Q.  How long have you lived there?
19  A.  Right at four years.
20  Q.  Where did you live before that?
21  A.
22  Q.  And how long did you live at that address?
23  A.  About ten years.

Page 6

1  Q.  Does anybody live in your home with you?
2  A.  Yes.
3  Q.  Who?
4  A.  My husband and my four kids.
5  Q.  Are any of your kids 19 or older?
6  A.  I've got one that's 19.
7  Q.  Excuse me.  18 or older.
8  A.  Yes.  I've got one that's 19.
9  Q.  What is his or her name?
10  A.
11  Q.  Where does he live?
12  A.  He lives at home, but he goes to school in
13      Marion.
14  Q.  Marion ...
15  A.  Alabama.  I'm sorry.
16  Q.  What school?
17  A.  Marion Military Institute.
18  Q.  What is your husband's name?
19  A.
20  Q.  What does he do?
21  A.  He is a master plumber with Associated
22      Mechanical Contractors.
23  Q.  Where does he work?

Page 7

1  A.  Montgomery.
2  Q.  Does he own the company or does he work for
3      them?
4  A.  No.  He works for them.
5  Q.  How long has he been there?
6  A.  Five years.
7  Q.  What did he do before that?
8  A.  He was a police officer with --
9  Q.  Where?
10  A.  He was with Macon County Sheriff's
11      Department and also Notasulga Police
12      Department.
13  Q.  How long was he in law enforcement?
14  A.  Long time.  12 years.
15  Q.  Are you currently employed?
16  A.  Yes, sir.
17  Q.  Where do you work?
18  A.  Advanced Disposal Services.
19  Q.  The defendant in this lawsuit?
20  A.  Yes, sir.
21  Q.  How long have you worked for Advanced
22      Disposal Services?
23  A.  Right at six years.

Page 8

1  Q.  What are your duties?
2  A.  I'm the office manager.  I handle human
3      resources, payroll, customer service.
4  Q.  Anything else?
5  A.  I handle a lot of stuff.  As far as just
6      customer service, payroll, HR, sales
7      coordination.  That's about it.
8  Q.  When you say human resources, what do you
9      mean?
10  A.  Benefits, personnel files.
11  Q.  Right.  But how does -- how does your work
12      relate to that?  You don't pay the
13      benefits, obviously.
14  A.  No.  But I keep up with the personnel files
15      and do the payroll and enter all the
16      information.
17  Q.  For the employees?
18  A.  Yes.
19  Q.  Anything else with regard to HR?
20  A.  I handle any unemployment claims that come
21      in, verifications of employment.  Things
22      like that.
23  Q.  With regard to unemployment claims, did you

Page 9

```
 1        handle Mr. Cannon's?
 2   A.   Yes.
 3   Q.   Does Advanced Disposal have an
 4        anti-harassment policy?
 5   A.   Yes.
 6   Q.   Does it have an anti-harassment policy with
 7        regard to sexual harassment?
 8   A.   It's -- Yes.
 9   Q.   Does it have a list of people who are to
10        receive complaints of harassment within the
11        company?
12   A.   They come to me or we get in touch with
13        corporate, as far as Glenn Guest.
14   Q.   That wasn't quite my question, though.
15   A.   I'm sorry.
16   Q.   I'm talking about the anti-harassment
17        policy in place. Is there -- Does the
18        policy direct employees who have
19        complaints --
20   A.   To call --
21   Q.   -- to certain people to register their
22        complaints, certain people or certain
23        offices within the company?
```

Page 10

```
 1   A.   I don't know. I don't know if it has
 2        individual names.
 3        MR. DYKES: Have you got the
 4        policy? I mean, she could ...
 5        MR. DOUGLAS: I've got what you
 6        provided if you want me to
 7        give that to her.
 8   Q.   Let me ask you this. Did you receive a
 9        copy of the handbook from Advanced
10        Disposal?
11   A.   Yes.
12   Q.   As an employee?
13   A.   Yes.
14   Q.   You're familiar with that?
15   A.   Yes.
16   Q.   I'm going to hand you what purports to be
17        the Advanced Disposal Services and
18        Subsidiaries Employee Handbook, which is
19        Bates stamp ADS 91 through 125.
20   A.   Yes. It says the direct supervisors, human
21        resources manager or upper management --
22   Q.   And what page are you --
23   A.   -- with whom you feel comfortable.
```

Page 11

```
 1   Q.   What page are you reading from down at the
 2        bottom?
 3   A.   Two and three. Page three.
 4   Q.   Just give me the Bates stamp number at the
 5        bottom right, if you would.
 6   A.   I'm sorry. 98.
 7   Q.   Yes.
 8        MR. DYKES: 97 and 98.
 9   A.   97 and 98.
10   Q.   97 and 98?
11   A.   (Witness nods head.)
12   Q.   And is that the portion of the handbook
13        that relates to the anti-harassment policy
14        we were speaking of earlier?
15   A.   Yes.
16   Q.   And it directs the employee to make reports
17        to who?
18   A.   Direct supervisor, human resources manager,
19        any member of upper management with whom
20        you feel comfortable.
21   Q.   Would you call yourself a human resource
22        manager?
23   A.   Yes.
```

Page 12

```
 1   Q.   So you are one of the people who could
 2        receive those types of complaints?
 3   A.   Yes.
 4   Q.   Did you know that before you read it in the
 5        policy just now?
 6   A.   No. I mean, I knew that, yes. I'm sorry.
 7        Yes, I knew that before I read it in here.
 8   Q.   Okay.
 9   A.   Sorry. Yes. I misunderstood you.
10   Q.   Have you ever received a complaint from an
11        employee regarding either sexual or racial
12        harassment?
13   A.   Yes.
14   Q.   And do you always do the same thing when
15        you receive those reports?
16   A.   Yes.
17   Q.   Tell me what you do.
18   A.   I usually write up what was given to me and
19        then I get with the human resource director
20        at corporate.
21   Q.   And who is that?
22   A.   Glenn Guest.
23   Q.   And he's in the room with us today?
```

Page 13

1  A.  Yes.
2  Q.  I don't want to quibble words with you.  I
3     just want to make sure I understand your
4     testimony.  I asked you if you did the same
5     thing and you said usually I'll do --
6  A.  I'm sorry.
7  Q.  -- and you explained the process.  Are
8     there times when you don't do that?
9  A.  No.  I do that.
10 Q.  That's what you always do?
11 A.  Yes, sir.
12 Q.  Are you charged with any responsibility as
13    far as making a determination regarding a
14    harassment complaint as far as who's right
15    and who's wrong?
16 A.  No.
17 Q.  You just pass on the information to
18    corporate?
19 A.  Yes.
20 Q.  With regard to payroll, what are your
21    duties?
22 A.  I input payroll information.  I check it
23    and make sure it's correct.  I send it to

Page 14

1     ADP, get it back, just preview it and then
2     accept it.
3  Q.  What's ADP?
4  A.  It's the people who process our checks.
5  Q.  An outside company?
6  A.  Yes.
7  Q.  With regard to your duties concerning
8     customer service, what do you do?
9  A.  I handle customer service complaints.  I
10    have customer service reps that take phone
11    calls and help the customers.  If they have
12    an issue or a problem with an account, I
13    help them with that.
14 Q.  Is it fair to say that you're available to
15    help the customers with whatever complaints
16    they may have?
17 A.  Yes.
18 Q.  And your company is in the business of
19    what?
20 A.  Waste hauling.
21 Q.  And in layman's terms, what does that mean?
22 A.  Picking up garbage.
23 Q.  And doing what with it?

Page 15

1  A.  Disposing of it.
2  Q.  Where do y'all dispose of it?
3  A.  In a landfill.
4  Q.  Which one?
5  A.  We have several.  Well, as far as a
6     landfill, one in Tallassee.  But we have
7     convenience centers also, or transfer
8     stations.
9  Q.  In this area?
10 A.  Yes.
11 Q.  Where are they?
12 A.  We have one in Opelika and one in
13    Montgomery.
14 Q.  You testified earlier that part of your
15    duties was sales coordinator.  What does
16    that mean?
17 A.  I input sales contracts, make sure that the
18    car -- cans are delivered and routed for
19    the customer to be serviced.
20 Q.  Does your company provide the cans?
21 A.  Yes.
22 Q.  Are your customers all businesses, or do
23    you have residential customers also?

Page 16

1  A.  We have residential also.
2  Q.  So you do both?
3  A.  Yes.
4  Q.  Have we covered what your basic day-to-day
5     duties are?
6  A.  Yes.
7  Q.  Have your duties changed at all in the six
8     years that you've been with Advanced
9     Disposal?
10 A.  No.
11 Q.  So you've been doing the same thing for six
12    years?
13 A.  Well, the first year whenever I first
14    started I was just commercial dispatch, and
15    then the second year is whenever I became
16    officer manager and had the other duties.
17 Q.  What does commercial dispatch mean?
18 A.  Where a customer calls in for a haul or a
19    pull on a container and you dispatch it out
20    to the drivers.
21 Q.  Would that be a business that would be
22    calling?
23 A.  Yes.  Business -- Well, yes, businesses and

Page 17

1    customers, business customers.
2  Q.  So even a residential customer might do
3       that?
4  A.  If -- Not for the commercial side of it.
5       But they would call in if there was a miss
6       or something like that, and we'd handle it
7       for them.
8  Q.  So you were commercial dispatcher for the
9       first year?
10  A.  (Witness nods head.)
11  Q.  Then you became office manager; correct?
12  A.  Yes.
13  Q.  Is there a commercial dispatcher that works
14       under you there now?
15  A.  Yes.
16  Q.  What is his or her name?
17  A.  Amy Kramer.
18  Q.  How long has she been in that job?
19  A.  She's been back now probably about four
20       months.
21  Q.  Did she leave and come back?
22  A.  Uh-huh (positive response).
23  Q.  Why?

Page 18

1  A.  She left and -- quit and went to another
2       job and then came back.  She had a baby in
3       that time also.
4  Q.  Prior to working at Advanced Disposal,
5       where did you work?
6  A.  CitiFinancial.
7  Q.  What did you do with CitiFinancial?
8  A.  I was a loan processor.
9  Q.  What type of loans?
10  A.  Personal loans, home loans, vehicle loans.
11  Q.  Where was that branch located?
12  A.  Opelika.
13  Q.  Opelika, not Auburn?
14  A.  Huh-uh (negative response).
15  Q.  Was it where the old Provino's used to be?
16  A.  There's one there, but there's also one
17       down -- What shopping center is that?  It's
18       behind -- I think it's a Western Sizzlin or
19       something.  Up in that shopping center.
20  Q.  How long were you a loan processor for
21       CitiFinancial?
22  A.  Three years.
23  Q.  Before that?

Page 19

1  A.  Rental Uniform Service in Auburn.
2  Q.  What did you do there?
3  A.  I was a match out processor.  Matched up
4       the uniform shirts with the uniform pants.
5  Q.  Before that?
6  A.  I did that for nine years.  I was in school
7       before that.
8  Q.  What type of school were you in?
9  A.  High school.
10  Q.  Did you graduate from high school?
11  A.  Yes.
12  Q.  What high school?
13  A.  Notasulga High School.
14  Q.  What year?
15  A.  '90.
16  Q.  Did you attend any schooling after high
17       school?
18  A.  No.  I was a volunteer with the fire
19       department, but other than that, I
20       didn't -- I worked.
21  Q.  I asked you earlier about Mr. Cannon's --
22       Mr. Robert Cannon's unemployment claim.
23  A.  Uh-huh (positive response).

Page 20

1  Q.  Is that yes?
2  A.  Yes.  I'm sorry.
3  Q.  You need to speak up so she can take it
4       down.
5  A.  Yes.
6  Q.  What were your duties with regard to that
7       claim?
8  A.  All I would do is, any information that was
9       given to me in reference to a termination,
10       put the dates and the cause and just fax it
11       back.  Or if they had any earnings, I would
12       put the earnings on there.
13  Q.  Fax to who?
14  A.  The unemployment -- The people who sent it,
15       the unemployment office.
16  Q.  Do you recall who you dealt with on
17       Mr. Cannon's unemployment?
18  A.  No, sir, not an individual.
19  Q.  Do you know if there was a hearing?
20  A.  Yes, there was.
21  Q.  Did you attend that hearing?
22  A.  Yes, I did.
23  Q.  What was your role at the hearing?

Deposition of Sherry Beasley                                                    April 10, 2008

Page 21

1   A.  I was just there because I had filled out
2       paperwork. I didn't testify or anything.
3   Q.  Who else was there?
4   A.  Russell Davis.
5   Q.  Why was he there?
6   A.  He was the operations manager at the time.
7   Q.  All right. What does an operations manager
8       do, if you know?
9   A.  He's over all the drivers, making sure the
10      routes are picked up and handles complaints
11      and --
12  Q.  In how many different locations?
13  A.  As far as counties or ...
14  Q.  Well, you tell me.
15  A.  There was --
16  Q.  Mr. Cannon worked out of Tallassee; is that
17      correct?
18  A.  I don't remember. I don't remember where
19      he worked out of.
20  Q.  How many areas did Mr. -- was Mr. Davis
21      over, if you know?
22  A.  He had five counties.
23  Q.  Okay.

Page 22

1   A.  And it was Tallapoosa, Macon, Autauga,
2       Montgomery and Elmore.
3   Q.  And Mr. Davis was over all the drivers in
4       those counties?
5   A.  Yes.
6   Q.  And he was at the unemployment hearing?
7   A.  Yes.
8   Q.  What was his role at the hearing?
9   A.  He testified against -- as far as what
10      happened or in reference to the
11      termination.
12  Q.  Did you review any information with
13      Mr. Davis prior to that hearing?
14  A.  Yes.
15  Q.  What information did you review with him?
16  A.  The termination paperwork and the
17      information that we had filled out on the
18      unemployment form.
19  Q.  And when you say we, who do you mean?
20  A.  Well, I always got -- If I didn't know
21      everything that happened, or whatever, I
22      would get -- ask the -- ask him, ask the
23      supervisor.

Page 23

1   Q.  Mr. Russell Davis?
2   A.  Yes.
3   Q.  And so did y'all meet before the hearing?
4   A.  No. It was just a phone hearing.
5   Q.  Okay. Well, I'm asking what, if anything,
6       you and Mr. Davis did before the hearing.
7   A.  Nothing. We just got his paperwork
8       together for the hearing.
9   Q.  Did you and Mr. Davis speak about what the
10      testimony might be at the hearing?
11  A.  No.
12  Q.  Was there anybody else at the hearing
13      besides you and Mr. Davis and Mr. Cannon?
14  A.  The unemployment person. I don't know what
15      her name was.
16  Q.  So four of you?
17  A.  Yes.
18  Q.  And you didn't testify at the hearing at
19      all?
20  A.  No, sir.
21  Q.  The hearing was done by telephone; is that
22      correct?
23  A.  Yes, sir.

Page 24

1   Q.  Were you and Mr. Davis at the same
2       location?
3   A.  Yes.
4   Q.  Did you write any notes for him while he
5       was testifying?
6   A.  No.
7   Q.  Did he write any notes to you while he was
8       testifying or while Mr. Cannon was
9       testifying?
10  A.  No.
11  Q.  So there was nothing passed between you
12      during the hearing?
13  A.  No.
14  Q.  Have you been at the same office for the
15      last five years?
16  A.  I left for four weeks -- or excuse me --
17      eight weeks and came back.
18  Q.  What do you mean when you say left?
19  A.  I went into operations in June, went over
20      to be a supervisor, and it didn't work out
21      as far as the long hours. And they had
22      done away with office management, so I had
23      to -- I didn't have a position that I could

Deposition of Sherry Beasley

April 10, 2008

Page 25

1   be at, so I left and went to AES. And
2   about -- after the eight weeks, the
3   district manager called me back. And it's
4   kind of like I didn't leave or -- you know,
5   as far as benefits and things of that
6   nature. Everything was the same.
7   Q.  What is AES?
8   A.  It's AES Mechanical. They handle HVAC,
9   ventilation. Things of that nature.
10  Q.  What were your duties with them?
11  A.  I was the controller.
12  Q.  Is that another way of saying you kept the
13      books?
14  A.  Yes. I'm sorry.
15  Q.  So when did this happen that you left
16      Advanced for a short period?
17  A.  It was the end of June of '07.
18  Q.  Would you say that you quit or --
19  A.  Yes. I resigned.
20  Q.  You resigned?
21  A.  Uh-huh (positive response).
22  Q.  Didn't seek out any sort of unemployment
23      benefits or anything?

Page 26

1   A.  No.
2   Q.  But you weren't terminated?
3   A.  Right.
4   Q.  And the reason you quit was because ...
5   A.  They had eliminated my position.
6   Q.  And when you came back, they had reinstated
7       your position?
8   A.  Yes.
9   Q.  The time that you've been working with
10      Advanced over the last five years, have you
11      always been in the same office?
12  A.  Yes.
13  Q.  What is that office address?
14  A.  1303 Washington Boulevard, Tallasee.
15  Q.  Have you used the same computer the entire
16      time you've been there?
17  A.  Yes.
18  Q.  Do you have e-mail?
19  A.  Yes.
20  Q.  Is it company e-mail?
21  A.  Yes.
22  Q.  For example, what is your e-mail address?
23  A.  sbeasley@advanceddisposal.com

Page 27

1   Q.  Did Mr. Davis have e-mails -- have e-mail?
2   A.  I wouldn't think so. He wasn't in the
3       office. I'm sorry. Mr. Davis. I'm
4       thinking Mr. Cannon. I apologize. Yes,
5       sir, he did.
6   Q.  And you knew his e-mail address?
7   A.  Yes.
8   Q.  Does he still work for the company?
9   A.  No.
10  Q.  When did he stop working for the company?
11  A.  I don't remember.
12  Q.  Can you give me a year?
13  A.  I think it was March. March of '07 or
14      something. No. It had to be later than
15      that.
16          MR. DYKES: If you don't know ...
17  A.  I don't know.
18  Q.  I don't know is a fine answer.
19  A.  Okay.
20  Q.  Are you confident it was in 2007?
21  A.  Yes.
22  Q.  Do you know where he is now?
23  A.  No.

Page 28

1   Q.  Have you heard of where he is now?
2   A.  No.
3   Q.  Do you know why he left?
4   A.  No.
5   Q.  Did you hear any rumors as to why he left?
6   A.  I just know there was a new general
7       manager. Right after the new general
8       manager got there his position was
9       eliminated.
10  Q.  Who was the new general manager?
11  A.  At that time it was Zach Poucher.
12  Q.  And is he still employed at Advanced
13      Disposal?
14  A.  Yes.
15  Q.  Is he no longer the general manager?
16  A.  No. Well, I don't know what his position
17      is now. He's at another location.
18  Q.  Okay. Do you know where Mr. Russell Davis
19      lived while he was working at Advanced
20      Disposal?
21  A.  Yes.
22  Q.  Where did he live?
23  A.  In Tallasee.

Page 29

1   Q.  Do you know where in Tallassee?
2   A.  No, sir.  I know Weldon Road, but I don't
3       know his full address.
4   Q.  Did you exchange e-mails periodically with
5       Mr. Russell Davis?
6   A.  No.
7   Q.  You guys never e-mailed one another --
8   A.  No, sir.
9   Q.  -- while he was working at Advanced?
10  A.  Right.  No, sir.
11  Q.  Did you ever e-mail anybody or did anybody
12      ever e-mail you regarding Mr. Cannon?
13  A.  No, sir.
14  Q.  Do you keep your e-mails from a couple of
15      years ago or do you delete them?
16  A.  Usually I delete them.  If they're not of
17      any significance, I don't keep them.
18  Q.  Are you confident, though, as we sit here
19      today you don't have anything on your
20      computers as far as former e-mails
21      regarding Mr. Cannon?
22  A.  I'm confident, yes.
23  Q.  Were you ever asked by anybody to see if

Page 30

1       there were any e-mails regarding
2       Mr. Cannon?
3   A.  No.
4   Q.  When did you first meet Mr. Robert Cannon?
5   A.  I never have.
6   Q.  You've never met him?
7   A.  (Witness shakes head.)
8   Q.  Is that, no, I've never met him?
9   A.  No, I've never met him.  I'm sorry.
10  Q.  Do you have any idea what he looks like?
11  A.  No, sir.
12  Q.  Have you ever talked to him?
13  A.  No, sir, not that I can remember.
14  Q.  Probably would have heard him at the
15      hearing.
16  A.  I heard him at the hearing, but I didn't
17      talk with him.
18  Q.  Other than that, have you ever heard his
19      voice?
20  A.  No, sir.
21  Q.  Tell me about the -- Tell me about your
22      role, if any, in the drug screening
23      procedure for Advanced.  Did you have

Page 31

1       anything to do with that?
2   A.  No, sir.
3   Q.  Do you have anything to do with telling the
4       employees when or where they're getting
5       tested?
6   A.  The only time I would have anything to do
7       with -- as far as telling them where to be
8       tested is if a supervisor is not there.
9       And we would have them a sheet.  The
10      supervisor would tell me to fill out that
11      sheet as far as where to send them, but
12      other than that ...
13  Q.  Do you typically fill out those sheets?
14  A.  No.
15  Q.  So that would be something that would be
16      out of the ordinary for you?
17  A.  Yes.
18  Q.  Is your -- In your position are you drug
19      tested with the company?
20  A.  Yes.
21  Q.  Randomly?
22  A.  Uh-huh (positive response).
23  Q.  Is that yes?

Page 32

1   A.  Yes.  Sorry.
2   Q.  Are you aware of the company's policy with
3       regard to testing positive for illegal
4       drugs?
5   A.  Yes.
6   Q.  What is that policy?
7   A.  You're terminated.
8   Q.  No matter your position?
9   A.  No matter your position.
10  Q.  No matter which illegal drug?
11  A.  No matter.
12  Q.  Is that correct?
13  A.  That's correct.
14  Q.  Were you told that when you were hired?
15  A.  Yes.
16  Q.  Do you know anything about the companies
17      which your company sends the specimens to
18      to be drug tested?
19  A.  No.
20  Q.  Are you in any way involved with selecting
21      which company will be used?
22  A.  No.
23  Q.  Do you have any involvement in collecting

Deposition of Sherry Beasley                                    April 10, 2008

Page 33

| | |
|---|---|
| 1 | the samples to be sent off? |
| 2 | A.  No. |
| 3 | Q.  Do you have anything to do with the |
| 4 | packaging of the samples to be sent off? |
| 5 | A.  No. |
| 6 | Q.  When the results come back, do they come |
| 7 | back to you? |
| 8 | A.  No. |
| 9 | Q.  Who do they come back to? |
| 10 | A.  It's usually the operations manager -- or |
| 11 | is the operations manager or the |
| 12 | supervisor.  Now it's the safety manager. |
| 13 | We have a safety manager. |
| 14 | Q.  But when Mr. Cannon worked there, who did |
| 15 | they come to? |
| 16 | A.  Russell Davis. |
| 17 | Q.  Would you ever lay eyes on anybody's -- the |
| 18 | results from anyone's -- any employee's |
| 19 | drug screen? |
| 20 | A.  Only when it's brought to put in their |
| 21 | personnel file. |
| 22 | Q.  And at that point you would put it in the |
| 23 | file? |

Page 34

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  Would it be your practice to look and see |
| 3 | if they passed or not? |
| 4 | A.  No.  I just look at the name and file it. |
| 5 | Q.  What was your first knowledge of this |
| 6 | case -- Mr. Cannon's case? |
| 7 | A.  When I received a termination form. |
| 8 | Q.  Who did you receive that from? |
| 9 | A.  Danny Futral. |
| 10 | Q.  Do you know when that was? |
| 11 | A.  No, I don't know. |
| 12 | Q.  Was it before he was terminated? |
| 13 | MR. DYKES:  Are you asking about |
| 14 | this case, the lawsuit, or are |
| 15 | you asking about, I guess -- |
| 16 | MR. DOUGLAS:  I was.  But it looks |
| 17 | like she was going a different |
| 18 | direction, which is fine with |
| 19 | me. |
| 20 | MR. DYKES:  Okay.  And you can |
| 21 | keep going.  I think she |
| 22 | was ... |
| 23 | MR. DOUGLAS:  Right. |

Page 35

| | |
|---|---|
| 1 | Q.  Your first knowledge of this was before |
| 2 | Mr. Cannon was fired? |
| 3 | A.  As -- No.  Whenever I received the |
| 4 | termination paper on him, he was already |
| 5 | terminated. |
| 6 | Q.  Was that, like, a day or two after he was |
| 7 | terminated -- |
| 8 | A.  Yes. |
| 9 | Q.  -- or some time after? |
| 10 | A.  It was after -- after he was terminated.  I |
| 11 | don't remember how many days or anything |
| 12 | like that. |
| 13 | Q.  And I guess that would have come to you |
| 14 | just in a sense that you were to file the |
| 15 | paperwork? |
| 16 | A.  Right. |
| 17 | Q.  Is that correct? |
| 18 | A.  Right. |
| 19 | Q.  Did Mr. -- Is it Futral? |
| 20 | A.  Yes, sir. |
| 21 | Q.  Did he make any comments to you regarding |
| 22 | Mr. Cannon? |
| 23 | A.  No, sir. |

Page 36

| | |
|---|---|
| 1 | Q.  Not a word? |
| 2 | A.  Huh-uh (negative response). |
| 3 | Q.  Is that no? |
| 4 | A.  No. |
| 5 | Q.  And did you make any inquiry as to why |
| 6 | Mr. Cannon was being terminated? |
| 7 | A.  No. |
| 8 | Q.  After that what was your next knowledge of |
| 9 | this situation? |
| 10 | A.  I guess I'm not understanding.  Is it the |
| 11 | lawsuit or the termination? |
| 12 | Q.  The termination. |
| 13 | A.  The next thing would have been the |
| 14 | unemployment papers that I received. |
| 15 | Q.  And have you told me everything that you |
| 16 | did with regard to the unemployment |
| 17 | proceeding? |
| 18 | A.  Yes. |
| 19 | Q.  You've already testified about that? |
| 20 | A.  No.  No. |
| 21 | Q.  Tell me what you -- |
| 22 | A.  I'm sorry. |
| 23 | Q.  -- haven't told me. |

Page 37

1  A.  I mean, the unemployment paper.  I would
2      fill out the unemployment paper, fax it
3      over, and then there was an appeal in
4      reference to the benefits.  And that was
5      it.
6  Q.  And you've testified about that?
7  A.  Yes.
8  Q.  And then the hearing?
9  A.  Yes.  Sorry.
10 Q.  Just relax.  Everything is fine.
11     Do you recall what your next knowledge
12     was about Mr. Cannon's situation?
13 A.  Just this, the deposition.
14 Q.  Did you know that a lawsuit had been filed?
15 A.  No.
16 Q.  Until -- I guess you knew when you were
17     told you were going to have to give a
18     deposition?
19 A.  Yes.  Yesterday.
20 Q.  So yesterday was the first you knew that
21     Mr. Cannon had filed a lawsuit against your
22     company?
23 A.  Yes.

Page 38

1  Q.  So, obviously, then, you haven't talked to
2      anybody about his situation or his lawsuit?
3  A.  No.
4  Q.  And nobody has talked to you?
5  A.  No.
6  Q.  I'm going to show you a document which was
7      marked to Mr. Cannon's deposition earlier
8      today.  It was marked as Defendant's
9      Exhibit Number 19 to Mr. Cannon's
10     deposition.  I'm going to ask if you
11     recognize that document.
12 A.  Yes.
13 Q.  What is that document?
14 A.  It's a verification of employment.
15 Q.  It's a two-page document.  Is -- Are both
16     pages verification of employment?
17 A.  Just the one page.
18 Q.  The second page?
19 A.  The second page.
20 Q.  The first page is what?
21 A.  Just the fax cover sheet.
22 Q.  And did you fax that document?
23 A.  Yes.

Page 39

1  Q.  And on that document you made a notation
2      regarding Mr. Cannon's employment with
3      Advanced; is that correct?
4  A.  Yes.
5  Q.  And one of the things that you noted was
6      that he had failed or was in violation of
7      the company's drug and alcohol policy; is
8      that correct?
9  A.  Yes.
10 Q.  On what basis did you make that notation?
11 A.  That was on his termination paper.
12 Q.  I want to be sure that I know exactly what
13     you're speaking of, so I'm going to show
14     you two documents which were previously
15     marked Defendant's Exhibit 13 and
16     Defendant's Exhibit 14 to Mr. Cannon's
17     deposition and ask you if you can identify
18     those documents.
19 A.  Yes.
20 Q.  What are they?  Starting with 13.
21 A.  This is a final clearance for terminating
22     employee.
23 Q.  And what is 14?

Page 40

1  A.  Employee disciplinary report.
2  Q.  Now, when I asked you what you based the
3      notation you made on Defendant's Exhibit
4      19, you mentioned something.
5  A.  Yes.
6  Q.  Is that something you mentioned either
7      Defendant's 13 or 14?
8  A.  Yes.  They were together.
9  Q.  They go together?
10 A.  Yes.
11 Q.  So based upon what was -- what you saw on
12     Defendant's Exhibits 13 and 14, you made
13     the notation of violation of company's
14     alcohol and drug policy --
15 A.  Yes.
16 Q.  -- that's located on Defendant's Exhibit
17     19?
18 A.  Yes.  Yes.
19 Q.  Did you base that entry on anything other
20     than Defendant's 13 and 14?
21 A.  No.
22 Q.  I'm going to show you what was previously
23     marked as Defendant's Exhibit 10 and ask

Page 41

1    you if you can identify that document.
2    A.  Yes.
3    Q.  What is that?
4    A.  The results of a drug test.
5    Q.  Do you know if that document was in
6         Mr. Cannon's personnel file?
7    A.  Yes.
8    Q.  How do you know that?
9    A.  Because I filed it there.
10   Q.  Did you rely on that document in preparing
11        anything that's contained on Defendant's
12        Exhibit 19?
13   A.  No.
14   Q.  What is St. Louis MRO comma Inc.?
15   A.  That's the company that they send the
16        specimens to, I guess.
17   Q.  You've testified you don't have anything to
18        do with that?
19   A.  No.
20   Q.  All right.  I'm going to -- And for the
21        Record, Defendant's Exhibit 10 indicates a
22        positive drug screen for cocaine; is that
23        correct?

Page 42

1    A.  Yes.
2    Q.  All right.  I'm going to show you what was
3         previously marked to Mr. Cannon's
4         deposition as Defendant's Exhibit 11.  Do
5         you recognize that document?
6    A.  Yes.
7    Q.  What is that?
8    A.  It's a drug screen -- results of a drug
9         screen.
10   Q.  And you note on that document that the
11        results for the test of all illegal drugs
12        are negative?
13   A.  Yes.
14   Q.  That were tested for?
15   A.  Yes.
16   Q.  Were you aware at the point in time that
17        you sent Defendant's Exhibit 19 that there
18        were drug tests a couple of weeks apart
19        which showed different results --
20   A.  No.
21   Q.  -- in Mr. Cannon's file?
22   A.  No.
23   Q.  Had no idea?

Page 43

1    A.  I mean, I knew of them being filed, but I
2         didn't look at the results.  And that's not
3         what I based this off of.
4    Q.  So Defendant's Exhibit 19 would only be as
5         accurate as Defendant's Exhibits 13 and 14
6         were?
7    A.  Yes.  This paper when it came in, I got
8         with the operations manager.  And --
9    Q.  Is that Mr. Russell Davis?
10   A.  Yes.
11        And he told me as far as the reasoning
12        right here, but everything else --
13        MR. DYKES:  You're pointing to --
14        THE WITNESS:  I'm sorry.
15        MR. DYKES:  -- if yes, give date
16        and explain?
17        THE WITNESS:  Yes.
18   A.  About the two tests.  He told me about
19        that.  And I wrote what he was saying.
20   Q.  And could you read that for the Record?
21   A.  3/9/07 results came back in reference to
22        preemployment testing, had to take two
23        tests.  First test had wrong social

Page 44

1    security number on it, so we retested.
2    Q.  Well, at that point did you feel any need
3         to perhaps go and look at the two tests
4         themselves?
5    A.  No.  I didn't.
6    Q.  Why not?
7    A.  I didn't -- As far as this, I didn't -- I
8         don't know.  I didn't go look at the
9         testing.  I just went off the termination
10        information, and I tried to get the
11        operations manager to fill this out in
12        reference to employment verification,
13        because ...
14   Q.  And who were you sending Defendant's
15        Exhibit 19 to?
16   A.  Ann Dora's Custom Wrought Iron.
17   Q.  Do you have any idea what kind of company
18        that is?
19   A.  No, sir.
20   Q.  Is it --
21   A.  Other than wrought iron.  I don't know what
22        that is.
23   Q.  In your experience working with companies,

Deposition of Sherry Beasley

Page 45

1   would you agree with me that having a
2   positive drug screen will affect an
3   applicant negatively as far as getting
4   employment?
5   A.  I would think so.  But if it's in reference
6       to a driver, I feel like it, you know --
7       we're supposed to tell them that in
8       reference to DOT.
9   Q.  Oh, I'm not -- I'm not arguing that you
10      shouldn't do that.
11  A.  Right.
12  Q.  I'm just asking your opinion as --
13  A.  Oh, yeah.
14  Q.  -- if -- Do you have any responsibilities
15      with regard to hiring people for your
16      company?
17  A.  No.
18  Q.  No input whatsoever?
19  A.  No.
20  Q.  Okay.
21  A.  I mean, we would interview, or whatever.
22      If we -- If someone asked you your
23      opinion.  But, no, nothing -- nothing

Page 46

1   permanent; I mean, yes or no, would I hire
2   him or not.
3   Q.  Are you involved in the hiring decisions of
4       new employees in any way?
5   A.  Only in customer service.  Not drivers or
6       anything like that.
7   Q.  Customer service employees?
8   A.  Yes.
9              (Off-the-Record discussion.)
10  Q.  On Defendant's Exhibit 11, there's a name
11      in the upper left-hand portion that's
12      written.  It says, attention Ms. Pullum; is
13      that right?
14  A.  Pullum.
15  Q.  Do you know who that person might be?
16  A.  No.
17  Q.  How about the handwritten portion on the
18      upper right-hand portion of Defendant's
19      Exhibit 11?
20  A.  No.
21  Q.  Can you read it?
22  A.  Claimant.  I don't know what that is.  And
23      then 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 is what it looks like.

Page 47

1   Q.  Do you know if that's Mr. Cannon's social
2       security number or not?
3   A.  I don't know without looking at it.
4   Q.  But that's not your handwriting, I take it?
5   A.  No.
6   Q.  You didn't write any of the stuff that is
7       written on Defendant's Exhibit 11?
8   A.  No.
9   Q.  How about the part just below the MRO,
10      which is underlined?  Are you able to read
11      that?
12  A.  This is the company drug screen.
13  Q.  But you didn't write it?
14  A.  No.
15  Q.  Do you recognize the handwriting?
16  A.  No.
17  Q.  Defendant's Exhibit Number 10, there's a --
18      something that's written by hand just to
19      the right of the MRO logo.  Can you read
20      that?
21  A.  It might say Russell.
22  Q.  Is that your --
23  A.  That's what it looks like.

Page 48

1   Q.  -- handwriting?
2   A.  No.
3   Q.  Do you recognize the handwriting?
4   A.  No.
5   Q.  Do you have any idea who wrote it?
6   A.  No.
7   Q.  There's a number written up in the upper
8       left-hand portion of Defendant's Exhibit
9       11.  Number 26, is it?
10  A.  Uh-huh (positive response).
11  Q.  Is that yes?
12  A.  Yes.
13  Q.  Did you write that?
14  A.  No.
15  Q.  Do you know who did?
16  A.  No.
17  Q.  Do you know if it would mean anything as
18      far as your company's bookkeeping goes?
19  A.  No.
20  Q.  Did you speak with anyone at Ann Dora's
21      Custom Wrought Iron?
22  A.  No.
23  Q.  Did anyone from there call you?

Page 49

1  A.  No.
2  Q.  On Defendant's Exhibit 19, it looks like
3      they spelled your name incorrectly --
4  A.  Yes.
5  Q.  -- at first.  Do you -- Did you scratch
6      out --
7  A.  I did, yes.  When I refaxed it.
8  Q.  And in the from column, it says from -- I
9      don't know what that name is.  It looks
10     look it starts with an A.  Do you have any
11     idea?
12 A.  I don't know.
13 Q.  Do you have any recollection of who you
14     spoke with, if anybody?
15 A.  I didn't speak with anybody.
16 Q.  You're sure of that?
17 A.  I'm sure.
18 Q.  Do you know who Bill Lucas is?
19 A.  No.
20 Q.  The explanation that's contained on
21     Defendant's Exhibit 19, which you read into
22     the Record earlier -- Do you recall that?
23 A.  Yes.

Page 50

1  Q.  That is your handwriting, I take it?
2  A.  Yes.
3  Q.  But you're saying that Mr. Davis told you
4      to write that?
5  A.  Yes.
6  Q.  Was he standing over your shoulder at the
7      time?
8  A.  He was in my office, yes.
9  Q.  And he was basically just giving you
10     dictation and you were --
11 A.  Right.
12 Q.  -- copying down exactly what he said?
13 A.  Right.
14 Q.  Did you ask him what should be written
15     there, if anything, or did he direct you to
16     write that?
17 A.  No.  I asked him.
18 Q.  Why?
19 A.  Because on the -- I knew it was terminated
20     in violation of drug policy, but I didn't
21     know if I needed to write anything else as
22     far as an explanation.
23 Q.  Have you had occasion to fill out forms

Page 51

1      similar to these on employees who have been
2      fired due to violation of the company's
3      drug and alcohol policy?
4  A.  I do that with every individual.
5  Q.  What's that?  You do what?
6  A.  I'm sorry.  Filling out the verification of
7      employment.
8  Q.  Well, I understand that.  I'm asking if you
9      filled one out, other than Mr. Cannon,
10     where the termination was checked for
11     violation of the company's alcohol and drug
12     policy.
13 A.  I don't recall.
14 Q.  Don't recall one way or the other?
15 A.  I don't recall.
16 Q.  The reason I ask you that question is
17     because you said that you knew because it
18     was a positive drug test or failure of the
19     drug policy that you might need to write
20     something out.  At least that's what I
21     understood you to say.
22 A.  Well, any time -- If a driver verification
23     comes over, I try to get the supervisor to

Page 52

1      fill it out in reference to what they know,
2      because I don't know everything other than
3      what's on the paperwork that's given for
4      termination.  So I don't know if, you
5      know ...
6  Q.  So you requested an explanation from
7      Mr. Davis?
8  A.  Well, I didn't know based on him being a
9      driver and terminated for the violation of
10     policy, or whatever, if we needed to write
11     an explanation or anything.
12 Q.  So you inquired of Mr. Davis as to whether
13     something needed to be written?
14 A.  Yes.
15 Q.  As an explanation?
16 A.  Yes.
17 Q.  And he said, yes, and what appears on
18     Defendant's Exhibit 19 is what he told you
19     to write?
20 A.  Yes.
21 Q.  You're certain of that?
22 A.  Yes.
23 Q.  Have you spoken to Mr. Davis about this

Page 53

1   case at all?
2   A.   No.
3   Q.   Do you have any people who live in Lee,
4        Macon, Randolph or Tallapoosa County --
5   A.   I do in --
6   Q.   -- that are members of your family or by
7        blood or marriage?
8   A.   I do in Macon and Tallapoosa.
9   Q.   Can you give me their names and their
10       relationship to you?
11  A.   Aleshia McKee is my stepsister.  Lee McKee
12       is my brother-in-law.  Sue Estridge is my
13       stepmother.  They live in Macon County.
14       And then in Tallapoosa it's my husband,
15       Jerry Beasley, and my sons; Brent, Heath
16       Chance and Brady Beasley.
17  Q.   Any other family members by blood or
18       marriage?
19  A.   No.
20  Q.   None of your husband's family live in those
21       counties?
22  A.   He has family but I don't know them.
23  Q.   I need to add Chambers County to my

Page 54

1   question, too.
2   A.   Chambers, no.
3   Q.   Any friends, any -- Not just people you
4        might know but any people you would call
5        your friends that live in those counties?
6   A.   Yes.  Kelly Bass in Macon County.  Jennifer
7        Hatchett in Tallapoosa.  I guess that would
8        be it.
9   Q.   The reason I'm asking is if this case were
10       tried and you might be a witness in the
11       case, I might need to know who your friends
12       would be.
13  A.   I understand.
14  Q.   So are there any others you can think of?
15  A.   Other than coworkers.
16  Q.   Well, tell me who your coworkers are.
17  A.   Julie Bice, Tonya Davis, Renee Harper, Kim
18       Whitfield, Sue Daughtry, Vernon Hunter.
19            MR. DYKES:  I think if they're
20            coworkers, they've got a place
21            of employment on the jury
22            list, so, I mean ...
23  Q.   You were about done, weren't you?

Page 55

1   A.   Huh?
2   Q.   Weren't you about done?
3   A.   There's a lot more.
4            MR. DYKES:  Yeah.
5   A.   I mean, it's just coworkers that I work
6        with daily.
7   Q.   Okay.  These are all people that currently
8        work at Advanced?
9   A.   Right.
10  Q.   Are there any people that used to work
11       there who don't work there any longer who
12       you would call your friends?
13  A.   No.
14  Q.   Anybody you might have dinner with or
15       something like that?
16  A.   No.
17  Q.   Have you ever been terminated from a job?
18  A.   No.
19  Q.   Have you ever made a claim of any type of
20       workplace harassment?
21  A.   No.
22  Q.   Have you ever been the victim of any type
23       of workplace harassment that you didn't

Page 56

1   report?
2   A.   No.
3   Q.   Are you aware of any instances of racial
4        harassment at Advanced that you've noticed?
5   A.   No.
6   Q.   Have you ever received a complaint at
7        Advanced of racial harassment?
8   A.   No.
9   Q.   Have you ever received a complaint of any
10       type of harassment at Advanced?
11  A.   Yes.
12  Q.   How many times?
13  A.   Just one.
14  Q.   And you would have taken whatever steps you
15       explained earlier?
16  A.   Yes.
17  Q.   If you'll give me just a minute, I'll be
18       about done.
19            (Off-the-Record discussion.)
20  Q.   Just one more question.
21            Did you have any knowledge that
22       Mr. Cannon had filed a complaint with the
23       Equal Employment Opportunity Commission?

Page 57

1    A.  No.
2    Q.  Did you get any documents together for the
3        EEOC?
4    A.  No, I don't think so.
5    Q.  Not that you recall?
6    A.  Not that I recall.
7    Q.  All right.  I think that's all the
8        questions I have for you.
9            MR. DYKES:  I don't have any.
10

          * * * * * * * * * * * *
11

     FURTHER DEPONENT SAITH NOT
12
          * * * * * * * * * * * *
13
14
15
16
17
18
19
20
21
22
23

Page 58

1        REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    ELMORE COUNTY:
4        I, Haley A. Phillips, Certified Court
5    Reporter, ACCR # 151, and Commissioner for the
6    State of Alabama at Large, do hereby certify that I
7    reported the deposition of:
8        SHERRY BEASLEY
9    who was first duly sworn by me to speak the truth,
10   the whole truth and nothing but the truth, in the
11   matter of:
12       ROBERT CANNON,
13       Plaintiff,
14       vs.
15       ADVANCED DISPOSAL SERVICES
16       ALABAMA, LLC, d/b/a SUNFLOWER
17       WASTE, LLC,
18       Defendants.
19       In The U.S. District Court
20       For the Middle District of Alabama
21       Eastern Division
22       Case Number 3:07-CV-846-WKW
23   on Thursday, April 10, 2008.

Page 59

1        The foregoing 58 computer-printed pages
2    contain a true and correct transcript of the
3    examination of said witness by counsel for the
4    parties set out herein.  The reading and signing of
5    same is hereby waived.
6        I further certify that I am neither of kin
7    nor of counsel to the parties to said cause nor in
8    any manner interested in the results thereof.
9        This 2nd day of May 2008.
10
11
12
13       _____
         Haley A. Phillips, ACCR #151
         Expiration Date:  9/30/08
14       Certified Court Reporter and
         Commissioner for the State
15       of Alabama at Large
16
17
18
19
20
21
22
23

Deposition of Sherry Beasley

April 10, 2008

Page 1

**A**

able 47:10
about 5:23 8:7 9:16
  17:19 19:21 23:9
  25:2 30:21,21 32:16
  34:13,15 36:19 37:6
  37:12 38:2 43:18,18
  46:17 47:9 52:23
  54:23 55:2 56:18
accept 14:2
account 14:12
ACCR 1:16 3:7 58:5
  59:13
accurate 43:5
ACTION 1:7
add 53:23
address 5:16,22 26:13
  26:22 27:6 29:3
ADP 14:1,3
ADS 10:19
Advanced 1:8 7:18,21
  9:3 10:9,17 16:8 18:4
  25:16 26:10 28:12,19
  29:9 30:23 39:3 55:8
  56:4,7,10 58:15
AES 25:1,7,8
affect 45:2
after 4:6 19:16 25:2
  28:7 35:6,9,10,10
  36:8
against 22:9 37:21
ago 29:15
agree 45:1
agreed 3:2,16,23
agreement 1:15
Alabama 1:2,8,17,19
  2:6,10 3:8 6:15 58:2
  58:6,16,20 59:15
alcohol 39:7 40:14 51:3
  51:11
Aleshia 53:11
already 35:4 36:19
always 12:14 13:10
  22:20 26:11
Amy 17:17
Ann 44:16 48:20
another 1:11 25:12
  28:17 29:7
answer 5:10 27:18
anti-harassment 9:4,6
  9:16 11:13
anybody 6:1 23:12
  29:11,11,23 38:2
  49:14,15 55:14
anybody's 33:17
anyone 48:20,23
anyone's 33:18
anything 8:4,19 21:2

**B**

B 2:4,5
baby 18:2
back 14:1 17:19,21
  18:2 20:11 24:17
  25:3 26:6 33:6,7,9
  43:21
base 40:19
based 40:2,11 43:3
  52:8
basic 16:4
basically 50:9
basis 39:10
Bass 54:6
Bates 10:19 11:4
Beasley 1:14 3:4 4:5,12
  4:13 6:10,19 53:15
  53:16 58:8
became 16:15 17:11
before 1:15 3:6 4:19
  5:20 7:7 12:4,7 18:23
  19:5,7 23:3,6 34:12
  35:1
behind 18:18
being 5:1 36:6 43:1

**C**

52:8
below 47:9
benefits 8:10,13 25:5
  25:23 37:4
besides 23:13
best 5:4
between 3:3,17 4:1
  24:11
Bice 54:17
Bill 49:18
Birmingham 2:10
blood 53:7,17
bookkeeping 48:18
books 25:13
both 16:2 38:15
bottom 11:2,5
Boulevard 26:14
Brady 53:16
branch 18:11
Brent 6:10 53:15
Brooks 2:8
brother-in-law 53:12
brought 33:20
business 14:18 16:21
  16:23 17:1
businesses 15:22 16:23

**C**

call 9:20 11:21 17:5
  48:23 54:4 55:12
called 25:3
calling 16:22
calls 14:11 16:18
came 18:2 24:17 26:6
  43:7,21
Cannon 1:5 4:14 21:16
  23:13 24:8 27:4
  29:12,21 30:2,4
  33:14 35:2,22 36:6
  37:21 51:9 56:22
  58:12
Cannon's 9:1 19:21,22
  20:17 34:6 37:12
  38:7,9 39:2,16 41:6
  42:3,21 47:1
cans 15:18,20
car 15:18
case 3:18,20 34:6,6,14
  53:1 54:9,11 58:22
Catherine 1:18 2:5
cause 20:10 59:7
center 18:17,19
centers 15:7
certain 9:21,22,22
  52:21
CERTIFICATE 58:1
Certified 1:16 3:7 58:4
  59:14
certify 58:6 59:6

**Chambers** 53:23 54:2
Chance 53:16
changed 16:7
charged 13:12
check 13:22
checked 51:10
checks 14:4
CitiFinancial 18:6,7,21
Civil 1:7 3:5
claim 19:22 20:7 55:19
Claimant 46:22
claims 8:20,23
clearance 39:21
cocaine 41:22
collecting 32:23
column 49:8
come 8:20 9:12 17:21
  33:6,6,9,15 35:13
comes 51:23
comfortable 10:23
  11:20
comma 41:14
commencing 1:20
comments 35:21
commercial 16:14,17
  17:4,8,13
commission 3:9 56:23
Commissioner 1:17 3:8
  58:5 59:14
companies 32:16 44:23
company 7:2 9:11,23
  14:5,18 15:20 26:20
  27:8,10 31:19 32:17
  32:21 37:22 41:15
  44:17 45:16 47:12
company's 32:2 39:7
  40:13 48:18 51:2,11
complaint 12:10 13:14
  56:6,9,22
complaints 9:10,19,22
  12:2 14:9,15 21:10
computer 26:15
computers 29:20
computer-printed 59:1
concerning 14:7
confident 27:20 29:18
  29:22
Constangy 2:8
contain 59:2
contained 41:11 49:20
container 16:19
Contractors 6:22
contracts 15:17
controller 25:11
convenience 15:7
coordination 8:7
coordinator 15:15
copy 10:9
copying 50:12

**corporate** 9:13 12:20
  13:18
correct 13:23 17:11
  21:17 23:22 32:12,13
  35:17 39:3,8 41:23
  59:2
counsel 3:3,17 59:3,7
counties 21:13,22 22:4
  53:21 54:5
County 7:10 53:4,13,23
  54:6 58:3
couple 29:14 42:18
court 1:1,16,19 2:5 3:7
  5:2 58:4,19 59:14
cover 38:21
covered 16:4
coworkers 54:15,16,20
  55:5
currently 7:15 55:7
Custom 44:16 48:21
customer 8:3,6 14:8,9
  14:10 15:19 16:18
  17:2 46:5,7
customers 14:11,15
  15:22,23 17:1,1

**D**

daily 55:6
Danny 34:9
date 43:15 59:13
dates 20:10
Daughtry 54:18
Davis 21:4,20 22:3,13
  23:1,6,9,13 24:1 27:1
  27:3 28:18 29:5
  33:16 43:9 50:3 52:7
  52:12,23 54:17
day 35:6 59:9
days 35:11
day-to-day 16:4
dealt 20:16
decisions 46:3
defendant 1:10 2:7
  7:19
Defendants 58:18
Defendant's 38:8 39:15
  39:16 40:3,7,12,16
  40:20,23 41:11,21
  42:4,17 43:4,5 44:14
  46:10,18 47:7,17
  48:8 49:2,21 52:18
delete 29:15,16
delivered 15:18
department 7:11,12
  19:19
DEPONENT 57:11
deposition 1:14 3:4,6
  3:13,18 4:2,19 37:13
  37:18 38:7,10 39:17

42:4 58:7
determination 13:13
dictation 50:10
different 21:12 34:17
  42:19
dinner 55:14
direct 9:18 10:20 11:18
  50:15
direction 34:18
director 12:19
directs 11:16
disciplinary 40:1
discussion 46:9 56:19
dispatch 16:14,17,19
dispatcher 17:8,13
Disposal 1:8 7:18,22
  9:3 10:10,17 16:9
  18:4 28:13,20 58:15
dispose 15:2
Disposing 15:1
district 1:1,2 25:3
  58:19,20
Division 1:3 58:21
document 38:6,11,13
  38:15,22 39:1 41:1,5
  41:10 42:5,10
documents 39:14,18
  57:2
doing 14:23 16:11
done 23:21 24:22 54:23
  55:2 56:18
Dora's 44:16 48:20
DOT 45:8
Douglas 1:18 2:4,4,16
  4:10,13 10:5 34:16
  34:23
down 11:1 18:17 20:4
  50:12
driver 45:6 51:22 52:9
drivers 16:20 21:9 22:3
  46:5
drug 30:22 31:18 32:10
  32:18 33:19 39:7
  40:14 41:4,22 42:8,8
  42:18 45:2 47:12
  50:20 51:3,11,18,19
drugs 32:4 42:11
due 51:2
duly 4:6 58:9
during 24:12
duties 8:1 13:21 14:7
  15:15 16:5,7,16 20:6
  25:10
Dykes 2:8 10:3 11:8
  27:16 34:13,20 43:13
  43:15 54:19 55:4
  57:9
d/b/a 1:8 58:16

E

each 4:15
earlier 11:14 15:14
  19:21 38:7 49:22
  56:15
earnings 20:11,12
Eastern 1:3 58:21
EEOC 57:3
eight 24:17 25:2
either 3:14,20 12:11
  40:6
eliminated 26:5 28:9
Elmore 22:2 58:3
employed 7:15 28:12
employee 10:12,18
  11:16 12:11 39:22
  40:1
employees 8:17 9:18
  31:4 46:4,7 51:1
employee's 33:18
employment 8:21
  38:14,16 39:2 44:12
  45:4 51:7 54:21
  56:23
end 25:17
enforcement 7:13
enough 5:12,13
enter 8:15
entire 26:15
entry 40:19
Equal 56:23
Esq 2:4,8
Estridge 53:12
even 17:2
ever 4:19 12:10 29:11
  29:12,23 30:12,18
  33:17 55:17,19,22
  56:6,9
every 51:4
everything 22:21 25:6
  36:15 37:10 43:12
  52:2
evidence 3:13
exactly 39:12 50:12
examination 2:15 4:9
  59:3
example 26:22
exchange 29:4
excuse 6:7 24:16
Exhibit 38:9 39:15,16
  40:3,16,23 41:12,21
  42:4,17 43:4 44:15
  46:10,19 47:7,17
  48:8 49:2,21 52:18
Exhibits 40:12 43:5
experience 44:23
Expiration 59:13
explain 43:16

explained 13:7 56:15
explanation 49:20
  50:22 52:6,11,15
eyes 33:17
e-mail 26:18,20,22 27:1
  27:6 29:11,12
e-mailed 29:7
e-mails 27:1 29:4,14,20
  30:1

F

fail 5:6
failed 39:6
failure 51:18
fair 5:11,13 14:14
familiar 10:14
family 53:6,17,20,22
far 8:5 9:13 13:13,14
  15:5 21:13 22:9
  24:21 25:5 29:20
  31:7,11 43:11 44:7
  45:3 48:18 50:22
fax 20:10,13 37:2 38:21
  38:22
Federal 2:10 3:5
feel 10:23 11:20 44:2
  45:6
Fifth 2:9
file 33:21,23 34:4 35:14
  41:6 42:21
filed 37:14,21 41:9 43:1
  56:22
files 8:10,14
filing 3:18,22
fill 31:10,13 37:2 44:11
  50:23 52:1
filled 21:1 22:17 51:9
Filling 51:6
final 39:21
fine 27:18 34:18 37:10
fire 19:18
fired 35:2 51:2
first 4:6 16:13,13 17:9
  30:4 34:5 35:1 37:20
  38:20 43:23 49:5
  58:9
five 7:6 21:22 24:15
  26:10
follows 4:8
foregoing 59:1
form 3:11 22:18 34:7
formality 3:9
former 29:20
forms 50:23
four 5:19 6:4 17:19
  23:16 24:16
friends 54:3,5,11 55:12
from 10:9 11:1 12:10
  19:10 29:14 33:18

34:8 48:23 49:8,8
  52:6 55:17
full 29:3
further 3:16,23 57:11
  59:6
Futral 34:9 35:19

G

garbage 14:22
general 28:6,7,10,15
getting 31:4 45:3
give 10:7 11:4 27:12
  37:17 43:15 53:9
  56:17
given 4:19 12:18 20:9
  52:3
giving 50:9
Glenn 2:12 9:13 12:22
go 40:9 44:3,8
goes 6:12 48:18
going 4:21 5:4 10:16
  34:17,21 37:17 38:6
  38:10 39:13 40:22
  41:20 42:2
graduate 19:10
guess 34:15 35:13
  36:10 37:16 41:16
  54:7
Guest 2:12 9:13 12:22
guys 29:7

H

Haley 1:15 3:6 58:4
  59:13
hand 10:16 47:18
handbook 10:9,18
  11:12
handle 8:2,5,20 9:1
  14:9 17:6 25:8
handles 21:10
handwriting 47:4,15
  48:1,3 50:1
handwritten 46:17
happen 25:15
happened 22:10,21
happy 5:7
harassment 9:7,10
  12:12 13:14 55:20,23
  56:4,7,10
Harper 54:17
Hatchett 54:7
haul 16:18
hauling 14:20
having 4:6 45:1
head 11:11 17:10 30:7
hear 28:5
heard 28:1 30:14,16,18
hearing 20:19,21,23
  22:6,8,13 23:3,4,6,8

23:10,12,18,21 24:12
  30:15,16 37:8
Heath 53:15
help 14:11,13,15
her 6:9 10:7 17:16
  23:15
hereto 3:21 4:1
high 19:9,10,12,13,16
him 22:15,22 24:4 30:6
  30:8,9,12,14,16,17
  35:4 46:2 50:14,17
  52:8
hire 46:1
hired 32:14
hiring 45:15 46:3
home 6:1,12 18:10
hours 24:21
HR 8:6,19
Huh 55:1
Huh-uh 18:14 36:2
human 8:2,8 10:20
  11:18,21 12:19
Hunter 54:18
husband 6:4 53:14
husband's 6:18 53:20
HVAC 25:8

I

idea 30:10 42:23 44:17
  48:5 49:11
identify 39:17 41:1
illegal 32:3,10 42:11
Inc 41:14
incorrectly 49:3
INDEX 2:15
indicates 41:21
individual 10:2 20:18
  51:4
information 8:16 13:17
  13:22 20:8 22:12,15
  22:17 44:10
input 13:22 15:17
  45:18
inquired 52:12
inquiry 36:5
instances 56:3
Institute 6:17
interested 59:8
interview 45:21
introduced 3:19
involved 32:20 46:3
involvement 32:23
iron 44:16,21 48:21
issue 14:12

J

J 2:8
James 2:4
Jennifer 54:6

Jerry 6:19 53:15
Jim 4:13
job 17:18 18:2 55:17
Jr 2:4 6:19
Julie 54:17
June 24:19 25:17
jury 54:21
just 5:1,7 8:5 11:4 12:5
  13:3,17 14:1 16:14
  20:10 21:1 23:4,7
  28:6 34:4 35:14
  37:10,13 38:17,21
  44:9 45:12 47:9,18
  50:9 54:3 55:5 56:13
  56:17,20

**K**

keep 8:14 29:14,17
  34:21
Kelly 54:6
kept 25:12
kids 6:4,5
Kim 54:17
kin 59:6
kind 25:4 44:17
knew 12:6,7 27:6 37:16
  37:20 43:1 50:19
  51:17
know 4:15 5:7 10:1,1
  12:4 20:19 21:8,21
  22:20 23:14 25:4
  27:16,17,18,22 28:3
  28:6,16,18 29:1,2,3
  32:16 34:10,11 37:14
  39:12 41:5,8 44:8,21
  45:6 46:15,22 47:1,3
  48:15,17 49:9,12,18
  50:21 52:1,2,4,5,8
  53:22 54:4,11
knowledge 34:5 35:1
  36:8 37:11 56:21
Kramer 17:17

**L**

landfill 15:3,6
Large 1:17 3:8 58:6
  59:15
last 24:15 26:10
later 27:14
law 1:18 2:9 7:13
lawsuit 4:14 7:19 34:14
  36:11 37:14,21 38:2
lay 33:17
layman's 14:21
least 51:20
leave 17:21 25:4
Lee 53:3,11
left 18:1 24:16,18 25:1
  25:15 28:3,5

left-hand 46:11 48:8
let 5:7 10:8
like 5:1 8:22 17:6 25:4
  30:10 34:17 35:6,12
  45:6 46:6,23 47:23
  49:2 55:15
list 9:9 54:22
live 5:14,20,22 6:1,11
  28:22 53:3,13,20
  54:5
lived 5:18 28:19
lives 6:12
LLC 1:8,9 58:16,17
loan 18:8,20
loans 18:9,10,10,10
located 18:11 40:16
location 24:2 28:17
locations 21:12
logo 47:19
long 5:18,22 7:5,13,14
  7:21 17:18 18:20
  24:21
longer 28:15 55:11
look 34:2,4 43:2 44:3,8
  49:10
looking 47:3
looks 30:10 34:16
  46:23 47:23 49:2,9
lot 8:5 55:3
Louis 41:14
Lucas 49:18

**M**

Macon 7:10 22:1 53:4
  53:8,13 54:6
made 3:11 39:1 40:3,12
  55:19
make 5:5 11:16 13:3,23
  15:17 35:21 36:5
  39:10
making 13:13 21:9
management 10:21
  11:19 24:22
manager 8:21 10:21
  11:18,22 16:16 17:11
  21:6,7 25:3 28:7,8,10
  28:15 33:10,11,12,13
  43:8 44:11
manner 3:20 59:8
many 21:12,20 35:11
  56:12
March 27:13,13
Marion 6:13,14,17
marked 38:7,8 39:15
  40:23 42:3
marriage 53:7,18
master 6:21
match 19:3
Matched 19:3

matter 32:8,9,10,11
  58:11
may 3:6,12,13,19 14:16
  59:9
ma'am 4:11 5:14
McKee 53:11,11
McNeal 1:18 2:4
mean 8:9 10:4 12:6
  14:21 15:16 16:17
  22:19 24:18 37:1
  43:1 45:21 46:1
  48:17 54:22 55:5
Mechanical 6:22 25:8
meet 23:3 30:4
member 11:19
members 53:6,17
mentioned 40:4,6
met 4:17 30:6,8,9
Middle 1:2 58:20
might 17:2 23:10 46:15
  47:21 51:19 54:4,10
  54:11 55:14
Military 6:17
minute 56:17
miss 17:5
misunderstood 12:9
Montgomery 7:1 15:13
  22:2
months 17:20
more 55:3 56:20
MRO 41:14 47:9,19

**N**

name 4:11,13 6:9,18
  17:16 23:15 34:4
  46:10 49:3,9
names 10:2 53:9
nature 25:6,9
need 3:11 20:3 44:2
  51:19 53:23 54:11
needed 50:21 52:10,13
negative 18:14 36:2
  42:12
negatively 45:3
neither 59:6
never 29:7 30:5,6,8,9
  new 28:6,7,10 46:4
next 36:8,13 37:11
nine 19:6
nobody 38:4
nods 11:11 17:10
None 53:20
North 2:9
Notasulga 5:21 7:11
  19:13
notation 39:1,10 40:3
  40:13
note 42:10
noted 39:5

notes 24:4,7
nothing 4:8 23:7 24:11
  45:23,23 58:10
noticed 56:4
number 11:4 38:9 44:1
  47:2,17 48:7,9 58:22

**O**

oath 4:22
objections 3:10,10
obviously 8:13 38:1
occasion 50:23
off 33:1,4 43:3 44:9
offered 3:13
office 8:2 17:11 20:15
  24:14,22 26:11,13
  27:3 50:8
officer 7:8 16:16
offices 1:18 9:23
Off-the-Record 46:9
  56:19
Oh 45:9,13
okay 5:8,9 12:8 21:23
  23:5 27:19 28:18
  34:20 45:20 55:7
old 18:15
older 6:5,7
one 2:10 6:6,8 12:1
  15:4,6,12,12 18:16
  18:16 29:7 38:17
  39:5 51:9,14 56:13
  56:20
only 31:6 33:20 43:4
  46:5
Opelika 15:12 18:12,13
operations 21:6,7
  24:19 33:10,11 43:8
  44:11
opinion 45:12,23
Opportunity 56:23
ordinary 31:16
other 3:10,14,20 4:15
  16:16 19:19 30:18
  31:12 40:19 44:21
  51:9,14 52:2 53:17
  54:15
others 54:14
out 16:19 19:3 21:1,16
  21:19 22:17 24:20
  25:22 31:10,13,16
  37:2 44:11 49:6
  50:23 51:6,9,20 52:1
  59:4
outside 14:5
over 21:9,21 22:3
  24:19 26:10 37:3
  50:6 51:23
own 7:2

**P**

packaging 33:4
page 10:22 11:1,3
  38:17,18,19,20
pages 38:16 59:1
pants 19:4
paper 35:4 37:1,2
  39:11 43:7
papers 36:14
paperwork 21:2 22:16
  23:7 35:15 52:3
part 15:14 47:9
parties 3:3,17 4:1 59:4
  59:7
party 3:14,20
pass 13:17
passed 24:11 34:3
pay 8:12
payroll 8:3,6,15 13:20
  13:22
people 9:9,21,22 12:1
  14:4 20:14 45:15
  53:3 54:3,4 55:7,10
perhaps 44:3
period 25:16
periodically 29:4
permanent 46:1
person 23:14 46:15
Personal 18:10
personnel 8:10,14
  33:21 41:6
Phillips 1:16 3:6 58:4
  59:13
phone 14:10 23:4
picked 21:10
Picking 14:22
place 2:10 9:17 54:20
Plaintiff 1:6 2:3 58:13
please 4:11
plumber 6:21
point 33:22 42:16 44:2
pointing 43:13
police 7:8,11
policy 9:4,6,17,18 10:4
  11:13 12:5 32:2,6
  39:7 40:14 50:20
  51:3,12,19 52:10
portion 11:12 46:11,17
  46:18 48:8
position 24:23 26:5,7
  28:8,16 31:18 32:8,9
positive 17:22 19:23
  25:21 31:22 32:3
  41:22 45:2 48:10
  51:18
Poucher 28:11
practice 34:2
preemployment 43:22

preparing 41:10
PRESENT 2:11
preview 14:1
previously 39:14 40:22
    42:3
prior 4:17 18:4 22:13
probably 17:19 30:14
problem 14:12
procedure 5:3 30:23
proceeding 36:17
process 13:7 14:4
processor 18:8,20 19:3
provide 15:20
provided 3:15,21 10:6
Provino's 18:15
pull 16:19
Pullum 46:12,14
purports 10:16
purpose 3:14
pursuant 1:14 3:4
put 20:10,12 33:20,22
p.m 1:20

**Q**

question 3:11 5:8,10,11
    9:14 51:16 54:1
    56:20
questions 3:10 4:21 5:4
    57:8
quibble 13:2
quit 18:1 25:18 26:4
quite 9:14

**R**

racial 12:11 56:3,7
Randolph 53:4
Randomly 31:21
read 12:4,7 43:20
    46:21 47:10,19 49:21
reading 11:1 59:4
reason 26:4 51:16 54:9
reasoning 43:11
recall 20:16 37:11
    49:22 51:13,14,15
    57:5,6
receive 9:10 10:8 12:2
    12:15 34:8
received 12:10 34:7
    35:3 36:14 56:6,9
recognize 38:11 42:5
    47:15 48:3
recollection 49:13
Record 41:21 43:20
    49:22
refaxed 49:7
reference 20:9 22:10
    37:4 43:21 44:12
    45:5,8 52:1
regard 8:19,23 9:7

13:20 14:7 20:6 32:3
    36:16 45:15
regarding 12:11 13:13
    29:12,21 30:1 35:21
    39:2
regardless 3:21
register 9:21
reinstated 26:6
relate 8:12
relates 11:13
relationship 53:10
relax 37:10
rely 41:10
remember 21:18,18
    27:11 30:13 35:11
Renee 54:17
Rental 19:1
rephrase 5:7
report 40:1 56:1
reported 58:7
Reporter 1:16 3:7 58:5
    59:14
REPORTER'S 58:1
reports 11:16 12:15
represent 4:14
representing 3:3,17
reps 14:10
requested 52:6
reserved 3:12
residential 15:23 16:1
    17:2
resigned 25:19,20
resource 11:21 12:19
resources 8:3,8 10:21
    11:18
response 17:22 18:14
    19:23 25:21 31:22
    36:2 48:10
responsibilities 45:14
responsibility 13:12
results 33:6,18 41:4
    42:8,11,19 43:2,21
    59:8
retested 44:1
review 22:12,15
right 5:3,19 7:23 8:11
    11:5 13:14 21:7 26:3
    28:7 29:10 34:23
    35:16,18 41:20 42:2
    43:12 45:11 46:13
    47:19 50:11,13 55:9
    57:7
right-hand 46:18
Riverside 5:17
Road 29:2
Robert 1:5 4:14 19:22
    30:4 58:12
role 20:23 22:8 30:22
room 12:23

routed 15:18
routes 21:10
Rules 3:5
ruling 3:12
rumors 28:5
Russell 21:4 23:1 28:18
    29:5 33:16 43:9
    47:21

**S**

safety 33:12,13
SAITH 57:1
sales 8:6 15:15,17
same 3:22 12:14 13:4
    16:11 24:1,14 25:6
    26:11,15 59:5
samples 33:1,4
saw 40:11
saying 25:12 43:19
    50:3
says 10:20 46:12 49:8
sbeasley@advanced...
    26:23
school 6:12,16 19:6,8,9
    19:10,12,13,17
schooling 19:16
scratch 49:5
screen 33:19 41:22
    42:8,9 45:2 47:12
screening 30:22
second 16:15 38:18,19
security 44:1 47:2
see 29:23 34:2
seek 25:22
selecting 32:20
send 13:23 31:11 41:15
sending 44:14
sends 32:17
sense 5:5 35:14
sent 20:14 33:1,4 42:17
service 8:3,6 14:8,9,10
    19:1 46:5,7
serviced 15:19
Services 1:8 7:18,22
    10:17 58:15
set 59:4
several 15:5
sexual 9:7 12:11
shakes 30:7
sheet 31:9,11 38:21
sheets 31:13
Sheriff's 7:10
Sherry 1:14 3:4 4:5,12
    58:8
shirts 19:4
shopping 18:17,19
short 25:16
shoulder 50:6
show 38:6 39:13 40:22

42:2
showed 42:19
side 17:4
signature 4:2
significance 29:17
signing 59:4
similar 51:1
sir 4:16,18,20,23 5:3
    7:16,20 13:11 20:18
    23:20,23 27:5 29:2,8
    29:10,13 30:11,13,20
    31:2 35:20,23 44:19
sit 29:18
situation 36:9 37:12
    38:2
six 7:23 16:7,11
Sizzlin 18:18
Smith 2:8
social 43:23 47:1
some 4:21 35:9
someone 45:22
something 17:6 18:19
    27:14 31:15 40:4,6
    47:18 51:20 52:13
    55:15
sons 53:15
sorry 6:15 9:15 11:6
    12:6,9 13:6 20:2
    25:14 27:3 30:9 32:1
    36:22 37:9 43:14
    51:6
sort 25:22
speak 4:7 20:3 23:9
    48:20 49:15 58:9
speaking 11:14 39:13
specimens 32:17 41:16
spelled 49:3
spoke 49:14
spoken 52:23
St 41:14
stamp 10:19 11:4
standing 50:6
started 16:14
Starting 39:20
starts 49:10
state 1:17 3:8 4:11 58:2
    58:6 59:14
STATES 1:1
stations 15:8
Statute 3:15,21
stepmother 53:13
steps 56:14
stepsister 53:11
still 27:8 28:12
stipulated 3:2,16,23
stipulation 1:15 3:1
stop 27:10
Street 5:21
stuff 8:5 47:6

Subsidiaries 10:18
Sue 53:12 54:18
Suite 2:5,10
SUNFLOWER 1:8
    58:16
supervisor 11:18 22:23
    24:20 31:8,10 33:12
    51:23
supervisors 10:20
supposed 45:7
sure 13:3,23 15:17 21:9
    39:12 49:16,17
sworn 4:7 58:9

**T**

take 14:10 20:3 43:22
    47:4 50:1
taken 1:14 3:4,6 56:14
talk 30:17
talked 30:12 38:1,4
talking 9:16
Tallapoosa 22:1 53:4,8
    53:14 54:7
Tallassee 5:15 15:6
    21:16 26:14 28:23
    29:1
telephone 23:21
tell 12:17 21:14 30:21
    30:21 31:10 36:21
    45:7 54:16
telling 31:3,7
ten 5:23
terminated 26:2 32:7
    34:12 35:5,7,10 36:6
    50:19 52:9 55:17
terminating 39:21
termination 20:9 22:11
    22:16 34:7 35:4
    36:11,12 39:11 44:9
    51:10 52:4
terms 14:21
test 41:4 42:11 43:23
    51:18
tested 31:5,8,19 32:18
    42:14
testified 4:8 15:14 22:9
    36:19 37:6 41:17
testify 21:2 23:18
testifying 24:5,8,9
testimony 13:4 23:10
testing 32:3 43:22 44:9
    44:3
tests 42:18 43:18,23
their 9:21 33:20 53:9,9
themselves 44:4
thereof 59:8
thing 12:14 13:5 16:11
    36:13
things 8:21 25:5,9 39:5

Deposition of Sherry Beasley

think 18:18 27:2,13
    34:21 45:5 54:14,19
    57:4,7
thinking 27:4
though 9:14 29:18
three 11:3,3 18:22
through 10:19
Thursday 1:19 58:23
time 3:12,12 7:14 18:3
    21:6 26:9,16 28:11
    31:6 35:9 42:16 50:7
    51:22
times 5:6 13:8 56:12
Tobias 2:8
today 4:17 12:23 29:19
    38:8
together 23:8 40:8,9
    57:2
told 32:14 36:15,23
    37:17 43:11,18 50:3
    52:18
Tonya 54:17
touch 9:12
transcript 59:2
transfer 15:7
trial 3:19
tried 44:10 54:10
true 59:2
truth 4:7,7,8 58:9,10
    58:10
try 51:23
Tuskegee 5:21
two 11:3 35:6 39:14
    43:18,22 44:3
two-page 38:15
type 18:9 19:8 55:19,22
    56:10
types 12:2
typically 31:13

                U
Uh-huh 17:22 19:23
    25:21 31:22 48:10
under 4:22 17:14
underlined 47:10
understand 4:22 5:1
    13:3 51:8 54:13
understanding 36:10
understood 5:11 51:21
unemployment 8:20,23
    19:22 20:14,15,17
    22:6,18 23:14 25:22
    36:14,16 37:1,2
uniform 19:1,4,4
UNITED 1:1
Until 37:16
upper 10:21 11:19
    46:11,18 48:7
used 3:14,20 18:15

26:15 32:21 55:10
usually 12:18 13:5
    29:16 33:10
U.S 58:19

                V
vehicle 18:10
ventilation 25:9
verification 38:14,16
    44:12 51:6,22
verifications 8:21
Vernon 54:18
victim 55:22
violation 39:6 40:13
    50:20 51:2,11 52:9
voice 30:19
volunteer 19:18
vs 1:7 58:14

                W
waived 3:19 4:3 59:5
waiving 3:22
want 10:6 13:2,3 39:12
Washington 26:14
wasn't 9:14 27:2
Waste 1:9 14:20 58:17
way 25:12 32:20 46:4
    51:14
weeks 24:16,17 25:2
    42:18
Weldon 29:2
Well 15:5 16:13,23
    21:14 22:20 23:5
    28:16 44:2 51:8,22
    52:8 54:16
went 18:1 24:19,19
    25:1 44:9
were 11:14 17:8 18:20
    19:8 20:6 24:1 25:10
    29:23 30:1 32:14,14
    35:14 37:16,17 39:14
    40:8 42:14,16,18
    43:6 44:14 50:10
    54:9,23
weren't 26:2 54:23
    55:2
Western 18:18
we're 45:7
whatsoever 45:18
while 24:4,7,8 28:19
    29:9
Whitfield 54:18
whole 4:7 58:10
witness 4:1,2,6 11:11
    17:10 30:7 43:14,17
    54:10 59:3
word 36:1
words 13:2
work 6:23 7:2,17 8:11

18:5 24:20 27:8 55:5
    55:8,10,11
worked 7:21 19:20
    21:16,19 33:14
working 18:4 26:9
    27:10 28:19 29:9
    44:23
workplace 55:20,23
works 7:4 17:13
wouldn't 27:2
write 12:18 24:4,7 47:6
    47:13 48:13 50:4,16
    50:21 51:19 52:10,19
written 46:12 47:7,18
    48:7 50:14 52:13
wrong 13:15 43:23
wrote 43:19 48:5
wrought 44:16,21
    48:21

                Y
yeah 45:13 55:4
year 16:13,15 17:9
    19:14 27:12
years 5:19,23 7:6,14,23
    16:8,12 18:22 19:6
    24:15 26:10 29:15
yesterday 37:19,20
y'all 15:2 23:3

                Z
Zach 28:11

                #
#151 59:13

                0
07 25:17 27:13

                1
10 1:19 40:23 41:21
    47:17 58:23
10141 5:21
11 42:4 46:10,19 47:7
    48:9
12 7:14
125 10:19
13 39:15,20 40:7,12,20
    43:5
1303 26:14
14 39:16,23 40:7,12,20
    43:5
151 1:16 3:7 58:5
1710 1:18 2:5
18 6:7
1819 2:9
19 6:5,6,8 38:9 40:4,17
    41:12 42:17 43:4
    44:15 49:2,21 52:18

                2
2nd 59:9
2:15 1:20
2007 27:20
2008 1:20 58:23 59:9
26 48:9

                3
3/9/07 43:21
3:07-CV-846-WKW
    1:7 58:22
35203 2:10
36830 2:6

                4
4 2:16
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 46:23

                5
522 5:17
58 59:1

                9
9/30/08 59:13
90 19:15
900 2:10
91 10:19
97 11:8,9,10
98 11:6,8,9,10

# DEPOSITION OF GLENN GUEST

## April 10 and 11, 2008

## Pages 1 through 107

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL  36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              EASTERN DIVISION
4
5   ROBERT CANNON,
6        Plaintiff,
7   Vs.                CIVIL ACTION NO.
                       3:07-CV-846-WKW
8   ADVANCED DISPOSAL SERVICES
    ALABAMA, LLC, d/b/a SUNFLOWER
9   WASTE, LLC,
10       Defendant.
11
12
          * * * * * * * * * * * * *
13
14       DEPOSITION OF GLENN GUEST, taken pursuant to
15   stipulation and agreement before Haley A. Phillips,
16   Certified Court Reporter, ACCR # 151, and
17   Commissioner for the State of Alabama at Large, in
18   the Law Offices of McNeal & Douglas, 1710 Catherine
19   Court, Auburn, Alabama, on Thursday, April 10,
20   2008, commencing at approximately 2:15 p.m. and on
21   Friday, April 11, 2008 commencing at approximately
22   10:00 a.m.
23

Page 2

1              APPEARANCES
2
    FOR THE PLAINTIFF:
3
    James B. Douglas, Jr., Esq.
4   McNeal & Douglas
    Suite B
5   1710 Catherine Court
    Auburn, Alabama 36830
6
    FOR THE DEFENDANT:
7
    J. Tobias Dykes, Esq.
8   Constangy, Brooks & Smith
    Attorneys at Law
9   1819 Fifth Avenue North
    One Federal Place, Suite 900
10  Birmingham, Alabama 35203
11        * * * * * * * * * * * *
12       EXAMINATION INDEX
13   BY MR. DOUGLAS . . . . . . . . . . .  4
     BY MR. DYKES . . . . . . . . . . . . 105
14
15       PLAINTIFF'S EXHIBIT INDEX
16  1   Composite of documents          39
17  2   Composite of documents contained in Mr.    57
        Cannon's personnel file
18
    3   Advanced Disposal Services, Inc., and   78
19      Subsidiaries Employee Handbook
20
21        * * * * * * * * * * * *
22
23

Page 3

1              STIPULATION
2       It is hereby stipulated and agreed by and
3   between counsel representing the parties that the
4   deposition of GLENN GUEST is taken pursuant to the
5   Federal Rules of Civil Procedure and that said
6   deposition may be taken before Haley A. Phillips,
7   Certified Court Reporter, ACCR # 151, and
8   Commissioner for the State of Alabama at Large,
9   without the formality of a commission, that
10  objections to questions other than objections as to
11  the form of the question need not be made at this
12  time but may be reserved for a ruling at such time
13  as the said deposition may be offered in evidence
14  or used for any other purpose by either party
15  provided for by the Statute.
16      It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23      It is further stipulated and agreed by and

Page 4

1   between the parties hereto and the witness that the
2   signature of the witness to this deposition is
3   hereby not waived.
4         * * * * * * * * * * * * *
5              GLENN GUEST
6       The witness, after having first been duly
7   sworn to speak the truth, the whole truth and
8   nothing but the truth testified as follows:
9              EXAMINATION
10  BY MR. DOUGLAS:
11   Q.  State your name, please, sir.
12   A.  Glenn Guest.
13   Q.  Glenn, where are you from?
14   A.  Athens, Georgia.
15   Q.  Where do you live now?
16   A.  Jacksonville, Florida.
17   Q.  How long have you lived there?
18   A.  18 years.
19   Q.  Have you ever lived in Alabama?
20   A.  No.
21   Q.  Ever had a job in Alabama?
22   A.  No.
23   Q.  Do you have any family in any of the

Deposition of Glenn Guest

April 10 and 11, 2008

Page 5

1  counties I mentioned earlier?
2  A.  I don't think so.
3  Q.  Any friends in any of those counties you
4  know about?
5  A.  No.
6  Q.  One of the things that would be important
7  is to make sure that I finish my question
8  and I'll be sure to make sure you finish
9  your answer so it will read better on the
10  transcript, okay?
11  A.  Okay.
12  Q.  I assume you've probably given a deposition
13  before.
14  A.  Yes, sir, I have.
15  Q.  Are you currently employed?
16  A.  Yes, sir, I am.
17  Q.  Who are you employed with?
18  A.  Advanced Disposal Services.
19  Q.  What is Advanced Disposal Services?
20  A.  It's a garbage company.
21  Q.  How long have you been with Advanced
22  Disposal Services?
23  A.  Two years.

Page 6

1  Q.  Does -- Is Advanced Disposal Services the
2  subsidiary of any other corporation or
3  business entity?
4  A.  I'll have to -- I'll have to -- I guess
5  I'll have to explain it.  I work for
6  Advanced Disposal Services, Incorporated.
7  We are the parent company of all of our
8  subsidiaries that pick up and collect
9  garbage.
10  Q.  Do you have any subsidiaries in Alabama?
11  A.  Yes, sir, we do.
12  Q.  Do you have a lot of them?
13  A.  Three or four.
14  Q.  Can you tell me who they are?
15  A.  Advanced Disposal Services, Montgomery,
16  formally known as Sunflower Waste in
17  Tallassee, Alabama; Advanced Disposal
18  Services, Gulf Coast, LLC, in Mobile,
19  Alabama, and Urrutia, Incorporated, doing
20  business as Arrow Disposal in Birmingham,
21  Alabama.
22  Q.  Who is the president of Advanced Disposal
23  Services, Inc.?

Page 7

1  A.  Wally Hall.
2  Q.  How many owners of the company, if you
3  know?
4  A.  I don't know exactly, because most of our
5  company is owned by an equity group known
6  as AIG Highstar.  There are employees of
7  the company who have stock ownership.  I
8  don't know exactly how many or how -- what
9  percentage they have.
10  Q.  Is Advanced Disposal Services publicly
11  traded?
12  A.  No, sir, it's not.
13  Q.  It's private?
14  A.  Yes, sir, it is.
15  Q.  Do you own any stock in the company?
16  A.  I don't have any stock.  I own -- I have
17  promises of stock grants in the future.
18  Q.  And the company's headquarters is in
19  Jacksonville, Florida?
20  A.  Yes, sir.
21  Q.  How far did you go in school?
22  A.  I have a master's degree.
23  Q.  From where?

Page 8

1  A.  Jacksonville University.
2  Q.  In what?
3  A.  Executive business.
4  Q.  And before that where -- what was your last
5  degree in?
6  A.  Bachelor of business administration.
7  Q.  Where?
8  A.  University of Georgia.
9  Q.  In what?
10  A.  Business.
11  A.  Business.
12  And, obviously, you graduated high
13  school?
14  A.  Yes, sir.
15  Q.  Where and when?
16  A.  Clarke Central High School, Athens,
17  Georgia, 1977.
18  Q.  Do you have any other degrees you haven't
19  told me about?
20  A.  Yes, sir, I do.
21  Q.  Tell me about those.
22  A.  I have an associate of arts from Oxford
23  College of Emory University.

Page 9

1  Q.  When did you get that?
2  A.  1979.
3  Q.  Anything else?
4  A.  That's it.
5  Q.  Do you have any professional licenses?
6  A.  I do not have any licenses.  I do have
7     certifications.
8  Q.  What are those?
9  A.  It's senior human resource management.
10  Q.  And where did you get that certification
11     from?
12  A.  From the Society of Human Resources.
13  Q.  Where is that?
14  A.  Alexandria, Virginia.
15  Q.  Is that a class you took?
16  A.  Yes, it was.
17  Q.  Was it just one class?
18  A.  No, sir, it was not.
19  Q.  So it was a --
20  A.  It was a series of classes on different
21     aspects of human resources.
22  Q.  How many times have you testified as a
23     corporate representative of Advanced

Page 10

1     Disposal Services, Inc., or any of its
2     subsidiaries?
3  A.  In a deposition or any?
4  Q.  Yeah, in a deposition.
5  A.  I don't -- I think zero.  I don't recall if
6     I did.
7  Q.  So today is the first time?
8  A.  For Advanced Disposal, yes, sir.
9  Q.  Or any of its subsidiaries?
10  A.  Or any of its subsidiaries.
11  Q.  Or any of its sister corporations?
12  A.  Correct.
13  Q.  How long have you been in your present
14     employment?
15  A.  Two years.
16  Q.  You told me that.  I apologize.
17     Before that?
18  A.  Arnold Transportation Services.
19  Q.  That's who you worked for?
20  A.  Yes.
21  Q.  In what capacity?
22  A.  Director of human recourses.
23  Q.  Is that company in any way related to

Page 11

1     Advanced Disposal Services?
2  A.  None whatsoever.
3  Q.  And how long were you in that job?
4  A.  Seven years.
5  Q.  Before that?
6  A.  Norrell Corporation.  About -- I think it
7     was maybe a year and a half.
8  Q.  Norrell?
9  A.  Correct.  Two Rs, two Ls.
10  Q.  What was your position with that company?
11  A.  Site manager of human resources.
12  Q.  Before that?
13  A.  Yellow Freight Systems.
14  Q.  What does Yellow Freight Systems do?
15  A.  They pick up and deliver less than
16     truckload shipments.
17  Q.  How long were you with that company?
18  A.  Ten years.
19     We've got a ways to go before you get
20     to '82.
21  Q.  What did you do with that company?
22  A.  I had several positions.  I started off as
23     an operation supervisor.  Operations

Page 12

1     manager, human resources coordinator, then
2     weight and research coordinator.
3  Q.  Have you ever driven a truck?
4  A.  No, sir, I have not.
5  Q.  Do you know how to?
6  A.  No, sir, I don't.
7  Q.  Me neither.
8     Before that?
9  A.  ABF Freight Systems.
10  Q.  What does ABF Freight Systems do?
11  A.  They pick up and deliver less than
12     truckload packages.
13  Q.  How long were you with them?
14  A.  I believe it was around three years.
15  Q.  So we've covered your employment for the
16     last 20 years or so?
17  A.  That would be correct.
18  Q.  Is it fair to say that your primary area of
19     expertise is HR?
20  A.  Today, yes.
21  Q.  As we sit here today?
22  A.  Correct.
23  Q.  Do you know Robert Cannon?

Deposition of Glenn Guest

April 10 and 11, 2008

Page 13

1  A.  No, sir, I don't.
2  Q.  Just met him today for the first time?
3  A.  That's correct.
4  Q.  Have you personally ever been involved in
5     litigation?  Have you ever sued anybody or
6     has anybody ever sued you?
7  A.  No, sir.
8  Q.  You've never been named as a defendant for
9     any of the companies that you've worked
10    for?
11 A.  No, sir.
12 Q.  Before I leave this part of the deposition,
13    you mentioned that Advanced Disposal
14    Services, Incorporated, was owned by a
15    private something or another.
16 A.  Equity firm, yes.
17 Q.  What's the name of that firm?
18 A.  AIG Highstar.
19 Q.  And what do they do?
20 A.  They buy companies and take profits from
21    them.
22 Q.  How many persons are on the board of
23    directors of Advanced Disposal Services,

Page 14

1     Incorporated?
2  A.  I'm not positive.
3  Q.  How many different states do the operations
4     operate in?
5  A.  Right now I believe four.
6  Q.  Can you tell me what they are?
7  A.  Yeah.  Mississippi, Alabama, Georgia and
8     Florida.
9  Q.  What is the approximate amount of gross
10    revenue per year that the company
11    generates?
12       MR. DYKES:  Object to the form.
13 A.  I have absolutely no idea.
14 Q.  These earlier positions we talked about
15    with these other companies, have you ever
16    been terminated by any of them?
17 A.  No, sir.
18 Q.  So your leaving was always your decision?
19 A.  All but -- Well, the ones we talked about,
20    yes.
21 Q.  Have you ever been terminated from any job
22    for allegedly failing a drug test?
23 A.  Never.

Page 15

1  Q.  Are you drug tested with the company?
2  A.  Yes, sir, I am.
3  Q.  Advanced Disposal Services?
4  A.  Yes, sir.
5  Q.  You're randomly tested?
6  A.  Yes, sir.
7  Q.  Does that apply to everybody who works for
8     the company?
9  A.  Yes, sir, it does.
10 Q.  How does Advanced Disposal Services make
11    its money?  In other words, what are they
12    paid to do?
13 A.  They have basically four different
14    divisions:  Residential, picking up garbage
15    from your house and then getting paid for
16    it; picking up from businesses like yours
17    in a dumpster or a construction site, which
18    is called C & D in open-top containers and
19    disposing of it; and then we also operate
20    landfills.
21 Q.  Well, like in Auburn, the City has trash
22    trucks that come around.  Does ADS work in
23    any cities?

Page 16

1  A.  Yes, sir, I believe it does.
2  Q.  Are they hired by cities from time to time?
3  A.  Yes, sir.
4  Q.  You're familiar, I take it, with the
5     company's policies regarding
6     discrimination?
7  A.  Yes, sir.
8  Q.  Did you help to formulate any of those
9     policies as they exist today?
10 A.  No, sir.  They were already in place when I
11    took my position.
12 Q.  And they've not changed in any material way
13    since you took your position?
14 A.  Not on discrimination, no, sir.
15 Q.  And what are your duties, if any, with
16    regard to discrimination or enforcing the
17    anti-discrimination policy for the company?
18 A.  It's my job to -- in this aspect to take --
19    intake any complaints that may arise,
20    investigate and either resolve or -- in one
21    way or another those complaints.
22 Q.  How do you investigate?
23 A.  There's several different ways.  I mean, I

4 (Pages 13 to 16)

Page 17

1   look at paperwork that's generated
2   within -- in whatever manner it comes to
3   me, whether it be from the employer, from
4   the supervisors, and I also interview
5   employees and supervisors.
6   Q.   Regarding the company's anti-drug policy,
7        are you familiar with that?
8   A.   Yes, sir, I am.
9   Q.   Have you played any part in formulating
10       that policy?
11  A.   No, sir, I haven't.
12  Q.   It was in existence at the time you arrived
13       at the company?
14  A.   That's correct.
15  Q.   And it's not changed in any material way?
16  A.   No, sir, not to my knowledge.
17  Q.   And the penalty for testing positive for
18       illegal drugs is what?
19  A.   Termination.
20  Q.   For anybody?
21  A.   Correct.
22  Q.   Particularly a driver or just anybody?
23  A.   Anybody.

Page 18

1   Q.   No exceptions?
2   A.   None.
3   Q.   How about with regard to alcohol?  Does the
4        company have a policy with regard to the
5        use of alcohol?
6   A.   Yes.  Yes, sir, they do.
7   Q.   What is it?
8   A.   It's the same for drugs.
9   Q.   You can't test positive at all?
10  A.   Correct.
11  Q.   What if you're -- Even if you're a clerk in
12       an office?
13  A.   Correct.
14  Q.   You can't drink at all?
15  A.   No.
16  Q.   And that's been the policy since you've
17       been there?
18  A.   As far as I know, yes.
19  Q.   So people that work for your company have
20       to have their enjoyment without beer or
21       wine or any kind of spirit?
22  A.   Correct.  I'd like to change that from time
23       to time, but I don't think --

Page 19

1   Q.   Well, I noticed that Georgia watch, and I
2        was wondering how you handled the whole
3        tailgate thing.
4   A.   Luckily that's a Saturday.
5   Q.   How are the results of drug screens
6        specifically reported?
7   A.   I'm not --
8   Q.   Well, that's a poor question.
9            Walk me through the process of the
10       whole drug screening procedure of
11       employees.
12  A.   One, it's not my area as far as exactly how
13       it's done, but I am familiar with the
14       process.
15  Q.   Okay.
16  A.   All applicants or employees are subject to
17       preemployment drug testing.  They sign a
18       release.  They're sent to the drug testing
19       facility.  A specimen is collected in
20       accordance with DOT regulations.  It's sent
21       to an independent laboratory for analysis.
22       Those results are -- come back either --
23       one of three ways; positive, negative or

Page 20

1   diluted, can't test it.
2   Q.   What does diluted mean, if you know?
3   A.   Either -- There's two ways to dilute a
4        specimen.  It's either you drink a ton of
5        water on your way down to the clinic and,
6        therefore, there's more water that has
7        passed through your system and it dilutes
8        the urine, or you've poured water into the
9        urine sample.
10  Q.   What happens to employees who have a
11       diluted sample?
12  A.   It has to be retested.
13  Q.   So they're not terminated for that?
14  A.   Not right then, no.
15  Q.   Now, the company which handled Mr. Cannon's
16       drug test, MRO St. Louis or something like
17       that -- St. Louis MRO.
18  A.   Right.
19  Q.   Are you familiar with that company?
20  A.   I've heard of them, yes.
21  Q.   When did the company begin using them?
22  A.   I couldn't tell you.
23  Q.   I sent some interrogatories to your lawyer,

Page 21

1    which I believe that you verified; is that
2    correct?
3  A.  Yes, sir.
4  Q.  I didn't understand one of the answers, so
5    I just wanted to ask.  I asked how long
6    that the company had used St. Louis MRO,
7    and your response was, defendant used
8    St. Louis MRO, Inc., to test specimens of
9    its employees for the presence of drugs
10    from January 2007 through March 2007.  That
11    was your answer.
12  A.  Yes.
13  Q.  My question is, was it only that period of
14    time or were you giving me what you thought
15    was a relevant period of time?
16  A.  No.  That, I can't -- That question was
17    posed to our director of safety, and that's
18    the answer he gave me.  And it was my
19    understanding that it was not just relevant
20    to that period of time.  That was when --
21    that was the only time period we were
22    contracted with them.
23  Q.  So three months?

Page 22

1  A.  That could be correct, yes.  That's what --
2  Q.  According to the answer?
3  A.  According to the answer that I got from our
4    director of safety.
5  Q.  What is that gentleman's or lady's name?
6  A.  His name is Tom Davis.
7  Q.  He is the director of safety?
8  A.  That is correct.
9  Q.  Where does he work?
10  A.  Jacksonville, Florida.
11  Q.  Now, is that director of safety over all of
12    the branches of the company?
13  A.  Yes, sir; he is.
14  Q.  Is there just one director of safety?
15  A.  Yes, sir.
16  Q.  And he's it?
17  A.  He's it.
18  Q.  Do you have any idea why the company
19    stopped using St. Louis MRO in March of
20    '07?
21  A.  No, sir.
22  Q.  Can you tell me who would know?
23  A.  Tom Davis.

Page 23

1  Q.  Okay.  Does the company conduct background
2    checks on its prospective truckdrivers to
3    see if they have previously been terminated
4    for use of drugs or alcohol or anything
5    like that?
6  A.  Yes, sir, they're supposed to.
7  Q.  What's that mean?
8  A.  That's -- That's the policy.
9  Q.  Does the company have trouble with its
10    people implementing that part of the
11    policy?
12  A.  It has from time to time.
13  Q.  What is the company policy with regard to
14    hiring truckdrivers who have previously
15    been terminated for violating a drug
16    policy?
17  A.  To the best of my knowledge, they have to
18    have entered a drug treatment program and
19    successfully passed it before we're allowed
20    by DOT law to accept them as a driver.
21  Q.  Have you personally reprimanded anyone at
22    the company for failing to do proper
23    background for applicants?

Page 24

1  A.  Yes, sir, I have.
2  Q.  Have you done that for any of the personnel
3    who worked where Mr. Cannon worked at that
4    facility?
5  A.  I don't recall.
6  Q.  Are you aware of any alleged allegations of
7    discrimination at the facility where
8    Mr. Cannon worked other than his lawsuit?
9      MR. DYKES:  I'm going to object.
10      I mean, I think anything race
11      related, retaliation related
12      is -- I mean, all this -- I'm
13      going to object to anything
14      outside of the type
15      allegations we've got here.
16      MR. DOUGLAS:  All right.
17      THE WITNESS:  Answer?
18      MR. DYKES:  I mean, you can --
19      MR. DOUGLAS:  Are you telling him
20      to only --
21  A.  What was your question?
22      MR. DOUGLAS:  Actually, my
23      question was with regard to

| | Page 25 |
|---|---|

1           race discrimination.
2           MR. DYKES: Was it? Okay.
3           MR. DOUGLAS: Yeah. As far as
4       that goes.
5   Q.  Are you aware of any allegations of race
6       discrimination at the facility Mr. Cannon
7       worked with other than his complaint?
8   A.  No, sir, I'm not.
9   Q.  Does your company policy with regard to
10      anti-discrimination apply equally to race
11      and gender?
12  A.  Yes, it does.
13  Q.  So your implementation of it or the
14      triggering of the policy would be the same
15      no matter what type of discrimination we're
16      talking about?
17  A.  Yes, sir. That would also go for religion,
18      national origin.
19  Q.  Sure. All the Title VII categories.
20  A.  Absolutely.
21  Q.  I understand.
22          Have you yourself done any
23      investigation of any type of discrimination

| | Page 26 |
|---|---|

1       at the facility that Mr. Cannon worked?
2   A.  Which type of discrimination?
3   Q.  Any type.
4   A.  Yes, sir, I have.
5   Q.  What type?
6   A.  Well, let's see. Sexual -- Sexual
7       harassment. I guess that's probably not
8       discrimination, but ...
9   Q.  Was that before or after he worked there?
10  A.  I don't recall. It was in -- It was within
11      six months either way. I don't recall when
12      it exactly was.
13  Q.  Was anybody terminated?
14  A.  No.
15  Q.  Do you know the racial makeup of the
16      drivers who worked at the -- Can I call it
17      the Tallassee facility? Is that correct,
18      or is it something else?
19  A.  No. That's correct.
20  Q.  Can I call it that?
21  A.  Sure.
22  Q.  The Tallassee facility, do you know the
23      racial makeup of the drivers from January

| | Page 27 |
|---|---|

1       22, 2007 through March 9th or 10th, 2007?
2   A.  No.
3   Q.  No idea?
4   A.  None.
5   Q.  Would you have those records?
6   A.  Yes, sir, I would. I think so. I'm not
7       positive my assistant could dig it out, but
8       we do keep -- we do keep records.
9   Q.  Okay. Can you get that information
10      regarding the racial makeup of the drivers
11      to your attorney?
12  A.  If the system will allow it, yes.
13  Q.  Are you saying that you have a computer
14      system that's poor or you don't know how to
15      operate it?
16  A.  It's poor.
17  Q.  If the system will allow it, will you get
18      the information to your lawyer for me?
19  A.  Absolutely.
20  Q.  I appreciate it.
21          MR. DYKES: Just so I'm clear, you
22      just want the drivers -- the
23      drivers at the Tallassee

| | Page 28 |
|---|---|

1       facility?
2           MR. DOUGLAS: Right.
3           MR. DYKES: Okay. I just wanted
4       to make sure.
5           MR. DOUGLAS: As of this point,
6       that's all I'm asking for.
7   Q.  Do you know a Mr. Coke Conway?
8   A.  No, sir.
9   Q.  Do you know if he ever worked for the
10      company?
11  A.  Yes, sir, I do.
12  Q.  All right. Do you know when he worked for
13      the company?
14  A.  No, sir, I don't.
15  Q.  Is he no longer working for the company?
16  A.  To my knowledge, he is not.
17  Q.  Do you know what led to the end of his
18      employment?
19  A.  I believe so.
20  Q.  Can you tell me what it is?
21  A.  I believe he resigned.
22  Q.  Do you know why he resigned?
23  A.  No, sir, I don't.

Page 29

1  Q.  Was -- Would this have been within the last
2      year, if you know?
3  A.  I believe so.
4  Q.  Do you know what his duties were with the
5      company?
6  A.  No, sir, I don't.
7  Q.  Do you know if he was a driver or a
8      helper or -- Does the term "helper" mean
9      anything to you?
10 A.  Yes, sir, it does.
11 Q.  What is the helper?
12 A.  It's the person on a residential truck who
13     stands on the back and actually takes your
14     household garbage and throws it into the
15     truck.
16 Q.  What are the requirements for being a
17     helper with the company, or are there any?
18 A.  Well, you have to be able to lift --
19 Q.  Sure.
20 A.  -- repetitively.
21 Q.  Other than physical requirements, are there
22     any?
23 A.  No, sir.

Page 30

1  Q.  How about for drivers?
2  A.  Yes.
3  Q.  What are their requirements that are
4      different than the helpers?
5  A.  The driver has to have a CDL, commercial
6      driver's license.
7  Q.  Anything else?
8  A.  Has to have a medical card -- DOT medical
9      card.
10 Q.  Anything else?
11 A.  I don't think so.
12 Q.  Did Mr. Con -- Was Mr. Conway ever a driver
13     for your company?
14 A.  I'm not positive.
15 Q.  Can you find that out for me?
16 A.  Sure.
17 Q.  Can you get that information to your
18     lawyer?
19 A.  Absolutely.
20 Q.  Would your system differentiate by date
21     when he was a helper and when he was a
22     driver if that is the case?
23 A.  It could if it was input, yes.

Page 31

1  Q.  Okay.  And you'll get that information to
2      your attorney for me if you have it?
3  A.  Yes.
4  Q.  All right.  At the Tallassee facility from
5      January 22, 2007 through March 9, 2007, who
6      was in charge of that facility?  Who ran
7      the day-to-day operations, if you know?
8  A.  That's two different questions.
9  Q.  Okay.  Can you answer them both and tell me
10     which one you're answering?
11 A.  Yes, sir.  Van Forester was the district
12     manager, and he was over the entire
13     operation.  That's drivers, landfill,
14     office.  And Russell --
15 Q.  Davis?
16 A.  -- Davis was the operations manager over
17     the driving portion.  And Trey Allen was
18     the general manager of the landfill.
19 Q.  Is this one landfill we're talking about?
20 A.  Yes, sir, it is.
21 Q.  What does the general manager of the
22     landfill do?
23 A.  That's a good question.  I believe -- I

Page 32

1      mean, he's over the day-to-day operations
2      of the landfill.  He's charged with making
3      sure that the operations are running
4      smoothly, safely and that we're not
5      violating any environmental laws.
6  Q.  And the landfills just -- forgive my
7      ignorance -- that's just a place where
8      people kind of -- or where you guys come
9      and put the garbage; is that right?
10 A.  That's correct.
11 Q.  Now, Van Forester, what was his title
12     again?
13 A.  District manager.
14 Q.  What was his district?
15 A.  Tallassee.
16 Q.  Just Tallassee?
17 A.  Well, I mean, it included the counties that
18     Ms. Beasley had talked about previously,
19     which also has two transfer stations in it
20     as well.
21 Q.  Okay.  So would Mr. Forester have been
22     above Mr. Davis and Mr. Allen?
23 A.  Yes, sir.

Page 33

1  Q.  And Mr. Davis and Allen -- Mr. Davis and
2      Mr. Allen, would they be kind of horizontal
3      in the chain of command or would one be
4      over the other?
5  A.  One wouldn't be over the other, but
6      Mr. Allen is -- was a title ahead, so to
7      speak, than Mr. Davis.
8  Q.  And are all these gentlemen Caucasian?
9  A.  I believe so.
10 Q.  At the Tallassee facility, who would have
11     been below, if anybody, Mr. Davis?
12 A.  Danny Futral would have been, and I don't
13     recall the other individual's name.
14 Q.  And what was Danny Futral's position?
15 A.  I believe he was residential supervisor.
16 Q.  And I take it that would be someone who
17     supervised the pickup of residential
18     garbage?
19 A.  Yes, sir.
20 Q.  And is Mr. Futral a Caucasian?
21 A.  Yes, sir, I believe he is.
22 Q.  And you don't recall the other person's
23     name?

Page 34

1  A.  No, sir.
2  Q.  Was that a man or a woman?
3  A.  I believe it was a man.
4  Q.  Do you know his race?
5  A.  No, I don't.
6  Q.  What drugs are tested for by the company
7      when their employees are required to submit
8      to random drug screens?
9  A.  I don't know all of them.
10 Q.  On Defendant's Exhibit 11, which was the
11     second drug screen of Mr. Cannon,
12     amphetamines, marijuana, opiates, cocaine
13     and -- I can't pronounce the last one --
14     phencyclidine were tested for.  Does that
15     ring a bell at all?
16 A.  Yes, sir.
17 Q.  Are those the only illegal drugs that are
18     tested for, to your knowledge?
19 A.  I'm not positive.
20 Q.  Do you know if it's changed since the
21     company stopped using St. Louis MRO?
22 A.  I don't know.
23 Q.  Don't know one way or the other?

Page 35

1  A.  No, sir.
2  Q.  Have you encountered a situation where an
3      employee has tested positive for drugs and
4      they claim it was a prescription drug of
5      some sort?
6  A.  Absolutely.
7  Q.  How does that sort itself out?
8  A.  To my understanding, it is a call between
9      the MRO and the employee.  When the
10     specimen is taken, the employee is asked
11     are you taking any prescription medication
12     and then -- yes or no.  They list the
13     prescription if there is one.  When the
14     sample goes to the MRO for testing, if
15     there's a prescription listed, then it's my
16     understanding the MRO pays special
17     attention to see if it could be one based
18     on their knowledge that would trigger a
19     positive test for one of the drugs they're
20     testing for.
21 Q.  Okay.  And for the Record, MRO stands
22     for ...
23 A.  Medical Review Officer.

Page 36

1  Q.  At the Tallassee facility, do you know
2      which doctor or medical provider the
3      employees were instructed to go to to
4      submit their samples for drug testing?
5  A.  No, sir, I don't.
6  Q.  Who would make that decision?
7  A.  Tom Davis.
8  Q.  Who would have made it in January of 2007?
9  A.  Tom Davis.
10 Q.  We had spoken briefly earlier about the
11     company's requirement that truck driving
12     applicants be subjected to a background
13     check.  Do you recall that?
14 A.  Yes, sir, I do.
15 Q.  What were the company's procedures as far
16     as how that background check was to be
17     conducted?  In other words, where would
18     they look -- where were the people to look
19     who --
20 A.  At that time?
21 Q.  Yes, at that time.
22 A.  I'm not positive.  I know parts of it, but
23     I don't know the entire process.

Page 37

1   Q.  Tell me what you do know.
2   A.  Their name would be submitted to a third
3       party vendor who would check their criminal
4       background and may or may not -- I don't
5       know if they went as far as calling
6       previous employers or not.
7   Q.  You don't know if that was required back
8       then?
9   A.  I don't, no.
10  Q.  Would someone with a criminal background
11      that -- You were here for Mr. Cannon's
12      deposition?
13  A.  Yes, sir, I was.
14  Q.  You heard his testimony?
15  A.  Yes, sir, I did.
16  Q.  Would someone with his criminal background
17      have been eligible to be hired?
18  A.  Yes, sir, they would.
19  Q.  If the background check had revealed the
20      positive drug test in the files of Waste
21      Management, would he have been eligible to
22      be hired?
23  A.  I don't believe so.

Page 38

1   Q.  Not without completing some sort of course;
2       right?
3   A.  That's correct.  Then he would be eligible.
4   Q.  Have you spoken to anyone at the company as
5       to whether or not a background check was
6       done with regard to Mr. Cannon?
7   A.  I don't recall.
8   Q.  You don't know if you spoke to anybody or
9       not?  Does that mean you might have?
10  A.  I could have, yes.
11  Q.  If you did, do you have any idea what was
12      said?
13  A.  No, sir.
14  Q.  Where are the personnel files of the
15      employees kept who worked at the Tallassee
16      facility?
17  A.  In Tallassee.
18  Q.  So is it fair to call Jacksonville
19      corporate?
20  A.  That's correct.
21  Q.  Would any personnel files be kept at
22      corporate of the employees?
23  A.  In Tallassee or any ...

Page 39

1   Q.  In Tallassee.  The Tallassee employees.
2   A.  No, sir.
3   Q.  Was Mr. Cannon's file ever sent to
4       corporate?
5   A.  Yes, it was.
6   Q.  When?
7   A.  When I got the first notice of an EEOC
8       charge.
9   Q.  Would the entire file at that point have
10      been sent to corporate?
11  A.  I believe so.
12  Q.  And would have remained there through
13      today, I take it?
14  A.  Well, I'm sorry.  A copy of the file was
15      sent to corporate.
16  Q.  So there would have been a copy at
17      Tallassee and a copy at corporate?
18  A.  That's correct.
19          (Plaintiff's Exhibit 1 was marked
20          for identification.)
21  Q.  I'm going to mark as Plaintiff's Exhibit
22      Number 1 a group of documents that your
23      lawyer was kind enough to provide to me,

Page 40

1       which are Bates stamped pages one through
2       32.  I'm going to ask you if you would take
3       a look at Plaintiff's Exhibit Number 1 and
4       tell me if you recognize it.
5           (Off-the-Record discussion.)
6   A.  What was the question again, please?
7   Q.  Do you recognize those group of documents?
8   A.  Yes.
9   Q.  And you've seen them before today?
10  A.  Yes, sir.
11  Q.  If you could flip to Bates stamped page
12      nine.
13  A.  Is that at the bottom right?
14  Q.  Yes.
15          MR. DYKES:  Yes.
16  A.  Okay.
17  Q.  That should be the charge of
18      discrimination.
19  A.  Yes, sir.
20  Q.  When did you first lay eyes on this
21      document as best you can recall?
22  A.  Within a few days of it being received in
23      Tallassee.

Page 41

1    Q.  Did you have any knowledge regarding
2        Mr. Cannon prior to receiving page nine of
3        Plaintiff's Exhibit Number 1?
4    A.  Yes, sir, I did.
5    Q.  What did you know before that?
6    A.  He had tested positive for cocaine.
7    Q.  How did you know that?
8    A.  I found it.
9    Q.  Found it where?
10   A.  I need some liberty to --
11   Q.  Sure.
12   A.  -- give an explanation.
13   Q.  Sure. Go ahead.
14   A.  I was doing some research on positive drug
15       tests, and I was given a list of all
16       employees at Advanced Disposal who had
17       been -- tested positive for drugs or
18       alcohol. And in my field if I'm going to
19       verify something, I make sure that it's
20       followed through.
21           I personally took every social security
22       number, matched it to the name and typed it
23       into my system to be sure every employee

Page 42

1        had been terminated until I got to
2        Mr. Cannon's and he was still showing
3        active. And at that time I took it to Tom
4        Davis and informed him we had an active
5        employee who tested positive for drugs.
6    Q.  What led you to this analysis in the first
7        place. Why were you doing what you were
8        doing?
9    A.  It had to do with a separate lawsuit or
10       allegation. I can't remember if it was a
11       lawsuit or an allegation.
12   Q.  And what did the lawsuit involve?
13   A.  Discrimination because they had failed a
14       drug test.
15   Q.  Were they saying that not everybody was
16       treated the same who failed the drug test?
17   A.  Yes.
18   Q.  Was it a race discrimination case?
19   A.  No.
20   Q.  Gender?
21   A.  No. I guess not -- maybe not a
22       discrimination. It was, I was terminated
23       for drugs; not everybody who tests positive

Page 43

1        has been terminated for drugs; you know, I
2        don't think I've been treated fairly.
3    Q.  Was there a lawsuit filed?
4    A.  I don't think so. I'm not positive, but I
5        don't think there was. I don't have that
6        many lawsuits, so I know most of them but
7        some I've forgotten but -- when I first got
8        to the company.
9    Q.  Where did the employee work who was making
10       this complaint?
11   A.  I can't recall.
12   Q.  You can't recall any of the four states,
13       what state it might have been?
14   A.  I could make a guess. I mean --
15   Q.  Well, I don't want you to guess.
16   A.  Well, then I'm telling you that I know it
17       was not Alabama. And we didn't -- I don't
18       think we had any employees in Mississippi
19       at the time, so it had to be Georgia or
20       Florida.
21   Q.  Was an EEOC complaint filed in this case?
22   A.  No, sir, don't believe so.
23   Q.  Will you provide that person's name to your

Page 44

1        lawyer?
2    A.  I don't have that person's name.
3    Q.  You don't even know who it is?
4    A.  No.
5    Q.  No way of finding out?
6    A.  I don't think so. I'll look but I don't
7        think so.
8    Q.  If you can will you provide it to your
9        lawyer?
10   A.  Yes, sir.
11   Q.  He may object to giving it to me, but will
12       you provide it to him?
13   A.  Absolutely.
14           MR. DYKES: Yeah. He can provide
15           it and I'll decide if I ...
16   Q.  Okay. So do you recall when this was? I
17       bet it was in February of 2007, huh?
18   A.  I imagine it probably was.
19   Q.  All right. And so did you come across
20       anybody else who was still active who had
21       shown to have tested positive for drugs?
22   A.  None.
23   Q.  Just Mr. Cannon?

Page 45

1    A.   Just Mr. Cannon.
2    Q.   So you informed Mr. Davis?
3    A.   Correct.
4    Q.   What did he say?
5    A.   I don't know that I can say in front of
6         this young lady.
7    Q.   Well ...
8    A.   He was not happy.
9    Q.   This young lady will be happy to take it
10        down.  What did he say?
11   A.   I can't believe this shit or something to
12        that effect.
13   Q.   Okay.  And was he expressing exasperation
14        that he was still working for the company?
15   A.   Absolutely.
16   Q.   Okay.  And what was your response to his
17        retort?
18   A.   You need to find -- make -- My first thing
19        was we need to make sure this individual is
20        really not working and just hasn't been
21        terminated out of the system because
22        somebody didn't key him out of the system.
23   Q.   Okay.

Page 46

1    A.   And once I found that out, Mr. Davis took
2         matters into his own hands to make sure he
3         was terminated.
4    Q.   How did he do that?
5    A.   I believe he called Tallassee and informed
6         them they needed to terminate Mr. Cannon.
7    Q.   Would all this have happened prior to the
8         drug screen which is referenced on
9         Defendant's Exhibit 11?
10   A.   I couldn't recall.
11   Q.   Okay.  Well, just so we're all on the same
12        page.  There were two drug screens;
13        correct?
14   A.   Yes, sir.
15   Q.   Defendant's Exhibit 10, which contains the
16        name Robert and some last name that we
17        don't know; is that correct?  Number 10 I'm
18        talking about.
19   A.   Yeah.
20   Q.   Is that correct?
21   A.   That's correct.
22   Q.   Indicating a positive test for cocaine?
23   A.   Correct.

Page 47

1    Q.   And then we have Defendant's Exhibit 11,
2         which was taken a couple of weeks later
3         which is negative?
4    A.   That's correct.
5    Q.   For cocaine?
6    A.   Correct.
7    Q.   Defendant's Exhibit 10 is negative for
8         everything other than cocaine?
9    A.   That's correct.
10   Q.   So do you know what gave rise to Mr. Cannon
11        taking the drug screen evidenced by
12        Defendant's Exhibit 11?
13   A.   No, sir.
14   Q.   No idea?
15   A.   I have an idea, but I don't have any proof.
16   Q.   Well, what's your idea?
17   A.   My idea is Mr. Cannon was positive for
18        cocaine.  Mr. Davis needed an employee
19        to -- that knew the routes to service the
20        Phenix City account, which they had just
21        got which was a big deal for Tallassee, and
22        gave him a drug test later hoping he'd be
23        clean.

Page 48

1    Q.   But he was clean; right?
2    A.   Not in the first case he wasn't.  He was
3         hoping the -- by the time -- if nobody had
4         noticed already -- he gets him a drug test
5         and then says, well, I -- ignoring the
6         first one and showing that he did do a
7         preemployment, because both of them are
8         marked preemployment, saying I -- you know,
9         in his file here -- in case a safety person
10        looked, here is a negative drug test.
11   Q.   Mr. Russell Davis?
12   A.   That's my opinion.
13   Q.   That's your opinion?
14   A.   Yes.
15   Q.   Did you talk to Mr. Davis about this?
16   A.   No, sir, I didn't.
17   Q.   You didn't ask him?
18   A.   No, sir, I didn't.
19   Q.   Why do you think that?
20   A.   I don't recall who told me, but somebody
21        other than Mr. Davis -- because I didn't
22        talk to Mr. Davis about it -- gave the
23        explanation back to me.  It could have been

Page 49

1    Mr. Davis. It could have been
2    Mr. Forester.
3    Q. Mr. Tom Davis --
4    A. Correct.
5    Q. -- could have told you --
6    A. Told me that's why it happened. Because I
7    caught it, brought it up and said, you
8    know, you need to fix this.
9    Q. Or Mr. Forester?
10   A. Yes.
11   Q. One of those two you believe?
12   A. I believe it was Mr. Davis. I'm not
13   positive. But if I had to pick between the
14   two of them -- That's the only two people I
15   would have consulted after the fact to get
16   to the bottom of it, would have been
17   Mr. Davis or Mr. Forester. Mr. Davis works
18   in my office. It would have been easier to
19   talk to him by just leaning out the
20   doorway.
21   Q. So Defendant's Exhibit 11, which is the
22   second test, was actually not marked
23   correctly, because it wasn't a

Page 50

1    preemployment test; correct?
2    A. Well, it didn't fit any of the other
3    categories. But I think -- My opinion is
4    Mr. Davis was trying to make it look like
5    it was a preemployment test.
6    Q. Mr. Russell Davis?
7    A. Yes.
8    Q. Who's no longer with the company?
9    A. That's correct.
10   Q. Do you know why he's no longer with the
11   company?
12   A. Not directly I don't, but I do have my
13   opinion.
14   Q. What is it?
15   A. That he was failing in a lot of his duties,
16   this included.
17   Q. Do you know where he is?
18   A. No, sir, I don't.
19   Q. Did y'all send him a final check?
20   A. I'm sure they did.
21   Q. Did y'all send him a W-2?
22   A. Yes, sir, I'm sure.
23   Q. Would you get that address to your lawyer

Page 51

1    for us?
2    A. Absolutely.
3    Q. Can we take a little break?
4    A. Absolutely.
5        (Off-the-Record discussion.)
6        (Deposition adjourned at this
7        time.)
8        (Deposition resumed on Friday,
9        April 11, 2008 at approximately
10       10:00 a.m. after taking the
11       deposition of Mr. Danny Futral.)
12   Q. (Examination continued by Mr. Douglas):
13   We're resuming your deposition. And you
14   understand you're still under oath;
15   correct?
16   A. Yes, sir.
17   Q. If you would flip to Bates stamped page 18
18   of Plaintiff's Exhibit Number 1. Can you
19   identify that document?
20   A. It's one of the pages in our company
21   handbook.
22   Q. And what is -- What does this page deal
23   with?

Page 52

1    A. Employment policies.
2    Q. And, specifically, this page deals with
3    your -- the company's harassment policy?
4    A. Yes, sir. And the EEO policy.
5    Q. And what do those initials mean?
6    A. Equal opportunity employer.
7    Q. Did you have anything to do with the
8    selection of page 18 from Plaintiff's
9    Exhibit 1 to be included in the EEOC
10   filing?
11   A. I'm not sure what you mean by that.
12       MR. DYKES: I mean, I'm going
13       to -- Can we go off the Record
14       for a second?
15       MR. DOUGLAS: Sure.
16       (Off-the-Record discussion.)
17       MR. DOUGLAS: We're back on.
18   A. No.
19   Q. If we could flip to Bates stamped page
20   Number 19 of Plaintiff's Exhibit 1. For
21   the Record, pages 19 through 22 are what?
22   A. They are the application for employment for
23   Mr. Robert Cannon.

13 (Pages 49 to 52)

Page 53

1  Q.  Had you seen his application prior to the
2      file being sent to you at corporate, which
3      you testified about yesterday?
4  A.  No, sir, I haven't.
5  Q.  So when the file was sent to you at
6      corporate would have been the first time
7      you laid eyes on his application?
8  A.  Yes, sir.
9  Q.  There were some questions for Mr. Cannon
10     yesterday regarding his failure to answer a
11     question on the application, have you ever
12     been convicted of a felony. Do you recall
13     that testimony?
14 A.  Yes, sir, I do.
15 Q.  Would it be the company's position that
16     Mr. Cannon lied on this application for
17     leaving that blank, or do you accept his
18     explanation?
19         MR. DYKES:  Object to the form.
20         You can answer.
21         THE WITNESS:  Yeah, I know.
22 A.  I would say he didn't lie because he didn't
23     put anything on there. He might have been

Page 54

1      deceptive, but he didn't lie.
2  Q.  Would you expect your hiring personnel to
3      inquire as to why that question was not
4      answered?
5  A.  Yes, I would.
6  Q.  If you'll flip to page 28 of Plaintiff's
7      Exhibit 1. And when I say pages, I mean
8      the Bates stamped page every time. If I
9      don't say Bates stamped, that's what I'm
10     referring to.
11         Are you there?
12 A.  Yes, sir.
13 Q.  This is the positive drug test that
14     contains Mr. Cannon's social security
15     number but not his last name; is that
16     correct?
17 A.  Yes, sir, it is.
18 Q.  Do you know anything about the handwriting
19     portion just to the right of the St. Louis
20     MRO logo?
21 A.  I'm -- I don't understand the question.
22 Q.  Did you write that?
23 A.  No, sir.

Page 55

1  Q.  You see that something has been
2      handwritten?
3  A.  Yes, sir.
4  Q.  Can you read it?
5  A.  Yes, sir. It looks like Russell.
6  Q.  Do you know if that's Russell's
7      handwriting?
8  A.  No, sir, I don't.
9  Q.  Do you know whose handwriting it is?
10 A.  No, sir, I don't.
11 Q.  Do you have any idea why it would have been
12     written on that form?
13 A.  No, sir, I don't.
14 Q.  If you'll flip to the next page, 29. You
15     were here for Mr. Futral's testimony
16     regarding this form, which is Defendant's
17     Exhibit 13 to Mr. Cannon's deposition?
18 A.  Yes, sir, I was.
19 Q.  Do you agree with his testimony with regard
20     to what the purpose of this form is?
21 A.  Yes, sir, I do.
22 Q.  And is he correct in his testimony with
23     regard to the difference between

Page 56

1      Defendant's Exhibit 13 and Defendant's
2      Exhibit 14? And do you need to look at it?
3  A.  Yes, sir. And by the difference, you're
4      saying that 14 is a disciplinary form and
5      13 is a termination form?
6  Q.  That's what I recall Mr. Futral's testimony
7      to be.
8  A.  Yes, sir, I agree with that.
9  Q.  And he's correct about that?
10 A.  Yes, sir.
11 Q.  Would it be company policy to have the
12     employee who is being terminated sign
13     Defendant's Exhibit Number 13?
14 A.  Yes, sir.
15 Q.  And I take it it would be company policy to
16     acknowledge an employee's refusal to sign
17     the disciplinary form?
18 A.  Yes, sir.
19 Q.  And do you know the gentleman who signed
20     Defendant's Exhibit 14?
21 A.  No, sir, I don't.
22 Q.  Do you know -- I guess you don't know if he
23     works with the company if you don't know?

Page 57

1   A.  No, sir, I don't.
2   Q.  I'm going to hand you a document, which
3      I'll mark as Plaintiff's Exhibit Number 2,
4      which is a group of documents which are
5      Bates stamped pages 33 through 90.
6         (Plaintiff's Exhibit 2 was marked
7         for identification.)
8   Q.  If you would take a moment and tell me if
9      you can identify those documents for me,
10     please, sir.
11   A.  Okay. I'm done.
12   Q.  Can you identify those documents?
13   A.  Yes, sir.
14   Q.  What is it? What are they?
15   A.  They should -- They're documents that
16     should have been contained in Mr. Cannon's
17     employee file as well as his DOT file.
18   Q.  Those are two separate files?
19   A.  Yes, sir.
20   Q.  Does your company write anything on the
21     outside of the file folders?
22   A.  Their name.
23   Q.  Anything else?

Page 58

1   A.  Maybe their location, but that would be --
2     that should be all that's on them.
3   Q.  Anything other than biographical
4     information?
5   A.  No, sir.
6   Q.  Was his application contained in
7     Plaintiff's Exhibit Number 2?
8   A.  I don't recall seeing it.
9   Q.  I didn't see it.
10   A.  I think I saw it in Plaintiff's Exhibit 1.
11   Q.  It was in Plaintiff's Exhibit 1.
12   A.  Right.
13   Q.  I don't want to imply anything wrong.
14   A.  No.
15        MR. DYKES: And I think -- I think
16       what I -- Because I probably
17       took it out to attach to the
18       statement of position.
19       It's -- I mean, it was in the
20       personnel file --
21      MR. DOUGLAS: Okay.
22      MR. DYKES: -- when I got it. And
23      if it's not in here now, it's

Page 59

1     because I took it out to do my
2     statement of position and it
3     was put in that file.
4   Q.  Let me ask you, sir. Did you take anything
5     out or anybody that worked for you take
6     anything out of the personnel file?
7   A.  Absolutely not.
8   Q.  So you would have given the whole file to
9     your attorney?
10   A.  Yes, sir.
11        MR. DOUGLAS: And we've been given
12       the whole file in some form?
13      MR. DYKES: Yeah. Yeah.
14      MR. DOUGLAS: Okay.
15      MR. DYKES: Yeah.
16   Q.  If you would flip to Bates stamped page
17     number 45 which is contained in Plaintiff's
18     Exhibit 2.
19   A.  Okay.
20   Q.  Can you identify that document?
21   A.  It appears to be a wage verification from
22     the Opelika Housing Authority.
23   Q.  Why --

Page 60

1   A.  Concerning Mr. Cannon.
2   Q.  Why is this form generated, if you know?
3   A.  I have no idea.
4   Q.  You don't know if it has anything to do
5     with Section 8 Housing or anything like
6     that?
7   A.  No, sir, I don't know what that is.
8   Q.  If you would flip to page 51 of Plaintiff's
9     Exhibit Number 2. This appears to be a fax
10     from Rebecca Brooner to Sherry Beasley; is
11     that correct?
12   A.  No, sir.
13        MR. DOUGLAS: No.
14   Q.  Okay. What does it appear to be?
15   A.  It appears to be a fax that originally had
16     come from the Opelika Housing Authority and
17     instead of using a new cover sheet just
18     crossed it out and sent it back to the
19     Opelika Housing Authority.
20   Q.  Got you.
21     And the Housing Authority is -- I'm
22     sorry. Ms. Barns at the Housing Authority
23     is requesting another form. Is that

Page 61

1     what -- Do you see that in the comment
2     section?
3   A.   Yes, sir, I do.
4   Q.   A job termination form; correct?
5   A.   Yes, sir.
6   Q.   And if you flip to page 52, that is a job
7     termination verification; is that correct?
8   A.   Yes, sir.
9   Q.   And at the bottom the firm name is
10     Sunflower Waste, LLC, and signed by
11     Rebecca -- Brooner, is it?
12   A.   Brooner.
13   Q.   Do you know her?
14   A.   Yes, sir, I do.
15   Q.   Who is she?
16   A.   She was the controller for the Tallassee
17     office.
18   Q.   Okay.  And Ms. Brooner indicated that
19     Mr. Cannon was terminated on March 9, 2007;
20     correct?
21   A.   Yes, sir, that's what it says.
22   Q.   If you would flip to page 54.
23   A.   Okay.

Page 62

1   Q.   There is another term -- This is a separate
2     termination verification sent to the
3     Housing Authority regarding Mr. Cannon; is
4     that correct?
5   A.   Yes, sir, it is.
6   Q.   Now, the date on page 54 -- And that one is
7     signed by Ms. Beasley March 13, 2007;
8     correct?
9   A.   Yes, sir, it is.
10   Q.   Now, on page 54 there's an indication that
11     Mr. Cannon was terminated due to violation
12     of drug and alcohol policy; is that
13     correct?
14   A.   Yes, sir, that's what it says.
15   Q.   But on page 52 when Ms. Brooner -- when
16     Ms. -- excuse me -- when Ms. Brooner sent
17     the termination verification, she left off
18     the reason under additional remarks.
19   A.   That's correct.
20   Q.   Which one of -- Is Ms. Beasley's actions in
21     putting the reason down there appropriate
22     under company policy?
23   A.   Yes, sir, they are.

Page 63

1   Q.   Is Ms. Brooner's decision not to put the
2     reason appropriate under company policy?
3   A.   Yes, sir, it is.
4   Q.   So that's within the discretion of who is
5     sending the form?
6   A.   Also at the -- if they actually knew the
7     reason.
8   Q.   Who's they?
9   A.   Or if Ms. Brooner actually knew the
10     reason.  Maybe that's -- It would be
11     speculating.  But --
12   Q.   Right.
13   A.   -- not everybody is privy to the
14     information.  Some people can see dates of
15     employment but do not have access to the
16     files to know why they were terminated.
17   Q.   To your knowledge, is there any particular
18     reason why it was included on one and not
19     included on the other?
20   A.   No, sir.
21   Q.   Think it had anything to do with the fact
22     that Mr. Cannon was pursuing a claim?
23         MR. DYKES:  Object to the form.

Page 64

1   A.   No, sir.
2   Q.   You haven't spoken to either one of them
3     about it, I take it?
4   A.   No.
5   Q.   On page 56, can you identify that document
6     in Plaintiff's Exhibit 2?
7   A.   It's a notice of termination form from our
8     company.
9   Q.   Signed by Mr. Futral?
10   A.   Yes, sir, appears that way.
11   Q.   And appears that he signed it on March 9,
12     2007; is that correct?
13   A.   Yes.
14   Q.   What would be the point or the reason of
15     having this notice of termination form as
16     well as Defendant's Exhibit 13?
17   A.   Well, this one is giving instructions
18     concerning issues that happen after your
19     termination concerning insurance.
20     Mr. Futral would have limited knowledge of
21     COBRA insurance policies or W-2s or things
22     of that nature.  So it's directing
23     Mr. Cannon to contact Sherry Beasley and

Page 65

| | |
|---|---|
| 1 | not Mr. Futral concerning those issues. |
| 2 | Q.  So the notice of termination on page 56 of |
| 3 | Plaintiff's Exhibit 2 would have been given |
| 4 | to Mr. Cannon? |
| 5 | A.  Would appear that way, yes. |
| 6 | Q.  Should have been given to Mr. Cannon? |
| 7 | A.  Yes. |
| 8 | Q.  And page 56 of Plaintiff's Exhibit 2 does |
| 9 | not call for Mr. Cannon's signature |
| 10 | anywhere on the form? |
| 11 | A.  No, sir. |
| 12 | Q.  Well, can you tell me why -- and if you |
| 13 | don't know, that's fine -- Because |
| 14 | Ms. Beasley also signed Defendant's Exhibit |
| 15 | 13.  Why not just put the information |
| 16 | regarding insurance on one form?  Why two |
| 17 | forms? |
| 18 | A.  I have no idea. |
| 19 | MR. DOUGLAS:  Off the Record. |
| 20 | (Off-the-Record discussion.) |
| 21 | Q.  I apologize if I asked you this question |
| 22 | yesterday, but you heard the testimony |
| 23 | where Ms. Beasley indicated that she had |

Page 66

| | |
|---|---|
| 1 | sent verification of employment to Ann |
| 2 | Dora's in Montgomery, Alabama; is that |
| 3 | correct? |
| 4 | A.  Yes.  Yes, it is. |
| 5 | Q.  And you heard her testimony with regard to |
| 6 | putting that Mr. Cannon was terminated for |
| 7 | violation of drug and alcohol policy; |
| 8 | correct? |
| 9 | A.  Yes, sir, I did. |
| 10 | Q.  Is that within company policy for her to |
| 11 | send that information to Ann Dora's? |
| 12 | A.  Can I see the document? |
| 13 | Q.  Sure, you can. |
| 14 | MR. DYKES:  It's number 58. |
| 15 | A.  Oh, is it in here? |
| 16 | Q.  Yeah.  It's page 58 of Plaintiff's Exhibit |
| 17 | 2, and it was also an exhibit yesterday to |
| 18 | Mr. Cannon's deposition. |
| 19 | (Off-the-Record discussion.) |
| 20 | A.  Yes, sir.  It would be appropriate in this |
| 21 | case to send it to Ann Dora's. |
| 22 | Q.  Why is that? |
| 23 | A.  Mr. Cannon released -- gave the |

Page 67

| | |
|---|---|
| 1 | authorization to release the information. |
| 2 | Q.  And that -- on that piece of paper or -- |
| 3 | A.  Yes, sir. |
| 4 | Q.  Is that the only reason it's appropriate? |
| 5 | A.  No, sir. |
| 6 | Q.  What are other reasons it's appropriate? |
| 7 | A.  If it's -- If they're going to be operating |
| 8 | equipment controlled by the Department of |
| 9 | Transportation, we're required by law to |
| 10 | provide that information. |
| 11 | Q.  You don't have a choice? |
| 12 | A.  No, sir. |
| 13 | Q.  You must provide it? |
| 14 | A.  Yes, sir.  And you must provide the facts |
| 15 | that are known to you at the time. |
| 16 | Q.  Which makes it important that the facts be |
| 17 | correct? |
| 18 | A.  Absolutely. |
| 19 | Q.  Did you have any role with regard to |
| 20 | Mr. Cannon's claim for unemployment |
| 21 | compensation? |
| 22 | A.  No, sir. |
| 23 | Q.  Do you know who did? |

Page 68

| | |
|---|---|
| 1 | A.  No, sir. |
| 2 | Q.  Would that have happened before your |
| 3 | involvement with his file in any way? |
| 4 | A.  Yes.  No -- Well, not exactly sure what you |
| 5 | mean by with this file. |
| 6 | Q.  With -- Before Mr. Cannon's file came to |
| 7 | corporate. |
| 8 | A.  I wouldn't have had any part of the |
| 9 | unemployment claim. |
| 10 | Q.  Are you aware that Mr. Cannon was awarded |
| 11 | unemployment benefits? |
| 12 | A.  Not till I got the file. |
| 13 | Q.  Do you have any understanding as to when a |
| 14 | former employee is entitled to unemployment |
| 15 | benefits or not? |
| 16 | A.  I guess it's up to the state of -- in which |
| 17 | they reside. |
| 18 | Q.  Of course, it is.  But do -- |
| 19 | A.  I don't -- I mean, all the states are |
| 20 | different.  I don't necessarily agree with |
| 21 | them.  But, I mean, if it fits their |
| 22 | criteria, yes. |
| 23 | Q.  Do you have an understanding that if |

Page 69

1      someone is fired for cause then they're not
2      entitled to unemployment benefits?
3  A.  Yes.
4          MR. DYKES:  Object to the form.
5  Q.  You have that understanding?
6  A.  Yes.
7  Q.  Are you in any way miffed or surprised that
8      Mr. Cannon was awarded unemployment
9      benefits in this case?
10  A.  I'm surprised, yes.
11  Q.  Miffed?
12  A.  As in mad?
13          MR. DYKES:  Object to the form.
14  Q.  Yeah.
15  A.  No.
16  Q.  Page 64, please, sir.  Can you identify
17      this document for me?
18  A.  I have absolutely no idea.
19  Q.  There's a notation at the bottom, 5/29/07,
20      that says faxed copy of drug test ID'd as
21      batch ID 20070202 to Tom Davis, 3:45 p.m.
22      Did I read that correctly?
23  A.  Yes, sir.

Page 70

1  Q.  Do you know whose handwriting that is?
2  A.  No, sir.
3  Q.  Do you have an opinion as to whose
4      handwriting that is?
5  A.  Yes, sir.
6  Q.  What's your opinion?
7  A.  It's probably Becky Brooner.
8  Q.  Do you know where this form was sent or if
9      it was sent anywhere?  There's a fax cover
10      sheet, which is the next page, and I don't
11      know if it goes with page 64 or not.  Do
12      you have an opinion as to whether it does
13      or not?
14  A.  I don't know if the sheet behind it went
15      with --
16  Q.  I would guess it doesn't, because the fax
17      cover sheet says there's -- it's a six-page
18      fax.  But these aren't my documents, so ...
19  A.  Right.
20  Q.  If you have an opinion, please share it
21      with me.
22  A.  The only opinion I -- or think I can tell
23      you is they were dated the same day.  And

Page 71

1      as far as if it was part of it or not ...
2  Q.  Were you finished with your answer?
3  A.  Yes.
4  Q.  All right.  Page 66 of Plaintiff's Exhibit
5      2, are you able to identify that document?
6  A.  Chain of custody for a drug test.
7  Q.  And what is a chain of custody?
8  A.  In layman's terms?
9  Q.  Sure.
10  A.  Because I'm not an expert on it.  But it's
11      a form that makes sure the right specimen
12      from the right individual under his or her
13      supervision is labeled correctly and goes
14      to the MRO so there's no mix-up.
15  Q.  Well, what is the journey of the specimen?
16      It goes from the body of the employee to a
17      container?
18  A.  Correct.
19  Q.  And then where?
20  A.  Then to a third-party testing facility.
21  Q.  Some sort of medical provider?
22  A.  Yes.
23  Q.  And then where?

Page 72

1  A.  I'm assuming it is disposed of.
2  Q.  Mr. Futral testified earlier today that it
3      was his understanding that if there is a
4      positive drug test that the employee would
5      be notified by the MRO.  Is that true?
6  A.  That's the procedure, yes, sir.
7  Q.  Was that the procedure of St. Louis MRO,
8      Inc.?
9  A.  If they're a DOT drug testing facility,
10      they would have to be.
11  Q.  Do you know if Mr. Cannon was contacted by
12      St. Louis MRO, Inc.?
13  A.  I don't know that.
14  Q.  Do you know of any evidence in Mr. Cannon's
15      file that he was contacted by St. Louis
16      MRO?
17  A.  I'd have to look through the file.
18  Q.  Well, we've got his file as Plaintiff's
19      Exhibit 2; right?  And I'm happy for your
20      lawyer to direct you anywhere.
21  A.  Okay.
22  Q.  It's not a memory test.
23  A.  Okay.  Then it appears that they were

Page 73

1    unable to contact Mr. Cannon.
2    Q.  And you're reading from page 67?
3    A.  Yes, sir, that's correct.
4    Q.  Do you know why they were unable to contact
5        him?
6    A.  No, sir.
7    Q.  Have you or anybody at the company, to your
8        knowledge, done any investigation as to why
9        they were not able to contact him?
10   A.  No, sir.
11   Q.  Okay.  If you will flip to page 69 of
12       Plaintiff's Exhibit 12.  This is the second
13       drug test, which was negative, taken on
14       February 12th, verified February 14th.  Do
15       you know who marked on this page 69?
16   A.  No, sir, I don't.
17   Q.  You see that several things are circled?
18   A.  Yes, sir, I do.
19   Q.  You don't have any idea who did any of
20       that?
21   A.  None.
22   Q.  Any of the handwritten information at the
23       top of the page where it says attention

Page 74

1    Ms. Pullum?  Do you know who wrote that?
2    A.  No, sir.
3    Q.  Do you recognize the handwriting?
4    A.  No, sir, I don't.
5    Q.  Do you have any opinion as to who wrote any
6        of the handwriting stuff on page 69?
7    A.  None.
8    Q.  Is there a company policy with regard to
9        writing on documents like this?
10   A.  Not -- No, sir.
11   Q.  Pages 72 through 74 of Plaintiff's Exhibit
12       2 are what?
13   A.  It's a medical examination report for
14       somebody who's certified or has a CDL
15       driver's license.
16   Q.  Is this form required by the federal
17       government?
18   A.  Yes, sir, it is.
19   Q.  And you would have one for all of your
20       drivers; correct?
21   A.  Yes, sir, we do.
22   Q.  Page 78 of Plaintiff's Exhibit Number 2,
23       what is that?

Page 75

1    A.  It's a checklist for an observation of a
2        road test for an employee.
3    Q.  The date on this road test was January 31,
4        2007; is that correct?
5    A.  Yes, sir, that's what it reads.
6    Q.  About a week after Mr. Cannon was hired?
7    A.  Yes.
8    Q.  Is it typical to give the road test a week
9        or so after the employee is hired?
10   A.  No, sir, it's not.
11   Q.  What is typical?
12   A.  Before they're -- Well, I'll back up.  It's
13       not typical if they're driving.  It's -- It
14       may be typical if they weren't driving up
15       until the road test was done.
16   Q.  If they're driving, they should have taken
17       the road test before they started driving?
18       That's true, isn't it?
19   A.  Yes, sir.
20   Q.  That's required, isn't it?
21   A.  I don't know that it's required by the
22       Department of Transportation.
23   Q.  It is company policy, however?

Page 76

1    A.  Yes, sir.
2    Q.  Page 79 of Plaintiff's Exhibit 2, that's
3        just a certification of the driving record
4        of the prospective employee; is that
5        correct?
6    A.  Given by that employee, yes, sir.
7    Q.  And pages 80 and 81 of Plaintiff's Exhibit
8        2 are what?
9    A.  I'm sorry.  80 and ...
10   Q.  81.
11   A.  Okay.  Appears to be a copy of a background
12       check.
13   Q.  On Mr. Cannon?
14   A.  Yes, sir.  By a third party.
15   Q.  What type of background check?  What are
16       they checking?
17   A.  In this case it looks like his driving
18       record.
19   Q.  And he had a clean driving record according
20       to this report?
21   A.  Yes, sir, it appears that way.
22   Q.  Okay.  Pages 86 and 87 of Plaintiff's
23       Exhibit Number 2, can you identify those

Page 77

1    for me?
2    A.  Appears to be two pages out of the safety
3        manual concerning drug free workplace.
4    Q.  Are those two pages contained in the
5        employee handbook?
6    A.  Not these exact two pages, no, sir.
7    Q.  Are these two pages contained -- So these
8        two pages are not part of the handbook?
9    A.  No, sir.
10   Q.  They are separate?
11   A.  Yes, sir.  There's a separate safety
12       handbook.
13   Q.  Do the employees get that entire handbook
14       or they just get these two pages?
15   A.  They get the entire handbook.
16   Q.  Why are these two pages in his personnel
17       file?
18   A.  I have no idea.
19   Q.  Do you recall if these two pages were in
20       his personnel file when you got the file?
21   A.  I don't recall that, no.
22   Q.  Would typically xeroxed pages from the
23       safety manual be in an employee's personnel

Page 78

1    file?
2    A.  Yes, sir.
3    Q.  So that's not unusual?
4    A.  No, sir.
5    Q.  Would it be unusual for the whole handbook
6        to be in there or just these two pages?
7    A.  Yes, sir.  That would be unusual for the
8        entire handbook to be in there.
9    Q.  But not unusual for just those two pages?
10   A.  Or maybe -- There could be other pages in
11       there but not the whole handbook.
12   Q.  Who would make that determination as to
13       what goes in the file?
14   A.  If this is part of the DOT file, it would
15       be the safety manager.  Or in the absence
16       of a safety manager, the operations
17       manager.
18          (Plaintiff's Exhibit 3 was marked
19           for identification.)
20   Q.  All right.  I'm going to show you a group
21       of documents I have marked collectively as
22       Plaintiff's Exhibit Number 3.  They are
23       Bates stamped pages 91 through 125.  If you

Page 79

1    would take a look at those for me, please.
2    A.  Okay.
3    Q.  What are those documents?
4    A.  This is a copy of the company handbook in
5        place of -- in July of '06.
6    Q.  And was it in place during Mr. Cannon's
7        tenure?
8    A.  Yes, sir, it was.
9    Q.  Is this the entire handbook?
10   A.  Yes, sir, it is.
11   Q.  Every employee would get a copy when they
12       began work at your company?
13   A.  Yes, sir, they should.
14   Q.  And all the employees have to sign that
15       they received a copy?
16   A.  Correct.
17   Q.  On page 103 of Plaintiff's Exhibit Number 3
18       and page 104, there is a section entitled,
19       drug free workplace.  Are you familiar with
20       that?
21   A.  Yes, sir.
22   Q.  And does that reflect the company policy
23       regarding the use of drugs that you

Page 80

1    testified yesterday?
2    A.  Yes, sir, it does.
3    Q.  And the fact that all employees will suffer
4        automatic termination if they test positive
5        for drugs, you would agree with me would
6        make it very important that the drug
7        testing be accurate?
8    A.  Yes, sir.
9    Q.  Would Mr. Cannon be eligible -- I want you
10       to assume -- Strike that.
11          I want you to assume -- I want you to
12       assume a hypothetical for me.
13   A.  Okay.
14   Q.  I'm not asking you to accept that this is
15       true, only -- But I am for the purposes of
16       my question.
17   A.  Okay.
18   Q.  All right.  For purposes of my question, I
19       want you to assume that the positive drug
20       test on Mr. Cannon was inaccurate for
21       whatever reason.
22   A.  Okay.
23   Q.  Just for purposes of my question.  Would he

Page 81

1　be eligible for rehire if that was true?
2　　　　MR. DYKES: Object to the form.
3　A. If it could be proved it was inaccurate,
4　yes.
5　Q. Obviously. I'm asking you to assume --
6　A. Yes.
7　Q. -- that that's true.
8　　　I mean, the only reason he was
9　terminated was the positive test result --
10　drug test result?
11　A. Correct.
12　Q. Have you ever had an employee other than
13　Mr. Cannon dispute a positive drug test
14　result who was terminated?
15　A. At Advanced Disposal?
16　Q. Yes.
17　A. Not to my knowledge.
18　Q. Did anybody at the company, to your
19　knowledge -- Well, let me ask you this.
20　Did you take any steps -- you or anybody at
21　the company, to your knowledge, take any
22　steps to confirm that the test was
23　accurate?

Page 82

1　A. What do you mean by accurate?
2　Q. Well, that's fair. Did -- You recall that
3　Mr. Futral's testimony was that Mr. Cannon
4　denied that he had used drugs?
5　A. Yes, sir.
6　Q. Do you know if that denial was passed up
7　the chain to anybody beyond Mr. Futral?
8　A. Not to my knowledge.
9　Q. Did you hear Mr. Futral's testimony
10　regarding his explanation of why the second
11　test was done that was negative?
12　A. Yes, sir, I did.
13　Q. Do you have any reason to dispute that?
14　A. You mean dispute that he said that or why
15　he said that?
16　Q. Well, he offered a reason.
17　A. Yes.
18　Q. Do you have any reason to dispute his
19　reason?
20　A. I'd have to hear the reason exactly again
21　to ...
22　Q. Well, is there any procedure in place for
23　an employee if they erroneously tested

Page 83

1　positive -- if that happens, is there
2　any -- is there any way that the employee
3　can prove their innocence if they're really
4　innocent?
5　A. Yes, sir, there is.
6　Q. How would one go about doing that?
7　A. They would have to request a split sample
8　be tested, which are two samples taken --
9　or two samples are given. One is tested
10　and one is sealed and not tested. And if
11　they dispute it, it's up to them to have
12　the MRO at their expense test the second
13　sample.
14　Q. At the employee's expense?
15　A. Yes, sir.
16　Q. So the way that would happen would be the
17　MRO getting in contact with the employee;
18　is that correct?
19　A. If they could, yes, sir.
20　Q. So in a situation, assuming the documents
21　to be true, where the MRO couldn't get in
22　touch with Mr. Cannon for whatever reason
23　and Mr. Cannon denies that the positive

Page 84

1　drug test was correct, what is an employee
2　to do in that situation, if anything?
3　A. Contact the MRO and ask them to do a split
4　sample.
5　Q. There's no mechanism for the company to
6　contact the MRO based on the employee's
7　assertion that the test is wrong?
8　A. It's not their responsibility.
9　Q. Not whose responsibility?
10　A. The company's.
11　Q. Why not?
12　A. Well, we'd be asking for a split sample to
13　be done at -- for an employee and then
14　charging it to the employee.
15　Q. What's wrong with that?
16　A. Well, there's a lot wrong with it if all of
17　a sudden you get a bill for something and
18　you're, like, well, I didn't ask for that
19　split sample; the company requested it.
20　Q. So it's a financial problem?
21　A. I would imagine it would be for an employee
22　who just lost his job to have to come up
23　with the money to do a split sample, yes.

Deposition of Glenn Guest

Page 85

1  Q.  You imagine what?
2  A.  That it would be a problem for the employee
3      if all of a sudden he gets a bill. And, of
4      course, he's going to dispute it.
5          MR. DYKES:  I don't think he's --
6          I think --
7  Q.  It sounds like you and I have gotten on
8      different wavelengths on this.
9  A.  Okay.  Fair enough.
10         MR. DYKES:  Because I think he's
11         answering -- If you
12         don't mind, I mean --
13         MR. DOUGLAS:  I don't mind.  I'm
14         happy to get it cleared up.
15         MR. DYKES:  I mean, I think you
16         were asking him why the
17         company doesn't do it and pay
18         for it itself, and he's
19         answering -- I think you took
20         the question to mean why
21         doesn't the company request
22         the test be taken.  And he's
23         saying because they don't want

Page 86

1      the employee --
2          MR. DOUGLAS:  That was my
3          question.
4  Q.  I want to know why the company doesn't
5      request it if -- Why can't the employee
6      complain to the company and the company
7      say, okay, we'll do a split sample for you;
8      we'll ask the MRO to do a split sample?
9  A.  You want my opinion why we don't do it
10     or ...
11  Q.  Is there a reason?  If there's a reason
12     that you know, that's what I'd like to
13     hear.
14  A.  I don't know of a reason.  I just -- I know
15     that if he's positive, it's up to him to
16     clear it up.
17  Q.  But isn't it reasonable for some -- Assume
18     for the purposes of my question that
19     Mr. Cannon hadn't taken drugs in January of
20     2007.
21  A.  Okay.
22  Q.  Isn't it reasonable for someone in that
23     situation when they're told they're going

Page 87

1      to lose their job because they've tested
2      positive for drugs to tell their employer I
3      haven't taken any drugs?  I mean, that's
4      reasonable, isn't it?
5          MR. DYKES:  Object to the form.
6  A.  It's reasonable.  But at the same time, I
7      don't know that I've ever heard in my 20
8      plus years in the transportation business
9      of a driver saying that he did take drugs
10     and admit it.  They're all not guilty.
11  Q.  Is that right?  You've never had an
12     employee test positive for drugs and just
13     say, okay, you got me?
14  A.  No, sir, not to me they haven't.
15  Q.  Okay.  Well, I asked you earlier if this
16     had ever happened at Advanced Disposal and
17     you said no.
18  A.  That's correct.
19  Q.  How many times had it happened throughout
20     your career where they had denied the
21     positive drug test?
22  A.  Probably -- Maybe ten times.
23  Q.  Okay.  And are you saying that in your

Page 88

1      20-some-odd career (sic) in this business
2      you've only known of ten to 15 people who
3      have been terminated for using illegal
4      drugs?
5  A.  No.  I'm telling you there's only about ten
6      that have complained to me.  I don't --
7      This isn't -- This isn't my -- This isn't
8      part of my day-to-day operation.  If
9      somebody complains, yes, they bring it to
10     me.  But they could complain to somebody
11     else.  In my past history when they have
12     complained to me, they complained I didn't
13     do it.
14  Q.  I understand.  But there's been a lot of
15     people who have tested positive who have
16     not complained at all?
17  A.  I'm sure there are, yes.
18  Q.  You know, they just get fired and that's
19     it.
20  A.  Right.
21  Q.  Okay.  And there's certainly a lot more of
22     those than ones that complain; correct?
23  A.  Correct.

Page 89

1  Q.  Okay.  So back to my question.  You agree
2      with me if Mr. Cannon was really clean it's
3      reasonable for him to tell his bosses, hey,
4      I'm clean?
5          MR. DYKES:  Object to the form.
6  Q.  That's reasonable for him to do that, isn't
7      it?
8          MR. DYKES:  Object to the form.
9  A.  Yes, sir.
10 Q.  What, if anything, would be Mr. Futral's or
11     Mr. Russell Davis' responsibility after
12     Mr. Cannon has told them, hey, I was clean?
13 A.  They're -- I guess define their
14     responsibility.
15 Q.  What should they say to him then?
16 A.  If you disagree you can have a split
17     sample.
18 Q.  All right.  So would that -- Would it be
19     company policy that they tell him he had
20     that option?
21 A.  That, I don't know.  That's more of a
22     safety issue or question than mine.  I
23     would defer to safety on that.

Page 90

1  Q.  Well, there was -- there was a positive
2      test, and then two weeks later there's two
3      negative tests; one by his personal
4      physician and one by the company.
5  A.  Correct.
6  Q.  But he's fired after the negative test
7      comes back.
8  A.  That's correct.
9  Q.  Why?
10 A.  Because he had a positive.
11 Q.  Then why even do the second test?
12 A.  I didn't request a second test, so I can't
13     answer that.  I know he came up positive,
14     and then when I found it in my research, I
15     took it to safety.
16 Q.  Right.
17 A.  Safety checked it out, and Tom Davis made
18     the decision to terminate him.
19 Q.  Well, why was the positive test, if you
20     know, given more weight than the negative
21     test?
22 A.  Because if the DOT came in and found us
23     with a person with a positive test, we'd be

Page 91

1      cited for it.  You can't have a driver out
2      there with a positive test under DOT
3      regulations.
4  Q.  With the employee's name misspelled and not
5      even signed by a medical officer, and then
6      you've got another test, which is properly
7      formatted, which shows negative, you'd
8      still get in trouble, you think?
9  A.  Yeah.  The drugs could have been out of his
10     system by the time the second test was
11     taken.
12 Q.  How do you know that?
13 A.  From years of experience and knowing that
14     cocaine doesn't stay in the body as long as
15     marijuana does.
16 Q.  Okay.  According to your experience, how
17     long does cocaine stay in the body?
18         MR. DYKES:  Well, I --
19         MR. DOUGLAS:  He volunteered this
20         information.
21         MR. DYKES:  No.  I understand
22         that.  You're saying -- I
23         would just like it cleared up

Page 92

1      from his experience taking
2      cocaine but from his
3      experience, because I --
4          MR. DOUGLAS:  Of course not.
5          MR. DYKES:  Okay.  Your question
6          sounded like -- I mean, I just
7          wanted that clear, that it's
8          from your experience and
9          general knowledge of what --
10         MR. DOUGLAS:  And I used his exact
11         words.  I said from your
12         experience.
13         MR. DYKES:  Okay.
14 A.  I've already testified I've never used
15     drugs, so ...
16 Q.  Yeah.  Right.
17 A.  In my experience, it's -- My knowledge is
18     that it can run out of the system in three
19     to four days.
20 Q.  And where did you acquire that knowledge?
21 A.  From different safety instruction I've had
22     over 20 years in the transportation
23     business.

Page 93

1 Q. Would you have gotten that knowledge from a
2   medical -- someone in the medical field?
3 A. I don't recall if it was a -- from an MRO
4   or from a safety director.
5 Q. Well, how long does marijuana stay in the
6   system according to your experience in the
7   industry?
8 A. Up to 30 days.
9 Q. Oh, just one thing that's clear. On
10   Mr. Cannon's application, he disclosed that
11   he had worked for Waste Management?
12 A. Yes, sir, he did.
13 Q. As a driver?
14 A. Yes, sir.
15 Q. Any driver would know that a -- Strike
16   that.
17     On Defendant's Exhibit 10, which is the
18   positive drug test we've been speaking
19   about, when does it indicate that the
20   sample was collected?
21 A. Hold on. I believe it says January 22nd.
22 Q. That's what I believe as well. And when
23   does it indicate that the sample was

Page 94

1   received, which is a couple lines below
2   that?
3 A. January 22nd.
4 Q. Okay. And what is the verification date on
5   the bottom right of that sample, which is
6   not signed?
7 A. 2/2/07.
8 Q. And then something is handwritten under
9   there?
10 A. Yes.
11 Q. What's the handwritten date?
12 A. February 12, 2007.
13 Q. Okay. So at a minimum, it was between
14   January 22nd, when the sample was received,
15   until February 2nd before it was verified,
16   is that correct, according to the form?
17 A. And what do you mean by ver -- I mean ...
18 Q. The verification date.
19 A. Okay.
20 Q. Is that correct?
21 A. That's correct.
22 Q. Defendant's Exhibit 11 indicates, I
23   believe, that the sample was collected --

Page 95

1   and this is the negative test -- was
2   collected on February 12th; is that
3   correct?
4 A. Yes.
5 Q. Received on February 12th also?
6 A. Correct.
7 Q. And verified two days later on February
8   14th?
9 A. Correct.
10 Q. Does not the lapse of time on Defendant's
11   Exhibit 10 give you pause as to the
12   accuracy of that test?
13 A. No, sir.
14 Q. Why not?
15 A. Well, on Exhibit 11 they don't make -- they
16   don't have to make a determination to the
17   company, because it's negative. They
18   cannot make representation to the company
19   because they couldn't contact the employee
20   on Exhibit 10. They have to wait a certain
21   number of days in order for the employee to
22   contact them back if they leave messages
23   and can't get ahold of them. Because

Page 96

1   you're waiting potentially for a split
2   sample to be done, and then you verify.
3 Q. And what are the -- what is that amount of
4   time, if you know?
5 A. I don't know. I believe it's two to three
6   days from the time they start -- they get a
7   positive until they haven't been able to
8   contact the employee before they're allowed
9   to notify us.
10 Q. Is there anything in your files which would
11   indicate any efforts by the MRO to contact
12   the employee through the company?
13 A. They can't do that.
14 Q. They can't even call and ask for his number
15   or anything?
16 A. It's given on the chain of custody, a
17   daytime and a nighttime phone number.
18 Q. Did the company do any investigation as to
19   why they were not able to get in touch with
20   Mr. Cannon?
21 A. No, sir.
22 Q. Even after this litigation?
23 A. No, sir.

Page 97

1   Q.   So you have no idea about that?
2   A.   No, sir.
3   Q.   And do you know who wrote February 12, 2007
4        on Defendant's Exhibit 10?
5   A.   No idea.
6   Q.   Do you have any opinion?
7   A.   No, sir.
8   Q.   And I believe you testified yesterday you
9        don't know why the company is no longer
10       using St. Louis MRO, Inc.?
11  A.   That's correct.
12  Q.   Don't know if it has anything to do with
13       this Cannon incident or not?
14  A.   I don't believe it does.
15  Q.   Well, why don't you believe it does if you
16       don't have any idea of why?  If you --
17  A.   I'm --
18  Q.   I'm not trying to argue with you.
19  A.   No.
20  Q.   But you're either clueless or you have some
21       idea.  So which is it?
22  A.   I'll take the Fifth on -- No.  Because we
23       don't handle our vendors based on a

Page 98

1        lawsuit.
2   Q.   Just as a general rule?
3   A.   Right.  Just because somebody came back
4        positive and there was an argument about it
5        doesn't mean the vendor was correct or
6        incorrect, so we wouldn't take any adverse
7        action.
8   Q.   And that's what you base your statement you
9        don't think it has anything to do with this
10       case?
11  A.   Correct.
12  Q.   And I believe I asked you yesterday.  You
13       haven't taken any statements from anybody
14       regarding this matter?
15  A.   No, sir.
16  Q.   And other than to your counsel, you've told
17       me about all the conversations you've had
18       regarding this matter?
19  A.   I believe so, yes.
20  Q.   I'm going to ask you just a couple of
21       questions about the hierarchy, if you will,
22       of the company.  Yesterday you told me that
23       Van Forester was the district manager.

Page 99

1   A.   That's correct.
2   Q.   How many district managers are in the
3        company?
4   A.   Today?
5   Q.   Yes.
6   A.   That role has --
7             MR. DYKES:  Well -- I'm sorry.
8   A.   That role has changed.
9   Q.   Let's say when Mr. Cannon was working
10       there.
11  A.   Okay.  I believe there was four.
12  Q.   Were any of them African-American at that
13       time?
14  A.   No, sir.
15  Q.   Mr. Russell Davis' title when Mr. Cannon
16       was working there was what type of manager?
17  A.   I believe it was operations manager.
18  Q.   Operations manager.
19            How many of those were there when
20       Mr. Cannon worked for your company?
21  A.   In the entire company?
22  Q.   Yeah.
23  A.   Somewhere between six and eight.

Page 100

1   Q.   Were any of those African-American?
2   A.   I don't believe so.
3   Q.   I'm sorry.  I've forgotten Trey's last
4        name.
5   A.   Allen.
6   Q.   What was his title again?
7   A.   Land -- General manager --
8   Q.   General manager of the landfill?
9   A.   -- of the landfill.
10  Q.   How many of those were there when
11       Mr. Cannon worked for the company?
12  A.   I believe around five or six.
13  Q.   Were any of those African-American?
14  A.   No, sir.
15  Q.   Mr. Futral, what was his position?  He was
16       just a supervisor?
17  A.   Correct.
18  Q.   Do you know how many of those you had?
19       Probably not.
20  A.   No.  If I had to guess, there was probably
21       a lot more of those.  Probably 15 or 20.
22  Q.   Do you know if any of those were
23       African-American?

Page 101

1   A.  Yes.  Yes, there were.
2   Q.  Do you know what the percentage was
3       roughly?
4   A.  Probably 30, 35 percent.
5   Q.  30 percent African-American?
6   A.  Correct?
7   Q.  60 to 65 percent white?
8   A.  Correct.
9   Q.  Do you recall Mr. Cannon's testimony
10      regarding Mr. Futral making the comment
11      that I'm going to get Coke off the back of
12      that truck?
13  A.  Yes, sir.
14  Q.  You remember that testimony?
15  A.  Yes, sir.
16  Q.  Assuming that testimony was true, that
17      wouldn't be proper, would it?
18  A.  Absolutely not.
19  Q.  Do you yourself know if Mr. Conway was
20      hired as a driver or a helper?
21  A.  No, sir, I don't.
22  Q.  Do you know if Mr. Conway's duties got
23      better or less arduous or more pay after

Page 102

1       Mr. Cannon was terminated or not?
2   A.  No, sir, I don't.
3           MR. DOUGLAS:  Off the Record.
4           (Off-the-Record discussion.)
5           MR. DOUGLAS:  We're back on the
6           Record.
7   Q.  I asked you earlier why Mr. Cannon was
8       terminated when there were two different
9       tests showing different things and you
10      answered that question, because you had a
11      positive test?
12  A.  That's correct.
13  Q.  Is there any other reason?
14  A.  None whatsoever.
15  Q.  That's the only one?
16  A.  Yes.
17  Q.  Are you aware of Reuben Lowder?
18  A.  I've heard the name.
19  Q.  You heard Mr. Futral testifying about an
20      accident that he had?
21  A.  Yes.
22  Q.  And that he was subsequently drug tested?
23  A.  Yes.

Page 103

1   Q.  What is the determination as to whether or
2       not a driver who has an accident is drug
3       tested or not?
4   A.  The extent of the accident under DOT law.
5   Q.  And how much of an extent is sufficient or
6       would trigger that requirement?
7   A.  To my knowledge, a vehicle is towed from
8       the scene, if a party involved in the
9       accident seeks medical attention, if
10      there's a fatality or if there's a citation
11      issued.
12  Q.  Any party to the accident or just a non --
13      the nondriver seeking medical attention?
14  A.  Anybody within the accident.
15  Q.  So even the driver of the truck?
16  A.  If the driver of the truck is -- seeks
17      medical attention or the person we hit or
18      hit us seeks medical attention, no matter
19      the fault of the accident.
20  Q.  You heard Mr. Futral's testimony regarding
21      the accident that Mr. Conway had?
22  A.  Yes, sir.
23  Q.  Do you have any familiarity with that

Page 104

1       accident?
2   A.  Not the -- Not the specific details.
3   Q.  Well, tell me what you know about it, if
4       anything.
5   A.  That it was a minor accident and it didn't
6       fall within the parameters of a mandatory
7       drug test.
8   Q.  You yourself haven't done any investigation
9       with regard to that accident?
10  A.  No, sir.
11  Q.  Who would have made the determination that
12      it was a minor accident and not required
13      the --
14  A.  Safety department.
15  Q.  Mr. Davis' department?
16  A.  Yes.
17  Q.  Would there be a record of Mr. Conway's
18      accident at your company?
19  A.  There should be, yes.
20  Q.  Police report?
21  A.  If there was a police report.
22  Q.  Where would that information be?
23  A.  It would be in either his DOT file or in



Page 105

1    his personnel file.
2    Q.  I'm all out of folders, so I'm all out of
3        questions.  Thank you very much.
4            MR. DYKES:  I don't have any.
5            Well, hold on.  Can we
6            talk a minute?
7        THE WITNESS:  Yeah.
8            (Off-the-Record discussion.)
9            MR. DYKES:  I do have a couple of
10           questions.
11               EXAMINATION
12   BY MR. DYKES:
13   Q.  Mr. Guest, who was it that you consulted
14       after you found the positive drug test
15       record for Mr. Cannon?
16   A.  Tom Davis.
17   Q.  And what is his position?
18   A.  Director of safety.
19   Q.  How many directors of corporate safety do
20       y'all have?
21   A.  One.
22   Q.  What race is Mr. Davis?
23   A.  African-American.

Page 106

1            MR. DYKES:  No questions.
2
3        * * * * * * * * * * * * *
4        FURTHER DEPONENT SAITH NOT
5        * * * * * * * * * * * * *
6            REPORTER'S CERTIFICATE
7    STATE OF ALABAMA:
8    ELMORE COUNTY:
9        I, Haley A. Phillips, Certified Court
10   Reporter, ACCR # 151, and Commissioner for the
11   State of Alabama at Large, do hereby certify that I
12   reported the deposition of:
13           GLENN GUEST
14   who was first duly sworn by me to speak the truth,
15   the whole truth and nothing but the truth, in the
16   matter of:
17           ROBERT CANNON,
18           Plaintiff,
19           vs.
20           ADVANCED DISPOSAL SERVICES
21   ALABAMA, LLC, d/b/a SUNFLOWER
22   WASTE, LLC,
23           Defendants.

Page 107

1        In The U.S. District Court
2        For the Middle District of Alabama
3        Eastern Division
4        Case Number 3:07-CV-846-WKW
5    on Thursday, April 10, 2008 and Friday, April 11,
6    2008.
7        The foregoing 106 computer-printed pages
8    contain a true and correct transcript of the
9    examination of said witness by counsel for the
10   parties set out herein.  The reading and signing of
11   same is hereby waived.
12       I further certify that I am neither of kin
13   nor of counsel to the parties to said cause nor in
14   any manner interested in the results thereof.
15       This 2nd day of May 2008.
16
17
18
19           Haley A. Phillips, ACCR #151
             Expiration Date:  9/30/08
20           Certified Court Reporter and
             Commissioner for the State
21           of Alabama at Large
22
23

**A**

ABF 12:9,10
able 29:18 71:5 73:9
  96:7,19
about 5:4 8:19,21 11:6
  14:14,19 18:3 25:16
  30:1 31:19 32:18
  36:10 46:18 48:15,22
  53:3 54:18 56:9 64:3
  75:6 83:6 88:5 93:19
  97:1 98:4,17,21
  102:19 104:3
above 32:22
absence 78:15
absolutely 14:13 25:20
  27:19 30:19 35:6
  44:13 45:15 51:2,4
  59:7 67:18 69:18
  101:18
accept 23:20 53:17
  80:14
access 63:15
accident 102:20 103:2
  103:4,9,12,14,19,21
  104:1,5,9,12,18
accordance 19:20
according 22:2,3 76:19
  91:16 93:6 94:16
account 47:20
ACCR 1:16 3:7 106:10
  107:19
accuracy 95:12
accurate 80:7 81:23
  82:1
acknowledge 56:16
acquire 92:20
across 44:19
action 1:7 98:7
actions 62:20
active 42:3,4 44:20
actually 24:22 29:13
  49:22 63:6,9
additional 62:18
address 50:23
adjourned 51:6
administration 8:6
admit 87:10
ADS 15:22
Advanced 1:8 2:18
  5:18,19,21 6:1,6,15
  6:17,22 7:10 9:23
  10:8 11:1 13:13,23
  15:3,10 41:16 81:15
  87:16 106:20
adverse 98:6
African-American
  99:12 100:1,13,23
  101:5 105:23

after 4:6 26:9 49:15
  51:10 64:18 75:6,9
  89:11 90:6 96:22
  101:23 105:14
again 32:12 40:6 82:20
  100:6
agree 55:19 56:8 68:20
  80:5 89:1
agreed 3:2,16,23
agreement 1:15
ahead 33:6 41:13
ahold 95:23
AIG 7:6 13:18
Alabama 1:2,8,17,19
  2:5,10 3:8 4:19,21
  6:10,17,19,21 14:7
  43:17 66:2 106:7,11
  106:21 107:2,21
alcohol 18:3,5 23:4
  41:18 62:12 66:7
Alexandria 9:14
allegation 42:10,11
allegations 24:6,15
  25:5
alleged 24:6
allegedly 14:22
Allen 31:17 32:22 33:1
  33:2,6 100:5
allow 27:12,17
allowed 23:19 96:8
already 16:10 48:4
  92:14
always 14:18
amount 14:9 96:3
amphetamines 34:12
analysis 19:21 42:6
Ann 66:1,11,21
another 13:15 16:21
  60:23 62:1 91:6
answer 5:9 21:11,18
  22:2,3 24:17 31:9
  53:10,20 71:2 90:13
answered 54:4 102:10
answering 31:10 85:11
  85:19
answers 21:4
anti-discrimination
  16:17 25:10
anti-drug 17:6
anybody 13:5,6 17:20
  17:22,23 26:13 33:11
  38:8 44:20 59:5 73:7
  81:18,20 82:7 98:13
  103:14
anyone 23:21 38:4
anything 9:3 23:4
  24:10,13 29:9 30:7
  30:10 52:7 53:23
  54:18 57:20,23 58:3

58:13 59:4,6 60:4,5
  63:21 84:2 89:10
  96:10,15 97:12 98:9
  104:4
anywhere 65:10 70:9
  72:20
apologize 10:16 65:21
appear 60:14 65:5
APPEARANCES 2:1
appears 59:21 60:9,15
  64:10,11 72:23 76:11
  76:21 77:2
applicants 19:16 23:23
  36:12
application 52:22 53:1
  53:7,11,16 58:6
  93:10
apply 15:7 25:10
appreciate 27:20
appropriate 62:21 63:2
  66:20 67:4,6
approximate 14:9
approximately 1:20,21
  51:9
April 1:19,21 51:9
  107:5,5
arduous 101:23
area 12:18 19:12
argue 97:18
argument 98:4
arise 16:19
Arnold 10:18
around 12:14 15:22
  100:12
arrived 17:12
Arrow 6:20
arts 8:22
asked 21:5 35:10 65:21
  87:15 98:12 102:7
asking 28:6 80:14 81:5
  84:12 85:16
aspect 16:18
aspects 9:21
assertion 84:7
assistant 27:7
associate 8:22
assume 5:12 80:10,11
  80:12,19 81:5 86:17
assuming 72:1 83:20
  101:16
Athens 4:14 8:16
attach 58:17
attention 35:17 73:23
  103:9,13,17,18
attorney 27:11 31:2
  59:9
Attorneys 2:8
Auburn 1:19 2:5 15:21
Authority 59:22 60:16

60:19,21,22 62:3
authorization 67:1
automatic 80:4
Avenue 2:9
aware 24:6 25:5 68:10
  102:17
a.m 1:22 51:10

**B**

B 2:3,4
Bachelor 8:6
back 19:22 29:13 37:7
  48:23 52:17 60:18
  75:12 89:1 90:7
  95:22 98:3 101:11
  102:5
background 23:1,23
  36:12,16 37:4,10,16
  37:19 38:5 76:11,15
Barns 60:22
base 98:8
based 35:17 84:6 97:23
basically 15:13
batch 69:21
Bates 40:1,11 51:17
  52:19 54:8,9 57:5
  59:16 78:23
Beasley 32:18 60:10
  62:7 64:23 65:14,23
Beasley's 62:20
Becky 70:7
beer 18:20
before 1:15 3:6 5:13
  8:4 10:17 11:5,12,19
  12:8 13:12 23:19
  26:9 40:9 41:5 68:2,6
  75:12,17 94:15 96:8
began 79:12
begin 20:21
behind 70:14
being 29:16 40:22 53:2
  56:12
believe 12:14 14:5 16:1
  21:1 28:19,21 29:3
  31:23 33:9,15,21
  34:3 37:23 39:11
  43:22 45:11 46:5
  49:11,12 93:21,22
  94:23 96:5 97:8,14
  97:15 98:12,19 99:11
  99:17 100:2,12
bell 34:15
below 33:11 94:1
benefits 68:11,15 69:2
  69:9
best 23:17 40:21
bet 64:7
better 5:9 101:23

between 3:3,17 4:1
  35:8 49:13 55:23
  94:13 99:23
beyond 82:7
big 47:21
bill 84:17 85:3
biographical 58:3
Birmingham 2:10 6:20
blank 53:17
board 13:22
body 71:16 91:14,17
bosses 89:3
both 31:9 48:7
bottom 40:13 49:16
  61:9 69:19 94:5
branches 22:12
break 51:3
briefly 36:10
bring 88:9
Brooks 2:8
Brooner 60:10 61:11
  61:12,18 62:15,16
  63:9 70:7
Brooner's 63:1
brought 49:7
business 6:3,20 8:3,6
  8:10,11 87:8 88:1
  92:23
businesses 15:16
buy 13:20

**C**

C 15:18
call 26:16,20 35:8
  38:18 65:9 96:14
called 15:18 46:5
calling 37:5
came 68:6 90:13,22
  98:3
Cannon 1:5 12:23 24:3
  24:8 25:6 26:1 34:11
  38:6 41:2 44:23 45:1
  46:6 47:10,17 52:23
  53:9,16 60:1 61:19
  62:3,11 63:22 64:23
  65:4,6 66:6,23 68:10
  69:8 72:11 73:1 75:6
  76:13 80:9,20 81:13
  82:3 83:22,23 86:19
  89:2,12 96:20 97:13
  99:9,15,20 100:11
  102:1,7 105:15
  106:17
Cannon's 2:17 20:15
  37:11 39:3 42:2
  54:14 55:17 57:16
  65:9 66:18 67:20
  68:6 72:14 79:6
  93:10 101:9

Deposition of Glenn Guest

Page 2

capacity 10:21
card 30:8,9
career 87:20 88:1
case 3:18,20 30:22
  42:18 43:21 48:2,9
  66:21 69:9 76:17
  98:10 107:4
categories 25:19 50:3
Catherine 1:18 2:5
Caucasian 33:8,20
caught 49:7
cause 69:1 107:13
CDL 30:5 74:14
Central 8:16
certain 95:20
certainly 88:21
CERTIFICATE 106:6
certification 9:10 76:3
certifications 9:7
certified 1:16 3:7 74:14
  106:9 107:20
certify 106:11 107:12
chain 33:3 71:6,7 82:7
  96:16
change 18:22
changed 16:12 17:15
  34:20 99:8
charge 31:6 39:8 40:17
charged 32:2
charging 84:14
check 36:13,16 37:3,19
  38:5 50:19 76:12,15
checked 90:17
checking 76:16
checklist 75:1
checks 23:2
choice 67:11
circled 73:17
citation 103:10
cited 91:1
cities 15:23 16:2
City 15:21 47:20
Civil 1:7 3:5
claim 35:4 63:22 67:20
  68:9
Clarke 8:16
class 9:15,17
classes 9:20
clean 47:23 48:1 76:19
  89:2,4,12
clear 27:21 86:16 92:7
  93:9
cleared 85:14 91:23
clerk 18:11
clinic 20:5
clueless 97:20
Coast 6:18
COBRA 64:21
cocaine 34:12 41:6

46:22 47:5,8,18
  91:14,17 92:2
Coke 28:7 101:11
collect 6:8
collected 19:19 93:20
  94:23 95:2
collectively 78:21
College 8:23
come 15:22 19:22 32:8
  44:19 60:16 84:22
comes 17:2 90:7
command 33:3
commencing 1:20,21
comment 61:1 101:10
commercial 30:5
commission 3:9
Commissioner 1:17 3:8
  106:10 107:20
companies 13:9,20
  14:15
company 5:20 6:7 7:2,5
  7:7,15 10:23 11:10
  11:17,21 14:10 15:1
  15:8 16:17 17:13
  18:4,19 20:15,19,21
  21:6 22:12,18 23:1,9
  23:13,22 25:9 28:10
  28:13,15 29:5,17
  30:13 34:6,21 38:4
  43:8 45:14 50:8,11
  51:20 56:11,15,23
  57:20 62:22 63:2
  64:8 66:10 73:7 74:8
  75:23 79:4,12,22
  81:18,21 84:5,19
  85:17,21 86:4,6,6
  89:19 90:4 95:17,18
  96:12,18 97:9 98:22
  99:3,20,21 100:11
  104:18
company's 7:18 16:5
  17:6 36:11,15 52:3
  53:15 84:10
compensation 67:21
complain 86:6 88:10
  88:22
complained 88:6,12,12
  88:16
complains 88:9
complaint 25:7 43:10
  43:21
complaints 16:19,21
completing 38:1
Composite 2:16,17
computer 27:13
computer-printed
  107:7
Con 30:12
concerning 60:1 64:18

64:19 65:1 77:3
conduct 23:1
conducted 36:17
confirm 81:22
Constancy 2:8
construction 15:17
consulted 49:15 105:13
contact 64:23 73:1,4,9
  83:17 84:3,6 95:19
  95:22 96:8,11
contacted 72:11,15
contain 107:8
contained 2:17 57:16
  58:6 59:17 77:4,7
container 71:17
containers 15:18
contains 46:15 54:14
continued 51:12
contracted 21:22
controlled 67:8
controller 61:16
conversations 98:17
convicted 53:12
Conway 28:7 30:12
  101:19 103:21
Conway's 101:22
  104:17
coordinator 12:1,2
copy 39:14,16,17 69:20
  76:11 79:4,11,15
corporate 9:23 38:19
  38:22 39:4,10,15,17
  53:2,6 68:7 105:19
corporation 6:2 11:6
corporations 10:11
correct 10:12 11:9
  12:17,22 13:3 17:14
  17:21 18:10,13,22
  21:2 22:1,8 26:17,19
  32:10 38:3,20 39:18
  45:3 46:13,17,20,21
  46:23 47:4,6,9 49:4
  50:1,9 51:15 54:16
  55:22 56:9 60:11
  61:4,7,20 62:4,8,13
  62:19 64:12 66:3,8
  67:17 71:18 73:3
  74:20 75:4 76:5
  79:16 81:11 83:18
  84:1 87:18 88:22,23
  90:5,8 94:16,20,21
  95:3,6,9 97:11 98:5
  98:11 99:1 100:17
  101:6,8 102:12 107:8
correctly 49:23 69:22
  71:13
counsel 3:3,17 98:16
  107:9,13
counties 5:1,3 32:17

COUNTY 106:8
couple 47:2 94:1 98:20
  105:9
course 38:1 68:18 85:4
  92:4
Court 1:1,16,19 2:5 3:7
  106:9 107:1,20
cover 60:17 70:9,17
covered 12:15
criminal 37:3,10,16
criteria 68:22
crossed 60:18
currently 5:15
custody 71:6,7 96:16

———————————
D
———————————
D 15:18
Danny 33:12,14 51:11
date 30:20 62:6 75:3
  94:4,11,18 107:19
dated 70:23
dates 63:14
Davis 22:6,23 31:15,16
  32:22 33:1,1,7,11
  36:7,9 42:4 45:2 46:1
  47:18 48:11,15,21,22
  49:1,3,12,17,17 50:4
  50:6 69:21 89:11
  90:17 99:15 104:15
  105:16,22
day 70:23 107:15
days 40:22 92:19 93:8
  95:7,21 96:6
daytime 96:11
day-to-day 31:7 32:1
  88:8
deal 47:21 51:22
deals 52:2
deceptive 54:1
decide 44:15
decision 14:18 36:6
  63:1 90:18
defendant 1:10 2:6
  13:8 21:7
Defendants 106:23
Defendant's 34:10 46:9
  46:15 47:1,7,12
  49:21 55:16 56:1,1
  56:13,20 64:16 65:14
  93:17 94:22 95:10
  97:4
defer 89:23
define 89:13
degree 7:22 8:5
degrees 8:18
deliver 11:15 12:11
denial 82:6
denied 82:4 87:20
denies 83:23

department 67:8 75:22
  104:14,15
DEPONENT 106:3
deposition 1:14 3:4,6
  3:13,18 4:2 5:12 10:3
  10:4 13:12 37:12
  51:6,8,11,13 55:17
  66:18 106:12
details 104:2
determination 78:12
  95:16 103:1 104:11
difference 55:23 56:3
different 9:20 14:3
  15:13 16:23 30:4
  31:8 68:20 85:8
  92:21 102:8,9
differentiate 30:20
dig 27:7
dilute 20:3
diluted 20:1,2,11
dilutes 20:7
direct 72:20
directing 64:22
directly 50:12
director 10:22 21:17
  22:4,7,11,14 93:4
  105:18
directors 13:23 105:19
disagree 89:16
disciplinary 56:4,17
disclosed 93:10
discretion 63:4
discrimination 16:6,14
  16:16 24:7 25:1,6,15
  25:23 26:2,8 40:18
  42:13,18,22
discussion 40:5 51:5
  52:16 65:20 66:19
  102:4 105:8
Disposal 1:8 2:18 5:18
  5:19,22 6:1,6,15,17
  6:20,22 7:10 10:1,8
  11:1 13:13,23 15:3
  15:10 41:16 81:15
  87:16 106:20
disposed 72:1
disposing 15:19
dispute 81:13 82:13,14
  82:18 83:11 85:4
district 1:1,2 31:11
  32:13,14 98:23 99:2
  107:1,2
Division 1:3 107:3
divisions 15:14
doctor 36:2
document 40:21 51:19
  57:2 59:20 64:5
  66:12 69:17 71:5
documents 2:16,17

39:22 40:7 57:4,9,12
57:15 70:18 74:9
78:21 79:3 83:20
doing 6:19 41:14 42:7,8
83:6
done 19:13 24:2 25:22
38:6 57:11 73:8
75:15 82:11 84:13
96:2 104:8
doorway 49:20
Dora's 66:2,11,21
DOT 19:20 23:20 30:8
57:17 72:9 78:14
90:22 91:2 103:4
104:23
Douglas 1:18 2:3,4,13
4:10 24:16,19,22
25:3 28:2,5 51:12
52:15,17 58:21 59:11
59:14 60:13 65:19
85:13 86:2 91:19
92:4,10 102:3,5
down 20:5 45:10 62:21
drink 18:14 20:4
driven 12:3
driver 17:22 23:20
29:7 30:5,12,22 87:9
91:1 93:13,15 101:20
103:2,15,16
drivers 26:16,23 27:10
27:22,23 30:1 31:13
74:20
driver's 76:6 71:6
driving 31:17 36:11
75:13,14,16,17 76:3
76:17,19
drug 14:22 15:1 19:5
19:10,17,18 20:16
23:15,18 34:8,11
35:4 36:4 37:20
41:14 42:14,16 46:8
46:12 47:11,22 48:4
48:10 54:13 62:12
66:7 69:20 71:6 72:4
72:9 73:13 77:3
79:19 80:6,19 81:10
81:13 84:1 87:21
93:18 102:22 103:2
104:7 105:14
drugs 17:18 18:8 21:9
23:4 34:6,17 35:3,19
41:17 42:5,23 43:1
44:21 79:23 80:5
82:4 86:19 87:2,3,9
87:12 88:4 91:9
92:15
due 62:11
duly 4:6 106:14
dumpster 15:17

during 79:6
duties 16:15 29:4 50:15
101:22
Dykes 2:7,13 14:12
24:9,18 25:2 27:21
28:3 40:15 44:14
52:12 53:19 58:15,22
59:13,15 63:23 66:14
69:4,13 81:2 85:5,10
85:15 87:5 89:5,8
91:18,21 92:5,13
99:7 105:4,9,12
106:1
d/b/a 1:8 106:21

E
earlier 5:1 14:14 36:10
72:2 87:15 102:7
easier 49:18
Eastern 1:3 107:3
EEO 52:4
EEOC 39:7 43:21 52:9
effect 45:12
efforts 96:11
eight 99:23
either 3:14,20 16:20
19:22 20:3,4 26:11
64:2 97:20 104:23
eligible 37:17,21 38:3
80:9 81:1
ELMORE 106:8
Emory 8:23
employed 5:15,17
employee 2:19 35:3,9
35:10 41:23 42:5
43:9 47:18 56:12
57:17 68:14 71:16
72:4 75:2,9 76:4,6
77:5 79:11 81:12
82:23 83:2,17 84:1
84:13,14,21 85:2
86:1,5 87:12 95:19
95:21 96:8,12
employees 7:6 17:5
19:11,16 20:10 21:9
34:7 36:3 38:15,22
39:1 41:16 43:18
77:13 79:14 80:3
employee's 56:16 77:23
83:14 84:6 91:4
employer 17:3 52:6
87:2
employers 37:6
employment 10:14
12:15 28:18 52:1,22
63:15 66:1
encountered 35:2
end 28:17
enforcing 16:16

enjoyment 18:20
enough 39:23 85:9
entered 23:18
entire 31:12 36:23 39:9
77:13,15 78:8 79:9
99:21
entitled 68:14 69:2
79:18
entity 6:3
environmental 32:5
Equal 52:6
equally 25:10
equipment 67:8
equity 7:5 13:16
erroneously 82:23
Esq 2:3,7
even 18:11 44:3 90:11
91:5 96:14,22 103:15
ever 4:19,21 12:3 13:4
13:5,6 14:15,21 28:9
30:12 39:3 53:11
81:12 87:7,16
every 41:21,23 54:8
79:11
everybody 15:7 42:15
42:23 63:13
everything 47:8
evidence 3:13 72:14
evidenced 47:11
exact 77:6 92:10
exactly 7:4,8 19:12
26:12 68:4 82:20
examination 2:12 4:9
51:12 74:13 105:11
107:9
exasperation 45:13
exceptions 18:1
excuse 62:16
Executive 8:3
exhibit 2:15 34:10
39:19,21 40:3 41:3
46:9,15 47:1,7,12
49:21 51:18 52:9,20
54:7 55:17 56:1,2,13
56:20 57:3,6 58:7,10
58:11 59:18 60:9
64:6,16 65:3,8,14
66:16,17 71:4 72:19
73:12 74:11,22 76:2
76:7,23 78:18,22
79:17 93:17 94:22
95:11,15,20 97:4
exist 16:9
existence 17:12
expect 54:2
expense 83:12,14
experience 91:13,16
92:1,3,8,12,17 93:6
expert 71:10

expertise 12:19
Expiration 107:19
explain 6:5
explanation 41:12
48:23 53:18 82:10
expressing 45:13
extent 103:4,5
eyes 40:20 53:7

F
facility 19:19 24:4,7
25:6 26:1,17,22 28:1
31:4,6 33:10 36:1
38:16 71:20 72:9
fact 49:15 63:21 80:3
facts 67:14,16
failed 42:13,16
failing 14:22 23:22
50:15
failure 53:10
fair 12:18 38:18 82:2
85:9
fairly 43:2
fall 104:6
familiar 16:4 17:7
19:13 20:19 79:19
familiarity 103:23
family 4:23
far 7:21 18:18 19:12
25:3 36:15 37:5 71:1
fatality 103:10
fault 103:19
fax 60:9,15 70:9,16,18
faxed 69:20
February 44:17 73:14
73:14 94:12,15 95:2
95:5,7 97:3
federal 2:9 3:5 74:16
felony 53:12
few 40:22
field 41:18 93:2
Fifth 2:9 97:22
file 2:17 39:3,9,14 48:9
53:2,5 57:17,17,21
58:20 59:3,6,8,12
68:3,5,6,12 72:15,17
72:18 77:17,20,20
78:1,13,14 104:23
105:1
filed 43:3,21
files 37:20 38:14,21
57:18 63:16 96:10
filing 3:18,22 52:10
final 50:19
financial 84:20
find 30:15 45:18
finding 44:5
fine 65:13
finish 5:7,8

finished 71:2
fired 69:1 88:18 90:6
firm 13:16,17 61:9
first 4:6 10:7 13:2 39:7
40:20 42:6 43:7
45:18 48:2,6 53:6
106:14
fit 50:2
fits 68:21
five 100:12
fix 49:8
flip 40:11 51:17 52:19
54:6 55:14 59:16
60:8 61:6,22 73:11
Florida 4:16 7:19 14:8
22:10 43:20
folders 57:21 105:2
followed 41:20
follows 4:8
foregoing 107:7
Forester 31:11 32:11
32:21 49:2,9,17
98:23
forgive 32:6
forgotten 43:7 100:3
form 3:11 14:12 53:19
55:12,16,20 56:4,5
56:17 59:12 60:2,23
61:4 63:5,23 64:7,15
65:10,16 69:4,13
70:8 71:11 74:16
81:2 87:5 89:5,8
94:16
formality 3:9
formally 6:16
formatted 91:7
former 68:14
forms 65:17
formulate 16:8
formulating 17:9
found 41:8,9 46:1
90:14,22 105:14
four 6:13 14:5 15:13
43:12 92:19 99:11
free 77:3 79:19
Freight 11:13,14 12:9
12:10
Friday 1:21 51:8 107:5
friends 5:3
from 4:13 7:23 8:22
9:11,12 13:20 14:21
15:15,16 16:2 17:3,3
18:22 21:10 22:3
23:12 26:23 31:4
52:8 59:21 60:10,16
64:7 71:12,16 73:2
77:22 91:13 92:1,2,8
92:11,21 93:1,3,4
96:6 98:13 103:7

front 45:5
further 3:16,23 106:3
  107:12
Futral 33:12,20 51:11
  64:9,20 65:1 72:2
  82:7 100:15 101:10
  102:19
Futral's 33:14 55:15
  56:6 82:3,9 89:10
  103:20
future 7:17

**G**

garbage 5:20 6:9 15:14
  29:14 32:9 33:18
gave 21:18 47:10,22
  48:22 66:23
gender 25:11 42:20
general 31:18,21 92:9
  98:2 100:7,8
generated 17:1 60:2
generates 14:11
gentleman 56:19
gentleman's 22:5
gentlemen 33:8
Georgia 4:14 8:8,17
  14:7 19:1 43:19
gets 48:4 85:3
getting 15:15 83:17
give 41:12 75:8 95:11
given 5:12 41:15 59:8
  59:11 65:3,6 76:6
  83:9 90:20 96:16
giving 21:14 44:11
  64:17
Glenn 1:14 3:4 4:5,12
  4:13 106:13
go 7:21 11:19 25:17
  36:3 41:13 52:13
  83:6
goes 25:4 35:14 70:11
  71:13,16 78:13
going 24:9,13 39:21
  40:2 41:18 52:12
  57:2 67:7 78:20 85:4
  86:23 98:20 101:11
good 31:23
gotten 85:7 93:1
government 74:17
graduated 8:12
grants 7:17
gross 14:9
group 7:5 39:22 40:7
  57:4 78:20
guess 6:4 26:7 42:21
  43:14,15 56:22 68:16
  70:16 89:13 100:20
Guest 1:14 3:4 4:5,12
  105:13 106:13

guilty 87:10
Gulf 6:18
guys 32:8

**H**

Haley 1:15 3:6 106:9
  107:19
half 11:7
Hall 7:1
hand 57:2
handbook 2:19 51:21
  77:5,8,12,13,15 78:5
  78:8,11 79:4,9
handle 97:23
handled 19:2 20:15
hands 46:2
handwriting 54:18
  55:7,9 70:1,4 74:3,6
handwritten 55:2
  73:22 94:8,11
happen 14:8 83:16
happened 46:7 49:6
  68:2 87:16,19
happens 20:10 83:1
happy 45:8,9 72:19
  85:14
harassment 26:7 52:3
having 4:6 64:15
headquarters 7:18
hear 82:9,20 86:13
heard 20:20 37:14
  65:22 66:5 87:7
  102:18,19 103:20
help 16:8
helper 29:8,8,11,17
  30:21 101:20
helpers 30:4
her 61:13 66:5,10
  71:12
hereto 3:21 4:1
hey 89:3,12
hierarchy 98:21
high 8:12,16
Highstar 7:6 13:18
him 13:2 24:19 42:4
  44:12 45:22 47:22
  48:4,17 49:19 50:19
  50:21 73:5,9 85:16
  86:15 89:3,6,15,19
  90:18
hired 16:2 37:17,22
  75:6,9 101:20
hiring 23:14 54:2
history 88:11
hit 103:17,18
hold 93:21 105:5
hoping 47:22 48:3
horizontal 33:2
house 15:15

household 29:14
Housing 59:22 60:5,16
  60:19,21,22 62:3
HR 12:19
huh 44:17
human 9:9,12,21 10:22
  11:11 12:1
hypothetical 80:12

**I**

ID 69:21
idea 14:13 22:18 27:3
  38:11 47:14,15,16,17
  55:11 60:3 65:18
  69:18 73:19 77:18
  97:1,5,16,21
identification 39:20
  57:7 78:19
identify 51:19 57:9,12
  59:20 64:5 69:16
  71:5 76:23
ID'd 69:20
ignorance 32:7
ignoring 48:5
illegal 17:18 34:17 88:3
imagine 44:18 84:21
  85:1
implementation 25:13
implementing 23:10
imply 58:13
important 5:6 67:16
  80:6
inaccurate 80:20 81:3
Inc 2:18 6:23 10:1 21:8
  72:8,12 97:10
incident 97:13
included 32:17 50:16
  52:9 63:18,19
Incorporated 6:6,19
  13:14 14:1
incorrect 98:6
independent 19:21
INDEX 2:12,15
indicate 93:19,23 96:11
indicated 61:18 65:23
indicates 94:22
Indicating 46:22
indication 62:10
individual 45:19 71:12
individual's 33:13
industry 93:7
information 27:9,18
  30:17 31:1 58:4
  63:14 65:15 66:11
  67:1,10 73:22 91:20
  104:22
informed 42:4 45:2
  46:5
initials 52:5

innocence 83:3
innocent 83:4
input 30:23
inquire 54:3
instead 60:17
instructed 36:3
instruction 92:21
instructions 64:17
insurance 64:19,21
  65:16
intake 16:19
interested 107:14
interrogatories 20:23
interview 17:4
introduced 3:19
investigate 16:20,22
investigation 25:23
  73:8 96:18 104:8
involve 42:12
involved 13:4 103:8
involvement 68:3
issue 89:22
issued 103:11
issues 64:18 65:1

**J**

J 2:7
Jacksonville 4:16 7:19
  8:1 22:10 38:18
James 2:3
January 21:10 26:23
  31:5 36:8 75:3 86:19
  93:21 94:3,14
job 4:21 11:3 14:21
  16:18 61:4,6 84:22
  87:1
journey 71:15
Jr 2:3
July 79:5
just 9:17 13:2 17:22
  21:5,19 22:14 27:21
  27:22 28:3 32:6,7,16
  44:23 45:1,20 46:11
  47:20 49:19 54:19
  60:17 65:15 76:3
  77:14 78:6,9 80:23
  84:22 86:14 87:12
  88:18 91:23 92:6
  93:9 98:2,3,20
  100:16 103:12

**K**

keep 27:8,8
kept 38:15,21
key 45:22
kin 107:12
kind 18:21 32:8 33:2
  39:23
knew 47:19 63:6,9

know 5:4 7:3,4,8 12:5
  12:23 18:18 20:2
  22:22 26:15,22 27:14
  28:7,9,12,17,22 29:2
  29:4,7 31:7 34:4,9,20
  34:22,23 36:1,22,23
  37:1,5,7 38:8 41:5,7
  43:1,6,16 44:3 45:5
  46:17 47:10 48:8
  49:8 50:10,17 53:21
  54:18 55:6,9 56:19
  56:22,22,23 60:2,4,7
  61:13 63:16 65:13
  67:23 70:1,8,11,14
  72:11,13,14 73:4,15
  74:1 75:21 82:6 86:4
  86:12,14,14 87:7
  88:18 89:21 90:13,20
  91:12 93:15 96:4,5
  97:3,9,12 100:18,22
  101:2,19,22 104:3
knowing 91:13
knowledge 17:16 23:17
  28:16 34:18 35:18
  41:1 63:17 64:20
  73:8 81:17,19,21
  82:8 92:9,17,20 93:1
  103:7
known 6:16 7:5 67:15
  88:2

**L**

labeled 71:13
laboratory 19:21
lady 45:6,9
lady's 22:5
laid 53:7
Land 100:7
landfill 31:13,18,19,22
  32:2 100:8,9
landfills 15:20 32:6
lapse 95:10
Large 1:17 3:8 106:11
  107:21
last 8:4 12:16 29:1
  34:13 46:16 54:15
  100:3
later 47:2,22 90:2 95:7
law 1:18 2:8 23:20 67:9
  103:4
laws 32:5
lawsuit 24:8 42:9,11,12
  43:3 98:11
lawsuits 43:6
lawyer 20:23 27:18
  30:18 39:23 44:1,9
  50:23 72:20
lay 40:20
layman's 71:8

leaning 49:19
leave 13:12 95:22
leaving 14:18 53:17
led 28:17 42:6
left 62:17
less 11:15 12:11 101:23
let 59:4 81:19
let's 26:6 99:9
liberty 41:10
license 30:6 74:15
licenses 9:5,6
lie 53:22 54:1
lied 53:16
lift 29:18
like 15:16,21 18:22
  20:16 23:5 50:4 55:5
  60:5 74:9 76:17
  84:18 85:7 86:12
  91:23 92:6
limited 64:20
lines 94:1
list 35:12 41:15
listed 35:15
litigation 13:5 96:22
little 51:3
live 4:15
lived 4:17,19
LLC 1:8,9 6:18 61:10
  106:21,22
location 58:1
logo 54:20
long 4:17 5:21 10:13
  11:3,17 12:13 21:5
  91:14,17 93:5
longer 28:15 50:8,10
  97:9
look 17:1 36:18,18 40:3
  44:6 50:4 56:2 72:17
  79:1
looked 48:10
looks 55:5 76:17
lose 87:1
lost 84:22
lot 6:12 50:15 84:16
  88:14,21 100:21
Louis 20:16,17 21:6,8
  22:19 34:21 54:19
  72:7,12,15 97:10
Lowder 102:17
Ls 11:9
Luckily 19:4

M

mad 69:12
made 3:11 36:8 90:17
  104:11
make 5:7,8 15:10 28:4
  36:6 41:19 43:14
  45:18,19 46:2 50:4

78:12 80:6 95:15,16
  95:18
makes 67:16 71:11
makeup 26:15,23
  27:10
making 32:2 43:9
  101:10
man 34:2,3
management 9:9 37:21
  93:11
manager 11:11 12:1
  31:12,16,18,21 32:13
  78:15,16,17 98:23
  99:16,17,18 100:7,8
managers 99:2
mandatory 104:6
manner 3:20 17:2
  107:14
manual 77:3,23
many 7:2,8 9:22 13:22
  14:3 43:6 87:19 99:2
  99:19 100:10,18
  105:19
March 21:10 22:19
  27:1 31:5 61:19 62:7
  64:11
marijuana 34:12 91:15
  93:5
mark 39:21 57:3
marked 39:19 48:8
  49:22 57:6 73:15
  78:18,21
master's 7:22
matched 41:22
material 16:12 17:15
matter 25:15 98:14,18
  103:18 106:16
matters 46:2
may 3:6,12,13,19 16:19
  37:4,4 44:11 75:14
  107:15
maybe 11:7 42:21 58:1
  63:10 78:10 87:22
McNeal 1:18 2:4
mean 16:23 20:2 23:7
  24:10,12,18 29:8
  32:1,17 38:9 43:14
  52:5,11,12 54:7
  58:19 68:5,19,21
  81:8 82:1,14 85:12
  85:15,20 87:3 92:6
  94:17,17 98:5
mechanism 84:5
medical 30:8,8 35:23
  36:2 71:21 74:13
  91:5 93:2,2 103:9,13
  103:17,18
medication 35:11
memory 72:22

mentioned 5:1 13:13
messages 95:22
met 13:2
Middle 1:2 107:2
miffed 69:7,11
might 38:9 43:13 53:23
mind 85:12,13
mine 89:22
minimum 94:13
minor 104:5,12
minute 105:6
Mississippi 14:7 43:18
misspelled 91:4
mix-up 71:14
Mobile 6:18
moment 57:8
money 15:11 84:23
Montgomery 6:15 66:2
months 21:23 26:11
more 20:6 88:21 89:21
  90:20 100:21 101:23
most 7:4 43:6
MRO 20:16,17 21:6,8
  22:19 34:21 35:9,14
  35:16,21 54:20 71:14
  72:5,7,12,16 83:12
  83:17,21 84:3,6 86:8
  93:3 96:11 97:10
much 103:5 105:3
must 67:13,14

N

name 4:11 13:17 22:5,6
  33:13,23 37:2 41:22
  43:23 44:2 46:16,16
  54:15 57:22 61:9
  91:4 100:4 102:18
named 13:8
national 25:18
nature 64:22
necessarily 68:20
need 3:11 41:10 45:18
  45:19 49:8 56:2
needed 46:6 47:18
negative 19:23 47:3,7
  48:10 73:13 82:11
  90:3,6,20 91:7 95:1
  95:17
neither 12:7 107:12
never 13:8 14:23 87:11
  92:14
new 60:17
next 55:14 70:10
nighttime 96:17
nine 40:12 41:2
nobody 48:3
non 103:12
nondriver 103:13
None 11:2 18:2 27:4

44:22 73:21 74:7
  102:14
Norrell 11:6,8
North 2:9
notation 69:19
nothing 4:8 106:15
notice 39:7 64:7,15
  65:2
noticed 19:1 48:4
notified 72:5
notify 96:9
number 39:22 40:3
  41:3,22 46:17 51:18
  52:20 54:15 56:13
  57:3 58:7 59:17 60:9
  66:14 74:22 76:23
  78:22 79:17 95:21
  96:14,17 107:4

O

oath 51:14
object 14:12 24:9,13
  44:11 53:19 63:23
  69:4,13 81:2 87:5
  89:5,8
objections 3:10,10
observation 75:1
obviously 8:12 81:5
off 11:22 52:13 62:17
  65:19 101:11 102:3
offered 3:13 82:16
office 18:12 31:14
  49:18 61:17
officer 35:23 91:5
Offices 1:18
Off-the-Record 40:5
  51:5 52:16 65:20
  66:19 102:4 105:8
Oh 66:15 93:9
okay 5:10,11 19:15
  23:1 25:2 27:9 28:3
  31:1,9 32:21 35:21
  40:16 44:16 45:13,16
  45:23 46:11 57:11
  58:21 59:14,19 60:14
  61:18,23 72:21,23
  73:11 76:11,22 79:2
  80:13,17,22 85:9
  86:7,21 87:13,15,23
  88:21 89:1 91:16
  92:5,13 94:4,13,19
  99:11
once 46:1
one 2:9 5:6 9:17 16:20
  19:12,23 21:4 22:14
  31:10,19 33:3,5
  34:13,23 35:13,17,19
  40:1 48:6 49:11
  51:20 62:16,20 63:18

64:2,17 65:16 74:19
  83:6,9,10 90:3,4 93:9
  102:15 105:21
ones 14:19 88:22
only 21:13,21 24:20
  34:17 49:14 67:4
  70:22 80:15 81:8
  88:2,5 102:15
Opelika 59:22 60:16,19
open-top 15:18
operate 14:4 15:19
  27:15
operating 67:7
operation 11:23 31:13
  88:8
operations 11:23 14:3
  31:7,16 32:1,3 78:16
  99:17,18
opiates 34:12
opinion 48:12,13 50:3
  50:13 70:3,6,12,20
  70:22 74:5 86:9 97:6
opportunity 52:6
option 89:20
order 95:21
origin 25:18
originally 60:15
other 3:10,14,20 6:2
  8:18 14:15 15:11
  24:8 25:7 29:21 33:4
  33:5,13,22 34:23
  36:17 47:8 48:21
  50:2 58:3 63:19 67:6
  78:10 81:12 98:16
  102:13
out 27:7 30:15 35:7
  44:5 45:21,22 46:1
  49:19 58:17 59:1,5,6
  60:18 77:2 90:17
  91:1,9 92:18 105:2,2
  107:10
outside 24:14 57:21
over 22:11 31:12,16
  32:1 33:4,5 92:22
own 7:15,16 46:2
owned 7:5 13:14
owners 7:2
ownership 7:7
Oxford 8:22

P

packages 12:12
page 40:11 41:2 46:12
  51:17,22 52:2,8,19
  54:6,8 55:14 59:16
  60:8 61:6,22 62:6,10
  62:15 64:5 65:2,8
  66:16 69:16 70:10,11
  71:4 73:2,11,15,23

74:6,22 76:2 79:17
79:18
pages 40:1 51:20 52:21
54:7 57:5 74:11 76:7
76:22 77:2,4,6,7,8,14
77:16,19,22 78:6,9
78:10,23 107:7
paid 15:12,15
paper 67:2
paperwork 17:1
parameters 104:6
parent 6:7
part 13:12 17:9 23:10
68:8 71:1 77:8 78:14
88:8
particular 63:17
Particularly 17:22
parties 3:3,17 4:1
107:10,13
parts 36:22
party 3:14,20 37:3
76:14 103:8,12
passed 20:7 23:19 82:6
past 88:11
pause 95:11
pay 85:17 101:23
pays 35:16
penalty 17:17
people 18:19 23:10
32:8 36:18 49:14
63:14 88:2,15
per 14:10
percent 101:4,5,7
percentage 7:9 101:2
period 21:13,15,20,21
person 29:12 48:9
90:23 103:17
personal 90:3
personally 13:4 23:21
41:21
personnel 2:17 24:2
38:14,21 54:2 58:20
59:6 77:16,20,23
105:1
persons 13:22
person's 33:22 43:23
44:2
phencyclidine 34:14
Phenix 47:20
Phillips 1:15 3:6 106:9
107:19
phone 96:17
physical 29:21
physician 90:4
pick 6:8 11:15 12:11
49:13
picking 15:14,16
pickup 33:17
piece 67:2

place 2:9 16:10 32:7
42:7 79:5,6 82:22
Plaintiff 1:6 2:2 106:18
Plaintiff's 2:15 39:19
39:21 40:3 41:3
51:18 52:8,20 54:6
57:3,6 58:7,10,11
59:17 60:8 64:6 65:3
65:8 66:16 71:4
72:18 73:12 74:11,22
76:2,7,22 78:18,22
79:17
played 17:9
please 4:11 40:6 57:10
69:16 70:20 79:1
plus 87:8
point 28:5 39:9 64:14
police 104:20,21
policies 16:5,9 52:1
64:21
policy 16:17 17:6,10
18:4,16 23:8,11,13
23:16 25:9,14 52:3,4
56:11,15 62:12,22
63:2 66:7,10 74:8
75:23 79:22 89:19
poor 19:8 27:14,16
portion 31:17 54:19
posed 21:17
position 11:10 16:11,13
33:14 53:15 58:18
59:2 100:15 105:17
positions 11:22 14:14
positive 14:2 17:17
18:9 19:23 27:7
30:14 34:19 35:3,19
36:22 37:20 41:6,14
41:17 42:5,23 43:4
44:21 46:22 47:17
49:13 54:13 72:4
80:4,19 81:9,13 83:1
83:23 86:15 87:2,12
87:21 88:15 90:1,10
90:13,19,23 91:2
93:18 96:7 98:4
102:11 105:14
potentially 96:1
poured 20:8
preemployment 19:17
48:7,8 50:1,5
prescription 35:4,11,13
35:15
presence 21:9
present 10:13
president 6:22
previous 37:6
previously 23:3,14
32:18
primary 12:18

prior 41:2 46:7 53:1
private 7:13 13:15
privy 63:13
probably 5:12 26:7
44:18 58:16 70:7
87:22 100:19,20,21
101:4
problem 84:20 85:2
procedure 3:5 19:10
72:6,7 82:22
procedures 36:15
process 19:9,14 36:23
professional 9:5
profits 13:20
program 23:18
promises 7:17
pronounce 34:13
proof 17:3
proper 23:22 101:17
properly 91:6
prospective 23:2 76:4
prove 83:3
proved 81:3
provide 39:23 43:23
44:8,12,14 67:10,13
67:14
provided 3:15,21
provider 36:2 71:21
publicly 7:10
Pullum 74:1
purpose 3:14 55:20
purposes 80:15,18,23
86:18
pursuant 1:14 3:4
pursuing 63:22
put 32:9 53:23 59:3
63:1 65:15
putting 62:21 66:6
p.m 1:20 69:21

### Q

question 3:11 5:7 19:8
21:13,16 24:21,23
31:23 40:6 53:11
54:3,21 65:21 80:16
80:18,23 85:20 86:3
86:18 89:1,22 92:5
102:10
questions 3:10 31:8
53:9 98:21 105:3,10
106:1

### R

race 24:10 25:1,5,10
34:4 42:18 105:22
racial 26:15,23 27:10
ran 31:6
random 34:8
randomly 15:5

read 5:9 55:4 69:22
reading 73:2 107:10
reads 75:5
really 45:20 83:3 89:2
reason 62:18,21 63:2,7
63:10,18 64:14 67:4
80:21 81:8 82:13,16
82:18,19,20 83:22
86:11,11,14 102:13
reasonable 86:17,22
87:4,6 89:3,6
reasons 67:6
Rebecca 60:10 61:11
recall 10:5 24:5 26:10
26:11 33:13,22 36:13
38:7 40:21 43:11,12
44:16 46:10 48:20
53:12 56:6 58:8
77:19,21 82:2 93:3
101:9
received 40:22 79:15
94:1,14 95:5
receiving 41:2
recognize 40:4,7 74:3
record 35:21 52:13,21
65:19 76:3,18,19
102:3,6 104:17
105:15
records 27:5,8
recourses 10:22
referenced 46:8
referring 54:10
reflect 79:22
refusal 56:16
regard 16:16 18:3,4
23:13 24:23 25:9
38:6 55:19,23 66:5
67:19 74:8 104:9
regarding 16:5 17:6
27:10 41:1 53:10
55:16 62:3 65:16
79:23 82:10 98:14,18
101:10 103:20
regardless 3:21
regulations 19:20 91:3
rehire 81:1
related 10:23 24:11,11
release 19:18 67:1
released 66:23
relevant 21:15,19
religion 25:17
remained 39:12
remarks 62:18
remember 42:10
101:14
repetitively 29:20
report 74:13 76:20
104:20,21
reported 19:6 106:12

Reporter 1:16 3:7
106:10 107:20
REPORTER'S 106:6
representation 95:18
representative 9:23
representing 3:3,17
reprimanded 23:21
request 83:7 85:21
86:5 90:12
requested 84:19
requesting 60:23
required 34:7 37:7
67:9 74:16 75:20,21
104:12
requirement 36:11
103:6
requirements 29:16,21
30:3
research 12:2 41:14
90:14
reserved 3:12
reside 68:17
residential 15:14 29:12
33:15,17
resigned 28:21,22
resolve 16:20
resource 9:9
resources 9:12,21
11:11 12:1
response 21:7 45:16
responsibility 84:8,9
89:11,14
result 81:9,10,14
results 19:5,22 107:14
resumed 51:8
resuming 51:13
retaliation 24:11
retested 20:12
retort 45:17
Reuben 102:17
revealed 37:19
revenue 14:10
Review 35:23
right 14:5 20:14,18
24:16 28:2,12 31:4
32:9 38:2 40:13
44:19 48:1 54:19
58:12 63:12 70:19
71:4,11,12 72:19
78:20 80:18 87:11
88:20 89:18 90:16
92:16 94:5 98:3
ring 34:15
rise 47:10
road 75:2,3,8,15,17
Robert 1:5 12:23 46:16
52:23 106:17
role 67:19 99:6,8
roughly 101:3

routes 47:19
Rs 11:9
rule 98:2
Rules 3:5
ruling 3:12
run 92:18
running 32:3
Russell 31:14 48:11
 50:6 55:5 89:11
 99:15
Russell's 55:6

S

safely 32:4
safety 21:17 22:4,7,11
 22:14 48:9 77:2,11
 77:23 78:15,16 89:2
 89:23 90:15,17 92:21
 93:4 104:14 105:18
 105:19
SAITH 106:3
same 3:22 18:8 25:14
 42:16 46:11 70:23
 87:6 107:11
sample 20:9,11 35:14
 83:7,13 84:4,12,19
 84:23 86:7,8 89:17
 93:20,23 94:5,14,23
 96:2
samples 36:4 83:8,9
Saturday 19:4
saw 58:10
saying 27:13 42:15
 48:8 56:4 85:23 87:9
 87:23 91:22
says 48:5 61:21 62:14
 69:20 70:17 73:23
 93:21
scene 103:8
school 7:21 8:13,16
screen 34:11 46:8
 47:11
screening 19:10
screens 19:5 34:8 46:12
sealed 83:10
second 34:11 49:22
 52:14 73:12 82:10
 83:12 90:11,12 91:10
section 60:5 61:2 79:18
security 41:21 54:14
see 23:3 26:6 35:17
 55:1 58:9 61:1 63:14
 66:12 73:17
seeing 58:8
seeking 103:13
seeks 103:9,16,18
seen 40:9 53:1
selection 52:8
send 50:19,21 66:11,21

sending 63:5
senior 9:9
sent 19:18,20 20:23
 39:3,10,15 53:2,5
 60:18 62:2,16 66:1
 70:8,9
separate 42:9 57:18
 62:1 77:10,11
series 9:20
service 47:19
Services 1:8 2:18 5:18
 5:19,22 6:1,6,15,18
 6:23 7:10 10:1,18
 11:1 13:14,23 15:3
 15:10 106:20
set 107:10
Seven 11:4
several 11:22 16:23
 73:17
Sexual 26:6,6
share 70:20
sheet 60:17 70:10,14,17
Sherry 60:10 64:23
shipments 11:16
shit 45:11
show 78:20
showing 42:2 48:6
 102:9
shown 44:21
shows 91:7
sic 88:1
sign 19:17 56:12,16
 79:14
signature 4:2 65:9
signed 56:19 61:10
 62:7 64:9,11 65:14
 91:5 94:6
signing 107:10
since 16:13 18:16 34:20
sir 4:11 5:14,16 6:11
 7:12,14,20 8:14,20
 9:18 10:8 12:4,6 13:1
 13:7,11 14:17 15:2,4
 15:6,9 16:1,3,7,10,14
 17:8,11,16 18:6 21:3
 22:13,15,21 23:6
 24:1 25:8,17 26:4
 27:6 28:8,11,14,23
 29:6,10,23 31:11,20
 32:23 33:19,21 34:1
 34:16 35:1 36:5,14
 37:13,15,18 38:13
 39:2 40:10,19 41:4
 43:22 44:10 46:14
 47:13 48:16,18 50:18
 50:22 51:16 52:4
 53:4,8,14 54:12,17
 54:23 55:3,5,8,10,13
 55:18,21 56:3,8,10

56:14,18,21 57:1,10
 57:13,19 58:5 59:4
 59:10 60:7,12 61:3,5
 61:8,14,21 62:5,9,14
 62:23 63:3,20 64:1
 64:10 65:11 66:9,20
 67:3,5,12,14,22 68:1
 69:16,23 70:2,5 72:6
 73:3,6,10,16,18 74:2
 74:4,10,18,21 75:5
 75:10,19 76:1,6,14
 76:21 77:6,9,11 78:2
 78:4,7 79:8,10,13,21
 80:2,8 82:5,12 83:5
 83:15,19 87:14 89:9
 93:12,14 95:13 96:21
 96:23 97:2,7 98:15
 99:14 100:14 101:13
 101:15,21 102:2
 103:22 104:10
sister 10:11
sit 12:21
site 11:11 15:17
situation 35:2 83:20
 84:2 86:23
six 26:11 99:23 100:12
six-page 70:17
Smith 2:8
smoothly 32:4
social 41:21 54:14
Society 9:12
some 20:23 35:5 38:1
 41:10,14 43:7 46:16
 53:9 59:12 63:14
 71:21 86:17 97:20
somebody 45:22 48:20
 74:14 88:9,10 98:3
someone 33:16 37:10
 37:16 69:1 86:22
 93:2
something 13:15 20:16
 26:18 41:19 45:11
 55:1 84:17 94:8
Somewhere 99:23
sorry 39:14 60:22 76:9
 99:7 100:3
sort 35:5,7 38:1 71:21
sounded 92:6
sounds 85:7
speak 4:7 33:7 106:14
speaking 93:18
special 35:16
specific 104:2
specifically 19:6 52:2
specimen 19:19 20:4
 35:10 71:11,15
specimens 21:8
speculating 63:11
spirit 18:21

split 83:7 84:3,12,19,23
 86:7,8 89:16 96:1
spoke 38:8
spoken 36:10 38:4 64:2
St 20:16,17 21:6,8
 22:19 34:21 54:19
 72:7,12,15 97:10
stamped 40:1,11 51:17
 52:19 54:8,9 57:5
 59:16 78:23
stands 29:13 35:21
start 96:6
started 11:22 75:17
state 1:17 3:8 4:11
 43:13 68:16 106:7,11
 107:20
statement 58:18 59:2
 98:8
statements 98:13
states 1:1 14:3 43:12
 68:19
stations 32:19
Statute 3:15,21
stay 91:14,17 93:5
steps 81:20,22
still 42:2 44:20 45:14
 51:14 91:8
stipulated 3:2,16,23
stipulation 1:15 3:1
stock 7:7,15,16,17
stopped 22:19 34:21
Strike 80:10 93:15
stuff 74:6
subject 19:16
subjected 36:12
submit 34:7 36:4
submitted 37:2
subsequently 102:22
subsidiaries 2:19 6:8
 6:10 10:2,9,10
subsidiary 6:2
successfully 23:19
sudden 84:17 85:3
sued 13:5,6
suffer 80:3
sufficient 103:5
Suite 2:4,9
Sunflower 1:8 6:16
 61:10 106:21
supervised 33:17
supervision 71:13
supervisor 11:23 33:15
 100:16
supervisors 17:4,5
supposed 23:16
sure 5:7,8,8 25:19
 26:21 28:4 29:19
 30:16 32:3 41:11,13
 41:19,23 45:19 46:2

50:20,22 52:11,15
 66:13 68:4 71:9,11
 88:17
surprised 69:7,10
sworn 4:7 106:14
system 20:7 27:12,14
 27:17 30:20 41:23
 45:21,22 91:10 92:18
 93:6
Systems 11:13,14 12:9
 12:10

T

tailgate 19:3
take 13:20 16:4,18
 33:16 39:13 40:2
 45:9 51:3 56:15 57:8
 59:4,5 64:3 79:1
 81:20,21 87:9 97:22
 98:6
taken 1:14 3:4,6 35:10
 47:2 73:13 75:16
 83:8 85:22 86:19
 87:3 91:11 98:13
takes 29:13
taking 35:11 47:11
 51:10 92:1
talk 48:15,22 49:19
 105:6
talked 14:14,19 32:18
talking 25:16 31:19
 46:18
Tallassee 1:17 26:17,22
 27:23 31:4 32:15,16
 33:10 36:1 38:15,17
 38:23 39:1,1,17
 40:23 46:5 47:21
 61:16
tell 6:14 8:21 14:6
 20:22 22:22 28:20
 31:9 37:1 40:4 57:8
 65:12 70:22 87:2
 89:3,19 104:3
telling 24:19 43:16
 88:5
ten 11:18 87:22 88:2,5
tenure 79:7
term 29:8 62:1
terminate 46:6 90:18
terminated 14:16,21
 20:13 23:3,15 26:13
 42:1,22 43:1 45:21
 46:3 56:12 61:19
 62:11 63:16 66:6
 81:9,14 88:3 102:1,8
termination 17:19 56:5
 61:4,7 62:2,17 64:7
 64:15,19 65:2 80:4
terms 71:8

test 14:22 18:9 20:1,16
  21:8 35:19 37:20
  42:14,16 46:22 47:22
  48:4,10 49:22 50:1,5
  54:13 69:20 71:6
  72:4,22 73:13 75:2,3
  75:8,15,17 80:4,20
  81:9,10,13,22 82:11
  83:12 84:1,7 85:22
  87:12,21 90:2,6,11
  90:12,19,21,23 91:2
  91:6,10 93:18 95:1
  95:12 102:11 104:7
  105:14
tested 15:1,5 34:6,14
  34:18 35:3 41:6,17
  42:5 44:21 82:23
  83:8,9,10 87:1 88:15
  102:22 103:3
testified 4:8 9:22 53:3
  72:2 80:1 92:14 97:8
testifying 102:19
testimony 37:14 53:13
  55:15,19,22 56:6
  65:22 66:5 82:3,9
  101:9,14,16 103:20
testing 17:17 19:17,18
  35:14,20 36:4 71:20
  72:9 80:7
tests 41:15 42:23 90:3
  102:9
Thank 105:3
their 18:20 30:3 34:7
  35:18 36:4 37:2,3
  57:22 58:1 68:21
  83:3,12 84:8 87:1,2
  89:13
thereof 107:14
thing 19:3 45:18 93:9
things 5:6 64:21 73:17
  102:9
think 5:2 10:5 11:6
  18:23 24:10 27:6
  30:11 43:2,4,5,18
  44:6,7 48:19 50:3
  58:10,15,15 63:21
  70:22 85:5,6,10,15
  85:19 91:8 98:9
third 37:2 76:14
third-party 71:20
thought 21:14
three 6:13 12:14 19:23
  21:23 92:18 96:5
through 19:9 20:7
  21:10 27:13 31:5
  39:12 40:1 41:20
  52:21 57:5 72:17
  74:11 78:23 96:12
throughout 87:19

throws 29:14
Thursday 1:19 107:5
till 68:12
time 3:12,12 10:7 13:2
  16:2,2 17:12 18:22
  18:23 21:14,15,20,21
  23:12,12 36:20,21
  42:3 43:19 48:3 51:7
  53:6 54:8 67:15 87:6
  91:10 95:10 96:4,6
  99:13
times 9:22 87:19,22
title 25:19 32:11 33:6
  99:15 100:6
Tobias 2:7
today 10:7 12:20,21
  13:2 16:9 39:13 40:9
  72:2 99:4
told 8:19 10:16 48:20
  49:5,6 86:23 89:12
  98:16,22
Tom 22:6,23 36:7,9
  42:3 49:3 69:21
  90:17 105:16
ton 20:4
top 73:23
touch 83:22 96:19
towed 103:7
traded 7:11
transcript 5:10 107:8
transfer 32:19
transportation 10:18
  67:9 75:22 87:8
  92:22
trash 15:21
treated 42:16 43:2
treatment 23:18
Trey 31:17
Trey's 100:3
trial 3:19
trigger 35:18 103:6
triggering 25:14
trouble 23:9 91:8
truck 12:3 29:12,15
  36:11 101:12 103:15
  103:16
truckdrivers 23:2,14
truckload 11:16 12:12
trucks 15:22
true 72:5 75:18 80:15
  81:1,7 83:21 101:16
  107:8
truth 4:7,7,8 106:14,15
  106:15
trying 50:4 97:18
two 5:23 10:15 11:9,9
  20:3 31:8 32:19
  46:12 49:11,14,14
  57:18 65:16 77:2,4,6

77:7,8,14,16,19 78:6
  78:9 83:8,9 90:2,2
  95:7 96:5 102:8
type 24:14 25:15,23
  26:2,3,5 76:15 99:16
typed 41:22
typical 75:8,11,13,14
typically 77:22

___

U

unable 73:1,4
under 51:14 62:18,22
  63:2 71:12 91:2 94:8
  103:4
understand 21:4 25:21
  51:14 54:21 88:14
  91:21
understanding 21:19
  35:8,16 68:13,23
  69:5 72:3
unemployment 67:20
  68:9,11,14 69:2,8
UNITED 1:1
University 8:1,8,23
until 42:1 75:15 94:15
  96:7
unusual 78:3,5,7,9
urine 20:8,9
Urrutia 6:19
use 18:5 23:4 79:23
used 3:14,20 21:6,7
  82:4 92:10,14
using 20:21 22:19
  34:21 60:17 88:3
  97:10
U.S 107:1

___

V

Van 31:11 32:11 98:23
vehicle 103:7
vendor 37:3 98:5
vendors 97:23
ver 94:17
verification 59:21 61:7
  62:2,17 66:1 94:4,18
verified 21:1 73:14
  94:15 95:7
verify 41:19 96:2
very 80:6 105:3
VII 25:19
violating 23:15 32:5
violation 62:11 66:7
Virginia 9:14
volunteered 91:19
vs 1:7 106:19

___

W

wage 59:21
wait 95:20

waiting 96:1
waived 3:19 4:3 107:11
waiving 3:22
Walk 19:9
Wally 7:1
want 27:22 43:15 58:13
  80:9,11,11,19 85:23
  86:4,9
wanted 21:5 28:3 92:7
wasn't 48:2 49:23
Waste 1:9 6:16 37:20
  61:10 93:11 106:22
watch 19:1
water 20:5,6,8
wavelengths 85:8
way 10:23 16:12,21
  17:15 20:5 26:11
  34:23 44:5 64:10
  65:5 68:3 69:7 76:21
  83:2,16
ways 11:19 16:23 19:23
  20:3
week 75:6,8
weeks 47:2 90:2
weight 12:2 90:20
well 14:19 15:21 19:1,8
  26:6 29:18 32:17,20
  39:14 43:15,16 45:7
  46:11 47:16 48:5
  50:2 57:17 64:16,17
  65:12 68:4 71:15
  72:18 75:12 81:19
  82:2,16,22 84:12,16
  84:18 87:15 90:1,19
  91:18 93:5,22 95:15
  97:15 99:7 104:3
  105:5
went 37:5 70:14
were 11:3,17 12:13
  16:10 21:14,21 29:4
  34:14 36:3,15,18
  37:11 42:7,7,15
  46:12 53:9 55:15
  63:16 70:23 71:2
  72:23 73:4,9 77:19
  85:16 96:19 99:12,19
  100:1,10,13,22 101:1
  102:8
weren't 75:14
we'll 86:7,8
we're 23:19 25:15
  31:19 32:4 46:11
  51:13 52:17 67:9
  102:5
we've 11:17 12:15
  24:15 59:11 72:18
  93:18
whatsoever 11:2
  102:14

white 101:7
whole 4:7 19:2,10 59:8
  59:12 78:5,11 106:15
wine 18:21
witness 4:1,2,6 24:17
  53:21 105:7 107:9
woman 34:2
wondering 19:2
words 15:11 36:17
  92:11
work 6:5 15:22 18:19
  22:9 43:9 79:12
worked 10:19 13:9
  24:3,3,8 25:7 26:1,9
  26:16 28:9,12 38:15
  59:5 93:11 99:20
  100:11
working 28:15 45:14
  45:20 99:9,16
workplace 77:3 79:19
works 15:7 49:17 56:23
wouldn't 33:5 68:8
  98:6 101:17
write 54:22 57:20
writing 74:9
written 55:12
wrong 58:13 84:7,15
  84:16
wrote 74:1,5 97:3
W-2 50:21
W-2s 64:21

___

X

xeroxed 77:22

___

Y

Yeah 10:4 14:7 25:3
  44:14 46:19 53:21
  59:13,13,15 66:16
  69:14 91:9 92:16
  99:22 105:7
year 11:7 14:10 29:2
years 4:18 5:23 10:15
  11:4,18 12:14,16
  87:8 91:13 92:22
Yellow 11:13,14
yesterday 53:3,10
  65:22 66:17 80:1
  97:8 98:12,22
young 45:6,9
y'all 50:19,21 105:20

___

Z

zero 10:5

___

#

#151 107:19

___

0

06 79:5
07 22:20

**1**

1 2:16 39:19,22 40:3
    41:3 51:18 52:9,20
    54:7 58:10,11
10 1:19 46:15,17 47:7
    93:17 95:11,20 97:4
    107:5
10th 27:1
10:00 1:22 51:10
103 79:17
104 79:18
105 2:13
106 107:7
11 1:21 34:10 46:9 47:1
    47:12 49:21 51:9
    94:22 95:15 107:5
12 73:12 94:12 97:3
12th 73:14 95:2,5
125 78:23
13 55:17 56:1,5,13 62:7
    64:16 65:15
14 56:2,4,20
14th 73:14 95:8
15 88:2 100:21
151 1:16 3:7 106:10
1710 1:18 2:5
18 4:18 51:17 52:8
1819 2:9
19 52:20,21
1977 8:17
1979 9:2

**2**

2 2:17 57:3,6 58:7
    59:18 60:9 64:6 65:3
    65:8 66:17 71:5
    72:19 74:12,22 76:2
    76:8,23
2nd 94:15 107:15
2/2/07 94:7
2:15 1:20
20 12:16 87:7 92:22
    100:21
20-some-odd 88:1
2007 21:10,10 27:1,1
    31:5,5 36:8 44:17
    61:19 62:7 64:12
    75:4 86:20 94:12
    97:3
20070202 69:21
2008 1:20,21 51:9
    107:5,6,15
22 27:1 31:5 52:21
22nd 93:21 94:3,14
28 54:6
29 55:14

**3**

3 2:18 78:18,22 79:17
3:07-CV-846-WKW
    1:7 107:4
3:45 69:21
30 93:8 101:4,5
31 75:3
32 40:2
33 57:5
35 101:4
35203 2:10
36830 2:5
39 2:16

**4**

4 2:13
45 59:17

**5**

5/29/07 69:19
51 60:8
52 61:6 62:15
54 61:22 62:6,10
56 64:5 65:2,8
57 2:17
58 66:14,16

**6**

60 101:7
64 69:16 70:11
65 101:7
66 71:4
67 73:2
69 73:11,15 74:6

**7**

72 74:11
74 74:11
78 2:18 74:22
79 76:2

**8**

8 60:5
80 76:7,9
81 76:7,10
82 11:20
86 76:22
87 76:22

**9**

9 31:5 61:19 64:11
9th 27:1
9/30/08 107:19
90 57:5
900 2:9
91 78:23



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Birmingham District Office
December 20, 2007

Ridge Park Place

1130 22ⁿᵈ Street, South, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Pamela Hayes
CONSTANGY BROOKS & SMITH, LLC
One Federal Place
Suite 900
1819 - 5ᵗʰ Avenue North
Birmingham, AL 35203

    RE:   Robert Cannon v. Sunflower Waste, LLC
             EEOC Charge Number: 420-2007-03001

Enclosed please find the requested documents pursuant to your Section 83 Request.  If

we can assist you further, please do not hesitate to contact us.

                Sincerely,

                Kay Lindsey
                Investigator Support Assistant

**PLAINTIFF'S
EXHIBIT**

PENGAD-Bayonne, N. J.

CONFIDENTIAL
ADS / CANNON
0001

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

ROBERT CANNON                          ]
                                       ]
            Plaintiff,                 ]
                                       ]
vs.                                    ]
                                       ]
SUNFLOWER WASTE, LLC                   ].
                                       ]
                                       ]
            Defendant.                 ]
                                       ]

C E R T I F I C A T I O N

I, Delner Franklin-Thomas, after being duly sworn on my oath, depose and say as follows:

1.  I am the District Director of the Birmingham District Office of the Equal Employment Opportunity Commission (EEOC);

2.  The Equal Employment Opportunity Commission is an agency of the United States of America charged with, "inter alia", the administration, interpretation and enforcement of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et. Seg.

3.  Pursuant to its statutory authority, the EEOC receives and investigates charges of employment discrimination;

4.  In the course of its investigations, the EEOC collects documents and compiles records;

CONFIDENTIAL
ADS / CANNON
0002

5.  I am custodian of all the records of this office;

6.  I have reviewed the EEOC's investigative file of <u>Robert Cannon v. Sunflower Waste, LLC</u>, Charge No.: 420-2007-03001;

7.  I have personal knowledge of the contents thereof;

8.  I hereby certify that the attached documents are true and correct copies of records which were compiled during the course of the investigation of the above mentioned charge.


Delner Franklin-Thomas
District Director
Birmingham District Office
Equal Employment Opportunity Commission


Sworn to and subscribed before me this the _20th_ day of _December 2007._


NOTARY PUBLIC _____

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 8, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

My Commission Expires _____

CONFIDENTIAL
ADS / CANNON
0003

## MAILING INSTRUCTIONS

CHARGE NO. *420-2007-03001*

CHARGING PARTY

Name *Mr. Robert Cannon*

Street Address _____

City, State & Zip _____

Telephone No. (w/ area code) _____

CHARGING PARTY ATTORNEY

Name *James B. Douglas, Jr., Atty*

Firm *Mc Neal & Douglas*

Street Address *Post Office Box 1423*

City, State & Zip *Auburn, Al. 36630*

Telephone No. (w/ area code) *(334) 821-1596*

Correct name and address of Respondent and Respondent's Representative to whom correspondence (decision, etc.)
should be mailed:

*Sunflower Waste LLC*

*115 Herrin Hill Road*

*Tallassee, Al 36078*

*(334) 252-0458*

If there is an attorney, other than Respondent's Representative named above, give correct name, firm, and address.
(If the attorney is not an "in house" attorney, give name of a Respondent Representative (above) to whom copies
should be mailed.) *J. Tobias Dykes, Atty*

*Constangy, Brooks & Smith LLC*

*One Federal Place*

*1819 - Fifth Avenue, North Suite 900*

*B'ham, Al. 35203    (205) 226-5469*

If any of the above information has changed since the investigation, provide the most current information below
(include names, addresses, zip codes, and telephone numbers where it is indicated above.)

Coding Information:    CLR-C. P. Legal Representative      RLR-Legal Representative
                          CPR-CP Representative                      RPC-Contact Information
                          CPC-Contact Information                      ROF-Requesting Official

CONFIDENTIAL
ADS / CANNON
0004

## CASE LOG

(Continue on Reverse)

| Charge No. | Respondent | Charging Party |
|---|---|---|
| 420-2007-03001 | | |

| Date | Action | Entered | Reviewed/ |
|---|---|---|---|
| 6-19-07 | Received case file today. | (mc) | |
| 7-9-07 | Prepared mailing sheet + Tab file, + analyzed documents. PS was due on 6-22-07 | | |
| 7-13-07 | Called CP's atty to Analyzed + Reviewed evidence with him. Left message for him to call me | (mc) | |
| 7-17-07 | Called CP's Atty, spoke with paralegal today, reviewed evidence gathered during investigation See Tab C. She did not submit any additional information to the Commission | | |
| 7-17-07 | Submitted case file to Superior for review + final approval. | (mc) | |

CONFIDENTIAL
ADS / CANNON
0005

## CASE LOG

(Continue on Reverse)

| Charge No. | | Respondent | | Charging Party | |
|---|---|---|---|---|---|

| Date | Action | Entered | Reviewed/ |
|---|---|---|---|
| 5/18/07 | CHARGE RECEIVED BY BIDO | RRM | |
| 5/22/07 | 131/CHARGE MAILED TO RESPONDENT | | |
| | 131 NO ACTION MAILED TO RESPONDENT | | |
| | TO ENFORCEMENT UNIT _____ FOR ASSIGNMENT | | |
| RRM | TO ADR FOR ASSIGNMENT ✓ | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EEOC Form 159 (10/94)

CONFIDENTIAL
ADS / CANNON
0006

EEOC Form 161 (3/98)

## U.S. FEDERAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Mr. Robert Cannon<br>426B Tommer Court<br>Opelika, AL 36801 | From: | Birmingham District Office<br>Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |
|---|---|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2007-03001 | Ollie M. Croom,<br>Investigator | (205) 212-2140 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☐ | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| ☐ | While reasonable efforts were made to locate you, we were not able to do so. |
| ☐ | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| ☒ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Delner Franklin-Thomas*                 8/27/7

Delner Franklin-Thomas,
**District Director**

Enclosures(s)                                                (Date Mailed)

cc: | Sunflower Wast LLC<br>115 Herrin Hill Road<br>Tallassee, AL 36078 | James B. Douglas, Jr. ,Attorney<br>McNeal & Douglas<br>Post Office Box 1423<br>Auburn, AL 36630 |
|---|---|

J. Tobias Dykes, Attorney
Constangy, Brooks, & Smith LLC
One Federal Place
1819 Fifth Avenue, North Suite 900
Birmingham, AL 35203

CONFIDENTIAL
ADS / CANNON
0007

Enclosure with EEOC
Form 161 (3/98)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 -- *not* 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

CONFIDENTIAL
ADS / CANNON
0008

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | |
| x | EEOC | 420-2007-03001 |

and EEOC

_State or local Agency, if any_

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Robert Cannon | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Sunflower Waste, LLC | | 334.252.0458 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 115 Herrin Hill Road, Tallassee, AL 36078 | | Macon |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | | |
|---|---|---|
| [X] RACE | [ ] COLOR | [ ] SEX | [ ] RELIGION | [ ] AGE |
| [ ] RETALIATION | [ ] NATIONAL ORIGIN | [ ] DISABILITY | [ ] OTHER (Specify) | |

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)       LATEST (ALL)

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On March 9, 2007, I was unjustly terminated by Sunflower Waste, LLC. I believe my termination was based upon race, because the reason I was given, failure of a drug screen, was false. Sunflower Waste, LLC falsified and fabricated the reason for my termination, as I have documented proof that my drug screen, for which Sunflower Waste, LLC, claims I was terminated, was, in fact, negative. I was qualified to perform the work I was doing, I was terminated unjustly, and, upon information and belief, the person who took over my duties was not a minority. Therefore, I believe my termination was based on my race.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT _Robert Cannon_ |
| 5-14-07 _Robert Cannon_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
| Date          Charging Party (Signature) | 14 MAY 2007 |

EEOC FORM 5 (10/94)

CONFIDENTIAL
ADS / CANNON

EEOC FORM 131 (5/01)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Becky Bruner<br>Controller<br>SUNFLOWER WASTE, LLC<br>P. O. Box 781150<br>Tallassee, AL 36078 | **Robert Cannon** |

THIS PERSON *(check one or both)*

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**420-2007-03001**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act       [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act       [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **22-JUN-07** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by          to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **13-JUN-07** to **Debra B. Leo, ADR Coordinator, at (205) 212-2033** If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| Aaron N. Hallaway,<br>Intake Supervisor | Birmingham District Office<br>Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |
|---|---|
| *EEOC Representative* | |
| *Telephone* **(205) 212-2123** | |

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [ ] RETALIATION   [ ] OTHER

## See enclosed copy of charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| May 22, 2007 | Delner Franklin-Thomas,<br>District Director | *Delner Franklin-Thomas* |

CONFIDENTIAL
ADS / CANNON
0010

Enclosure with EEOC
Form 131 (5/01)

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14   Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

CONFIDENTIAL
ADS / CANNON
0011

LAW OFFICES OF

## McNEAL & DOUGLAS

ATTORNEYS AT LAW, L.L.C.
A LIMITED LIABILITY COMPANY
COMPOSED OF PROFESSIONAL CORPORATIONS

TELEPHONE
(334) 821-1596
FAX
(334) 821-9346

MARRELL J. McNEAL, ATTORNEY AT LAW, P.C.
JAMES B. DOUGLAS, JR., ATTORNEY AT LAW, P.C.

1710 CATHERINE COURT
SUITE B
POST OFFICE BOX 1423
AUBURN, ALABAMA 36830

August 9, 2007

EEOC
Attn: Debra B. Leo
Ridge Park Place
1130 22nd Street South
Suite 2000
Birmingham, AL 35205

RE: Robert Cannon

Dear Ms. Leo:

*470-2017-03001*

On June 7, 2007, I sent you a letter, indicating that my client was not interested in mediating at this time. Since then, I have spoken to my client and he indicates that he would be amenable to mediation, if the opposing party would be also. If it is not too late to conduct a mediation, we would be willing to cooperate in that regard.

If you have any questions, please do not hesitate to contact me.

Sincerely,

McNEAL & DOUGLAS,
ATTORNEYS AT LAW, L.L.C.

BY _____
James B. Douglas, Jr.

JBD/fla

CONFIDENTIAL
ADS / CANNON
0012

LAW OFFICES OF

## McNEAL & DOUGLAS

ATTORNEYS AT LAW, L.L.C.
A LIMITED LIABILITY COMPANY
COMPOSED OF PROFESSIONAL CORPORATIONS

MARRELL J. McNEAL, ATTORNEY AT LAW, P.C.
JAMES B. DOUGLAS, JR., ATTORNEY AT LAW, P.C.

TELEPHONE
(334) 821-1596
FAX
(334) 821-9346

1710 CATHERINE COURT
SUITE B
POST OFFICE BOX 1423
AUBURN, ALABAMA 36830

May 16, 2007

EEOC
Ridge Park Place
1130 22nd Street South
Suite 2000
Birmingham, AL 35205

RE: Robert Cannon

Dear Sir or Madam:

Enclosed is a Charge of Discrimination form regarding Robert Cannon. My office is representing Mr. Cannon. I look forward to receiving report of your investigation.

If you have any questions, please do not hesitate to contact me.

Sincerely,

McNEAL & DOUGLAS,
ATTORNEYS AT LAW, L.L.C.

BY _____
James B. Douglas, Jr.

JBD/lcw
Enclosure

MAY 1 8 2007

CONFIDENTIAL
ADS / CANNON
0013



# CONSTANGY
## BROOKS & SMITH, LLC

ONE FEDERAL PLACE
SUITE 900
1819 FIFTH AVENUE NORTH
BIRMINGHAM, ALABAMA 35203
FACSIMILE (205) 323-7674
www.constangy.com
tdykes@constangy.com
205-226-5469

June 29, 2007

Ollie Croom
Investigator
U.S. Equal Employment Opportunity Commission
Birmingham District Office
1130 22nd Street, South
Birmingham, Alabama 35205

**Re:    Robert Cannon, Charging Party**
**Advanced Disposal Services, Respondent**
**Charge No. 420-2007-03001**

Dear Ms. Croom:

This letter will serve as the response of Respondent Advanced Disposal Services ("ADS") d/b/a Sunflower Waste to the charge of discrimination filed by Robert Cannon.[1] ADS denies that it discriminated against Mr. Cannon on the basis of his race in violation of Title VII . Accordingly, ADS asks that the Commission issue a no-cause finding and dismiss Mr. Cannon's charge.

### A.    COMPANY BACKGROUND AND POLICY INFORMATION

ADS provides waste management services throughout the Southeast including Alabama.    In Alabama, ADS does business as Sunflower Waste, but the

---

[1] The information contained in this letter, and the accompanying materials submitted herewith, have been provided to the Equal Employment Opportunity Commission upon the condition that all such information and material, as well as the names and identities of any individuals mentioned therein, shall be kept strictly confidential.  The following information and material has been prepared for the sole and express purpose of "conference, conciliation and persuasion" as contemplated by 29 C.F.R. Section 1601.26(a) of the EEOC's Title VII and ADA Procedural Guidelines.   The information and material contained in this letter is additionally subject to the confidential material disclosure provisions set forth in Sections 83.6(b)(1) and (5) of the EEOC's Compliance Manual, as well as the exception to disclosure requirements of the Freedom of Information Act , codified at 5 U.S.C. Section 552(b)(7).  Respondent reserves the right to supplement this letter when necessary and as additional information becomes available.

CONFIDENTIAL
ADS / CANNON
0014

June 27, 2007
Page 2

employees are ADS employees.  ADS is an Equal Employment Opportunity employer
that prohibits discrimination on any basis protected by the law. (ADS' EEO Policy is
attached as Exhibit 1).

**B.    MR. CANNON'S EMPLOYMENT**

Mr. Cannon was a driver for Waste Management, Inc. in Opelika, Alabama in
December 2007.  However, ADS, through Sunflower Waste, bid and received the
municipal contract on which Mr. Cannon worked.  Because Mr. Cannon and the other
Waste Management drivers knew the routes for the municipal contract, ADS
encouraged Mr. Cannon and the other drivers to apply for jobs with ADS.  As a
result, Mr. Cannon submitted an application to ADS on January 22, 2007 to work as a
driver. (Mr. Cannon's Employment Application is attached as Exhibit 2).  ADS hired
Mr. Cannon on January 22, 2007, and provided him with a copy of the ADS
Employee Handbook.    (Acknowledgment of Receipt of Employee Handbook is
attached as Exhibit 3).

**C.    MR. CANNON FAILS HIS DRUG TEST**

ADS' Drug Free Workplace policy provides in part as follows:

> All applicants considered final candidates for a position may be tested
> for the presence of drugs as part of the application process.    Any
> applicant refusing to submit to a pre-employment drug test will be
> ineligible for hire.   If an applicant's test is confirmed positive, the
> applicant will not be considered for employment at that time and will
> be informed that he or she has failed to meet employment standards.

> . . . .

> In the case of a violation of the Company policy, including a positive
> drug or alcohol test result, you will be subject to discipline up to and
> including discharge.

(Drug Free Workplace Policy is attached as Exhibit 4).  Pursuant to DOT regulations
and its Drug Free Workplace Policy, ADS requires all new hires to take and pass a
drug test.  Drivers, like Mr. Cannon, who had been working for Waste Management,
which had a DOT alcohol and drug testing program, were allowed to begin driving
for ADS before ADS received the pre-employment drug test results.

Mr. Cannon signed an Alcohol and/or Drug Test Notification on January 22,
2007, indicating that he would be taking a drug test that would be administered in
compliance with the Federal Motor Carrier Safety Regulations; on January 22, 2007

CONFIDENTIAL
ADS / CANNON
0015

June 27, 2007
Page 3

at 2:00 p.m. (Alcohol and/or Drug Test Notification attached as Exhibit 5). Mr. Cannon took his drug test on January 22, 2007. Mr. Cannon failed his pre-employment drug screen test because he tested positive for cocaine.[2] (A copy of the drug test results are attached as Exhibit 6). Therefore, Mr. Cannon's employment was terminated on March 9, 2007 for violation of the drug and alcohol policy.[3] (Final Clearance for Terminating Employee attached as Exhibit 7). William Perry, Jr. (BM) replaced Mr. Cannon.

### D.     CHARGE OF DISCRIMINATION

On May 14, 2007, Mr. Cannon filed a Charge of Discrimination, alleging that ADS terminated his employment because of his race in violation of Title VII. Specifically, Mr. Cannon alleges that the test results were fabricated; however, there is no evidence that the positive drug test for cocaine was fabricated. (EEOC Charge is attached as Exhibit 8).

### E.     DISCUSSION OF THE CHARGE

As the above discussion makes clear, Mr. Cannon's allegations do not amount to a claim of actionable discrimination and his Charge should be dismissed with a no-cause finding. Because there is no direct evidence of discrimination, Mr. Cannon must demonstrate that (1) he is in a protected class; (2) he was qualified to perform his job; (3) his employment was terminated; and (4) some evidence creating an inference of race discrimination. Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003). If a plaintiff establishes his *prima facie* case, then the employer must articulate a legitimate, nondiscriminatory reason for its decision or actions. Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000). To ultimately prevail, the plaintiff must then show that the employer's articulated reason was false and that the real reason was the plaintiff's race. Id.; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 519 (1993). A common method of establishing the fourth prong of the *prima facie* case is evidence that the employer replaced the plaintiff with someone outside of the protected class. Walker v. Nationsbank of Florida, 53 F.3d 1548, 1556 (11th Cir. 1995). Alternatively, a plaintiff can demonstrate that a similarly-situated employee outside of the protected class was treated more favorably. Knight, 330 F.3d at 1316.

---

2 The confirmation of the drug test misstates Mr. Cannon's name as Mr. Rannon, but the social security number and date of birth on the results are Mr. Cannon's.

3 There was a delay between the confirmation of the failed drug test and the discharge because Mr. Cannon took a second drug test on February 12, 2007, which was almost three weeks after the initial sample was taken. Mr. Cannon passed the second test. However, ADS policy provides that a failed drug test is grounds for discharge, so Mr. Cannon was discharged for failing his initial drug test.

CONFIDENTIAL
ADS / CANNON
0016

June 27, 2007
Page 4

While Mr. Cannon is a member of a protected class and was discharged, he was not qualified to perform his job because he did not pass his drug test. Further, there is no inference of discrimination. First, William Perry, Jr., a black male, replaced plaintiff. Second, no drivers in Alabama since December 1, 2006 have failed a drug test and remained employed with or been hired by ADS. As such, Mr. Cannon cannot demonstrate that a similarly situated employee was treated more favorably than him. Therefore, Mr. Cannon cannot prove an inference of discrimination, and his Charge is due to be dismissed.

Even if Mr. Cannon could prove a *prima facie* case of discrimination, ADS terminated Mr. Cannon's employment for a legitimate, nondiscriminatory reason: **a failed drug test**. Further, there is no evidence of pretext in ADS' decision to terminate Mr. Cannon's employment for failing his drug test by testing positive for cocaine. As such, Mr. Cannon's Charge is due to be dismissed.

### F.    CONCLUSION

For all of the reasons addressed herein, Mr. Cannon cannot establish his discrimination claim. Accordingly, Advanced Disposal Services respectfully requests that the EEOC issue a no-cause finding and dismiss Mr. Cannon's Charge. If you have any questions or need further information, do not hesitate to contact me.

Sincerely,

J. Tobias Dykes

JTD/mb
·Enclosures

CONFIDENTIAL
ADS / CANNON
0017

221649.1

# EMPLOYMENT POLICIES

## Equal Opportunity Employer 

It is the intent of the Company to attract and retain the best qualified people available, and we will not discriminate in employment on the basis of race, color, religion, national origin, sex, marital status, status as a disabled veteran or veteran of the Vietnam era, age, or disability.

This policy applies to all employment decisions with all employees and applicants. It includes recruitment, hiring, compensation, promotion, transfer, training, demotion, layoff, recall and all other terms and conditions of employment.

Any employee who feels that he or she has not been treated in accordance with this policy should contact their supervisor or any member of management in order to discuss this matter.

## Harassment

### GENERAL HARASSMENT POLICY

Advanced Disposal Services is committed to maintaining a work environment that is free of discrimination. In keeping with this commitment, we will not tolerate harassment of Advanced Disposal Services employees by anyone, including any supervisor, co-worker, vendor, contractor or other regular visitor of the Company.

Harassment consists of unwelcome conduct, whether verbal, physical, or visual, that is based upon a person's protected status, such as sex, color, race, religion, ancestry, national origin, age, disability, or other legally protected group status. Advanced Disposal Services will not tolerate harassing conduct that affects tangible job benefits, that interferes unreasonably with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment.

The conduct forbidden by this policy specifically includes, but is not limited to: (a) epithets, slurs, negative stereotyping, or intimidating acts that are based on a person's protected status; and (b) written or graphic material circulated or posted within the workplace that shows hostility toward a person or persons because of their protected status.

Sexual harassment deserves special mention. Unwelcome sexual advances, requests for sexual favors, and other physical, verbal, or visual conduct based on sex constitute sexual harassment when (1) submission to the conduct is an explicit or implicit term or condition of employment, (2) submission to or rejection of the conduct is used as the basis for an employment decision, or (3) the conduct has the purpose or effect of unreasonably

CONFIDENTIAL
ADS / CANNON
0018

# DRIVER'S
# APPLICATION FOR EMPLOYMENT

**Sunflower Waste**
**Russell Davis**
**1303 Washington Blvd.**
**Tallassee, Alabama 36078**
**(866) 252-0488**

Company _____
Address _____
City _____ Zip _____

(answer all questions - please print)

In compliance with Federal and State equal employment opportunity laws, qualified applicants are considered for all positions without regard to race, color, religion, sex, national origin, age, marital status, veteran status, non-job related disability or any other protected group status.

Date of application: _1-22-07_

Position(s) Applied for: _DRIVER_

Name: _CANNON_ (Last)   _ROBERT_ (First)   _JAMES_ (Middle)   Social Security No. _____

List your addresses of residency for the past 5 years.

Current Address:
Street _____   City _____
State _AL_   Zip Code _36001_   Phone _____   How Long? _1 YR_ (yr./mo.)

Previous Addresses:
Street _____   City _____   State & Zip Code _____   How Long? _____ (yr./mo.)
Street _____   City _____   State & Zip Code _____   How Long? _____ (yr./mo.)
Street _____   City _____   State & Zip Code _____   How Long? _____ (yr./mo.)

Do you have the legal right to work in the United States? _YES_

Date of Birth _12 / 5 / 89_ (Required for Commercial Drivers)   Can you provide proof of age? _YES_

Have you worked for this company before? _NO_   Where? _____

Dates: From _____ To _____   Rate of Pay _____   Position _____

Reason for leaving _____

Are you now employed? _NO_   If not, how long since leaving last employment? _1 MONTH_

Who referred you? _FRIEND_   Rate of pay expected _____

Have you ever been bonded? _____   Name of bonding company _____
(answer only if a job requirement)

Have you ever been convicted of a felony? _____

If yes, please explain fully on a separate sheet of paper. Conviction of a crime is not an automatic bar to employment-all circumstances will be considered.

Is there any reason you might be unable to perform the functions of the job for which you have applied (as described in the attached job description)?

If yes, explain if you wish _____
_____
_____

© Copyright 2002 J.J. KELLER & ASSOCIATES, INC., Neenah, WI · USA · (800) 327-6868 · www.jjkeller.com · Printed in the United States    15F (Rev. 6/02) #01

CONFIDENTIAL
ADS / CANNON
0019

EXPERIENCE AND QUALIFICATIONS — OTHER

SHOW ANY TRUCKING, TRANSPORTATION OR OTHER EXPERIENCE THAT MAY HELP IN YOUR WORK FOR THIS COMPANY

*I can operate front loader, skid loader, one arm loader, rear loader, etc.*

LIST COURSES AND TRAINING OTHER THAN SHOWN ELSEWHERE IN THIS APPLICATION

LIST SPECIAL EQUIPMENT OR TECHNICAL MATERIALS YOU CAN WORK WITH (OTHER THAN THOSE ALREADY SHOWN)

## TO BE READ AND SIGNED BY APPLICANT

This certifies that this application was completed by me, and that all entries on it and information in it are true and complete to the best of my knowledge.

I authorize you to make such investigations and inquiries of my personal, employment, financial or medical history and other related matters as may be necessary in arriving at an employment decision. (Generally, inquiries regarding medical history will be made only if and after a conditional offer of employment has been extended.) I hereby release employers, schools, health care providers and other persons from all liability in responding to inquiries and releasing information in connection with my application.

In the event of employment, I understand that false or misleading information given in my application or interview(s) may result in discharge. I understand, also, that I am required to abide by all rules and regulations of the Company.

1-22-07
DATE

Applicant's Signature

## PROCESS RECORD

APPLICANT HIRED _____     REJECTED _____

DATE EMPLOYED _____     POINT EMPLOYED _____

DEPARTMENT _____     CLASSIFICATION _____
(IN REJECTED, SUMMARY REPORT OF REASONS SHOULD BE PLACED IN FILE)

## THIS SECTION TO BE FILLED IN BY RESPONSIBLE OFFICER OR COMPANY REPRESENTATIVE

|  | SUPERIOR | GOOD | FAIR | BELOW AVERAGE | POOR | WRITTEN RECORD ON FILE |
|---|---|---|---|---|---|---|
| 1. APPLICATION |  |  |  |  |  |  |
| 2. INTERVIEW |  |  |  |  |  |  |
| 3. PAST EMPLOYMENT |  |  |  |  |  |  |
| 4. WRITTEN EXAM |  |  |  |  |  |  |
| 5. ROAD TEST |  |  |  |  |  |  |
| 6. CRIMINAL AND TRAFFIC CONVICTIONS |  |  |  |  |  |  |

SIGNATURE OF INTERVIEWING OFFICER _____

## TRANSFERS

FROM: _____ TO: _____     FROM: _____ TO: _____

DATE: _____     DATE: _____

REASON FOR TRANSFER _____     REASON FOR TRANSFER _____

FROM: _____ TO: _____     FROM: _____ TO: _____

DATE: _____     DATE: _____

REASON FOR TRANSFER _____     REASON FOR TRANSFER _____

## TERMINATION OF EMPLOYMENT

DATE TERMINATED _____     DEPARTMENT RELEASED FROM _____

DISMISSED _____     VOLUNTARILY QUIT _____     OTHER _____

TERMINATION REPORT PLACED IN FILE _____     SUPERVISOR _____

PAGE 4 146 (Rev. 4/02) ABI

CONFIDENTIAL
ADS / CANNON
0020

ACCIDENT RECORD: EQUIPMENT YEARS OR MI.    ATTACH SHEET IF MORE SPACE IS NEEDED) IF NONE, WRITE NONE

| DATES | | NATURE OF ACCIDENT (HEAD-ON, REAR-END, UPSET, ETC.) | FATALITIES | INJURIES |
|---|---|---|---|---|
| LAST ACCIDENT | | | | |
| NEXT PREVIOUS | | | | |
| NEXT PREVIOUS | | | | |

TRAFFIC CONVICTIONS AND FORFEITURES FOR THE PAST 3 YEARS (OTHER THAN PARKING VIOLATIONS) IF NONE, WRITE NONE

| LOCATION | DATE | CHARGE | PENALTY |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

(ATTACH SHEET IF MORE SPACE IS NEEDED)

## EDUCATION

CIRCLE HIGHEST GRADE COMPLETED:  1  2  3  4  5  6  7  8       HIGH SCHOOL:  1  2  3  4       COLLEGE:  1  2  3  4

LAST SCHOOL ATTENDED _____ *GED* _____
                              (NAME)                                    (CITY)

## EXPERIENCE AND QUALIFICATIONS – DRIVER

| | STATE | LICENSE NO. | TYPE | EXPIRATION DATE |
|---|---|---|---|---|
| DRIVER LICENSES | *AL* | | *Class A* | *6-8-08* |

A.  Have you ever been denied a license, permit or privilege to operate a motor vehicle?        YES _____    NO __✓__

B.  Has any license, permit or privilege ever been suspended or revoked?        YES _____    NO __✓__

IF THE ANSWER TO EITHER A OR B IS YES, GIVE DETAILS _____

DRIVING EXPERIENCE IF NONE, WRITE NONE

| CLASS OF EQUIPMENT | TYPE OF EQUIPMENT (VAN, TANK, FLAT, ETC.) | DATES FROM | TO | APPROX. NO. OF MILES (TOTAL) |
|---|---|---|---|---|
| STRAIGHT TRUCK | | | | |
| TRACTOR AND SEMI-TRAILER | ✓ | | | |
| TRACTOR - TWO TRAILERS | | | | |
| MOTORCOACH - SCHOOL BUS | | | | |
| OTHER | | | | |

LIST STATES OPERATED IN FOR LAST FIVE YEARS _____

SHOW SPECIAL COURSES OR TRAINING THAT WILL HELP YOU AS A DRIVER: _____

WHICH SAFE DRIVING AWARDS DO YOU HOLD AND FROM WHOM? _____

PAGE 3 IGF (Rev. 5/02) 201

CONFIDENTIAL
ADS / CANNON
0021

## EMPLOYMENT HISTORY

All driver applicants to drive in interstate commerce must provide the following information on all employers during the preceding 3 years. List complete mailing address, street number, city, state and zip code.

Applicants to drive a commercial motor vehicle in intrastate or interstate commerce shall also provide an additional 7 years' information on those employers for whom the applicant operated such vehicle. (NOTE: List employers in reverse order starting with the most recent. Add another sheet as necessary.)

### EMPLOYER

| | | DATE | |
|---|---|---|---|
| NAME _WASTE MANAGEMENT_ | | FROM MO. _2_ YR. _01_ | TO MO. _12_ YR. _07_ |
| ADDRESS _4210 1661 Rd. 183_ | | POSITION HELD _Driver_ | |
| CITY _OPELIKA_ | STATE _AL_ ZIP _36801_ | SALARY/WAGE _$27.00 lat rate_ | |
| CONTACT PERSON _Lewis Webb_ | PHONE NUMBER | REASON FOR LEAVING _out of work_ | |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☑ YES ☐ NO | | | |

### EMPLOYER

| | | DATE | |
|---|---|---|---|
| NAME _Leshier Mills_ | | FROM MO. _94_ | TO MO. YR. _2000_ |
| ADDRESS _2 H Ave_ | | POSITION HELD _Assist. Supervisor_ | |
| CITY _OPELIKA_ | STATE _AL_ ZIP _36801_ | SALARY/WAGE _12.25_ | |
| CONTACT PERSON _Sold out_ | PHONE NUMBER | REASON FOR LEAVING | |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐ YES ☐ NO | | | |

### EMPLOYER

| | | DATE | |
|---|---|---|---|
| NAME _H W Woodward_ | | FROM MO. _2_ YR. _80_ | TO YR. _90_ |
| ADDRESS _Lafayette Parll_ | | POSITION HELD _Labor_ | |
| CITY _OPELIKA_ | STATE _AL_ ZIP _36801_ | SALARY/WAGE _P50_ | |
| CONTACT PERSON | PHONE NUMBER | REASON FOR LEAVING | |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐ YES ☐ NO | | | |

### EMPLOYER

| | | DATE | |
|---|---|---|---|
| NAME | | FROM MO. YR. | TO MO. YR. |
| ADDRESS | | POSITION HELD | |
| CITY | STATE ZIP | SALARY/WAGE | |
| CONTACT PERSON | PHONE NUMBER | REASON FOR LEAVING | |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐ YES ☐ NO | | | |

### EMPLOYER

| | | DATE | |
|---|---|---|---|
| NAME | | FROM MO. YR. | TO MO. YR. |
| ADDRESS | | POSITION HELD | |
| CITY | STATE ZIP | SALARY/WAGE | |
| CONTACT PERSON | PHONE NUMBER | REASON FOR LEAVING | |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐ YES ☐ NO | | | |

### EMPLOYER

| | | DATE | |
|---|---|---|---|
| NAME | | FROM MO. YR. | TO MO. YR. |
| ADDRESS | | POSITION HELD | |
| CITY | STATE ZIP | SALARY/WAGE | |
| CONTACT PERSON | PHONE NUMBER | REASON FOR LEAVING | |
| DID YOU DRIVE A VEHICLE REQUIRING A CDL? ☐ YES ☐ NO | | | |

*Includes vehicles having a GVWR of 26,001 lbs. or more, vehicles designed to transport 15 or more passengers, or any size vehicle used to transport hazardous materials in a quantity requiring placarding.

PAGE 2  15F (Rev. 6/02) 091

CONFIDENTIAL
ADS / CANNON
0022

## ACKNOWLEDGEMENT OF RECEIPT OF EMPLOYEE HANDBOOK

This will acknowledge that I have received my copy of Advanced Disposal Services Employee Handbook. I have read it and been given the opportunity to ask questions that I may have concerning any of the Company's policies and procedures.

I understand that this Handbook represents only current policies, regulations, and benefits, and that it does not create a contract of employment. The Company retains the right to change these policies, procedures and benefits, as it deems advisable.

I understand that I am an "*at will*" employee. I have the right to terminate my employment at any time, with or without cause, and that the Company has a similar right. I further understand that my status as an "*at-will*" employee may not be changed except in writing signed by the President of the Company. Nothing in this Handbook is intended to void my "*at-will*" status.

I understand that I am employed subject to a 90-calendar-day introductory period. I understand that I may be required to reimburse the Company for the cost of any uniforms I received if I voluntarily resign during the introductory period.

I understand that under circumstances as outlined in the Drug and Alcohol policy, I will be subject to physical examination, including a hair, blood and/or urine analysis by qualified personnel.

PRINTED FULL NAME: *Robert Cannon*

SIGNATURE: *Robert Cannon*

DATE: *1-22-07*

NOTE: *This form should be signed, detached and returned to your supervisor or human resources administrator within three (3) days after receiving your Employee Handbook.*

CONFIDENTIAL
ADS / CANNON
0023

## Customer Relations

The Company expects all employees who interact in any manner with customers to be responsive to their requests and treat them with respect. Do not hesitate to ask your supervisor for assistance if a customer becomes abusive or irate, if the customer specifically asks to speak with a supervisor or manager or if you feel more confident having your supervisor or a manager assist the customer.

## Dress and Appearance

The image of the Company is influenced by the appearance of its employees. We are all expected to practice good hygiene and dress appropriately for our job duties. The dress requirements for your facility or department may be posted or communicated to you by your supervisor. Generally, clothing that is too revealing, tight fitting or provocative is inappropriate during business hours.

Some Company facilities require the use of uniforms while employees are engaged in their job duties. If uniforms are required, you must obtain your supervisor's approval before wearing any other type of clothing. Your supervisor will also advise you about the procedure for obtaining and cleaning uniforms.

In all cases regarding what is considered acceptable attire, the final decision rests with the Company. If your attire does not meet standards considered acceptable, you may be requested to go home to change, with time involved unpaid.

## Drug Free Workplace

In a commitment to safeguard the health of our employees and to provide a safe working environment for everyone, the Company has a drug-free workplace policy. It is the intent of the Company to provide a safe work environment for all employees free of the effects of substance abuse or abusers. Similarly, it is your responsibility to maintain personal health so you are physically and mentally capable of performing in the workplace. The abuse of drugs or alcohol is an unsafe and counter-productive practice that will not be tolerated. *If you believe you have a substance abuse problem, you are urged to seek assistance before your actions violate Company policy.*

Our drug-free workplace policy includes the following provisions:

- The Company prohibits the illegal use, possession, sale, manufacture, or distribution, of drugs, alcohol, or other controlled substances on Company property and in Company vehicles or equipment. It is against Company policy for you to report to work or to perform job duties, including the operation of a motor vehicle, under the influence of drugs or alcohol.

CONFIDENTIAL
ADS / CANNON
0024



- All applicants considered final candidates for a position may be tested for the presence of drugs as part of the application process. Any applicant refusing to submit to a pre-employment drug test will be ineligible for hire. If an applicant's test is confirmed positive, the applicant will not be considered for employment at that time and will be informed that he or she has failed to meet employment standards.

- *You are subject to <u>random drug testing</u> in accordance with Company policies and governmental regulations.*

- *You may be tested when there is a <u>reasonable suspicion</u> that you are using or have used drugs/alcohol.*

- If you suffer an injury on the job that requires referral for medical treatment you may be tested.

- If you refuse to submit to a drug/alcohol test, you will be terminated from employment or otherwise disciplined.

- Prescription drugs prescribed by your physician may be taken during work hours. You should notify your supervisor if the use of properly prescribed prescription drugs might adversely affect your work performance. You may be assigned other duties if the use of prescribed medication may interfere with your regular job duties. Abuse of prescription drugs will be considered a violation of this policy.

- In the case of a violation of the Company policy, including a positive drug or alcohol test result, you will be subject to discipline up to and including discharge.

## Honesty

Honesty and integrity are personal characteristics that each of us should strive for at all times. Unfortunately, there are times when, for whatever reason, the line that separates honesty and integrity is violated. If that line is violated in any of the following areas, the employee may be subject to disciplinary action up to and including discharge:

- Falsifications of Company paperwork, including but not limited to service agreements, landfill and recycling tickets, incentive pay sheets, vehicle condition reports, repair orders, time cards, expense reports, accident and safety reports, purchase orders, insurance forms, commission calculations, adjustment forms, employment applications and any other type of form or paperwork that you are required to complete from time-to-time.

- Theft of Company equipment, including but not limited to, tools owned by the Company or other employees, office equipment, office supplies, sales marketing and promotional items and any other Company or employee owned property.

CONFIDENTIAL
ADS / CANNON
0025

# ALCOHOL AND/OR DRUG TEST NOTIFICATION

Part 382 - Controlled Substances and Alcohol Use Testing applies to drivers of this company.

**§382.113 Requirement for notice.**
Before performing an alcohol or controlled substances test under this part, each employer shall notify a driver that the alcohol or controlled substances test is required by this part. No employer shall falsely represent that a test is administered under this part.

Company Name: _Sunflower Waste_

Driver/Applicant Name: _Robert Cannon_
(Print) (First, M.I., Last)

You are hereby notified the following test will be administered in compliance with the Federal Motor Carrier Safety Regulations.

1. The test is scheduled:    Date: _1/22/07_

    Location: _Tallassee_

    Time: _2:00 PM_

2. Check type of test:    ☐ Alcohol    ☑ Controlled Substance

3. Check reason for test:    ☑ Pre-employment    ☐ Random    ☐ Reasonable suspicion
    ☐ Post-accident    ☐ Return to duty    ☐ Follow-up

4. Appointment instructions/comments:

_____

_____

_____

I understand as a condition of my employment with this company, the above identified test is required.

_Robert Cannon_                                    _1-22-07_
Driver/Applicant's Signature                          Date

Witnessed by:

_Russell _____                                    _1/22/06_
Company Representative                                Date

CONFIDENTIAL
ADS / CANNON
0026
375-FS-C2 3048
(Rev. 7/01)

© Copyright 2001
Published by J.J. Keller & ASSOCIATES, INC.
Neenah, WI  54957-0368 • www.jjkeller.com

RETAIN IN EMPLOYEE'S CONFIDENTIAL FILE

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com.

Acct# CGWT
Ioc code: V01J1B1UBN

5T742560    SPECIMEN ID NO.

now a unit of Quest Diagnostics
10101 Renner Blvd
Lenexa, KS 66219
(800) 725-4064

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.
ADVANCED DISPOSAL SVCS-SUNFLOWER
OER: TOM DAVIS
9085 GATE PARKWAY NORTH
JACKSONVILLE FL 32246
PH 904-493-7000  FAX 904-493-3055

B. MRO Name, Address, Phone and Fax No.
HORACIO MARAÑON - EMPLOYEE SCREE   Ph 337-837-1516
P. O. BOX 82112                    Fx 337-769-1134
221 SOUTHPARK BLDG. B
LAFAYETTE LA 70598

C. Donor SSN or Employee I.D. No.

D. Reason for Test:   ☒ Pre-employment   ☐ Random   ☐ Reasonable Suspicion/Cause   ☐ Post-Accident
                      ☐ Return to Duty   ☐ Follow-up   ☐ Other (specify)

E. Drug Tests to be Performed:  ☒ THC, COC, PCP, OPI, AMP   ☐ THC & COC Only   ☐ Other (specify)

F. Collection Site Address:
TALLASSEE FAMILY CARE
716 HERREN HILL RD
TALLASSEE AL 36078

Collector Phone No.  334-283-6477
Collector Fax No.    334-283-9166

**STEP 2: COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature   Specimen Collection
between 90° and 100° F?  ☒ Yes  ☐ No, Enter Remark   ☒ Split  ☐ Single  ☐ None Provided (Enter Remark)  ☐ Observed (Enter Remark)

**STEP 3:** Collector affixes bottle seal(s) to bottle(s). Collector dates and/or Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

REMARKS MONIQ

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable Federal requirements.

Collector's Name (PRINT First, MI, Last)
JANE S BELIEW

Signature of Collector

Date of Collection  01-22-07   Time of Collection  02:44  ☐ AM  ☒ PM

SPECIMEN BOTTLE(S) RELEASED TO:
SHC COURIER
Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB
X
Signature of Accessioner

(PRINT) Accessioner's Name (First, MI, Last)    Date (Mo./Day/Yr.)

Primary Specimen Bottle Seal Intact
☐ Yes
☐ No, Enter Remark Below

SPECIMEN BOTTLE(S) RELEASED TO:

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X _____    _____    01-22-07
Signature of Donor           (PRINT) Donor's Name (First, MI, Last)    Date (Mo./Day/Yr.)

Daytime Phone No. _____   Evening Phone No. _____    Date of Birth  Mo. __ Day __ Yr. __

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you chose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification is:
☐ NEGATIVE   ☐ POSITIVE   ☐ TEST CANCELED   ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE                                      ☐ ADULTERATED   ☐ SUBSTITUTED

REMARKS

X _____    _____    _____
Signature of Medical Review Officer   (PRINT) Medical Review Officer's Name (First, MI, Last)   Date (Mo./Day/Yr.)

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:
☐ RECONFIRMED   ☐ FAILED TO RECONFIRM - REASON

X _____    _____    _____
Signature of Medical Review Officer   (PRINT) Medical Review Officer's Name (First, MI, Last)   Date (Mo./Day/Yr.)

From: unknown    Page: 1/1    Date: 5/29/2007 6:15:55 PM

CONFIDENTIAL
ADS / CANNON
0027





3895 Jeffco Boulevard
Arnold, Missouri 63010
636/532.4099

**ATTENTION:**

Tom Davis
Advanced Disposal Services, Inc. - DH
9798 Normandy Blvd
Jacksonville, FL 32221

Participant: Robert Ranhon
Other ID:
SSN:

### Results of DOT Controlled Substance Test

| | |
|---|---|
| Record Status: Positive | Laboratory: Quest Diagnostics |
| Test Type: Pre-Employment | 506 E State Parkway |
| Collection Date/Time: 01/22/2007   2:49 PM | Schaumburg, IL 60173 |
| Batch ID: 20070202 | Collection Site: TALLASSEE FAMILY CARE |
| Specimen ID: 51742550 | 115 HERON HILL ROAD |
| Date COC Received: 01/22/2007 | TALLASSEE, AL 36078 |
| Sample Type: Urine | Specimen Collector: JANE S BELLEW |

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | POSITIVE |
| Marijuana | Negative | Phencyclidine | Negative |
| Opiates | Negative | | |

MRO UNABLE TO CONTACT
TEST IS POSITIVE:
COCAINE

Horacio Marañón M.D., MRO

2/2/2007
Verification Date

FEB 12, 2007

Results for Robert Ranhon, Other ID:

Printed on 2/2/2007 at 6:56:42PM

CONFIDENTIAL
ADS / CANNON
0028

# FINAL CLEARANCE FOR TERMINATING EMPLOYEE

Robert Cannon                              Driver
_____    _____    _____
Employee Name                    SS#         Position

Opelika                3/9/07          1 Feb 07
_____    _____    _____
Location                         Termination Date    Date of Hire

Violating Drug and alcohol Policy
_____
Reason:

Eligible For Rehire:    Yes  _____    No  ✓

## PLEASE DETERMINE IF ANY OF THE FOLLOWING ARE OUTSTANDING: Please Initial

| | | | | Date |
|---|---|---|---|---|
| Travel Advance | _____ | Accounting | _____ | _____ |
| Petty Cash Advance | _____ | Accounting | _____ | _____ |
| *Avail. Vacation Accrual | _____ | | | |
| *Avail. Sick Accrual | _____ | * Number of hours | | |
| *Avail. PTO Accrual | _____ | | | |

## *PLEASE COLLECT/CANCEL THE FOLLOWING: PLEASE INITIAL

| | | | Date |
|---|---|---|---|
| Telephone Credit Card | Supervisor | _____ | _____ |
| Credit Card/Fuel Card/Toll Card | Supervisor | _____ | _____ |
| DP Access Codes | Supervisor | _____ | _____ |
| Bldg. Keys/Access Codes/Loan Equipment | Supervisor | _____ | _____ |
| Miscellaneous (tools, manuals, etc.) | Supervisor | _____ | _____ |
| ID Card/Badge | Supervisor | _____ | _____ |
| Policy Manuals and/or Handbook | Supervisor | _____ | _____ |
| Locker Key | Supervisor | _____ | _____ |
| Uniforms | Supervisor | _____ | _____ |
| Office Equipment (i.e., cell phone, fax machine, pager, computer) | Supervisor | DCJ | Date 3/9/07 |
| Payroll Deductions for Insurance | $ _____ | | Date _____ |
| Cobra letter sent | 17M | | Date _____ |

Select One:    Mail check to:    _____    Hold For Pick up: _____

_____

_____

Employee Signature:  _Robert Cannon_       Date 3/9/07

Supervisor Signature:  _Danny C. Smith_      Date 3/9/07

CHECK RELEASED:

Payroll Coordinator:  _Blasley_            Date _____

CONFIDENTIAL
ADS / CANNON
0029

From: 3342832670        Page: 4/6        Date: 5/29/2007 4:05:31 PM

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 420-2007-03001 |
| ☒ EEOC | and EEOC |

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. Robert Cannon | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Sunflower Waste, LLC | | 334.252.0458 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 115 Herrin Hill Road, Tallassee, AL 36078 | | Macon |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | | DATE DISCRIMINATION TOOK PLACE |
|---|---|---|
| ☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ AGE | | EARLIEST (ADEA/EPA)       LATEST (ALL) |
| ☐ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify) | | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On March 9, 2007, I was unjustly terminated by Sunflower Waste, LLC. I believe my termination was based upon race, because the reason I was given, failure of a drug screen, was false. Sunflower Waste, LLC falsified and fabricated the reason for my termination, as I have documented proof that my drug screen, for which Sunflower Waste, LLC, claims I was terminated, was, in fact, negative. I am qualified to perform the work I was doing, I was terminated unjustly, and, upon information and belief, the person who took over my duties was not a minority. Therefore, I believe my termination was based on my race.

RECEIVED

MAY 1 8 2007

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | *Robert Cannon* |
| 5-14-07 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
| Date        *Robert Cannon* | 14, MAY 2007 |
|                Charging Party (Signature) | |

EEOC FORM 5 (10/94)

CONFIDENTIAL
ADS / CANNON
0030



# CONSTANGY
## BROOKS & SMITH, LLC

ONE FEDERAL PLACE
SUITE 900
1819 FIFTH AVENUE NORTH
BIRMINGHAM, ALABAMA 35203
FACSIMILE (205) 323-7674
www.constangy.com

**RECEIVED**
**EEOC**

**JUN 1 4 2007**

**BIRMINGHAM DISTRICT OFFICE**

tdykes@constangy.com
205-226-5469

June 11, 2007

Aaron N. Hallaway
Intake Supervisor
U.S. Equal Employment Opportunity Commission
Birmingham District Office
Ridge Park Place
1130--2nd Street South
Birmingham, AL 35205

> Re:   **Respondent**   : *Advanced Disposal Services*
>       **Charging Party** : *Robert Cannon*
>       **Charge No.**   : *420-2007-03001*

Dear Mr. Hallaway:

Please be advised that Respondent Advanced Disposal Services d/b/a/ Sunflower Waste, LLC has referred the above-referenced charge to the law firm of Constangy, Brooks & Smith for handling. Please send copies of all future correspondence and inquiries to the attention of J. Tobias Dykes, Constangy, Brooks & Smith, 1819 Fifth Avenue North, One Federal Place, Suite 900, Birmingham, Alabama 35203.

We are in the process of investigating this matter and will provide a Statement of Position as soon as possible.

Thank you for your cooperation in this regard.

Sincerely,

J. Tobias Dykes

JTD/mb

CONFIDENTIAL
ADS / CANNON
0031

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 420-2007-03001 |
| ☒ EEOC | |

and EEOC

_____ State or local Agency, if any _____

NAME(Indicate Mr., Ms., Mrs.)
Mr. Robert Cannon

HOME TELEPHONE (Include Area Code)

STREET ADDRESS          CITY, STATE AND ZIP CODE

DATE OF BIRTH

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME Sunflower Waste, LLC | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) 334.252.0458 |
|---|---|---|

| STREET ADDRESS CITY, STATE AND ZIP CODE 115 Herrin Hill Road, Tallassee, AL 36078 | COUNTY Macon |
|---|---|

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ AGE
☐ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)          LATEST (ALL)

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On March 9, 2007, I was unjustly terminated by Sunflower Waste, LLC. I believe my termination was based upon race, because the reason I was given, failure of a drug screen, was false. Sunflower Waste, LLC falsified and fabricated the reason for my termination, as I have documented proof that my drug screen, for which Sunflower Waste, LLC, claims I was terminated, was, in fact, negative. I was qualified to perform the work I was doing, I was terminated unjustly, and, upon information and belief, the person who took over my duties was not a minority. Therefore, I believe my termination was based on my race.

RECEIVED
MAY 18 2007
BIRMING...

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their proceedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

SIGNATURE OF COMPLAINANT
_Robert Cannon_

Date 5-14-07          Charging Party (Signature) _Robert Cannon_

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)
14 MAY 2007

EEOC FORM 5 (10/94)

CONFIDENTIAL
ADS / CANNON



You may be released at any time during the introductory period if it is determined that you are not suited for the work required. Once you have completed the introductory period successfully, you will be entitled to the benefits based on your employment status.

If you resign or are released during the introductory period, you will be required to reimburse Sunflower for the cost of any uniforms received, drug tests, or other employment costs.

*Robert Connor*



PLAINTIFF'S
EXHIBIT
2
PENGAD-Bayonne, N. J.

CONFIDENTIAL
ADS / CANNON
0033

# MEDICAL QUESTIONNAIRE
(To be completed after an offer of employment is extended.)

Name of employer _Robert Cannon_

Name of employee _Sunflower Waste_

Employee's Social Security no. _____    Height _6'5"_  Weight _162_

1. Do you now have, or have you ever had, any of the following?

| Yes | No | |
|---|---|---|
| ☐ | ☑ | Epilepsy (convulsions, seizures) |
| ☐ | ☑ | Diabetes (medication? ☐ Yes   ☐ No) |
| ☐ | ☑ | Cardiac (heart) disease |
| ☐ | ☑ | Meniscectomy (inflammation of cartilage of certain joints—e.g., knee) |
| ☐ | ☑ | Amputation of foot, leg, arm or hand |
| ☐ | ☑ | Total loss of sight of one or both eyes, or a partial loss of corrected vision of more than 75% bilaterally |
| ☐ | ☑ | Polio (poliomyelitis) |
| ☐ | ☑ | Cerebral palsy |
| ☐ | ☑ | Multiple sclerosis |
| ☐ | ☑ | Parkinson's disease |
| ☐ | ☑ | Patellectomy (surgically removed kneecap) |
| ☐ | ☑ | Ruptured cruciate ligament (knee ligament) |
| ☐ | ☐ | Hemophilia |
| ☐ | ☐ | Chronic osteomyelitis (infection in bone) |

| Yes | No | |
|---|---|---|
| ☐ | ☑ | Surgical or spontaneous fusion of a major weight-bearing joint (frozen joint) |
| ☐ | ☑ | Hyperinsulinism |
| ☐ | ☑ | Muscular dystrophy |
| ☐ | ☑ | Thrombophlebitis |
| ☐ | ☑ | Herniated intervertebral disk |
| ☐ | ☑ | Surgical removal of an intervertebral disk, or spinal fusion |
| ☐ | ☑ | Total deafness |
| ☐ | ☑ | One or more back or neck injuries or a disease process of the back or neck, substantiated by a doctor's opinion and resulting in disability over a total of 120 or more days |
| ☐ | ☑ | Obesity (30% overweight) |
| ☐ | ☑ | Other _____ |
| | | _____ |
| | | _____ |

2. Have you previously received workers' compensation for an on-the-job injury?  ☐ Yes  ☑ No  If yes, please write why, when and where.*

3. Have you ever received a disability rating or had one assigned to you by an insurance company or state/federal agency?  ☐ Yes  ☑ No
   If yes, state percentage: _____%.

4. Have you ever injured or sprained your back?  ☐ Yes  ☑ No  If yes, did you have surgery?  ☐ Yes  ☐ No   If yes, please give details.*

5. Have you ever injured or sprained your neck?  ☐ Yes  ☑ No  If yes, did you have surgery?  ☐ Yes  ☐ No   If yes, please give details.*

6. Have you ever injured or sprained a knee?  ☐ Yes  ☑ No  If yes, did you have surgery?  ☐ Yes  ☐ No   If yes, please give details.*

7. Have you ever had any other type of surgery not mentioned above?  ☐ Yes  ☑ No   If yes, please give details.*

8. Do you have arthritis?  ☐ Yes  ☑ No  If yes, what parts of the body are affected?* _____
   Are you on medication for arthritis?  ☐ Yes  ☑ No

*The information on this form shall not be used to discriminate against a qualified individual with a disability because of the existence of the disability in regard to the following: job application procedures; hiring, advancement or discharge of the employee; employee compensation; job training; and other terms, conditions and privileges of employment.*

*...der penalty of perjury, I declare that I have read the foregoing and that the facts alleged are true to the best of my knowledge and belief.*

Employee's signature _Robert Joe Cannon_    Date _1-22-07_

Employer's signature _____    Position _____    Date _1/22/07_

* Please use another sheet to give further explanation and details.

CONFIDENTIAL
ADS / CANNON
00154

# MEDICAL RELEASE

This authorization, or photocopy thereof, will authorize you to give
_____ or its representative all information you have regarding my condition while under your observation or treatment, including the history obtained, X-ray and physical findings, diagnosis and prognosis.

Signature: _Robert J. Cannon_ SSN: _____ Date: _1-22-07_
(Injured person)

Witness: _Russell Watts_ _____ Date: _1/22/07_

FS 440.105

An injured employee or any other party making a claim under this chapter shall provide his or her personal signature attesting that he or she has reviewed, understands and acknowledges the following statement: Any person who, knowingly and with intent to injure, defraud, or deceive any employer or employee, insurance company, or self-insured program, files a statement of claim containing any false or misleading information commits insurance fraud, punishable as provided in s. 817.234. If the injured employee or other party refuses to sign the document attesting that he or she has reviewed, understands and acknowledges the statement, benefits or payments under this chapter shall be suspended until such signature is obtained.

_Complete this form and send it to:_

CONFIDENTIAL
ADS / CANNON
0035

CONFIDENTIAL
ADS / CANNON
4016

FORM

# A-4 REV. 3/2007

ALABAMA DEPARTMENT OF REVENUE

## Employee's Withholding Exemption Certificate

FULL NAME _Robert James Pollock_

HOME ADDRESS _____ SOCIAL SECURITY NO. _____

CITY _____ STATE _AL_ ZIP CODE _____

If you had no Alabama income tax liability last year and you anticipate no Alabama income tax liability this year, you may claim "exempt" from Alabama withholding tax. To claim exempt status, check the block below, sign and date this form and file it with your employer. Employees claiming exempt status are not required to complete Lines 1–6.

See instructions on the back of Form A-4 before checking this box........ ☐

**HOW TO CLAIM YOUR WITHHOLDING EXEMPTIONS**

1. If you claim no personal exemption for yourself, write the figure "0", sign and date the bottom of Form A-4 (Note: If you claim no personal exemption you cannot claim dependent exemptions on Line 4). ................

2. IF YOU ARE SINGLE or MARRIED FILING SEPARATELY a $1,500 personal exemption is allowed.
   (a) If you are SINGLE and claim personal exemption for yourself ($1,500) write the letter "S"
   (b) If you are MARRIED FILING SEPARATELY and claim personal exemption for yourself ($1,500) write the letter "S" ..........

3. IF YOU ARE MARRIED or SINGLE CLAIMING HEAD OF FAMILY, a $3,000 personal exemption is allowed.
   (a) If you are MARRIED and claim exemption for both yourself and your spouse ($3,000), write the letters "MS"
   (b) If you are MARRIED and claim personal exemption for yourself only ($3,000), write the letter "M" ........ _M_
   (c) If you are single with dependents and claim HEAD OF FAMILY exemption ($3,000), write the letter "H"

4. If you are married and wish to withhold at the higher single rate ($1,500), write the letter "S" ........

5. Additional amount, if any, you want deducted each pay period. If during the year you will provide more than one-half of the support of persons closely related to you (other than spouse) write the number of such dependents ................ $ _3_

   THIS LINE TO BE COMPLETED BY EMPLOYER:

6. TOTAL EXEMPTIONS (Example: Employee claims "M" on Line 3 and "1" on Line 4. Employer should use column headed M-1 in the Withholding Tables.) ....... $ _5_

DATE _1-22-07_ SIGNED _Robert J. Pollock_

# Form W-4 (2007)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2007 expires February 16, 2008. See Pub. 505, Tax Withholding and Estimated Tax.

**Note.** You cannot claim exemption from withholding if (a) your income exceeds $850 and includes more than $300 of unearned income (for example, interest and dividends) and (b) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the Personal Allowances Worksheet below. The worksheets on page 2 adjust your withholding allowances based on

itemized deductions, certain credits, adjustments to income, or two-earner/multiple job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the Personal Allowances Worksheet below. See Pub. 919, How Do I Adjust My Tax Withholding, for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax

for Individuals. Otherwise, you may owe additional tax. If you have pension or annuity income, see Pub. 919 to find out if you should adjust your withholding on Form W-4 or W-4P.

**Two earners/Multiple jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2007. See Pub. 919, especially if your earnings exceed $130,000 (Single) or $180,000 (Married).

---

## Personal Allowances Worksheet (Keep for your records.)

**A** Enter "1" for yourself if no one else can claim you as a dependent . . . . . . . . . . . . . . . . **A**

**B** Enter "1" if:
- You are single and have only one job; or
- You are married, have only one job, and your spouse does not work; or
- Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less.

**B** M

**C** Enter "1" for your spouse. But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . **C**

**D** Enter number of dependents (other than your spouse or yourself) you will claim on your tax return . . . **D**

**E** Enter "1" if you will file as head of household on your tax return (see conditions under Head of household above) . **E**

**F** Enter "1" if you have at least $1,500 of child or dependent care expenses for which you plan to claim a credit . **F**
(Note. Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.)

**G** Child Tax Credit (including additional child tax credit). See Pub 972, Child Tax Credit, for more information.
- If your total income will be less than $57,000 ($85,000 if married), enter "2" for each eligible child.
- If your total income will be between $57,000 and $84,000 ($85,000 and $119,000 if married), enter "1" for each eligible child plus "1" additional if you have 4 or more eligible children.

**G** 3

**H** Add lines A through G and enter total here. Note. This may be different from the number of exemptions you claim on your tax return.) ▶ **H**

For accuracy, complete all worksheets that apply.
- If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the Deductions and Adjustments Worksheet on page 2.
- If you have more than one job or are married and you and your spouse both work and the combined earnings from all jobs exceed $40,000 ($25,000 if married) see the Two-Earners/Multiple Jobs Worksheet on page 2 to avoid having too little tax withheld.
- If neither of the above situations applies, stop here and enter the number from line H on line 5 of Form W-4 below.

---

Cut here and give Form W-4 to your employer. Keep the top part for your records.

---

Form **W-4**

Department of the Treasury
Internal Revenue Service

## Employee's Withholding Allowance Certificate

▶ Whether you are entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS.

OMB No. 1545-0074

**2007**

**1** Type or print your first name and middle initial. _Robert J._   Last name _CANNON_   **2** Your social security number

Home address (number and street or rural route)

**3** ☐ Single ☑ Married ☐ Married, but withhold at higher Single rate.
Note. If married, but legally separated, or spouse is a nonresident alien, check the "Single" box.

City or town, state, and ZIP code

**4** If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a replacement card. ▶ ☐

**5** Total number of allowances you are claiming (from line H above or from the applicable worksheet on page 2)   **5**

**6** Additional amount, if any, you want withheld from each paycheck   **6** $

**7** I claim exemption from withholding for 2007, and I certify that I meet both of the following conditions for exemption.
- Last year I had a right to a refund of all federal income tax withheld because I had no tax liability and
- This year I expect a refund of all federal income tax withheld because I expect to have no tax liability.
- If you meet both conditions, write "Exempt" here   **7**

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct, and complete.

Employee's signature
(Form is not valid unless you sign it.) ▶ _Robert J. Cannon_   Date ▶ _1-22-07_

**8** Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.)   **9** Office code (optional)   **10** Employer identification number (EIN)

For Privacy Act and Paperwork Reduction Act Notice, see page 2.   Cat. No. 10220Q   Form **W-4** (2007)

CONFIDENTIAL
ADS / CANNON
0037

Sunflower Waste, LLC.
Sunflower Landfill, LLC.
New Employee Information Sheet

Social Security Number:
Employee Name:
Employee Address: _Robert J. Cannon_____

City:
State:
Zip Code:
Phone #

Department:
FEL, ROL, RES, Landfill, G&A    _RES_

Pay Rate:    _$125.00_
Frequency:    _per Day_

Direct Deposit Information:
Bank Name:
Routing Transit Number:
Account Number:

CONFIDENTIAL
ADS / CANNON
0038

**Form 8850**
(Rev. October 2002)
Department of the Treasury
Internal Revenue Service

# Pre-Screening Notice and Certification Request for the Work Opportunity and Welfare-to-Work Credits

▶ See separate instructions.

OMB No. 1545-1500

Job applicant: Fill in the lines below and check any boxes that apply. Complete only this side.

Your name _____    Social security number ▶ _____

Street address where you live _____

City or town, state, and ZIP code _____

Telephone number    (      )

If you are under age 25, enter your date of birth (month, day, year) ____/____/____

## Work Opportunity Credit

1 ☐ Check here if you received a conditional certification from the state employment security agency (SESA) or a participating local agency for the work opportunity credit.

2 ☐ Check here if any of the following statements apply to you.

  • I am a member of a family that has received assistance from Temporary Assistance for Needy Families (TANF) for any 9 months during the last 18 months.

  • I am a veteran and a member of a family that received food stamps for at least a 3-month period within the last 15 months.

  • I was referred here by a rehabilitation agency approved by the state or the Department of Veterans Affairs.

  • I am at least age 18 but not age 25 or older and I am a member of a family that:

    a Received food stamps for the last 6 months or

    b Received food stamps for at least 3 of the last 5 months, but is no longer eligible to receive them.

  • Within the past year, I was convicted of a felony or released from prison for a felony and during the last 6 months I was a member of a low-income family.

  • I received supplemental security income (SSI) benefits for any month ending within the last 60 days.

## Welfare-to-Work Credit

3 ☐ Check here if you received a conditional certification from the SESA or a participating local agency for the welfare-to-work credit.

4 ☐ Check here if you are a member of a family that:

  • Received TANF payments for at least the last 18 months, or

  • Received TANF payments for any 18 months beginning after August 5, 1997, and the earliest 18-month period beginning after August 5, 1997, ended within the last 2 years, or

  • Stopped being eligible for TANF payments within the last 2 years because Federal or state law limited the maximum time those payments could be made.

## All Applicants

Under penalties of perjury, I declare that I gave the above information to the employer on or before the day I was offered a job, and it is, to the best of my knowledge, true, correct, and complete.

Job applicant's signature ▶ _____    Date ____/____/____

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 22051R    Form 8850 (Rev. 10-02)

CONFIDENTIAL
ADS / CANNON
0030

Form 8850 (Rev. 10-03)

Page 2

## For Employer's Use Only

Employer's name _____  Telephone no. ( )___  EIN ▶ _____

Street address _____

City or town, state, and ZIP code _____

Person to contact, if different from above _____  Telephone no. ( )___

Street address _____

City or town, state, and ZIP code _____

If, based on the individual's age and home address, he or she is a member of group 4 or 6 (as described under Members of Targeted Groups in the separate instructions), enter that group number (4 or 6) ▶ _____

| Date applicant: | Gave information | Was offered job | Was hired | Started job |
|---|---|---|---|---|
| | / / | / / | / / | / / |

Under penalties of perjury, I declare that I completed this form on or before the day a job was offered to the applicant and that the information I have furnished is, to the best of my knowledge, true, correct, and complete. Based on the information the job applicant furnished on page 1, I believe the individual is a member of a targeted group or a long-term family assistance recipient. I hereby request a certification that the individual is a member of a targeted group or a long-term family assistance recipient.

Employer's signature ▶ _____  Title _____  Date / /

## Privacy Act and Paperwork Reduction Act Notice

*Section references are to the Internal Revenue Code.*

Section 51(d)(12) permits a prospective employer to request the applicant to complete this form and give it to the prospective employer. The information will be used by the employer to complete the employer's Federal tax return. Completion of this form is voluntary and may assist members of targeted groups and long-term family assistance recipients in securing employment. Routine uses of this form include giving it to the state employment security agency (SESA), which will contact appropriate sources to confirm that the applicant is a member of a targeted group or a long-term family assistance recipient. This form may also be given to the Internal Revenue Service

for administration of the Internal Revenue laws, to the Department of Justice for civil and criminal litigation, to the Department of Labor for oversight of the certifications performed by the SESA, and to cities, states, and the District of Columbia for use in administering their tax laws. In addition, we may disclose this information to Federal, state, or local agencies that investigate or respond to acts of threats of terrorism or participate in intelligence or counterintelligence activities concerning terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file this form will vary depending on individual circumstances. The estimated average time is:

Recordkeeping . . . . . . . 3 hr., 46 min.
Learning about the law
or the form . . . . . . . . 36 min.
Preparing and sending this form
to the SESA . . . . . . . . 36 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making this form simpler, we would be happy to hear from you. You can write to the Tax Forms Committee, Western Area Distribution Center, Rancho Cordova, CA 95743-0001.

Do not send this form to this address. Instead, see When and Where To File in the separate instructions.

Form 8850 (Rev. 10-03)

CONFIDENTIAL
ADS / CANNON
0040

# ADVANCED DISPOSAL SERVICES
## SEAT BELT POLICY

### TALLASSEE
Location

### 10-13-2003
Effective Date of this Policy

Seat belts save lives and prevent injuries. More than one-third of all occupational fatalities are the result of motor vehicle accidents. Many of those lives would have been saved had the vehicle occupants been wearing a seat belt.

- All occupants of automobiles, pick-ups, service vehicles or any other vehicles under 10,000 GVW, operated on or for company business, must be restrained by an effective safety seat belt system.
- All occupants of route vehicles in excess of 10,000 GVW are required to wear an effective safety belt system while driving to and from their route, to and from the disposal facility, and, to and from the facility location.
- All powered industrial vehicle and heavy equipment operators are required to wear an effective safety seat belt system.

_____
Employee Signature

_____1-22-09_____
Date

CONFIDENTIAL
ADS / CANNON
0041

# JOB DESCRIPTION

| Title: | |
|---|---|
| Job Description: | |
| Typical Work Conditions: | |
| Equipment Used: | |
| Knowledge/Training: | |
| Key Tasks: | |

## PHYSICAL DEMAND SUMMARY

| Activity | Frequency | | | | | Activity | Frequency | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Lift/Carry | N | O | F | C | | | N | O | F | C |
| 10 lbs or less | | | | | | Twist/Turn | | | | |
| 11-20 lbs | | | | | | Climb | | | | |
| 21-50 lbs | | | | | | Crawl | | | | |
| 51-100 lbs | | | | | | Reach above Shoulder | | | | |
| 100 + lbs | | | | | | Reach Outward | | | | |
| Push/Pull | | | | | | Handling/Fingering | | | | |
| 12 lbs or less | | | | | | Stand/Walk | | | | |
| 13-25 lbs | | | | | | Sit | | | | |
| 26-40 lbs | | | | | | Drive: | | | | |
| 41-100 lbs | | | | | | Automatic | | | | |
| Bend | | | | | | Standard | | | | |
| Squat/Kneel | | | | | | | | | | |
| | | | | | | Type/Keypunch | | | | |

Key:   N = Never    O = Occasional    F = Frequent    C = Constant

CONFIDENTIAL
ADS / CANNON
0042

Employee: _____ Claim: _____ Date _____

Fund Member: _____ Prepared by: _____

### JOB SPECIFICATIONS

Job Title _____ Full time _____ Part-Time _____

Work Setting _____

Tools, Equipment, Machines Used _____

Special Equipment Used _____

### PHYSICAL ACTIVITIES (To be filled out by Employer or Employer Representative)

| Upper Extremities | Yes | No | Physical Activities On a daily basis | Yes | No |
|---|---|---|---|---|---|
| Reach Overhead | ____ | ____ | Standing | | |
| Reach Forward | ____ | ____ | Sitting | ____ | ____ |
| Push/Pull | ____ | ____ | Balancing | ____ | ____ |
| Handling/Fingering | ____ | ____ | Climb Stairs | ____ | ____ |
| **Torso and Lower Extremities** | | | | ____ | ____ |
| Kneeling | ____ | ____ | Climb, Other | | |
| Crawling | ____ | ____ | Walk/ Other | ____ | ____ |

**Lifting and Carrying**

_____ 10 lbs _____ 20 lbs _____ 50 lbs

| Stooping | ____ | ____ | | | |
|---|---|---|---|---|---|
| Twisting | ____ | ____ | **Lifting Only** | | |
| Squatting | ____ | ____ | | | |

_____ 10 lbs _____ 20 lbs _____ 50 lbs

COMMENTS: _____

_____

Wages _____ Work Hours _____

Check below if either option applies:

_____ This job could be modified.

_____ Another position could be available.

Signature _____ Date _____

Title _____ Company _____

\GC-F-8

CONFIDENTIAL
ADS / CANNON
0043

# DRIVER BONUS PLAN

- $1200.00 Annual Bonus
- Employee Eligibility
    1. Must be employed at end of bonus period
    2. Must meet all probation requirements
    3. Must attend all safety meetings

- Penalties and Deductions
    1. Tardiness & Excessive absents - $20.00
    2. No more than 3 miss/pickups in a week -$10.00
    3. Must past truck inspections - $50.00
    4. No Accidents or Injuries – cost of Accident – Cost
    5. No call / No show - $100.00 per day
    6. Clean behind blade - $50.00
    7. Paperwork must be completed daily (Route sheets, VCR's, Coversheets, Etc) - $25.00
    8. Write ups for Disciplinary Actions - $200.00
    9. Suspension - $250.00
    10. Truck Abuse – Cost of repairs
    11. Must wear uniforms daily - $100.00

**MANAGEMENT RESERVES THE RIGHT TO OVERRIDE ANY POLICY**

*Robert Cannon*
PRINT NAME

*Robert Cannon*
EMPLOYEE SIGN

*1-31-07*
DATE

*Russell Holt*
MANAGER SIGN

CONFIDENTIAL
ADS / CANNON
0044

FEB-12-2007 MON 11:04 AM        FAX NO.                    P. 03

# Opelika Housing Authority

P.O. Box 786
Opelika, Alabama 36801
(334)745-2250
Please Fax to (334)745-6793

## WAGE VERIFICATION

Name: __Robert Cannon__                    Soc. Sec. No.: _____

Address: _____                    Date: __2|12|07__

To Whom It May Concern:

The above applicant/resident is requesting rental assistance from our agency and has given your name as an employer. Regulations governing eligibility and rental rate determination require positive employer income verification. Your prompt reply to the information requested below will be greatly appreciated and will, of course, be treated as confidential. Your cooperation in this matter will not only benefit your employee, but will assist this Authority in the eligibility process.

Yours very truly,                    I authorize the release of this information
                                     to the Opelika Housing Authority.

_Jennifer Barnes_                    _Robert Cannon_
Eligibility Specialist                Applicant/Resident

1.  Employed since: __1-23-2007__  Occupation: __Driver__

2.  Is job: ☑Permanent  ☐ Temporary  ☐ Seasonal (From_____ To_____)

3.  Salary Base Rate Per Hour: $ __6 25.00__   Pay Period: ☑Weekly  ☐ Biweekly  ☐ Monthly
    Please indicate average number of hours worked per week __40__

4.  Total gross earning for these periods:
    From_____ Through __1-27-07__ $ __500.00__
    From_____ Through __2-9-07__ $ __651.01__
    From_____ Through_____ $_____

5.  Estimate Gross Earning for the next 12 months_____. If impossible, to give this figure, please state reason:
    __625.00 × 12 = 7500.00__

    Any other compensation not included above (specify for overtime, commissions, Meals, tips, etc.)

6.  Is employee entitled to receive vacation with pay? ☑Yes ☐No  __after 1 yr Anniversary__
    Number of days per year: __5__

7.  Please indicate the days and hours this employee works:
    Ⓜ Ⓣ Ⓦ Ⓣh Ⓕ S  Su  Hours: From __5:00__ (AM)PM  TO __4:00__ AM(PM)
    Other:_____

REMARKS (Tenure of job, etc.)

Firm Name: __Sunflower Waste__        Signed: __Sherry Beasley__

Phone no: __334-252-0458__            Date: __2-12-07__

CONFIDENTIAL
ADS / CANNON
0045

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                          Case No. 06-81093-WRS
                                               Chapter 13
ROBERT CANNON


Soc. Sec. No.

                    Debtor.


                    INCOME WITHHOLDING ORDER

TO:  SUNFLOWER WASTE
     ATTN PAYROLL
     P O BOX 781150
     TALLASSEE AL  36078

     The debtor  subjected all  of his  income,  including  future
earnings and wages, to the jurisdiction  of this Court by filing a
case  under  Chapter  13 of the  United  States  Bankruptcy  Code.
It is hereby

     ORDERED that SUNFLOWER WASTE withhold from the
wages,  earnings,  or other  income  of this debtor  the  sum  of
$90.00 weekly and remit all such funds withheld to:

                    CHAPTER 13 TRUSTEE
                    06-81093 ROBERT CANNON
                    P O BOX 830529
                    BIRMINGHAM AL  35283

     The wages, earnings,  or other income  withheld in compliance
with this  Order  should  be  remitted  to  the  Trustee  no  less
frequently than each month.

     This Order continues in force  and effect until further Order
of this Court.

     Done this 07th day of February, 2007.

                              *Original is Signed*
                              WILLIAM R SAWYER
                              United States Bankruptcy Judge


cc: Debtor
    Debtor's Attorney



SUNFLOWER WASTE                        Soc. Sec. No.  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
ATTN PAYROLL
P O BOX 781150
TALLASSEE AL  36078                          CONFIDENTIAL
                                             ADS / CANNON
                                                0046

EMPLOYER:    SUNFLOWER WASTE

ROBERT CANNON _____        06-81093-WRS
Name                                              Case Number

Please complete the form below and fax it to (334)262-8599 or mail
it to:
                Chapter 13 Trustee
                P O Box 173
                Montgomery AL  36101-0173

The above address is for correspondence only, all payments need to
be sent to the address on the front of the Income Withholding Order.

[✓] The above named is employed by me and the wages will be remitted
    at least once a month.

[ ] The above named is not employed by me.

[ ] He or she left our employ approximately: _____

[ ] He or she, after leaving us, may be employed by: _____

_____   _____
New Employer                          Address

                                      Company Name  Sunflower Waste
_____   Address       PO Box 987150
Signature                                           Tallassee, AL 36078

Date  2-8-07 _____

CONFIDENTIAL
ADS / CANNON
0047

Advanced
Disposal

## VACATION/ABSENCE REQUEST FORM

_Robert Cannon_                                    _Tallassee_

EMPLOYEE NAME                                      LOCATION

_____ VACATION

FIRST CHOICE:

FROM THE DATE OF ___2-6-07___ THROUGH ___2-6-07___

RETURNING TO WORK ON ___2-7-07___

SECOND CHOICE:

FROM THE DATE OF _____ THROUGH _____

RETURNING TO WORK ON _____

_____ OTHER ABSENCE

_____ SICK                    _____ JURY DUTY

_____ BEREAVEMENT             _____ DISCIPLINE

_____ PERSONAL DAY            _____ OTHER

_____ PAID ABSENCE            ✓ UNPAID ABSENCE

COMMENTS: _____

_____

_____

EMPLOYEE'S SIGNATURE: _____  DATE: _____

MANAGER'S SIGNATURE _____  DATE: _2-12-07_

* Copy to be sent to Human Resources Department in Jacksonville, Florida

CONFIDENTIAL
ADS / CANNON
0048

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                    Case No. 06-81093-WRS
                                         Chapter 13
ROBERT CANNON


Soc. Sec. No.

            Debtor.


AMENDED INCOME WITHHOLDING ORDER

TO:  SUNFLOWER WASTE
     ATTN PAYROLL
     P O BOX 781150
     TALLASSEE AL  36078

    The debtor subjected all of his income, including future
earnings and wages, to the jurisdiction of this Court by filing a
case under Chapter 13 of the United States Bankruptcy Code.
It is hereby

    ORDERED that SUNFLOWER WASTE withhold from the
wages, earnings, or other income of this debtor the sum of
$100.00 weekly and remit all such funds withheld to:

            CHAPTER 13 TRUSTEE
            06-81093 ROBERT CANNON
            P O BOX 830529
            BIRMINGHAM AL  35283

    The wages, earnings, or other income withheld in compliance
with this Order should be remitted to the Trustee no less
frequently than each month.

    This Order continues in force and effect until further Order
of this Court.

    Done this 15th day of February, 2007.

                            *Original is Signed*
                            WILLIAM R SAWYER
                            United States Bankruptcy Judge

cc: Debtor
    Debtor's Attorney


SUNFLOWER WASTE                    Soc. Sec. No.  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
ATTN PAYROLL
P O BOX 781150
TALLASSEE AL  36078                CONFIDENTIAL
                                   ADS / CANNON
                                   0049

EMPLOYER:    SUNFLOWER WASTE

ROBERT CANNON
Name

06-81093-WRS
Case Number

Please complete the form below and fax it to (334)262-8599 or mail it to:

Chapter 13 Trustee
P O Box 173
Montgomery AL  36101-0173

The above address is for correspondence only, all payments need to be sent to the address on the front of the Income Withholding Order.

[✓] The above named is employed by me and the wages will be remitted at least once a month.

[ ] The above named is not employed by me.

[ ] He or she left our employ approximately: _____

[ ] He or she, after leaving us, may be employed by: _____

New Employer

Address

_Signature_

Company Name   Sunflower Waste
Address   PO Box 78150
          Tallassee, AL 36078

Date  3-2-07

CONFIDENTIAL
ADS / CANNON
0050

# OPELIKA HOUSING AUTHORITY



**1706 Toomer Street**
**P. O. Box 786**
**Opelika, Alabama 36803-0786**
**Telephone: (334) 745-4171  Fax:  (334) 745-6783**
**www.opelikaha.org**

opelikaha@opelikaha.org

## FACSIMILE COVER SHEET

FROM!  Rebecca BROONER

To:  Ms Sherry Beasley

With:  Sunflower Waste

Phone #

Fax #:  334 - 283 - 2670

Comments: Ms. Beasley, I know you fixed the job termination for Mr. Cannon. However I can not find the form. Could you please fax again? I need the form for auditing purposes.
Thanks,
Jennifer Barnes

If there is no inconvenience please respond back as soon as possible.
Thank You for Your Cooperation and Have a Great Day.

TO!

From: Jennifer Barnes

PHA Representative

If you have any Question please fill free to contact me at the number above at ext __24__

Total Number of Pages Faxed: __2__ (including cover sheet)

Date: __6/7/07__

CONFIDENTIAL
ADS / CANNON
0051

06/07/2007  16:05   3347456783                    OPELIKA HOUSING AUTH        PAGE  02/02

334-283-2670

**Opelika Housing Authority**
P.O Box 786
Opelika, Alabama 36801
(334)745-2250
Please Fax to (334)745-6783

## JOB TERMINATION VERIFICATION

Name: _Robert Cannon_

Address:                                    Soc. Sec. No.: _____

                                           Date: _3-12-07_

To Whom It May Concern:

The above named person is currently renting through our Public Housing Program. They have reported to us that your company no longer employs them. To make necessary changes we must have written verification of this information. Your promptly reply to the information requested below will be greatly appreciated. All information is kept confidential. Thanks for your cooperation in this matter.

Sincerely,                                 I authorize the release of this information to the O.H.A.

_J Barry_                                  _Robert Cannon_

Housing Authority Representative           Resident

1.   Employed Since _1-23-07_          Last date employee worked _3-9-07_

2.   Was employee ☒ terminated, ☐ laid off, or ☐ voluntarily quit?

     (a.)  If laid-off: Permanent or temporary? _____
     (b.)  If temporary, how long do you expect lay off to last? _____

3.   Date employee received last check _3-16-07_

Additional remarks:

_____

_____

_____

Firm Name: _Sunflower Waste, LLC_          Signed: _Rebecca S Broomer_

Phone No.: _334-252-0458_                   Date: _6/7/07_

CONFIDENTIAL
ADS / CANNON
0052



# OPELIKA HOUSING AUTHORITY

1706 Toomer Street
P. O. Box 786
Opelika, Alabama 36803-0786
Telephone: (334) 745-4171   Fax:  (334) 745-6783
www.opelikaha.org

opelikaha@opelikaha.org

## FACSIMILE COVER SHEET

From

To:    Ms. Shery Beasley

With :    Sunflower Waste

Phone #

Fax #:    334-283-2670

Comments:

If there is no inconvenience please respond back as soon as possible.
Thank You for Your Cooperation and Have a Great Day.

To
From:    _____

PHA Representative

If you have any Question please fill free to contact me at the number above at ext    24

Total Number of Pages Faxed:    2    (including cover sheet)

Date:    3/13/07

CONFIDENTIAL
ADS / CANNON
0053

334-283-2670

### Opelika Housing Authority
P.O Box 786
Opelika, Alabama 36801
(334)745-2250
Please Fax to (334)745-6783

## JOB TERMINATION VERIFICATION

Name: Robert Cannon

Address

Soc. Sec. No.: _____

Date: 3-12-07

To Whom It May Concern:

The above named person is currently renting through our Public Housing Program. They have reported to us that your company no longer employs them. To make necessary changes we must have written verification of this information. Your promptly reply to the information requested below will be greatly appreciated. All information is kept confidential. Thanks for your cooperation in this matter.

Sincerely,

_____
Housing Authority Representative

I authorize the release of this information to the O.H.A.

_____
Resident

1. Employed Since 1-23-2007    Last date employee worked 3-9-2007

2. Was employee ☒ terminated, ☐ laid off, or ☐ voluntarily quit?

   (a.) If laid-off: Permanent or temporary? _____
   (b.) If temporary, how long do you expect lay off to last? _____

3. Date employee received last check 3-16-07

Additional remarks: Terminated due to Violation of drug & Alcohol policy

Firm Name: Sunflower Waste, LLC    Signed: _____

Phone No.: 334-252-0458    Date: 3-13-07

CONFIDENTIAL
ADS / CANNON
0054

## EMPLOYEE DISCIPLINARY REPORT

EMPLOYEE NAME  Robert Cannon    DATE OF OFFENSE

POSITION  Driver    COMPANY LOCATION  Opelika

COMPANY NAME  Sunflower    DISTRICT  AL

The following disciplinary action was taken today and is to be made part of the official record of the above mentioned employee.

The Company views progressive discipline and the issuance of written disciplinary action as a constructive method of communicating to employees the importance of meeting the performance standards established by the Company. The Company believes that adherence to Company policies and procedures and exemplification of a positive work ethic by all employees is essential in creating a work environment that is satisfying, safe and productive.

The Company believes that progressive discipline is a mutually beneficial process for both employee and employer. It is the Company's intention to utilize this process, whenever practical, to identify deficiencies in job performance and provide direction to employees for taking corrective measures.

However, continued violation of Company policies could result in additional disciplinary action, leading up to and/or including termination. The Company recognizes there are certain offenses that, if committed by an employee, are serious enough to justify immediate discharge, thereby, superseding the progressive discipline process.

| | | |
|---|---|---|
| ☐ Verbal Documentation | ☐ 1st Written Warning | ☐ 2nd Written Warning in lieu of suspension    ☒ Termination |
| | | ☐ 2nd Written Warning with suspension without pay ____ day(s)    Attach Exit Interview |

Suspension - Designate Specific Dates  /  /  thru  /  /    Return to work on  /  /

| | | |
|---|---|---|
| ☐ 1. Unexcused absence | ☒ 11. Violation of company drug and alcohol policy | ☐ 17. Preventable accident |
| ☐ 2. Excessive tardiness/absence | | ☐ 18. Failure to wear personal safety equipment |
| ☐ 3. Abuse of lunch/break privileges | ☐ 12. Failure to maintain required driving credentials | ☐ 19. Destruction of company property |
| ☐ 4. Improper conduct | | ☐ 20. Reckless driving |
| ☐ 5. Dishonesty | ☐ 13. Substandard work/customer complaints | ☐ 21. Equipment abuse |
| ☐ 6. Insubordination | | ☐ 22. Violation of safety rules |
| ☐ 7. Failure to follow instructions | ☐ 14. Housekeeping (work area/assigned vehicle) | ☐ 23. Stealing/Unauthorized accounts |
| ☐ 8. Failure to report an accident | | ☐ 24. Salvaging |
| ☐ 9. Failure to report an injury | ☐ 15. Fighting | ☐ 25. Falsification of documents |
| ☐ 10. Leaving without permission | ☐ 16. Carelessness | ☐ 26. Other _____ |

Explain Violation: _____

_____

Corrective Measures To Be Taken By Employee: _____

_____

I have read this report and acknowledge receipt.

x_____    x_____Tony Dunlap____
Employee Signature    Employee refused to sign - witness signature

Employee Comments (continue on back of this form if necessary): _____

Issued By:  Danny C. Entist    Title  Resident Mgr    Date Issued  3/9/07
           Name

Reviewed By:  _____    Title  _____    Date Reviewed
           Name

MAR-09-2007 FRI 01:08 PM SUNFLOWER WASTE    FAX NO. 3342832670    P. 02/03



**Advanced Disposal**

## NOTICE OF TERMINATION

Date: _March 9, 2007_

To: _Robert Cannon_

You are hereby given notice that your employment with the company shall be terminated on _3/9/07_ _____, _____.

This action is necessary due to the following violations of company policies and/or work rules: _Violation Company Drug and Alcohol policy_

Your final paycheck shall be for the period ending _3/9/07_.

There shall be no severance pay since your termination was for just cause. Please contact _Sherry Beasley_ concerning insurance coverage or other accrued benefits to which you may be entitled.

We regret this action is necessary and wish you success in your future endeavors.

Sincerely,

_Danny C. [signature]_

CONFIDENTIAL
ADS / CANNON
0056

# ANN`DORA'S CUSTOM
# WROUGHT IRON

**504 B Fairview st.**
**Montgomery, Al. 36104**
Telephone: (334) 224-0591 Fax: (334) 242-2157

## FACSIMILE COVER SHEET

*From*

**To:** ~~Cherry~~ Sherry

**With:**

**Phone #**

**Fax #**

**Comments:** *Please fill out Information and Return*

**If there is no inconvenience please respond back as soon as possible.**
**Thank You for Your Cooperation and Have a Great Day.**

*To*

**From:**

**Total number of pages faxed:** _2_ **(including cover sheet)**
**Date** _4/2/07_

CONFIDENTIAL
ADS / CANNON
0057

PREVIOUS EMPLOYER INFORMATION REQUEST

FROM: ANN DORA'S
504 B FAIRVIEW ST
MONTGOMERY, AL 36104
334-224-0591 FAX 334-242-2157
CONTACT: ANTHONY FLOYD

PREVIOUS EMPLOYER
COMPANY: _Sun Flower Waste LLC_
STREET: _115 Herren Hill Rd._
CITY: _Tallassee  AL, 36078_
PHONE: 334 _252-0458_ FAX _283-2670_

THE PERSON NAMED BELOW HAS MADE APPLICATION FOR EMPLOYMENT AT ANN DORA'S AS A DRIVER. YOUR
NAME WAS GIVEN AS A PAST/PRESENT EMPLOYER. YOUR PROMPT ATTENTION AND RESPONSE WILL BE GREATLY
APPRECIATED.

APPLICANTS NAME _Robert Cannon_    DATE _3/28/07_
SOCIAL SECURITY #                   DRIVERS LICENSE#             STATE _AL_
**********************************************************************

ABOVE FILLED OUT BY APPLICANT

DATE OF EMPLOYMENT _1-23-07_ TO _3-9-07_ POSITION HELD _Res Driver_
INDICATE EQUIPMENT OPERATED: _✓_ STRAIGHT TRUCK _____ TRACTOR TRAILER
                                      TYPE OF TRAILER
TYPE OF DRIVING? _✓_ LOCAL _____ OVER THE ROAD
IN COMPLIANCE WITH 49 C.F.R. 382, WAS THIS APPLICANT SUBJECT TO FEDERAL ALCOHOL
& DRUG TESTING? _✓_ YES _____ NO
DID HE/SHE TEST POSITIVE ON DRUG TEST? _✓_ YES _____ NO ALCOHOL .04>? _____ YES _✓_ NO
IF YES, GIVE DATE AND EXPLAIN _3-9-07 / results came back in reference to pre-_
_employment testing – had to take 2 tests – 1st test had wrong SSN# on it_
HAS THIS PERSON, IN THE LAST 2 YEARS, HAD ANY DRUG OR ALCOHOL VIOLATIONS? _✓_ YES _____ NO _So we retested_
IF YES, EXPLAIN. ___ _See Above_

REASON FOR LEAVING _Terminated !_

WOULD YOU REHIRE? _____ YES _✓_ NO _____ IF NO, PLEASE EXPLAIN _Violation of drug + Alcohol_
_policy_

WAS THIS PERSON INVOLVED IN ANY ACCIDENTS? _____ YES _✓_ NO    IF SO, WHEN?

WAS ACCIDENT EMPLOYEES FAULT? _____ YES _____ NO  IF YES, EXPLAIN _N/A_

NAME OF PERSON SUPPLYING INFORMATION _Sherry Beasley_    TITLE _Office Manager_
SIGNATURE _Sherry Beasley_    DATE _4-2-07_

APPLICANT WAIVER
FORMER EMPLOYER: _____    DATE _____

I HEREBY AUTHORIZE YOU TO RELEASE THE ABOVE INFORMATION ALONG WITH ANY MEDICAL INFORMATION
THAT MIGHT AFFECT MY ABILITY TO PERFORM IN THE POSITION I HAVE APPLIED FOR.

APPLICANT'S SIGNATURE _Robert Cannon_    WITNESS _Bill Lucas_

Please Fax RESPONSE: 1-334-242-2157

CONFIDENTIAL
ADS / CANNON
0058

ALABAMA DEPARTMENT OF INDUSTRIAL RELATIONS
UNEMPLOYMENT COMPENSATION DIVISION

B241F

IMPORTANT NOTE: If your response is not received by 03/21/07 a determination may be made based solely on information furnished by the claimant.

    

# NOTICE OF CLAIM AND REQUEST FOR SEPARATION INFORMATION

JACKSON II DONWARD W ETAL
SUNFLOWER WASTE LLC
PO BOX 781150
TALLASSEE AL 36078-1150

Return to:

ADJUDICATION SUPPORT
ROOM 3438
649 MONROE STREET
MONTGOMERY, AL  36131
FAX NUMBER 334 353-1265

The individual identified below has filed a claim for Unemployment Compensation benefits.

1. CLAIMANT'S NAME:  CANNON/ROBERT J
2. SOCIAL SECURITY NO:
3. CLAIM DATE:  03/11/07
4. ACCT NUMBER:  0029512205

5. DATE MAILED:  03/13/07
6. EFFECTIVE DATE:  03/11/07
7. CALL-CENTER :  6001
8. TYPE OF CLAIM:  N-01

The claimant identified you as his/her last employer and alleges the reason for separation to be:

11    DISCH./DISHONEST OR CRIMINAL ACT/DRUG-RELDW 03/09/07

## EMPLOYER RESPONSE (INSTRUCTIONS FOR COMPLETION ON REVERSE)

9. Claimant's last day employed was  3-9-07
(If temporary layoff, enter expected date of recall: _____)

10. If the claimant earned wages or was paid vacation and/or sick pay or will receive a pension upon termination with you **on or after the date shown in item #6.** above, complete the applicable space(s) below:
   a. GROSS WAGES   for hours worked. **(AFTER DATE IN #6)**  $ _0_

   b. HOLIDAY $ _____ paid for which holiday ?_____

   c. VAC, SICK $_____ Was vacation pay for a specific time period following separation ?
   (circle one) Yes  No  If Yes what was the period ?_____ to _____

   d. WARN PAY $_____ paid for period _____ to _____

   e. PENSION $ _____ per month.  Effective date: _____

11. DISCHARGED. What was the date of the final incident that caused the discharge:  3-9-07

12.  WARNING FOR SAME OR SIMILAR INCIDENT :(CIRCLE ONE)  YES  NO  WARNING DATE: _____

13  QUIT: Date quit: _____  Reason for quit _____

14. REASON FOR SEPARATION: (ATTACH ADDITIONAL SHEET IF NECESSARY)
Violation of company drug & Alcohol policy

15. Enter your federal identification number:  59-3707144

CONFIDENTIAL
ADS / CANNON
0059

Sherry Beasley
Print Name

Office Mgr
Title

252-0458
Telephone No.

3-14-07
Date



March 26, 2007

Alabama Dept of Industrial Relations
Hearings & Appeals Division
649 Monroe Street
Montgomery, AL 36131

Re: Robert J Cannon

To Whom It May Concern:

This letter is to appeal the determination that this claimant is eligible for benefits. If you have any questions, please feel free to call me at 334-252-0458.

Sincerely,

Sherry Beasley
Office Manager
Sunflower Waste, LLC

CONFIDENTIAL
ADS / CANNON
0060

EN--8

ALABAMA DEPARTMENT OF INDUSTRIAL RELATIONS
UNEMPLOYMENT COMPENSATION AGENCY
MONTGOMERY, ALABAMA 36131



# EMPLOYER NOTICE OF DETERMINATION

EMPLOYER NO.0029512205

JACKSON II DONWARD W ETAL
SUNFLOWER WASTE LLC
PO BOX 781150
TALLASSEE AL 36078-1150

1. CLAIMANT'S NAME :           CANNON/ROBERT J                    8. DATE MAILED:      03/23/07
2. SOCIAL SECURITY NO                                             9. LOCAL OFFICE:     6001
3. BENEFIT YEAR BEGINS:        03/11/07                          10. TYPE OF CLAIM:    NEW
4. EFFECTIVE DATE:             03/11/07                          11. MAIL CODE:        9
5. WEEKLY BENEFIT AMOUNT:                  $230.00              12. CONTACT LINE:      800-361-4524
6. MAXIMUM BENEFIT AMOUNT :                $5977.00
7. BASE PERIOD:A FOUR QUARTER PERIOD
          BEGINNING QTR/YR      4/05

A DETERMINATION HAS BEEN MADE ON THIS CLAIM HOLDING THE CLAIMANT ELIGIBLE
FOR BENEFITS.

CONFIDENTIAL
ADS / CANNON
0061

SEE BACK OF THIS NOTICE FOR EXPLANATIONS OF MOST FREQUENT DISQUALIFICATIONS.

GHT TO APPEAL: This determination becomes final within 15 calendar days from date mailed unless appealed
ll appeals MUST be filed by a letter addressed to the Hearings and Appeals Division, 649 Monroe Street,
ontgomery, Al 36131, or by Fax to 334-242-2084. The appeal must be received within the prescribed time
hether filed by mail or fax. Should the last calendar day for filing an appeal fall on a Saturday, Sunday or
ate holiday or other office closing, the period is extended to the next business day.

NOTE: THIS NOTICE IS FOR YOUR RECORDS. IF YOU WRITE REGARDING THIS

AT-58



STATE OF ALABAMA
DEPARTMENT OF INDUSTRIAL RELATIONS
HEARINGS AND APPEALS DIVISION
MONTGOMERY, ALABAMA  36130

## DECISION ON UNEMPLOYMENT COMPENSATION CLAIM

**CLAIMANT**

ROBERT J CANNON

**EMPLOYER**

JACKSON II DONWARD W ETAL
SUNFLOWER WASTE LLC
PO BOX 781150
TALLASSEE AL 36078-1150

**APPELLANT** : EMPLOYER
**LOCATION** : MONTGOMERY
(TELEPHONE)
**OC NO.** : 00-74

**DATE MAILED** : 04/20/07
**CASE NO.** : 03502-AT-07
**S. S. NO.**
**HEARING DATE** : 04/13/07

**APPEARANCES AT THE HEARING:** Claimant and employer representative with observer

**ISSUE(S):** Whether the claimant was discharged or removed from work for a dishonest or criminal act committed in connection with work or for sabotage or an act endangering the safety of others or for the use of illegal drugs after previous warning or for the refusal to submit to or cooperate with a blood or urine test after previous warning. Section 25-4-78(3)(a) Code of Alabama 1975

Availability for work. Section 25-4-77(a)(3) Code of Alabama 1975

**FINDINGS:** This employer, with whom the claimant had most recent bona fide work, appealed an Examiner's determination on a claim for unemployment benefits.

The claimant worked for the listed employer as a CDL driver from January 23, 2007, until March 9, 2007. The employer requires a pre-employment drug test, which the claimant took on January 22, 2007, before beginning work the following day. Because the employer was in the process of changing medical review officers, the results were not returned immediately. When the manager noticed the misspelling of the claimant's name, although the social security number was correct, the manager then asked the claimant to take another drug test, which he did, on February 12, 2007. On that same day, approximately two hours later, the claimant went to his own doctor, took the drug test, and returned the results to the employer, showing that it was negative. The results of the second drug test completed by the employer were also negative. The employer has a drug policy, which has been in effect for at least seven years. The claimant received a copy of the policy. The employer falls under the Department of Transportation's regulations. All employees are subject to drug testing. Their doctor's office collects the specimen, which is then sent to the medical review officer for the results. The results of the pre-employment test were returned on March 6, 2007. The manager's supervisor instructed him to terminate the claimant, based upon the positive results of the first drug test taken, which he did on March 9, 2007.

**CONCLUSIONS:** Section 25-4-78(3)(a) of the Law requires a disqualification of an individual discharged or removed from work for a dishonest or criminal act committed in connection with work or for sabotage or an act endangering the safety of others or for the use of illegal drugs after previous

CONFIDENTIAL
ADS / CANNON
0062

FORM AA-4I
(REV. 6/06)

Conf #
30044469

STATE OF ALABAMA
DEPARTMENT OF INDUSTRIAL RELATIONS
HEARINGS AND APPEALS DIVISION
MONTGOMERY, ALABAMA 36131

NOTICE OF UNEMPLOYMENT COMPENSATION TELEPHONE HEARING

JACKSON II DONWARD W ETAL
SUNFLOWER WASTE LLC
PO BOX 781150
TALLASSEE AL                    36078-1150        PARTICIPANT ID: 0350202

                                                  CLAIM DATE :    03/11/07

                                                  DATE MAILED:    04/02/2007

CLAIMANT: ROBERT J CANNON                         CLAIMANT'S SSN:

EMPLOYER: JACKSON II DONWARD W ETAL               APPELLANT:      EMPLOYER

ADM HEARING OFR: JO ANN HOLDER                    CASE NO:        03502AT07

HEARING WILL BE HELD ON        APRIL 13, 2007     AT: 10:30 AM CDT


PLEASE READ THE IMPORTANT INFORMATION ON THE BACK OF THIS NOTICE

*INSTRUCTIONS FOR TELEPHONE HEARINGS:*
You have been granted a telephone hearing. You must immediately telephone the
Hearings and Appeals Divison and provide a telephone number where you may be
reached prior to the hearing. Call 1-800-321-9323. If you do not provide a telephone
number prior to the hearing the Hearing Officer will not call you. The use of a cell
phone is not suitable for a teleconference hearing.

*ISSUES:*
          SECTION 25-4-78(2) AND/OR 25-4-78(3) CODE OF
          ALABAMA 1975: WHETHER THE CLAIMANT LEFT THE MOST
          RECENT BONA FIDE WORK VOLUNTARILY WITHOUT GOOD
          CAUSE CONNECTED WITH SUCH WORK OR WAS DISCHARGED
          FOR MISCONDUCT CONNECTED WITH THE WORK.
          —
          —
          —

          DH

CONFIDENTIAL
ADS / CANNON
0063

5/29/07

Robert James Cannon

Start Date: 1/23/07
Termination Date: 3/9/07

If you need anything additional - please advise.

Becky Brooner

5/29/07
Faxed copy of drug test ID'd as Batch ID 20070202 to
Tom Davis 3:45 pm

CONFIDENTIAL
ADS / CANNON
0064

# SUNFLOWER WASTE LLC
## P.O. BOX 781150
## TALLASSEE, AL  36078-1150
### TOLL FREE (866) 252-0458
### FAX (334)283-2670

*Robert Cannon*

FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| TO: *Tom Davis* | FROM: *Van Forrester* |
| COMPANY: | DATE: *5/29/07* |
| FAX NUMBER: *904-493-3053* | TOTAL NO. OF PAGES INCLUDING COVER: *6* |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: | YOUR REFERENCE NUMBER: |

X URGENT    X FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

CONFIDENTIAL
ADS / CANNON
0065

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Acct # 03WT

Unit Code XAU038 DSW

**5T742560**  SPECIMEN ID NO.

A part of Quest Diagnostics
10101 Renner Blvd
Lenexa, KS 66219
(800) 728-4064

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.
ADVANCED DISPOSAL SVCS-SUNFLOWER
GER: TOM DAVIS
9905 GATE PARKWAY NORTH
JACKSONVILLE FL 32246
PH 904-493-7000 FAX 904-493-3053

B. MRO Name, Address, Phone and Fax No.
HORACIO MARAÑON, EMPLOYEE SCREE │ Ph 337-231-1816
P. O. BOX 82113
221 SOUTHPARK BLDG. B
LAFAYETTE LA 70598
Fx 337-769-1134

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☒ Pre-employment ☐ Random ☐ Reasonable Suspicion/Cause ☐ Post-Accident
☐ Return to Duty ☐ Follow-up ☐ Other (specify)

E. Drug Tests to be Performed: ☒ THC, COC, PCP, OPI, AMP. ☐ THC & COC Only ☐ Other (specify)

F. Collection Site Address:
TALLASSEE FAMILY CARE
715 HERREN HILL RD
TALLASSEE AL 36078

Collector Phone No. 3 3 9 - 2 8 3 - 4 7 7
Collector Fax No. 3 3 9 - 2 8 3 - 4 1 6 2

**STEP 2: COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F? ☒ Yes ☐ No, Enter Remark | Specimen Collection ☒ Split ☐ Single ☐ None Provided (Enter Remark) ☐ Observed (Enter Remark)

STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

REMARKS: NONE

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable Federal requirements.

Collector's Name (PRINT First, MI, Last)
JANET S BELLEW

Signature of Collector  X

Date of Collection 01-22-07 (MO) (DAY) (YR)
Time of Collection 02 99 ☐ AM ☒ PM

SPECIMEN BOTTLE(S) RELEASED TO:
DHL COURIER
Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB**
X
Signature of Accessioner

(PRINT) Accessioner's Name (First, MI, Last)    Date (Mo./Day/Yr.)

Primary Specimen Bottle Seal Intact ☐ Yes ☐ No, Enter Remark Below

SPECIMEN BOTTLE(S) RELEASED TO:

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X Signature of Donor
(PRINT) Donor's Name (First, MI, Last)
Date (Mo./Day/Yr.) 01-22-07

Daytime Phone No.    Evening Phone No.    Date of Birth (Mo.) (Day) (Yr.)

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you chose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification is:

☐ NEGATIVE ☐ POSITIVE ☐ TEST CANCELED ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE ☐ ADULTERATED ☐ SUBSTITUTED

REMARKS

X Signature of Medical Review Officer
(PRINT) Medical Review Officer's Name (First, MI, Last)
Date (Mo./Day/Yr.)

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED ☐ FAILED TO RECONFIRM - REASON

X Signature of Medical Review Officer
(PRINT) Medical Review Officer's Name (First, MI, Last)
Date (Mo./Day/Yr.)

CONFIDENTIAL
ADS / CANNON
0066

From: 3342832670    Page: 1/1    Date: 5/29/2007 4:37:18 PM

02/06/2007 13:10 FAX                                                    @002/002





3835 Jeffco Boulevard
Arnold, Missouri 63010
636/532.4099

**ATTENTION:**

Tom Davis
Advanced Disposal Services, Inc. - Dot          Participant: Robert Rannon
9798 Normandy Blvd                              Other ID:
Jacksonville, FL 32221                          SSN:

## Results of DOT Controlled Substance Test

| | |
|---|---|
| Record Status: Positive | Laboratory: Quest Diagnostics |
| Test Type: Pre-Employment | 506 E State Parkway |
| Collection Date/Time: 01/22/2007  2:48 PM | Schaumburg, IL 60173 |
| Batch ID: 20070202 | Collection Site: TALLASSEE FAMILY CARE |
| Specimen ID: 51742560 | 115 HERON HILL ROAD |
| Date COC Received: 01/22/2007 | TALLASSEE, AL  36078 |
| Sample Type: Urine | Specimen Collector: JANE B BELLEW |

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | POSITIVE |
| Marijuana | Negative | Phencyclidine | Negative |
| Opiates | Negative | | |

MRO UNABLE TO CONTACT
TEST IS POSITIVE:
COCAINE

_____                    2/2/2007
Horacio Marafioti M.D., MRO          Verification Date

                                     Feb 12, 2007

Results for Robert Rannon, Other ID:              Printed on 2/2/2007 at 6:59:42PM

CONFIDENTIAL
ADS / CANNON
0067





**St. Louis**
**MRO, Inc.**

3895 Jeffco Boulevard
Arnold, Missouri 63010
636/532.4099

**ATTENTION:**

Tom Davis
Advanced Disposal Services, Inc. - Dot
9798 Normandy Blvd
Jacksonville, FL  32221

Participant: Robert Ranhon
Other ID:
SSN:

### Results of DOT Controlled Substance Test



| | |
|---|---|
| Record Status: Positive | Laboratory: Quest Diagnostics |
| Test Type: Pre-Employment | 506 E State Parkway |
| Collection Date/Time: 01/22/2007  2:49 PM | Schaumburg, IL  60173 |
| Batch ID: 20070202 | Collection Site: TALLASSEE FAMILY CARE |
| Specimen ID: 51742560 | 115 HERON HILL ROAD |
| Date COC Received: 01/22/2007 | TALLASSEE, AL  36078 |
| Sample Type: Urine | Specimen Collector: JANE S BELLEW |

| Substance Tested | Result | | Substance Tested | Result |
|---|---|---|---|---|
| Amphetamines | Negative | | Cocaine | POSITIVE |
| Marijuana | Negative | | Phencyclidine | Negative |
| Opiates | Negative | | | |

**MRO UNABLE TO CONTACT**
**TEST IS POSITIVE:**
**C O C A I N E**

|  |  |
|---|---|
| | 2/2/2007 |
| Horacio Marafioti M.D. MRO | Verification Date |
| | feb 12, 2007 |

Results for Robert Ranhon, Other ID;

Printed on 2/2/2007 at 6:58:42PM

CONFIDENTIAL
ADS / CANNON
0068

03/28/2007  14:24  3347456783                    OPELIKA HOUSING AUTH                    PAGE  05/05
MAR-13-07   07:41AM  FROM-ST LOUIS MRO INC        0306322007                    T-812  P.001/001  F-323

ATTN:
— MS. Pullum

St. Louis
**MRO, Inc.**

THIS IS THE COMPANY DRUG SCREEN

3895 Jeffco Boulevard
Arnold, Missouri 63010
636/682.4099

**ATTENTION:**
Tom Davis
Advanced Disposal Services, Inc. - Dot
9780 Normandy Blvd
Jacksonville, FL 32221

Participant: Robert Cannon
Other ID:

### Results of DOT Controlled Substance Test

| | |
|---|---|
| Record Status: Negative | Laboratory: Quest Diagnostics |
| Test Type: Pre-Employment | 506 E State Parkway |
| Collection Date/Time: 02/12/2007 08:42 AM | Schaumburg, IL 60173 |
| Batch ID: 20070214 | Collection Site: TALLASSEE FAMILY CARE |
| Specimen ID: 6662214 | 119 HERON HILL ROAD |
| Date COC Received: 02/12/2007 | TALLASSEE, AL 36078 |
| Sample Type: Urine | Specimen Collector: JANE BELLEW |

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | Negative | Cocaine | Negative |
| Marijuana | Negative | Phencyclidine | Negative |
| Opiates | Negative | | |

Horacio Marafioti M.D. MRO

2/14/2007
Verification Date

CONFIDENTIAL
ADS / CANNON
0069

# REQUEST FOR CHECK OF DRIVING RECORD

**NOTE TO MOTOR CARRIER: SEE BACK SIDE FOR STATES THAT ACCEPT THIS FORM.**

ereby authorize you to release the following information to _SunFlower Waste_
(Prospective Employer)

for purposes of investigation as required by Sections 391.23 and 391.25 of the Federal Motor Carrier Safety Regulations. You are released from any and all liability which may result from furnishing such information.

_Robert G. Pannier_      _1-22-07_
(Applicant's Signature)        (Date)

In accordance with the provisions of Sections 604 and 607 of the **Fair Credit Reporting Act,** Public Law 91-508, as amended by the Consumer Credit Reporting Act of 1996 (Title II, Subtitle D, Chapter 1, of Public Law 104-208), I hereby certify the following:

1. The consumer (applicant) has authorized in writing the procurement of this report;
2. The consumer (applicant) has been informed in a separate written disclosure that a consumer report may be obtained for employment purposes;
3. The information requested below will be used for a "permissible purpose" (i.e., information for employment purposes) and will be used for no other purpose;
4. The information being obtained will not be used in violation of any federal or state equal opportunity law or regulation; and
5. Before taking an adverse action based in whole or in part on the report the consumer (applicant) will receive a copy of the requested report and the summary of consumer rights as provided with the report by the consumer reporting agency.

I also hereby certify that this report request and the above applicant's release notice meet the definition of "permissible uses" of state motor vehicle records under the provisions of the **Driver's Privacy Protection Act of 1994** (Public Law 103-322, Title XXX, Section 300002(a)).

(Signature of Requester)        (Date)

## DEAR SIR/MADAM:

☐ The following named person has made application with our company for the position of _____
_____ . In accordance with Section 391.23, Federal Department of Transportation Regulations, please furnish the undersigned with the applicant's driving record for the past three years.

☐ The following named person is employed with our company in the position of _____
_____ . In accordance with Section 391.25, Federal Department of Transportation Regulations, please furnish the undersigned with the employee's driving record for the past year.

NAME OF APPLICANT/DRIVER _____

ADDRESS _____
        (Number & Street)     (City)     (State)     (Zip Code)

FORMER ADDRESS _____
        (Number & Street)     (City)     (State)     (Zip Code)

DATE OF BIRTH _____ SSN _____ LICENSE NO. _____

### REQUESTED BY

(Name of Company)        (Typed Name)

(Address)        (Title)

(City)     (State)     (Signature)

**CONFIDENTIAL**
**ADS / CANNON**
**0070**

© Copyright 2005 J.J. KELLER & ASSOCIATES, INC.

MEDICAL EXAMINER'S CERTIFICATE

I certify that I have examined **Robert Cannon** in accordance with the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) and with knowledge of the driving duties, I find this person is qualified; and, if applicable, only when:

☐ wearing corrective lenses ☐ driving within an exempt intracity zone (49 CFR 391.62)
☐ wearing hearing aid ☐ accompanied by a Skill Performance Evaluation Certificate (SPE)
☐ accompanied by a _____ waiver/exemption ☐ qualified by operation of 49 CFR 391.64

The information I have provided regarding this physical examination is true and complete. A complete examination form with any attachment embodies my findings completely and correctly, and is on file in my office.

| SIGNATURE OF MEDICAL EXAMINER | TELEPHONE | DATE 1-22-07 |
|---|---|---|
| MEDICAL EXAMINER'S NAME (PRINT) Neelam Khan, MD | ☒ MD ☐ DO ☐ Chiropractor ☐ Physician Assistant ☐ Advanced Practice Nurse | |
| MEDICAL EXAMINER'S LICENSE OR CERTIFICATE NO./ISSUING STATE AL 27096 | | |
| SIGNATURE OF DRIVER Robert Cannon | DRIVER'S LICENSE NO. | STATE AL |
| ADDRESS OF DRIVER | | |
| MEDICAL CERTIFICATE EXPIRATION DATE Jan 22, 2008 | | |

MOTOR CARRIER COPY

SEPARATE MOTOR CARRIER COPY BEFORE REMOVING LINER FROM LAMINATE

CONFIDENTIAL
ADS / CANNON
0071

# Medical Examination Report

## FOR COMMERCIAL DRIVER FITNESS DETERMINATION

649-F (Rev. 10/03) (6045)

**Driver completes this section.**

| | |
|---|---|
| ☐ New Certification | Date of Exam |
| ☐ Recertification | 1-22-07 |
| ☐ Follow Up | |

**1. DRIVER'S INFORMATION**

Driver's Name (Last, First, Middle): Cannon, James

Address: _____

City, State, Zip Code: _____

Social Security No. _____

Work Tel: ( )

Home Tel: _____

Birthdate: _____

Age: 42

Sex: ☑ M  ☐ F

Driver License No. _____

License Class: ☑ A ☐ C  ☐ B  ☐ D  ☐ Other

Date of Issue: 1-22-07

State of Issue: AC

**2.** Driver completes this section, but medical examiner is encouraged to discuss with driver.

**Yes No** — Any illness or injury in the last 5 years?

| Yes | No | |
|---|---|---|
| ☐ | ☑ | Head/Brain injuries, disorders or illnesses |
| ☐ | ☑ | Seizures, epilepsy |
| | | ☐ medication |
| ☐ | ☑ | Eye disorders or impaired vision (except corrective lenses) |
| ☐ | ☑ | Ear disorders, loss of hearing or balance |
| ☐ | ☑ | Heart disease or heart attack; other cardiovascular condition |
| | | ☐ medication |
| ☐ | ☑ | Heart surgery (valve replacement/bypass, angioplasty, pacemaker) |
| ☐ | ☑ | High blood pressure  ☐ medication |
| ☐ | ☑ | Muscular disease |
| ☐ | ☑ | Shortness of breath |

| Yes | No | |
|---|---|---|
| ☐ | ☑ | Lung disease, emphysema, asthma, chronic bronchitis |
| ☐ | ☑ | Kidney disease, dialysis |
| ☐ | ☑ | Liver disease |
| ☐ | ☑ | Digestive problems |
| ☐ | ☑ | Diabetes or elevated blood sugar controlled by: |
| | | ☐ diet  ☐ pills  ☐ insulin |
| ☐ | ☑ | Nervous or psychiatric disorders, e.g., severe depression |
| | | ☐ medication |
| ☐ | ☑ | Loss of, or altered consciousness |

| Yes | No | |
|---|---|---|
| ☐ | ☑ | Fainting, dizziness |
| ☐ | ☑ | Sleep disorders, pauses in breathing while asleep, daytime sleepiness, loud snoring |
| ☑ | ☐ | Stroke or paralysis |
| ☐ | ☑ | Missing or impaired hand, arm, foot, leg, finger, toe |
| ☐ | ☑ | Spinal injury or disease |
| ☐ | ☑ | Chronic low back pain |
| ☐ | ☑ | Regular, frequent alcohol use |
| ☐ | ☑ | Narcotic or habit forming drug use |

For any YES answer, indicate onset date, diagnosis, treating physician's name and address, and any current limitation. List all medications (including over-the-counter medications) used regularly or recently.

I certify that the above information is complete and true. I understand that inaccurate, false or missing information may invalidate the examination and my Medical Examiner's Certificate.

Driver's Signature: _____

Date: 1-22-07

Medical Examiner's Comments on Health History (The medical examiner must review and discuss with the driver any "yes" answers and potential hazards of medications, including over-the-counter medications, while driving. This discussion must be documented below.)

CONFIDENTIAL
ADS / CANNON

# TESTING (Medical Examiner completes Section 3 through 7)

Name: Last: _Cannon_  First: _Robert_  Middle: _____

## 3. VISION

Standard: At least 20/40 acuity (Snellen) in each eye with or without correction. At least 70° peripheral in horizontal meridian measured in each eye. The use of corrective lenses should be noted on the Medical Examiner's Certificate.

**INSTRUCTIONS:** When other than the Snellen chart is used, give test results in Snellen-comparable values. In recording distance vision, use 20 feet as normal. Report visual acuity as a ratio with 20 as numerator and the smallest type read at 20 feet as denominator. If the applicant wears corrective lenses, these should be worn while visual acuity is being tested. If the driver habitually wears contact lenses, or intends to do so while driving, sufficient evidence of good tolerance and adaptation to their use must be obvious. Monocular drivers are not qu—

Numerical readings must be provided.

| ACUITY | UNCORRECTED | CORRECTED | HORIZONTAL FIELD OF VISION |
|---|---|---|---|
| Right Eye | 20/ | 20/25 | Right Eye | ° |
| Left Eye | 20/ | 20/25 | Left Eye | ° |
| Both Eyes | 20/ | 20/25 | | |

Complete next line only if vision testing is done by an ophthalmologist or optometrist

Date of Examination _____

Applicant can recognize and distinguish among traffic control signals and devices showing standard red, green, and amber colors?  ☑ Yes  ☐ No

Applicant meets visual acuity requirement only when wearing: ☑ Corrective Lenses

Monocular Vision: ☐ Yes  ☑ No

Name of Ophthalmologist or Optometrist (print) _____  Tel. No. _____  License No./State of Issue _____  Signature _____

## 4. HEARING

Standard: a) Must first perceive forced whispered voice ≥ 5 ft., with or without hearing aid, or b) average hearing loss in better ear ≤ 40 dB

**INSTRUCTIONS:** To convert audiometric test results from ISO to ANSI, -14 dB from ISO for 500 Hz, -10 dB for 1,000 Hz, -8.5 dB for 2,000 Hz. To average, add the readings for 3 frequencies tested and divide by 3.

☐ Check if hearing aid used for tests.  ☐ Check if hearing aid required to meet standard.

a) Record distance from individual at which forced whispered voice can first be heard.

| | Right Ear | Left Ear |
|---|---|---|
| | \Feet | \Feet |

b) If audiometer is used, record hearing loss in decibels. (acc. to ANSI Z24.5-1951)

Numerical readings must be recorded.

| | Right Ear | | | Left Ear | | |
|---|---|---|---|---|---|---|
| | 500 Hz | 1000 Hz | 2000 Hz | 500 Hz | 1000 Hz | 2000 Hz |
| | Average: | | | Average: | | |

## 5. BLOOD PRESSURE/PULSE RATE

Numerical readings must be recorded. Medical examiner should take at least two readings to confirm BP.

| Blood Pressure | Reading | Category | Expiration Date | Recertification |
|---|---|---|---|---|
| Systolic _148_  Diastolic _92_ | 140-159/90-99 | Stage 1 | 1 year | 1 year if ≤ 140/90. One-time certificate for 3 months if 141-159/91-99. |
| | 160-179/100-109 | Stage 2 | One-time certificate for 3 months. | 1 year from date of exam if ≤ 140/90 |
| | ≥ 180/110 | Stage 3 | 6 months from date of exam if ≤ 140/90 | 6 months if ≤ 140/90 |

Driver qualified if ≤ 140/90.

Pulse Rate: ☑ Regular  ☐ Irregular

Record Pulse Rate: _88_

## 6. LABORATORY AND OTHER TESTING FINDINGS

Urinalysis is required. Protein, blood or sugar in the urine may be an indication for further testing to rule out any underlying medical problem.

Other Testing (Describe and record)

Numerical readings must be recorded.

| URINE SPECIMEN | SP. GR. | PROTEIN | BLOOD | SUGAR |
|---|---|---|---|---|
| | 1.020 | Ø | Ø | Ø |

CONFIDENTIAL
ADS / CANNON
0073

7. PHYSICAL EXAMINATION

Height: 6'5" (in.)    Weight: 204 (lbs.)    Name: Last: Cullum    First: Robert    Middle:

The presence of a certain condition may not necessarily disqualify a driver, particularly if the condition is controlled adequately, is not likely to worsen or is readily amenable to treatment. Even if a condition does not disqualify a driver, the medical examiner may consider deferring the driver temporarily. Also, the driver should be advised to take the necessary steps to correct the condition as soon as possible particularly if the condition, if neglected, could result in more serious illness that might affect driving.

Check YES if there are any abnormalities. Check NO if the body system is normal. Discuss any YES answers in detail in the space below, and indicate whether it would affect the driver's ability to operate a commercial motor vehicle safely. Enter applicable item number before each comment. If organic disease is present, note that it has been compensated for.

See Instructions to the Medical Examiner for guidance.

| BODY SYSTEM | CHECK FOR: | YES* | NO |
|---|---|---|---|
| 1. General Appearance | Marked overweight, tremor, signs of alcoholism, problem drinking, or drug abuse. | | ✓ |
| 2. Eyes | Pupillary equality, reaction to light, accommodation, ocular motility, ocular muscle imbalance, extraocular movement, nystagmus, exophthalmos. Ask about retinopathy, cataracts, aphakia, glaucoma, macular degeneration and refer to a specialist if appropriate. | | ✓ |
| 3. Ears | Scarring of tympanic membrane, occlusion of external canal, perforated eardrums. Irremediable deformities likely to interfere with breathing or swallowing. | | ✓ |
| 4. Mouth and Throat | | | ✓ |
| 5. Heart | Murmurs, extra sounds, enlarged heart, pacemaker, implantable defibrillator. | | ✓ |
| 6. Lungs and chest, not including breast examination. | Abnormal chest wall expansion, abnormal respiratory rate, abnormal breath sounds including wheezes or alveolar rales, impaired respiratory function, cyanosis. Abnormal findings on physical exam may require further testing such as pulmonary tests and/or xray of chest. | | ✓ |

| BODY SYSTEM | CHECK FOR: | YES* | NO |
|---|---|---|---|
| 7. Abdomen and Viscera | Enlarged liver, enlarged spleen, masses, bruits, hernia, significant abdominal wall muscle weakness. | | ✓ |
| 8. Vascular System | Abnormal pulse and amplitude, carotid or arterial bruits, varicose veins. | | ✓ |
| 9. Genito-urinary System | Hernias. | | ✓ |
| 10. Extremities - Limb impaired. Driver may be subject to SPE certificate if otherwise qualified. | Loss or impairment of leg, foot, toe, arm, hand, finger. Perceptible limp, deformities, atrophy, weakness, paralysis, clubbing, edema, hypotonia. Insufficient grasp and prehension in upper limb to maintain steering wheel grip. Insufficient mobility and strength in lower limb to operate pedals properly. | | ✓ |
| 11. Spine, other musculoskeletal | Previous surgery, deformities, limitation of motion, tenderness. | | ✓ |
| 12. Neurological | Impaired equilibrium, coordination or speech pattern; asymmetric deep tendon reflexes, sensory or positional abnormalities, abnormal patellar and Babinski's reflexes, ataxia. | | ✓ |

*COMMENTS:

Note certification status here. See Instructions to the Medical Examiner for guidance.

☐ Meets standards in 49 CFR 391.41; qualifies for 2 year certificate
☐ Does not meet standards
☑ Meets standards, but periodic monitoring required due to _____
☐ Driver qualified only for: ☐ 3 months ☐ 6 months ☑ 1 year ☐ Other
☐ Temporarily disqualified due to (condition or medication): _____
Return to medical examiner's office for follow up on _____

☐ Wearing corrective lenses
☐ Wearing hearing aid.
☐ Accompanied by a _____ waiver/exemption. Driver must present exemption at time of certification.
☐ Skill Performance Evaluation (SPE) Certificate
☐ Driving within an exempt intracity zone (See 49 CFR 391.62)
☐ Qualified by operation of 49 CFR 391.64

Medical Examiner's Signature: [signature]

Medical Examiner's Name: Neshan Khan MD

Address: 115 Herron Hill Rd Tallasee AL 36078

Telephone Number: 334-283-3477

If meets standards, complete a Medical Examiner's Certificate as stated in 49 CFR 391.43(h). (Driver must carry certificate when operating a commercial vehicle.)

CONFIDENTIAL
ADS / CANNON
0074

LabOne

now a part of Quest Diagnostics
10101 Renner Blvd
Lenexa, KS 66219
(800) 728-4064

9430

A. ACC.# 0001

STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE
Employer Name, Address, I.D. No.

**51742560**
SPECIMEN ID NO:

B. MRO Name, Address, Phone and Fax No.

ADVANCED DISPOSAL SVC.S SUNFLOWER
GEN: TOM DAMS
9995 GATE PARKWAY NORTH
JACKSONVILLE FL 32246
PH 904-403-7000  FAX 904-493-5555

HORACIO MARAÑON - EMPLOYEE SCREE   Ph 337-837-1616
P.O. BOX 87113                      Fx 337-769-1131
221 SOUTHPARK BLDG. D
LAFAYETTE LA 70598

C. Donor SSN or Employee I.D. No.

D. Reason for Test:  ☑ Pre-employment   ☐ Random      ☐ Reasonable Suspicion/Cause   ☐ Post-Accident
                     ☐ Return to Duty   ☐ Follow-up    ☐ Other (specify) _____
E. Drug Tests to be Performed:  ☑ THC, COC, PCP, OPI, AMP   ☐ THC & COC Only   ☐ Other (specify) _____
F. Collection Site Address:

TALLASSEE FAMILY CARE
115 HERREN HILL RD
TALLASSEE AL 36078

Collector Phone No. 3 3 0 - 2 8 3 - 0 7 7

Collector Fax No. 3 3 0 - 2 8 2 - 0 1 2

STEP 2: COMPLETED BY COLLECTOR

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F? ☑ Yes  ☐ No, Enter Remark

Specimen Collection
☑ Split  ☐ Single  ☐ None Provided (Enter Remark)   ☐ Observed (Enter Remark)

STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s), Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)
STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

REMARKS _____

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable Federal requirements.

Collector's Name (PRINT First, MI, Last)

X _____
Signature of Collector

| of Collection |  | Time of Collection |  |  | SPECIMEN BOTTLE(S) RELEASED TO: |
|---|---|---|---|---|---|
| MO - DAY - YR |  | HR - MIN | ☐ AM ☑ PM |  | Name of Delivery Service Transferring Specimen to Lab |

RECEIVED AT LAB

X _____
Signature of Accessioner

_____
(PRINT) Accessioner's Name (First, MI, Last)      Date (Mo./Day/Yr.)

Primary Specimen
Bottle Seal Intact
☐ Yes
☐ No, Enter Remark Below

SPECIMEN BOTTLE(S) RELEASED TO:

STEP 5: COMPLETED BY DONOR

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X _____
Signature of Donor

_____
(PRINT) Donor's Name (First, MI, Last)

01/22/07
Date (Mo./Day/Yr.)

Daytime Phone No. _____   Evening Phone No. _____   Date of Birth _____ / _____ / _____
                                                                        Mo.   Day   Yr.

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you chose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). - DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN

In accordance with applicable Federal requirements, my determination/verification is:

☐ NEGATIVE   ☐ POSITIVE   ☐ TEST CANCELED   ☐ REFUSAL TO TEST BECAUSE:
☐ DILUTE                                      ☐ ADULTERATED   ☐ SUBSTITUTED

REMARKS _____

X _____
Signature of Medical Review Officer

_____
(PRINT) Medical Review Officer's Name (First, MI, Last)

_____ / _____ / _____
Date (Mo./Day/Yr.)

STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED   ☐ FAILED TO RECONFIRM - REASON _____

X _____
Signature of Medical Review Officer

_____
(PRINT) Medical Review Officer's Name (First, MI, Last)

_____ / _____ / _____
Date (Mo./Day/Yr.)

CONFIDENTIAL
ADS / CANNON
0075

# U.S. Department of Transportation (DOT)
## Alcohol Testing Form ►
*(The instructions for completing this form are on the back of Copy 3)*

**STEP 1: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

Employee Name _____

(Print)   (First, M.I., Last)

B: SSN or Employee ID No. _____

C: Employer Name _____

Street _____

City, ST ZIP _____
DER Name and
Telephone No.

DER Name _____    DER (Area Code & Phone Number) _____

D: Reason for Test: ☐ Random ☐ Reasonable Susp. ☐ Post-Accident ☐ Return to Duty ☐ Follow-up ☐ Pre-employment

**STEP 2: TO BE COMPLETED BY EMPLOYEE**

I certify that I am about to submit to alcohol testing required by U.S. Department of Transportation regulations and that the identifying information provided on the form is true and correct.

Signature of Employee _____    Date ___ Month / Day / Year

**STEP 3: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

(If the technician conducting the screening test is not the same technician who will be conducting the confirmation test, each technician must complete their own form.) I certify that I have conducted alcohol testing the above named individual in accordance with the procedures established in the U.S. Department of Transportation regulation, 49 CFR Part 40, that I am qualified to operate the testing device(s) identified, and that the results are as recorded.

TECHNICIAN: ☐ BAT ☐ STT   DEVICE: ☐ SALIVA ☐ BREATH* 15-Minute Wait: ☐ Yes ☐ No

SCREENING TEST: *(For BREATH DEVICE* write in the space below only if the testing device is not designed to print.)*

| Test # | Testing Device Name | Device Serial # OR Lot # & Exp. Date | Activation Time | Reading Time | Result |
|--------|---------------------|--------------------------------------|-----------------|--------------|--------|
|        |                     |                                      |                 |              |        |

CONFIRMATION TEST: *Results MUST be affixed to each copy of this form or printed directly onto the form.*

REMARKS: _____

_____

_____

Alcohol Technician's Company _____    Company Street Address _____

(PRINT) Alcohol Technician's Name (First, M.I., Last) _____    Company City, State, Zip _____

Phone Number (Area Code & Number) _____

Signature of Alcohol Technician _____    Date ___ Month / Day / Year

**STEP 4: TO BE COMPLETED BY EMPLOYEE IF TEST RESULT IS 0.02 OR HIGHER**

I certify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand that I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are 0.02 or greater.

Signature of Employee _____    Date ___ Month / Day / Year

OMB No. 2105-0529

CONFIDENTIAL
ADS / CANNON
0076

Motor Vehicle Driver's

# CERTIFICATION OF COMPLIANCE
## WITH DRIVER LICENSE REQUIREMENTS

MOTOR CARRIER INSTRUCTIONS: The requirements in Part 383 apply to every driver who operates in intrastate, interstate, or foreign commerce and operates a vehicle weighing 26,001 pounds or more, can transport more than 15 people, or transports hazardous materials that require placarding.

The requirements in Part 391 apply to every driver who operates in interstate commerce and operates a vehicle weighing 10,001 pounds or more, can transport more than 15 people, or transports hazardous materials that require placarding.

DRIVER REQUIREMENTS: Parts 383 and 391 of the Federal Motor Carrier Safety Regulations contain some requirements that you as a driver must comply with. They are as follows:

1) **POSSESS ONLY ONE LICENSE:** You, as a commercial vehicle driver, may not possess more than one motor vehicle operator's license.

2) **NOTIFICATION OF LICENSE SUSPENSION, REVOCATION OR CANCELLATION:** Sections 391.15(b)(2) and 383.33 of the Federal Motor Carrier Safety Regulations require that you notify your employer the NEXT BUSINESS DAY of any revocation or suspension of your driver's license. In addition, Section 383.31 requires that any time you violate a state or local traffic law (other than parking), you must report it within 30 days to: 1) your employing motor carrier, and 2) the state that issued your license (If the violation occurs in a state other than the one which issued your license). The notification to both the employer and state must be in writing.

The following license is the only one I possess:

Driver's License No. _____ State _AL_ Exp. Date _6·8-08_

DRIVER CERTIFICATION: I certify that I have read and understood the above requirements.

Driver's Name (Printed): _Robert Cannon_

Driver's Signature: _Robert J. Cannon_ Date: _1-22-07_

Notes: _____

(This form is not required for DOT compliance)

CONFIDENTIAL
ADS / CANNON
0077

© Copyright 2005 J. J. KELLER & ASSOCIATES, INC., Neenah, WI • USA • (800) 327-6868 • www.jjkeller.com • Printed in the United States
ORIGINAL - MAY BE RETAINED IN PERMANENT FILE

90-FS-C2  1619
(Rev. 2/05)

# RECORD OF ROAD TEST

Driver's Name _Robert Cannon_   Address _____

License No. _____ ate _AL_  Equipment Driven:  Truck _____ Tractor _40530_ Trailer _____

Checked From _____   To _____  Date _10/31/07_

For those items that apply, checkmark (✓) if driver's performance is satisfactory, mark with an X if driver's performance is unsatisfactory.
Explain unsatisfactory items under Remarks. Use not applicable (NA) for items that do not apply.

**PART 1 – PRE-TRIP INSPECTION AND EMERGENCY EQUIPMENT**

Checks general condition approaching unit ✓
Looks for leakage of coolants, fuel, lubricants
Checks under hood – oil, water, general condition of engine compartment, steering ✓
Checks around unit – tires, lights, trailer hookup, brake and light lines, body, doors, horn, windshield wipers ✓
Tests brake action, tractor protection valve, and parking (hand) brake ✓
Checks horn, windshield wipers, mirrors, emergency equipment; reflectors, flares, fuses, tire chains (if necessary), fire extinguisher ✓
Checks instruments for normal readings
Checks dashboard warning lights for proper functioning
Cleans windshield, windows, mirrors, lights, reflectors
Reviews and signs previous report

**PART 2 – COUPLING AND UNCOUPLING**

Lines up units
Connects glad hands to trailer to apply trailer brakes before coupling
Connects glad hands and light line properly
Couples without difficulty
Raises landing gear fully after coupling
Visually checks king pin assembly to be certain of proper coupling
Checks coupling by applying hand valve or tractor protection valve (trailer air supply valve) and gently applying pressure by trying to pull away from trailer
Assure that surface will support trailer before uncoupling

**PART 3 – PLACING VEHICLE IN MOTION AND USE OF CONTROLS**

**A. ENGINE**

Places transmission in neutral before starting engine
Starts engine without difficulty ✓
Allows proper warm-up ✓
Understands gauges on instrument panel ✓
Maintains proper engine speed (rpm) while driving ✓
Does not abuse motor ✓

**B. CLUTCH AND TRANSMISSION**

Starts loaded unit smoothly
Uses clutch properly
Times gearshifts properly
Shifts gears smoothly
Uses proper gear sequence

**C. BRAKES**

Knows proper use of tractor protection valve ✓
Understands low air warning ✓
Tests service brakes ✓
Builds full air pressure before moving ✓

**D. STEERING**

Controls steering wheel ✓
Good driving posture and good grip on wheel ✓

**E. LIGHTS**

Knows lighting regulations ✓
Uses proper headlight beam ✓
Dim lights when meeting or following other traffic
Adjusts speed to range of headlights
Proper use of auxiliary lights

**PART 4 – BACKING AND PARKING**

**A. BACKING**

Gets out and checks before backing ✓
Looks back as well as uses mirror ✓
Gets out and rechecks conditions on long back
Avoids backing from blind side ✓
Signals when backing ✓
Controls speed and direction properly while backing ✓

**B. PARKING (City)**

Does not hit nearby vehicles or stationary objects
Parks proper distance from curb
Sets parking brake, puts in gear, chocks wheels, shuts off motor ✓
Checks traffic conditions and signals when pulling out from parked position ✓
Parks in legal and safe location ✓

**C. PARKING (Road)**

Parks off pavement ✓
Avoids parking on soft shoulder
Uses emergency warning signals when required ✓
Secures unit properly ✓

13F 682 (Rev. 5/02)

CONFIDENTIAL
ADS / CANNON
0078

MOTOR VEHICLE DRIVER'S
## Certification of Violations/Annual Review of Driving Record

MOTOR CARRIER INSTRUCTIONS: Each motor carrier shall at least once every 12 months, require each driver it employs to prepare and furnish it with a list of violations of motor vehicle traffic laws and ordinances (other than violations involving only parking) of which the driver has been convicted, or on account of which he/she has forfeited bond or collateral during the preceding 12 months (Section 391.27). Drivers who have provided information required by Section 383.31 need not repeat that information on this form.

DRIVER REQUIREMENTS: Each driver shall furnish the list as required by the motor carrier above. If the driver has not been convicted of, or forfeited bond or collateral on account of any violation which must be listed, he/she shall so certify (Section 391.27).

### COMPLETED BY DRIVER - CERTIFICATION OF VIOLATIONS

NAME OF DRIVER: (PRINT) *Robert Cannon*

HOME TERMINAL (CITY AND STATE) *TALLASSEE AL*

SOCIAL SECURI

DRIVER'S LICENSE NUMBER

STATE *AL*

DATE OF EMPLOYMENT *1-22-07*

EXPIRATION DATE *6-8-08*

I certify that the following is a true and complete list of traffic violations required to be listed (other than those I have provided under Part 383) for which I have been convicted or forfeited bond or collateral during the past 12 months.

**(If you have had no violations, check the following box – ☐ None.)**

| DATE | OFFENSE | LOCATION | TYPE OF VEHICLE OPERATED |
|------|---------|----------|--------------------------|
| *1/22/07* | *N/A* | | |
| | | | |
| | | | |
| | | | |

If no violations are listed above, I certify that I have not been convicted or forfeited bond or collateral on account of any violation (other than those I have provided under Part 383) required to be listed during the past 12 months.

Date of Certification *1-22-07*    Driver's Signature *Robert G. Cannon*

### COMPLETED BY MOTOR CARRIER - ANNUAL REVIEW OF DRIVING RECORD

MOTOR CARRIER INSTRUCTIONS: Review the Certification of Violations listed above and other information described in Section 391.25 of the Federal Motor Carrier Safety Regulations. Complete the information requested below.

I have hereby reviewed the driving record of the above named driver in accordance with Section 391.25 and find that he/she (check one):

☐ Meets minimum requirements for safe driving        ☐ Is disqualified to drive a motor vehicle pursuant to Section 391.15

☐ Does not adequately meet satisfactory safe driving performance

Action taken with driver: _____

Reviewed by: _____

Signature                                                    Date

Printed Name                                                 Title

CONFIDENTIAL
ADS / CANNON
0079

Motor Carrier Name _____    Motor Carrier Address _____

MAINTAIN THIS DOCUMENT IN THE DRIVER'S QUALIFICATION FILE. THIS DOCUMENT MAY BE PURGED AFTER 3 YEARS FROM DATE OF EXECUTION.

© Copyright 2002 J. J. KELLER & ASSOCIATES, INC., Neenah, WI • USA • (800) 327-6868 • www.jjkeller.com

643-FS-C2 (5/02)

ORIGINAL - MAY BE RETAINED IN PERMANENT FILE



## Subject Profile

ORDER#: 4922004
COMPANY NAME: Advanced Disposal Service
STORE NUMBER/BILLING CODE sfw
ORDER HAS BEEN OPENED: Jan 22 2007 12:37PM
SOC.SEC.NUMBER:
NAME: Cannon, Robert J
DRIVER'S LICENSE:     STATE: AL
DOB:

## Results Status

### To Send Adverse Action Letter Click Here

| Service | Status | Finding |
|---|---|---|
| MOTOR VEHICLE REPORT (MVR) | CLOSED | See Results Below |

## Dmv Results (Print)

**Driver License#:**

**State: AL**

```
REKLAMI PRINT IMAGE 80
START OF DRIVING RECORD


ALABAMA Driver Record - B8178   Order Date: 01/22/2007


Host Used: Online            Reference: 4922004_1

Period: THREE YEARS          License:

                             Name:    CANNON, ROBERT JAMES
                             Address:
                             City, St:
                             As of:

Sex :        Weight:         DOB    :              AGE:
Eyes:        Height:         Iss Date: 07/12/2004
Hair:                        Exp Date: 06/08/2008

                             STATUS: SEE BELOW


Violations/Convictions And Failures to Appear And Accidents

TYPE VIOL    CONV    ACD  AVD  V/C     DESCRIPTION

                  ** NONE TO REPORT ***
```

CONFIDENTIAL
ADS / CANNON
0080

Suspensions/Revocations

| ACTIONS | ORD/DATE | EFF/DATE | END/DATE | CODE | AVD |
|---------|----------|----------|----------|------|-----|

*** NO ACTIVITY ***

License and Permit Information

License: PERSONAL        Issue:07/12/2004   Expire:06/08/2008   Status:VALID
    Class:   OPERATOR
    RESTRICTION: CORRECTIVE LENSES
License: COMMERCIAL      Issue:            Expire:            Status:VALID
    Class:A  COMBINATION VEHICLE WITH GVWR OVER 26,001 LBS WITH VEHICLE IN TOW OVER 10K GVWR.
License: COMMERCIAL      Issue:            Expire:            Status:VALID

Miscellaneous State Data

*** NONE TO REPORT ***

| FOR STATED BUSINESS | Underwriting: | Policy | Initials: |
| PURPOSES ONLY | Date:  /  / | Issue Date:  /  / | Control Number: IVDKZT |

END OF DRIVING RECORD

2/17/07

Back To Top
Return To Order List

Print This Page

CONFIDENTIAL
ADS / CANNON
0081

# DRIVER STATEMENT OF ON-DUTY HOURS
## (For Newly Hired Drivers)

INSTRUCTIONS: Motor carriers when using a driver for the first time shall obtain from the driver a signed statement giving the total time on-duty during the immediately preceding 7 days and time at which such driver was last relieved from duty prior to beginning work for such carrier. Rule 395.8(j)(2) Federal Motor Carrier Safety Regulations. NOTE: Hours for any compensated work during the preceding 7 days, including work for a non-motor carrier entity, must be recorded on this form.

Driver Name (Print) _Robert Cannon_

Social Security Number __

Driver's License: State _AL_ Number _____    _ Class _A_ Endorsement(s) _____ Restriction(s) _____

Type of License _Class A_    Issuing State _AL_

| DAY | 1 (yesterday) | 2 | 3 | 4 | 5 | 6 | 7 | |
|-----|------|---|---|---|---|---|---|---|
| DATE | | | | | | | | |
| HOURS WORKED | N/A | | | | | | | TOTAL HOURS |

I hereby certify that the information given above is correct to the best of my knowledge and belief, and that I was last relieved from work at

_____ A.M.
Time            P.M.    On _____
                            Day        Month        Year

_Robert J. Cannon_                    _1-22-07_
Driver's Signature                        Date

====================================================================

# DRIVER CERTIFICATION FOR OTHER COMPENSATED WORK

INSTRUCTIONS: When employed by a motor carrier, a driver must report to the carrier all on-duty time including time working for other employers. The definition of on-duty time found in Section 395.2 paragraphs (8) and (9) of the Federal Motor Carrier Safety Regulations includes time performing any other work in the capacity of, or in the employ or service of, a common, contract or private motor carrier, also performing any compensated work for any nonmotor carrier entity.

(check one)

Are you currently working for another employer?                    ☐ Yes    ☒ No

At this time do you intend to work for another employer while still employed by this company?                    ☐ Yes    ☐ No

I hereby certify that the information given above is true and I understand that once I become employed with this company, if I begin working for any additional employer(s) for compensation that I must inform this company immediately of such employment activity.

_Robert J. Cannon_                    _1-22-07_
Driver's Signature                        Date

Witness: _Russell W.___                    _1/22/07_
Company Representative                        Date

CONFIDENTIAL
ADS / CANNON
0082

© Copyright 1998 J. J. KELLER & ASSOCIATES, INC., Neenah, WI • USA • (800) 327-6868
ORIGINAL - MAY BE RETAINED IN PERMANENT FILE        644-FS-C2 (Rev. 2/98)

Quest
Diagnostics
800-877-7484

0121694   5462214   SPECIMEN ID NO.   800.877.7484

LAB ACCESSION NO.

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.
ADVANCED DISPOSAL SERVICE
LORI DAVIS
3995 GATE PARKWAY NORTH
JACKSONVILLE FL 32246
PH:904-288-0650   FAX:904-636-0699

B. MRO Name, Address, Phone and Fax No.
HORACIO MARAPLOTZ, MD   HORA000020
3995 JEFFCO BLVD
ARNOLD MO 63010
PH:636-532-4099   FAX:636-461-3691

C. Donor SSN or Employee I.D. No.

D. Reason for Test:   [X] Pre-employment   [ ] Random   [ ] Reasonable Suspicion/Cause   [ ] Post-Accident
   [ ] Return to Duty   [ ] Follow-up   [ ] Other (specify) _____

E. Drug Tests to be Performed:   [X] THC, COC, PCP, OPI, AMP   [ ] THC & COC Only   [ ] Other (specify) _____
   ( ) 35304N NIDA 5 PANEL H/HH

F. Collection Site Name: TALLASSEE FAMILY CARE
   Address: 715 HERRON HILL RD                    Collection Site Code:
   City, State and Zip: TALLASSEE          AL 36078          Collector Phone No.:334-283-6477
                                                             Collector Fax No.:334-283-4167

**STEP 2: COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F? [X] Yes [ ] No, Enter Remark | Specimen Collection: [X] Split [ ] Single [ ] None Provided (Enter Remark) [ ] Observed (Enter Remark)

REMARKS _____

**STEP 3:** Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed, and released to the Delivery Service noted in accordance with applicable Federal requirements.

X _____ Signature of Collector | Time of Collection _____ [ ] AM [ ] PM | SPECIMEN BOTTLE(S) RELEASED TO: [ ] Quest Diagnostics Courier [ ] FedEx [X] DHL / Airborne [ ] Other
_____ (Print) Collector's Name (First, MI, Last) | Date (Mo./Day/Yr.) | Name of Delivery Service Transferring Specimen to Lab

RECEIVED AT LAB: X _____ Signature of Accessioner | Primary Specimen Bottle Seal Intact [ ] Yes [ ] No, Enter Remark Below | SPECIMEN BOTTLE(S) RELEASED TO:
_____ (Print) Accessioner's Name (First, MI, Last) | Date (Mo./Day/Yr.)

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X _____ Signature of Donor | Robert J. Cannon (PRINT) Donor's Name (First, MI, Last) | 02 12 07 Date (Mo./Day/Yr.)

Daytime Phone No. _____   Evening Phone No. _____   Date of Birth ___ Mo. ___ Day ___ Yr.

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and other over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you choose to make a list, do so either on a separate piece of paper or on the back of your copy (Copy 5). - DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification is:

[ ] NEGATIVE   [ ] POSITIVE   [ ] TEST CANCELLED   [ ] REFUSAL TO TEST BECAUSE:
   [ ] DILUTE                                    [ ] ADULTERATED   [ ] SUBSTITUTED

REMARKS _____

_____ Signature of Medical Review Officer | _____ (PRINT) Medical Review Officer's Name (First, MI, Last) | ___ / ___ / ___ Date (Mo./Day/Yr.)

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SECONDARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:

[ ] RECONFIRMED   [ ] FAILED TO RECONFIRM - REASON _____

X _____ Signature of Medical Review Officer | _____ (PRINT) Medical Review Officer's Name (First, MI, Last) | ___ / ___ / ___ Date (Mo./Day/Yr.)

CONFIDENTIAL
ADS / CANNON
0083

*Personal*

**KENT V. KLINNER, JR., M.D.**
**1711 PEPPERELL PARKWAY**
**OPELIKA, AL 36801**
**(334)745-7098**

**EMPLOYEE NAME** Robert Cannon          **COLLECTION  DATE** 2-12-07

**ID/SS#**

**TIME OF COLLECTION** 10:18 AM          **NAME OF COLLECTOR** TJ Curtis

_Robert Cannon_                          _Q. Curt_
**DONOR'S SIGNATURE**                    **COLLECTOR'S SIGNATURE**

**LOCATION OF TEST: 1711 PEPPERELL PKWY, OPELIKA, AL 36801**

**TIME OF TEST** 10:20 **(AM/PM)**

**TEST OPERATOR** TJ Curtis

**TESTING RESULTS**

    **COCAINE** neg
    **AMPHETAMINES** neg
    **THC** neg
    **OPITAES** neg
    **PCP** neg

    **REMARKS**

**CUSTODY AND CONTROL**
    **SPECIMEN RECEIVED BY** TJ Curtis **DATE** 2-12-07
    **SPECIMEN DESTROYED BY** TJ Curtis **DATE** 2-12-07

_Robert Cannon_                          _Q. Curt_
**DONOR'S SIGNATURE**                    **COLLECTOR'S SIGNATURE**

CONFIDENTIAL
ADS / CANNON
0084



Advanced
Disposal

Driver Qualification File Forms

Signature of Reviewing
Manager/Supervisor

1. Driver's application for employment:

2. Consent for release of alcohol and
controlled substance test or violations:

3. Request for check of driving record for
each state contacted (attach the MVR):

4. Previous employer inquiry:

5. Physical exam and certificate (pre-employment):

6. NIDA 5 drug screen (attach results to blue
copy of CoC along with test notification log):

7. Breath alcohol testing sample report:

8. Driver certification of compliance with license:

9. Road test record and certification:

10. Certification of violations and annual review:

11. Notification of disqualification (part 391 & 383):

12. Driver's statement on on-duty hours (new drivers):

13. Need to know training certificate & district
drug & alcohol policy signed by driver:

14. Any NIDA 5 random, post accident,
reasonable suspicion drug and/or alcohol reports (#7)

15. Copy of FMCSR pocketbook (stapled to front
of folder):

16. Copy of CDL:

The following may be removed from the DQF 3 years after the date of execution (391.51 d):
a. response of each State agency to the annual driver record inquiry; and
b. the annual review of the driver's driver record; and
c. the certificate of violations completed by the driver on an annual basis; and
d. the medical examiner's certificate; and
e. the letter issued granting a waiver of a physical disqualification..

CONFIDENTIAL
ADS / CANNON
0085

Advanced Disposal Services, Inc.

---

Policy and Procedures Manual

---

POLICY                                                            Number 4.0

---

In this period of ever-increasing concern about safety and health, and due to the nature of our business as well as the need to comply with the Drug-Free Workplace Act of 1988, other applicable federal laws or regulations, any contractual obligations, and all laws of the states in which we provide services, Advanced Disposal Services, Inc., and any other subsidiary companies, all of which are hereinafter referred to as "Advanced", must maintain strict standards of conduct which includes the possible effects of alcohol, drugs and contraband in the workplace. Our position regarding substance abuse is the same whether alcohol, marijuana, illegal drugs, prescription drugs, or controlled substances are involved, hereinafter referred to as "controlled substances".

This statement summarizes Advanced's policies and procedures regarding the use, abuse, trade, possession, presence in the system, and sale of alcohol, contraband, drugs and any other intoxicating substances that may be in an employee's system while on duty or affect the safety of those performing or affected by our services. This policy applies to all Advanced personnel and all visitors, leased, part-time or contract personnel.

No controlled substance, including but not limited to alcohol, controlled substances, illegal drugs, mind-altering chemicals, depressants, stimulants, and marijuana is allowed "on premises" or in the employee's system without express approval by Advanced management.

The off-duty use of controlled substances is prohibited if the off-duty use results in the presence of or evidence of the substance in the employee's system when on-duty. Therefore, each employee should be aware that such substances are detectable in the human body for a substantial period of time after consumption. Alcohol consumption while on duty will not be allowed under any circumstances.

Effective: June 6, 2003
Revised:
Page 1 of 2

CONFIDENTIAL
ADS / CANNON
0086

Advanced Disposal Services, Inc.

---

Policy and Procedures Manual

---

POLICY                                                                Number 4.0

---

In this period of ever-increasing concern about safety and health, and due to the nature of our business as well as the need to comply with the Drug-Free Workplace Act of 1988, other applicable federal laws or regulations, any contractual obligations, and all laws of the states in which we provide services, Advanced Disposal Services, Inc., and any other subsidiary companies, all of which are hereinafter referred to as "Advanced", must maintain strict standards of conduct which includes the possible effects of alcohol, drugs and contraband in the workplace. Our position regarding substance abuse is the same whether alcohol, marijuana, illegal drugs, prescription drugs, or controlled substances are involved, hereinafter referred to as "controlled substances".

This statement summarizes Advanced's policies and procedures regarding the use, abuse, trade, possession, presence in the system, and sale of alcohol, contraband, drugs and any other intoxicating substances that may be in an employee's system while on duty or affect the safety of those performing or affected by our services. This policy applies to all Advanced personnel and all visitors, leased, part-time or contract personnel.

No controlled substance, including but not limited to alcohol, controlled substances, illegal drugs, mind-altering chemicals, depressants, stimulants, and marijuana is allowed "on premises" or in the employee's system without express approval by Advanced management.

The off-duty use of controlled substances is prohibited if the off-duty use results in the presence of or evidence of the substance in the employee's system when on-duty. Therefore, each employee should be aware that such substances are detectable in the human body for a substantial period of time after consumption. Alcohol consumption while on duty will not be allowed under any circumstances.

---

---

Effective: *June 6, 2003*
Revised:
Page 1 of 2

CONFIDENTIAL
ADS / CANNON
0087





CONFIDENTIAL
ADS / CANNON
0088

## ACKNOWLEDGEMENT OF RECEIPT OF EMPLOYEE HANDBOOK

This will acknowledge that I have received my copy of Advanced Disposal Services Employee Handbook. I have read it and been given the opportunity to ask questions that I may have concerning any of the Company's policies and procedures.

I understand that this Handbook represents only current policies, regulations, and benefits, and that it does not create a contract of employment. The Company retains the right to change these policies, procedures and benefits, as it deems advisable.

I understand that I am an *"at will"* employee. I have the right to terminate my employment at any time, with or without cause, and that the Company has a similar right. I further understand that my status as an *"at-will"* employee may not be changed except in writing signed by the President of the Company. Nothing in this Handbook is intended to void my *"at-will"* status.

I understand that I am employed subject to a 90-calendar-day introductory period. I understand that I may be required to reimburse the Company for the cost of any uniforms I received if I voluntarily resign during the introductory period.

I understand that under circumstances as outlined in the Drug and Alcohol policy, I will be subject to physical examination, including a hair, blood and/or urine analysis by qualified personnel.

CONFIDENTIAL
ADS / CANNON
0089

# Employee Information

Name _Robert   Brunson_

Address _#16_

City _Opelika_                State _AL_  Zip _36803_

Home Phone _____

Cell Phone _____

Emergency Contact

Name _____

Relationship _WIFE_

Phone Number _____

CONFIDENTIAL
ADS / CANNON
0090



# ADVANCED DISPOSAL SERVICES, INC. AND SUBSIDIARIES EMPLOYEE HANDBOOK



PLAINTIFF'S
EXHIBIT
3

PENGAD-Bayonne, N. J.

July 2006

CONFIDENTIAL
ADS / CANNON
0091

## PURPOSE OF THE HANDBOOK

*This handbook is a summary of the policies, work rules and benefits in effect at the time of its publication and is designed to provide you with a reference source to answer most of your questions about your employment with the Company. It is to be used for general information and does not replace more detailed policies and procedures. In the case of insurance and similar benefits, current plan documents will prevail.*

*The contents of this handbook are subject to revision from time to time. However, important changes may be printed and distributed to employees during the period between re-printings, and the Company retains the right to change any policies, procedures, work rules, and benefits, as it deems necessary, at any time.*

*Under no circumstances are these materials to be considered to create any contractual or quasi-contractual relationship between any employee and the Company. The Company does, moreover, hereby specifically disclaim any intent or purpose that these materials be considered or looked upon as contractual obligations or undertakings. They are informative materials only.*

## EMPLOYMENT AT WILL

*Your employment with the Company is not to be considered permanent or for any guaranteed length of time. Our employment relationship will continue as long as it is mutually satisfactory to both parties. You may resign at any time, with or without notice. Likewise, the Company may terminate your employment at any time, for any reason it deems necessary.*

JAX\688478_2

CONFIDENTIAL
ADS / CANNON
0092

2

## ACKNOWLEDGEMENT OF RECEIPT OF EMPLOYEE HANDBOOK

This will acknowledge that I have received my copy of Advanced Disposal Services Employee Handbook. I have read it and been given the opportunity to ask questions that I may have concerning any of the Company's policies and procedures.

I understand that this Handbook represents only current policies, regulations, and benefits, and that it does not create a contract of employment. The Company retains the right to change these policies, procedures and benefits, as it deems advisable.

I understand that I am an "*at will*" employee. I have the right to terminate my employment at any time, with or without cause, and that the Company has a similar right. I further understand that my status as an "*at-will*" employee may not be changed except in writing signed by the President of the Company. Nothing in this Handbook is intended to void my "*at-will*" status.

I understand that I am employed subject to a 90-calendar-day introductory period. I understand that I may be required to reimburse the Company for the cost of any uniforms I received if I voluntarily resign during the introductory period.

I understand that under circumstances as outlined in the Drug and Alcohol policy, I will be subject to physical examination, including a hair, blood and/or urine analysis by qualified personnel.

PRINTED FULL NAME: _____

SIGNATURE: _____

DATE: _____

*NOTE: This form should be signed, detached and returned to your supervisor or human resources administrator within three (3) days after receiving your Employee Handbook.*

CONFIDENTIAL
ADS / CANNON
0093

# TABLE OF CONTENTS

## Employment Policies
Equal Opportunity Employer ................................................................ 2
Harassment ........................................................................................ 2
Americans with Disabilities ................................................................ 3
Introductory Period ............................................................................ 3
Employment Classifications ................................................................ 3
Outside Employment .......................................................................... 4
Employment Forms ............................................................................ 4
Termination ........................................................................................ 5

## Work Rules
Absences and Tardiness ...................................................................... 6
Bulletin Boards .................................................................................. 6
Communication Devices ...................................................................... 6
Company Property .............................................................................. 7
Confidentiality .................................................................................... 7
Customer Relations ............................................................................ 8
Dress and Appearance ........................................................................ 8
Drug Free Workplace .......................................................................... 8
Honesty .............................................................................................. 9
Housekeeping and Office Appearance ................................................ 10
Meals and Rest Breaks ...................................................................... 10
Notification of Changes in Personal Information ................................ 10
Personal Computers/Internet/E-mail and Voice Mail ........................ 10
Personal Property .............................................................................. 13
Personal Telephone Calls and Visitors .............................................. 13
Salvaging and Scavenging ................................................................ 13
Solicitations ...................................................................................... 13
Smoking ............................................................................................ 13
Telephone Technique ........................................................................ 14
Unions .............................................................................................. 14
Vehicles and Equipment .................................................................... 14
Voting .............................................................................................. 15

## Safety
Accidents and Injuries ...................................................................... 16
Motor Vehicle Safety ........................................................................ 16

## Compensation
Work Week ........................................................................................ 17
Overtime .......................................................................................... 18
Time Cards ........................................................................................ 18

CONFIDENTIAL
ADS / CANNON
0094

Pay Advances and Loans ........................................................................ 18
Deductions ........................................................................................... 18
Wage and Salary Adjustments ................................................................ 19

# Benefits and Paid Time Off

Holidays ............................................................................................... 19
Vacation ............................................................................................... 20
Personal Days ....................................................................................... 21
Funerals ................................................................................................ 21
Jury Duty .............................................................................................. 22
Leaves of Absence ................................................................................ 22
Social Security Retirement System ........................................................ 24
Unemployment Compensation ............................................................... 24
Workers' Compensation ........................................................................ 24
Pay Calculations for Benefits ................................................................ 24

Health and Insurance Benefits ............................................................... 25

# Standards of Conduct ........................................................................ 26

CONFIDENTIAL
ADS / CANNON
0095



WELCOME

We are pleased to welcome you as an employee of Advanced Disposal Services. Advanced Disposal Services and its management are referred to collectively herein as the "Company." Advanced Disposal Services is a rapidly growing, privately held company in multiple states providing waste collection, recycling and disposal services.

We are committed to providing the highest quality service to our customers while operating in a safe and environmentally responsible manner. We believe that our employees should be treated fairly and with dignity. We also believe that the employees and the Company have a mutual interest in the success of the Company and that teamwork is the best approach.

Your supervisor has been trained and is knowledgeable about Company policies and procedures. He/she also knows who to contact or direct you to if you have any questions that he/she cannot answer. Your supervisor is here to help you do your job better while providing the best service possible to our customers. You should become well acquainted with your supervisor and ask for his or her help whenever necessary.

Felix A. Crawford, Chairman

CONFIDENTIAL
ADS / CANNON
0096

# EMPLOYMENT POLICIES

## Equal Opportunity Employer

It is the intent of the Company to attract and retain the best qualified people available, and we will not discriminate in employment on the basis of race, color, religion, national origin, sex, marital status, status as a disabled veteran or veteran of the Vietnam era, age, or disability.

This policy applies to all employment decisions with all employees and applicants. It includes recruitment, hiring, compensation, promotion, transfer, training, demotion, layoff, recall and all other terms and conditions of employment.

Any employee who feels that he or she has not been treated in accordance with this policy should contact their supervisor or any member of management in order to discuss this matter.

## Harassment

### GENERAL HARASSMENT POLICY

Advanced Disposal Services is committed to maintaining a work environment that is free of discrimination. In keeping with this commitment, we will not tolerate harassment of Advanced Disposal Services employees by anyone, including any supervisor, co-worker, vendor, contractor or other regular visitor of the Company.

Harassment consists of unwelcome conduct, whether verbal, physical, or visual, that is based upon a person's protected status, such as sex, color, race, religion, ancestry, national origin, age, disability, or other legally protected group status. Advanced Disposal Services will not tolerate harassing conduct that affects tangible job benefits, that interferes unreasonably with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment.

The conduct forbidden by this policy specifically includes, but is not limited to: (a) epithets, slurs, negative stereotyping, or intimidating acts that are based on a person's protected status; and (b) written or graphic material circulated or posted within the workplace that shows hostility toward a person or persons because of their protected status.

Sexual harassment deserves special mention. Unwelcome sexual advances, requests for sexual favors, and other physical, verbal, or visual conduct based on sex constitute sexual harassment when (1) submission to the conduct is an explicit or implicit term or condition of employment, (2) submission to or rejection of the conduct is used as the basis for an employment decision, or (3) the conduct has the purpose or effect of unreasonably

CONFIDENTIAL
ADS / CANNON
0097

interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Advanced Disposal Services employees and its Subsidiary's employees are responsible for helping assure that we avoid harassment. If you feel that you have experienced or witnessed harassment, you are to immediately notify your direct supervisor, the Human Resources Manager, or any other member of upper management with whom you feel comfortable. Advanced Disposal Services forbids retaliation against anyone for reporting harassment, assisting in making a harassment complaint, or cooperating in a harassment investigation. Advanced Disposal Services will preserve confidentiality to the extent the needs of the investigation permit.

The Company will promptly and thoroughly investigate all claims of harassment and/or discrimination. Any employee who violates the Company's Harassment Policy will be disciplined up to and including termination.

## Americans with Disabilities

It is the policy of the Company to prohibit employment discrimination against qualified individuals with disabilities and to make reasonable accommodations to persons with disabilities unless to do so would pose an undue hardship or pose a safety threat to the employee, co-workers or others.

## Introductory Period

Every new employee is considered to be in an introductory period for ninety (90) calendar days after the date of hire. This time is for you to evaluate the Company and to allow both you and your supervisor to become acquainted with each other. During this introductory period, your supervisor will review your quality and quantity of work, attendance and punctuality, and make some assessments about your suitability for the job you have been hired to perform.

You may be released at any time during the introductory period if it is determined that you are not suited for the work required. Once you have completed the introductory period successfully, you will be entitled to the benefits based on your employment status.

If you resign during the introductory period, you may be required to reimburse the Company for the cost of any uniforms you received.

## Employment Classifications

Your employment classification determines your eligibility for benefits and your work schedule. The following classifications have been created:

CONFIDENTIAL
ADS / CANNON
0098

**Introductory -**   An employee who is in the ninety (90) day introductory period. Introductory employees are expected to work a regular schedule but are not eligible for insurance, benefits or paid time off.

**Regular full time –**   An employee who is regularly scheduled to work forty (40) hours or more per week, has completed the introductory period and is in a position of continued employment for an indefinite time. Regular full time employees are eligible for benefits.

**Regular part time –**   An employee who has completed the introductory period and is regularly scheduled to work less than forty (40) hours per week but works in a position of continued employment for an indefinite time. Regular part-time employees are not eligible for benefits or paid time off.

**Temporary –**   An employee who is employed in a position for a limited or definite period of time, generally not longer than ninety (90) days, or hired for a specific short-term assignment. Temporary employees are not eligible for benefits. Temporary employees may apply for full time employment.

## Outside Employment

The Company understands that its employees may occasionally need to supplement their income by working more than one job. We are concerned that our employees do not jeopardize their ability to serve our customers by working excessive hours. If it is determined that outside employment is adversely affecting an employee's ability to perform their job with the Company, the employee may be required to terminate the outside employment.

You will be required to observe certain rules regarding your outside employment. You cannot work for a company that directly or indirectly competes with the Company for business or customers. You must obtain prior approval from your supervisor before working for a customer or vendor of the Company since such dual employment situations may create a conflict of interest.

Drivers of the Company who are subject to Department of Transportation driving hours limitations will not be permitted to work in outside employment that require driving vehicles.

## Employment Forms

Upon hire, new employees must fill out all appropriate payroll, personnel, tax and certain other forms. Your supervisor will provide you with these forms as well as other documents you may be required to read and sign. Failure to complete all required

CONFIDENTIAL
ADS / CANNON
0099

paperwork may delay the issuance of your paychecks. Paychecks will not be processed until W-4, I-9 and any state applicable withholding forms have been completed and returned to the payroll or human resources administrator.

## Termination

Occasionally, it becomes necessary for an employee and the Company to end its employment relationship. There are four (4) classifications of terminations and your eligibility for benefits and rehire are determined by these classifications:

**Resignation -** Resignation is when an employee voluntarily decides to leave the Company. If you decide to resign, you are expected to give at least a two (2) weeks notice, in writing, so an orderly transition can be made. If you give a two (2) weeks notice, you will be paid for unused vacation days. Your supervisor may allow you to work out your notice or you may be asked to leave prior to the end of your notice period. Failure to give the required notice, poor conduct or unsatisfactory job performance while you are working out your notice may affect your ability to be rehired by the Company or your ability to be paid for unused vacation days. *This classification includes retirement.*

**Release -** Release is a termination that results when an employee may not be suited for the type of work, may lack the qualifications or is unable to perform job duties in a satisfactory manner. If you are released, you will be paid for unused vacation days.

**Layoff -** Layoff results when no work is available for an employee or the job position has been eliminated. If you are laid off, you will be paid for unused vacation days.

**Discharge -** Discharge is a termination that results from violation of standards of conduct, willful failure to observe Company policies and procedures, purposely performing job duties in an unsatisfactory manner or other forms of gross misconduct. If you are discharged, you will not receive pay for unused vacation days or other accrued non-wage benefits unless required by law. This provision does not alter the at-will relationship.

**Before you can receive your final paycheck you must:**

- Return all Company property, including keys, tools, handbooks, credit cards, cellular telephones, uniforms, etc., that is in your possession

- Satisfy all financial obligations you have to the Company

CONFIDENTIAL
ADS / CANNON
0100

You will not be eligible for bonus pay, incentive compensation or any other additional compensation unless you are actively at work on the day that such compensation is payable to eligible employees.

The final paycheck for terminated employees will be processed with the next regularly scheduled payroll.

## Work Rules

### Absences and Tardiness

Your contribution to the success of our Company is important and we need you at work every day. Absenteeism and tardiness cause a loss of efficiency and places an undue burden on your fellow employees.

You should give advance notice, whenever possible, to your supervisor of an expected absence or late arrival to work. This will give your supervisor time to reassign your work. If you are unable to give advance notice due to unforeseen events, such as illness or family emergency, you or an adult member of your family should contact your supervisor as soon as possible about your situation and when you expect to return to work. In addition, if your return from an absence is uncertain or unscheduled, you should contact your supervisor the day before you expect to return to work so your workday can be scheduled. Failure to notify your supervisor before returning to work could result in your being sent home for lack of work. If your supervisor is not available, another member of management should be contacted. Do not leave a message with the first person who answers the phone or the voice mail system; we want to hear from you.

The Company may require a physician's release, obtained at your expense, before you are permitted to return to work if the absence was due to an illness or injury. The Company may also require a physical examination, at the Company's expense, by a physician chosen by the Company. This is to protect you from further injury or illness caused by returning to work before you are capable.

Unauthorized or excessive absenteeism or tardiness may result in disciplinary action up to and including discharge. If you are absent without notice to your supervisor or other member of management, it will be presumed that you have voluntarily resigned your position without notice.

### Bulletin Boards

The Company may post notices on bulletin boards, walls, and fences or erect signs to communicate with its employees. You may not post any notices on Company property, including vehicles and equipment, without prior approval by the Company.

CONFIDENTIAL
ADS / CANNON
0101

## Communication Devices

Drivers and certain other employees may be issued radios or similar communication devices to assist them in staying in touch with their supervisor, dispatcher or scale operator. If you have been issued such a device, you are required to monitor it while performing your duties and advise your supervisor or dispatcher whenever you are expected to be away from your device for more than a few minutes. You must check that your communications device is operating properly at the beginning and end of each day. If your device is inoperable, you are required to make contact as directed by your supervisor.

Your communications device must be used for Company business only and in accordance with Federal laws and Company regulations.

## Company Property

You will most likely be entrusted with the operation or use of company property while performing your job duties. Some employees will use office equipment, computers and telephones while others will drive or operate large and costly trucks and equipment. Regardless of the type of Company property entrusted to your use, you are responsible for operating and handling the equipment in a safe and proper manner. If you have difficulty operating or are unsure about the proper way to operate Company property, you should contact your supervisor. If you abuse or operate Company property in a careless or improper manner, you may be disciplined up to and including discharge.

## Confidentiality

All information relating to the Company's business, its customers and its employees must be treated with strict confidence. You are responsible for the safeguard and protection of all Company information entrusted to you. You should only discuss such information with other employees whose job responsibilities permit them access to such information.

Customer lists and pricing, employee pay rates and pricing arrangements with vendors are among the most confidential information you may encounter. Disclosure of any customer information to individuals outside the Company is a very serious offense that could lead to civil action. Employee pay rates, including your own, are not to be disclosed or discussed with anyone except your supervisor, payroll administrator or human resources administrator. Agreements with vendors help the Company maintain its competitiveness and such information may not be disclosed.

Employees performing certain job duties may be required to sign written confidentiality agreements.

Disclosure of customer, employee, vendor and other Company information may subject you to disciplinary action up to and including discharge.

CONFIDENTIAL
ADS / CANNON
0102

## Customer Relations

The Company expects all employees who interact in any manner with customers to be responsive to their requests and treat them with respect. Do not hesitate to ask your supervisor for assistance if a customer becomes abusive or irate, if the customer specifically asks to speak with a supervisor or manager or if you feel more confident having your supervisor or a manager assist the customer.

## Dress and Appearance

The image of the Company is influenced by the appearance of its employees. We are all expected to practice good hygiene and dress appropriately for our job duties. The dress requirements for your facility or department may be posted or communicated to you by your supervisor. Generally, clothing that is too revealing, tight fitting or provocative is inappropriate during business hours.

Some Company facilities require the use of uniforms while employees are engaged in their job duties. If uniforms are required, you must obtain your supervisor's approval before wearing any other type of clothing. Your supervisor will also advise you about the procedure for obtaining and cleaning uniforms.

In all cases regarding what is considered acceptable attire, the final decision rests with the Company. If your attire does not meet standards considered acceptable, you may be requested to go home to change, with time involved unpaid.

## Drug Free Workplace

In a commitment to safeguard the health of our employees and to provide a safe working environment for everyone, the Company has a drug-free workplace policy. It is the intent of the Company to provide a safe work environment for all employees free of the effects of substance abuse or abusers. Similarly, it is your responsibility to maintain personal health so you are physically and mentally capable of performing in the workplace. The abuse of drugs or alcohol is an unsafe and counter-productive practice that will not be tolerated. *If you believe you have a substance abuse problem, you are urged to seek assistance before your actions violate Company policy.*

Our drug-free workplace policy includes the following provisions:

- The Company prohibits the illegal use, possession, sale, manufacture, or distribution, of drugs, alcohol, or other controlled substances on Company property and in Company vehicles or equipment. It is against Company policy for you to report to work or to perform job duties, including the operation of a motor vehicle, under the influence of drugs or alcohol.

CONFIDENTIAL
ADS / CANNON
0103

- All applicants considered final candidates for a position may be tested for the presence of drugs as part of the application process. Any applicant refusing to submit to a pre-employment drug test will be ineligible for hire. If an applicant's test is confirmed positive, the applicant will not be considered for employment at that time and will be informed that he or she has failed to meet employment standards.

- *You are subject to <u>random drug testing</u> in accordance with Company policies and governmental regulations.*

- *You may be tested when there is a <u>reasonable suspicion</u> that you are using or have used drugs/alcohol.*

- If you suffer an injury on the job that requires referral for medical treatment you may be tested.

- If you refuse to submit to a drug/alcohol test, you will be terminated from employment or otherwise disciplined.

- Prescription drugs prescribed by your physician may be taken during work hours. You should notify your supervisor if the use of properly prescribed prescription drugs might adversely affect your work performance. You may be assigned other duties if the use of prescribed medication may interfere with your regular job duties. Abuse of prescription drugs will be considered a violation of this policy.

- In the case of a violation of the Company policy, including a positive drug or alcohol test result, you will be subject to discipline up to and including discharge.

## Honesty

Honesty and integrity are personal characteristics that each of us should strive for at all times. Unfortunately, there are times when, for whatever reason, the line that separates honesty and integrity is violated. If that line is violated in any of the following areas, the employee may be subject to disciplinary action up to and including discharge:

- Falsifications of Company paperwork, including but not limited to service agreements, landfill and recycling tickets, incentive pay sheets, vehicle condition reports, repair orders, time cards, expense reports, accident and safety reports, purchase orders, insurance forms, commission calculations, adjustment forms, employment applications and any other type of form or paperwork that you are required to complete from time-to-time.

- Theft of Company equipment, including but not limited to, tools owned by the Company or other employees, office equipment, office supplies, sales marketing and promotional items and any other Company or employee owned property.

CONFIDENTIAL
ADS / CANNON
0104

## Housekeeping and Office Appearance

The appearance of individual offices, workstations and other work areas, including truck and equipment cabs is representative of the type of service we provide and a reflection on our fellow employees. Clean, neat and uncluttered work areas represent the kind of service we wish to provide to our customers. Employees are asked to keep work areas well maintained, especially work areas in view of customers who visit our offices.

## Meal and Rest Breaks

Breaks for meals and rest will depend upon your job function and the facility or department where you are employed. Break times and duration will be posted or communicated to you by your supervisor. Due to variable workload and assignments, you may be required to vary the time and duration of your break.

Employees subject to the regulations of the U.S. Department of Transportation who work at least seven (7) hours per day are required to take a thirty (30) minute work break.

## Notification of Change in Personal Information

We need to know how to reach you when you're off the job, if necessary, and who to contact in case something happens to you on the job. The Company may also periodically mail you important documents that require your attention. Therefore, certain information about you must be kept up-to-date. You are required to help us keep our records current by promptly notifying your supervisor of any change in your name, address, phone number, and primary person to contact in the event of an emergency.

## Personal Computers / Internet / E-mail and Voice Mail

### Personal computers and software

Personal computers ("PC") and all the files on the PC are the property of the Company and not the personal property of any individual employee. Use of the PC for anything other than business related functions must have the prior approval of your supervisor. All non-business related activity on a Company PC must be done on your own time and only with the prior approval of your supervisor. The following rules apply to PC and software:

**Viruses** - No files may be copied onto a PC or accessed from a floppy or removable disk or drive without checking for viruses. If your PC is not installed with a virus scanner, you should contact your supervisor or a member of the computer department before copying any files. If a virus is found, you should immediately tell your supervisor or contact a member of the computer department. Do not continue to use the PC if a virus has been found without authorization from your supervisor or the computer department.

CONFIDENTIAL
ADS / CANNON
0105

**Unauthorized Software** - No software, including personally owned software, screen savers and games, may be loaded onto the PC without prior approval from the computer department.

**Passwords** - No passwords may be used that block entry to your PC or to specific files without prior approval from your supervisor. If a password is approved, the password must be given to your supervisor. Your unique network login, e-mail and network applications passwords control your level of access and such passwords may not be disclosed to anyone except to members of the computer department.

**Security** - Upon your separation from the Company, all files on the PC remain or become the property of the Company. Copying of such files for personal use is prohibited.

**Care and Maintenance** - Normal wear of the PC is to be expected. However, please use common sense when working with the PC. Food and drinks should not be placed on or near where the PC resides. If the PC fails for any reason, please contact your supervisor or member of the computer department.

**Moving** – All computers have been tagged for inventory and location control. No computers, printers, or other attached devices may be moved without prior authorization from the computer department.

**Internet Usage** – The Internet and the World Wide Web networks provide a unique service for acquiring and sharing government, technical and other information. Employees using the Internet need to ensure that they do so in a proper, ethical and professional manner. Any employee who violates this policy or uses the system for improper purposes will be subject to discipline up to and including discharge. Employees who use the Company access to the Internet:

- Must not disclose or transmit Company proprietary information via the Internet unless approved by the Company.

- Must not download, upload or view material containing the following:

|  |  |
|---|---|
| -Derogatory racial content | -Political statements |
| -Sexual content | -Offensive language |
| -Derogatory religious content | -Games |
| -Any content, which would negatively reflect upon the Company | |

- Must not use the Internet for personal gain or non-business solicitation.

- Must not attempt to gain unauthorized access to any computer or communications systems on the Internet.

- Must check any downloaded executable software using an approved virus package before that software is run on any Company computer system.

CONFIDENTIAL
ADS / CANNON
0106

- Are not permitted to use personal Internet accounts on Company time without your supervisor's approval.

**E-mail and Voice Mail**

Ownership of internal communication systems, whether they are technologically or paper based remains with the Company. The Company reserves the right to read anything contained in a Company owned electronic or paper communication system and listen to messages in the voice mail system. The Company's e-mail and voice mail policies are set forth below:

- The electronic and voice mail systems hardware and software and the paper communication system (referred to collectively herein as "Mail Systems") are Company property. Additionally, all messages composed, sent, received or recorded on the Mail Systems are and remain the property of the Company. They are not the private property of any employee.

- The use of the Mail Systems is reserved solely for the conduct of business at the Company. They may not be used for personal business.

- The Mail Systems may not be used to solicit for commercial ventures, political cause, outside organizations, or other non-job-related solicitations.

- The Mail Systems are not to be used to create any offensive or disruptive messages. Among those which are considered offensive are any messages which contain sexual implications, racial slurs, gender specific comments, or any other comment that offensively addresses someone's age, religious beliefs, national origin, disability or other protected status.

- The Mail Systems may not be used to send or receive copyrighted materials, trade secrets, proprietary financial information, or similar materials without the Company's authorization.

- The Company reserves the right to review all messages created, received, sent or recorded over the Mail Systems for any purpose. The contents of electronic and voice mail may be disclosed within the Company without the permission of the employee, even if it was properly obtained for legitimate business purposes. An employee's use of the Mail Systems is considered to be a waiver of privacy to the Mail Systems.

- The confidentiality of any message should not be assumed. Even when a message is erased, it is still possible to retrieve and read that message.

- Notwithstanding the Company's right to retrieve and read any electronic and listen to voice mail messages, such messages should be treated as confidential by other employees and accessed only by the intended recipient. Employees are not

JAX\688478_2                                   -12-

CONFIDENTIAL
ADS / CANNON
0107

authorized to retrieve or read any e-mail or voice mail messages that are not sent to them.

## Personal Property

The Company is not responsible for the loss or theft of employee's personal property or valuables. It is your responsibility to keep such property in a safe place. If you drive Company vehicles or equipment, you should remove all personal property at the end of your shift.

## Personal Telephone Calls and Visitors

Our telephone lines are exclusively for the conduct of Company business. Employees should refrain from using our telephones for calls, except in emergencies. The cost of personal long distance calls must be reimbursed to the Company. Visits by friends or relatives can be disturbing to our operations and are discouraged.

## Salvaging or Scavenging

Local governmental ordinances in some locations prohibit the salvaging or scavenging of recyclable or other solid waste materials. The Company has adopted the policy of prohibiting this type activity.

## Solicitations

Solicitations and distributions can put undue pressure on employees and interfere with work activities. Solicitations of employees and distributions of literature during working time or in work areas are strictly prohibited. Solicitations that are prohibited include, but are not limited to, magazine and periodical sales, memberships in organizations and political contributions. Distributions of prohibited literature include, but are not limited to, political or religious literature, advertising brochures, packages of materials, leaflets or information bulletins.

Fund raising for charities, such as United Way and other community wide appeals, may be permitted but only with the prior approval of the supervisor or manager of the facility or department where the fund raising will occur.

## Smoking

It is the intent of the Company to foster a healthy environment and observe local laws by maintaining a smoke-free environment in all Company buildings. All smoking must occur in designated areas outside Company buildings. Smoking is also prohibited while conducting business with our customers, including while operating Company vehicles and equipment.

CONFIDENTIAL
ADS / CANNON
0108

## Telephone Technique

Proper use of the telephone will give callers the feeling that we are friendly, helpful and considerate. Your help in being polite, courteous and professional when receiving or making calls to and from customers will create a positive image for all employees. Try to avoid keeping a caller on hold and do not allow a phone to ring unanswered. Also, try to assist the customer without forwarding the call to another employee – customers should not have to explain their needs more than once. If your office has an approved greeting, always use it when answering the telephone. You should confirm information received from the caller and hang up only after the caller has done so.

## Unions

It has never been necessary for an employee to join a union to get or keep a job in the Company. You may talk directly to your supervisor about your pay, benefits, and working conditions without interference from outsiders. The Company is committed to the fair treatment of employees with competitive pay practices and benefits. We feel that it is in the best interest of employees and the Company when we work together for growth and success.

## Vehicles and Equipment

You may be required to operate heavy trucks and/or equipment as part of your job duties. Such vehicles and equipment represent a significant capital investment by the Company and their proper and safe operation is essential in providing service to our customers. If the operation of such vehicles or equipment is part of your job, you are required to operate them in a safe and proper manner in accordance with federal, state and local laws and Company regulations and guidelines that may be distributed in addition to this handbook.

If your job duties require you to drive a Company vehicle or your personal vehicle, you may do so only if you possess a valid driver's license, which authorizes you to operate the size and type of vehicle, you are required to drive. Driving any vehicle in the performance of your job duties without a valid driver's license is strictly prohibited.

Mechanical malfunctions or suspected problems are to be reported promptly to your supervisor, dispatcher or shop manager. Seemingly minor problems can get progressively worse and develop into serious problems resulting in the vehicle being pulled out of service if left uncorrected.

Drivers and certain other employees may be required to operate Company vehicles and equipment away from Company premises. If you are operating such a vehicle or equipment, you must return it at the end of the workday to the appropriate Company

CONFIDENTIAL
ADS / CANNON
0109

facility. You may not leave it off the premises or at another Company facility without prior approval from your supervisor.

If your job duties require you to drive a heavy vehicle on public streets and highways, you are required to conduct a pre-trip inspection of your assigned vehicle using prevailing inspection procedures.

You may only drive the vehicle or operate the equipment that has been assigned and entrusted to you. You should not operate another vehicle or equipment unless your supervisor has assigned it to you or you have obtained your supervisor's authorization.

You are responsible for certain maintenance items on your vehicle or equipment. You should keep the inside of cab clean and orderly. Personal items that are not necessary for its operation are not permitted. Loose items that could cause windshield damage when the cab is tilted during servicing must be removed. Drivers of trucks with packer bodies must clean the area in front of the blade daily to avoid the accumulation of trash that diminishes the operational efficiency of the packer. All drivers should periodically check the exhaust system and remove any flammable material from the area.

If your job duties require you to work with bin containers, you should use certain precautions to avoid damage to the containers. Containers should be approached carefully to avoid damage from forks. Containers should be emptied completely. Containers with casters should be handled in a manner to avoid damage or breakage of casters when dropping or moving.

## Voting

The Company encourages all employees to exercise their right to vote. The polls are usually open a sufficient number of hours to allow you to vote either before or after your regular work hours. Employees will not receive pay for time taken off to vote.

## Safety

One of the Company's objectives is to provide a safe and healthy work environment for its employees. All employees are expected to comply with all federal, state and local occupational safety and health regulations and Company safety policies. However, compliance with governmental regulations and policies do not necessarily guarantee that we will have a safe work environment. Safety also depends primarily on the individual and collective efforts of our employees who have an active interest in their safety and the safety of others. Employees are expected to help promote a safe and healthy work environment by reporting unsafe practices and conditions to their supervisor, safety director or other member of management.

CONFIDENTIAL
ADS / CANNON
0110

This is a brief summary of some of the safety rules and is not intended to be a safety manual. There are other safety-related resources available from your supervisor and the safety director that may be distributed to you or obtained upon request.

## Accidents and Injuries

You must report immediately all accidents and injuries, regardless of extent, involving Company vehicles, equipment and/or employees and members of the general public while on the job. You must not leave the scene of an accident until authorized by your supervisor, safety director, or other member of management unless you have been injured and transported to a medical care facility. You may also be required to stay beyond the end of your shift to assist in the completion of paperwork required following an accident or injury. Failure to report an accident or injury is cause for disciplinary action up to and including discharge, unless injuries sustained in an accident render you incapable of making a timely report.

In the event of an accident or injury that requires medical treatment and when the injury appears to be life threatening, the employee should be taken to a hospital emergency room or an emergency rescue service called. For a less serious injury, an emergency primary care center designated by the Company should be used. You must report any on-the-job injuries promptly, to your supervisor or the safety director. Failure to promptly report on-the-job injuries could jeopardize your workers compensation benefits.

An employee who has had more than one (1) preventable accident or injury in a twelve (12) month period may be required to take additional training or may be subject to disciplinary action up to and including discharge.

## Motor Vehicle Safety

The Company is committed to providing a workplace free from the unsafe operation of Company vehicles as well as the unsafe operation of personal vehicles while conducting Company business.

Employees who operate Company vehicles or their personal vehicles on Company business must observe the following rules:

- If your job duties require you to drive a Company vehicle or your personal vehicle, you may do so only if you possess a valid driver's license, which authorizes you to operate the size and type of vehicle, you are required to drive. Driving any vehicle in the performance of your job duties without a valid driver's license is strictly prohibited.

- Upon request, employees and prospective employees must present a copy of their driving record and certificate of insurance for personal vehicles.

CONFIDENTIAL
ADS / CANNON
0111

- The Company will conduct periodic checks of the driving records of employees who drive a Company-owned vehicle or use their personal vehicles for Company business.

- Employees, either when driving a Company vehicle or when using their personal vehicle while conducting Company business, must operate the vehicles with care, and in a courtesy and safe manner. Employees demonstrating a pattern of recklessness (i.e., driving under the influence, excessive speeding, leaving the scene of an accident), or other unacceptable vehicular violations, will be subject to disciplinary action up to and including discharge.

- Employees who drive a Company-owned vehicle or use their personal vehicles for Company business must maintain no less than the minimal insurance coverage as required by the state in which they reside.

- Employees who drive a Company-owned vehicle or use their personal vehicles for Company business must notify their supervisor of any criminal vehicular violations within five days after such conviction.

- Employees must obey all federal, state and local driving laws.

- Employees must refrain from the use of alcoholic beverages or drugs that may impair driving abilities.

- Employees must immediately report any accidents to their supervisor.

# Compensation

## Work Week

The workweek refers to the period beginning 12:01 a.m. Sunday and ending midnight of the following Saturday.

The operating hours for administrative offices and facilities vary throughout our Companies. Your work hours will be posted or communicated to you by your supervisor. You must obtain permission from your supervisor to start work earlier/later or to end work earlier/later than the posted or stated time. Operating hours may be changed or extended to better serve our customers or take advantage of daylight hours.

The normal payday is Friday for the previous workweek. Your supervisor will determine the time and method for the distribution of paychecks within your department or facility.

CONFIDENTIAL
ADS / CANNON
0112

## Overtime   fill in with color like other bars

Employees eligible for overtime pay who work over forty (40) hours in a workweek will be compensated for overtime in accordance with federal and state laws.  Paid time for holidays, vacation, personal days and other paid absences is not considered "time worked" for purposes of determining overtime compensation.

The nature of your job duties and business circumstances may require you to work overtime on a regular or occasional basis.  You are expected to work overtime if required, unless excused by your supervisor.  Hours worked in excess of your regular schedule must be approved in advance by your supervisor.

Overtime pay does not apply to employees whose job duties exempt them from overtime pay.  These employees generally occupy administrative, professional, outside sales, executive and some computer-related positions.

## Time Cards

Employees are required to record their time worked, usually through the use of a time clock or a time sheet.  You must record your own time.  You must not permit another employee to record your time and you may not record the time of another employee without approval from your supervisor.  If you make a mistake recording your time, you should contact your supervisor or nearest member of management immediately to make the correction.  The employee and supervisor or manager should initial corrections.  At the end or your workweek, you must sign your time card or time sheet verifying that the time you entered is true and correct.  Falsification and tampering with time records are serious matters that could lead to disciplinary action up to and including discharge.

## Pay Advances and Loans

Employees are expected to be responsible for their own financial affairs and to budget their expenses wisely.  Company policies expressly prohibit pay advances and loans to employees.

## Deductions

The Company is required by federal and state laws to make certain deductions from your gross pay.  Additionally, you may authorize certain other voluntary deductions.

Deductions which the Company is required to make every pay period include federal and state income tax (withholding tax), social security taxes and Medicare taxes.  The Company may also be required to make deductions for past due federal and state income taxes, child support, garnishments and other deductions as directed by the courts or governmental agencies.

CONFIDENTIAL
ADS / CANNON
0113

Voluntary deductions include group medical, life and disability insurance, 401(k) plan contributions, charitable contributions, additional federal or state income taxes and other deductions, which you may authorize.

Payroll deductions will be itemized on your paycheck stub or direct deposit notice. If you have any questions about your deductions, you should contact your supervisor or payroll administrator.

## Wage and Salary Adjustments

It is the intent of the Company to maintain wage and salary rates that are competitive for similar work offered by other companies in the geographic area where our division operates. Wages and salaries are generally reviewed annually either on an anniversary or departmental basis. It is in the Company's discretion whether and when to award increases.

## Benefits and Paid Time Off

Your paycheck is important but it does not represent all of the compensation you receive from the Company. Not only do you receive your wages each payday, you may also receive a substantial amount of employee benefits, which, while not paid in cash, still represent real dollars to you and your family. These benefits include various types of insurance, paid vacations, paid holidays and other paid time off.

*Work schedules and routes are made in advance, so please request time off well ahead of time and have it approved by your supervisor.*

## Holidays

The Company observes the following five (5) paid holidays:

> New Year's Day
> Independence Day
> Labor Day
> Thanksgiving Day
> Christmas Day

The following rules apply to the holiday pay benefit:

- In some locations where the Company operates, local governmental ordinances or business circumstances may require the observation of additional holidays or the observation of certain holidays at different times, and in such instances it may be necessary for the holiday schedule to be altered in those locations.

CONFIDENTIAL
ADS / CANNON
0114

- If a paid holiday occurs on a Saturday or Sunday, the holiday may be observed on that day and paid during the following pay period.

- You must work the day before and the day after a holiday as well as any "make up" day to receive holiday pay, unless you are taking an approved personal or vacation day or otherwise have been excused by your supervisor.

- Because of the nature of our business and requirements of our customers, it may be necessary for employees to work on holidays. If you work on a holiday, you will receive pay for all hours worked in addition to holiday pay.  If you are scheduled to work during a holiday and fail to do so, you may be subject to disciplinary action.

- If a Company observed, paid holiday occurs while you are on a scheduled vacation, you will be paid for the holiday as well as the vacation day.

- Employees on family and medical leaves, military duty, workers compensation leaves and other approved unpaid leaves of absence will not receive holiday pay.

## Vacation

The Company encourages its employees to periodically take time off for rest and relaxation and provides its regular full-time employees with a paid vacation benefit based on length of service with the Company.

You will become eligible for the vacation benefit after one (1) year of continuous employment from your date of hire. Your vacation benefit accrues on your annual anniversary date according to the following schedule:

| Completed Years of Continuous Service | Annual Vacation Days |
|---|---|
| After 1 year | Five (5) days |
| After 2 years | Ten (10) days |
| After 7 years | Fifteen (15) days |

The following rules apply to the vacation benefit:

- Vacation time must be scheduled in advance and approved by your supervisor.  You should submit your vacation request in writing to your supervisor for approval as soon you know your desired vacation dates.

- Your supervisor has no obligation to approve your vacation for the time you request.  Consideration will be given to business needs, personnel requirements and other requests for absences.  You may be required to take your vacation at another time.

CONFIDENTIAL
ADS / CANNON
0115

- You must work the day before and the day after your vacation to receive vacation pay, unless you are taking a holiday, an approved personal day or otherwise have been excused by your supervisor.

- You can choose to receive part of your vacation benefit in pay instead of taking time off work if you have more than five (5) days of paid vacation available. This is often referred to as "selling" your vacation. You must take at least five (5) of your vacation days each year – you cannot sell those days. Request to "sell" your vacation must be submitted in writing and given to your supervisor.

- Vacation days do not accumulate and carry over from year-to-year. Any vacation days you have not used on your next anniversary date will be paid to you in the form of additional pay.

- Vacation time must be taken in minimum increments of one (1) day.

- Paid vacation time accruable in future periods may not be advanced.

- If a Company observed, paid holiday occurs while you are on a scheduled vacation, you will be paid for the vacation day as well as the holiday.

- Employees will be paid for unused vacation upon termination provided the employee is not discharged and gives a minimum of two (2) weeks notice.

## Personal Days

The Company recognizes that employees need to have occasional paid time off for illness, religious holidays and other personal reasons. If you are a regular full-time employee, you will receive up to Six (6) paid personal days per year. Each employee must work two (2) months in order to receive one (l) personal day. New employees will be eligible at the end of their introductory period for personal days. You will be paid for any unused personal days at the end of each calendar year if you are still an employee of the Company at that time. Any unused personal days will be paid at the beginning of the following year as additional pay. Accrued personal days are not paid if your employment is terminated prior to the end of the calendar year.

## Funeral

The Company recognizes the need for absence because of a death in the family. In the event of the death of a member of the immediate family (spouse, child, brother or sister of the employee, parent or grandparent of the employee), a two (2) day absence with pay will be automatically granted. If the funeral is held more than two hundred and fifty (250) miles from your home, you will be granted a third day absence with pay. It is further recognized that in some cases this is not sufficient time to handle necessary details and in such cases you may use your available personal or vacation days or you may

CONFIDENTIAL
ADS / CANNON
0116

request additional time off without pay. Absences for funerals must have the prior approval of your supervisor and may require additional documentation upon your return to work.

## Jury Duty

If you are subpoenaed for involuntary jury duty or as a witness in a court of law, you must notify your supervisor promptly of the time and place you are to appear. You are expected to return to work if you are dismissed from jury duty or complete your appearance before the end of your regularly scheduled workday. You will be paid the difference between your regular pay and the amount you receive from the court for up to three (3) days, during any twelve (12) month period, while serving on a jury or appearing in court during days which you would have been otherwise scheduled to work. You must give your original receipt showing the amount of pay received from the courts to your supervisor before you will receive any pay for jury duty.

## Leaves of Absence

A leave of absence is an excused absence without pay. It may be granted to maintain continuity of service in cases that require you to be absent for a prolonged period. Accrued vacation and personal days will be used at the beginning of any leave of absence. A leave of absence should be requested in writing at least two (2) weeks in advance or with as much notice as practical and be approved by your supervisor.

**Military Leave**

An employee will be granted unpaid time off from employment to satisfy military reserve obligations and/or active military duty in accordance with federal and state law. Employees are required to give advance written or verbal notice of an absence for military service, unless circumstances make it unreasonable or impossible to do so. Employees should provide written notice as soon as possible to their immediate supervisor and the Human Resources Manager.

Employees are entitled to take a cumulative leave of absence for military service for up to 5 years. An employee may elect to use any accrued vacation or other paid leave during the military leave. If an employee elects to use accrued vacation, he or she will receive full vacation pay.

At the conclusion of military service, employees who wish to return to work with the Company must report to the Company, or submit an application for re-employment, within a certain time frame. The time frame required depends on your length of military service, so you should contact the Human Resources Manager immediately to discuss your deadline for re-employment. The Company, of course, will comply with all federal and state laws concerning employees' military rights and obligations, including those laws dealing with re-employment and benefit continuation rights. If you have any questions regarding such issues, you should contact the Human Resources Manager.

CONFIDENTIAL
ADS / CANNON
0117

**Family and Medical Leave**

The Company's leave policies include benefits provided by the federal Family and Medical Leave Act (FMLA). Under the FMLA, an eligible employee may take up to 12 weeks of unpaid leave during a rolling calendar year:

      (a)    to care for the employee's child after birth, placement for adoption, or foster care;

      (b)    to care for the employee's spouse, child, or parent, who has a serious health condition (if the employee is needed to care for the family member); or

      (c)    for a serious health condition that makes the employee unable to perform the employee's job.

Under certain conditions, an employee may be entitled to take intermittent leave or to work on a reduced leave schedule.

To be eligible for the leave, an employee must have worked for the Company for at least one year, and for 1,250 hours over the previous 12 months. In addition, to be eligible for the leave, an employee must work at a worksite that employs 50 or more employees within a 75-mile radius.

An employee must give notice of the need for FMLA leave by advising his or her immediate supervisor at least 30 days before the leave when the leave is foreseeable. If 30 days' notice is not practicable because of an emergency or other circumstances, then the employee must advise the Company of the need for leave as soon as practicable (within no more than one or two working days of learning of the need). The employee will be required to explain the reason for the leave. The Company may require medical certification to support a request for leave because of a serious health condition, and may require second or third opinions (at the Company's expense) and a fitness for duty report to return to work. Periodic reports may also be required during any leave.

During FMLA leave, the Company will maintain the employee's health insurance coverage on the same basis as coverage would have been provided if the employee had been employed during the leave. Employees must make arrangements with the Human Resources Manager to pay for any benefits normally payroll deducted while on leave, such as premium payments for group health insurance. Although other benefits will not accrue, the employee will not lose any benefit already accrued prior to the start of FMLA leave.

Failure of the employee to pay their insurance premiums will result in loss of coverage.

Upon return from FMLA leave, the employee will be restored to his or her original or an equivalent position with equivalent pay, benefits, and other employment terms, except

CONFIDENTIAL
ADS / CANNON
0118

where not required by the FMLA. Employees who do not return to work promptly at the conclusion of approved leave will be presumed to have voluntarily resigned.

In order to return to work, employees must secure a doctor's release indicating that they may return to work. If the physician places restrictions on an employee's ability to return to work, Human Resources will evaluate whether the employee can return to their former job and whether an accommodation is necessary to permit the employee to do his or her job.

An employee will be required to substitute otherwise available paid leave for a portion of the unpaid FMLA leave. An employee must use available vacation time, sick leave, and family leave prior to using any available and/or approved unpaid leave. FMLA leave is subject to the provisions and limitations of the FMLA, whether or not the terms of the FMLA are specifically included in this Handbook. We welcome questions about FMLA leave, which should be directed to the Human Resources Manager.

## Social Security Retirement System

You may receive a lifetime monthly pension based upon earnings and the number of years worked if you are covered under the Social Security Act. In addition to the amount you have deducted from your paycheck, the Company also matches your deduction dollar for dollar and pays it into your social security account.

## Unemployment Compensation

The Company pays the entire cost of unemployment compensation insurance to provide a benefit to you in the unlikely event of a lay-off or other circumstances. You may receive a weekly benefit for a specified period of time while you search for other employment. Eligibility of qualifications is determined by the state where the claims are filed.

## Workers' Compensation

When an on-the-job accident is determined to be in the course and scope of your employment, workers' compensation insurance covers the cost for your medical expenses and hospital care plus compensation for lost wages. The company pays the entire cost of this benefit. All injuries, no matter how superficial they may appear, should be reported immediately, and within twenty-four (24) hours, to your supervisor. Failure to promptly report an injury could jeopardize your workers' compensation benefits.

## Pay Calculations for Benefits

Employees may, in certain instances, receive pay for unused vacation and personal days. It is usually necessary to determine the employee's daily or hourly rate to calculate the payment of this benefit. When the employee's rate is not stated as a daily or hourly rate, the equivalent daily or hourly rate will be calculated. Bonus pay, safety bonuses,

CONFIDENTIAL
ADS / CANNON
0119

overtime and all other forms of additional pay will not be considered in the calculation of the rate used for the payment of benefits.

CONFIDENTIAL
ADS / CANNON
0120

## Health and Insurance Benefits

### Eligibility

Eligibility for health insurance benefits is fairly simple. All full time, regular employees are eligible to enroll themselves and their dependents on the first of the month following ninety (90) days of active continuous employment. Your eligible dependents include your spouse and your unmarried children under age 19 or 25 (if a full time student in an accredited institution) who is legally dependent upon the Employee for at least fifty-one (51%) percent of support.. Children who are qualified mentally or physically disabled continue to be covered after age 19.

### Medical Plan Options

Depending on where you live, you may have a choice of up to two (2) medical plan options – a Point of Service ("POS"), or a Preferred Provider Organization ("PPO"). The POS and PPO options offer a network of providers and varying degrees of coordination of care. All medical plans include a prescription drug plan. If you choose medical plan coverage, you will share the cost of the benefits through a payroll deduction. Your cost for this benefit represents a small portion of the Company's total premium cost.

### Dental Plan

Dental benefits are also offered, which covers preventative, restorative and orthodontic, care. The plan has a per person and family deductible with annual maximum and lifetime maximum for certain types of care. You will share in the cost of the dental benefits if you choose to be covered by this plan.

### Enrollment

You will receive an Enrollment Kit during your Introductory Period. The kit will explain how the enrollment process works and includes details about the options you're eligible to choose and the cost. If you want to participate, you must follow the directions in your kit and complete the enrollment process by the deadline specified in your enrollment material.

### COBRA

COBRA refers to the Consolidated Omnibus Budget Reconciliation Act of 1985. If you are an employee of the Company covered by our medical insurance plan, you have the right to choose continued coverage at your expense if you lose your group health coverage because of a certain reduction in your hours of employment or the termination of your employment (for reasons other than gross misconduct on your part). Your eligible dependents may also have the right to elect and pay for continuation coverage for a

CONFIDENTIAL
ADS / CANNON
0121

temporary period in certain circumstances where their coverage under the insurance plan would otherwise end.  This notice is intended to inform you, in a summary fashion, of your rights and obligations under the continuation coverage provisions of the law.

## Standards of Conduct

The purpose of these rules and regulations is not to restrict, but to define and protect all employees.  Certain rules and regulations are required to safely and efficiently operate a business.  As circumstances change, rules often must change.  Therefore, the Company may from time to time amend these rules.

An employee is subject to disciplinary action, up to and including discharge, if any of the following rules are violated:

- Unsatisfactory work performance.

- Illegal gambling in any form while on Company premises or on company business.

- Failure of employee to give notification to or receive authorization from his or her supervisor before leaving the workstation, work site, or the job.

- Violation of Drug Free Workplace Policy.

- Limiting one's output or directly or indirectly encouraging another employee to cut down production.

- Failure to observe the ordinary rules of hygiene for sanitation or any special rules posted by the Company.

- Failure to comply with supervisory authority.

- Carelessness or neglect of duty in carrying out assignments or instructions from those in authority or insubordination of any kind.

- Falsification or withholding of facts on any Company records, including employment applications, time sheets, etc.

- Excessive absenteeism or excessive tardiness.

- Accepting payment or gifts for favoritism or services rendered other than gifts of nominal value (generally under $25), which are customary during certain; holiday periods or for special occasions, such as birthdays.
- Failure to follow policies, procedures and guidelines contained in the employee handbook, posted on Company premises or property or otherwise distributed to its employees.

CONFIDENTIAL
ADS / CANNON
0122

- Conviction of a serious crime, the nature of which would be considered to render an individual unreliable as an employee.

- Failure to follow safety rules and regulations.

- Conduct during work hours that could be construed as negative to our customers or the Company.

- Contracting with customers to perform work of any kind for them.

- Non-disclosure of interest in, or connection with any business that competes with the Company.

- Threatening, intimidating, coercing, or interfering with the performance of other employees.

- Engaging in such other practices inconsistent with the ordinary and reasonable rules of conduct necessary for the welfare of the Company, its employees or customers.

- Pilferage or theft of the property of the Company, customers, fellow employees or others.

- Fighting, disorderly, or immoral conduct on Company premises.

- Any solicitation in violation of Company policy.

- Carrying dangerous or concealed weapons.

- Sleeping on the job.

- Any form of unlawful harassment.

- Falsely stating or making claim of occupational or non-occupational injury or illness.

- Failure to report accidents immediately (including personal injury on the job).

- Horseplay.

- Discourtesy or impoliteness to Customers.

- Making false, vicious, profane, abusive or malicious statements.

- Holding unauthorized meetings on Company premises.

- Disregarding prescribed cash handling procedure.

CONFIDENTIAL
ADS / CANNON
0123

- Disclosure, or use, of confidential information not available to the general public for personal gain or benefit.

- Possession of firearms or explosives or other weapons on Company premises (including parking areas used by Company employees or customers).

- Conduct off the job that could cause loss of business or customers

- Willful or careless destruction of Company property.

*This list of Company rules is not necessarily a complete list of all activities that may result in disciplinary action.*

CONFIDENTIAL
ADS / CANNON
0124

JAX\688478_1 – Advanced Disposal – Employee Handbook

CONFIDENTIAL
ADS / CANNON
0125

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

ROBERT CANNON,                    )
                                  )
    Plaintiff,                    )
                                  )
v.                                )
                                  )    CIVIL ACTION NO.
ADVANCED DISPOSAL                 )    3:07cv846-wkw
SERVICES ALABAMA L.L.C.,          )
d/b/a SUNFLOWER WASTE             )
L.L.C.,                           )
                                  )
    Defendant.                    )

## DECLARATION OF GLENN GUEST

My name is Glenn Guest. I have been Director, Corporate Human Resources, for Advanced Disposal Services for the last two years. In my job as Director, Corporate Human Resources, I have access to employee files and drug testing information. I am aware of the lawsuit filed by Robert Cannon, and this Declaration is based on my personal knowledge.

1.    ADS provides waste management services throughout the Southeast including Alabama. ADS offers residential and commercial service, and ADS operates landfills to dispose of the garbage collected. Mr. Cannon worked in ADS' Tallassee facility as a residential driver driving a garbage truck.

2.    ADS acquired a municipal contract that had been Waste Management's in late 2006. Mr. Cannon had driven on that contract for Waste

Management. ADS sought Waste Management drivers, such as Mr. Cannon, who knew the routes on the municipal contract. Drivers, like Mr. Cannon, who had worked for Waste Management, which had a DOT alcohol and drug testing program, were allowed to begin driving for ADS before ADS received the pre-employment drug test results. When Mr. Cannon started working for ADS, it had no knowledge of the failed drug test on file with Waste Management.

3.    In late February or early March 2007, I was doing research on positive drug tests within the company. I was reviewing a list of employees with ADS who had tested positive for drugs or alcohol. I was ensuring that all employees who failed a drug test had been discharged, and I noticed that Mr. Cannon had a failed drug test but had not been discharged. No other employees who had failed a drug test were still working for ADS.    Therefore, I contacted Mr. Tom Davis (B), Director of Safety, and informed him that there was an active employee who had tested positive for drugs.

4.    William Perry, Jr. (B) replaced Mr. Cannon. (Mr. Perry's hiring paperwork is attached as Exhibit 1).

5.    Coke Conway (W) was hired as a driver on January 22, 2007, and continued to work as a driver after plaintiff's discharge. (Mr. Conway's Employment Records are attached as Exhibit 2). Mr. Conway never failed a drug or alcohol test required by ADS, and ADS had no knowledge of any failed drug or

alcohol tests by Mr. Conway while he worked for ADS. Mr. Conway (W) was in a vehicle accident but was not tested because of the minor nature of the accident, which did not require testing pursuant to DOT regulations. There was no medical treatment required by any persons involved in the accident and none of the vehicles had damages that prevented them from being driven.

6.     Rueben Lowder (B) was in a vehicle accident and was subsequently drug tested pursuant to DOT regulations based on the severity of the accident. Mr. Lowder's drug test was negative.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of July, 2008.

Glenn Guest

Employee Master File Report

**Company Code:** SP2

**Date:** 06-16-2008

**File Number:** 422    **Name:** Perry Jr, William    **Social Security Number:** 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

## PERSONAL INFORMATION:

| | | | |
|---|---|---|---|
| Address: | 4731 Pollman St | Gender: | M |
| | | Birth Date: | 07/17/1981 |
| | Columbus | Marital Status: | S |
| | GA | # of Dependents: | 0 |
| | 31907 | | |
| Home Phone #: | 706-565-8783 | | |
| Status: | Active | | |
| Hire Date: | 04/02/2007 | Years Of Service: | 1:2 |
| | | Seniority Date: | 04/02/2007    Sen Years:  1:2 |
| Home Dept: | 0SW030 | Location: | 0SW |
| Worker's Comp: | 9403 | Employee Type: | FT    Assigned Shift:  1 |
| EEO Ethnic Code: | Black | EEO Occupation: | Operative    EEO OJT Class:  Production |

## ALLOCATION INFORMATION:

## PAY RATE INFORMATION:

Rate Type:    Daily    Rate 1:    128.7500    Effective Date:    04/14/2008
Rate 2:                           128.7500    Rate 3:                 128.7500    Pay Frequency:    W
Rate Multiplier Code:    1.5 1.0
Use Period End Date 1 (Pay Group1)

## TAX INFORMATION:

Federal Filing Status:                    S    Federal Filing Exemptions:    0
W-2 Display for Qualified Pension:    Company Default

State Worked In:                          AL    Filing Status:                          S
Exemptions/Allowances:              0    12th of Month:                        Month 1
SUI/SDI Code:                            03

Not Owner/Officer

**EXHIBIT 1**

**Company Code:  SP2**                                                      **Date:**  07-01-2008

| File Number: | 403 | Name: | Conway Jr, Coke | | Social Security Number: | 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 |

**PERSONAL INFORMATION:**

| Address: | 5474 Lee Rd 390 | **Gender:** | M |
| | Opelika | **Birth Date:** | 05/11/1969 |
| | AL | **Marital Status:** | S |
| | 36804 | | |
| Home Phone #: | 334-745-6784 | | |
| Status: | Terminat | | |
| Hire Date: | 01/22/2007 | **Years Of Service:** | 0:11 |
| Termination Date: | 12/28/2007 | **Reason:**  D | **Seniority Date:** | 01/22/2007 | **Sen Years:**  1:5 |
| | | **Status:**  N | | |
| Home Dept: | 0SW030 | **Location:** | 0SW |
| Worker's Comp: | 9403 | **Employee Type:** | FT | **Assigned Shift:** | 1 |
| EEO Ethnic Code: | White | **EEO Occupation:** | Operative | **EEO OJT Class:** | Production |

**ALLOCATION INFORMATION:**

**PAY RATE INFORMATION:**

| Rate Type: | Daily | Rate 1: | 128.7500 | **Effective Date:** | 06/18/2007 |
| Rate 2: | | | 128.7500 | **Rate 3:** | 128.7500 | **Pay Frequency:** | W |
| Rate Multiplier Code: | | | 1.5 1.0 | | |
| Use Period End Date 1 (Pay Group1) | | | | | |

**TAX INFORMATION:**

| Federal Filing Status: | S | **Federal Filing Exemptions:** | 2 |
| W-2 Display for Qualified Pension: | Company Default | | |

| State Worked In: | AL | **Filing Status:** | S |
| Exemptions/Allowances: | 1 | **12th of Month:** | Month 1 |
| SUI/SDI Code: | 03 | | |

**Pay-by-Pay Workers' Compensation Classification:**

| Status | Type | Job Class Code | Description |
|---|---|---|---|
| | Not Owner/Officer | | |

**EXHIBIT 2**

# DEPOSITION OF DANNY FUTRAL

## April 11, 2008

## Pages 1 through 44

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**



Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3                     EASTERN DIVISION
4
5    ROBERT CANNON,
6          Plaintiff,
7    Vs.              CIVIL ACTION NO.
                      3:07-CV-846-WKW
8    ADVANCED DISPOSAL SERVICES
     ALABAMA, LLC, d/b/a SUNFLOWER
9    WASTE, LLC,
10         Defendant.
11
12
13
             * * * * * * * * * * * * *
14
15        DEPOSITION OF DANNY FUTRAL, taken pursuant
16   to stipulation and agreement before Haley A.
17   Phillips, Certified Court Reporter, ACCR # 151, and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of McNeal & Douglas, 1710 Catherine
20   Court, Auburn, Alabama, on Friday, April 11, 2008,
21   commencing at approximately 9:00 a.m.
22
             * * * * * * * * * * * * *
23
```

Page 2

```
1              APPEARANCES
2
     FOR THE PLAINTIFF:
3
     James B. Douglas, Jr., Esq.
4    McNeal & Douglas
     Suite B
5    1710 Catherine Court
     Auburn, Alabama 36830
6
     FOR THE DEFENDANT:
7
     J. Tobias Dykes, Esq.
8    Constangy, Brooks & Smith
     Attorneys at Law
9    1819 Fifth Avenue North
     One Federal Place, Suite 900
10   Birmingham, Alabama 35203
11
             * * * * * * * * * * * * *
12
13
14           EXAMINATION INDEX
15   BY MR. DOUGLAS . . . . . . . . . .  4
16
17           * * * * * * * * * * * * *
18
19
20
21
22
23
```

Page 3

```
1                STIPULATION
2       It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of DANNY FUTRAL is taken pursuant to the
5    Federal Rules of Civil Procedure and that said
6    deposition may be taken before Haley A. Phillips,
7    Certified Court Reporter, ACCR # 151, and
8    Commissioner for the State of Alabama at Large,
9    without the formality of a commission, that
10   objections to questions other than objections as to
11   the form of the question need not be made at this
12   time but may be reserved for a ruling at such time
13   as the said deposition may be offered in evidence
14   or used for any other purpose by either party
15   provided for by the Statute.
16      It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23      It is further stipulated and agreed by and
```

Page 4

```
1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby not waived.
4            * * * * * * * * * * * * *
5                DANNY FUTRAL
6       The witness, after having first been duly
7    sworn to speak the truth, the whole truth and
8    nothing but the truth testified as follows:
9                EXAMINATION
10   BY MR. DOUGLAS:
11   Q.   State your name, please, sir.
12   A.   Danny C. Futral.
13   Q.   Mr. Futral, my name is Jim Douglas.  I
14        represent Robert Cannon.  You and I haven't
15        met before today, have we?
16   A.   No, sir.
17   Q.   Have you ever given a deposition before?
18   A.   Yes, sir.
19   Q.   I'm going to ask you some questions this
20        morning.  I'll do my best to ask good
21        questions.  There will be times when I
22        don't do a good job of it.  If you would
23        just let me know, I'll be happy to rephrase
```

April 11, 2008

Page 5

1       my question, okay?
2   A.  Yes, sir.
3   Q.  If I ask a question and you answer it, I'll
4       assume you understood my question.
5   A.  Yes, sir.
6   Q.  Fair enough?
7   A.  Fair enough.
8   Q.  How many times other than today have you
9       given a deposition?
10  A.  Twice.
11  Q.  Tell me about those.
12  A.  One, I was a -- I guess you'd call it site
13      manager for Waste Management in Alexander
14      City.  Before I got there, there had been
15      an accident with one of our drivers.  And
16      it went on and on and on for a couple of
17      years, and when finally it come up for
18      court, I had to go in and give a deposition
19      that I knew the guy and what was going on
20      and what had happened in the time frame I
21      had been there.
22          The other time was -- Again, I was a
23      manager in Montgomery, and one of our guys

Page 6

1       had a car accident that I had investigated
2       who had hit a car.  And I had to go and
3       give a deposition for him.  And that's the
4       only two times.
5   Q.  So in both of those depositions, you
6       weren't one of the parties who were really
7       involved in the case?
8   A.  No, sir.
9   Q.  Have you ever sued anybody?
10  A.  No, sir.
11  Q.  Have you ever been sued?
12  A.  No, sir.
13  Q.  Where do you live?
14  A.  Montgomery.  Well, Marbury, Alabama.
15  Q.  Give me the address, if you would, please.
16  A.
17
18  Q.  How long have you lived there?
19  A.  Since '92.
20  Q.  Where did you live before then?
21  A.  United States Army.  Seattle.
22  Q.  Washington?
23  A.  Yes, sir.

Page 7

1   Q.  How long were you there?
2   A.  Nine years.  And before that it was just
3       all over.
4   Q.  When did you -- How long were you in the
5       Army?
6   A.  20 years.
7   Q.  From when to when?
8   A.  Lord.  '72 to '92.
9   Q.  And you were honorably discharged?
10  A.  Yes, sir.
11  Q.  What was your rank when you were
12      discharged?
13  A.  I was a sergeant first class.
14  Q.  Are you currently employed?
15  A.  Yes, sir.
16  Q.  Who with?
17  A.  Advanced Disposal.
18  Q.  How long have you been there?
19  A.  Three years.
20  Q.  What do you do there?
21  A.  Site manager.  A manager.  They --
22      Supervisor, manager.
23  Q.  What does that mean?

Page 8

1   A.  I was over the residential section.
2   Q.  Right.  But what are your duties?
3   Q.  Sir?
4   Q.  What are your duties?  What do you do when
5       you come to work?
6   A.  Supervise people, help them if they have
7       any questions, take care of them, take care
8       of their wants and needs, make sure they've
9       got the equipment to work with, making sure
10      their routes get picked up every day,
11      making sure that they're safe.
12  Q.  Making sure who is safe?
13  A.  The drivers are acting -- they're being
14      safe.  Their vehicles are safe and all of
15      that.
16  Q.  So you supervise the drivers?
17  A.  Yes, sir.
18  Q.  On the trucks are there drivers and
19      helpers?
20  A.  Yes, sir.
21  Q.  Do you super --
22  A.  On some of the trucks, there's drivers and
23      a helper.

Deposition of Danny Futral

April 11, 2008

Page 9

1　Q.  For the ones that there are, do you
2　　　 supervise both the drivers and the helpers?
3　A.  Yes, sir.
4　Q.  So you would be their immediate boss?
5　　　 Would that be fair to say?
6　A.  Yes, sir.
7　Q.  And who do you report to?
8　A.  My supervisor, which was anybody over me.
9　　　 Usually, it's the operations manager.
10　Q.  Do you remember Robert Cannon?
11　A.  Yes, sir.
12　Q.  Who was your supervisor when Robert Cannon
13　　　 worked for Advanced Disposal?
14　A.  Russell Davis.
15　Q.  Did you report to him?
16　A.  Yes, sir.
17　Q.  Did you report to anybody else?
18　A.  Yes, sir.
19　Q.  Who else?
20　A.  Van Forester.  He was the manager.
21　Q.  Anybody else?
22　A.  No.
23　Q.  Did you have daily contact with those two

Page 10

1　　　 gentlemen that you just named that you
2　　　 reported to?
3　A.  Yes.  Russell especially.
4　Q.  Do you know where Russell is now?
5　A.  I was -- No.
6　Q.  Have you heard where he is?
7　A.  Yes, sir.
8　Q.  Tell me what you've heard.
9　A.  Weldon.  He lives on Weldon Road, and he
10　　　 works for a recycling company on Highway
11　　　 14 is what I was told.
12　Q.  In Tallassee?
13　A.  Yes, sir.
14　Q.  Who told you that?
15　A.  Just different people that knows him.
16　Q.  And Weldon Road is in Tallassee, Alabama?
17　A.  Yes, sir.
18　Q.  And the recycling -- Do you know the
19　　　 recycling company on Highway 14?
20　A.  I don't know the name of it, but it's the
21　　　 only one on 14.  Right there close to
22　　　 Wetumpka.
23　Q.  So between Tallassee and Wetumpka?

Page 11

1　A.  Yes, sir.  On Highway 14.
2　Q.  On the right or the left as you're headed
3　　　 to Wetumpka?
4　A.  Right.
5　Q.  Have you ever been convicted of a felony?
6　A.  No, sir.
7　Q.  Have you ever filed for bankruptcy
8　　　 protection?
9　A.  No, sir.
10　Q.  Are you taking any medications this
11　　　 morning?
12　A.  Lord, yes.
13　Q.  Any of them that alter your memory?
14　A.  Oh, no, sir.
15　Q.  What are you taking?
16　A.  I'm a heart patient.
17　Q.  Okay.
18　A.  And I have blood pressure medicine.  And
19　　　 that's it.
20　Q.  Have you had heart surgery in the last
21　　　 couple of years?
22　A.  Yes, sir.
23　Q.  When was that?

Page 12

1　A.  Ninety -- It was either '98 or '99.  And I
2　　　 had open-heart surgery, five bypasses.
3　Q.  And doing okay since?
4　A.  Had a couple heart attacks since then.
5　Q.  When was the last one?
6　A.  It was more of an anxiety attack than
7　　　 heart.  That was about five years ago.
8　Q.  How long did Robert Cannon work for
9　　　 Advanced Disposal?
10　A.  Exactly, I wouldn't know.
11　Q.  Approximately?
12　A.  Couple of weeks.
13　Q.  What did you think of him as an employee?
14　A.  Good employee.
15　Q.  So you didn't have any complaints with his
16　　　 performance?
17　A.  No.
18　Q.  Do you know why he was terminated?
19　A.  Yes.
20　Q.  How did you come across that information?
21　A.  Given to me by Russell Davis.
22　Q.  What did Russell tell you?
23　A.  That he was positive on a drug test.

Page 13

1  Q.  And what did you say to Russell, if
2      anything?
3  A.  I couldn't believe it.  I was shocked.  I
4      just hadn't -- had no idea.
5  Q.  You were surprised that he had tested
6      positive?
7  A.  (Witness nods head.)
8  Q.  Is that yes?
9  A.  Yes, sir.  I'm sorry.
10 Q.  I just need you to answer audibly --
11 A.  Yeah, I understand.
12 Q.  -- so she can get it down.
13 A.  Yes, sir.  I was surprised he was positive
14     on a drug test.
15 Q.  Did Russell say anything to you about
16     giving him another test to try to keep him?
17 A.  He said the social security number matched,
18     everything matched except there was a
19     discrimination (sic) with the first name.
20     I think is the way he said it.  Or either
21     the last name.  One of the names.  And I
22     said, well, are we sure that's him.  And he
23     said, yeah; I'm going to talk to Van.

Page 14

1          They come back and told me -- He come
2      back and told me that they was going to
3      give him another test.  I was standing
4      there, as a matter of fact, when Van says,
5      retest him and make sure the name and
6      everything is correct.  And that was, as
7      far as I know, how it went.
8  Q.  Is that -- Have you told me everything you
9      remember about that conversation with
10     Mr. Davis?
11 A.  Yes, sir.
12 Q.  Regarding Mr. Cannon?
13 A.  Yes, sir.
14 Q.  Did you have any conversations either
15     before or after that with Mr. Davis
16     regarding Mr. Cannon?
17 A.  He come back to me and -- Well, I had a
18     paper that was given to me by Red of a
19     personal drug test.  And I carried it to
20     Russell and says, look, and showed it to
21     Russell.  And Russell said -- Well,
22     supposedly he had been retested.  And
23     Russell told me that he was -- he had to go

Page 15

1      ahead and terminate him anyway because of
2      the first drug test.
3  Q.  Did Russell tell you what the second
4      company drug test was, whether it was
5      negative or positive?
6  A.  No, sir.  I assumed it was positive, but I
7      didn't know.  I just -- He told me to
8      terminate him.  I didn't have no choice but
9      to do that.
10 Q.  If I represented to you that the second
11     drug test was negative taken by the
12     company, would that refresh your memory as
13     to whether you were ever told that or not?
14 A.  No, sir.
15 Q.  So you just assumed it was positive because
16     they told you they had to let him go?
17 A.  Because of the first drug -- He had to be
18     let go because of the first drug test
19     because he associated (sic) positive on it.
20 Q.  Okay.  Any other conversations after that
21     regarding Mr. Cannon?
22 A.  No, sir, not that I can remember.  I mean,
23     I signed the paper and carried it back to

Page 16

1      Russell and told him I had terminated him,
2      so it could go in his file.  But as far me
3      and him sitting down and specifically
4      talking about Red, no.
5  Q.  Did -- Tell me what conversations you had
6      with Mr. Cannon after you found out -- when
7      you first found out that he had allegedly
8      tested positive for drugs.
9  A.  I went to him.  I asked him and he said,
10     no.  And he said, I'm going to get one from
11     my private doctor.  I said, whatever.  And
12     when he brought that to me -- I mean, it
13     was, like, the next day he brought it to
14     me.  And I sent it to Russell.  And I went
15     back to Red.  He said, what.  I said, I'm
16     going to have to wait and see what's going
17     on.  And that's when I told him, I said,
18     you're going to be retested.  And he was
19     retested.
20 Q.  What was your next conversation with
21     Mr. Cannon about this issue, if any?
22 A.  That he had showed positive on the initial
23     drug test.

Deposition of Danny Futral

April 11, 2008

Page 17

1  Q.  Right.  But you had already told him that?
2  A.  It was pre-hire.  Yeah.  I gave him the
3      results.  I asked him if -- I asked him if
4      the doctors had contacted him, because
5      usually they do that --
6  Q.  And what did he say?
7  A.  -- before they ever contact us.
8          No.
9  Q.  So Mr. Cannon told you that the doctors had
10     not contacted him?
11 A.  Yeah.
12 Q.  Is that right?
13 A.  Yes, sir.
14         See, it was -- At the same time,
15     Russell -- Red was having some problems
16     with his housing and he was on and off work
17     because of his housing problem he had.
18     They was evicting him.  And I think it's
19     back -- All that was going on about the
20     same time with him.
21 Q.  After you had the conversation with
22     Mr. Cannon telling him that he had tested
23     positive on the first test and then later

Page 18

1      he brings you the test from his doctors --
2      You said the next day; is that right?
3  A.  I think so.  I'm not sure.  It was the
4      next -- It was right in there after that.
5  Q.  Tell me about your next conversation with
6      Mr. Cannon about this issue, if there were
7      any more conversations.
8  A.  I called him in when Russell told me to
9      terminate him and told him, Red -- I said,
10     Red, because of the initial positive, I've
11     got to let you go.  I said, I ain't got no
12     choice about it.  I've been told by my
13     superior that you've got to go and --
14     because of our policy at the company.
15         He said, Danny, I wasn't positive.  I
16     said, all I know is the results.  And I
17     terminated him.  And it -- I could tell it
18     hurt him.  You know, of course, it's going
19     to hurt him.
20 Q.  How did you terminate him?  Did you just
21     tell him you're -- I've got to let you go?
22 A.  I've got to let you go, Red; I can't use
23     you no more, you know, because of the drug

Page 19

1      test, company policy.  And he says, all
2      right.  You know, I just -- He had just
3      brought me his nephew to put him -- no, not
4      nephew, I think -- to put him on the back
5      ·of the truck.
6  Q.  What was his name?
7  A.  Willie Summers.
8  Q.  Is he with the company still?
9  A.  Still with the company.
10 Q.  What's he do?
11 A.  But I haven't -- He's a helper.  Always
12     been a helper.  He can't get a driver's
13     license, so ...
14 Q.  And did Mr. Cannon leave after you told
15     him?
16 A.  Yes, he did.
17 Q.  Did he sign anything at that meeting with
18     you?
19 A.  Termination paper.  We have a form that we
20     use, the termination paper.  And we put on
21     there why we let him go, and then I sign it
22     and he signs it.
23 Q.  Okay.  But he told you -- In that meeting

Page 20

1      when you told him he was terminated, he
2      told you that he was not dirty?
3  A.  Check.
4  Q.  Is that -- Is that a yes?
5  A.  Yes, sir.  I'm sorry.
6  Q.  I'm going to show you what was marked as
7      Plaintiff's -- I'm sorry -- Defendant's
8      Exhibits 13 and 14 to Mr. Cannon's
9      deposition yesterday.  I'm going to ask you
10     if you recognize either one of those
11     documents.
12 A.  I had seen this one.
13 Q.  Tell me which one this one is.
14 A.  This is the one that's got Troy Darby's
15     signature on it.
16 Q.  Right.  Tell me the number.
17         MR. DYKES:  Number 14.
18 A.  Oh, I'm sorry.  Number 14.
19         I don't know whether that's Troy's
20     signature.  I don't know Troy's signature.
21     This is the one that was done that
22     morning.  It's completely different.
23     Number --

Page 21

1    MR. DYKES: Number 13.
2    A.   -- 13 was the one that I remember using.
3    Q.   You said that's completely different?
4    A.   Well, the form is different. It's the same
5         form -- type form, but it's different from
6         the other one. And we used to use this.
7         This was the old one.
8    Q.   You used to use 14?
9    A.   Yes, sir. And they switched to 13 mainly
10        because of the stuff the driver turned in,
11        if he had any of it.
12   Q.   Did Mr. Cannon sign either of those forms
13        with you that day when you terminated him?
14   A.   Yes, sir. This one.
15   Q.   And what number is that?
16   A.   13.
17   Q.   And what did you mean when you said that
18        it's different? Does that have anything to
19        do with Mr. Cannon or are --
20   A.   No, sir, it don't have nothing to do with
21        Mr. Cannon. The type form.
22   Q.   You're saying that they switched the type
23        forms they used before Mr. Cannon started

Page 22

1         working there?
2    A.   See, this is a termination form. 13.
3    Q.   Number 13.
4    A.   14 is a disciplinary report that you would
5         use to write up anybody. It don't
6         necessarily mean that you're terminating
7         anybody. This was a counseling is what I'm
8         getting at. In other words, I can call
9         anybody in and say, you did something this
10        morning that was inexcusable; you failed --
11        you didn't do what your supervisor told
12        you, and check failure to follow
13        instructions. It does not mean that I
14        terminated him.
15            You know, you can get three or four of
16        these in your record, anybody can. If they
17        do something wrong, their immediate
18        supervisor can write them up.
19   Q.   So number four -- Defendant's Exhibit 14
20        can be used for any type of discipline?
21   A.   Yes, sir.
22   Q.   Defendant's Exhibit 13 is exclusively the
23        termination form?

Page 23

1    A.   Used in termination, yes, sir. Final
2         clearance for terminating employee.
3    Q.   And did Mr. Cannon sign Number 13?
4    A.   Yes, he did.
5    Q.   Do you -- Other than seeing his name on the
6         paper, do you recall him signing it?
7    A.   Yes, I do.
8    Q.   And did you sign Defendant's Exhibit 13?
9    A.   Yes, sir. That's my signature.
10   Q.   Were there any other forms or documents
11        that either you or Mr. Cannon signed with
12        regard to his termination?
13   A.   Not that I can remember.
14   Q.   Well, I -- this is the only time I get to
15        talk to you, so I want you to make sure
16        that --
17   A.   No, sir, I don't think --
18   Q.   -- you search in your memory as good as you
19        can.
20   A.   Yes, sir. Not that I can remember that he
21        signed anything else. That's usually the
22        only form that we would use.
23   Q.   At the time that Mr. Cannon was driving for

Page 24

1         the company, do you recall what the racial
2         makeup of the drivers were?
3    A.   Five and one. I had one white driver and
4         one, two -- five other employees. Yeah, I
5         think it was five to one. Pretty well
6         positive it was five to one.
7    Q.   Five black drivers and one white driver?
8    A.   Yes, sir. The blacks, all of them wasn't
9         drivers. I had one that was not a driver.
10   Q.   All right. Well, let's back up. I want to
11        talk about drivers first and then helpers.
12   A.   Okay.
13   Q.   What was the racial makeup of the drivers
14        when Mr. Cannon worked there?
15   A.   Four and one.
16   Q.   Four blacks?
17   A.   Four blacks, one white.
18   Q.   Who was the white guy?
19   A.   Coke Conyers.
20   Q.   Conway?
21   A.   Conway. Yeah. I always do that.
22   Q.   Do you know where that -- Do you know where
23        that guy is?

Page 25

1  A.  Not now.
2  Q.  Do you know why he left the company?
3  A.  Told me he was having problems with one of
4     the other drivers --
5  Q.  Did he tell you --
6  A.  -- helping him and all, you know, not
7     giving him the -- not giving him the help
8     when he needed it.
9  Q.  Did he name that driver?
10  A.  Uh-huh (positive response).
11  Q.  Who was it?
12  A.  Reggie.
13  Q.  Reggie who?
14  A.  I cannot think of his last name.  I knew
15     you was going to ask that.
16  Q.  Is he no longer with the company?
17  A.  He's still with the company.
18  Q.  Reggie is?
19  A.  Yes.
20     Mosley.
21  Q.  Reggie Mosley.
22     Now, the helpers at the point in time
23     that Mr. Cannon worked for the company,

Page 26

1     what was the racial makeup?
2  A.  When he started, one; when he finished,
3     two.  One of them being his cousin.  Willie
4     Summers was a helper.  He could not drive
5     the truck.  The other one was Joe, and he
6     could not drive a truck.  He had no
7     license.
8  Q.  Were -- And what was the race of those
9     gentleman?
10  A.  Sir?
11  Q.  Were those both black guys or were --
12  A.  Both black.
13  Q.  Those were the only two helpers?
14  A.  Yes, sir.
15  Q.  Mr. Cannon testified that at the point in
16     time he worked there that Conway was a
17     helper.
18  A.  No, sir.
19  Q.  You dispute that?
20  A.  Yes, sir.
21  Q.  You maintain he was driving the whole time
22     Mr. Cannon was there?
23  A.  Not the whole time.

Page 27

1  Q.  Okay.  Well, straighten it out for me,
2     because I wasn't there.
3  A.  When we hired people, what we wanted to do
4     and what our goal was was to get driver,
5     driver on a truck.  All right.
6  Q.  And what do you mean by that?
7  A.  What I mean is -- Slinging in an area like
8     that, Phenix City, 12,600 customers, you
9     can whip them in quick, one right after the
10     other for three or four hours.  What our
11     goal was and to make things go faster was
12     drive for a while and then swap.
13  Q.  In other words, you'll have two drivers on
14     a truck and they'll both drive and they'll
15     both help; is that right?
16  A.  Yes, sir.  They rotate every so often.
17     Preferably we like to use -- we tell them
18     two to three -- two to three hours, you
19     know.  It's up to you; y'all work it out
20     together.  And that was the goal.  Coke
21     would drive awhile and he would sling
22     awhile; then he'd drive awhile, he'd sling
23     awhile.  And I want to say he was with

Page 28

1     Harvey.  And then he would get to where --
2     I know one time I seen Coke and he says,
3     hey, man, I'll just sling; it's easier for
4     me slinging; I don't like driving up here
5     in all these type alleys and stuff like
6     that.
7     And, of course, now, Willie Summers, he
8     worked with Red.  I figured that was
9     smart.  The two of them know each other,
10     work well with each other.  Let them work
11     well.
12  Q.  So would it be fair to say that Mr. Conway
13     was primarily a helper because he wanted to
14     be?  Is that what you're saying?
15  A.  No, sir, I'm not.  I'm saying he was hired
16     as a driver, and that's what I expected
17     from him.  Drive so often, dump so often;
18     drive so often and dump so often.  Rotate
19     it and keep from killing him and Harvey.
20  Q.  Does Harvey still work for the company?
21  A.  No, sir.
22  Q.  What's his last name?
23  A.  Stanford, I think.

Deposition of Danny Futral

Page 29

1   Q.  Do you know where he is?
2   A.  He should be around Opelika. The last time
3       I heard he had a job in the Valley, but I
4       can't really -- No, I don't really know
5       exactly where he's at, but ...
6   Q.  Why did he leave the company?
7   A.  Better job.
8           MR. DOUGLAS: Will y'all try to
9           get me Harvey Stanford's
10          address if you have it?
11          MR. DYKES: Will you shoot me a
12          letter when we get done with
13          things you've asked for just
14          so we make sure we get
15          everything --
16          MR. DOUGLAS: Of course.
17          MR. DYKES: -- and are on the same
18          page?
19  Q.  All right. After Mr. Cannon was
20      terminated, who drove his truck?
21  A.  Lord. I want to say Harvey did.
22  Q.  I'll represent to you that Mr. Cannon
23      testified yesterday that he saw Mr. Conway

Page 30

1       driving his truck. Do you dispute that?
2   A.  I had four trucks up there. He could have
3       drove his truck. Does not mean he was on
4       the same route. And, then again, he might
5       have been on the same route. I don't know.
6   Q.  So is it fair to say you're not sure?
7   A.  Yes, sir.
8   Q.  Would you have any records at the office
9       that would answer that question for us?
10  A.  I would think so. It's called a vehicle
11      condition report.
12  Q.  Will you get those records up and get them
13      to your attorney for me?
14  A.  Uh-huh (positive response).
15  Q.  Is that a yes?
16  A.  Yes, sir. The maintenance manager should
17      have them.
18  Q.  Okay. But you'll go get them and get them
19      to your lawyer for me?
20  A.  I will try to go get them and get them to
21      my lawyer. I have a section in Montgomery
22      that I work and I'm on the road every day.
23      But I'll try my best to do that.

Page 31

1   Q.  Okay. If you --
2   A.  I'll get somebody to get them to him for
3       you.
4   Q.  That will work too.
5   A.  All right.
6   Q.  I appreciate it.
7           Did you and Mr. Cannon ever have words
8       on the job?
9   A.  No.
10  Q.  Did you ever cuss him?
11  A.  No.
12  Q.  Not once?
13  A.  Not once.
14  Q.  So if he testifies that you did, he's
15      making that up?
16  A.  Yes, sir, he is.
17  Q.  You're saying that never happened?
18  A.  Never happened.
19  Q.  You never got angry with him at all?
20  A.  I ain't said I never got angry but I never
21      cussed him.
22  Q.  Did you ever yell at him --
23  A.  No.

Page 32

1   Q.  -- raise your voice?
2   A.  (Witness shakes head.)
3   Q.  Is that no?
4   A.  No.
5   Q.  So if he says you did, you would deny that?
6   A.  Yes, sir, I would.
7   Q.  Did you ever tell him that you were going
8       to get Coke off the back of that truck?
9       Did you ever say words to that effect?
10  A.  No.
11  Q.  That never happened?
12  A.  Never happened.
13  Q.  Did Mr. Cannon ever complain to you that he
14      was having to help other people with their
15      jobs but they weren't helping him with his?
16  A.  Yep.
17  Q.  Tell me about that.
18  A.  He was complaining because he said Reggie
19      wouldn't help him. When we hired
20      everybody, I had everybody at the table --
21      Well, after Russell hired them, I'd give
22      training to the guys. And I said, this is
23      the way we're going to do it; three trucks

Deposition of Danny Futral

April 11, 2008

Page 33

1    go out in the morning, three trucks come in
2    together until we get these routes
3    situated. Then we'll fix them where -- You
4    know, once we got -- make sure we've got
5    them even, then it's on you to get your
6    route up. And that's the way it started.
7        Well, he didn't want to follow the
8    policy. And I told him, I said, we've got
9    to do it this way; three trucks go out in
10   the morning, three trucks come in
11   together. If you finished your route, you
12   call that other guy and make sure he's up.
13   If he's not up or he tells you, I've got
14   it; go on home, that's a different story.
15  Q. Was Reggie the only driver he was
16   complaining about?
17  A. Yes.
18  Q. And is Reggie white or black?
19  A. Black.
20  Q. Did you say anything to Reggie about --
21  A. A couple of times I talked to Reggie about
22   it. And even talked to Joe. And they was
23   picking up more homes than Red at the

Page 34

1    time. At the time if we had a problem,
2    Reggie and Joe was going in and fixing it.
3    What I mean by going in and fixing it,
4    picking up the extra.
5  Q. Extra garbage?
6  A. Yes, sir.
7  Q. So you thought the reason that Red was
8   getting finished faster was he was picking
9   up less homes?
10  A. Yes, sir. And he only wanted to work the
11   area he knew. He didn't really want to
12   work anything he didn't know, like, with a
13   map, you know, pick up this road here and
14   pick up this road here.
15  Q. Are you saying he refused to do that or --
16  A. He never refused to do anything.
17  Q. He just didn't want to?
18  A. Didn't want to.
19  Q. But he did what you told him?
20  A. Yes, sir, he did.
21  Q. And you were pleased with his work?
22  A. I ain't have no problems with his work. I
23   hated to lose him.

Page 35

1  Q. Was there ever a situation where Red's
2   truck was late getting on the road and he
3   wanted help to --
4       Hold on. Let me finish the question.
5      -- he wanted help on his route and you
6   didn't instruct or allow the other drivers
7   to help him?
8  A. No.
9  Q. Does that situation ring any type of a
10   bell?
11  A. No.
12  Q. Was there ever a situation where his truck
13   had to be repaired early in the morning and
14   he got a late start?
15  A. That's very well possible. I do not
16   remember.
17  Q. Did Mr. Cannon ever complain about you to
18   Mr. Russell Davis?
19      MR. DYKES: Object to the form.
20  A. Not that I know of. I don't know.
21     (Off-the-Record discussion.)
22  Q. Did Mr. Russell Davis ever speak to you
23   about a complaint made by Mr. Cannon?

Page 36

1  A. No, sir.
2  Q. Never?
3  A. Never.
4  Q. Did you and Mr. Cannon ever have any
5   conversations where he told you that he
6   complained to Mr. Davis about you?
7  A. No.
8  Q. So would it be fair to say as far as you
9   were concerned when you were instructed to
10   terminate Red you thought y'all were on
11   fine terms?
12  A. Yes, sir.
13  Q. Have you had any conversations with anybody
14   regarding this case?
15      MR. DYKES: Just to the extent --
16  Q. Other than counsel, obviously.
17  A. No.
18  Q. When did you first hear that there was a
19   case?
20  A. When he called me on the phone.
21  Q. He being ...
22  A. The lawyer.
23  Q. And I guess that would have been pretty

Page 37

1     recent, huh?
2  A.  Yes, sir.
3  Q.  Okay.  So you haven't heard anything about
4     it until recently?
5  A.  Yes, sir.
6  Q.  Whose decision was it to terminate
7     Mr. Cannon?  I know you did it, but who
8     gave the order?
9  A.  Russell Davis.
10  Q.  Do you know if the company still uses
11     St. Louis MRO, Inc., to test for drugs?
12  A.  I do not know.
13  Q.  Don't know one way or the other?
14  A.  (Witness nods head.)
15  Q.  Is that --
16  A.  No, sir.
17  Q.  I take it you're randomly drug tested?
18  A.  Yes, sir.
19  Q.  When was the last time?
20  A.  For me?
21  Q.  Yes, sir.
22  A.  It was pre-hire.  No, I take that back.  I
23     have to do the random, also if I get my

Page 38

1     recertification, usually, if we do DOT.  I
2     think mine was probably about a year ago,
3     my last one.
4  Q.  Do you know a Mr. Reuben Lowder?
5  A.  Yes, I know Reuben.
6  Q.  Who is he?
7  A.  He -- I hired him as a driver.
8  Q.  Does he still work for the company?
9  A.  No, sir.
10  Q.  Why did he leave?
11  A.  Same.  I was told the same thing as
12     everybody else.  Reggie would not help
13     him.  And he was -- I honestly can't -- It
14     was hurting him.  He was tired.
15  Q.  From the work you mean?
16  A.  Yes, sir.  It was tiring.
17  Q.  Did he ever have an accident while he was
18     working there?
19  A.  Yes, he did.
20  Q.  How long did he work there?
21  A.  Roughly off the top of my head two months.
22  Q.  Do you know if he was drug tested after the
23     accident?

Page 39

1  A.  Yes, he was.
2  Q.  Is it company policy that if a driver has
3     an accident they're to be drug tested?
4  A.  Depends on the accident -- the severity of
5     the accident, if somebody was hurt or not.
6  Q.  Is that the only factor?
7  A.  No, sir.  Somebody could be killed, one of
8     the vehicles cannot move, the policeman who
9     is investigating the accident says he wants
10     him drug tested.  Then, of course, there's
11     random and his pre-hire.
12  Q.  Well, what is the company policy with
13     regard to when a driver will be drug tested
14     after they have an accident, if you know
15     it?
16  A.  I don't.
17  Q.  Well, then why did you say that it depends
18     on how severe the accident is?
19  A.  That's by DOT regulation.
20  Q.  Do you know what those DOT regs are?
21  A.  If he has one -- I was told if a vehicle
22     cannot be moved, somebody is -- I mean
23     cannot be drove away from the accident and

Page 40

1     if somebody is killed or the policeman at
2     the scene says do it.
3  Q.  Do you know the results of Mr. Lowder's
4     drug test after the accident?
5  A.  I was told negative.
6  Q.  How long after the accident did -- before
7     he quit or ...
8  A.  Maybe a month.
9  Q.  Did Mr. Conway ever have an accident when
10     he was driving the truck?
11  A.  I think so, yes.
12  Q.  Do you know if he was drug tested after
13     that accident?
14  A.  No, I don't know.  I don't know whether he
15     was or not.  I can't truthfully say.
16  Q.  What do you know about that accident, if
17     anything?
18  A.  I think he hit a pole or something.  It was
19     something minor.
20  Q.  Hit a what?  I'm sorry?
21  A.  Pole.
22  Q.  Like a telephone pole?
23  A.  Backed into a pole.

Deposition of Danny Futral

Page 41

| 1 | Q. Like a telephone pole? |
|---|---|
| 2 | A. I think so. |
| 3 | Q. Was any damage done to the truck? |
| 4 | A. No. Our trucks are in good shape. |
| 5 | Q. Well, they can be in good shape and still |
| 6 | have damage done to it. I mean -- |
| 7 | A. But we never had a problem. |
| 8 | Q. Was there any other vehicles involved in |
| 9 | that accident? |
| 10 | A. I do not know. I cannot remember that. |
| 11 | Q. Are there any of your answers that you need |
| 12 | to change or add -- |
| 13 | A. I told you just like I -- just like I |
| 14 | remember. |
| 15 | Q. And have you remembered anything else since |
| 16 | we've been talking about any of my earlier |
| 17 | questions when you said you couldn't |
| 18 | remember? |
| 19 | A. No, sir. |
| 20 | Q. Do you think your memory is as good today |
| 21 | as it's going to be in nine -- |
| 22 | A. Yes, sir. |
| 23 | Q. -- or ten months from now? |

Page 42

| 1 | A. Yes, sir. |
|---|---|
| 2 | Q. All right. That's all the questions I have |
| 3 | for you. I appreciate you coming in. |
| 4 | * * * * * * * * * * * * * |
| 5 | FURTHER DEPONENT SAITH NOT |
| 6 | * * * * * * * * * * * * * |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

Page 43

| 1 | REPORTER'S CERTIFICATE |
|---|---|
| 2 | STATE OF ALABAMA: |
| 3 | ELMORE COUNTY: |
| 4 | I, Haley A. Phillips, Certified Court |
| 5 | Reporter, ACCR # 151, and Commissioner for the |
| 6 | State of Alabama at Large, do hereby certify that I |
| 7 | reported the deposition of: |
| 8 | DANNY FUTRAL |
| 9 | who was first duly sworn by me to speak the truth, |
| 10 | the whole truth and nothing but the truth, in the |
| 11 | matter of: |
| 12 | ROBERT CANNON, |
| 13 | Plaintiff, |
| 14 | vs. |
| 15 | ADVANCED DISPOSAL SERVICES |
| 16 | ALABAMA, LLC, d/b/a SUNFLOWER |
| 17 | WASTE, LLC, |
| 18 | Defendants. |
| 19 | In The U.S. District Court |
| 20 | For the Middle District of Alabama |
| 21 | Eastern Division |
| 22 | Case Number 3:07-CV-846-WKW |
| 23 | on Friday, April 11, 2008. |

Page 44

| 1 | The foregoing 43 computer-printed pages |
|---|---|
| 2 | contain a true and correct transcript of the |
| 3 | examination of said witness by counsel for the |
| 4 | parties set out herein. The reading and signing of |
| 5 | same is hereby waived. |
| 6 | I further certify that I am neither of kin |
| 7 | nor of counsel to the parties to said cause nor in |
| 8 | any manner interested in the results thereof. |
| 9 | This 2nd day of May 2008. |
| 10 | |
| 11 | |
| 12 | |
| 13 | Haley A. Phillips, ACCR #151 |
| | Expiration Date: 9/30/08 |
| 14 | Certified Court Reporter and |
| | Commissioner for the State |
| 15 | of Alabama at Large |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

**A**

about 5:11 12:7 13:15
14:9 16:4,21 17:19
18:5,6,12 24:11
32:17 33:16,20,21
35:17,23 36:6 37:3
38:2 40:16 41:16
accident 5:15 6:1 38:17
38:23 39:3,4,5,9,14
39:18,23 40:4,6,9,13
40:16 41:9
ACCR 1:17 3:7 43:5
44:13
across 12:20
acting 8:13
ACTION 1:7
add 41:12
address 6:15 29:10
Advanced 1:8 7:17
9:13 12:9 43:15
after 4:6 14:15 15:20
16:6 17:21 18:4
19:14 27:9 29:19
32:21 38:22 39:14
40:4,6,12
again 5:22 30:4
ago 12:7 38:2
agreed 3:2,16,23
agreement 1:16
ahead 15:1
ain't 18:11 31:20 34:22
Alabama 1:2,8,18,20
2:5,10 3:8 6:14,16
10:16 43:2,6,16,20
44:15
Alexander 5:13
allegedly 16:7
alleys 28:5
allow 35:6
already 17:1
alter 11:13
always 19:11 24:21
angry 31:19,20
another 13:16 14:3
answer 5:3 13:10 30:9
answers 41:11
anxiety 12:6
anybody 6:9 9:8,17,21
22:5,7,9,16 36:13
anything 13:2,15 19:17
21:18 23:21 33:20
34:12,16 37:3 40:17
41:15
anyway 15:1
APPEARANCES 2:1
appreciate 31:6 42:3
approximately 1:21
12:11

April 1:20 43:23
area 27:7 34:11
Army 6:21 7:5
around 29:2
asked 16:9 17:3,3
29:13
associated 15:19
assume 5:4
assumed 15:6,15
attack 12:9
attacks 12:4
attorney 30:13
Attorneys 2:8
Auburn 1:20 2:5
audibly 13:10
Avenue 2:9
away 39:23
awhile 27:21,22,22,23
a.m 1:21

**B**

B 2:3,4
back 14:1,2,17 15:23
16:15 17:19 19:4
24:10 32:8 37:22
Backed 40:23
bankruptcy 11:7
before 1:16 3:6 4:15,17
5:14 6:20 7:2 14:15
17:7 21:23 40:6
being 8:13 26:3 36:21
believe 13:3
bell 35:10
best 4:20 30:23
Better 29:7
between 3:3,17 4:1
10:23
Birmingham 2:10
black 24:7 26:11,12
33:18,19
blacks 24:8,16,17
blood 11:18
boss 9:4
both 6:5 9:2 26:11,12
27:14,15
brings 18:1
Brooks 2:8
brought 16:12,13 19:3
bypasses 12:2

**C**

C 4:12
call 5:12 22:8 33:12
called 18:8 30:10 36:20
Cannon 1:5 4:14 9:10
9:12 12:8 14:12,16
15:21 16:6,21 17:9
17:22 18:6 19:14
21:12,19,21,23 23:3

23:11,23 24:14 25:23
26:15,22 29:19,22
31:7 32:13 35:17,23
36:4 37:7 43:12
Cannon's 20:8
car 6:1,2
care 8:7,7
carried 14:19 15:23
case 3:18,20 6:7 36:14
36:19 43:22
Catherine 1:19 2:5
cause 44:7
CERTIFICATE 43:1
Certified 1:17 3:7 43:4
44:14
certify 43:6 44:6
change 41:12
check 20:3 22:12
choice 15:8 18:12
City 5:14 27:8
Civil 1:7 3:5
class 7:13
clearance 23:2
close 10:21
Coke 24:19 27:20 28:2
32:8
come 5:17 8:5 12:20
14:1,1,17 33:1,10
coming 42:3
commencing 1:21
commission 3:9
Commissioner 1:18 3:8
43:5 44:14
company 10:10,19 15:4
15:12 18:14 19:1,8,9
24:1 25:2,16,17,23
28:20 29:6 37:10
38:8 39:2,12
complain 32:13 35:17
complained 36:6
complaining 32:18
33:16
complaint 35:23
complaints 12:15
completely 20:22 21:3
computer-printed 44:1
concerned 36:9
condition 30:11
Constancy 2:8
contact 9:23 17:7
contacted 17:4,10
contain 44:2
conversation 14:9
16:20 17:21 18:5
conversations 14:14
15:20 16:5 18:7 36:5
36:13
convicted 11:5
Conway 24:20,21

26:16 28:12 29:23
40:9
Conyers 24:19
correct 14:6 44:2
counsel 3:3,17 36:16
44:3,7
counseling 22:7
County 6:16 43:3
couple 5:16 11:21 12:4
12:12 33:21
course 18:18 28:7
29:16 39:10
court 1:1,17,20 2:5 3:7
5:18 43:4,19 44:14
cousin 26:3
currently 7:14
cuss 31:10
cussed 31:21
customers 27:8

**D**

daily 9:23
damage 41:3,6
Danny 1:15 3:4 4:5,12
18:15 43:8
Darby's 20:14
Date 44:13
Davis 9:14 12:21 14:10
14:15 35:18,22 36:6
37:9
day 8:10 16:13 18:2
21:13 30:22 44:9
decision 37:6
Defendant 1:10 2:6
Defendants 43:18
Defendant's 20:7 22:19
22:22 23:8
deny 32:5
depends 39:4,17
DEPONENT 42:5
deposition 1:15 3:4,6
3:13,18 4:2,17 5:9,18
6:3 20:9 43:7
depositions 6:5
different 10:15 20:22
21:3,4,5,18 33:14
dirty 20:2
discharged 7:9,12
disciplinary 22:4
discipline 22:20
discrimination 13:19
discussion 35:21
Disposal 1:8 7:17 9:13
12:9 43:15
dispute 26:19 30:1
District 1:1,2 43:19,20
Division 1:3 43:21
doctor 16:11
doctors 17:4,9 18:1

documents 20:11 23:10
doing 12:3
done 20:21 29:12 41:3
41:6
DOT 38:1 39:19,20
Douglas 1:19 2:3,4,15
4:10,13 29:8,16
down 13:12 16:3
drive 26:4,6 27:12,14
27:21,22 28:17,18
driver 21:10 24:3,7,9
25:9 27:4,5 28:16
33:15 38:7 39:2,13
drivers 5:15 8:13,16,18
8:22 9:2 24:2,7,9,11
24:13 25:4 27:13
35:6
driver's 19:12
driving 23:23 26:21
28:4 30:1 40:10
drove 29:20 30:3 39:23
drug 12:23 13:14 14:19
15:2,4,11,17,18
16:23 18:23 37:17
38:22 39:3,10,13
40:4,12
drugs 16:8 37:11
duly 4:6 43:9
dump 28:17,18
duties 8:2,4
Dykes 2:7 20:17 21:1
29:11,17 35:19 36:15
d/b/a 1:8 43:16

**E**

each 28:9,10
earlier 41:16
early 35:13
easier 28:3
Eastern 1:3 43:21
effect 32:9
either 3:14,20 12:1
13:20 14:14 20:10
21:12 23:11
ELMORE 43:3
employed 7:14
employee 12:13,14
23:2
employees 24:4
enough 5:6,7
equipment 8:9
especially 10:3
Esq 2:3,7
even 33:5,22
ever 4:17 6:9,11 11:5,7
15:13 17:7 31:7,10
31:22 32:7,9,13 35:1
35:12,17,22 36:4
38:17 40:9

Deposition of Danny Futral

April 11, 2008

Page 2

every 8:10 27:16 30:22
everybody 32:20,20
  38:12
everything 13:18 14:6
  14:8 29:15
evicting 17:18
evidence 3:13
exactly 12:10 29:5
examination 2:14 4:9
  44:3
except 13:18
exclusively 22:22
Exhibit 22:19,22 23:8
Exhibits 20:8
expected 28:16
Expiration 44:13
extent 36:15
extra 34:4,5

**F**

fact 14:4
factor 39:6
failed 22:10
failure 22:12
fair 5:6,7 9:5 28:12
  30:6 36:8
far 14:7 16:2 36:8
faster 27:11 34:8
Federal 2:9 3:5
felony 11:5
Fifth 2:9
figured 28:8
file 16:2
filed 11:7
filing 3:18,22
Final 23:1
finally 5:17
fine 36:11
finish 35:4
finished 26:2 33:11
  34:8
first 4:6 7:13 13:19
  15:2,17,18 16:7
  17:23 24:11 36:18
  43:9
five 12:2,7 24:3,4,5,6,7
fix 33:3
fixing 34:2,3
follow 22:12 33:7
follows 4:8
foregoing 44:1
Forester 9:20
form 3:11 19:19 21:4,5
  21:5,21 22:2,23
  23:22 35:19
formality 3:9
forms 21:12,23 23:10
found 16:6,7
four 22:15,19 24:15,16

24:17 27:10 30:2
frame 5:20
Friday 1:20 43:23
from 7:7 16:10 18:1
  21:5 28:17,19 38:15
  39:23 41:23
further 3:16,23 42:5
  44:6
Futral 1:15 3:4 4:5,12
  4:13 43:8

**G**

garbage 34:5
gave 17:2 37:8
gentleman 26:9
gentlemen 10:1
getting 22:8 34:8 35:2
give 5:18 6:3,15 14:3
  32:21
given 4:17 5:9 12:21
  14:18
giving 13:16 25:7,7
go 5:18 6:2 14:23 15:16
  15:18 16:2 18:11,13
  18:21,22 19:21 27:11
  30:18,20 33:1,9,14
goal 27:4,11,20
going 4:19 5:19 13:23
  14:2 16:10,16,16,18
  17:19 18:18 20:6,9
  25:15 32:7,23 34:2,3
  41:21
good 4:20,22 12:14
  23:18 41:4,5,20
guess 5:12 36:23
guy 5:19 24:18,23
  33:12
guys 5:23 26:11 32:22

**H**

Haley 1:16 3:6 43:4
  44:13
happened 5:20 31:17
  31:18 32:11,12
happy 4:23
Harvey 28:1,19,20
  29:9,21
hated 34:23
having 4:6 17:15 25:3
  32:14
head 13:7 32:2 37:14
  38:21
headed 11:2
hear 36:18
heard 10:6,8 29:3 37:3
heart 11:16,20 12:4,7
help 8:6 25:7 27:15
  32:14,19 35:3,5,7
  38:12

helper 8:23 19:11,12
  26:4,17 28:13
helpers 8:19 9:2 24:11
  25:22 26:13
helping 25:6 32:15
hereto 3:21 4:1
hey 28:3
Highway 10:10,19 11:1
  12:13 13:16,16,22
  14:3,5 15:1,8,16 16:1
  16:1,3,9,9,17 17:1,2
  17:3,3,4,10,18,20,22
  18:8,9,9,17,18,19,20
  18:21 19:3,4,15,21
  20:1 21:13 22:14
  23:6 25:6,7,7 28:17
  28:19 31:2,10,19,21
  31:22 32:7,15,19
  33:8 34:19,23 35:7
  38:7,13,14 39:10
hired 27:3 28:15 32:19
  32:21 38:7
hit 6:2 40:18,20
Hold 35:4
home 33:14
homes 33:23 34:9
honestly 38:13
honorably 7:9
hours 27:10,18
housing 17:16,17
huh 37:1
hurt 18:18,19 39:5
hurting 38:14

**I**

idea 13:4
immediate 9:4 22:17
Inc 37:11
INDEX 2:14
inexcusable 22:10
information 12:20
initial 16:22 18:10
instruct 35:6
instructed 36:9
instructions 22:13
interested 44:8
introduced 3:19
investigated 6:1
investigating 39:9
involved 6:7 41:8
issue 16:21 18:6

**J**

J 2:7
James 2:3
Jim 4:13
job 4:22 29:3,7 31:8
jobs 32:15

Joe 26:5 33:22 34:2
Jr 2:3
just 4:23 7:2 10:1,15
  13:4,10 15:7,15
  18:20 19:2,2 28:3
  29:13 34:17 36:15
  41:13,13

**K**

keep 13:16 28:19
killed 39:7 40:1
killing 28:19
kin 44:6
knew 5:19 25:14 34:11
know 4:23 10:4,18,20
  12:10,18 14:7 15:7
  18:16,18,23 19:2
  20:19,20 22:15 24:22
  24:22 25:2,6 27:19
  28:2,9 29:1,4 30:5
  33:4 34:12,13 35:20
  35:20 37:7,10,12,13
  38:4,5,22 39:14,20
  40:3,12,14,14,16
  41:10
knows 10:15

**L**

Large 1:18 3:8 43:6
  44:15
last 11:20 12:5 13:21
  25:14 28:22 29:2
  37:19 38:3
late 35:2,14
later 17:23
Law 1:19 2:8
lawyer 30:19,21 36:22
leave 19:14 29:6 38:10
left 11:2 25:2
less 34:9
let 4:23 15:16,18 18:11
  18:21,22 19:21 28:10
  35:4
letter 29:12
let's 24:10
license 19:13 26:7
like 16:13 27:7,17 28:4
  28:5 34:12 40:22
  41:1,13,13
live 6:13,20
lived 6:18
lives 10:9
LLC 1:8,9 43:16,17
long 6:18 7:1,4,18 12:8
  38:20 40:6
longer 25:16
look 14:20
Lord 7:8 11:12 29:21
lose 34:23

Louis 37:11
Lowder 38:4
Lowder's 40:3

**M**

made 3:11 35:23
mainly 21:9
maintain 26:21
maintenance 30:16
make 8:8 14:5 23:15
  27:11 29:14 33:4,12
makeup 24:2,13 26:1
making 8:9,11,12
  31:15
man 28:3
Management 5:13
manager 5:13,23 7:21
  7:21,22 9:9,20 30:16
manner 3:20 44:8
many 5:8
map 34:13
Marbury 6:14,16
marked 20:6
matched 13:17,18
matter 14:4 43:11
may 3:6,12,13,19 44:9
Maybe 40:8
McNeal 1:19 2:4
mean 7:23 15:22 16:12
  21:17 22:6,13 27:6,7
  30:3 34:3 38:15
  39:22 41:6
medications 11:10
medicine 11:18
meeting 19:17,23
memory 11:13 15:12
  23:18 41:20
met 4:15
Middle 1:2 43:20
might 30:4
mine 38:2
minor 40:19
Montgomery 5:23 6:14
  30:21
month 40:8
months 38:21 41:23
more 12:6 18:7,23
  33:23
morning 4:20 11:11
  20:22 22:10 33:1,10
  35:13
Mosley 25:20,21
move 39:8
moved 39:22
MRO 37:11

**N**

name 4:11,13 10:20
  13:19,21 14:5 19:6

23:5 25:9,14 28:22
named 10:1
names 13:21
necessarily 22:6
need 3:11 13:10 41:11
needed 25:8
needs 8:8
negative 15:5,11 40:5
neither 44:6
nephew 19:3,4
never 31:17,18,19,20
  31:20 32:11,12 34:16
  36:2,3 41:7
next 16:13,20 18:2,4,5
nine 7:2 41:21
Ninety 12:1
nods 13:7 37:14
North 2:9
nothing 4:8 21:20
  43:10
number 13:17 20:16,17
  20:18,23 21:1,15
  22:3,19 23:3 43:22

**O**

Object 35:19
objections 3:10,10
obviously 36:16
off 17:16 32:8 38:21
offered 3:13
office 30:8
Offices 1:19
Off-the-Record 35:21
often 27:16 28:17,17
  28:18,18
Oh 11:14 20:18
okay 5:1 11:17 12:3
  15:20 19:23 24:12
  27:1 30:18 31:1 37:3
old 21:7
once 31:12,13 33:4
one 2:9 5:12,15,23 6:6
  10:21 12:5 13:21
  16:10 20:10,12,13,13
  20:14,21 21:2,6,7,14
  24:3,3,4,5,6,7,9,15
  24:17 25:3 26:2,3,5
  27:9 28:2 37:13 38:3
  39:7,21
ones 9:1
only 6:4 10:21 23:14,22
  26:13 33:15 34:10
  39:6
Opelika 29:2
open-heart 12:2
operations 9:9
order 37:8
other 3:10,14,20 5:8,22
  15:20 21:6 22:8 23:5

23:10 24:4 25:4 26:5
  27:10,13 28:9,10
  32:14 33:12 35:6
  36:16 37:13 41:8
out 16:6,7 27:1,19 33:1
  33:9 44:4
over 7:3 8:1 9:8

**P**

page 29:18
pages 44:1
paper 14:18 15:23
  19:19,20 23:6
parties 3:3,17 4:1 6:6
  44:4,7
party 3:14,20
patient 11:16
people 8:6 10:15 27:3
  32:14
performance 12:16
personal 14:19
Phenix 27:8
Phillips 1:17 3:6 43:4
  44:13
phone 36:20
pick 34:13,14
picked 8:10
picking 33:23 34:4,8
Place 2:9
Plaintiff 1:6 2:2 43:13
Plaintiff's 20:7
please 4:11 6:15
pleased 34:21
point 25:22 26:15
pole 40:18,21,22,23
  41:1
policeman 39:8 40:1
policy 18:14 19:1 33:8
  39:2,12
positive 12:23 13:6,13
  15:5,6,15,19 16:8,22
  17:23 18:10,15 24:6
  25:10 30:14
possible 35:15
Preferably 27:17
pressure 11:18
pretty 24:5 36:23
pre-hire 17:2 37:22
  39:11
primarily 28:13
private 16:11
probably 38:2
problem 17:17 34:1
  41:7
problems 17:15 25:3
  34:22
Procedure 3:5
protection 11:8
provided 3:15,21

purpose 3:14
pursuant 1:15 3:4
put 19:3,4,20

**Q**

question 3:11 5:1,3,4
  30:9 35:4
questions 3:10 4:19,21
  8:7 41:17 42:2
quick 27:9
quit 40:7

**R**

race 26:8
racial 24:1,13 26:1
raise 32:1
random 37:23 39:11
randomly 37:17
rank 7:11
reading 44:4
really 6:6 29:4,4 34:11
reason 34:7
recall 23:6 24:1
recent 37:1
recently 37:4
recertification 38:1
recognize 20:10
record 22:6
records 30:8,12
recycling 10:10,18,19
Red 14:18 16:4,15
  17:15 18:9,10,22
  28:8 33:23 34:7
  36:10
Red's 35:1
refresh 15:10
refused 34:15,16
regard 23:12 39:13
regarding 14:12,16
  15:21 36:14
regardless 3:21
Reggie 25:12,13,18,21
  32:18 33:15,18,20,21
  34:2 38:12
regs 39:20
regulation 39:19
remember 9:10 14:9
  15:22 21:2 23:13,20
  35:16 41:10,14,18
remembered 41:15
repaired 35:13
rephrase 4:23
report 9:7,15,17 22:4
  30:11
reported 10:2 43:7
Reporter 1:17 3:7 43:5
  44:14
REPORTER'S 43:1
represent 4:14 29:22

represented 15:10
representing 3:3,17
reserved 3:12
residential 8:1
response 25:10 30:14
results 17:3 18:16 40:3
  44:8
retest 14:5
retested 14:22 16:18,19
Reuben 38:4,5
right 8:2 10:21 11:2,4
  17:1,12 18:2,4 19:2
  20:16 24:10 27:5,9
  27:15 29:19 31:5
  42:2
ring 35:9
road 6:16 10:9,16
  30:22 34:13,14 35:2
Robert 1:5 4:14 9:10
  9:12 12:8 43:12
rotate 27:16 28:18
Roughly 38:21
route 30:4,5 33:6,11
  35:5
routes 8:10 33:2
Rules 3:5
ruling 3:12
Russell 9:14 10:3,4
  12:21,22 13:1,15
  14:20,21,21,23 15:3
  16:1,14 17:15 18:8
  32:21 35:18,22 37:9

**S**

safe 8:11,12,14,14
SAITH 42:5
same 3:22 17:14,20
  21:4 29:17 30:4,5
  38:11,11 44:5
saw 29:23
saying 21:22 28:14,15
  31:17 34:15
says 14:4,20 19:1 28:2
  32:5 39:9 40:2
scene 40:2
search 23:18
Seattle 6:21
second 15:3,10
section 8:1 30:21
security 13:17
see 16:16 17:14 22:2
seeing 23:5
seen 20:12 28:2
sent 16:14
sergeant 7:13
SERVICES 1:8 43:15
set 44:4
severe 39:18
severity 39:4

shakes 32:2
shape 41:4,5
shocked 13:3
shoot 29:11
show 20:6
showed 14:20 16:22
sic 13:19 15:19
sign 19:17,21 21:12
  23:3,8
signature 4:2 20:15,20
  20:20 23:9
signed 15:23 23:11,21
signing 23:6 44:4
signs 19:22
since 6:19 12:3,4 41:15
sir 4:11,16,18 5:2,5 6:8
  6:10,12,23 7:10,15
  8:3,17,20 9:3,6,11,16
  9:18 10:7,13,17 11:1
  11:6,9,14,22 13:9,13
  14:11,13 15:6,14,22
  17:13 20:5 21:9,14
  21:20 22:21 23:1,9
  23:17,20 24:8 26:10
  26:14,18,20 27:16
  28:15,21 30:7,16
  31:16 32:6 34:6,10
  34:20 36:1,12 37:2,5
  37:16,18,21 38:9,16
  39:7 41:19,22 42:1
site 5:12 7:21
sitting 16:3
situated 33:3
situation 35:1,9,12
situation 35:1,9,12
sling 27:21,22 28:3
slinging 27:7 28:4
smart 28:9
Smith 2:8
social 13:17
some 4:19 8:22 17:15
somebody 31:2 39:5,7
  39:22 40:1
something 22:9,17
  40:18,19
sorry 13:9 20:5,7,18
  40:20
speak 4:7 35:22 43:9
specifically 16:3
St 37:11
standing 14:3
Stanford 28:23
Stanford's 29:9
start 35:14
started 21:23 26:2 33:6
State 1:18 3:8 4:11
  43:2,6 44:14
States 1:1 6:21
Statute 3:15,21
still 19:8,9 25:17 28:20

37:10 38:8 41:5
stipulated 3:2,16,23
stipulation 1:16 3:1
story 33:14
straighten 27:1
stuff 21:10 28:5
sued 6:9,11
Suite 2:4,9
Summers 19:7 26:4
  28:7
SUNFLOWER 1:8
  43:16
super 8:21
superior 18:13
supervise 8:6,16 9:2
supervisor 7:22 9:8,12
  22:11,18
supposedly 14:22
sure 8:8,9,11,12 13:22
  14:5 18:3 23:15
  29:14 30:6 33:4,12
surgery 11:20 12:2
surprised 13:5,13
swap 27:12
switched 21:9,22
sworn 4:7 43:9

**T**

table 32:20
take 8:7,7 37:17,22
taken 1:15 3:4,6 15:11
taking 11:10,15
talk 13:23 23:15 24:11
talked 33:21,22
talking 16:4 41:16
Tallassee 10:12,16,23
telephone 40:22 41:1
tell 5:11 10:8 12:22
  15:3 16:5 18:5,17,21
  20:13,16 25:5 27:17
  32:7,17
telling 17:22
tells 33:13
ten 41:23
terminate 15:1,8 18:9
  18:20 36:10 37:6
terminated 12:18 16:1
  18:17 20:1 21:13
  22:14 29:20
terminating 22:6 23:2
termination 19:19,20
  22:2,23 23:1,12
terms 36:11
test 12:23 13:14,16
  14:3,19 15:2,4,11,18
  16:23 17:23 18:1
  19:1 37:11 40:4
tested 13:5 16:8 17:22
  37:17 38:22 39:3,10

39:13 40:12
testified 4:8 26:15
  29:23
testifies 31:14
their 8:8,10,14 9:4
  22:17 32:14
thereof 44:8
thing 38:11
things 27:11 29:13
think 12:13 13:20
  17:18 18:3 19:4
  23:17 24:5 25:14
  28:23 30:10 38:2
  40:11,18 41:2,20
thought 34:7 36:10
three 7:19 22:15 27:10
  27:18,18 32:23 33:1
  33:9,10
time 3:12,12 5:20,22
  17:14,20 23:14,23
  25:22 26:16,21,23
  28:2 29:2 34:1,1
  37:19
times 4:21 5:8 6:4
  33:21
tired 38:14
tiring 38:16
Tobias 2:7
today 4:15 5:8 41:20
together 27:20 33:2,11
told 10:11,14 14:1,2,8
  14:23 15:7,13,16
  16:1,17 17:1,9 18:8,9
  18:12 19:14,23 20:1
  20:2 22:11 25:3 33:8
  34:19 36:5 38:11
  39:21 40:5 41:13
top 38:21
training 32:22
transcript 44:2
trial 3:19
Troy 20:14
Troy's 20:19,20
truck 19:5 26:5,6 27:5
  27:14 29:20 30:1,3
  32:8 35:2,12 40:10
  41:3
trucks 8:18,22 30:2
  32:23 33:1,9,10 41:4
true 44:2
truth 4:7,7,8 43:9,10
  43:10
truthfully 40:15
try 13:16 29:8 30:20,23
turned 21:10
Twice 5:10
two 6:4 9:23 24:4 26:3
  26:13 27:13,18,18
  28:9 38:21

type 21:5,21,22 22:20
  28:5 35:9

**U**

Uh-huh 25:10 30:14
understand 13:11
understood 5:4
United 1:1 6:21
until 33:2 37:4
use 18:22 19:20 21:6,8
  22:5 23:22 27:17
used 3:14,20 21:6,8,23
  22:20 23:1
uses 37:10
using 21:2
usually 9:9 17:5 23:21
  38:1
U.S 43:19

**V**

Valley 29:3
Van 9:20 13:23 14:4
vehicle 30:10 39:21
vehicles 8:14 39:8 41:8
very 35:15
voice 32:1
vs 1:7 43:14

**W**

wait 16:16
waived 3:19 4:3 44:5
waiving 3:22
want 23:15 24:10 27:23
  29:21 33:7 34:11,17
  34:18
wanted 27:3 28:13
  34:10 35:3,5
wants 8:8 39:9
Washington 6:22
wasn't 18:15 24:8 27:2
Waste 1:9 5:13 43:17
way 13:20 32:23 33:6,9
  37:13
weeks 12:12
Weldon 10:9,9,16
well 6:14 13:22 14:17
  14:21 21:4 23:14
  24:5,10 27:1 28:10
  28:11 32:21 33:7
  35:15 39:12,17 41:5
went 5:16 14:7 16:9,14
were 6:6 7:1,4,9,11
  13:5 15:13 18:6
  23:10 24:2 26:8,11
  26:11,13 32:7 34:21
  36:9,9,10
weren't 6:6 32:15
West 6:16
Wetumpka 10:22,23

11:3
we'll 33:3
we're 32:23
we've 33:4,8 41:16
while 27:12 38:17
whip 27:9
white 24:3,7,17,18
  33:18
whole 4:7 26:21,23
  43:10
Willie 19:7 26:3 28:7
witness 4:1,2,6 13:7
  32:2 37:14 44:3
words 22:8 27:13 31:7
  32:9
work 8:5,9 12:8 17:16
  27:19 28:10,10,20
  30:22 31:4 34:10,12
  34:21,22 38:8,15,20
worked 9:13 24:14
  25:23 26:16 28:8
working 22:1 38:18
works 10:10
wouldn't 12:10 32:19
write 22:5,18
wrong 22:17

**Y**

yeah 13:11,23 17:2,11
  24:4,21
year 38:2
years 5:17 7:2,6,19
  11:21 12:7
yell 31:22
Yep 32:16
yesterday 20:9 29:23
y'all 27:19 29:9 36:10

**#**

#151 44:13

**1**

11 1:20 43:23
12,600 27:8
13 20:8 21:1,2,9,16
  22:2,3,22 23:3,8
14 10:11,19,21 11:1
  20:8,17,18 21:8 22:4
  22:19
151 1:17 3:7 43:5
1710 1:19 2:5
1819 2:9

**2**

2nd 44:9
20 6:16 7:6
2008 1:20 43:23 44:9

**3**

3:07-CV-846-WKW
  1:7 43:22
307 6:16
35203 2:10
36051 6:17
36830 2:5

**4**

4 2:15
43 44:1

**7**

72 7:8

**9**

9/30/08 44:13
9:00 1:21
900 2:9
92 6:19 7:8
98 12:1
99 12:1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT CANNON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **ADVANCED DISPOSAL** | ) | **3:07cv846-wkw** |
| **SERVICES ALABAMA L.L.C.,** | ) | |
| **d/b/a SUNFLOWER WASTE** | ) | |
| **L.L.C.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>DECLARATION OF DANNY FUTRAL</u>

My name is Danny Futral.  I am a Residential Site Manager for Advanced Disposal Services, d/b/a Sunflower Waste in Tallassee, Alabama.  I was Robert Cannon's supervisor during his employment with ADS.  I am aware of the lawsuit filed by Mr. Cannon, and this Declaration is based on my personal knowledge.

1.	Before drivers start driving for ADS, they undergo training and must pass a driving test.

2.	Mr. Cannon worked on the municipal contract for Phoenix City, Alabama.  There were three routes on that contract, and Mr. Cannon was responsible for one route.  Mr. Cannon had driven the route while working for Waste Management, so he knew the route.  Mr. Cannon did not like driving

434721.1

different routes. Mr. Cannon's route had the fewest collection sites of the three routes.

3.     Willie Sommers (B) was Mr. Cannon's helper, but he could not drive the truck. As a result, Mr. Cannon did not have to rotate and assist loading the trucks.

4.     After learning that Mr. Cannon failed his initial drug test his employment was not terminated. Instead, he was permitted to take a second drug test.

5.     Part of my job duties require that I follow the trucks to ensure that the drivers are driving safely and in compliance with all traffic laws. I followed Mr. Cannon's truck no more than any other trucks.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___10th___ day of July, 2008.

Danny Futral

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

ROBERT CANNON,

     Plaintiff,

v.

ADVANCED DISPOSAL
SERVICES ALABAMA L.L.C.,
d/b/a SUNFLOWER WASTE
L.L.C.,

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.
3:07cv846-wkw

## <u>DECLARATION OF TOM DAVIS</u>

My name is Tom Davis. I am Corporate Director of Safety for Advanced Disposal Services and have been for six years. I am aware of the lawsuit filed by Mr. Cannon, and this Declaration is based on my personal knowledge.

1.    As Corporate Director of Safety, one of my responsibilities is overseeing the company's drug and alcohol testing program. ADS does not permit employees who have failed a drug test to work for it. The risk of penalties from the Department of Transportation is too great. I am not aware of any employees who failed a drug test and continued working for ADS.

2.    I was not aware the Mr. Cannon had failed a drug test until I was notified by Glenn Guest that he had failed a drug test and was still listed as an active employee. I reviewed the results from Mr. Cannon's January 22, 2007 drug

test, and determined that he had tested positive for cocaine. I recognized that the last name was spelled "Rannon" instead of "Cannon" but the social security number on the results was Mr. Cannon's and the collection information was correct. Because Mr. Cannon had a positive drug test, I contacted Russell Davis and instructed him to terminate Mr. Cannon's employment for failing the drug test. I realized that Mr. Cannon had passed two drug tests after his failed test on January 22, 2007, but allowing Mr. Cannon to continue driving a garbage truck while having a positive drug test violated Department of Transportation regulations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ____26____ day of June, 2008.

_____
Tom Davis

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT CANNON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 3:07cv846-WKW |
| ADVANCED DISPOSAL SERVICES | ) | |
| ALABAMA LLC d/b/a SUNFLOWER | ) | |
| WASTE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF PRODUCTION

I, *Kathy Heatherly*____, am the records officer or custodian of records of the above-named organization responsible for the records requested by Defendant's Subpoena dated ___4-17-08___, which was served upon and directed to me and the organization in the above-captioned action.

o  To the best of my knowledge: 1) I have produced all records in my custody and control that are responsive to the specific requests included on the above referenced Subpoena;  2) The records produced with this affidavit are true and correct records, were kept in the regular course of the business activity of this organization; 3) It is and was at all relevant times thereto the regular practice of this organization to make or keep the records produced herewith; and 4) The records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters.

o      I have not enclosed any records.  I have made a diligent effort to obtain records within my custody and control that are responsive to the specific requests included on the above referenced Subpoena.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on ___4-24-08___, by *Kathy Heatherly*____, Custodian of Records.

332121.1

```
                                    PATIENT INFORMATION          REPORT STATUS  Final
                                    420882743
Employer Solutions                                              ORDERING PHYSICIAN
CLIENT SERVICE 800.877.7484
                                    Primary Id:                 CLIENT INFORMATION
                                    Sec Id: 51742560            60067398
SPECIMEN INFORMATION                                            HORACIO MARAFIOTI, MD
SPECIMEN:    827733E
REQUISITION: 1742560
LAB REF NO:                                                     3895 JEFFCO BLVD
                                                                ARNOLD, MO 63010

COLLECTED:  01/22/2007    14:49
RECEIVED:   01/23/2007    07:28
REPORTED:   01/25/2007    17:09    Reason: PRE-EMPLOYMENT
```

---

```
REPORT FOR:              IRA JANE HURST & ASSOC - 20260102
                         IRA JANE HURST
                         PO BOX 82113
                         LAFAYETTE, LA  70598

COLLECTOR'S NAME         JANE S BELLEW
COLL SITE PH#            334-283-3477
COLLECTION SITE NAME
COLLECT/CITY,ST,ZIP
LOCATION                 XAJ03806W
                         ***  POSITIVE/ABNORMAL REPORT   ***

Tests Ordered:  35304N (NIDA 5 PANEL W/NIT.)  OLDREQ (OLD REQ)


Employer/Donor Information

  DONOR ID

     PLEASE BE ADVISED THAT THE SPECIMEN ID NUMBER FOR THIS
     SPECIMEN HAS BEEN MODIFIED BY THE LABORATORY DUE TO THE
     RECEIPT OF A NON-QTN CCF.  FOR REFERENCE, THE ORIGINAL
     SPECIMEN ID NUMBER IS REPORTED AS THE SECONDARY ID ON
     YOUR ELECTRONIC REPORT.  PLEASE CONTACT THE NATIONAL
     CALL CENTER AT 1-800-877-7484 TO ORDER NEW CCFs.
```

Integrity Checks                        Acceptable Range

  OXIDIZING ADULTERANTS         Negative

DOT/SAMHSA Panel                            Initial       GC/MS Confirm
                                            Test  Level   Test Level

| | | Initial Test Level | GC/MS Confirm Test Level |
|---|---|---|---|
| AMPHETAMINES | Negative | 1000 ng/mL | 500 ng/mL |
| COCAINE METABOLITES | POSITIVE | 300 ng/mL | 150 ng/mL |
| MARIJUANA METABOLITES | Negative | 50 ng/mL | 15 ng/mL |
| OPIATES | Negative | 2000 ng/mL | 2000 ng/mL |
| PHENCYCLIDINE | Negative | 25 ng/mL | 25 ng/mL |

Quantitative Results

  COCAINE METABOLITE           399 ng/mL

        >> REPORT CONTINUED ON NEXT PAGE <<

---

51742560 - 827733E

PATIENT INFORMATION
**420882743**

REPORT STATUS  **Final**

Employer Solutions
CLIENT SERVICE 800.877.7484

ORDERING PHYSICIAN

Primary Id:
Sec Id: 51742560

CLIENT INFORMATION
60067398
HORACIO MARAFIOTI, MD

SPECIMEN INFORMATION
SPECIMEN:    827733E
REQUISITION: 1742560
LAB REF NO:

3895 JEFFCO BLVD
ARNOLD, MO 63010

COLLECTED: 01/22/2007    14:49
RECEIVED:  01/23/2007    07:28
REPORTED:  01/25/2007    17:09      Reason: PRE-EMPLOYMENT

REPORT FOR:          IRA JANE HURST & ASSOC - 20260102
                     IRA JANE HURST
                     PO BOX 82113
                     LAFAYETTE, LA  70598


        CERTIFYING SCIENTIST: Lynne Royce

SPECIMEN RECEIVED AND PROCESSED IN THE LENEXA DHHS CERTIFIED LABORATORY.

LAB:     Quest Diagnostics-Lenexa
         10101 Renner Blvd
         Lenexa KS 66219

                >> END OF REPORT <<

Acct# 0SW

Loc Code: XAJ038-OSW

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

A. Employer Name, Address, I.D. No.

ADVANCED DISPOSAL SVCS-SUNFLOWER

DER: TOM DAVIS

9995 GATE PARKWAY NORTH

JACKSONVILLE FL 32246

PH 904-493-7000  FAX 904-493-3053

B. MRO Name, Address, Phone and Fax No.

HORACIO MARAFIOTI - EMPLOYEE SCREE  Ph 337-237-1516

P. O. BOX 82113  Fx 337-769-1134

221 SOUTHPARK, BLDG. B

LAFAYETTE LA 70598

C. Donor SSN or Employee I.D. No.

D. Reason for Test:  ☒ Pre-employment  ☐ Random  ☐ Reasonable Suspicion/Cause  ☐ Post-Accident
☐ Return to Duty  ☐ Follow-up  ☐ Other (specify) _____

E. Drug Tests to be Performed:  ☒ THC, COC, PCP, OPI, AMP  ☐ THC & COC Only  ☐ Other (specify) _____

F. Collection Site Address:

TALLASSEE FAMILY CARE

115 HERREN HILL RD

TALLASSEE AL 36078

Collector Phone No. ☐3☐3☐9☐-☐2☐8☐3☐-☐9☐4☐7☐7

Collector Fax No. ☐3☐3☐9☐-☐2☐8☐3☐-☐9☐1☐6☐2

**STEP 2: COMPLETED BY COLLECTOR**

Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F?  ☒ Yes  ☐ No, Enter Remark

Specimen Collection  ☒ Split  ☐ Single  ☐ None Provided (Enter Remark)  ☐ Observed (Enter Remark)

STEP 3: Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4: CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY**

REMARKS NONE

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable Federal requirements.

Collector's Name (PRINT First, MI, Last)

JANE S BELLEW

X _Bellew_ Signature of Collector

Date of Collection  01-22-07

Time of Collection  02:49  ☐ AM  ☒ PM

SPECIMEN BOTTLE(S) RELEASED TO:
LHC Courier

Name of Delivery Service Transferring Specimen to Lab

**RECEIVED AT LAB**

X _____ Signature of Accessioner

(PRINT) Accessioner's Name (First, MI, Last)

Date (Mo./Day/Yr.)

Primary Specimen Bottle Seal Intact

☐ Yes

☐ No, Enter Remark Below

SPECIMEN BOTTLE(S) RELEASED TO:

**STEP 5: COMPLETED BY DONOR**

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; each specimen bottle used was sealed with a tamper-evident seal in my presence; and that the information provided on this form and on the label affixed to each specimen bottle is correct.

X _Robert Pannion_ Signature of Donor

Robert PANNION (PRINT) Donor's Name (First, MI, Last)

01.22.07 Date (Mo./Day/Yr.)

Daytime Phone No. _____  Evening Phone No. _____

Date of Birth ___/___/___  Mo.  Day  Yr.

Should the results of the laboratory tests for the specimen identified by this form be confirmed positive, the Medical Review Officer will contact you to ask about prescriptions and over-the-counter medications you may have taken. Therefore, you may want to make a list of those medications for your own records. THIS LIST IS NOT NECESSARY. If you chose to make a list, do so either on the back of your copy (Copy 5) - DO NOT PROVIDE THIS INFORMATION ON THE BACK OF ANY OTHER COPY OF THE FORM. TAKE COPY 5 WITH YOU.

**STEP 6: COMPLETED BY MEDICAL REVIEW OFFICER - PRIMARY SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification is:

☐ NEGATIVE  ☐ POSITIVE  ☐ TEST CANCELED  ☐ REFUSAL TO TEST BECAUSE:

☐ DILUTE  ☐ ADULTERATED  ☐ SUBSTITUTED

REMARKS

X _____ Signature of Medical Review Officer

(PRINT) Medical Review Officer's Name (First, MI, Last)

___/___/___ Date (Mo./Day/Yr.)

**STEP 7: COMPLETED BY MEDICAL REVIEW OFFICER - SPLIT SPECIMEN**

In accordance with applicable Federal requirements, my determination/verification for the split specimen (if tested) is:

☐ RECONFIRMED  ☐ FAILED TO RECONFIRM - REASON _____

X _____ Signature of Medical Review Officer

(PRINT) Medical Review Officer's Name (First, MI, Last)

___/___/___ Date (Mo./Day/Yr.)

FEDERAL DRUG TESTING CUSTODY AND CONTROL FORM

Acct# 09WT

Loc Code: XA1030-0614

51742560
SPECIMEN ID NO.

827733E
Quest Diagnostics
10101 Renner Blvd
Lenexa, KS 66219

**STEP 1: COMPLETED BY COLLECTOR OR EMPLOYER REPRESENTATIVE**

| A. Employer Name, Address, I.D. No. | B. MRO Name, Address |
|---|---|
| ADVANCED DISPOSAL SVCS.-SUNFLOWER | HORACIO MARAFIOTI - EMPLOYEE SCREE   Ph 337-837-1616 |
| DER:  TOM DAVIS | P. O. BOX 82113   Fx 337-769-1134 |
| 9995 GATE PARKWAY NORTH | 221 SOUTHPARK, BLDG. B |
| JACKSONVILLE FL 32246 | LAFAYETTE LA 70598 |
| PH 904-493-7000   FAX 904-493-3053 | |

C. Donor SSN or Employee I.D. No.

D. Reason for Test: ☒ Pre-employment  ☐ Random   ☐ Reasonable Suspicion/Cause   ☐ Post-Accident
☐ Return to Duty  ☐ Follow-up   ☐ Other (specify)

E. Drug Tests to be Performed: ☒ THC, COC, PCP, OPI, AMP   ☐ THC & COC Only   ☐ Other (specify)

F. Collection Site Address:

TALLASSEE FAMILY CARE
115 HERREN HILL RD
TALLASSEE AL 36078

Collector Phone No. 3 3 4 - 2 8 3 - 3 4 7 7

Collector Fax No. 3 3 4 - 2 8 3 - 4 7 6 2

**STEP 2: COMPLETED BY COLLECTOR**

| Read specimen temperature within 4 minutes. Is temperature between 90° and 100° F? ☒ Yes ☐ No, Enter Remark | Specimen Collection ☒ Split ☐ Single ☐ None Provided (Enter Remark) ☐ Observed (Enter Remark) |
|---|---|

**STEP 3:** Collector affixes bottle seal(s) to bottle(s). Collector dates seal(s). Donor initials seal(s). Donor completes STEP 5 on Copy 2 (MRO Copy)

**STEP 4:** CHAIN OF CUSTODY - INITIATED BY COLLECTOR AND COMPLETED BY LABORATORY

REMARKS  NONE

I certify that the specimen given to me by the donor identified in the certification section on Copy 2 of this form was collected, labeled, sealed and released to the Delivery Service noted in accordance with applicable Federal requirements.

Collector's Name (PRINT First, MI, Last)

JANE S BELLEW

X [signature]
Signature of Collector

Date of Collection  01-22-07   Time of Collection  02:49  ☐ AM  ☒ PM

SPECIMEN BOTTLE(S) RELEASED TO:
DHL COURIER
Name of Delivery Service Transferring Specimen to Lab

| RECEIVED AT LAB | Primary Specimen Bottle Seal Intact | SPECIMEN BOTTLE(S) RELEASED TO: |
|---|---|---|
| X [signature] Stacey Jungehemeyer Paid to internal Chain of Custody ▶ JAN 23 2007 (PRINT) Accessioner's Name (First, MI, Last)   Date (Mo./Day/Yr.) | ☒ Yes ☐ No, Enter Remark Below | |

**STEP 5a: PRIMARY SPECIMEN TEST RESULTS - COMPLETED BY PRIMARY LABORATORY**

| ☐ NEGATIVE | ☒ POSITIVE for: | ☐ MARIJUANA METABOLITE | ☐ CODEINE | ☐ AMPHETAMINE | ☐ ADULTERATED |
|---|---|---|---|---|---|
| ☐ DILUTE | | ☒ COCAINE METABOLITE | ☐ MORPHINE | ☐ METHAMPHETAMINE | ☐ SUBSTITUTED |
| ☐ REJECTED FOR TESTING | | ☐ PCP | ☐ 6-ACETYLMORPHINE | | ☐ INVALID RESULT |

REMARKS _____    ~~COCAINE METABOLITE~~ 399 NG/ML

TEST LAB (if different from above) _____

I certify that the specimen identified on this form was examined upon receipt, handled using chain of custody procedures, and reported in accordance with applicable Federal requirements.

X [signature]
Signature of Certifying Scientist

LYNNE ROYCE
(PRINT) Certifying Scientist's Name (First, MI, Last)

JAN 2 2007
Date (Mo./Day/Yr.)

**STEP 5b: SPLIT SPECIMEN TEST RESULTS - (IF TESTED) COMPLETED BY SECONDARY LABORATORY**

| | ☐ RECONFIRMED   ☐ FAILED TO RECONFIRM - REASON _____ |
|---|---|
| Laboratory Name | I certify that the split specimen identified on this form was examined upon receipt, handled using chain of custody procedures, analyzed, and reported in accordance with applicable Federal requirements. |
| Laboratory Address | X [signature]  Signature of Certifying Scientist   (PRINT) Certifying Scientist's Name (First, MI, Last)   Date (Mo./Day/Yr.) |

Peel on an upward angle across form.

🚫 Do not peel directly across form.

F

G

OMB No. 0930-0158

PRESS HARD. YOU ARE MAKING MULTIPLE COPIES

**COPY 1 - LABORATORY COPY**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

ROBERT CANNON,      )
                     )
     **Plaintiff,**       )
                     )
**v.**                  )
                     )    **CIVIL ACTION NO.**
**ADVANCED DISPOSAL**   )    **3:07cv846-wkw**
**SERVICES ALABAMA L.L.C.,** )
**d/b/a SUNFLOWER WASTE**  )
**L.L.C.,**                )
                     )
     **Defendant.**     )

## DEFENDANT'S BRIEF IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Cannon ("plaintiff") filed this lawsuit against defendant Advanced Disposal Services Alabama L.L.C., d/b/a Sunflower Waste, ("ADS" or "defendant"), alleging that he was discriminated against because of his race in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981. Plaintiff further makes allegations of fraud and slander against defendant. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant has moved this Court for summary judgment on all claims asserted by plaintiff. There are no material facts in dispute, and defendant is entitled to judgment as a matter of law.

The essential facts are as follows: plaintiff accepted a job with ADS and was required to take a pre-employment drug test. Plaintiff failed the drug test, and

ADS terminated his employment. Then, pursuant to DOT regulations, ADS informed a prospective employer that plaintiff's employment had ended for his violation of the drug and alcohol policy.

## I.     SUMMARY JUDGMENT STANDARD

The legal standard for summary judgment is well settled and well known to the Court. Summary judgment is appropriate if this Court finds that there exists no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322 (1986); <u>Turnes v. AmSouth Bank, N.A.</u>, 36 F.3d 1057, 1061 (11th Cir. 1994).

## II.     STATEMENT OF FACTS[1]

### A.     Company Background

ADS provides waste management services throughout the Southeast, including Alabama. (Guest Depo. p. 6, lines 4-21, p. 14, lines 3-8). ADS offers residential and commercial service, and ADS operates landfills to dispose of the garbage collected. (Guest Dec. ¶ 1). Essentially, ADS picks up garbage and disposes of the garbage in landfills. (Beasley Depo. p. 14, lines 21-23, p. 15, lines 1-4) In Alabama, ADS does business as Sunflower Waste, but the employees are ADS employees. (Guest Depo. p. 6, lines 4-21).

---

[1] For purposes of this Motion and supporting Brief only, defendant accepts plaintiff's version of the facts.

Plaintiff worked in ADS' Tallassee facility as a residential driver driving a garbage truck.  (Guest Dec. ¶ 1).  Van Forester (W) was the District Manager over the entire operation in the district, which included Tallapoosa, Macon, Autauga, Montgomery, and Elmore counties.  (Guest Depo. p. 31, lines 11-14, p. 32, lines 14-20). Russell Davis (W) was the Operations Manager, and Danny Futral (W) was the Residential Site Manager.  (Beasley Depo. p. 21, lines 4-6; Futral Depo. p. 7, lines 20-22).   Mr. Davis was responsible for all the drivers in the district, both residential and commercial.  (Beasley Depo. p. 21, lines 20-23, p. 22, lines 1-5). Mr. Futral was responsible for residential drivers and helpers in Tallassee and was plaintiff's direct supervisor.  (Futral Depo. p. 8, lines 1-23).  Mr. Futral reported to Russell Davis during plaintiff's employment.  (Futral Depo. p. 9, lines 12-16).

In late 2006, ADS acquired a municipal contract for Phoenix City, Alabama on which plaintiff had worked for Waste Management.   (Guest Dec. ¶ 2). Therefore, ADS sought Waste Management drivers, such as plaintiff, who knew the routes on the Phoenix City contract.  (Guest Dec. ¶ 2).

**B.    ADS' EEO POLICY**

ADS is an Equal Employment Opportunity employer that prohibits discrimination on any basis protected by the law. (Guest Depo. p. 52, lines 2-11 & Exh. 1).  Specifically, ADS prohibits discrimination on the basis of "race, color, religion, national origin, sex, marital status, status as a disabled veteran or veteran

of the Vietnam era, age, or disability." (Guest Depo. p. 52, lines 2-11 & Exh. 1).

Defendant's EEO policy is included in its Employee Handbook, which all

employees receive upon being hired. (Guest. Depo. p. 52, lines 14-16).

C.    **ADS' Drug And Alcohol Policy**

ADS' Drug Free Workplace policy, which is in the Employee Handbook,

provides in part as follows:

> All applicants considered final candidates for a position may be tested
> for the presence of drugs as part of the application process. Any
> applicant refusing to submit to a pre-employment drug test will be
> ineligible for hire. If an applicant's test is confirmed positive, the
> applicant will not be considered for employment at that time and will
> be informed that he or she has failed to meet employment standards.
>
> . . . .
>
> In the case of a violation of the Company policy, including a positive
> drug or alcohol test result, you will be subject to discipline up to and
> including discharge.

(Pl. Depo. p. 66, lines 13-23 & Exh. 8).  Once a specimen is collected in

accordance with DOT regulations, it is sent to an independent laboratory for

testing. (Guest Depo. p. 19, lines 16-23).  While plaintiff was employed with

defendant, St. Louis MRO, Inc. was the independent lab used for testing. (Guest

Depo. p. 20, lines 15-20).

D.    **PLAINTIFF'S EMPLOYMENT HISTORY**

Plaintiff applied for a job as a driver with defendant on January 22, 2007 and

was hired as a driver. (Pl. Depo. Pl. Depo. p. 63, lines 21-23, p. 64, lines 1-10, p.

65, lines 18-22 & Exh. 6). Plaintiff acknowledged receiving the Employee Handbook on January 22, 2007. (Pl. Depo. p. 65, lines 21-23, p. 66, lines 1-11 & Exh. 7).

As a driver, plaintiff operated one of three trucks that were responsible for three collection routes. (Futral Dec. ¶ 2). The drivers for each route started at the same time each morning, and, if one driver finished his route earlier than the others, he helped on another route. (Futral Depo. p. 32, lines 20-23, p. 33, lines 1-14). Each driver had a helper to assist loading the garbage onto the trucks. (Pl. Depo. p. 75, lines 10-15). Preferably, the helper could also drive so that the driver and helper could switch out when the helper got tired. (Futral Depo. p. 27, lines 13-23, p. 28, lines 1-11). In total, there were five drivers, four blacks and one white, and two helpers, both black. (Futral Depo. p. 23, lines 13-19, p. 11-14). Willie Sommers (B) was plaintiff's helper, but he could not drive the truck. (Pl. Depo. p. 75, lines 16-17; Futral Depo. p. 26, lines 2-7). As a result, plaintiff did not have to rotate and assist loading the truck. (Futral Dec. ¶ 3). Coke Conway was the only white driver, and he also worked as a helper. (Futral Depo. p. 24, lines 18-21, p. 27, lines 20-23). Mr. Conway and Harvey Stanford (B) operated a truck together, with both of them driving and helping. (Futral Depo. p. 28, lines 12-23).

Plaintiff received no discipline and had no decreases in pay while working for ADS.  (Pl. Depo. p. 88, lines 10-12, p. 89, lines 3-5).

## E.    PLAINTIFF'S DRUG TESTS

Drivers, like plaintiff, who had worked for Waste Management, which had a DOT alcohol and drug testing program, were allowed to begin driving for ADS before ADS received the pre-employment drug test results.[2]  (Guest Dec. ¶ 2).

### 1.    Test 1

Plaintiff signed an Alcohol and/or Drug Test Notification on January 22, 2007, indicating that he would be taking a drug test that would be administered in compliance with the Federal Motor Carrier Safety Regulations on January 22, 2007 at 2:00 p.m.  (Pl. Depo. p. 96, lines 1-8 & Exh. 15).  On January 22, 2007 at 2:49 p.m., plaintiff provided a urine sample to Jane Bellew as part of his pre-employment drug test.  (Pl. Depo. p. 76, lines 6-12, p. 77, lines 12-13).  Plaintiff signed the Collection Form on January 22, 2007, which accurately reflected his date of birth and social security number.  (Pl. Depo. p. 26, lines 1-2, p. 76, lines 18-23 & Exh. 9).  The specimen number on the Collection Form was 51742560.  (Pl. Depo. p. 76, lines 6-12 & Exh. 9).

---

[2] While plaintiff denies failing a drug test with Waste Management, his personnel file with Waste Management contains Lab Test Results showing a failed drug test for cocaine on December 28, 2006.  (Pl. Depo. p. 8, lines 2-11 & Exh. 11).  When plaintiff started working for ADS, ADS had no knowledge of the failed drug test on file with Waste Management.  (Guest Dec. ¶ 2).

On February 2, 2007, St. Louis MRO, Inc., the testing company, verified a positive result for cocaine on specimen number 51742560, plaintiff's specimen number. (Pl. Depo. p. 78, lines 6-21 & Exh. 10). The social security number on the test results matched plaintiff's social security number,[3] the collection date and time on the test results matched the collection date and time from the Collection Form, and the specimen collector matched the specimen collector from the Collection Form. (Pl. Depo. p. 80, lines 5-20 & Exhs. 9-10). However, instead of spelling plaintiff's last name Cannon, the results indicated a last name of "Rannon." (Pl. Depo. p. 80, lines 15-16 & Exh. 10).[4]

The results indicated that St. Louis MRO, Inc. was unable to contact plaintiff about the failed test. (Pl. Depo. p. 80, lines 15-16 & Exh. 10).

**2.     Tests 2 & 3**

When Mr. Futral learned of plaintiff's failed drug, he did not terminate plaintiff's employment. (Futral Dec. ¶ 4). Instead, Mr. Futral told plaintiff that he failed the initial test and instructed him to take a second test. (Pl. Depo. p. 84, lines 13-23). Plaintiff passed a second drug test through ADS on February 12, 2007. (Pl. Depo. p. 83, lines 5-22 & Exh. 11; Futral Depo. p. 14, lines 1-7).

---

[3] Defendant has redacted plaintiff's social security number on his drug test pursuant to the Middle District's privacy rules. Should the Court wish to review an unredacted copy, defendant will make one available.

[4] Plaintiff thinks the results are incorrect because the results show "Rannon" instead of "Cannon" and because it was not signed by a medical review officer. (Pl. Depo. p. 82, lines 1-5). The official records certifying results from St. Louis MRO, Inc. show a certifying scientist's name and signature. (Subpoenaed Records from St. Louis MRO, Inc.).

Additionally, plaintiff submitted a negative drug test from Dr. Klinner dated February 17, 2007. (Pl. Depo. p. 85, lines 5-18 & Exh. 12).

## F.    PLAINTIFF'S DISCHARGE

In late February or early March 2007, Glenn Guest (W), Director, Corporate Human Resources, was doing research on positive drug tests within the company. (Guest. Depo. p. 41, lines 7-20; Guest Dec. ¶ 3). Mr. Guest was reviewing a list of employees with defendant who had tested positive for drugs or alcohol. (Guest Depo. p. 41, lines 14-23). Mr. Guest was ensuring that all employees who had failed a drug test had been discharged, and he noticed that plaintiff had a failed drug test but had not been discharged. (Guest Depo. p. 41, lines 21-23, p. 42, lines 1-5). No other employees who had failed a drug test were still working for defendant. (Guest Depo. p. 44, lines 19-22). Therefore, Mr. Guest contacted Mr. Tom Davis (B), Director of Safety, and informed him that there was an active employee who had tested positive for drugs. (Guest Depo. p. 42, lines 1-5; Davis Dec. ¶ 3). Tom Davis then reviewed the results for plaintiff's January 22, 2007 drug test, and confirmed that the social security number on the sample and result matched. (Davis Dec. ¶ 2). Therefore, Tom Davis contacted Russell Davis and instructed him to terminate plaintiff's employment for the failed drug test. (Davis

Dec. ¶ 2).[5]

Then, Russell Davis told Mr. Futral that he needed to terminate plaintiff's employment because he was positive on the first drug test. (Futral Depo. p. 12, lines 18-23, p. 15, lines 15-19). As such, Mr. Futral terminated plaintiff's employment on March 9, 2007 for failing his drug test. (Pl. Depo. p. 86, lines 13-23, p. 87, lines 1-12 & Exhs. 13-14; Futral Depo. p. 18, lines 8-19).

William Perry, Jr. (B) replaced plaintiff.[6] (Guest Dec. ¶ 4& Exh. 1).

## G.    INQUIRY FROM ANN DORA'S

After his discharge from ADS, plaintiff applied for a job with Ann Dora's Custom Wrought Iron as a driver. (Pl. Depo. p. 105, lines 13-19 & Exh. 19). Ann Dora's submitted a Previous Employer Information Request form to defendant, with a release from plaintiff permitting ADS to respond to inquiries about his employment with ADS. (Pl. Depo. p. 105, lines 13-19 & Exh. 19; Guest Depo. p. 66, lines 10-23). As Office Manager, Sherry Beasley was responsible for handling such inquiries on behalf of ADS. (Beasley Depo. p. 8, lines 1-3, 18-23). Therefore, Ms. Beasley reviewed the Final Clearance for Terminating Employee and the Employee Disciplinary Report, and Ms. Beasley spoke with Russell Davis regarding plaintiff's discharge. (Beasley Depo. p. 39, lines 10-23, p. 40, lines 1-

---

[5] Tom Davis was not aware of plaintiff's failed drug test until Glenn Guest brought it to his attention. (Davis Dec. ¶ 2).

[6] Plaintiff claims that Coke Conway (W) replaced him as a driver; however, plaintiff's belief is based upon an observation by himself and his cousin that Mr. Conway was driving a truck. (Pl. Depo. p. 73, lines 1-6).

18, p. 43, lines 4-19). After investigating why plaintiff's employment ended, Ms. Beasley completed the request and indicated that plaintiff tested positive for a drug test and that he was terminated for violation of the drug and alcohol policy. (Pl. Depo. p. 105, lines 13-19 & Exh. 19;, p. 39, lines 1-19, p. 45, lines 5-11).

## H.    PLAINTIFF'S EVIDENCE

Plaintiff claims that he and Danny Futral did not see "eye to eye" on several things during his employment. (Pl. Depo. p. 68, lines 14-22). Plaintiff claims he was the fastest driver and got done before everybody else.[7] (Pl. Depo. p. 69, lines 10-12). As such, plaintiff alleges that he had to go out on everybody else's route two to three hours a week while the other drivers were drinking coffee and smoking cigarettes.[8] (Pl. Depo. p. 69, lines 10-17). Plaintiff alleges that he complained to Mr. Futral about doing the other driver's jobs. (Pl. Depo. p. 69, lines 18-23). Specifically, plaintiff complained to Mr. Futral about Reggie (B) not doing his job. (Futral Depo. p. 33, lines 7-19). When plaintiff complained to Mr. Futral about doing others' jobs, plaintiff asserts that Mr. Futral would cuss and raise his voice.[9] (Pl. Depo. p. 69, lines 18-23). At no time did plaintiff complain that he thought he was not getting help because of his race. (Pl. Depo. p. 74, lines

---

[7] Plaintiff was picking up less trash than the other drivers. (Futral Depo. p. 34, lines 7-14).
[8] Plaintiff wanted everyone to do their own route and go home instead of helping each other. (Pl. Depo. p. 76, lines 1-10).
[9] Mr. Futral denies cussing or yelling at plaintiff. (Futral Depo. p. 31, lines 10-11, 22-23).

14-15).[10]

Additionally, plaintiff alleges that Mr. Futral would tell him that he had a man on the back of the truck waiting to drive and that he was "going to get Coke off the back of that truck if it's the last thing I do."[11]  (Pl. Depo. p. 85, lines 1-4, p. 101, lines 4-13).    However, Mr. Conway (W) was hired as a driver at the same time as plaintiff and worked as a driver throughout plaintiff's employment.  (Guest Dec. ¶ 5).

On Wednesday, March 7, 2007, plaintiff claims that he had a heated argument with Mr. Futral and that, after the argument, Mr. Futral followed his truck the rest of the day on Wednesday and all day Thursday and Friday.[12]  (Pl. Depo. p. 86, lines 9-23).  Plaintiff alleges that Mr. Futral told him "I'm going to make sure you don't do nothing out of the ordinary because I'm tired of you smart mouth" when he asked why he was being followed.  (Pl. Depo. p. 88, lines 1-9).

At no time while he worked for defendant did anybody say anything to plaintiff about his race or color.  (Pl. Depo. p. 74, lines 18-21).   Further, plaintiff's own testimony shows that he did not believe his discharge was because of his race because he testified as follows:

---

[10] Additionally, plaintiff also alleges that he complained to Mr. Davis about Mr. Futral but that Mr. Davis just indicated that Mr. Futral was a military veteran.  (Pl. Depo. p. 70, lines 6-14).
[11] Mr. Futral denies making any such statement.  (Futral Depo. p. 32, lines 7-10).
[12] Part of his job duties require that Mr. Futral follow the trucks to ensure that the drivers are driving safely and in compliance with all traffic laws. (Futral Dec.  ¶ 4).  Mr. Futral followed plaintiff's truck no more than any other trucks.  (Futral Dec. ¶ 4).

I guess he just was tired of me complaining so he felt like that's a way to get rid of me, just say dirty urine and go ahead like that. I feel like that that's the reason that he lied on me with the dirty urine, because my urine was not dirty and I know that from neither drug screen. Neither one of them. My urine wasn't dirty at all.

(Pl. Depo. p. 104, lines 12-19).

### III.    LEGAL ARGUMENT

In his Complaint, plaintiff claims that ADS terminated his employment because of his race in violation of Title VII and 42 U.S.C. § 1981, that ADS slandered him, and that ADS committed fraud. There are no genuine issues of material fact related to plaintiff's claims, and they are due to be dismissed.

### A.    ADS DID NOT DISCRIMINATE AGAINST PLAINTIFF BECAUSE OF HIS RACE

#### 1.    ADS Did Not Terminate Plaintiff's Employment Because Of His Race

ADS did not terminate plaintiff's employment because of his race; instead, plaintiff's employment was terminated because he tested positive for cocaine on his pre-employment drug test.[13]  A plaintiff can establish his individual disparate treatment claim through either direct or circumstantial evidence of discrimination. "Only the most blatant remarks, whose intent could be nothing other than discrimination on the basis of [race], … constitute direct evidence of discrimination." Earley v. Champion International Corp., 907 F. 2d 1077, 1081

---

[13] The order and allocation of proof for claims under 42 U.S.C. § 1981 is the same as for claims under Title VII. Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 843 (11th Cir. 2000).

(11th Cir. 1990). Moreover, such remarks must be made by the decisionmaker and must be related to the adverse employment decision at issue. <u>Minton v. American Bankers Ins. Group</u>, 2003 WL 21303330 (11th Cir. Feb. 6, 2003). Here, there is no direct evidence of discrimination.

Because there is no direct evidence of discrimination, plaintiff must demonstrate that (1) he is in a protected class; (2) he was qualified to perform his job; (3) his employment was terminated; and (4) some evidence creating an inference of race discrimination. <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F.3d 1313, 1316 (11th Cir. 2003). A common method of establishing the fourth prong of the *prima facie* case is evidence that the employer replaced the plaintiff with someone outside of the protected class. <u>Walker v. Nationsbank of Florida</u>, 53 F.3d 1548, 1556 (11th Cir. 1995). Alternatively, a plaintiff can demonstrate that a similarly-situated employee outside of the protected class was treated more favorably. <u>Knight</u>, 330 F.3d at 1316.

If a plaintiff establishes his *prima facie* case, then the employer must articulate a legitimate, nondiscriminatory reason for its decision or actions. <u>Lee v. GTE Florida, Inc.</u>, 226 F.3d 1249, 1253 (11th Cir. 2000). To ultimately prevail, the plaintiff must then show that the employer's articulated reason was false and that the real reason was the plaintiff's race. <u>Id</u>

Plaintiff is a member of a protected class and was discharged.  However, plaintiff cannot establish that he was qualified for the job or the last element of his *prima facie* case – evidence creating an inference of race discrimination.

First, 49 C.F.R. § 382.501(b) provides as follows:

> No employer shall permit any driver to perform safety sensitive functions; including driving a commercial motor vehicle, if the employer has determined that the driver violated this section.

By failing a drug test, plaintiff violated the Federal Motor Carrier Safety Regulations, and ADS could not permit plaintiff to continue driving.  Because plaintiff could not legally drive the dump truck for ADS, he was not qualified to work as a dump truck driver for ADS.

Second, plaintiff cannot show an inference of discrimination.  First, plaintiff claims that Coke Conway (W) replaced him; however, Mr. Conway was hired as a driver on January 22, 2007, and continued to work as a driver after plaintiff's discharge.  (Guest Dec. ¶ 5).  As such, despite plaintiff's assertions, Mr. Conway did not replace plaintiff.  Instead, ADS hired William Perry Jr. (B) as a driver on April 2, 2007 to replace plaintiff.  (Guest Dec. ¶ 4 & Exh. 1). Additionally, there is no evidence of any white employees who failed a drug test and continued working for ADS.  In fact, Tom Davis and Glenn Guest have terminated all ADS drivers who have failed drug tests.  (Davis Dec. ¶ 1; Guest Dec. ¶ 3.)  Plaintiff attempts to create a comparator in Coke Conway; however, his attempt fails.  Conway never

failed a drug test while working for ADS.  (Guest Dec. ¶ 5).  Because plaintiff was not replaced by someone outside his protected class and because plaintiff cannot show he was treated differently than similarly situated white employees, he cannot show an inference of discrimination.  Therefore, plaintiff cannot prove a *prima facie* case of discrimination, and his claim is due to be dismissed.

Even assuming, arguendo, that  plaintiff could prove a *prima facie* case of discrimination, ADS had a legitimate, nondiscriminatory reason for his discharge: **a failed drug test**.  Further, there is absolutely no evidence of pretext.  Plaintiff claims that the test results were incorrect because his name was spelled "Rannon" instead of "Cannon" and because a physician did not sign the results.  (Pl. Depo. p. 82, lines 1-5).  Even assuming that ADS was mistaken in its belief that plaintiff failed the drug test, it had a good faith belief that he had done so, especially given the fact that the evidence is undisputed that the plaintiff's social security number was on the results, the specimen number from the sample matched the results, the collection date and time from the sample matched the results, and the collector of the specimen matched the collector on the results.  (Pl. Depo. p. 80, lines 5-20 & Exhs. 9-10).  "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation."  <u>Jones v. Gerwens</u>, 874 F.2d 1534, 1540 (11th

Cir. 1989) (citations omitted).  Additionally, an employer who fires an employee under the mistaken but honest impression that an employee violated a work rule is not evidence of pretext.  See EEOC v. Total System Services, Inc. 221 F.3d 1171, 1176 (11th Cir. 2000); Foster v. Mid State Land & Timber Co., Inc., 2007 WL 3287345, *14 (M.D. Ala. Nov. 7, 2007) (explaining that the proper inquiry is not whether the decision was correct but whether "defendant reasonably believed plaintiff committed the infractions that led to his termination.").

In addition to having a good faith belief that plaintiff failed the drug test, plaintiff admits there were no race based comments. (Pl. Depo. p. 74, lines 18-21). Further, Tom Davis instructed Russell Davis to terminate plaintiff's employment, and Tom Davis is black.  (Davis Dec. ¶ 2).  Additionally, Glenn Guest noticed that plaintiff had failed a drug test, and he had never met plaintiff.  (Guest Depo. p. 12, lines 21-23, p. 13, lines 1-3).  Most telling is plaintiff's own testimony that be believed Mr. Futral, who made no race based comments, "was tired of me complaining so he felt like that's a way to get rid of me."  (Pl. Depo. p. 104, lines 12-19).  There is absolutely no evidence that plaintiff's race played any role in the decision to terminate his employment, and his claim is due to be dismissed.

**2.    ADS Did Not Discriminate Against Plaintiff Because Of His Race In The Terms And Conditions Of His Employment**

Other than his discharge, which is addressed above, plaintiff had no decrease in pay, no demotions, no changes in job duties, no disciplines, and no other change

to any term, condition, or privilege of employment. Nonetheless, in his complaint, plaintiff alleges that ADS discriminated against him in the terms and conditions of his employment. Because there is no direct evidence of discrimination, for plaintiff to prove a *prima facie* case of discrimination in the terms and conditions of his employment, he must show (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees who were not members of his protected class more favorably; and (4) he was qualified for the job or job benefit at issue. Mathis v. Leggett & Platt, 2008 WL 124512, *2 (11th Cir. Jan. 15, 2008. As previously explained, plaintiff is not qualified to perform his job. Further, plaintiff suffered no adverse employment action, and similarly situated white employees were not treated differently than him.

To prove an adverse employment action, plaintiff must have suffered a material or substantial change to the terms, conditions, or privileges of his employment. See Davis v. Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001). The employee's subjective view of the significance and adversity of the employer's action is not controlling; instead, "the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Davis, 245 F.3d at 1239. Further, courts have been reluctant to find that changes in job duties amount to adverse employment actions unless there is a tangible harm, such

as a reduction in salary.  See Givens v. Chambers, 548 F. Supp. 2d 1259, 1271

(M.D. Ala. 2008) (explaining that loud verbal criticisms, excessive work, and

excessive scrutiny amount to tribulations of the workplace and not adverse

employment actions).  At most, plaintiff assisted other drivers with their work

assignments, was followed by Mr. Futral on three days, and had Mr. Futral curse at

him, with no racial comments.  None of these allegations constituted a change to

any term, condition, or privilege of employment, and do not constitute adverse

employment actions.  Moreover, plaintiff has shown no white employees who were

treated differently than him.

Even if plaintiff could prove a *prima facie* case of discrimination, ADS had

legitimate, nondiscriminatory reason for its actions: (1) Mr. Futral wanted the

drivers to assist each other so that they could finish together and (2) Mr. Futral had

to follow all the drivers to ensure that they followed proper safety procedures.

(Futral Depo. p. . 32, lines 20-23, p. 33, lines 1-14; Futral Dec. ¶ 5).  Finally, there

is no evidence of pretext.  As such, any terms and conditions claim being made by

plaintiff are due to be dismissed.

**B.    ADS DID NOT SLANDER PLAINTIFF**

Plaintiff claims that ADS slandered him by informing Ann Dora's that his

employment was terminated for violation of the drug and alcohol policy and that

he failed a drug test.  However, plaintiff's claim involves a written statement and

not a verbal statement, so it is more accurately defined as a libel claim and will be treated as such. Still, in Alabama, both slander and libel are considered a species of defamation and to establish a *prima facie* case of defamation, plaintiff must establish that (1) the defendant was at least negligent; (2) in publishing; (3) a false and defamatory statement; (4) concerning the plaintiff; and (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod). Ex parte Crawford Broadcasting, 904 So. 2d 221, 225 (Ala. 2004). Plaintiff's claim fails.

Truth is an absolute defense to a defamation case. S.B. v. Saint James School, 959 So. 2d 71, 100 (Ala. 2006). Plaintiff has failed to show any false statement. ADS informed Ann Dora's that plaintiff tested positive on a drug test, and a drug test matching plaintiff's social security number showed a positive result. Therefore, ADS' statement is true, and plaintiff has produced no substantive evidence to challenge the result. Additionally, ADS informed Ann Dora's that plaintiff was terminated for "violation of drug & alcohol" policy. Plaintiff was terminated for violating the drug and alcohol policy, so the information provided to Ann Dora's was correct. Because ADS made no false statements, plaintiff's claim should be dismissed.

Second, ADS' actions were privileged. In Smith v. Boyd Bros. Transportation, Inc., 406 F. Supp. 2d 1238, 1242 (M.D. Ala. 2005), plaintiff

alleged, among other things, that Boyd Bros. defamed him by informing an

independent employment history company for commercial drivers that plaintiff had

resigned/quit and was a no show.    Plaintiff alleged that the statements were

defamatory because he disputed the reason for his discharge.    The Court

determined that the statements to the independent employment history company

were privileged and provided as follows:

> Where a party makes a communication, and such communication is
> prompted by duty owed either to the public or to a third party, or the
> communication is one in which the party has an interest . . . .  The
> duty under which the party is privileged to make the communication
> need not be one having the force of legal obligation, but it is sufficient
> if it is social or moral in its nature and defendant in good faith
> believes he is acting in pursuance thereof, although in fact he is
> mistaken.

406 F. Supp. 2d, 1238, 1247 (quoting Willis v. Demopolis Nursing Home, Inc.,

336 So. 2d 1117, 1120 (Ala. 1976).  Unlike Body Bros., ADS had a legal duty to

provide Ann Dora's with the requested information.  49 C.F.R. § 40.25(b) requires

that potential new employers, after obtaining consent, hiring an employee to

perform safety sensitive duties must request of previous employers during the

previous two years information regarding, among other things, verified positive

drug tests.  Then, 49 C.F.R. § 40.25(h) provides as follows:

> If you are an employer from whom information is requested under
> paragraph (b) of this section, you must, after reviewing the
> employee's specific written consent, immediately release the
> requested information to the employer making the inquiry.

As such, pursuant to 49 C.F.R. § 40.25(b), Ann Dora's requested "Previous Employer Information" from ADS.  Plaintiff released ADS to provide the information.  Therefore, pursuant to 49 C.F.R. § 40.25(h), ADS released the requested information.  For these reasons, ADS had a legal obligation to release the drug testing information.

Because the information released to Ann Dora's was privileged, plaintiff must show malice to succeed with his claim.  Boyd Bros., 406 F. Supp. 2d 1238, 1247.  To show malice, plaintiff must show that ADS made the representations with knowledge that they were false or with reckless disregard as to whether they were false.  Id.  As previously explained, ADS had a good faith belief that plaintiff failed his drug test.  Further, prior to releasing the information, Ms. Beasley reviewed the discharge paperwork and spoke with Russell Davis, Operations Manager, about the separation.  (Beasley Depo. p. 39, lines 10-23, p. 40, lines 1-18, p. 43, lines 4-19).  Therefore, there is no evidence of malice, and plaintiff's claim is due to be dismissed.

Plaintiff cannot prove a *prima facie* case of defamation.  As explained, Ms. Beasley was diligent in her efforts to substantiate the reason for plaintiff's discharge and had a duty to release the information, so there was no negligence in her providing the information to Ann Dora's.  Second, as explained, there was no false statement.  Finally, plaintiff has shown no damage as a result of the release of

the information, much less that he did not receive the job from Ann Dora's because of the information from ADS.  Because plaintiff cannot prove a *prima facie* case of defamation, his claim is due to be dismissed.

For these reasons, plaintiff's slander claim is due to be dismissed.

## C.    ADS Did Not Defraud Plaintiff

Finally, plaintiff claims that ADS committed fraud by informing Ann Dora's that he failed a drug test and by telling him that ADS would properly drug test him. However, the evidence is clear that ADS had a good faith belief that plaintiff failed the drug test and that no misstatements were made.  Therefore, plaintiff's claim is due to be dismissed.

Under Alabama law, to prove a *prima facie* case of fraudulent misrepresentation, plaintiff must show: (1) a false representation; (2) concerning a material existing fact; (3) reasonably relied upon by the plaintiff; and (4) damage as a proximate result.  Desouza v. Lauderdale, 928 So. 2d 1035, 1042 (Ala. Civ. App. 2005).  A promissory fraud claim involves a claim to perform a future act, and the following additional elements must be proven to show promissory fraud: (1) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised and (2) proof that the defendant had an intent to deceive.  S.B. v. Saint James School, 959 So. 2d 72, 101 (Ala. 2006).

### 1.    ADS Did Not Defraud Plaintiff By Informing Ann Dora's Of His Drug Test Results And Discharge

Plaintiff alleges that ADS committed fraud by informing Ann Dora's that he failed a drug test and was discharged for violating the drug and alcohol policy. Plaintiff cannot prove a *prima facie* case of fraud because there was no false representation, no reliance, and no damage.  As previously explained, plaintiff failed the drug test and was discharged pursuant to the drug and alcohol policy. Simply not liking the results of the drug test does not create a false misrepresentation.

Additionally, while plaintiff may maintain a claim for a misrepresentation to a third party, such a claim will support fraud allegations "only when there is sufficient evidence of an intent on the part of the speaker to communicate to the third party in such a way as to induce the plaintiff to act.  Bush v. Teachers Insurance and Annuity Ass'c of America, 2006 WL 3075539, *3  (M.D. Ala. Oct. 30, 2006) (quoting Delta Health Group, Inc. v. Stafford, 887 So. 2d 887, 889 (Ala. 2004).    Further, plaintiff must still show reliance upon the alleged misrepresentation.  Ex parte DaimlerChrysler Corp., 952 So. 2d 1082, 1091 (Ala. 2006).  There is absolutely no evidence that plaintiff relied on the information provided to Ann Dora's, much less that he took any action based upon the information provided to Ann Dora's.

Finally, plaintiff has shown no damage as a result of the information

provided to Ann Dora's. Plaintiff claims that he was not offered the job from Ann Dora's because of the information provided by ADS. However, there is no evidence to support plaintiff's claim. In fact, Ann Dora's failure to hire plaintiff could be attributable to his failed drug test from Waste Management or for some other reason and not any information from ADS.

For these reasons, plaintiff's fraud claim fails.

**2.    ADS Properly Drug Tested Plaintiff**

Plaintiff alleges that ADS defrauded him by informing him that he would properly be drug tested. However, not agreeing with the test results does not create a claim for fraud. Because plaintiff's claim involves a future act, it is one for promissory fraud, and plaintiff cannot prove a claim of promissory fraud.

First, plaintiff has not shown a false statement because ADS properly drug tested him in accordance with its drug policy. Second, there is no evidence that ADS had an intent not to properly drug test plaintiff when he was hired. Plaintiff admits that he knows of no employees who were not given pre-employment drug testing. (Pl. Depo. p. 108, lines 20-23, p. 109, lines 1-3). Plaintiff has no complaints about defendant requiring him to take a urine test on January 22, 2007. (Pl. Depo. p. 77, lines 6-11). Plaintiff's only concern is that he does not agree with the result. However, to support his claim, plaintiff must show that ADS had no intention of properly testing him when he was hired and that ADS fixed the

results of plaintiff's drug tests to show a positive result.  There is no evidence to support plaintiff's claim, and it is due to be dismissed.

## IV.   CONCLUSION

Plaintiff failed his pre-employment drug test with ADS.  As such, ADS terminated plaintiff's employment.  Then, pursuant to Department of Labor regulations, ADS informed a potential employer that plaintiff failed a drug test and was discharged pursuant to its drug and alcohol policy.  Instead of accepting responsibility for his actions, plaintiff sued ADS.  For the reasons discussed above, defendant Advanced Disposal Services Alabama L.L.C., d/b/a Sunflower Waste, respectfully requests that the Court grant its Motion for Summary Judgment and dismiss plaintiff's claims with prejudice.

Respectfully Submitted,

*/s/ J. Tobias Dykes*
J. Tobias Dykes (ASB-0483-E66J)
Direct Dial No.: (205) 226-5469
CONSTANGY, BROOKS & SMITH, LLC
Suite 900, One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Facsimile:   (205) 323-7674

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James B. Douglas, Jr.
McNeal & Douglas, Attorneys at Law, L.L.C.
P.O. Box 1423
Auburn, Alabama 36831


*/s/ J. Tobias Dykes*
J. Tobias Dykes